## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| *In re* | Chapter 11 |
| **STANADYNE LLC, *et al.*,**[1] | Case No. 23-10207 (JTD) |
| **Debtors.** | (Joint Administration Requested) |

## DECLARATION OF JOHN PINSON, CHIEF EXECUTIVE OFFICER OF STANADYNE LLC, IN SUPPORT OF FIRST DAY RELIEF

JOHN PINSON hereby declares, under penalty of perjury, as follows:

1.      I am the Chief Executive Officer ("CEO") of debtors and debtors-in-possession Stanadyne LLC and Pure Power Technologies, Inc. ("PPT"), and I am a member of the board of directors/managers of those entities as well as debtors Stanadyne PPT Holdings, Inc. and Stanadyne PPT Group Holdings, Inc. (collectively, the "Debtors" or "Stanadyne"). I currently perform my duties primarily out of the Debtors' Jacksonville, North Carolina headquarters and Blythewood, South Carolina facility.  I submit this declaration (the "Declaration") in support of the Debtors' chapter 11 petitions and requests for relief contained in certain "first day" applications and motions (the "First Day Motions") filed on or shortly after the date hereof (the "Petition Date") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

2.      I have served as CEO since July 2022, prior to which I served as President.  I joined Stanadyne in 2009 as Chief Technology Officer, and subsequently served as President of Diesel Products and Managing Director before accepting my roles as Stanadyne's President and now

---

1.   The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are:  Stanadyne LLC (0378); Pure Power Technologies, Inc. (5202); Stanadyne PPT Holdings, Inc. (2594); and Stanadyne PPT Group Holdings, Inc. (1734).  The Debtors' headquarters are located at 405 White Street, Jacksonville, North Carolina 28546.

CEO.  Prior to joining Stanadyne, I worked for General Motors for approximately fourteen years.  In total, my experience in the automotive industry spans nearly 30 years.

3.      I received a Bachelor of Science and a Master of Science in Mechanical Engineering from Clemson University.  I then received a PhD in Mechanical Engineering from Penn State University, and a Master of Business Administration from the University of Michigan – Stephen M. Ross School of Business.

4.      As CEO, I am authorized to submit this Declaration on behalf of the Debtors.  Except as indicated otherwise, all statements in this Declaration are based upon my personal knowledge or my review of the Debtors' books and records, and other relevant documents and information prepared or collected by the Debtors' employees and advisors.  If called to testify as a witness in this matter, I could and would testify competently to each of the facts set forth herein.  In making the statements herein, I have relied in part upon others to accurately record, prepare and collect necessary documentation and information.

5.      Part I of this Declaration provides a brief overview of the Debtors and a summary of their chapter 11 cases (the "Chapter 11 Cases").  Part II of this Declaration describes in more detail the background of the Debtors' businesses, the developments that led to the filing of these Chapter 11 Cases, and the Debtors' goals in these Chapter 11 Cases.  Part III sets forth the relevant details of the various First Day Motions, and Part IV concludes this Declaration.

## I.      OVERVIEW AND SUMMARY

6.      The Debtors filed these Chapter 11 Cases because they will not be able to outrun their current interest rates, which have crippled the Debtors and drained liquidity since the rapid rise in their variable rates.  At their current debt service levels, the Debtors could not sustain operations.  They thus needed to commence these Chapter 11 Cases to hit the reset button, and to

give them the breathing room needed to be able to reorganize and emerge as financially stable and improved companies.

7.     The Debtors intend to continue to operate their business during the pendency of these Chapter 11 Cases through the effective date of a plan of reorganization.  Accordingly, in order to minimize the adverse effects of the commencement of these Chapter 11 Cases on their business operations, the Debtors request various forms of relief in the First Day Motions.  The First Day Motions are described in greater detail in Part III below, but generally seek, among other things, authorization from this Court for the Debtors to: (a)  continue their business operations with as little disruption as possible through the effective date of a chapter 11 plan; (b) compensate their employees through the chapter 11 process; (c) use cash collateral; (d) implement a critical vendor program; (e) continue their existing cash management system; (f) continue their existing customer programs; and (g) retain appropriate professionals whose services are necessary to the foregoing efforts and the confirmation and implementation of their chapter 11 plan.  It is crucial to the success of the Debtors' efforts to maximize the value of their estates and ensure an expeditious resolution of these Chapter 11 Cases that they obtain the requisite authority from this Court to maintain the support of their key constituencies and operate their day-to-day business with minimal disruption and erosion.

## II.     BACKGROUND

### A.     <u>Overview of the Debtors</u>.

8.     The Debtors design, manufacture and supply best-in-class powertrain pumping, injection, air and fluid management products and control solutions.  The Debtors' core products include fuel injectors, pumps, and other components necessary for diesel and gasoline internal combustion engines (ICEs), including gasoline direct injection pumps, diesel common rail pumps, diesel rotary pumps (mechanical and electronic), diesel fuel injectors (new and remanufactured),

remanufactured diesel turbochargers and exhaust gas recycling systems, and high-pressure diesel common rail connectors.

9.      The Debtors serve both the original equipment market and the aftermarket, with revenues split broadly equally. Within these segments, the Debtors serve both the on-road and off-road markets.  With respect to the on-road market, the Debtors supply parts for passenger vehicles, light duty vehicles (e.g., pickup trucks), medium duty vehicles (e.g., delivery trucks), and performance aftermarket vehicles.  With respect to the off-road market, the Debtors supply parts for agriculture (e.g., tractors), construction (e.g., bobcats), power generation and utility vehicles.

10.      The Debtors have a very stable revenue stream, with many longstanding customers. Stanadyne's customers include Tier 1 original equipment manufacturers that are household names in the automotive industry.

11.      As of the Petition Date, the Debtors' collective workforce in the United States is comprised of approximately 468 employees and approximately 120 temporary employees.

12.      Stanadyne LLC and PPT are the Debtors' two main operating entities.  Both perform similar functions, with Stanadyne LLC focusing more on the original equipment market, and PPT focusing more on the aftermarket segment.  Specifically, PPT's products service legacy engines that were manufactured in high volumes and installed in a range of commercial vehicles. Commercial vehicles have a long working life that can equal 20 years or longer.  These vehicles require ongoing maintenance and replacement parts.  For example, a diesel engine will typically require replacement fuel injectors five to seven times during its working life.

13.      Debtors Stanadyne PPT Holdings, Inc. and Stanadyne PPT Group Holdings, Inc. are solely holding companies that do not have any operations.

B.    __The Debtors' Facilities__.

14.    The Debtors operate in several different locations throughout the United States, including the Debtors' current headquarters located in Jacksonville, North Carolina, the Debtors' former headquarters located in Windsor, Connecticut, and manufacturing facilities located in Blythewood, South Carolina, Columbia, South Carolina, and Southfield, Michigan.  The Windsor, Connecticut and Jacksonville, North Carolina locations are owned by the Debtors; the rest of the locations are leased.

15.    In addition to serving as the Debtors' corporate headquarters, the Jacksonville, North Carolina facility is used to, among other things, perform gasoline assembly and testing, as well as engineering development and validation.

16.    The Blythewood, South Carolina facility is the Debtors' largest manufacturing facility and is used to, among other things, perform remanufacturing and testing of diesel fuel injectors.

17.    The Columbia, South Carolina facility is used to, among other things, perform diesel common rail component engineering development and validation.

18.    The Southfield, Michigan facility is used to, among other things, perform global engineering, program management, and customer support.

19.    The Debtors also engage in intercompany transactions with affiliates located in Italy, the United Arab Emirates, India, and China.  These non-debtor affiliates are key suppliers to the Debtors that produce highly customized products for the Debtors that are integral to the Debtors' operations.

20.    The Brescia, Italy facility is used to, among other things, perform sub-micron machining, diesel injector assembly, diesel injector nozzle manufacturing, and testing.

21.     The Sharjah, United Arab Emirates facility is used to, among other things, perform diesel rotary pump assembly and testing.

22.     The Chennai, India facility is used to, among other things, perform diesel rotary pump and injector assembly and testing, component manufacturing for other plant sites, and engineering development and validation.

23.     The Changshu and Suzhou, China facilities are used to, among other things, perform diesel common rail pump assembly and testing, and diesel common rail engineering development and validation, respectively.

24.     Collectively, Stanadyne has invested nearly $100 million of capital expenditures in its manufacturing facilities since 2014 to ensure that it can continue to deliver best-in-class products to its customers.

**C.     Stanadyne's History.**

25.     For more than 140 years, Stanadyne (and its predecessor companies) has thrived on creating one-of-a-kind solutions to the world's most vexing problems in diesel and gasoline fuel systems.

26.     In the post-World War II era, the company entered a new age of innovation.  During this time, it designed a diesel fuel injection pump that was smaller, lighter and more technically advanced than the fuel pumps available at the time.  The rotary pump, as it became known, greatly improved the efficiency, power, and practicality of diesel engines with new fuel distribution technology, allowing diesel engines to become the primary choice for heavy equipment and machinery.

27.     In 1970, the company ushered in a new wave of technologies, including fuel filters and additives.  At the time, Stanadyne diesel fuel pumps offered the most fuel-efficient design and the company experienced rapid growth during the 1973 oil crisis.

28.    In the following years, the company expanded its portfolio to include electronic governing diesel rotary pumps, diesel common rail pumps and direct injection fuel pumps for modern gasoline engines.  In the early 2000s, Stanadyne introduced the world's first 200 bar gasoline direct injection pump to the automotive market. It was quickly followed by another gasoline direct injection pump for the racing industry. With rapid innovation in gasoline and diesel fuel systems, the company was at a crossroads.  In 2014, the company sold the fuel filters and additives business to focus solely on fuel pumps and injectors.  Over the last decade, the company has sold approximately 10 million gasoline pumps into the U.S. market for popular Original Equipment Manufacturer ("OEM") pickup and performance passenger car applications and continues to supply these components at a rate of more than 800,000 units per year.

29.    In April 2019, Stanadyne LLC acquired PPT.  PPT is a leader in the engineering, manufacturing, and remanufacturing of diesel fuel injectors and turbochargers headquartered in Columbia, South Carolina.  The combined companies brought together highly complementary product lines that formed a global company delivering broad fuel and air management systems directly to OEMs and Original Equipment Supplier ("OES")/aftermarket channels.

30.    With world-class facilities supporting the design, development, validation and production of best-in-class products for its customers, the enhanced Stanadyne organization now offers extremely deep technical expertise in fuel management engineering and high-volume, high-precision manufacturing.  Complementary products, market channels and facilities enable the new company to leverage scale and better support an expanded customer base.

31.    PPT, bringing its years as an OEM to the aftermarket, is well-known for its high-precision, fuel, air-management and after-treatment systems for light-, medium- and heavy-duty diesel engines, having produced more than 30 million precision diesel fuel injectors since 1999.

32.     Today, Stanadyne is reimagining its product portfolio to enable the decarbonization of the internal combustion engine consistent with global efforts to reduce vehicle-based carbon emissions.  As Stanadyne embraces the future of alternative fuels, it continues to innovate and develop new technology to improve the efficiency, power and performance of fuel systems for the OE, OES, and aftermarket.

