# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| *In re* | Chapter 11 |
| **STANADYNE LLC, *et al.*,**[1] | Case No. 23-10207 (TMH) |
| **Debtors.** | (Jointly Administered) |
|  | **Hearing Date: May 18, 2023 at 11:30 a.m. (ET)** <br> **Objection Deadline:  May 11, 2023 at 4:00 p.m. (ET)** |

**DEBTORS' MOTION FOR ENTRY OF: (A) AN ORDER (I) SCHEDULING A HEARING ON THE APPROVAL OF THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL ENCUMBRANCES OTHER THAN ASSUMED LIABILITIES AND PERMITTED ENCUMBRANCES, AND THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (II) APPROVING CERTAIN BIDDING PROCEDURES AND ASSUMPTION AND ASSIGNMENT PROCEDURES, AND THE FORM AND MANNER OF NOTICE THEREOF, (III) AUTHORIZING THE DEBTORS TO ENTER INTO THE STALKING HORSE PURCHASE AGREEMENT, AND (IV) GRANTING RELATED RELIEF; AND (B) AN ORDER (I) APPROVING ASSET PURCHASE AGREEMENT, (II) AUTHORIZING THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL ENCUMBRANCES OTHER THAN ASSUMED LIABILITIES AND PERMITTED ENCUMBRANCES, (III) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (IV) GRANTING RELATED RELIEF**

The above captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>")

hereby submit this motion (this "<u>Motion</u>"), pursuant to sections 105, 363, 365, 503 and 507 of title

11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "<u>Bankruptcy Code</u>"), for the entry of:

(a) an order, substantially in the form attached hereto as **<u>Exhibit A</u>** (the "<u>Bidding Procedures</u>

<u>Order</u>"), (i) scheduling a hearing (the "<u>Sale Hearing</u>") on approval of the proposed sale (the "<u>Sale</u>"

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: Stanadyne LLC (0378); Pure Power Technologies, Inc. (5202); Stanadyne PPT Holdings, Inc. (2594); and Stanadyne PPT Group Holdings, Inc. (1734).  The Debtors' headquarters are located at 405 White Street, Jacksonville, North Carolina 28546.

of all or substantially all of the Debtors' assets (the "Assets"), free and clear of all encumbrances other than designated assumed liabilities and permitted encumbrances, to S-PPT Acquisition Company LLC (the "Stalking Horse Bidder") or, in the event the Stalking Horse Bidder is not the Successful Bidder (as defined herein), then to the Successful Bidder, and authorizing the assumption and assignment of certain executory contracts and unexpired leases in connection therewith; (ii) authorizing and approving certain bidding procedures for the Sale (collectively, the "Bidding Procedures," a copy of which is attached as **Exhibit 1** to the Bidding Procedures Order) and certain procedures for the assumption and assignment of the executory contracts and unexpired leases (collectively, and as more specifically set forth in the Bidding Procedures Order, the "Assumption Procedures"), and the form and manner of notice thereof; (iii) authorizing and approving the Debtors' entry into an Asset Purchase Agreement (the "Stalking Horse Purchase Agreement") with the Stalking Horse Bidder; and (iv) granting related relief; and (b) an order (the "Sale Order") (i) authorizing and approving the Sale on the terms contemplated in the Stalking Horse Purchase Agreement or, in the event the Stalking Horse Bidder is not the Successful Bidder, then an alternative asset purchase agreement ("Alternative APA") with the Successful Bidder and the Sale Order; (ii) authorizing and approving the assumption and assignment of certain executory contracts and unexpired leases in connection therewith (the "Assigned Contracts"); and (iii) granting related relief.  In support of this Motion, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

1.      The Debtors commenced these Chapter 11 Cases to, among other things, ensure that a value-maximizing outcome was realized for the Debtors' constituents.  Facing severe liquidity constraints, unmanageable secured debt obligations, and high interest rates, the Debtors

determined that a Court-supervised process would give the company the best opportunity to thrive on a go-forward basis.

2.    Since the Petition Date (as defined below), the Debtors have focused on stabilizing their operations and pivotal vendor relationships, while working constructively with the major constituents in this matter, including Cerberus Business Finance, LLC, as administrative agent and collateral agent for the Prepetition Secured Lenders (collectively, "Cerberus" or the "Prepetition Agent") and the Official Committee of Unsecured Creditors (the "Committee"), to pave that path for a value-maximizing resolution.

3.    Among other things, the Debtors have retained an experienced investment banker with significant experience in the automotive industry, Angle Advisors LLC ("Angle"), to market and solicit interest in the Debtors' assets.  At this juncture, while Angle continues to conduct its due diligence and inform the market of the value proposition available to third parties, the Debtors have begun negotiating a stalking horse asset purchase agreement with Cerberus.  As part of a broader agreement related to the ongoing consensual use of cash collateral, the Debtors have committed to executing a stalking horse purchase agreement with Cerberus (or an affiliated entity to be established for purposes of this sale), and designating that bid as the stalking horse, no later than May 5, 2023.  Notably, Cerberus will not be seeking any bid protections in connection with its stalking horse bid, and the Debtors seek the relief requested in this Motion to ensure that a timely and thorough sale process is implemented, and alternative purchasers understand the metrics and terms of the stalking horse arrangement when framing competitive offers for the subject assets.  The Debtors believe that the proposed procedures outlined herein are reasonable, value-maximizing and in the best interest of the estates and all interested parties.

## JURISDICTION AND VENUE

4.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  The Debtors confirm their consent, pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

5.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

6.      The statutory and legal predicates for the relief sought herein are sections 105, 363, 365, 503 and 507 of the Bankruptcy Code, Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 2002-1 and 6004-1.

## BACKGROUND

7.      On February 16, 2023 (the "Petition Date"), the Debtors commenced these bankruptcy cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").  On March 6, 2023, the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed the Committee [Docket No. 78].  No request has been made for the appointment of a trustee or examiner.

8.      The events leading up to the Petition Date and the facts and circumstances supporting the relief requested herein are set forth in the *Declaration of John Pinson, Chief Executive Officer of Stanadyne LLC, in Support of First Day Relief* [Docket No. 12].

**THE SALE PROCESS**

9.      The Debtors hereby seek authority to implement certain procedures and, ultimately, consummate a sale of all or substantially all of the Assets that will maximize recoveries for the Debtors' estates, maintain a viable business, and ensure the continued employment of hundreds of current employees.  As part of its agreement to allow continued consensual use of cash collateral, Cerberus agreed to serve as the Stalking Horse Bidder for the Assets and the Debtors, in turn, agreed to file this Motion and trigger the sale process in earnest.

10.      Angle has been conducting extensive due diligence on the Assets and the Debtors' operations since being retained, and remains actively involved with many interested parties which have expressed preliminary interest in acquisition opportunities.  Notwithstanding the contemplated stalking horse arrangement with Cerberus, Angle will continue to canvas the market for viable, value-maximizing proposals that will benefit all interested parties.

**A.      Use of Cash Collateral and Sale Timeline**

11.      Following arms'-length negotiations, the Debtors and the Prepetition Secured Parties[2] recently reached agreement on a case timeline that adequately balances the Debtors' need to execute a robust marketing process for the Assets with the need of their secured lender to have certainty on how and when the Debtors' assets will be monetized (the "Sale Process").  To that end, the Debtors respectfully request, pursuant to this Motion, a hearing to be held no later than May 18, 2023, to consider approval of the Bidding Procedures, consistent with the milestones (the "Transaction Milestones") approved by that certain *Final Order (I) Authorizing the Use of Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Lenders,*

---

[2]      As defined in the Cash Collateral Order (defined below).

*and (III) Granting Related Relief* [Docket No. 218] (the "Cash Collateral Order") entered on April

19, 2023, and summarized below:

| Event | Due Date |
|---|---|
| **Entry of an Order Approving the Retention of Angle Advisors LLC as Investment Banker to the Debtors** | No later than April 18, 2023 |
| **Entry into an asset purchase agreement with Cerberus as Stalking Horse** | No later than May 5, 2023 |
| **Entry of an order approving the Bidding Procedures** | No later than May 18, 2023 |
| **Deadline for submitting Qualified Bids** | No later than June 21, 2023 |
| **Commencement of an Auction (if necessary)** | No later than June 28, 2023 |
| **Sale Hearing** | No later than July 10, 2023 |
| **Entry of an Order Approving the Sale** | No later than July 11, 2023 |
| **Consummation of the Sale** | No later than July 25, 2023 |

## C.     Proposed Sale Process

12.     Among other things, the Sale Process will provide a transparent and

comprehensive avenue through which the Debtors will seek bids for the Assets.  In connection

with the Sale Process, Cerberus, as Stalking Horse Bidder, will have the right to submit a credit

bid for the Assets in the form of the Stalking Horse Purchase Agreement, to be executed and

designated on the docket as the stalking horse agreement no later than May 5, 2023.