33.     In particular, in 2022, the company developed a multipurpose port injector for delivering hydrogen, compressed natural gas, and dimethyl ether (DME) fuels.  Stanadyne's alternative fuel delivery systems lower emissions, increase efficiency, and improve performance while permitting the use and reuse of existing infrastructure to achieve carbon reduction goals.

34.     Stanadyne has also developed a low-pressure fuel injector is capable of high flow rates and has flexible packaging for a variety of port fuel injection applications utilizing alternative fuels.  The higher flow capacity and fuel-air mixing features of the new injector permit equivalent energy density fuel delivery when compared to traditional hydrocarbon fuels. Its modular design is based on improved materials for robust hydrogen, compressed natural gas, and DME compatibility.

35.     With natural gas, diesel, and gasoline internal combustion engines being forecasted to remain the dominant medium-duty and heavy-duty commercial vehicle powertrain through at least 2040, renewable fuels offer an effective means to reduce the carbon footprint of these powertrains on the way to reaching global climate goals.

36.     Stanadyne is focused on becoming a market leader with respect to its product lines in the renewable fuels market.  To this end, in addition to the renewable fuel parts Stanadyne has already manufactured discussed above, Stanadyne is currently engaged in substantial ongoing research and development efforts in products and systems for alternative fuels such as hydrogen,

natural gas and DME.  With these efforts, Stanadyne hopes to continue to innovate and lead the way for its customers both now and in the future, while at the same time improving the environment.

**C.     Prepetition Capital and Corporate Ownership Structure.**

(1)     Financing Agreement.

37.     Debtor Stanadyne LLC is the current borrower under a Financing Agreement, dated as of May 2, 2017 (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "Financing Agreement"), by and among Stanadyne PPT Holdings, Inc. (as successor by merger to Stanadyne Intermediate Holdings LLC), each subsidiary listed as a "Borrower" on the signature pages thereto, each subsidiary listed as a "Guarantor" on the signature pages thereto, the lenders from time to time party thereto (collectively, the "Prepetition Secured Lenders"), Cerberus Business Finance, LLC, ("Cerberus"), as collateral agent for the Prepetition Secured Lenders, and Cerberus, as administrative agent for the Prepetition Secured Lenders. Presently, Debtors PPT and Stanadyne PPT Holdings, Inc. are Guarantors under the Financing Agreement.

38.     Pursuant to the Financing Agreement, the Prepetition Secured Lenders have made terms loans totaling $248,488,344.84 and revolving loans totaling $25,000,000, for a total current principal balance of $273,488,344.84.  Interest accrues pursuant to a variable interest rate and is due monthly at the beginning of each month.  The Debtors made all required interest payments, through and including the interest payment due at the beginning of November 2022.  The dates on which interest and principal were due from December 1, 2022 – February 1, 2023 have been extended.

39.     The Prepetition Secured Lenders purport to have first priority liens on substantially all assets of Stanadyne LLC, Stanadyne PPT Holdings, Inc., and PPT, as well as a pledge of 65% of Stanadyne LLC's ownership interests in its non-Debtor affiliates located in Italy and India.

(2)     <u>Unsecured Debt</u>.

40.     The Debtors also have unsecured debt consisting primarily of trade debt, core return debt explained further below, pension and supplemental employee retirement plan obligations.

(3)     <u>Corporate Ownership Structure</u>.

41.     <u>Debtor Entities</u>.  An organizational chart showing the Stanadyne debtor and non-debtor entities and their ownership structure is attached to this Declaration as **<u>Exhibit A</u>**.  PPT is 100% owned by Stanadyne LLC.  Stanadyne LLC is 100% owned by Stanadyne PPT Holdings, Inc.  Stanadyne PPT Holdings, Inc. is 100% owned by Stanadyne PPT Group Holdings, Inc. Stanadyne PPT Group Holdings, Inc. is owned 50.4% by PPT-SD Holdings I, LLC, 21.6% by PPT-SD Holdings II, LLC, 20% by PPT-SD Holdings III, LLC, and 8% by former members of PPT management.  Each of the Debtor and non-Debtor entities is a private company.

42.     <u>Non-Debtor Affiliates</u>.  The Debtors rely heavily on goods and services provided to them by their non-Debtor, foreign affiliates, Stanadyne, S.p.A. ("<u>Stanadyne Italy</u>"), Stanadyne Changshu Corporation ("<u>Stanadyne China</u>"), Stanadyne India Private Ltd. ("<u>Stanadyne India</u>"), and Stanadyne Mideast FZE ("<u>Stanadyne UAE</u>") (collectively, the "<u>Non-Debtor Affiliates</u>"). The Non-Debtor Affiliates each manufacture and sell products, such as diesel injectors and nozzles.

43.     Stanadyne Italy and Stanadyne China are separate legal entities that are owned 100% by Stanadyne.  Stanadyne India is also a separate legal entity that is owned 99% by Stanadyne and 1% by Debtor Stanadyne PPT Holdings, Inc.  Stanadyne UAE is a separate legal entity that is 100% owned by Stanadyne India.

D.      **Events Leading to Chapter 11 Filings and Efforts to Restructure.**

44.      As with many companies, the COVID-19 pandemic negatively impacted the Debtors' operations.  Supply chain issues and lockdowns led to an approximately $37 million decrease in revenue for 2020.  Subsequent supply chain interruptions for the company and its customer base, including the global chip shortage, have constrained company sales during the market recovery, putting additional stress on company cash and resulting in a loss in revenue of approximately $26 million in 2022.

45.      Coupled with the lost revenue attributable to the COVID-19 pandemic, the Debtors have simply not been able to outrun a significant rise in the variable component of the interest rates that they must pay under the Financing Agreement.  These rate increases have pushed the Debtors' interest rates into the teens, with potentially more rate hikes on the horizon.  With these rate hikes, the Debtors' debt service obligations for 2023 are expected to total approximately $39 million, a number that is simply unsustainable for the Debtors to be able to continue to operate.

46.      Battling the sharp rise in their interest rate obligations, the Debtors faced severe liquidity constraints in the weeks leading up to the Petition Date.  Had the Debtors made all required debt service payments in December and early January, they would have run out of money.  In November 2022, the Debtors began engaging Cerberus in good-faith negotiations.

47.      The Debtors determined that it was in their best interests and the best interests of their stakeholders to seek bankruptcy relief in order to sustain their business operations and maximize value for stakeholders.

### III.     FIRST DAY MOTIONS

48.      In order to enable the Debtors to minimize the adverse effects of the commencement of the Chapter 11 Cases on their business operations, the Debtors have requested

various types of relief in certain First Day Motions,[2] which the Debtors filed concurrently with the filing of the Chapter 11 Cases.  The First Day Motions seek relief aimed at, among other things: (i) maintaining employee morale; (ii) preserving customer relationships; (iii) obtaining access to use of cash collateral; (iv) ensuring the continuation of the Debtors' cash management systems and other business operations without interruption; and (v) establishing certain administrative procedures to facilitate a smooth transition into, and uninterrupted operations throughout, the chapter 11 process.

49.      Gaining and maintaining the support of the Debtors' customers, employees and certain other key constituencies, as well as maintaining the Debtors' day-to-day business operations with minimal disruption, will be critical to the success of the Chapter 11 Cases and the Debtors' efforts to preserve and maximize the value of their assets.  The approval of each First Day Motion is an important element of the Debtors' efforts to maximize value for their stakeholders and is necessary to ensure a seamless transition into chapter 11 with minimal disruption to their operations.

50.      I have reviewed each of the First Day Motions, including the exhibits thereto, and believe that the relief requested therein is critical to the Debtors' ability to preserve and maximize the value of their assets and is thus in the best interests of the Debtors.  Factual information with respect to each First Day Motion is provided below and in the applicable First Day Motion.

---

2.   Terms used but not otherwise defined herein have the meanings assigned to such terms in the relevant First Day Motion.

**Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. § 105(a),
Fed. R. Bankr. P. 1015(b) and Local Rule 1015-1 Directing Joint Administration
of the Debtors' Related Chapter 11 Cases (the "Joint Administration Motion")**

51.     The Debtors request that the Court authorize and direct the joint administration of these Chapter 11 Cases and the consolidation thereof for procedural purposes only.  There are four affiliated Debtors in these Chapter 11 Cases.  The Debtors believe that many, if not most, of the motions, applications, and other pleadings filed in these Chapter 11 Cases will relate to relief sought jointly by each of the Debtors.  Joint administration of the Debtors' Chapter 11 Cases, for procedural purposes only, under a single docket entry, will also ease the administrative burdens on the Court by allowing these Chapter 11 Cases to be administered as a single joint proceeding instead of four independent Chapter 11 Cases.

52.     Joint administration of these Chapter 11 Cases will create a centralized location for the numerous documents that are likely to be filed and served in these cases by the Debtors, creditors, and parties-in-interest, and for all notices and orders entered by the Court.  A single docket will also make it easier for all parties in each of the Chapter 11 Cases to stay apprised of all the various matters before the Court.  The rights of creditors will not be adversely affected by the proposed joint administration of these Chapter 11 Cases; in fact, the rights of all of the creditors will be enhanced by the likely substantial reduction in costs resulting from joint administration of the cases.  Finally, the Debtors believe, and I agree, that the joint administration of these Chapter 11 Cases will simplify supervision of the administrative aspects of these Chapter 11 Cases for the Court and the Office of the United States Trustee for the District of Delaware.

53.     Accordingly, the Debtors believe, and I agree, that it is in the best interest of the Debtors, their estates and creditors and other parties-in-interest in these Chapter 11 Cases that the Court grant the relief requested in the Joint Administration Motion.

**Debtors' Application for Entry of an Order Appointing Kurtzman Carson Consultants LLC as Claims and Noticing Agent Pursuant to 28 U.S.C. § 156(c), 11 U.S.C. § 105(a), Bankruptcy Rule 2002(f) and Local Rule 2002-1(f) (the "Claims Agent Application")**

54.    The Debtors request, pursuant to 28 U.S.C. § 156(c), section 503(b) of the Bankruptcy Code, Bankruptcy Rule 2002(f), and Local Rule 2002-1(f) the entry of an order appointing Kurtzman Carson Consultants LLC ("KCC") as Claims and Noticing Agent for the Clerk's Office to, among other things (a) serve as the Court's noticing agent to mail notices to the estates' creditors and parties in interest, (b) provide computerized claims database services, (c) provide and maintain the Debtors' case management website, and (d) provide expertise, consultation and assistance in claim processing and other administrative information

55.    Prior to the selection of KCC, the Debtors reviewed and compared engagement proposals from four court-approved claims and noticing agents to ensure selection through a competitive process. I believe, based on the engagement proposals obtained and reviewed, that KCC's rates are competitive and reasonable given KCC's quality of services and expertise.