13.     The contemplated Stalking Horse Purchase Agreement will serve as the

baseline for all prospective bidders to negotiate from, and will be subject to higher or otherwise

better bids for the Assets pursuant to the Bidding Procedures.  Thus, upon the completion of the

Sale Process, the Debtors will have fully market tested the value of their Assets.

14.     In furtherance of Angle's ongoing efforts to actively market the Assets for

sale, and consistent with the Transaction Milestones and the contemplated Stalking Horse Purchase

Agreement, the Debtors have filed this Motion seeking authority to proceed with a bidding and

auction process to consummate a sale (or series of sales) that the Debtors expect will generate

maximum value for their Assets.  To facilitate the Sale, the Debtors, in consultation with Angle and their other professional advisors, have developed certain customary bidding procedures (i.e., the Bidding Procedures) to preserve flexibility in the Sale Process, generate the greatest level of interest in the Assets, and result in the highest or otherwise best value for those Assets.  Among other things, these procedures, in the Debtors' business judgment, create an appropriate timeline for the Sale Process, consistent with the Transaction Milestones and the contemplated Stalking Horse Purchase Agreement.

## STALKING HORSE PURCHASE AGREEMENT[3]

15.     The Debtors are in the process of negotiating, on a good faith and arms-length basis, the Stalking Horse Purchase Agreement with Cerberus as the Stalking Horse Bidder. The Debtors will file the finalized Stalking Horse Purchase Agreement with the Court no later than May 5, 2023, absent an extension consistent with paragraph 8(b) of the Cash Collateral Order.  The Debtors believe that consummation of the Stalking Horse Purchase Agreement, subject to higher or otherwise better offers, will maximize value for the Debtors' estates, provide for the continuation of the jobs of a significant portion of the Debtors' employees, and afford the Debtors the best possible opportunity to continue to service their customers and maintain business relationships with their vendors.

16.     As noted above, the Stalking Horse Bidder will have the right to credit bid any portion or all of its outstanding Prepetition Obligations (as defined in the Cash Collateral Order) to acquire the Assets.  It is currently contemplated that the Stalking Horse Bidder will

---

[3] Any summary of the Stalking Horse Purchase Agreement contained herein is qualified in its entirety by the actual terms and conditions of the Stalking Horse Purchase Agreement.  To the extent that there is any conflict between any summary contained herein and the actual terms and conditions of the Stalking Horse Purchase Agreement, the actual terms and conditions of the Stalking Horse Purchase Agreement shall control.

30300142.7

provide consideration of $225,000,000 (which amount will be satisfied by way of (A) an amount to be offset against the Prepetition Secured Obligations held by the Prepetition Secured Lenders pursuant to section 363(k) of the Bankruptcy Code and (B) the assumption of the Restructured Indebtedness (as defined in the Stalking Horse Purchase Agreement) (if any) at closing; assuming certain liabilities; and providing additional consideration for the estates.

17.    As discussed throughout this Motion, the Bidding Procedures have been designed with the objective of generating the greatest level of interest in and best value for the Assets, while allowing the Debtors to close the Sale in a timely and efficient manner.  The Debtors and their professional advisors are confident that the Bidding Procedures and the other relief requested herein, including entry into the Stalking Horse Purchase Agreement, will facilitate the sale of the Assets for the highest or otherwise best value, preserve as many jobs as possible for their dedicated employees, afford the Debtors the best possible opportunity to continue their relationships with their customers and vendors, and otherwise maximize recoveries for all stakeholders.  Finally, the robust auction and sale process contemplated by the Bidding Procedures will also serve as a market test to ensure that the Stalking Horse Purchase Agreement is a value-maximizing transaction.

18.    The Stalking Horse Bidder will be deemed to be a Qualified Bidder (as defined below) and the Stalking Horse Purchase Agreement will be deemed to be a Qualified Bid (as defined below).  Subject to the Cash Collateral Order, the Stalking Horse Bidder is credit bidding pursuant to and subject to 11 U.S.C. § 363(k), and thus is not required to make a Deposit (as defined below) with the Debtors.  The Stalking Horse Bidder shall have the unqualified right at any time to credit bid on a dollar-for-dollar basis up to the full amount of the Prepetition Obligations (up to the amount outstanding as of the projected closing date of the Sale (including

30300142.7

but not limited to, principal, accrued and unpaid interest (including postpetition interest to the extent provided in paragraph 4(e) of the Cash Collateral Order) and all outstanding fees and expenses and other amounts owed under the Loan Documents (as defined in the Cash Collateral Order)).  Upon executing the Stalking Horse Purchase Agreement, the Debtors will file a notice on the docket in these cases designating Cerberus as the Stalking Horse Bidder and, therein, the Debtors will provide a summary chart in accordance with Local Rule 6004-1(b)(iv) highlighting the material terms of the Stalking Horse Purchase Agreement.

### **BIDDING PROCEDURES**[4]

19.    The Debtors are in the process of soliciting bids for all of the Assets, or any number or combination thereof, in accordance with the Bidding Procedures.  The Bidding Procedures describe, among other things, (i) the Assets available for sale, (ii) the manner in which bids become "qualified," (iii) the coordination of diligence efforts among the bidders and the Debtors, (iv) the receipt and negotiation of bids received, (v) the conduct of any Auction, and (vi) the selection and approval of the Successful Bidder and the selection of the Back-Up Bidder (as defined below).  The Bidding Procedures reflect the Debtors' objective of conducting the Sale Process in an orderly, fair and open manner, while ensuring that the highest or best bid is generated for the Assets.

20.    Certain of the key terms of the Bidding Procedures, which shall apply to Potential Bidders, Qualified Bidders, the submission, receipt, and analysis of all bids relating to the Sale, and the conduct of the Sale and the Auction, are included below:

---

[4]    Any summary of the Bidding Procedures contained herein is qualified in its entirety by the actual terms and conditions of the Bidding Procedures as provided for in the Bidding Procedures Order.  To the extent that there is any conflict between any summary contained herein and the actual terms and conditions of the Bidding Procedures as provided for in the Bidding Procedures Order, the actual terms and conditions of the Bidding Procedures as provided for in the Bidding Procedures Order shall control.

30300142.7

(a)   Participation Requirements.  To receive due diligence information, including full access to the Debtors' electronic data room and to additional non public information regarding the Debtors, a potential bidder (each, an "Interested Party") must have delivered to each of:  (i) counsel to the Debtors: Hughes Hubbard & Reed LLP, One Battery Park Plaza, 16th Floor, New York, NY 10004 (Attn: Chris Gartman, Esq. (chris.gartman@hugheshubbard.com) and Katie Coleman, Esq. (Katie.coleman@hugheshubbard.com)); Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801 (Attn: Michael R. Nestor, Esq. (mnestor@ycst.com), Andrew L. Magaziner, Esq. (amagaziner@ycst.com) and Ashley E. Jacobs, Esq. (ajacobs@ycst.com)); and (ii) investment banker to the Debtors: Angle Advisors LLC, Cliff Roesler (croesler@angleadvisors.com) and Michael McCoy (mmcoy@angleadvisors.com), the following documents (the "Preliminary Bid Documents"):

> (i) an executed confidentiality agreement on terms reasonably acceptable to the Debtors and the Prepetition Agent;

> (ii) a statement and other factual support demonstrating to the Debtors' satisfaction, in consultation with the Consultation Parties, in the exercise of their reasonable business judgment that the Interested Party has a bona fide interest in purchasing some or all of the Assets; and

> (iii) preliminary proof by the Interested Party of its financial capacity to close the Interested Party's proposed Transaction(s), which may include financial statements of, or verified financial commitments obtained by, the Interested Party (or, if the Interested Party is an entity formed for the purpose of acquiring the desired Assets, the party that will bear liability for a breach), the adequacy of which will be assessed by the Debtors in consultation with their advisors.

Only those Interested Parties who have submitted acceptable Preliminary Bid Documents (each, a "Potential Bidder") may submit bids.  For the avoidance of doubt, the Stalking Horse Bidder has been deemed to be a Qualified Bidder (as defined below) and is not required to provide any of the foregoing Preliminary Bid Documents.

(b)   Bid Deadline.  A Potential Bidder that desires to make a proposal, solicitation, or offer for the Assets (each, a "Bid") shall transmit such Bid via email (in .pdf format) so as to be actually received on or before June 21, 2023 at 5:00 p.m. (prevailing Eastern Time) by the Debtors' Representatives at the address listed below.