56.    Based on KCC's considerable experience in providing similar services in large chapter 11 cases, the Debtors believe, and I agree, that KCC is eminently qualified to serve as Claims and Noticing Agent in these Chapter 11 Cases.  A detailed description of the services that KCC has agreed to render and the compensation and other terms of the engagement are provided in the Claims Agent Application, the Declaration of Robert Jordan in support thereof, and the engagement letter between the Debtors and KCC.  I have reviewed the terms of the engagement and believe that the Debtors' estates, their creditors, parties-in-interest and this Court will benefit as a result of KCC's experience and cost-effective methods.  Accordingly, the Claims Agent Application should be approved.

**Debtors' Motion For Entry of Interim and Final Orders (I) Authorizing the Use of
Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Lenders, and
(III) Granting Related Relief (the "Cash Collateral Motion")**

57.     In the Cash Collateral Motion, the Debtors request authority to (i) continue using

Cash Collateral in accordance with the terms of the Interim Order and (ii) grant, subject to a carve-

out, adequate protection to the Debtors' prepetition secured lenders for any diminution in value of

their interests, if any.  As of the Petition Date, the Debtors have approximately $3.8 million in total

cash on hand.  The Prepetition Secured Lenders assert that substantially all such cash is

encumbered by the Prepetition Secured Lender's liens, and therefore constitutes Cash Collateral.

The Debtors have an urgent need for the immediate use of the Cash Collateral.

58.     Absent the ability to use Cash Collateral, the Debtors will not be able to fund their

operations and pay present operating expenses, including wages, utility charges, and other critical

operating expenses.  Consequently, without access to Cash Collateral, the Debtors will not be able

to maintain their business operations and would likely be forced to cease operations immediately

and liquidate their assets.  This would likely result in a loss of going concern value that would

result in lower recoveries for the Debtors' stakeholders and cause the Debtors' estates to be

immediately and irreparably harmed.  In addition, the Debtors' customers rely upon the Debtors'

ability to supply just in time parts shipments to service their assembly plants on a real time basis

and the Debtors must be able to meet these customer needs.

59.     If the Debtors are instead permitted to continue to use the Cash Collateral, their

available cash on hand will grow substantially during the course of these Chapter 11 Cases.  While

the proposed use of Cash Collateral is not projected to result in any diminution of value of the

Prepetition Secured Lenders' interest in the property during the Chapter 11 Cases, by the Cash

Collateral Motion, the Debtors propose to grant the Prepetition Secured Parties an adequate

protection package in the form of replacement liens and superpriority claims to the extent of any diminution in the value of the collateral.

60.     I believe the requested relief is necessary to avoid the immediate and irreparable harm that would otherwise result if the Debtors are denied the liquidity that would be provided by the Cash Collateral.  Accordingly, I respectfully submit that the Cash Collateral Motion should be approved.

**Motion of Debtors for (I) Interim and Final Authorization to (A) Continue Their Existing Cash Management System, (B) Maintain Existing Bank Accounts and Business Forms and (C) Continue Engagement in Intercompany Transactions, and (II) Granting an Extension of Time to Comply with Section 345(b) of the Bankruptcy Code (the "Cash Management Motion")**

61.     The Debtors seek interim and final orders:  (a) authorizing, but not directing, the Debtors' continued use of (i) their current Cash Management System; and (ii) their existing Bank Accounts and existing Business Forms, including authorizing the Debtors to open and close bank accounts; (b) authorizing, but not directing, the Debtors to continue to implement the recent changes to their Cash Management System that began prepetition and will continue postpetition; (c) granting the Debtors a 45-day extension as necessary to comply with the requirements of section 345(b) of the Bankruptcy Code; (d) approving the continuation of Intercompany Transactions; (e) according administrative expense status to ordinary course postpetition Intercompany Transactions; and (f) authorizing all banks participating in the Cash Management System to honor certain transfers and charge bank fees and certain other amounts.

62.     The Debtors' ability to continue their Cash Management System is essential to their ability to maintain their current operations as they transition into chapter 11.  Absent the ability to maintain their Cash Management System, the Debtors would have to significantly alter their business operations to comply with U.S. Trustee ("UST") Guidelines.  In light of the timeline and

objectives of these Chapter 11 Cases, as well as the administrative burden the commencement of these Chapter 11 Cases has already placed on the Debtors' employees and management, compliance with the UST Guidelines would impose a substantial burden on the Debtors' estates.  Moreover, the Cash Management System provides benefits to the Debtors, such as enabling them to: (a) control and monitor corporate funds; (b) ensure cash availability; and (c) reduce costs and administrative expenses by facilitating the movement of funds.  These benefits are critical given the volume of transactions managed through the Cash Management System.

63.     In light of the status of the Debtors' ongoing operations, any further disruption in the Debtors' cash management procedures at this time will hamper the Debtors' efforts to preserve and enhance the value of their estates.  Altering the Cash Management System could delay the receipt of payables from customers or disrupt payments to essential employees and vendors at a time when their support is most critical.  It is therefore critical that the Debtors be permitted to continue to use their Cash Management System, including implementing the recent changes described herein and in the Cash Management Motion, in accordance with the cash management procedures they put in place prior to the filing of these Chapter 11 Cases.

64.     In the ordinary course of business, the Debtors use their Cash Management System to engage in various essential intercompany transactions (the "Intercompany Transactions") with the Non-Debtor Affiliates.

65.     Certain of the Debtors routinely engage in transactions with other Debtors and the Non-Debtor Affiliates (the "Intercompany Transactions").  The Intercompany Transactions reduce administrative costs and ensure the orderly and efficient operation of the Debtors' enterprise.  The Debtors are able to easily track and ascertain all Intercompany Transactions.

66.     These Intercompany Transactions generally fall into six principal categories: (a) product sales, (b) royalty transactions; (c) service transactions; (d) employee reimbursement; (e) debt service allocation; and (f) *de minimis* transactions.  Each category is described in greater detail below.

67.     <u>Product Sales</u>.  The Non-Debtor Affiliates supply their products to both Stanadyne and PPT, as well as third-party purchasers.[3]  The products are often customized to the Debtors' specifications such that they are not available to the Debtors locally.  The Debtors also realize significant cost savings by purchasing product from the Non-Debtor Affiliates because the Debtors receive the goods from the Non-Debtor Affiliates at cost plus a 15-20% markup pursuant to transfer pricing policies in place.  This pricing is significantly lower than pricing from a third-party trade supplier.  Preserving access to these products at the reduced pricing rate is vital to the Debtors' business in maintaining the lower standard cost for the Debtors' own products.

68.     <u>Royalty Transactions</u>.  Stanadyne has entered into intercompany license and royalty agreements with Stanadyne China and Stanadyne India that cover the trademarks, patents and related improvements for certain products integral to the business and which are owned or controlled by Stanadyne.  Stanadyne China and Stanadyne India are charged certain royalty fees under such agreements equal to a percentage of such business unit's net revenues for the licensed product(s).

69.     <u>Service Transactions</u>.   Pursuant to various intercompany corporate services agreement, Stanadyne provides to PPT and the Non-Debtor Affiliates various corporate services related to corporate planning and market development, human resource development, marketing business development and strategy, operations review, engineering design and oversight, and

---

3.   Stanadyne also supplies products to the Non-Debtor Affiliates to market in their respective regions.

shared information technology support.  In exchange for these services, Stanadyne allocates the costs of providing these services among the companies on a monthly basis.

70.     <u>Employee Reimbursement</u>.  Because of the international reach of the Debtors' business, employees on the payroll of one business unit are often called upon to provide services for the Debtors' global business.  Similar to the service transactions described above, the business unit employing that particular employee will invoice the other business units for a portion of that employee's salary, in accordance with established allocation methodologies.  For instance, Stanadyne invoices PPT and the Non-Debtor Affiliates for a portion of management's salary; Stanadyne Italy, in turn, bills Stanadyne, PPT, and the other Non-Debtor Affiliates for a portion its managing director's salary.  The salary for certain PPT personnel is allocated between Stanadyne and PPT.

71.     <u>Debt Service Allocation</u>.  Debtor PPT transfers funds to Stanadyne in payment of its portion of the outstanding prepetition secured debt.

72.     <u>*De Minimis* Transactions</u>.  Certain of the Debtors engage in a variety of *de minimis* transactions with the Non-Debtor Affiliates on an as-needed basis to fund cash activities.

73.     The above-described Intercompany Transactions result in receivables and payables between certain of the Debtors and the Non-Debtor Affiliates (the "<u>Intercompany Claims</u>").  Accordingly, at any given time, there may be Intercompany Claims owing either from one Debtor to another or from a Debtor to a Non-Debtor Affiliate.

74.     The Debtors maintains records of all intercompany transfers, which generally are reconciled on a monthly basis, and therefore, are able to ascertain, trace, and account for all intercompany transactions.  The Debtors will continue to do so during these Chapter 11 Cases.

75.     Each of the Intercompany Transactions were, and are, being conducted to facilitate the continued operations of the Debtors' and Non-Debtor Affiliates' businesses and are designed to maximize and appropriately allocate value for the services the Debtors and their affiliates provide.  Accordingly, the Debtors intend to continue these transactions in the ordinary course of business.  To the extent the Debtors seek to cease or materially modify any of these Intercompany Transactions during the course of these Chapter 11 Cases, the Debtors will provide notice to the U.S. Trustee and any Non-Debtor Affiliate that will be adversely affected prior to the implementation of such changes.

76.     If the Intercompany Transactions were to be discontinued, the Cash Management System and the Debtors' operations would be disrupted unnecessarily to the detriment of the Debtors, their creditors, and other stakeholders.  Because the Debtors engaged in the Intercompany Transactions on a regular basis prepetition and such transactions are common for enterprises like the Debtors, the Debtors believe that they may continue the Intercompany Transactions in the ordinary course under Bankruptcy Code section 363(c)(1), without court approval.  Nonetheless, out of an abundance of caution, the Debtors seek express authority, but not direction, to continue engaging in the Intercompany Transactions.  Consistent with their prepetition practice, the Debtors will maintain records of all transfers and can ascertain, trace, and account for all of the Intercompany Transactions.  In addition, the Debtors request that the postpetition Intercompany Transactions be granted administrative expense priority status, which will help to ensure the orderly and efficient operation of the Debtors' enterprise.

77.     I believe that maintaining the existing Cash Management System and approval of the Cash Management Motion is not only essential, but is in the best interests of the Debtors' estates, their creditors, and parties in interest.

**Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Pay (I) All Prepetition Employee Obligations, (II) Prepetition Withholding Obligations, and (III) Postpetition Employee Obligations in the Ordinary Course, and (B) Authorizing Banks to Honor Related Transfers (the "Employee Motion")**

78.     Pursuant to the Employee Motion, the Debtors seek authority, in their sole discretion (and subject to statutory caps contained in sections 507(a)(4) and 507(a)(5) and in accordance with any orders authorizing postpetition financing and the use of cash collateral and the applicable budget thereunder), to pay and honor, as the case may be, (i) all prepetition claims of Employees, including, but not limited to, claims for Wages, Commissions, PTO, as applicable, and certain costs and disbursements related to the foregoing, (ii) any claims or payments pursuant to the Employee Benefit Plans, (iii) all Benefits Withholding Obligations ((i) through (iii) collectively, the "Employee Obligations"), (iv) the Reimbursable Expenses, and (v) any prepetition claims for Independent Service Providers and Temporary Employees.