> (i) the Debtors: 405 White Street, Jacksonville, North Carolina 28546, Attn: Mr. Costas Loukellis;

> (ii) counsel to the Debtors: Hughes Hubbard & Reed LLP, One Battery Park Plaza, 16th Floor, New York, NY 10004 (Attn: Chris Gartman, Esq. (chris.gartman@hugheshubbard.com) and Katie Coleman, Esq.

(Katie.coleman@hugheshubbard.com)); Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801 (Attn: Michael R. Nestor, Esq. (mnestor@ycst.com), Andrew L. Magaziner, Esq. (amagaziner@ycst.com) and Ashley E. Jacobs, Esq. (ajacobs@ycst.com));

(iii)    investment banker to the Debtors: Angle Advisors LLC, 101 Southfield Road, 2nd Floor, Birmingham, MI 48009 (Attn: Cliff Roesler (croesler@angleadvisors.com) and Michael McCoy (mmcoy@angleadvisors.com));

(iv) counsel to the Committee: Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, NY 10036 (Attn: Adam C. Rogoff, Esq. (arogoff@kramerlevin.com)); Morris James LLP, 500 Delaware Avenue, Suite 1500, Wilmington, Delaware 19801 (Attn: Jeffrey R. Waxman, Esq. (jwaxman@morrisjames.com) and Eric J. Monzo, Esq. (emonzo@morrisjames.com)); and

(v) counsel to the Prepetition Agent: KTBS Law LLP, 1801 Century Park East, 26th Floor, Los Angeles, CA 90067 (Attn: Michael L. Tuchin, Esq. (mtuchin@ktbslaw.com), David A. Fidler, Esq. (dfidler@ktbslaw.com), Nir Maoz, Esq. (nmaoz@ktbslaw.com)); Pachulski Stang Zhiehl & Jones LLP, (Attn: Laura Davis Jones, Esq. (ljones@pszjlaw.com), Timothy P. Cairns, Esq. (tcairns@pszjlaw.com)).

(c)    <u>Bid Requirements</u>. Each Bid by a Potential Bidder (a "<u>Bidder</u>") must be submitted in writing and satisfy the following requirements (collectively, the "<u>Bid Requirements</u>").

(i) <u>Purpose</u>. The Bid must clearly identify the following: (i) the particular Assets, or the portion thereof, identified with reasonable specificity, to be acquired, including, without limitation, each and every executory contract and unexpired lease to be assumed by the Debtors and assigned and sold to the Bidder; and (ii) the liabilities and obligations to be assumed, including any debt to be assumed.

(ii) <u>Deposit</u>. Each Bid must be accompanied by a cash deposit in the amount equal to 10% of the aggregate cash portion of the purchase price of the Bid to be held in escrow by the Debtors (the "<u>Deposit</u>"); provided that the Stalking Horse Bidder will not be required to provide a deposit with respect to the Stalking Horse Purchase Agreement.

(iii) <u>Total Consideration</u>. Each Bid must identify the form and amount of the total consideration to be provided to the Debtors in cash and non-cash components to be paid, including assumed liabilities (the "<u>Bid Value</u>").

(iv) <u>Minimum Bid</u>. The Bid Value proposed by each Bid (or sum of Bids

for different Assets) must be equal to, or exceed, the sum of (i) $225,000,000 in cash; plus (ii) assumption of those Assumed Liabilities in the Stalking Horse Purchase Agreement that the Stalking Horse Bidder has agreed to pay or assume or the cash equivalent of such amount; plus (iii) cash equal to the "Transaction Fee" due to Angle Advisors based on the Bid, plus (iv) the minimum overbid amount of $2,000,000.

(v) Marked Agreement.  Each Bid must include a signed asset purchase agreement, together with all exhibits and schedules thereto, pursuant to which the Qualified Bidder proposes to effectuate the Transaction (collectively, the "Transaction Documents"), along with a redline version of such agreement relative to the Stalking Horse Purchase Agreement (the form of which will be provided to any Potential Bidder before the Bid Deadline).

(vi) Tax Structure; Structure.  The Bid must specify with particularity its tax structure, including whether it is intended to be structured in a tax-free manner or if the Debtors, under the Bid, will incur any incremental tax liabilities.   The Bid must also identify the structure proposed for undertaking the Transaction, including the specific Assets being acquired and liabilities being assumed, the proposed steps to accomplish such acquisition, and any financial, legal, or tax considerations upon which the Bid's proposed structure relies.

(vii) Timeline to Close.  The Bid must provide a commitment to close no later than the deadline for the Stalking Horse Bidder to close in the Stalking Horse Purchase Agreement.

(viii) Outside Date.  The Bid must include a signed writing stating that the Bidder's offer is irrevocable until the selection of the Successful Bidder, provided that if such Bidder is selected as the Successful Bidder or the Back-Up Bidder (each, as defined below) its offer shall remain irrevocable until the later of (i) the closing of the Transaction with the Successful Bidder or the Back-Up Bidder, and (ii) August 15, 2023 (the "Outside Date"); *provided* that for the avoidance of doubt, the Outside Date for the Stalking Horse Bidder shall be as set forth in the Stalking Horse Purchase Agreement.

(ix) Sources of Financing; Adequate Assurance.  To the extent that a Bid is not accompanied by evidence of the Bidder's capacity to consummate the proposed Transaction(s) set forth in its Bid with cash on hand, each Bid must contain written evidence of a commitment for financing or other evidence of the ability to consummate the Transaction at the Purchase Price (including sufficient financial or other information to establish adequate assurance of future performance pursuant to section 365(f)(2) of the Bankruptcy Code and, if applicable, section 365(b)(3) of the Bankruptcy Code to the non-Debtor counterparties to any executory contracts and

unexpired leases to be assumed by the Debtors and assigned and sold to the Bidder in connection with the proposed transaction) satisfactory to the Debtors in their reasonable discretion, after consultation with the Consultation Parties, with appropriate contact information for such financing sources.

(x) <u>No Financing Approval or Diligence Outs</u>.  A Bid shall not be conditioned on the obtaining or the sufficiency of financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy at the closing of specified representations and warranties or the satisfaction at the closing of specified conditions.

(xi) <u>Employees</u>.  A Bid shall contain a detailed description of how the Bidder intends to treat current employees of the Debtors.

(xii) <u>Authorization</u>.  Each Bid must contain evidence that the Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Debtors) with respect to the submission of its Bid and the consummation of the Transactions contemplated in such Bid.

(xiii) <u>Disclaimer of Fees</u>.  Each Bid must disclaim any right to receive a fee analogous to any break-up fee, termination fee, expense reimbursement or similar type of payment.

(xiv) <u>Identity</u>.  Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder or other financial backer of the Bidder, including if such Bidder is an entity formed for the purpose of consummating the proposed Transaction contemplated by such Bid), and the complete terms of any such participation.  Under no circumstances shall any undisclosed principals, equity holders, or financial backers be associated with any Bid.  Each Bid must also include contact information for the specific person(s) and counsel whom the Debtors or their advisors should contact regarding such Bid.  Nothing herein shall preclude multiple Bidders from submitting a joint Bid, subject to the Debtors' prior written consent to such submission and the disclosure requirements set forth herein.

(xv) <u>Consent to Jurisdiction</u>.  The Bidder must submit in writing to the exclusive jurisdiction of the Court (and to the Court entering a final judgment) and waive any right to a jury trial in connection with any disputes relating to Debtors' qualification of Bids, the Auction, the construction and enforcement of the Bidding Procedures, and the Transaction documents and the closing, as applicable.

(xvi) <u>No Collusion</u>.  The Bidder must acknowledge in writing (i) that it has not engaged in any collusion with respect to any Bids or the Transaction,

specifying that it did not agree with any other party, including, but not limited to, any other Potential Bidders or interested third parties, to control price or exert undue influence over the process; and (ii) agree not to engage in any such collusion or undue influence with respect to any Bids, the Auction, the Transaction, or the sale process.

(xvii) <u>Good Faith Offer</u>.  The Bid must constitute a good faith, bona fide offer to effectuate the Transaction.

(xviii) <u>As-Is, Where-Is</u>.  Each Bid must include a written acknowledgement and representation that the Bidder: (1) has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its offer; (2) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Assets in making its Bid; and (3) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Transaction Documents.

By submitting its Bid, each Bidder is agreeing, and shall be deemed to have agreed, to abide by and honor the terms of the Bidding Procedures, to waive the right to pursue a substantial contribution claim under section 503 of the Bankruptcy Code related in any way to the submission of its Bid, the Bidding Procedures, and the sale process for the Assets, and to refrain from submitting a Bid or seeking to reopen the Auction after conclusion of the Auction.  **The submission of a Bid shall constitute a binding and irrevocable offer to acquire the applicable Assets as reflected in such Bid.**  As soon as reasonably practicable following the designation of a Bid as a Qualified Bid in accordance with the Bidding Procedures, the Debtors shall notify each Bidder of such designation.  Within one (1) day of receiving a Bid, the Debtors shall share such Bid with the Consultation Parties.