79.     As of the Petition Date, the Debtors' collective workforce is comprised of approximately 468 employees in the United States.  Approximately 180 employees work for Stanadyne LLC, while approximately 288 employees work for PPT.  Of the current employees, approximately 164 are full-time salaried employees and approximately 304 are hourly employees. A few individuals provide services to both the Debtors and the Debtors' non-debtor affiliates.  The Debtors contribute a portion of these individuals' salaries.

80.     The Debtors also utilize the services of staffing agencies and independent contractors to fulfill critical employment needs and to address fluctuations in demand or provide special skills required by the Debtors.  The number of temporary employees fluctuates at any given time depending upon the Debtors' needs, and as of Petition Date, is currently approximately 120 individuals, of which 82 are employed at Stanadyne LLC and 38 are employed at PPT.

81.     The Employees perform a variety of critical functions for the Debtors' businesses, including, without limitation, accounting, administration, engineering, finance, human resources, information technology, operations, manufacturing, marketing, purchasing, shipping, transportation, research, and sales.  Their skills and specialized knowledge and understanding of the Debtors' infrastructure and operations, as well as their relationships with customers, vendors and other third parties, are essential to the Debtors' continuing business operations.

82.     **Payroll Processing Services.**  The Debtors incur costs incidental to Employee Wages and Commissions, such as payments to parties for charges associated with the administration of the Wages and for other costs incident to the provision thereof (collectively, the "Processing Costs").  The Debtors process payroll for all Employees through ADP.

83.     Fees paid to ADP total approximately $270,000 annually.   To the best of the Debtors' knowledge, as of the Petition Date, the Debtors owe ADP an outstanding amount equal to approximately $16,000.  The Debtors seek authority to pay this amount.  Payment of the unpaid Processing Costs to ADP and any other parties is justified because the failure to pay any such amounts might disrupt the services of third-party providers that are essential to the timely payment of Employees.   By paying these Processing Costs, the Debtors will avoid disruptions of such services, ensuring that the Employees obtain all of their compensation without interruption. Accordingly, the Debtors seek authority, but not direction, to continue remitting the Processing Costs to the appropriate third parties.

84.     **Wages and Commissions.**  All Employees are paid wages or salary (collectively, the "Wages") on either a weekly or a bi-monthly basis.  The Debtors pay Salaried Employees on a bi-monthly basis on account of service for the half month preceding the date that their Wages are paid.  Hourly Employees are paid in arrears on a weekly basis for the one-week period ending

one week before the date that their Wages are paid.  The pay date for weekly payroll is on Thursday of each week.  The pay date for semi-monthly is on the 15th and the last day of the month unless such date falls on a weekend or bank holiday, in which case the pay date for such period is the immediately preceding business day

85.     The Debtors' gross payroll is approximately $1.7 million to $1.8 million per month, excluding the Debtors' portion of the Payroll Taxes (as defined below).  The Debtors fund payroll on a weekly basis.  As of the Petition Date, the Debtors estimate that they owe Employees an aggregate of approximately $300,000 in accrued Wages and Overtime earned prior to the Petition Date (subject to the variability described above), and only one Employee is owed in excess of the statutory cap under section 507(a)(4) of the Bankruptcy Code on account of such Wages and Overtime.

86.     In addition to the Wages, certain of the Employees are eligible to receive commissions (the "Commissions").  The amount of Commissions payable to the eligible Employees constitutes a significant portion of such Employee's total earnings.  As of the Petition Date, the Debtors are not aware of any accrued and unpaid Commissions owed to any of the Employees.  However, the Debtors anticipate that there may be additional Commissions obligations accrued as of the Petition Date.

87.     The Debtors request the authority, in the ordinary course of business, to pay Wages and Commissions accrued prepetition to their Employees, up to the statutory priority amount of $15,150 per Employee (inclusive of other Employee Obligations that are subject to section 507(a)(4) of the Bankruptcy Code), and to continue to otherwise pay Employees in the ordinary course of business (and subject to and in accordance with any orders authorizing postpetition financing and the use of cash collateral and the applicable budget thereunder).

88.    **Payroll Obligations.**  As employers, the Debtors are required by law to withhold federal, state and local taxes from Wages for remittance to appropriate tax authorities (the "Employee Taxes").  In addition to the Employee Taxes, the Debtors are required to pay, from their own funds, social security and Medicare taxes and pay, based on a percentage of gross payroll and subject to state-imposed limits, additional amounts for state and federal unemployment insurance (together with the Employee Taxes, the "Payroll Taxes") and remit the same to the appropriate authorities (collectively, the "Taxing Authorities").

89.    In the aggregate, the Debtors estimate that Payroll Taxes total approximately $933,000 per month, based on actual monthly Payroll Taxes paid during January 2023.  As of the Petition Date, the Debtors are not aware of any unpaid, outstanding amounts owed to the Taxing Authorities on account of Payroll Taxes.  The Debtors seek authority, in their sole discretion (and subject to and in accordance with any orders authorizing postpetition financing and the use of cash collateral and the applicable budget thereunder), to continue remitting the Payroll Taxes to the appropriate Taxing Authorities as needed, including, without limitation, with respect to the most recent payroll period up to the Petition Date, and any prior period.

90.    **Vacation Time and Sick/Personal Days.**  The Debtors provide eligible Employees with paid time off ("PTO") each year to use for any reason, such as for vacation, personal time, observance of religious holidays, personal illness, personal injury or the illness or injury of dependents or family members.

91.    PTO earned in a given calendar year must be used during that calendar year, and any unused PTO at the end of that calendar year is not paid out and may not be carried over to the following calendar year.  The Debtors pay for accrued, but unused, PTO in connection with employee departures.  Accrued PTO, however, is not a current cash payment obligation, as

Employees are not entitled to cash payment for accrued and unused PTO, except upon separation and if required by applicable law or specific agreement.

92.     The Debtors request authority to continue to honor their PTO policies in the ordinary course of business and to honor all prepetition obligations up to the statutory cap related thereto in a manner consistent with their prepetition practices.

93.     **Employee Benefit Plans.**  The Debtors have established certain benefit plans and policies for eligible Employees that provide, among other benefits, medical, dental and vision plans, life insurance, disability insurance, retirement plans and other benefits which are described in more detail below (collectively, including any administrative costs with respect thereto, the "Employee Benefit Plans").[4]  A brief description of the Employee Benefit Plans is provided below:

**Medical Plan**

94.     The Debtors sponsor several health and welfare benefit plans, including medical, dental, and vision coverage for certain of their Employees.  The Debtors offer eligible Employees in the United States medical benefits through a self-funded plan (the "Medical Plan") administered by Blue Cross Blue Shield of South Carolina ("BCBS").  Employees are eligible to participate in the Medical Plan if they are full-time Employees working at least thirty hours per week.  Currently, the Debtors provide benefits to approximately 337 Employees under the Medical Plan.  Open enrollment for the 2023 Medical Plan concluded on November 11, 2022, with Employees' enrollment choices taking effect on January 1, 2023.

95.     The Debtors are required to pay for all costs arising under the Medical Plan, including claims payments and associated administrative costs, but Employees are responsible for

---

4.   In addition to the insurance programs discussed herein, the Debtors also maintain a workers' compensation insurance policy, which is addressed in the Insurance Motion.

making their employee share of policy premium payments, satisfying the annual deductible and for paying copayments to a network provider. Claims under the Medical Plan average approximately $350,000 per month. As of the Petition Date, the Debtors estimate that their liability on account of incurred but unpaid medical claims for Employees in the Medical Plan is approximately $250,000.

96.     The Debtors also pay approximately $54,100 per month to BCBS in administrative fees for their services in connection with the Medical Plan.

97.     The Debtors also carry stop-loss insurance to cover any individual's claims in excess of the amount of estimated claims in a calendar year. The Debtors pay approximately $45,000 per month for such stop-loss coverage provided by BCBS. As of the Petition Date, there are approximately $33,000 in unpaid and outstanding administrative fees and insurance premiums owed on account of the Medical Plan.

**Dental Plan**

98.     The Debtors offer self-funded dental benefits to eligible Employees and their dependents through Guardian (the "Dental Plan"). Employees are eligible to participate in the Dental Plans if they are full-time Employees working at least thirty hours per week. Currently, the Debtors provide benefits under the Dental Plan to approximately 391 Employees. The Debtors are required to pay for all costs arising under the Dental Plan, including claims payments and associated administrative costs, but Employees are responsible for making their employee share of policy premium payments, satisfying the annual deductible and for paying copayments to a network provider. Claims under the Dental Plan average approximately $18,300 per month. As of the Petition Date, the Debtors estimate that their liability on account of incurred but unpaid

medical claims for Employees in the Dental Plan is approximately $10,400.  There are also unpaid administrative fees in the amount of $1,400.

**Vision Plan**

99.     The Debtors offer vision benefits to their eligible Employees and their dependents through a fully insured plan (the "Vision Plan," and together with the Medical Plans and Dental Plan, the "Health Plans") administered by Vision Service Plan ("VSP").  Employees are eligible to participate in the Vision Plan if they are full-time Employees working at least thirty hours per week.  The Debtors pay the majority of the premiums of the Vision Plan.  Such payments cost the Debtors approximately $2,800 per month in the aggregate.  As of the Petition Date, the Debtors estimate that they owe approximately $2,900 in unpaid and outstanding premiums on account of the Vision Plans.

100.    The Debtors seek authority (subject to and in accordance with any orders authorizing postpetition financing and the use of cash collateral and the applicable budget thereunder) to (a) pay all such amounts owed under the Health Plans to the extent that they remain unpaid on the Petition Date subject to the statutory caps contained in sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code (as applicable), (b) continue to provide the Health Plans in the ordinary course of business, (c) continue to honor the Debtors' obligations under such benefit programs, including any premiums and administrative fees, and (d) pay any obligations in connection with the Health Plans in the ordinary course of business, including any premiums or administrative fees.

**Other Insurance**

101.    The Debtors offer eligible Employees disability insurance, including short-term disability insurance and long-term disability insurance (the "Disability Insurance Plans").  The

short-term disability insurance plan provides eligible Employees continued employment benefits for a maximum of twenty-six weeks following an extended illness or injury. The long-term disability insurance plan provides Employees who elect coverage with 60% of an employee's salary up to $4,000 per month for Stanadyne and up to $10,000 per month for PPT. On average, the Debtors incur an aggregate monthly cost of approximately $19,700 in connection with the Disability Insurance Plans. As of the Petition Date, the Debtors believe that there are approximately $19,700 in accrued and unpaid monthly costs in connection with the Disability Insurance Plans.

102.     Eligible Employees are also offered a basic life insurance benefit, which includes an Accidental Death & Dismemberment ("AD & D") benefit, for full-time Employees, who regularly work at least thirty hours per week, up to a maximum of $25,000 at Stanadyne and 1.5 times annual base salary at PPT with matching AD & D benefit (the "Life Insurance and AD & D Plan"). Currently, there are approximately 466 employees and 129 retirees on the Life Insurance and AD & D Plan with a total aggregate monthly premium of approximately $14,400. As of the Petition Date, the Debtors estimate there are approximately $14,400 in unpaid and outstanding premiums on account of the Life Insurance and AD & D Plan.