(d)     <u>Designation of Qualified Bidders</u>.  A qualified bidder ("<u>Qualified Bidder</u>") is a Bidder that, in the Debtors' reasonable determination in consultation with the Consultation Parties, (i) has timely submitted a Bid that satisfies each of the Bid Requirements and (ii) is able to consummate the proposed transaction within the required timeframe if selected as the Successful Bidder (such Bid submitted by a Qualified Bidder, a "<u>Qualified Bid</u>").  The Debtors may accept as a single Qualified Bid multiple bids for non-overlapping material portions of the Assets such that, when taken together in the aggregate, such bids would otherwise meet the standards for a single Qualified Bid.

No later than 5:00 p.m. (prevailing Eastern Time) on June 23, 2023, the Debtors will determine in consultation with the Consultation Parties, whether such Bidder is a Qualified Bidder, and notify the Bidder of such determination.

For the avoidance of doubt, (i) the Stalking Horse Bidder is a Qualified Bidder, (ii)

the Stalking Horse Purchase Agreement is a Qualified Bid, and (iii) the Stalking Horse Bidder is authorized to submit any Overbids (as defined below) during the Auction, in each instance without further qualification required of the Stalking Horse Bidder.

If no Qualified Bids (other than the Stalking Horse Purchase Agreement) are received by the Bid Deadline, then the Stalking Horse Bidder will be deemed the Successful Bidder, the Stalking Horse Purchase Agreement will be the Successful Bid, no Auction will be held, and the Debtors will as expeditiously as possible seek final Court approval of the sale of the Purchased Assets to the Stalking Horse Bidder as contemplated by the Stalking Horse Purchase Agreement.

(e)     Auction.  If the Debtors receive one or more Qualified Bids in addition to the Stalking Horse Purchase Agreement, the Debtors will conduct the Auction to determine the highest or otherwise best bid with respect to the Assets.  The Auction will commence on June 28, 2023 at 10:00 a.m. (prevailing Eastern Time) at the offices of Hughes Hubbard & Reed LLP, One Battery Park Plaza, New York, NY 10004, or on such other date and/or at such other location as determined by the Debtors in consultation with the Consultation Parties with the prior written consent of the Prepetition Agent (provided that the Prepetition Agent's and Stalking Horse Bidder's respective rights under the Stalking Horse Purchase Agreement and Cash Collateral Order shall remain unaffected).

Before commencement of the Auction, the Debtors will (i) notify all Qualified Bidders, the U.S. Trustee, the Committee, and the Prepetition Agent (collectively, but excluding the Qualified Bidders other than the Stalking Horse Bidder, the "Notice Parties") in writing of the highest or otherwise best Qualified Bid, as determined in the Debtors' business judgment, in consultation with the Consultation Parties (the "Baseline Bid"), and (ii) provide copies (to the extent not previously provided) of the documents supporting the Baseline Bid to all Qualified Bidders and Notice Parties.  The determination of which Qualified Bid constitutes the Baseline Bid, and which Qualified Bid constitutes the highest or otherwise best bid such that it is the Successful Bid (as defined below), shall take into account: (a) the type and amount of Assets sought to be purchased in the Bid; (b) the amount and nature of the total consideration; (c) the likelihood of the Bidder's ability to close a transaction and the timing thereof; and (d) the net economic effect of any changes to the value to be received by the Debtors' estates from the transaction contemplated by the Qualified Bid.

If there is an Auction, it will be conducted in accordance with the following procedures:

(i) Only a Qualified Bidder that has submitted a Qualified Bid will be eligible to participate at the Auction.  Only the authorized representatives of each of the Qualified Bidders (including the Stalking Horse Bidder), the Debtors, the Committee (including its counsel), and the Prepetition Agent (including its counsel) will be permitted to attend the Auction; provided,

however, that any Qualified Bidder other than the Stalking Horse Bidder that, at any point during the auction, declines to submit an Overbid as set forth below and thereby withdraws from continued participation in the Auction, shall not be permitted to attend the remainder of the Auction.

(ii) At least one (1) business day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Debtors whether it intends to attend the Auction and all Qualified Bidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder in attendance at the Auction in person; provided that in the event a Qualified Bidder elects not to attend the Auction, such Qualified Bidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Bidder.

(iii) Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that (i) it has not engaged in any collusion with respect to the bidding, and (ii) its Qualified Bid is a good faith bona fide offer and it intends to consummate the proposed Transaction if selected as the Successful Bidder.

(iv) The Debtors and their professionals will direct and preside over the Auction. At the start of the Auction, the Debtors will describe the terms of the Baseline Bid. All Bids made thereafter must be Overbids and will be made and received on an open basis, and all material terms of each Bid will be fully disclosed to all other Qualified Bidders. The Debtors will maintain a transcript of all Bids made and announced at the Auction, including the Baseline Bid, all Overbids, the Successful Bid, and the Back-Up Bid (as defined below).

(v) During the Auction, bidding will begin initially with the Baseline Bid and subsequently continue in minimum increments of at least $500,000 in cash (each, an "Overbid"); provided, however, that the Stalking Horse Bidder may satisfy the minimum bid increment requirement by credit bidding at least $500,000 of outstanding Prepetition Obligations (up to the amount outstanding as of the projected closing date of the Sale (including but not limited to, principal, accrued and unpaid interest (including postpetition interest to the extent provided in the Cash Collateral Order), and all outstanding fees and expenses and other amounts owed under the Loan Documents (as defined in the Cash Collateral Order)) that do not already form a part of the purchase price under the Stalking Horse Purchase Agreement. The Debtors will announce at the Auction the material terms of each Overbid, value each Overbid in accordance with these Bid Procedures and provide each Qualified Bidder with an opportunity to make a subsequent Overbid. Subject to the requirement (other than with regard to the Stalking Horse Bidder) that each Overbid include at least $500,000 in cash more than the cash component of the Baseline Bid or prevailing Overbid, additional consideration in excess of the amount set forth in the

30300142.7

Baseline Bid or the prevailing Overbid may include cash and/or other consideration in accordance with these procedures.  To the extent that an Overbid has been accepted entirely or in part because of the addition, deletion, or modification of a provision or provisions in the applicable Transaction Documents or the Stalking Horse Purchase Agreement, the Debtors will provide notice to each participant of the value ascribed by the Debtors to any such added, deleted, or modified provision or provisions, with such value being determined by the Debtors in consultation with the Consultation Parties.  The Debtors, with the consent of the Consultation Parties, shall have the right to establish different Overbids with respect to any bids for some but not all of the assets.

(vi) Any Overbid made from time to time by a Qualified Bidder must remain open and binding on the Qualified Bidder until and unless (i) the Debtors accept a Bid submitted by another Qualified Bidder during the Auction as an Overbid and (ii) such prior Overbid is not selected as the Back-Up Bid. To the extent not previously provided (which will be determined by the Debtors in consultation with the Consultation Parties), a Qualified Bidder submitting an Overbid must submit at the Debtors' request (in consultation with the Consultation Parties), as part of its Overbid, written evidence (in the form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors in consultation with the Consultation Parties) demonstrating such Qualified Bidder's ability to close the transaction at the purchase price contemplated by such Overbid.

The Debtors (in consultation with the Consultation Parties) reserve the right to make one or more adjournments in the Auction to, among other things (i) facilitate private discussions with individual Qualified Bidders and negotiate the terms of their Overbids, (ii) allow individual Qualified Bidders to consider how they wish to proceed, and (iii) give Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors may require in their reasonable discretion (and in consultation with the Consultation Parties) to determine that the Qualified Bidder has sufficient internal resources, or has received sufficient non-contingent debt and/or equity funding commitments, to consummate the proposed transaction at the prevailing Overbid amount.

(f)     <u>Selection of Successful Bid</u>.  The Auction shall continue until there is only one Qualified Bid that the Debtors determine, in the exercise of their reasonable business judgment, in consultation with the Consultation Parties, to be the highest or otherwise best bid submitted by a Qualified Bidder during the Auction for the Assets (the "<u>Successful Bid</u>") and the next highest or otherwise best bid after the Successful Bid (the "<u>Back-Up Bid</u>"), at which point the Auction will be closed; provided that the Auction shall not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid at the Auction to the then prevailing highest or otherwise best Bid.  Such acceptance by the Debtors of the Successful Bid is conditioned upon approval by the Court of the Successful Bid.