103.     The Debtors offer full-time Employees the ability to purchase supplemental life and AD & D insurance for Employees, their spouses and eligible children (the "Supplemental Life and AD & D Program") through Guardian. Currently, 340 Employees and 39 retirees are under the Supplemental Life and AD & D Program with a total aggregate monthly premium of approximately $17,400. The Debtors estimate there are approximately $17,400 in unpaid and outstanding premiums on account of the Supplemental Life and AD & D Program.

104.    The Debtors seek authority to pay, in their sole discretion (and subject to and in accordance with any orders authorizing postpetition financing and the use of cash collateral and the applicable budget thereunder), any and all prepetition amounts owed on account of the Disability Insurance Plans, Life Insurance and AD & D Plans, and the Supplemental Life Insurance and AD & D Program, and to continue their prepetition practices with respect to such benefits.

**Other Supplemental Insurance Programs**

105.    The Debtors' Employees may also choose to enroll in certain other insurance policies, including critical illness, accident, and cancer insurance (collectively, the "Other Supplemental Insurance Programs") through Guardian.  Currently, Employees have purchased 691 policies through the Other Supplemental Insurance Programs with a total aggregate monthly premium of approximately $8,800.  As of the Petition Date, the Debtors estimate there are approximately $8,800 in unpaid and outstanding premiums on account of the Other Supplemental Insurance Programs.

106.    The Debtors seek authority to pay, in their sole discretion (and subject to and in accordance with any orders authorizing postpetition financing and the use of cash collateral and the applicable budget thereunder), any and all prepetition amounts owed on account of the Other Supplemental Insurance Plans, and to continue their prepetition practices with respect to such benefits.

**Flexible Spending Accounts/Health Savings Accounts**

107.    The Debtors offer Employees the ability to contribute a portion of their pre-tax compensation to flexible spending accounts and health savings accounts ("Savings Accounts") to pay for eligible out-of-pocket health care and dependent care expenses.  Currently, approximately eighty Employees maintain Savings Accounts.  The funds deducted from the Employees' paychecks for contribution to the Savings Accounts are remitted to Fidelity or Health Equity,

which administers claims and remits reimbursements to Employees.  The Debtors pay Fidelity approximately $700 per month and Health Equity approximately $140 to administer the Savings Accounts, and the Debtors currently withhold approximately $9,200 per month on account of Employee contributions to the Savings Accounts.  The Debtors estimate that, as of the Petition Date, they are not holding anything in Savings Account deductions for remittance to Fidelity and owe approximately $500 on account of incurred, but unpaid, prepetition expenses in connection with the Savings Accounts.

**COBRA**

108.    The Debtors pay in the ordinary course of business certain costs associated with the provision of COBRA extended group health benefits insurance coverage to certain former employees and their dependents (the "COBRA Coverage").  The Debtors' COBRA Coverage is administered by ADP for a fee that is included as part of the Debtors' ADP compensation bundle (the "COBRA Program").  Under the COBRA Program, an Employee may elect to receive COBRA Coverage for the continuance of the Medical Plans, Dental Plan, and Vision Plan following their employment with the Debtors.  As of the Petition Date, only one former employee currently receive COBRA.  As of the Petition Date, the Debtors' do not have any unpaid and outstanding administrative fees on account of the COBRA Program.

**401(k) Plan**

109.    The Debtors maintain retirement savings plans for the benefit of eligible Employees in accordance with the requirements of section 401(k) of the Internal Revenue Code (the "401(k) Plan").  Approximately 450 Employees currently contribute to the 401(k) Plan.  Vanguard and Fidelity administer the 401(k) Plan.  Employees may contribute to the 401(k) Plan each year through salary deferrals up to the IRS limit.  With respect to Vanguard, the Debtors also provide

matching contributions to each Employee participant's account under the 401(k) Plan equal to 50% of Employee's salary deferrals, up to 6% of an Employee's compensation (the "Matching Contributions"). The Matching Contributions under the 401(k) Plan do not totally vest until an Employee has completed three years of service with the Debtors. Matching Contributions vest 33% after one year, 67% after two years, and 100% after three years. With respect to Fidelity, only discretionary matching is offered, which vests immediately. However, under IRS guidelines, termination of the 401(k) Plan will cause all unvested amounts to become automatically vested at the time of plan termination.

110.    The Debtors deduct contributions from Employees' paychecks and remit contribution amounts to Fidelity and Vanguard. The approximate monthly amount withheld from such Employees' paychecks for the 401(k) plan contributions is $226,000. On average, the Debtors pay approximately $55,800 per month in Matching Contributions. The Debtors estimate that they owe approximately $2,100 in matching contributions under the 401(k) Plan has accrued and is unpaid by the Debtors as of the Petition Date.

111.    The Debtors seek authority, in their discretion, to continue to honor their obligations with respect to the 401(k) Plan, including the Matching Contributions, in the ordinary course of their business.

**Other Benefit Programs**

112.    The Debtors provide eligible Employees with a tuition reimbursement program (the "Tuition Reimbursement Program"), pursuant to which the Debtors reimburse up to a maximum amount of $5,250 per year for actual expenses of an accepted class from an accredited college or university. Currently, there are five (5) employees enrolled in such classes. As of the Petition

Date, the total amount outstanding under the Tuition Reimbursement Program is approximately $3,000.

113.    Executives of Stanadyne receive automotive allowances of $800 per month.  This amount is included in the Debtors' payroll.

114.    The Debtors also offer a wellness program through Strive (the "Wellness Program"), which includes back care, maternity care, stress management, tobacco cessation, and weight management.  The costs of the Wellness Program are included in the administrative fees paid to BCBS.  As of the petition date, the Debtors do not owe any amounts in connection with the Wellness Program.

115.    **Pension, SERP and OPEB Obligations.**   The Debtors also maintain a Pension Plan, a SERP and an OPEB plan.  The Debtors are not seeking authority pursuant to this Motion to make payments on account of such plans.

116.    **Pension Plan.** The Debtors offer a pension plan (the "Pension Plan"), which has not required any cash funding by the Debtors since 2019.  The Pension Plan provides benefits to approximately 1,400 former employees and is paid out of the pension trust assets.

117.    **SERP.**  The Debtors also provide a Supplemental Executive Retirement Plan (the "SERP"), which was established as a non-ERISA plan for certain higher compensated employees who were capped for allowable benefits under the Pension Plan when it was frozen in 2007.  Twenty people are enrolled in the SERP.  The Debtors estimate that payments on account of the SERP amount to approximately $36,500.  The Debtors make contributions together with payroll cycles and are thus current with all such amounts presently due for 2023 to the best of their knowledge.

118.    **OPEB.**  The Debtors also provide other post-employment benefits to certain retired employees, including medical insurance and life insurance coverage benefits (such plan, the "OPEB").  The OPEB has approximately 52 active health care plan participants and 134 active life insurance plan participants.  The Debtors estimate that OPEB-related costs will total approximately $144,000 for 2023.  The Debtors make contributions together with payroll cycles and are thus current with all such amounts presently due for 2023 to the best of their knowledge.  The OPEB was last amended as of January 1, 2017.  Generally, employees are eligible for subsidized benefits if they were last hired before 1997 and are at least 57 years old with at least ten years of continuous service.  Employees who retired before 1991 with at least ten years of vesting service, who elected to commence pension benefits immediately and were employed by certain entities are also eligible for subsidized benefits.  Employees hired in 1997 or later are required to pay the full cost of coverage for the medical plan.  Spouses and unmarried children under age 19 are eligible for dependent medical coverage.  Medical coverage for surviving spouses continues after the death of an employee only if a joint and survivor annuity option was elected under the pension plan.  For retiree medical insurance, Stanadyne pays fixed amounts (not increasing over time) of $100 per month per retiree or spouse under age 65 and $50 per month per retiree or spouse over age 65.  The pre-65 benefit is self-insured; the post-65 benefit is fully-insured.  Retiree dental insurance benefits are offered to those eligible for medical insurance coverage, but participants must pay the full cost of coverage.  Retiree vision insurance benefits are not offered.  Basic life insurance coverage is offered to participants who meet the medical retirement eligibility requirements discussed above.  Stanadyne subsidizes life insurance coverage for employees who retired before 1997; post-1997 retirees pay the full cost of coverage.  Certain pre-1991 retirees receive a company

subsidy for supplemental life insurance coverage.  The average life insurance coverage amount is approximately $4,500 per retiree participating in the plan.

119.    **Reimbursable Business Expenses.**  Business expenses incurred by Employees in the course of employment and in furtherance of the Debtors' business are generally paid directly by the Employee and then charged to the Debtors in accordance with the Debtors' reimbursement policy.  The Debtors reimburse Employees for certain ordinary course expenses incurred within the scope of the Employees' employment, including personal protection equipment, travel and other miscellaneous expenses (collectively, the "Business Expenses").

120.    As of the Petition Date, the Debtors are aware of approximately $2,500 in accrued and unpaid Business Expenses awaiting payment.  However, the Debtors anticipate that some Employees have not yet submitted their recent expense reports for accrued and unpaid Business Expenses.  As a point of reference, the Debtors reimbursed approximately $36,900 in Business Expenses in January 2023.

121.    Failing to reimburse employees for Business Expenses could have a negative effect on Employee morale and would cause those employees with outstanding Business Expenses to suffer undue hardship.

122.    Accordingly, the Debtors seek authority, in their sole discretion, to (i) continue their prepetition practices with respect to the Business Expenses in the ordinary course of business, (ii) continue to pay the Business Expenses as they deem appropriate in their business judgment (subject to and in accordance with any orders authorizing postpetition financing and the use of cash collateral and the applicable budget thereunder), and (iii) pay all prepetition amounts outstanding in connection with the Business Expenses.

123.     **Benefits Withholding Obligations.**  As part of the relief requested herein, the Debtors seek authorization to pay the Payroll Taxes and all other withholdings such as contributions to savings, retirement or pension plans, insurance contributions and charitable contributions, if any (collectively, the "Benefits Withholding Obligations").

124.     The Debtors routinely withhold from Employee paychecks the Benefits Withholding Obligations, and are required to transmit these amounts to third parties.  The Debtors believe that such withheld funds, to the extent that they remain in the Debtors' possession, constitute moneys held in trust and therefore, are not property of the Debtors' estates.  Thus, whether or not such funds are prepetition amounts, the Debtors believe that directing such funds to the appropriate parties does not require Court approval.  Nevertheless, in the interests of transparency and full disclosure, the Debtors seek authority to pay any outstanding amounts owed for Benefits Withholding Obligations, in the ordinary course of business, including those incurred prior to the Petition Date.

125.     **Temporary Employees.**  In general, the Debtors use Temporary Employees to augment or provide flexibility to their workforce as needed.  Temporary Employees fulfill a variety of the Debtors' staffing needs.  Engaging Temporary Employees is crucial to the Debtors' ability to address seasonal or fluctuating client demand, fill certain roles in geographic areas where the Debtors have experienced hiring challenges, and to meet specialized needs.  The use of Temporary Employees also allows the Debtors to select individuals with the proper skills to potentially become members of their permanent workforce.