The Qualified Bidder that submits the Successful Bid will be deemed the "Successful Bidder." The Qualified Bidder that submits the Back-Up Bid, if any, will be deemed the "Back-Up Bidder"; provided, however, that if the Debtors indicate that they have identified a Bid of the Stalking Horse Bidder as the next highest or otherwise best bid after the Successful Bid, (i) the Stalking Horse Bidder shall not be required, under any circumstances, to serve as the Back-Up Bidder, but may, at its option, choose to do so, and (ii) if a Bid of another party (other than the Successful Bid and the Stalking Horse Bid) remains open, the Stalking Horse Bidder may, at its option, decline to serve as the Back-Up Bidder in favor of the next highest or otherwise best bid if one exists.

The Back-Up Bid, if any, will remain open and binding on the Back-Up Bidder until consummation of the Successful Bid with the Successful Bidder. If the Successful Bidder fails to consummate the Successful Bid within the time set forth therein, the Debtors will be authorized, but not required, in consultation with the Consultation Parties, to select the Back-Up Bidder, if any, as the new Successful Bidder, in which case the Debtors shall proceed to consummate the Successful Bid of the new Successful Bidder.

Within one (1) business day after conclusion of the Auction, the Debtors shall file a notice with the Bankruptcy Court identifying the Successful Bidder and the Back-Up Bidder, if any.

(g)    Sale Hearing. The Sale Hearing to consider approval of the sale of assets pursuant to the Successful Bid will be held before the Court on **July 10, 2023** and otherwise in accordance with any scheduling order entered by the Court; provided that if no Auction is held, the Debtors shall schedule the Sale Hearing before such time and as expeditiously as possible. Prior to the Hearing, the Successful Bidder (unless the Successful Bidder is the Stalking Horse Bidder) shall complete and execute all documents evidencing and containing the terms and conditions upon which the Successful Bid was made.

The Hearing may be adjourned or rescheduled by the Debtors with the consent of the Prepetition Agent and the Consultation Parties (provided that the Prepetition Agent's and Stalking Horse Bidder's respective rights under the Stalking Horse Purchase Agreement and Cash Collateral Order shall remain unaffected) to a time and date consistent with the Court's calendar, as set forth in a notice on the docket of these chapter 11 cases, a notice of agenda, or stated orally at the Hearing.

(h)    Return of Deposit. The Deposit of the Successful Bidder shall be applied to the purchase price of such transaction at closing. The Deposits for each Qualified Bidder (other than the Successful Bidder and the Back-Up Bidder) shall be returned on the date that is five (5) business days after the Auction, or as soon as is reasonably practicable thereafter. The Debtors shall return the Deposit of the Back-Up Bidder by the earlier of (i) thirty (30) days after the conclusion of the Auction and (ii) five (5) business days after the consummation of the Successful Bid, unless by such date the Debtors have selected the Back-Up Bidder as the new Successful

Bidder.

Notwithstanding the foregoing, if a Successful Bidder fails to consummate a proposed transaction because of a breach by such Successful Bidder, the Debtors will not have any obligation to return the Deposit deposited by such Successful Bidder, which may be retained by the Debtors as damages, in addition to any and all other rights, remedies, or causes of action that may be available to the Debtors, and the Debtors shall be free to consummate the proposed transaction with the applicable Back-Up Bidder without the need for an additional hearing or order of the Court.

(i)    Consultation Parties/Expedited Relief.  The term "Consultation Parties" shall mean the (i) Committee and the Committee's counsel, in each case, only to the extent that such party, members, or their respective affiliates, representatives, or advisors do not put forth a Bid, and (ii) the Prepetition Agent.  Any failure to specifically identify consultation rights in any section of the Bidding Procedures shall not limit or otherwise impair the rights of the Consultation Parties to consult with the Debtors.  In the event that the Debtors and the Consultation Parties disagree with matters for which the Debtors are required to consult with the Consultation Parties, then the Consultation Party shall have the right to seek relief from the Court on an expedited basis to resolve the dispute.

21.    The following is a summary of the key dates established by the Bidding

Procedures and the Assumption Procedures:

| Event | Date |
|---|---|
| Service of Notice of Assumption, Assignment, and Sale | Within Three Days of Entry of the Bidding Procedures Order |
| Cure Objection Deadline | June 7, 2023 at 4:00 p.m. (ET) |
| Sale Objection Deadline | June 21, 2023 at 4:00 p.m. (ET) |
| Bid Deadline | June 21, 2023 at 5:00 p.m. (prevailing Eastern Time) |
| Deadline for Debtors to Designate Qualified Bids | June 23, 2023 at 5:00 p.m. (ET) |
| Auction | June 28, 2023 at 10:00 a.m. (prevailing Eastern Time) |
| Debtors' Deadline to Reply to Sale Objections | July 6, 2023 at 6:00 p.m. (ET) |
| Sale Hearing | July 10, 2023 at 10:00 a.m. (prevailing Eastern Time) |

22.     The Debtors respectfully submit that the timeline set forth in the Bidding Procedures is reasonable and necessary under the circumstances of the Chapter 11 Cases. Such timeline provides an approximately 8-week period between the filing of this Motion and the Bid Deadline, which will allow parties in interest sufficient time to formulate bids for the Assets. Moreover, relevant information regarding the Debtors' business has been made available in the Data Room, allowing potential bidders (subject to the execution of an NDA) to immediately conduct diligence on the Debtors' Assets, and the Debtors and their advisors began marketing the Assets prior to the filing of this Motion.

**NOTICE PROCEDURES FOR THE SALE,**
**BIDDING PROCEDURES, AUCTION, AND SALE HEARING**

23.     The Debtors also request approval of the sale notice (the "Sale Notice"), substantially in the form attached to the proposed Bidding Procedures Order as **Exhibit 2**.

24.     Upon entry of the Bidding Procedures Order, the Debtors will serve the Sale Notice by regular mail on: (a) the U.S. Trustee; (b) counsel to the Committee; (c) counsel to Cerberus; (d) counsel to the Stalking Horse Bidder; (e) the United States Attorney's Office for the District of Delaware; (f) the state attorneys general for all states in which the Debtors conduct business; (g) all parties to Potential Assigned Contracts; (h) all parties who have expressed to the Debtors or their professionals in writing an interest in acquiring some or all of the Assets; (i) all known holders of liens, encumbrances, and other claims secured by any of the Assets; (j) the Internal Revenue Service; (k) all applicable state and local taxing authorities; (l) the Federal Trade Commission; (m) each governmental agency that is an interested party with respect to the Sale and transactions proposed thereunder; (n) all of the Debtors' other known creditors and equity security holders; and (o) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002.

30300142.7

25.     The Debtors will also cause the Sale Notice to be published once in the national edition of *USA Today* or another nationally circulated newspaper, with any modifications necessary for ease of publication, and post the Sale Notice and the Bidding Procedures Order on the website of the Debtors' claims and noticing agent.

### ASSUMPTION PROCEDURES[5]

26.     To facilitate the Sale, the Debtors seek authority to assume and assign to the Stalking Horse Bidder or, in the event the Stalking Horse Bidder is not the Successful Bidder, then to the Successful Bidder, certain executory contracts and unexpired leases in accordance with the Assumption Procedures.

27.     The Assumption Procedures are as follows:

(a)     **Notice of Assumption, Assignment and Sale**.  Within 3 business days following entry of the Bidding Procedures Order (the "Assumption, Assignment and Sale Service Deadline"), the Debtors shall file on the docket and serve a notice of contract assumption, in substantially the form attached to the Bidding Procedures Order as **Exhibit 3**, (the "Notice of Assumption, Assignment and Sale") via overnight delivery on all counterparties to all executory contracts and unexpired leases of the Debtors (collectively, the "Potential Assigned Contracts") and provide a copy of the same to the Stalking Horse Bidder.  The Notice of Assumption, Assignment and Sale shall inform each recipient of (i) the timing and procedures relating to such assumption, assignment and sale, (ii) the title of the Potential Assigned Contract, (iii) the name of the counterparty to the Potential Assigned Contract, (iv) Debtors' good faith estimates of the Cure Costs (if any) required in connection with the Potential Assigned Contract, (v) the identity of the Stalking Horse Bidder, and (vi) the Cure Objection Deadline (as defined below); *provided*, *however*, that service of a Notice of Assumption, Assignment and Sale does not constitute an admission that such Potential Assigned Contract is an executory contract or unexpired lease or that such stated Cure Cost constitutes a claim against the Debtors or a right against the Stalking Horse Bidder (or other Successful Bidder) and all rights with respect thereto shall be expressly reserved.  Further, the inclusion of a Potential Assigned Contract on the Notice of Assumption, Assignment and Sale is not a guarantee that such Potential Assigned Contract will ultimately be assumed, assigned and sold.