126.     The Temporary Employees are employed by temporary staffing agencies, including Carolina Industrial Staffing, Spherion Staffing, LLC, True Group, Inc., Holden Temporaries, Inc., and Mega Force Staffing Services.  The Debtors remit compensation for the Temporary Employees

to the temporary staffing agencies through the Debtors' accounts payable system ("Temporary Employee Compensation").  The Debtors' average monthly spending on Temporary Employee Compensation is approximately $244,000.  As of the Petition Date, the Debtors estimate that they owe approximately at least $247,800 to the staffing agencies on account of Temporary Employee Compensation (the "Temporary Employee Obligations").

127.    The Debtors request the authority, in the ordinary course of business, to pay Temporary Employee Obligations accrued prepetition, up to the statutory priority amount of $15,150 per Temporary Employee, and to continue to otherwise pay Temporary Employee Obligations in the ordinary course of business (and subject to and in accordance with any orders authorizing postpetition financing and the use of cash collateral and the applicable budget thereunder).

128.    **Independent Service Providers.**  In addition to the Employees, the Debtors contract with a limited number of independent contractors (the "Independent Service Providers") who provide services that are essential to the Debtors' ongoing business operations (the "Independent Services").  The services provided by the Independent Services Providers include general corporate and administrative functions.  The Independent Service Providers are critical to the Debtors' operations, and they rely on the Debtors for their individual income.

129.    The Debtors estimate that the aggregate accrued amount owing to the Independent Service Providers as of the Petition Date is approximately $2,400.  The Debtors believe that only one Independent Service Provider is owed more than $15,150 with respect to prepetition obligations. The Independent Service Providers are paid through the Debtors' respective accounts payable and not through the Debtors' payroll.  Nonetheless, if the Debtors are unable to pay the Independent Service Providers, the Debtors will lose the services, continuity and institutional

knowledge of the Independent Service Providers, and the Debtors' business operations will be severely and irreparably compromised.

130.    The Debtors request the authority, in the ordinary course of business, to pay Independent Service Providers for obligations accrued prepetition, up to the statutory priority amount of $15,150 per Independent Service Provider, and to continue to otherwise pay Independent Service Providers in the ordinary course of business (and subject to and in accordance with any orders authorizing postpetition financing and the use of cash collateral and the applicable budget thereunder).

131.    For the reasons discussed herein and in the Employee Motion, the Debtors respectfully submit, and I agree, that the relief requested therein is in the best interests of the Debtors, their estates and creditors, and therefore should be granted.

### Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Taxes and Regulatory Fees in the Ordinary Course of Business and (II) Authorizing Banks and Financial Institutions to Honor and Process Checks and Transfers Related Thereto (the "Taxes Motion")

132.    The Debtors respectfully request the entry of interim and final orders, (i) authorizing the Debtors to pay certain prepetition taxes and regulatory fees in the ordinary course of business; and (ii) authorizing banks and financial institutions to honor and process checks and transfers related thereto.

133.    In the ordinary course of business, the Debtors (i) incur taxes including, without limitation, sales and use taxes (the "Sales and Use Taxes"), income taxes (the "Income Taxes"), property taxes (the "Property Taxes"), and other miscellaneous taxes (together with the Sales and Use Taxes, Income Taxes and Property Taxes, the "Taxes"); (ii) incur business license, environmental, reporting, commercial, and vehicle fees, customs (import/export) fees,  and other similar assessments (collectively, the "Fees"); and (iii) remit such Taxes and Fees to various

taxing, licensing and governmental authorities (collectively, the "Authorities") or make payments to various third parties for Taxes who, in turn, remit such Taxes to the Authorities. The Debtors seek authorization to pay any Taxes and Fees (including amounts paid prepetition by checks that have not yet cleared as of the Petition Date) on an interim basis up to an aggregate amount of $750,000, and on a final basis up to the aggregate amount of $1,500,000.

134.    As of the Petition Date, the Debtors have not determined the amount of Income Taxes that may be owed for the fiscal year 2022. As explained more fully in the Taxes Motion, the relief requested therein should be granted because, among other things, (a) certain Taxes may constitute "trust fund" taxes and thus are not property of the Debtors' estates; (b) the failure to pay certain Taxes could result in a lien being placed on the Debtors' property; and/or (c) such Taxes constitute priority claims. The failure to pay the Taxes could disrupt the Debtors' operations and impair the Debtors' efforts to maximize the value of their assets for their stakeholders. Accordingly, the Debtors believe, and I agree, payment of the Taxes and Fees is in the best interest of the Debtors' estates and therefore request that the Taxes Motion be granted.

**Debtors' Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105(a) and 366 (I) Prohibiting Utilities from Altering, Refusing or Discontinuing Services on Account of Prepetition Invoices, (II) Deeming Utilities Adequately Assured of Future Performance, and (III) Establishing Procedures for Determining Adequate Assurance of Payment (the "Utilities Motion")**

135.    The Debtors respectfully request the entry of an interim order and final order, (i) determining that the Utility Providers (defined below) have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code; (ii) approving the Debtors' proposed offer of adequate assurance and procedures whereby the Utility Providers may request additional or different adequate assurance; (iii) prohibiting the Utility Providers from altering, refusing or discontinuing services on account of prepetition amounts outstanding or on

account of any perceived inadequacy of the Debtors' proposed adequate assurance; and (iv) determining that the Debtors are not required to provide any additional adequate assurance beyond what is proposed in the Utilities Motion.

136.    In the ordinary course of business, the Debtors regularly incur utility expenses for telephone, cellular, internet access, and other services (the "Utility Services"). The Debtors' aggregate average monthly cost for utility services is approximately $309,241.19. The utility services are provided by approximately twenty-two utility companies (the "Utility Providers").

137.    As of the Petition Date and as qualified in the Utilities Motion, the Debtors are generally current on payments to the Utility Providers for Utility Services. Overall, the Debtors have a long and established payment history with most of the Utility Providers indicating consistent payment for Utility Services with few to no material defaults or arrearages with respect to undisputed Utility Services invoices. As of the Petition Date, however, the Debtors may have had (a) prepetition accounts payable to certain Utility Providers, (b) outstanding checks issued to certain Utility Providers in payment for prepetition charges for Utility Services that had not cleared the Debtors' bank account prior to the Petition Date, or (c) liabilities for prepetition Utility Services for which the Debtors had not yet been billed.

138.    Access to Utility Services is critical to the Debtors' ongoing operations while they are exploring their strategic options. Should any Utility Provider refuse or discontinue a service even for a brief period of time, the Debtors' operations and administrative functions would suffer significant harm. Any interruption of the Utility Services would be severely disruptive to the Debtors' businesses and diminish the Debtors' value to the detriment of their stakeholders. Certain Utility Providers provide the Debtors with services necessary to run their day-to-day operations. Further, the Debtors are dependent upon internet and telephone service to maintain their ability to

send and receive electronic communications and records.  In this regard, the Debtors believe, and I agree, it is in the best interest of the Debtors, their estates and their creditors to maintain continuous and uninterrupted Utility Services during these Chapter 11 Cases.

139.    As adequate assurance of future payment to the Utility Providers, the Debtors propose to deposit cash in an amount equal to the approximate aggregate cost of 50% of the approximate average monthly total for utility service from the Utility Providers calculated from an historical approximate average for the three months prior to the Petition Date, or $154,620.60.

140.    Based on the foregoing, the relief requested in the Utilities Motion is not prejudicial to any party-in-interest and, in fact, only benefits the Debtors' estates and their creditors. Accordingly, I submit that the proposed adequate assurance is sufficient and that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, their creditors and parties-in-interest.

**Debtors' Motion for an Order (I) Authorizing the Debtors to (A) Continue Their Workers' Compensation Programs and Their Liability, Property, and Other Insurance Programs and (B) Pay Certain Obligations in Respect Thereof and (II) Authorizing the Debtors' Financial Institutions to Honor and Process Checks and Transfers <u>Related to Such Obligations (the "Insurance Motion")</u>**

141.    Pursuant to the Insurance Motion, the Debtors request entry of an order, (i) authorizing the Debtors to continue their liability, property, workers' compensation and other insurance programs (collectively, the "<u>Insurance Programs</u>"); (ii) authorizing the Debtors' financial institutions to honor and process checks and transfers related to such obligations; and (iii) authorizing the Debtors to pay, in their sole discretion (but subject to and in accordance with any orders authorizing postpetition financing and the use of cash collateral and the applicable budget thereunder), all undisputed premiums, amounts owed under a premium finance agreement, claims, deductibles, administrative fees, broker fees and other obligations relating to the Insurance

Programs as applicable, that were or are due and payable, and relate to the period before or after the Petition Date (collectively, the "Insurance Obligations").

142.    As of the Petition Date, aside from monthly Workers' Compensation premium payments totaling approximately $26,000 per month, the Debtors believe that they have paid all outstanding prepetition Insurance Obligations, but will owe approximately $286,000 in ordinary course payments postpetition under the Insurance Obligations, which is owed on account of Brokerage Fees ($17,500) and premium financing obligations ($268,000).  The Debtors also typically pay approximately $2,000 per month on account of prepetition runoff obligations relating to prior Workers' Compensation insurance policies.

143.    In connection with the operation of their businesses, the Debtors maintain the Insurance Programs through several different insurance carriers (the "Insurance Carriers").  The Insurance Programs provide the Debtors with insurance coverage for liabilities relating to, among other things, general liability, workers' compensation, directors' and officers' liability (including excess liability), foreign general liability, fiduciary liability, commercial property liability, commercial auto liability and various other property-related liability and general liabilities.  In addition to premiums that have been financed discussed herein and in the Insurance Motion, the Debtors presently owe the Insurance Carriers on account of premiums under certain of these contracts.  The Debtors believe, and I agree, that continuation of the Insurance Programs is essential to the operation of the Debtors' businesses and is necessary to protect the Debtors from catastrophic liability

144.    The Debtors are required to pay premiums under the Insurance Programs based upon rates established by the applicable Insurance Carrier.  For the 2022/2023 policy period, the annual premiums for the Insurance Programs totaled approximately $1,700,000 in the aggregate.

The Debtors pay premiums in full, directly or through premium financing arrangements discussed below, to the Insurance Carriers at the commencement of the respective policies or on a prorated basis. Pursuant to the Insurance Motion, the Debtors are seeking authority to pay any undisputed obligations under the Insurance program, in their discretion (but subject to and in accordance with any orders authorizing postpetition financing and the use of cash collateral and the applicable budget thereunder), as they come due.

145.    The Debtors are required to maintain workers' compensation coverage in each state in which they have employees, in order to cover claims arising from or related to such employment (the "Workers' Compensation Program"). Under the Workers' Compensation Program, the Debtors are insured through the Hanover American Insurance Company for statutory liabilities with $1,000,000 per occurrence coverage in the following covered states: Connecticut, North Carolina, South Carolina, Michigan, Florida, Illinois, Indiana, and New Jersey. As of the Petition Date, the Debtors believe that they have paid all Workers' Compensation Premiums for all periods through the Petition Date.