---

[5] Any summary of the Assumption Procedures contained herein is qualified in its entirety by the actual terms of the Bidding Procedures Order.  To the extent that there is any conflict between any summary contained herein and the actual terms of the Bidding Procedures Order, the actual terms of the Bidding Procedures Order shall control.

(b)     **Objections**.  Any counterparty to a Potential Assigned Contract shall file and serve on the Objection Notice Parties (as defined in the Bidding Procedures Order) any objections to (a) the proposed assumption and  assignment of its Potential Assigned Contract to the Successful Bidder (and must state in its objection, with specificity, the legal and factual basis of its objection), (b) if applicable, the proposed Cure Cost for its Potential Assigned Contract (and must state in its objection, with specificity, what Cure Cost is required with appropriate documentation in support thereof) and (c) the provision of adequate assurance of future performance by the Stalking Horse Bidder, **no later than June 7, 2023 at 5:00 p.m. (prevailing Eastern Time)** (the "Cure Objection Deadline").  If no objection is timely filed and served, (x) the counterparty to the Potential Assigned Contract shall be deemed to have consented to the assumption, assignment and sale of the Contract to the Successful Bidder pursuant to sections 363 and 365 of the Bankruptcy Code if such Potential Assigned Contract is designated by the Successful Bidder as an Assigned Contract, and shall be forever barred from asserting any objection with regard to such assumption, assignment and sale, except with respect to the adequate assurance of future performance by a Successful Bidder **other than** the Stalking Horse Bidder, and (y) the Cure Cost set forth in the Notice of Assumption, Assignment and Sale shall be controlling pursuant to section 365 of the Bankruptcy Code, notwithstanding anything to the contrary in any Potential Assigned Contract, or any other document, and the counterparty to the Potential Assigned Contract shall be deemed to have consented to the Cure Cost pursuant to section 365 of the Bankruptcy Code, and shall be forever barred from asserting any other claims related to such Potential Assigned Contract against the Debtors or the Successful Bidder, or the property of either of them.

(c)     **Supplemental Contract Assumption Notice**.  To the extent the Debtors, at any time after the Assumption, Assignment and Sale Service Deadline (i) identify additional Potential Assigned Contracts, (ii) remove Potential Assigned Contracts from the list of executory contracts and unexpired leases ultimately selected as Assigned Contracts that the Successful Bidder proposes be assumed, assigned and sold to it in connection with a Sale, and/or (iii) modify the previously stated Cure Cost associated with any Potential Assigned Contracts, the Debtors will promptly file with this Court and serve by overnight delivery a supplemental notice of contract assumption (a "Supplemental Assumption Notice") on each of the counterparties to the affected Potential Assigned Contracts and their counsel of record, if any.  Each Supplemental Assumption Notice will include the same information with respect to listed Potential Assigned Contracts as was included in the Notice of Assumption, Assignment and Sale.  Each Supplemental Assumption Notice that identifies a Potential Assigned Contract that was not previously designated to be assumed, assigned and sold or that reduces the Debtors' calculation of the Cure Cost shall provide a deadline of not less than seven business (7) days from the date of service of such Supplemental Assumption Notice by which the counterparty to any such Potential Assigned Contract may object **only** to (a) its listing as an Assigned Contract (if it was not previously designated to be assigned), and (b) the Debtors' calculation of the Cure Cost for such Potential Assigned

Contract (if such Cure Cost is lower than a previously listed Cure Cost for such Potential Assigned Contract or the amount asserted by such counterparty by the Cure Objection Deadline).

(d) **Supplemental Adequate Assurance Objection Deadline**. Following the Bid Deadline, in the event that the Debtors receive one or more Qualified Bids other than the Stalking Horse Purchase Agreement, upon request by any counterparty to a Potential Assigned Contract, the Debtors will send such party evidence that any Qualified Bidder that included such Potential Assigned Contract in its Bid has the ability to perform thereunder and otherwise complies with the requirements of adequate assurance of future performance under section 365(b)(1) of the Bankruptcy Code on a confidential basis for all nonpublic information. Consistent with Paragraph 5 of the Bidding Procedures Order, the Debtors will file a notice of successful bidder. Parties objecting to the proposed adequate assurance of future performance by a Successful Bidder **other than** the Stalking Horse Bidder must object at or before the Sale Hearing.

(e) **Dispute Resolution**. If the Debtors (subject to the consent of the Successful Bidder) and the non-debtor counterparty to a Potential Assigned Contract cannot resolve an objection to the Cure Cost for such Potential Assigned Contract, such objection may be adjourned and the Potential Assigned Contract may be (but is not required to be) assumed by the Debtors and assigned and sold to the Stalking Horse Bidder or Successful Bidder, as applicable, provided that the Cure Cost that the counterparty asserts is required to be paid shall be segregated pending the parties' consensual resolution of the objection to the Cure Cost or the Court's adjudication of such payment. Any objection to the proposed assumption, assignment and sale of a Potential Assigned Contract or to the related Cure Cost that remains unresolved as of the Sale Hearing shall, in the Debtors' discretion (subject to the consent of the Successful Bidder), be heard at the Sale Hearing or adjourned to a date and at a time determined by the Debtors (or otherwise scheduled by the Court). Pending the parties' consensual resolution of any Cure Cost objections or the Court's adjudication of such payments, the Successful Bidder may elect to re-designate the related Assigned Contracts to not be an Assigned Contract. Upon any Cure Cost amount that was subject to an objection becoming fixed, the Successful Bidder may elect to re-designate the related Assigned Contract to not be an Assigned Contract.

(f) **Contract Assumption**. No Assigned Contract shall be deemed assumed, assigned and sold pursuant to sections 365 and 363 of the Bankruptcy Code until the later of (i) the date the Court has entered an order assuming, assigning and selling such Assigned Contracts or (ii) the date the Sale has closed.

28. The inclusion of a Potential Assigned Contract on the Notice of Assumption, Assignment and Sale or any Supplemental Assumption Notice shall not: (a) obligate the Debtors to assume, assign or sell any executory contracts or unexpired leases listed thereon,

(b) obligate any Qualified Bidder or the Successful Bidder to designate such Potential Assigned Contract as an Assigned Contract or refrain from redesignating it to not be an Assigned Contract, or (c) constitute any admission or agreement of the Debtors that such Potential Assigned Contract is an executory contract or such lease is unexpired, as applicable.  Only those Potential Assigned Contracts that are included on a schedule of Assigned Contracts (for which the Stalking Horse Bidder's or other Successful Bidder's, as applicable, designation rights with respect thereto have expired) attached to a final asset purchase agreement approved by the Court will be assumed, assigned and sold.

## **RELIEF REQUESTED**

29.     By this Motion, the Debtors seek entry of: (a) the Bidding Procedures Order, (i) scheduling a date for the Sale Hearing, (ii) authorizing and approving the Bidding Procedures and the Assumption Procedures, and the form and manner of notice thereof, (iii) authorizing and approving the Debtors' entry into the Stalking Horse Purchase Agreement, which shall be executed and filed no later than May 5, 2023, and (iv) granting related relief; and (b) the Sale Order, which shall be filed no later than 21 days before the Sale Hearing, (i) authorizing and approving the Sale, free and clear of all encumbrances other than assumed liabilities and permitted encumbrances on the terms contemplated in the Stalking Horse Purchase Agreement or, in the event the Stalking Horse Bidder is not the Successful Bidder, then an Alternative APA, (ii) authorizing and approving the assumption and assignment of executory contracts and unexpired leases to the Stalking Horse Bidder or, in the event the Stalking Horse Bidder is not the Successful Bidder, then to the Successful Bidder; and (iii) granting related relief.

30300142.7

**BASIS FOR RELIEF**

A.    **Sufficient Business Justification Exists for Consummation of the Sale under Sections 105(a) and 363(b) of the Bankruptcy Code**

30.    Pursuant to section 105(a) of the Bankruptcy Code, a "[c]ourt may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  Section 363(b) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b).  Although section 363(b) does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, courts have required that such use, sale or lease be based upon the sound business judgment of the debtor. *See, e.g.*, *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (internal citation omitted); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070–71 (2d Cir. 1983); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147–48 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of *In re Lionel Corp.*); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 175–76 (D. Del. 1991) (holding that the Third Circuit adopted the "sound business judgment" test in *Abbotts Dairies*); *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999) (same).