146.    The Debtors pay approximately $26,000 per month in premiums with respect to the Workers' Compensation Program for the policy period July 1, 2022 to July 1, 2023. The Debtors also typically pay approximately $2,000 per month on account of prepetition runoff obligations relating to prior Workers' Compensation insurance policies, which amount varies and could be larger or smaller in a given month based on the amount of claims.

147.    In connection with the Insurance Programs, the Debtors employ the services of (i) Marsh and (ii) Risk Strategies (collectively, the "Insurance Brokers") to assist them with the procurement, placement and negotiation of their Insurance Programs. The Insurance Brokers assist the Debtors in obtaining comprehensive insurance coverage for the Debtors' operations in

the most cost-effective manner possible and enable the Debtors to obtain policies on advantageous terms and at competitive rates.

148.    The Insurance Brokers charge brokerage fees (the "Brokerage Fees"), which are typically paid by the applicable Insurance Carrier.  As of the Petition Date, the Debtors do not believe that they owe any prepetition Brokerage Fees to Marsh.  Risk Strategies charges its Brokerage Fees in quarterly installments, such that the Debtors will owe $17,500 in April 2023 for the prepetition Brokerage Fees associated with the current policy period.  Fees or commissions (or both) may also become due to the Insurance Brokers in connection with policy renewals.  Although the Debtors do not believe that they need Court approval to pay Brokerage Fees that may become due in the ordinary course, they hereby seek the authority to do so out of an abundance of caution.

149.    The Debtors have determined in their business judgment that it is economically advantageous to finance the payment of premiums for certain Policies.  Accordingly, in the ordinary course of the Debtors' business, the Debtors finance the premiums on certain Policies pursuant to one commercial premium financing agreement (the "PFA") with Intrust Bank, N.A. (the "Premium Financing Company").

150.    The Debtors presently finance a total of $970,420.90 of their insurance premiums with the PFA.  Pursuant to the PFA, the Debtors paid a cash down payment totaling $97,042.09.  The PFA requires monthly installment payments of $89,331.50 due on the 1st day of each month beginning on August 1, 2022 and continuing for a period of ten months.  The annual interest rate under the PFA is 4.95%.  The terms of the PFA provide that the Debtors pay the Premium Financing Company monthly installments in exchange for the Premium Financing Company's agreement to pay the annual insurance premiums, after adjustment for any down payment paid by the Debtors, to certain of the Insurance Carriers.

151.    Pursuant to the PFA, the Debtors' obligations to the Premium Financing Company are collateralized by a security interest in the Policies financed through the PFA.  Additionally, pursuant to the PFA, upon an event of default, the Debtors appoint the Premium Financing Company as the Debtors' Attorney-in-Fact and grant the Premium Financing Company the authority to cancel the Policies covered by the PFA.

152.    If the Debtors are unable to make payments under the PFA, the Premium Financing Company may impose a late fee totaling 5.0% of the installment due, and may attempt to terminate the Policies to recoup losses.  The Debtors would then be required to obtain replacement insurance on an expedited basis and at great cost to their estates.  Even if the Premium Financing Company or the Insurance Carriers were not permitted to terminate the Policies, any interruption of payments may negatively affect the Debtors' ability to extend the current Policies or acquire new insurance coverage in the future.

153.    The nature of the Debtors' business and the extent of their operations make it essential for the Debtors to maintain their Insurance Programs on an ongoing and uninterrupted basis.  The nonpayment of any premiums, deductibles, or related fees under one of the Insurance Programs could result in one or more of the Insurance Carriers terminating their existing policies, declining to renew their insurance policies or refusing to enter into new insurance agreements with the Debtors in the future.  If the Insurance Programs are allowed to lapse without renewal, the Debtors could be exposed to substantial liability for damages resulting to persons and property of the Debtors and others, which could have an extremely negative impact on the Debtors' ability to maximize the value of their assets for stakeholders. Furthermore, the Debtors would then be required to obtain replacement policies on an expedited basis at what would likely be a

significantly higher cost to their estates.  Accordingly, I believe that it is necessary for the Debtors to meet all Insurance Obligations with respect to the Insurance Programs.

154.    Accordingly, the relief requested in the Insurance Motion is not prejudicial to any party in interest and, in fact, only benefits the Debtors' estates and their creditors.  The Debtors submit, and I agree, that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors and parties-in-interest.

**Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Pay Prepetition Claims of Critical Vendors; (B) Authorizing Banks to Honor and Process Related Checks and Electronic Transfers; and (C) Granting Related Relief (the "Critical Vendor Motion")**

155.    Pursuant to the Critical Vendor Motion, the Debtors respectfully request entry of interim and final orders, (i) authorizing, but not directing, the Debtors, in their sole discretion (and subject to and in accordance with any orders authorizing postpetition financing and the use of cash collateral and the applicable budget thereunder), to pay critical vendors, including (without limitation) (a) certain domestic critical vendors and service providers (the "Domestic Critical Vendors," whose claims are the "Domestic Critical Vendor Claims"), (b) certain Shippers, Warehouseman and Statutory Lienholders (each as defined below) (collectively, the "Lienholders," whose claims are the "Lienholder Claims"), and (c) certain foreign vendors and service providers located outside the United States (the "Foreign Vendors," whose claims are the "Foreign Vendor Claims") (collectively, the "Critical Vendors," whose claims are the "Critical Vendor Claims"), collectively not to exceed an aggregate amount of $3,400,000 on an interim basis (the "Interim Critical Vendor Claims Cap") and $6,800,000 on a final basis (the "Final Critical Vendor Claims Cap" and, together with the Interim Critical Vendor Claims Cap, the "Critical Vendor Claims Cap"); (ii) authorizing financial institutions to honor and process checks

or electronic transfers used by the Debtors to pay the foregoing; and (iii) granting any additional relief as is necessary to effectuate the foregoing.

156.     In an exercise of their business judgment, the Debtors have determined that continuing to maintain a business relationship with certain Critical Vendors is necessary to the Debtors' ability to continue to operate their business as a going concern and to maximize value for all creditors.  If granted discretion to satisfy certain Critical Vendor Claims, as requested in the Critical Vendor Motion, the Debtors will assess, case by case and in real time, the benefits to their estates of paying each Critical Vendor Claim and will pay such claims only to the extent their estates will benefit.  The Debtors believe that unless they are able to exercise discretion to make these payments when necessary, the Critical Vendors may cease their business with the Debtors, or may otherwise take action to impede the Debtors' restructuring—a dire result for the Debtors and their stakeholders.

157.     The Debtors' ability to retain the confidence and loyalty of their Critical Vendors and to maintain their reputation within the automotive industry is essential.  The Debtors rely significantly on those third parties to generate revenue for their business.  Failing to pay the Critical Vendors for amounts owing prepetition may cause those vendors to cease providing goods or services to the Debtors.  The loss of such goods and services would cause immediate and irreparable harm to the Debtors' business.  Thus, with respect to such Critical Vendors, the Debtors are generally seeking to maintain the status quo by paying amounts owed in the ordinary course.

158.     To identify the Critical Vendors, the Debtors and their professionals reviewed their records with a focus on those third parties most essential to the Debtors' operations.  Interruption of these relationships would cause the Debtors irreparable harm and jeopardize the Debtors' ability to continue to operate their business in the ordinary course.  Having the discretion to pay Critical

Vendors would enhance the Debtors' ability to maintain the value of their business and thereby maximize value for the benefit of creditors and stakeholders.

159.    The Debtors seek the authority to pay, in their sole discretion and business judgment (subject to and in accordance with any orders authorizing postpetition financing and the use of cash collateral and the applicable budget thereunder) all or a portion of the Critical Vendor Claims.  The Debtors estimate that the amount of the Final Critical Vendor Claims Cap represents the maximum amount needed to pay the Critical Vendor Claims.  Of this amount, the Debtors estimate that the Interim Critical Vendor Claims Cap represents the maximum amount needed to pay Critical Vendor Claims before the final hearing.  The Final Critical Vendor Claims Cap represents the Debtors' best estimate as to how much must be paid to such creditors to ensure that they continue doing business with the Debtors.  The Debtors may pay less than the full requested amount.

160.    If authorized to pay the Critical Vendor Claims, the Debtors will use commercially reasonable efforts to require the applicable Critical Vendor to provide trade terms consistent with historical practice.  The Debtors therefore request authority, in their business judgment (subject to and in accordance with any orders authorizing postpetition financing and the use of cash collateral and the applicable budget thereunder), to condition payment on such Critical Vendor's entry into an agreement, substantially similar to the form of the letter attached to the Critical Vendor Motion, to (i) verify the amount owing to the specific Critical Vendor as of the Petition Date, (ii) accept such payment in satisfaction of all or a part of its claim, and (iii) continue maintaining its business relationship with the Debtors during these Chapter 11 Cases.

161.    The Critical Vendor Claims are summarized below.

### A.      Domestic Critical Vendor Claims

162.    The Debtors have determined that continuing to maintain a business relationship with certain Domestic Critical Vendors is essential to the Debtors' ability to continue to operate their business as a going concern and to maximize value for all creditors.  These Domestic Critical Vendors include, without limitation, (i) suppliers of component parts who have been certified as acceptable vendors by the Debtors' customers, (ii) sole-source suppliers of parts for equipment used in the manufacturing process, and (iii) service providers who provide services that the Debtors do not themselves provide, but are nonetheless necessary to create finished products for the Debtors' customers.

163.    The Debtors seek authorization, in their discretion, to pay certain Domestic Critical Vendor Claims up to $1,500,000 on an interim basis, and up to $3,000,000 on a final basis.

### B.      Lienholder Claims

164.    <u>Shippers and Warehousemen</u>.  In the ordinary course of business, the Debtors necessarily depend on an extensive shipping, warehousing, and distribution network to move goods to their factories and finished product to their customers.  The Debtors accordingly utilize the services of and make payments to commercial common carriers, dedicated carriers, movers, shippers, freight-forwarders, consolidators, delivery services, and other third-party service providers (collectively, the "<u>Shippers</u>") to ship, transport, and otherwise facilitate the movement of goods.  The Debtors also support their distribution capabilities by contracting with certain third-party warehousemen, distributors, and logistics providers who store goods in transit on behalf of the Debtors (the "<u>Warehousemen</u>").

165.    If the Debtors fail to pay any of the foregoing entities for charges incurred in connection with the transportation and storage of the Debtors' property, various statutes, tariffs, and agreements may permit the Shippers or Warehousemen, as applicable, to assert possessory

liens against or otherwise exercise control over the Debtors' (or their customers') property in their possession.  In addition, shipments may be stopped in transit or not released if customs duties are not paid by the Debtors or their customs agents when due in the ordinary course.  The successful operation of the Debtors' business, and thus their ability to maximize the value of their assets, depends on their ability to process such goods.