31.    The demonstration of a valid business justification by the debtor leads to a strong presumption "that in making [the] business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."  *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

32.    The Debtors submit that their decision to pursue and, ultimately, consummate the Sale[6] represents a reasonable exercise of the Debtors' business judgment and, accordingly, the Sale should be approved under sections 105(a) and 363(b) of the Bankruptcy Code.  The Debtors will continue to conduct an extensive and fulsome process to market the Assets.  The open and fair auction and sale process contemplated by the Bidding Procedures will ensure that the Debtors' estates receive the highest or best value available for the Assets by allowing the market to dictate the value of the Assets, and will provide a greater recovery than would be provided by any other available alternative.  Furthermore, compliance with the Bidding Procedures will ensure the fairness and reasonableness of the consideration to be paid by the Stalking Horse Bidder or, in the event the Stalking Horse Bidder is not the Successful Bidder, then the Successful Bidder, and establish that the Debtors and such bidder have proceeded in good faith.

33.    Additionally, the Debtors believe that the notice procedures described above are reasonable and adequate under the circumstances.  Bankruptcy Rules 2002(a) and (c) require the Debtors to notify creditors of the Sale, the terms and conditions of the Sale, the time and place of the Auction, and the deadline for filing any objections.  The Debtors believe that the proposed notice procedures fully comply with Bankruptcy Rule 2002, and are reasonably calculated to provide timely and adequate notice of the Stalking Horse Purchase Agreement, the Bidding Procedures, the Auction, the Sale Hearing, and the Sale to the Debtors' creditors and all other parties in interest that are entitled to notice, as well as those parties that have expressed a *bona fide* interest in acquiring the Assets.

---

[6] In the event that the Debtors receive Qualified Bids that contemplate a return for the Debtors' shareholders, the Debtors reserve the right to pursue a sale transaction through implementation of a plan of reorganization.

34.     The Sale, conducted in accordance with the Bidding Procedures, will generate significant value for the Debtors' estates, and represents the best path forward for maximizing recoveries in connection with the Chapter 11 Cases.  The Debtors submit that ample business justification exists for the consummation of the Sale, and therefore request that this Court approve such Sale.

**B.     The Sale of the Assets Free and Clear of All Encumbrances Is Authorized Under Section 363(f) of the Bankruptcy Code**

35.     Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests and encumbrances if:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).

36.     Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Assets "free and clear" of liens and interests.  *See Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that because section 363(f) is written in the disjunctive, a court may approve a sale free and clear if any one subsection is met); *see also Mich. Emp't Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (same); *In re Bygaph, Inc.*, 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same).

Furthermore, a debtor possesses broad authority to sell assets free and clear of liens.  *See In re Trans World Airlines, Inc.*, 322 F.3d 283, 289 (3d Cir. 2003).

37.    The Debtors submit that, in the interest of attracting the best offers, it is appropriate to sell the Assets on a final "as is" basis, free and clear of any and all encumbrances other than assumed liabilities and permitted encumbrances (and except as otherwise expressly set forth in the Sale Order), in accordance with section 363(f) of the Bankruptcy Code because one or more of the tests of section 363(f) are satisfied with respect to such Sale.  In particular, the Debtors believe that section 363(f)(2) of the Bankruptcy Code will be met because the Prepetition Secured Parties have a valid, blanket security interest in the Assets and have consented to the Sale to the Stalking Horse Bidder pursuant to the Stalking Horse Purchase Agreement, subject to higher or better terms as set forth in an Alternative APA.

38.    Moreover, with respect to any other party asserting a lien, claim, encumbrance or the like against the Assets, the Debtors anticipate that they will be able to satisfy one or more of the conditions set forth in section 363(f) of the Bankruptcy Code.  In particular, known lienholders will receive notice and will be given sufficient opportunity to object to the relief requested.  Such lienholders that do not object to the Sale should be deemed to have consented. *See FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 285-86 (7th Cir. 2002) ("[L]ack of objection (provided of course there is notice) counts as consent.  It could not be otherwise; transaction costs would be prohibitive if everyone who might have an interest in the bankrupt's assets had to execute a formal consent before they could be sold.") (internal citations omitted); *Hargrave v. Twp. of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (holding that creditor's failure to object to sale free and clear of liens, claims and encumbrances satisfies section 363(f)(2)); *In re Elliot*, 94 B.R. at 345 (same).  Consistent with the foregoing, the Bidding Procedures Order

provides that the absence of a timely objection to the sale of the Assets in accordance therewith shall be "consent" to such sale within the meaning of section 363(f)(2) of the Bankruptcy Code.

39.     Furthermore, the Debtors propose that any encumbrances asserted against the Assets be transferred to, and attach to, the proceeds of the Sale, and application of the proceeds generated by the Sale will be subject to any applicable provisions of the Cash Collateral Order.

## C.     The Sale Should Be Subject to the Protections of Section 363(m) of the Bankruptcy Code

40.     Section 363(m) of the Bankruptcy Code provides, in part, that the reversal or modification on appeal of an authorization of a sale pursuant to section 363(b) or section 363(c) of the Bankruptcy Code does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal. *See* 11 U.S.C. § 363(m).  In approving the Sale free and clear of encumbrances other than assumed liabilities and permitted encumbrances, the Debtors request that the Court find and hold that all purchasers of Assets purchased in accordance with the Bidding Procedures, including, without limitation, the Stalking Horse Bidder, are entitled to the protections afforded by section 363(m) of the Bankruptcy Code.  Such relief is appropriate in that selection of the Successful Bidder will be the result of a competitive bidding process and arm's-length, good-faith negotiations, and parties in interest will have the opportunity to review and object to a proposed transaction. *See Esposito v. Title Ins. Co. of Pa. (In re Fernwood Mkts.)*, 73 B.R. 616, 620 (Bankr. E.D. Pa. 1987) (good faith purchasers are protected under section 363(m) where notice is provided to lienholders).

D.     **The Court Should Approve the Bidding Procedures**

41.     The key objective in any sale of property of a debtor's estate is to maximize

the value received by the estate.  *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir.

2004) (finding that debtor "had a fiduciary duty to protect and maximize the estate's assets");

*Official Comm. of Unsecured Creditors of Cybergenics, Corp v. Chinery*, 330 F.3d 548, 573 (3d

Cir. 2003) (same).  Procedures used to enhance competitive bidding support this objective and,

therefore, are appropriate in the context of bankruptcy sales.  *See In re O'Brien Envtl. Energy,*

*Inc.*, 181 F.3d 527, 537 (3d Cir. 1999); *see also Integrated Res. Inc.*, 147 B.R. at 659 (stating that

bidding procedures "encourage bidding and . . . maximize the value of the debtor's assets").

42.     The Debtors and their professional advisors, including Angle, have

designed the Bidding Procedures to promote a competitive and fair bidding process and, thus, to

maximize value for the Debtors' estates and creditors.  The Bidding Procedures will allow the

Debtors to conduct the Auction in an orderly, fair and open fashion, which will encourage

participation by financially capable bidders, thereby increasing the likelihood that the Debtors will

receive the highest or best possible consideration for the Assets.  Furthermore, the Bidding

Procedures provide an appropriate framework for the Debtors and their professional advisors to

review, analyze and compare any bids received to determine which bids are in the best interests of

the Debtors' estates and their creditors.  Angle has reviewed the Bidding Procedures and, believes

that they are appropriately crafted to, and will maximize, the value of the Assets.  Moreover, the

Debtors are required under the Cash Collateral Order to complete the auction and sale process on

the timetable set forth therein and contemplated by the Bidding Procedures, which timetable is fair

and reasonable in light of the circumstances of the Chapter 11 Cases.

43.     The Debtors submit that the Bidding Procedures are necessary and transparent and will derive the highest or best bids for the Assets.  Therefore, the Debtors request the Court to approve the Bidding Procedures.

**E.     The Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with the Sale Satisfies Section 365 of the Bankruptcy Code**

44.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  The Second Circuit has stated that "[t]he purpose behind allowing the assumption or rejection of executory contracts is to permit the trustee or debtor-in-possession to use valuable property of the estate and to 'renounce title to and abandon burdensome property.'"  *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098 (2d Cir. 1993) (quoting 2 COLLIER ON BANKRUPTCY ¶ 365.01[1] (15th ed. 1993)).

45.     The standard applied to determine whether the assumption of a contract or an unexpired lease should be authorized is the "business judgment" standard.  *See In re AbitibiBowater Inc.*, 418 B.R. 815, 831 (Bankr. D. Del. 2009) (finding that a debtor's decision to assume or reject an executory contract will stand so long as "a reasonable business person would make a similar decision under similar circumstances."); *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (stating a debtor's decision to reject an executory contract is governed by the business judgment standard and can only be overturned if the decision was the product of bad faith, whim, or caprice).  As described above, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company.'"  *Integrated Res., Inc.*, 147 B.R. at 656 (quoting *Smith v. Van Gorkom*, 488 A.2d at

872). Indeed, "the sole issue is whether the rejection benefits the estate." *In re HQ Global*, 290 B.R. at 511.