166.    <u>Other Potential Lienholders</u>.    In addition to the claims of Shippers and Warehousemen, the Debtors also from to time transact business with a number of other third parties (the "<u>Statutory Lienholders</u>") who, under applicable non-bankruptcy law, may have the potential to assert liens against the Debtors and their property if the Debtors fail to pay for goods and services rendered prior to the Petition Date.  Such Statutory Lienholders may have provided equipment and/or performed various services for the Debtors, including (i) providing equipment and parts necessary for the operation of the Debtors' factors and (ii) rendering essential services related to the operation of the Debtors' facilities, such as machine repair and maintenance.  The services and materials provided by the Statutory Lienholders cannot be easily replaced.

167.    As of the Petition Date, certain Statutory Lienholders may not have been paid in full for certain prepetition goods, equipment and services, which may result in such Statutory Lienholders asserting, and perfecting, statutory liens against the Debtors' facilities or the Debtors' goods or equipment, notwithstanding the automatic stay under section 362 of the Bankruptcy Code.  Furthermore, certain Statutory Lienholders may refuse to perform ongoing services to the Debtors, including manufacturing, installation, repair and servicing obligations, unless their claims are paid in full.

168.    If the Debtors are unable to pay the Lienholder Claims, they risk losing access to critical property, which could immediately and irreparably harm the Debtors to the detriment of

all stakeholders.  Accordingly, the Debtors seek authority, in their discretion, to pay and discharge, on a case-by-case basis, the Lienholder Claims that the Debtors believe have created, or could give rise to, a lien against the Debtors' property, regardless of whether the related Lienholders have already perfected their interests, where the Debtors determine, in their reasonable business judgment, that such payment is in the best interests of the Debtors' estates.

169.    The Debtors seek authorization, in their discretion, to pay certain Lienholder Claims up to $400,000 on an interim basis, and up to $800,000 on a final basis.

### C.    Foreign Vendor Claims

170.    In the ordinary course of business, the Debtors incur various obligations to Foreign Vendors that provide essential goods and services to the Debtors.  These Foreign Vendors include vendors located in Europe and Asia.  The crucial goods, materials, and services provided by the Foreign Vendors include the manufacturing of critical component parts needed for the Debtors' products.

171.    Certain of the Foreign Vendors have claims on account of goods or services provided to the Debtors and related to the Debtors' operations which were received by the Debtors before the Petition Date.  The Debtors estimate that, as of the Petition Date, the total outstanding amount owed to the Foreign Vendors is approximately $1,500,000.  However, the Debtors also expect that, as of the Petition Date, certain of the Foreign Vendors will have accrued but unbilled charges for goods or services, including for goods in transit (e.g., ocean freight).

172.    The Debtors believe that most, if not all, of the Foreign Vendors may not be familiar with chapter 11.  As a result, despite the commencement of these Chapter 11 Cases and the imposition of the automatic stay, in the event of nonpayment of prepetition amounts or upon learning of the commencement of these Chapter 11 Cases, these Foreign Creditors could take actions that would cause immediate and irreparable harm to the Debtors' operations.

173.    The Debtors are making every effort to avoid interruptions in their operations and the adverse effects that even a temporary break could have on their businesses.  The Debtors submit that it is especially important that they have the flexibility to deal with the Foreign Vendors. Foreign Vendors may have confused and guarded reactions to the U.S. bankruptcy process.  They are likely to be unfamiliar or uncomfortable with the unique debtor-in-possession mechanism that is at the heart of chapter 11.  Based on the reactions of foreign suppliers in other chapter 11 cases, there is a significant risk that the nonpayment of even a single invoice could cause a Foreign Vendor to stop providing goods and services to the Debtors on a timely basis or completely sever its business relationship with the Debtors.  If the Debtors were unable to obtain products and services from the Foreign Vendors on a timely basis or on commercially reasonable terms, the Debtors' operations would be severely harmed, diminishing the Debtors' chance of successfully reorganizing.

174.    The Debtors seek authorization, in their discretion, to pay certain Foreign Vendor Claims up to $1,500,000 on an interim basis, and up to $3,000,000 on a final basis.

175.    In light of the potential for serious and potentially irreparable consequences, the Debtors have determined, in the exercise of their business judgment, that payment of the Foreign Vendors' claims is essential.

176.    The Debtors submit, and I agree, that payment of the Critical Vendor Claims is necessary to the Debtors' efforts to maintain their operations and thereby maximize the value of their businesses in chapter 11.  If the Critical Vendor Motion is not granted, the Debtors submit, and I agree, that many of the Critical Vendors will refuse to do business with the Debtors.  Such a result would be extremely damaging to the Debtors and their estates.

**Debtors' Motion for Authority to (I) Maintain and Administer Prepetition Customer Programs, and (II) Pay and Honor Related Prepetition Obligations (the "Customer Programs Motion")**

177.    Pursuant to the Customer Programs Motion, the Debtors request authority to (i) maintain and administer the prepetition Customer Programs (defined below), and (ii) pay and honor related prepetition obligations, subject to and in accordance with the requirements imposed on the Debtors under any approved debtor-in-possession financing facility, any order authorizing postpetition financing and the use of cash collateral, and any budget in connection therewith; and (iii) continue during the postpetition period their prepetition practices with respect to the Customer Programs without further order of this Court

178.    In order to develop and sustain their positive reputation in the marketplace, the Debtors have dedicated extensive time and resources to creating and negotiating a variety of provisions into their contracts with customers (collectively, and as described further below, the "Customer Program") designed to acquire and retain customers, grow market share, and, ultimately, generate sales and enhance long-term viability.  The Debtors believe such practices have been successful business strategies that play an important role in the purchasing decisions and long-term confidence of customers within the Debtors' markets.

179.    The benefits of the Customer Programs are integral to the Debtors' efforts to maximize the value of the Debtors' estates for the benefit of all the stakeholders in these chapter 11 cases.  For the reasons set forth herein, the Debtors hereby seek authority to (i) maintain and administer the Customer Programs, and (ii) pay and honor related prepetition Customer Program obligations in the ordinary course of business.

180.    It is critically important to the Debtors' long-term viability that they maintain the loyalty and trust of their customers and protect their reputation, particularly while operating in

chapter 11.  The Debtors must be able to assure their customers, and send a strong message to the

marketplace, that they are willing and able to honor their prepetition obligations to their customers

and continue to maintain, implement, and administer their Customer Programs in the ordinary

course of business consistent with the same integrity and accountability for which they are known.

181.    The Debtors' Customer Programs are described below.

182.    <u>The Warranty Program</u>.  In the ordinary course of their business, the Debtors offer

their customers warranties on certain of their products.  Warranty claims are generally de minimis

in amount (typically $2,000 or less, and in many cases $200 or less).  However, the warranties are

an important part of the Debtors' business, as their customers' satisfaction and loyalty are critical

to the Debtors' ability to generate future revenue and sustain operations.  The Debtors estimate

that presently known warranty claims total approximately $500,000.  However, there may be

warranty owed to customers for which the Debtors are presently unaware, and certain customers

may assert warranty claims postpetition relating to the prepetition parts sales.

183.    <u>The Core Program</u>.  As is common with automotive parts manufacturers, the

Debtors offer customers a "core" refund program in connection with certain of their parts.  The

"core" program is a critical component of the Debtors' businesses.  When the Debtors sell certain

parts to a customer, the purchase price consists of a core charge.  The core charge is a refundable

amount that is effectively a deposit that is paid to the customer if the customer returns the part (the

"core").  If the customer fails to return the part, then it does not receive its core return fee.  Thus,

it is a similar concept to a bottle deposit but in a higher amount.

184.    The core program is critical to the Debtors' operations because the Debtors need

the cores to be able to remanufacture parts to sell those remanufactured parts back to its customers,

including the same customers that returned the cores to the Debtors.  The Debtors are contractually

obligated to meet certain volume thresholds for the supply of parts to its customers.  These contractual obligations specifically contemplate the remanufacturing of parts to be used to meet these supply demands.  The core program allows for the recycling of parts, and thus benefits the environment and saves the Debtors money by enabling the Debtors to use recycled cores rather than purchasing them from outside vendors.  Absent return of the cores, the Debtors would have to source the parts elsewhere and would likely have to pay a higher cost to obtain the parts it needs to then meet its customers' supply demands for remanufactured parts, which would in turn lower its profit margin and potentially delay the supply of critical parts to its customers.  Any delay in supplying parts to customers could damage the Debtors' reputation with its customers and harm the Debtors' estates.

185.    Moreover, the Debtors' competitors offer core programs to their customers.  Indeed, core programs are the industry norm.  Accordingly, failing to maintain the Debtors' core program would put them at a significant competitive disadvantage and cause substantial harm to the Debtors' business operations.

186.    The Debtors' core program also furthers the Debtors' goals to reduce the impact of emissions and to improve the environment.  Specifically, a substantial portion of the Debtors' businesses is its remanufacturing of parts.  Absent remanufacturing of these parts, the old parts would simply go to waste.  The Debtors' remanufacturing processes enable used parts to gain new life, which in turn reduces waste and helps to improve the environment.  The core program is critical to this remanufacturing life cycle, as absent the payment incentive to return the used parts, customers would have less motivation to do so.

187.     The majority of the Debtors' core payment obligations do not require out-of-pocket payments.  Rather, the core refund payments are deducted from future payment obligations by customers.

188.     <u>Misc. Customer Programs</u>.  In the ordinary course of their businesses, the Debtors provide account credits, refunds and related payments to customers.  Such programs are commonly offered in the Debtors' industry and allow the Debtors to maintain positive customer relations.

189.     For the reasons discussed herein and in the Customer Programs Motion, the Debtors respectfully submit, and I agree, that the relief requested therein is in the best interests of the Debtors, their estates and creditors, and therefore should be granted.

**Debtors' Motion for an Order Authorizing the Debtors to Redact Individual Stakeholders' Personally Identifiable Information (the "PII Motion")**

190.     By the PII Motion, the Debtors seek leave to redact the personally identifiable information of individual stakeholders – employees and equityholders, past, present or future – from filings in these Chapter 11 Cases.

191.     As set forth in the Motion, The Debtors respectfully submit that cause exists to authorize the Debtors to redact personally identifiable information—including email addresses and home addresses—in respect of the Debtors' individual stakeholders, including but not limited to their current and former employees and individual equityholders, from any paper filed or to be filed with the Court in these Chapter 11 Cases, including, but not limited to, the creditor matrix, list of equityholders, and schedules and statements, because such information could be used, among other things, to perpetrate identity theft and phishing scams or to locate survivors of domestic violence, harassment, or stalking.

192.    Given the very real risk of harm to these individuals, the Debtors respectfully submit, and I agree, that it is imperative to protect their personally identifiable information from public disclosure through the protections proposed by the PII Motion.

## IV.    CONCLUSION

193.    For the reasons described herein and in the First Day Motions, I believe that the prospect for achieving these objectives for the benefit of creditors and other stakeholders will be substantially enhanced if this Bankruptcy Court grants the relief requested in each of the First Day Motions and respectfully request the Bankruptcy Court to do so.

[*Signature on next page*]

Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 16, 2023.

*/s/ John Pinson*
John Pinson
Chief Executive Officer

## **Exhibit A**

**Organizational Chart**

30128897.1

# STANADYNE LEGAL STRUCTURE



30128897.1