46.     The business judgment rule is crucial in chapter 11 cases and shields a debtor's management from judicial second-guessing. *See id.*; *see also Comm. of Asbestos Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions."). Generally, courts defer to a debtor in possession's business judgment to assume or reject an executory contract or lease. *See Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (stating that the business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption or] rejection of the executory contract will benefit the estate."); *see also N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984); *Control Data Corp. v. Zelman (In re Minges)*, 602 F.2d 38, 42-43 (2d Cir. 1979); *In re Riodizio, Inc.*, 204 B.R. 417, 424-25 (Bankr. S.D.N.Y. 1997); *In re G Survivor Corp.,* 171 B.R. 755, 757 (Bankr. S.D.N.Y. 1994).

47.     Here, the Debtors have exercised their sound business judgment in determining that assumption and assignment of the Assigned Contracts is in the best interests of the Debtors and their estates and, accordingly, the Debtors submit that the Court should approve the proposed assumption under section 365(a) of the Bankruptcy Code. *See, e.g.*, *In re Philadelphia Newspapers, LLC*, 424 B.R. 178, 182-83 (Bankr. E.D. Pa. 2010) (stating that if a debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an executory contract or unexpired lease); *Westbury Real Estate Ventures, Inc. v. Bradlees, Inc. (In re Bradlees Stores, Inc.)*, 194 B.R. 555, 558 n.1 (Bankr. S.D.N.Y. 1996); *Summit*

*Land Co. v. Allen (In re Summit Land Co.),* 13 B.R. 310, 315 (Bankr. D. Utah 1981) (holding that, absent extraordinary circumstances, court approval of a debtor's decision to assume or reject an executory contract "should be granted as a matter of course").

48.     As set forth above, the Sale will provide significant benefits to the Debtors' estates. To that end, the assumption, assignment and sale of the Assigned Contracts is necessary for the Debtors to obtain the benefits of the Stalking Horse Purchase Agreement or an Alternative APA, as applicable. In addition, under section 365(k) of the Bankruptcy Code, the assignment by a debtor to an entity of a contract or lease "relieves the trustee and the estate from any liability for any breach of such contract or lease occurring after such assignment." 11 U.S.C. § 365(k). Thus, following an assignment to the Successful Bidder of any Assigned Contract, the Debtors will be relieved from any liability for any subsequent breach associated therewith.

49.     Furthermore, section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the Assigned Contracts must be cured or that adequate assurance be provided that such defaults will be promptly cured. 11 U.S.C. § 365(b)(1). The Debtors propose to file with the Court, and serve on each counterparty to an Assigned Contract, a Notice of Assumption, Assignment and Sale that indicates the proposed Cure Cost for each such contract. As such, each counterparty will have the opportunity to object to the proposed assumption and assignment to the Successful Bidder and to the proposed Cure Cost, if applicable. Moreover, the payment or reserve of the applicable Cure Cost, as provided for in the Bidding Procedures, will be a condition to the Debtors' assumption and assignment of any Assigned Contract.

50.     Relatedly, section 365(f)(2) of the Bankruptcy Code provides that a debtor may assign an executory contract or unexpired lease of nonresidential real property if "adequate assurance of future performance by the assignee of such contract or lease is provided." 11 U.S.C.

§ 365(f)(2). The words "adequate assurance of future performance" must be given a "practical, pragmatic construction" in light of the facts and circumstances of the proposed assumption. *See In re Fleming Cos., Inc.*, 499 F.3d 300, 307 (3d Cir. 2007) (internal citation omitted); *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (same); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (finding that adequate assurance of future performance does not mean absolute assurance that debtor will thrive and profit); *In re Bon Ton Rest. & Pastry Shop, Inc.,* 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

51.     Specifically, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (holding that adequate assurance of future performance is given where the assignee of lease has financial resources and expressed a willingness to devote sufficient funding to the business to ensure its success, and that in the leasing context, the chief determinant of adequate assurance is whether rent will be paid).

52.     Here, the Successful Bidder will have provided adequate assurance of future performance with respect to any Assigned Contract. For its bid to be deemed a Qualified Bid, each Qualified Bidder will be required to provide evidence supporting its ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) and, if applicable, section 365(b)(3) of the Bankruptcy Code (the "Adequate Assurance Information"), including: (a) the bidder's financial wherewithal and willingness to perform under any contracts that are assumed and assigned to such potential bidder; and (b) a contact person for the proposed assignee that the counterparty may directly contact in connection with the adequate assurance of

future performance.  To the extent that the Qualified Bidder is a newly formed acquisition entity or the like, the financial and other information supporting the Qualified Bidder's financial wherewithal shall include financial and other information supporting the financial wherewithal of the Qualified Bidder's parent company or sponsor.  Furthermore, given that the Debtors will submit evidence that all requirements for the assumption and assignment of such contracts have been met at the Sale Hearing, the Court and other interested parties will have the opportunity to evaluate the ability of each Successful Bidder to provide adequate assurance of future performance.

53.     Therefore, the Debtors respectfully request the Court to (a) approve the proposed assumption and assignment of the Assigned Contracts, and (b) find that all anti-assignment provisions of such contracts to be unenforceable under section 365(f) of the Bankruptcy Code.[7]

## F.     The Stalking Horse Bidder Should Be Authorized to Credit Bid on the Assets under Section 363(k) of the Bankruptcy Code

54.     Section 363(k) of the Bankruptcy Code provides that, unless the court for cause orders otherwise, the holder of a claim secured by property that is the subject of a sale "may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property."  11 U.S.C. § 363(k).  Even if a secured creditor is undersecured as determined in accordance with section 506(a) of the Bankruptcy Code,

---

[7]     Section 365(f)(1) provides that "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease..."  11 U.S.C. § 365(f)(1).  Section 365(f)(3) further provides that "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee."  11 U.S.C. § 365(f)(3).

section 363(k) allows such secured creditor to bid the full face value of its claim and does not limit the credit bid to the claim's economic value.  *See Cohen v. KB Mezzanine Fund II, LP (In re Submicron Sys. Corp.)*, 432 F.3d 448, 459-60 (3d Cir. 2006).

55.     As a result, the Debtors propose that the Stalking Horse Bidder, which holds claims that are secured by valid, binding, enforceable, non-avoidable and perfected liens on and security interests in substantially all of the Assets as provided for in the Cash Collateral Order, be entitled to credit bid all or a portion of the amounts then outstanding under the Prepetition Secured Parties' claims, or any part thereof, under section 363(k) of the Bankruptcy Code and as provided for in the Cash Collateral Order and the Bidding Procedures.

## WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h) AND 6006(d)

56.     Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  Furthermore, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6006(d).  As set forth throughout this Motion, any delay in the Debtors' ability to consummate the Sale on the timeline contemplated by the Bidding Procedures would be detrimental to the Debtors, their creditors and estates.

57.     For this reason and those set forth above, the Debtors submit that ample cause exists to justify a waiver of the fourteen day stay imposed by Bankruptcy Rule 6004(h) and 6006(d), to the extent applicable.

## **NOTICE**

58.     Notice of this Motion will be provided to:  (i) the U.S. Trustee; (ii) counsel to the Committee; (iii) the Prepetition Agent; (iv) counsel to the Prepetition Agent; (v) the United States Attorney's Office for the District of Delaware; (vi) the Internal Revenue Service; (vii) the state attorneys general for all states in which the Debtors conduct business; (viii) all parties who have expressed a written interest in some or all of the Assets; (ix) all known holders of liens, encumbrances, and other claims secured by the Assets; (x) all parties to Potential Assigned Contracts; and (xi) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors request entry of the Bidding Procedures Order and the Sale Order, granting the relief requested herein and such other and further relief as is just and proper.

Dated:  April 27, 2023
Wilmington, Delaware

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Ashley E. Jacobs*
Michael R. Nestor (DE Bar No. 3526)
Andrew L. Magaziner (DE Bar No. 5426)
Ashley E. Jacobs (DE Bar No. 5635)
1000 North King Street
Rodney Square
Wilmington, Delaware 19801-6108
Telephone:  (302) 571-6600
Facsimile:   (302) 571-1253
Email:  mnestor@ycst.com
          amagaziner@ycst.com
          ajacobs@ycst.com

-and-

Kathryn A. Coleman
Christopher Gartman
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, NY 10004-1482
Telephone: (212) 837-6000
Facsimile:  (212) 422-4726
Email:  katie.coleman@hugheshubbard.com
          chris.gartman@hugheshubbard.com

*Counsel for the Debtors*