## EXHIBIT A

**Stalking Horse APA**

**EXECUTION VERSION**

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**S-PPT ACQUISITION COMPANY LLC,**

**as Purchaser,**

**and**

**STANADYNE PPT HOLDINGS, INC.**

**and**

**THE OTHER SELLERS NAMED HEREIN,**

**as Sellers,**

**Dated as of May 8, 2023**

# TABLE OF CONTENTS

**Page**

ARTICLE 1 PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES ............5

1.1    Purchase and Sale of Assets .................................................................................5
1.2    Excluded Assets ..................................................................................................7
1.3    Assumption of Liabilities ....................................................................................9
1.4    Excluded Liabilities ..........................................................................................10
1.5    Cure Costs; Schedule Updates; Designation Rights .........................................12

ARTICLE 2 CONSIDERATION ........................................................................................16

2.1    Consideration .....................................................................................................16
2.2    Wind-Down; Delivery of Surplus Cash to Purchaser .......................................17
2.3    Allocation of Purchase Price .............................................................................17
2.4    Bulk Sales Laws ................................................................................................18

ARTICLE 3 CLOSING AND TERMINATION .................................................................18

3.1    Closing ...............................................................................................................18
3.2    Closing Deliveries by Sellers ............................................................................18
3.3    Closing Deliveries by the Purchaser ..................................................................20
3.4    Termination of Agreement .................................................................................20
3.5    Procedure Upon Termination .............................................................................22
3.6    Effect of Termination .........................................................................................23

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF THE SELLERS ......................23

4.1    Organization and Qualification ..........................................................................23
4.2    Subsidiaries ........................................................................................................23
4.3    Authority Relative to this Agreement ................................................................23
4.4    Conflicts; Consents and Approvals ....................................................................24
4.5    Ordinary Course of Business .............................................................................24
4.6    Litigation ............................................................................................................25
4.7    Intellectual Property ...........................................................................................25
4.8    Material Contracts ..............................................................................................27
4.9    Permits ................................................................................................................29
4.10   Brokers and Finders ...........................................................................................29
4.11   Title to Assets ....................................................................................................29
4.12   [Reserved]. .........................................................................................................29
4.13   Real Property ......................................................................................................29
4.14   Compliance with Law ........................................................................................30
4.15   Tax Returns; Taxes .............................................................................................31
4.16   Benefit Plans ......................................................................................................32
4.17   Labor Matters .....................................................................................................33
4.18   Insurance Policies ..............................................................................................33
4.19   Environmental Matters .......................................................................................34
4.20   Vendors and Suppliers ........................................................................................34
4.21   Inventory ............................................................................................................34
4.22   Product Liability .................................................................................................34

4.23    Financial Statements; Group Holdings. ................................................35
4.24    Wind-Down Budget ..........................................................................36
4.25    Affiliate Transactions........................................................................36
4.26    Sole Representations; Non-Reliance ..................................................36

ARTICLE 5 REPRESENTATIONS AND WARRANTIES OF THE PURCHASER .................37

5.1    Organization and Qualification...........................................................37
5.2    Authority Relative to This Agreement ................................................37
5.3    Conflicts; Consents and Approvals.....................................................37
5.4    Litigation............................................................................................38
5.5    Brokers and Finders............................................................................38
5.6    Financial Ability; Solvency ................................................................38
5.7    Sole Representations ...........................................................................38

ARTICLE 6 EMPLOYEES ................................................................................................39

6.1    Employee Offers .................................................................................39
6.2    Assumed Seller Plans..........................................................................40
6.3    WARN Act Liability............................................................................40
6.4    No Third-Party Beneficiaries ..............................................................41

ARTICLE 7 BANKRUPTCY COURT MATTERS ............................................................41

7.1    Competing Bids ..................................................................................41
7.2    Bankruptcy Court Filings....................................................................41
7.3    Bankruptcy Court Milestones .............................................................42

ARTICLE 8 COVENANTS AND AGREEMENTS .............................................................42

8.1    Conduct of Business of the Sellers .....................................................42
8.2    Access to Information .........................................................................45
8.3    Notice of Certain Events ....................................................................45
8.4    Assignability of Certain Purchased Assets .........................................46
8.5    Contracts and Permits .........................................................................47
8.6    Further Agreements ............................................................................47
8.7    Insurance Cooperation ........................................................................48
8.8    Preservation of Records ......................................................................48
8.9    Publicity .............................................................................................48
8.10    Prohibition on Use of Purchased Names ............................................49
8.11    Taxes ..................................................................................................49
8.12    Further Assurances..............................................................................50
8.13    Delivery of Certain Financial Information ..........................................52
8.14    Personally Identifiable Information .....................................................53
8.15    Confidential Information .....................................................................53
8.16    Transition Services..............................................................................54
8.17    The Connecticut Transfer Act.............................................................54
8.18    Delivery of Wind-Down Budget and Schedules..................................54
8.19    Insurance .............................................................................................55

ARTICLE 9 CONDITIONS TO CLOSING.........................................................................55

9.1     Conditions Precedent to the Obligations of the Purchaser and the Sellers .................55
9.2     Conditions Precedent to the Obligations of the Sellers ...............................................55
9.3     Conditions Precedent to the Obligations of the Purchaser............................................56

ARTICLE 10 ADDITIONAL DEFINITIONS ..........................................................................58

10.1    Certain Definitions............................................................................................58
10.2    Additional Defined Terms .................................................................................67

ARTICLE 11 MISCELLANEOUS ...........................................................................................68

11.1    Payment of Expenses ........................................................................................68
11.2    Survival of Representations and Warranties; Survival of Post-Closing
        Covenants.........................................................................................................69
11.3    Entire Agreement; Amendments and Waivers ..................................................69
11.4    Schedules ..........................................................................................................69
11.5    Counterparts ......................................................................................................70
11.6    Governing Law ..................................................................................................70
11.7    Jurisdiction, Waiver of Jury Trial .....................................................................70
11.8    Notices ..............................................................................................................71
11.9    Binding Effect; Assignment..............................................................................72
11.10   Severability .......................................................................................................72
11.11   Injunctive Relief................................................................................................72
11.12   Third Party Beneficiaries ..................................................................................73
11.13   Non-Recourse ...................................................................................................73
11.14   No Effect Upon Lending Relationship ..............................................................73
11.15   Time of the Essence ..........................................................................................73
11.16   Certain Interpretations ......................................................................................73

## ANNEX AND EXHIBITS

Annex I        Wind-Down Budget

Exhibit A      Assignment and Assumption Agreement
Exhibit B      Patent Assignment Agreement
Exhibit C      Copyright Assignment Agreement
Exhibit D      Trademark Assignment Agreement
Exhibit E      Domain Name Assignment Agreement

## ASSET PURCHASE AGREEMENT

ASSET PURCHASE AGREEMENT (as amended, supplemented, amended and restated or otherwise modified from time to time, this "**Agreement**"), dated as of May 8, 2023 (the "**Execution Date**"), by and among (a) Stanadyne PPT Holdings, Inc., a Delaware corporation ("**Holdings**"), and the direct and indirect subsidiaries of Holdings party hereto as set forth on the signature pages attached hereto (together with Holdings, each a "**Seller**" and, collectively, the "**Sellers**"), and (b) S-PPT Acquisition Company LLC, a Delaware limited liability company (and together with its designees, successors or assigns, as applicable, as provided under Section 11.9, the "**Purchaser**"). Article 10 contains definitions of certain terms used in this Agreement and also provides cross-references to certain terms defined elsewhere in this Agreement.

## RECITALS

WHEREAS, on February 16, 2023 (the "**Petition Date**"), the Sellers filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), which cases are being jointly administered under Case No. 23-10207 (collectively, the "**Chapter 11 Cases**");

WHEREAS, each Seller continues in possession of its assets and is authorized under the Bankruptcy Code to continue the operation of its businesses as a debtor in possession;

WHEREAS, the Sellers are party to the Prepetition Financing Agreement with the Prepetition Secured Lenders and the Prepetition Agent;

WHEREAS, the Purchaser has been formed at the direction of the Prepetition Secured Lenders and the Prepetition Agent for the purpose of entering into this Agreement and, subject to the terms and conditions hereof, consummating the transactions contemplated hereby;

WHEREAS, subject to the terms and conditions hereof, (a) the Sellers desire to sell and transfer to the Purchaser, and the Purchaser desires to purchase and acquire from the Sellers, all of the Sellers' right, title and interest in and to the Purchased Assets, and (b) the Sellers desire to transfer and assign to the Purchaser, and the Purchaser desires to assume from the Sellers, all of the Assumed Liabilities;

WHEREAS, the Sellers and the Purchaser have agreed that the sale, transfer and assignment of the Purchased Assets and the Assumed Liabilities from the Sellers to the Purchaser shall be effected pursuant to sections 105, 363 and 365 of chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (as amended, the "**Bankruptcy Code**"); and

WHEREAS, in connection with the Chapter 11 Cases and subject to the terms and conditions contained herein, following entry of the Sale Order finding the Purchaser as the Successful Bidder, the Sellers shall sell and transfer to the Purchaser, and the Purchaser shall purchase and acquire from the Sellers, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, the Purchased Assets, and the Purchaser shall assume from the Sellers the Assumed Liabilities, all as more specifically provided herein and in the Sale Order.

4

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Purchaser and the Sellers hereby agree as follows:

## ARTICLE 1

## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

1.1     <u>Purchase and Sale of Assets</u>.  Pursuant to sections 105, 363 and 365 of the Bankruptcy Code and on the terms and subject to the conditions set forth in this Agreement and the Sale Order, each Seller shall sell, transfer, assign, convey and deliver to the Purchaser, and the Purchaser shall purchase, acquire and accept from each Seller, on the Closing Date, all of such Seller's right, title and interest in, to and under, free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances), all of the assets, properties, rights and interests of any nature, tangible or intangible, real or personal, wherever located, of such Seller related to, associated with or used, or held for use, in connection with the Business, now existing or hereafter acquired on or prior to the Closing Date, whether or not reflected on the books or financial statements of such Seller, as the same shall exist on the Closing Date, but in all cases excluding the Excluded Assets (as amended or modified by the Purchaser in accordance with <u>Section 1.5</u>, collectively, the "**Purchased Assets**"), including the following assets, properties, rights and interests of such Seller:

        (a)     all Accounts Receivable;

        (b)     all Documents not constituting an Excluded Asset;

        (c)     (i) all Contracts of such Seller to which such Seller is a party or is otherwise bound or to which it is a beneficiary, and all rights pursuant thereto, set forth on <u>Schedule 1.1(c)</u>; (ii) Customer Purchase Orders; and (iii) any other Contract of such Seller added as a Purchased Asset in accordance with <u>Section 1.5</u> (including any Contract added as a Purchased Asset on or prior to the applicable Designation Deadline in accordance with <u>Section 1.5</u>) (the Contracts referred to in this <u>Section 1.1(c)</u>, together with the Assumed Real Property Leases, collectively, the "**Assigned Contracts**"), subject to the right of the Purchaser to cause any Assigned Contract to be a Non-Assigned Contract in accordance with <u>Section 1.5</u>;

        (d)     all deposits and all prepaid charges and expenses of such Seller, including (i) security deposits with third party suppliers, vendors, service providers or landlords, and lease and rental payments, (ii) deposits in transit, (iii) rebates, (iv) tenant reimbursements, and (v) pre-payments, but excluding any Tax assets of the Sellers, except as set forth in <u>Section 1.1(m)</u>;

        (e)     all Furniture and Equipment;

        (f)     the names "Stanadyne" and "Pure Power Technologies", the names of the Sellers, all other trade names listed on <u>Schedule 1.1(f)</u> and, in all cases, any derivations thereof (collectively, the "**Purchased Names**");

(g)    (i) all leases and subleases for the Leased Real Property to which such Seller is a party or is otherwise bound or to which it is a beneficiary, and all rights pursuant thereto, set forth on Schedule 1.1(g) and (ii) any other lease or sublease for Leased Real Property added as a Purchased Asset in accordance with Section 1.5 (including any lease or sublease for Leased Real Property added as a Purchased Asset on or prior to the applicable Designation Deadline in accordance with Section 1.5) (such leases and subleases referred to in this Section 1.1(g), collectively, the "**Assumed Real Property Leases**" and, the underlying Leased Real Property, the "**Assumed Leased Real Property**"), subject to the right of the Purchaser to cause any Assumed Real Property Lease to be a Non-Assigned Contract in accordance with Section 1.5;

(h)    all Permits and all pending applications or filings therefor and renewals thereof and all rights and incidents of interest therein, subject to the right of the Purchaser to cause any Permit or pending applications or filings therefor or renewals thereof to be a Designation Rights Asset or Excluded Asset in accordance with Section 1.5;

(i)    all rights under non-disclosure or confidentiality, non-compete, or non-solicitation agreements to which such Seller is a party with current or former directors, officers, employees or agents, or with third parties, or any such agreement to which such Seller is a beneficiary;

(j)    (i) all rights, claims, credits, settlement proceeds, causes of action or rights of set off against third parties (including, for the avoidance of doubt, those arising under, or otherwise relating to, the Assigned Contracts), including all rights under vendors', manufacturers' and contractors' warranties, indemnities and guarantees, and (ii) all Avoidance Actions;

(k)    any claims, counterclaims, setoffs, rights of recoupment, equity rights or defenses that such Seller may have with respect to any Assumed Liabilities;

(l)    except as contemplated by Section 1.2(e), all of the Insurance Policies (including any environmental or pollution insurance policies) and rights and benefits thereunder (including (i) all rights pursuant to and proceeds from the Insurance Policies, (ii) all claims, demands, proceedings and causes of action asserted by such Seller under the Insurance Policies, (iii) all proceeds payable to such Seller in respect of life insurance policies that are owned by such Seller or for which such Seller is a beneficiary and (iv) any letters of credit related thereto);

(m)    any Tax cash refund of such Seller (other than any refund with respect to any Tax paid after the Closing Date except to the extent constituting Surplus Cash);

(n)    (i) all Seller Plans set forth on Schedule 1.1(n) and (ii) any other Seller Plan added as a Purchased Asset in accordance with Section 1.5 (such Seller Plans referred to in this Section 1.1(n), collectively, the "**Assumed Seller Plans**"), and any associated Contracts, funding media, assets, reserves, credits and service agreements, and all Documents created, filed or maintained in connection with the Assumed Seller Plans and any applicable insurance policies, subject to the right of the Purchaser to cause any Assumed Seller Plan to be an Excluded Asset in accordance with Section 1.5;

(o)    all Seller Intellectual Property and IT Assets;

(p)     all Inventory;

(q)     all Owned Real Property other than any Owned Real Property set forth on Schedule 1.2(l);

(r)     all bank, securities, commodity, deposit and lock box accounts;

(s)     except to the extent that any transfer or assignment is prohibited by applicable Law, all personnel files for Transferred Employees;

(t)     all goodwill and other intangible assets associated with, or relating to, the Business or the Purchased Assets;

(u)     all ownership interests in other entities owned by Sellers (except for equity of any Seller and any ownership interests set forth on Schedule 1.2(l)), together with any certificates evidencing ownership thereof, including in Stanadyne Changshu Corporation, a Chinese corporation, and Stanadyne India Private Ltd., an Indian limited company (collectively, the "**Acquired Entities**");

(v)     subject to section 363(b)(1)(A) of the Bankruptcy Code, all rights to the websites, domain names, telephone and facsimile numbers and e-mail addresses used by such Seller, as well as rights to receive mail and other communications addressed to such Seller (including mail and communications from customers, vendors, suppliers, distributors and agents);

(w)     all Cash and Cash Equivalents (other than Excluded Cash), whether on hand, in transit or in banks or other financial institutions, security entitlements, securities accounts, commodity contracts and commodity accounts and including any cash collateral that is collateralizing any letters of credit or insurance policies, or any obligations with respect thereto;

(x)     all consideration or proceeds received by the Sellers in respect of, and other benefits deriving from, any Designation Rights Asset;

(y)     all Surplus Cash;

(z)     all other assets, interests, properties, rights and claims and causes of action of any Seller of any kind or nature whatsoever not otherwise described above but that are not expressly designated as Excluded Assets; and

(aa)     the proceeds of any of the Purchased Assets described in the foregoing clauses (a) through (z).

1.2     Excluded Assets.  Notwithstanding anything to the contrary in this Agreement or any of the Ancillary Agreements, in no event shall any Seller be deemed to sell, transfer, assign, convey or deliver, and each Seller shall retain all right, title and interest to, in and under, the following assets, properties, rights and interests of such Seller (as amended or modified by the Purchaser in accordance with Section 1.5, collectively, the "**Excluded Assets**"):

(a)    all Contracts that are not Assigned Contracts (subject to <u>Section 1.5</u>, the "**Non-Assigned Contracts**");

(b)    all Documents (whether copies or originals) (i) to the extent they relate solely to any of the Excluded Assets or the Excluded Liabilities, (ii) that such Seller is required by Law to retain and is prohibited by Law from providing a copy of to the Purchaser or (iii) to the extent they relate solely to any employee of such Seller who is not a Transferred Employee and does not relate to an Assumed Seller Plan;

(c)    all Permits that relate solely to any of the Excluded Assets or the Excluded Liabilities;

(d)    all shares of capital stock or other equity interests of a Seller, or securities convertible into or exchangeable or exercisable for any such shares of capital stock or other equity interests;

(e)    all of such Seller's director and officer insurance policies, fiduciary policies or employment practices policies (in each case of the foregoing, including any tail policies or coverage thereon), and any of such Seller's rights, claims, demands, proceedings, credits, causes of action or rights of set off thereunder;

(f)    all rights under this Agreement and the Ancillary Agreements (including the right to receive the Purchase Price);

(g)    all Documents (whether copies or originals) relating to organization, formation, qualifications to conduct business as a foreign corporation or other legal entity, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, corporate seals, minute books, stock transfer books, stock ledgers, stock certificates and bylaws (together with analogous documentation);

(h)    all of the Seller Plans other than the Assumed Seller Plans, and any associated funding media, assets, reserves, credits and service agreements, and all Documents created, filed or maintained in connection with such Seller Plans and any applicable insurance policies;

(i)    all Tax Returns, related workpapers, Tax information and Tax records of any of the Sellers or their Affiliates (other than the Acquired Entities);

(j)    Cash and Cash Equivalents equal to the total amount of "Total Disbursements" in the wind-down budget to be set forth on <u>Annex I</u> hereto in accordance with <u>Section 8.18</u>, as may be amended from time to time with the prior written consent of the Purchaser in its sole and absolute discretion (such Cash and Cash Equivalents, the "**Excluded Cash**" and, such wind-down budget, the "**Wind-Down Budget**"), except to the extent constituting Surplus Cash;

(k)    except as set forth in <u>Section 1.1(m)</u>, all Tax assets of the Sellers, including Tax losses, credits, refunds (except to the extent constituting Surplus Cash), credit carry forwards and other Tax attributes, all deposits, prepaid or advance payments with respect to Taxes, and any

claims, rights, and interest in and to any Tax asset, refund (except to the extent constituting Surplus Cash),  credit, deduction or reduction of Taxes; and

(l)     the properties and assets set forth on <u>Schedule 1.2(l)</u>, as amended or modified by <u>Section 1.5</u>.

1.3     <u>Assumption of Liabilities</u>.  On the terms and subject to the conditions set forth in this Agreement and the Sale Order, on the Closing Date, the Purchaser shall assume only the following Liabilities expressly set forth in this <u>Section 1.3</u> (collectively, the "**Assumed Liabilities**"):

(a)     all Liabilities of any of the Sellers under each Assigned Contract arising after the Closing Date and which relate solely to events, facts, circumstances and periods of time occurring after the Closing Date;

(b)     all Determined Cure Costs with respect to any Assigned Contract;

(c)     (i) other than administrative claims arising under section 503(b)(9) of the Bankruptcy Code, undisputed post-Petition Date accrued trade payables of the Sellers incurred in the Ordinary Course of Business with respect to the Purchased Assets or Designation Rights Assets to the extent not paid by the Sellers at or prior to Closing and in an amount no greater in the aggregate than an amount equal to (1) $12,000,000, *less* (2) any amounts paid by the Sellers for such Liabilities at or prior to the Closing, and (ii) administrative claims arising under section 503(b)(9) of the Bankruptcy Code to the extent not paid by the Sellers at or prior to Closing and in an amount no greater in the aggregate than an amount equal to (1) $1,500,000, *less* (2) any amounts paid by the Sellers for such Liabilities at or prior to the Closing, except, in the case of each of the foregoing clauses (i) and (ii), expressly excluding all Liabilities set forth on <u>Schedule 1.3(c)</u>;

(d)     sponsorship of and all Liabilities arising under or otherwise in respect of the Assumed Seller Plans arising after the Closing Date and which relate solely to events, facts and circumstances occurring after the Closing Date or that are in combination with events, facts or circumstance occurring after the Closing Date;

(e)     all Liabilities arising from the ownership and operation of the Purchased Assets by the Purchaser from and after the Closing Date, but solely to the extent that such Liabilities relate to events, facts, circumstances and periods of time occurring after the Closing Date;

(f)     (A) any Taxes with respect to the Business or the Purchased Assets relating to the taxable period (or portion thereof) beginning on or after the Closing Date and (B) the Transfer Taxes;

(g)     solely in the event the Windsor, CT Property is a Purchased Asset and transferred to Purchaser, all Liabilities pursuant to the CT Transfer Act with respect to the Windsor, CT Property, that are solely and exclusively related to the transfer of the Windsor, CT Property pursuant to this Agreement; and

(h)    all Liabilities arising after the Petition Date with respect to wages and salaries, in each case, earned and accrued in the Ordinary Course of Business with respect to the Sellers' employees as of the Closing Date to the extent not previously paid by the Sellers and not in excess of an amount equal to $3,500,000, but expressly excluding all Liabilities described in Section 1.4(l).

Notwithstanding anything to the contrary herein, the Purchaser's assumption of the Assumed Liabilities shall in no way expand the rights or remedies of third parties against the Purchaser as compared to the rights and remedies which such parties would have had against Sellers had this Agreement not been consummated.

1.4    Excluded Liabilities.    Except for the Assumed Liabilities expressly set forth in Section 1.3, the Purchaser shall not assume, or become liable for the payment or performance of, any Liabilities of any Seller of any nature whatsoever, whether accrued or unaccrued, known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, liquidated or unliquidated, or due or to become due (collectively, the "**Excluded Liabilities**"), including the following Liabilities, all of which shall remain Liabilities of the Sellers for which the Sellers shall remain solely and exclusively liable:

(a)    all Liabilities of any of the Sellers relating to any of the Excluded Assets (including the Non-Assigned Contracts);

(b)    except as set forth in Section 1.3(g) (solely if the Windsor, CT Property is a Purchased Asset and transferred to Purchaser), all Liabilities relating to any environmental, health or safety matters (including any Liability under any Environmental Law), in any way arising out of or relating to any Seller's or its Affiliates operation of its business or its leasing, ownership, use or operation of real property prior to the Closing Date, no matter when raised and no matter whether raised prior to or after the Closing Date;

(c)    all Liabilities of any Seller in respect of Indebtedness, whether or not relating to the Business;

(d)    all Liabilities of any Seller to any current, former or prospective shareholder or other direct or indirect holder of equity securities or equity-linked securities of any Seller or Affiliate, including all Liabilities of any Seller or Affiliate related to the right to or issuance of any capital stock or other equity securities or the payment of any dividend or other distribution on or in respect of any capital stock or other equity securities;

(e)    all Liabilities arising out of any breach or default of the Assigned Contracts on or prior to the Closing Date or arising out of any event, fact, circumstance or period of time that occurs on or prior to the Closing Date which with the passage of time or giving of notice, or both, would constitute or give rise to such a breach or default, other than any Determined Cure Costs;

(f)    (i) sponsorship of and all Liabilities arising under or otherwise in respect of any Seller Plan that is not an Assumed Seller Plan and (ii) all Liabilities arising out of any breach or default of the Assumed Seller Plans on or prior to the Closing Date or arising out of any event, fact, circumstance or period that occurs on or prior to the Closing Date which, solely and not in combination with any event, fact, circumstance or period that occurs following the Closing Date,

10

with the passage of time or after giving notice, or both, would constitute or give rise to such a breach or default;

(g)    all Liabilities for Taxes of any Seller or its Affiliates and any for Taxes with respect to the Business or the Purchased Assets relating to the Pre-Closing Tax Period, in each case, excluding any Taxes of the Acquired Entities (other than, for the avoidance of doubt, any liability of Sellers for Taxes relating to the sale or assignment of the Acquired Entities) and any Taxes described in Section 1.3(f);

(h)    all Liabilities of any Seller or its Affiliates (other than the Acquired Entities) for the unpaid Taxes of any Person under Treas. Reg. § 1.1502-6 (or any similar provision of state, local, or non-U.S. Law), as a transferee or successor, or by contract (other than a contract the primary purpose of which is unrelated to Tax);

(i)    except to the extent that any such Liabilities are specifically assumed by the Purchaser pursuant to Section 1.3(g), all Liabilities of any Seller with respect to current or former employees that are not Transferred Employees, regardless of when arising;

(j)    all Liabilities of any Seller for pending or threatened Actions against such Seller or Affiliate, any of its assets, properties, rights or interests, the Business or such Seller's or Affiliate's operations or activities arising out of or relating to any matter, occurrence, action, omission or circumstance that occurred or existed on or prior to the Closing Date;

(k)    all Liabilities (whether civil or criminal) occurring, arising out of or relating to acts or omissions of any Seller, or any of their respective current or former directors, officers, employees, agents or independent contractors, in respect of any claimed violation of any Law at any time;

(l)    except to the extent that any such Liabilities are specifically assumed by the Purchaser pursuant to Section 1.3(h), all Liabilities of any Seller for any and all claims by or on behalf of such Seller's current or former employees relating to periods ending on or prior to the Closing Date, including employment practices, terms and conditions of employment, labor relations, union organizing, employee safety and health, wages and hours, fair labor standards, child labor, employee leaves of absence, unemployment insurance, disability rights or benefits, immigration, plant closings and layoffs, equal employment opportunity, discrimination, harassment, affirmative action (to the extent applicable), breach of contract and wrongful discharge, employee grievances and liability for any pension, profit sharing, deferred compensation (and the funding of any such benefits relating to all income earned by such Seller's current or former employees relating to periods ending on or prior to the Closing Date), workers' compensation or any other employee health, welfare or other benefit plans;

(m)    all Liabilities of any Seller or Affiliate's under any collective bargaining agreement or any agreement with any labor union;

(n)    all Liabilities for any legal, accounting, investment banking, financial advisory, reorganization, restructuring (including bankruptcy administrative expenses), brokerage or similar fees or expenses incurred by any Seller in connection with, resulting from or attributable to, the transactions contemplated by this Agreement, the Chapter 11 Cases or otherwise;

(o)    all Liabilities incurred in connection with charitable contributions from customers and amounts owed to charitable organizations; and

(p)    all Liabilities relating to or arising under any escheatment, abandoned property, unclaimed property or similar Laws of any jurisdiction.

1.5    Cure Costs; Schedule Updates; Designation Rights.

(a)    Contract and Cure Schedules.  Prior to the Execution Date, the Sellers have delivered to Purchaser a list (the "**Original Contract & Cure Schedule**") of each Contract of the Sellers and the Sellers' good faith estimate of the amount of Cure Costs applicable to each such Contract or indicating "$0.00" if no Cure Cost is estimated to be applicable for such Contract. From the Execution Date through (and including) the applicable Designation Deadline, promptly upon Purchaser's written consent or promptly following any material changes to the information set forth on the Original Contract & Cure Schedule (including any new Contracts to which any Seller becomes a party and any change in the Cure Cost of any Contract), the Sellers shall provide the Purchaser with a schedule that updates and corrects such information (as such schedule may be amended, supplemented or otherwise modified from time to time prior to the applicable Designation Deadline in accordance with the terms of this Agreement, the "**Contract & Cure Update Schedule**").  Without limiting the foregoing, if, following the Closing, it is discovered that a Contract that should have been listed on the Original Contract & Cure Schedule or any Contract & Cure Update Schedule was not so listed, the Sellers shall, promptly following the discovery thereof, notify the Purchaser in writing of any such Contract and the Sellers' good faith estimate of the amount of Cure Costs applicable to each such Contract or indicating "$0.00" if no Cure Cost is estimated to be applicable for such Contract.  Any Contract not designated by the Purchaser in writing as either an Assigned Contract or a Non-Assigned Contract, and any Permits and other assets designated in writing by the Purchaser, in each case at least one Business Day prior to the Closing, shall constitute "**Designation Rights Assets.**"  Promptly after the date hereof, if the Sellers have not already done so, the Sellers shall seek to obtain an order of the Bankruptcy Court, in form and substance acceptable to the Purchaser, extending the deadline under section 365(d)(4) of the Bankruptcy Code for the assumption of all unexpired leases of nonresidential real property to the date that is the 210th day following the Petition Date.  The Purchaser may, at any time and from time to time through (and including) the applicable Designation Deadline and prior to the entry of an order of the Bankruptcy Court approving the rejection of such Contracts, include in the definition of Assigned Contracts and exclude from the definition of Non-Assigned Contracts any Contract of any of the Sellers not otherwise included in the definition of Assigned Contracts and require such Seller to give not less than five Business Days' notice to the non-Seller parties to any such Contract of the Sellers' proposed assumption and assignment thereof to the Purchaser and the amount of Cure Costs associated with such Contract; provided, that no such change of the definitions of Assigned Contracts or Non-Assigned Contracts referred to in this sentence shall reduce or increase the amount of the Purchase Price, except to the extent of any increase in the assumption of the Assumed Liabilities as a result of Contracts being added to the Assigned Contracts by the Purchaser pursuant to this Section 1.5(a).  The Purchaser may, at any time and from time to time through (and including) the applicable Designation Deadline and prior to the assumption and assignment of such Contracts, exclude from the definition of Assigned Contracts and include in the definition of Non-Assigned Contracts, any Contract of any of the Sellers otherwise included in the definition of Assigned Contracts; provided, that no such change of the

12

definitions of Assigned Contracts or Non-Assigned Contracts referred to in this sentence shall reduce or increase the amount of the Purchase Price, except to the extent of any reduction in the assumption of the Assumed Liabilities as a result of Contracts being excluded from the Assigned Contracts by the Purchaser pursuant to this Section 1.5(a). To exercise its rights under this Section 1.5(a) to include Contracts in, or exclude Contracts from, the Assigned Contracts and the Non-Assigned Contracts, as applicable, the Purchaser shall deliver one or more written notices to the Sellers specifying the Contract(s) to be so included or excluded. If any Contract is added to (or excluded from) the Assigned Contracts and the Non-Assigned Contracts as permitted by this Section 1.5(a), then Schedule 1.1(c) or Schedule 1.1(g), as applicable, shall be deemed amended to reflect such addition, deletion or other change automatically (without any further action on the part of, or notice to, any Person) upon the delivery by the Purchaser of the notice referred to in the immediately preceding sentence and, as an administrative matter only, the Purchaser and the Sellers shall make appropriate additions, deletions or other changes to Schedule 1.1(c) or Schedule 1.1(g), as applicable, to reflect such addition or exclusion. In addition, if any Contract is added to (or excluded from) the Assigned Contracts and the Non-Assigned Contracts as permitted by this Section 1.5(a), the Sellers shall promptly take such steps as are reasonably necessary, including, if applicable, prompt delivery of notice to the non-Seller counterparty to such Contract, to cause such Contract to be assumed by the applicable Seller, and assigned to the Purchaser, or excluded and rejected, as applicable. As to each Designation Rights Asset that is not an Assigned Contract, promptly after receiving written notice from the Purchaser at any time between Closing and the applicable Designation Deadline requesting assumption, assignment and sale of any Designation Rights Asset to the Purchaser, Sellers shall take all steps necessary to assume, assign and sell to the Purchaser the applicable Designation Rights Asset.

(b)    Designation Rights Assets. With respect to any Designation Rights Asset, (i) the Purchaser shall have sole and complete authority and control over such Designation Rights Asset for the period from the Closing until the earlier of (A) the applicable Designation Deadline and (B) the date such Designation Rights Asset is assumed by the applicable Seller and assigned to the Purchaser or excluded and rejected, as applicable, (ii) the Purchaser shall, at its option, directly pay or reimburse (for reimbursement the Sellers shall provide all invoices and other supporting documentation requested by the Purchaser and afford the Purchaser and its Representatives access to all related books and records) Seller for any costs, expenses and any other liabilities incurred by the Sellers in the Ordinary Course of Business solely in connection with the operation of such Designation Rights Asset for the period from the Closing until the earlier of (A) the applicable Designation Deadline, (B) the date such Designation Rights Asset is assumed by the applicable Seller and assigned to the Purchaser and (C) the date Sellers receive written notice from Purchaser designating the exclusion of such Designation Rights Asset from the Purchased Assets, in each case other than costs, expenses or liabilities arising from or incurred in connection with (x) the administration of the Chapter 11 Cases or (y) the gross negligence, bad faith or willful misconduct of Sellers or any of their Affiliates or Representatives, (iii) all consideration or proceeds received by the Sellers in respect of, and other benefits deriving from, such Designation Rights Asset shall constitute Purchased Assets and be promptly delivered to the Purchaser, and (iv) the foregoing shall not affect the validity of the transfer to the Purchaser of any other Purchased Asset whether or not related to such Designation Rights Asset. Any Designation Rights Asset not designated as a Purchased Asset prior to the applicable Designation Deadline or that the Purchaser designates in writing to the Sellers for exclusion from the Purchased Assets shall, in each case, be an Excluded Asset for all purposes under this Agreement.

(c)    Cure Costs.  The Sellers shall be responsible for the verification of all Cure Costs for each Assigned Contract and shall, in consultation with and subject to the consent of the Purchaser, use commercially reasonable efforts to establish the proper Cure Costs, if any, for each Assigned Contract prior to the Closing Date.  To the extent that any Assigned Contract requires the payment of Cure Costs in order to be assumed pursuant to section 365 of the Bankruptcy Code, whether determined prior to or after the Closing, the Determined Cure Costs related to such Assigned Contract, or any portion thereof, shall be paid by the Purchaser within seven days after the date such Assigned Contract is assumed by the applicable Seller and assigned to the Purchaser. Notwithstanding the foregoing, (A) no prepetition Cure Costs with respect to any Designation Rights Asset shall be due until the permanent assumption thereof pursuant to this Section 1.5 and (B) the Purchaser shall not be required to make any payment for Cure Costs for, or otherwise have any Liabilities with respect to, any Non-Assigned Contract.

(d)    Disputed Cure Costs.  If any Contract requires the payment of Cure Costs in order to be assumed pursuant to section 365 of the Bankruptcy Code, and such Cure Costs will be Undetermined Cure Costs on the Closing Date because a non-Seller counterparty to such Contract proposed Cure Costs in an amount that is different than the amount of Cure Costs proposed by the Sellers and such difference will not be resolved prior to the Closing Date (each such Contract, a "**Disputed Amount Contract**"), then the Sellers shall provide the Purchaser, not less than three Business Days prior to the Closing Date, with a schedule that lists each such Disputed Amount Contract and the amount of Cure Costs that has been proposed by each such non-Seller counterparty.  If the Sellers, with the consent of the Purchaser, and the non-Seller counterparty with respect to any Disputed Amount Contract, are unable to agree on Cure Costs for such Disputed Amount Contract such that the Undetermined Cure Cost for such Disputed Amount Contract does not become a Determined Cure Cost, solely upon the Purchaser's written request, the Sellers shall seek to have the amount of Cure Costs related to such Disputed Amount Contract determined by the Bankruptcy Court.  With respect to (i) any Disputed Amount Contract for which the Cure Cost becomes a Determined Cure Cost and which becomes an Assigned Contract after the Closing Date in accordance with Section 1.5(a) and (ii) any Contract that is first disclosed to the Purchaser on or after the Closing Date and which becomes an Assigned Contract after the Closing Date in accordance with Section 1.5(a), (x) the applicable Sellers shall promptly take such steps as are reasonably necessary, including, if applicable, prompt delivery of no less than five Business Days' notice to the non-Seller counterparty to such Contract, to cause such Contract to be assumed by the applicable Seller and assigned to the Purchaser, and (y) the Purchaser shall pay the Determined Cure Costs with respect to such Assigned Contract within seven days after the date such Assigned Contract is assumed by the applicable Seller and assigned to the Purchaser.  Any reasonable and document out-of-pocket costs incurred by the Sellers in complying with this subsection shall be borne by Purchaser.

(e)    Assumption and Assignment of Assigned Contracts.  The Sellers shall take all actions required to assume and assign the Assigned Contracts to the Purchaser (other than payment of the Determined Cure Costs, which shall be the sole responsibility of the Purchaser), including taking all reasonable actions required to obtain a Bankruptcy Court order containing a finding that the proposed assumption and assignment of the Assigned Contracts to the Purchaser satisfies all applicable requirements of section 365 of the Bankruptcy Code.

(f)     <u>Post-Closing Cure Payment Arrangements</u>.  Notwithstanding the foregoing, the Purchaser may, in lieu of paying any Determined Cure Costs (or any portion thereof) with respect to any Assigned Contract directly to the applicable non-Seller counterparty, pay such Determined Cure Cost (or portion thereof) to the Sellers who shall promptly deliver such Determined Cure Cost to the applicable non-Seller counterparty.  In addition, notwithstanding anything herein to the contrary, in lieu of paying any Determined Cure Costs (or any portion thereof) with respect to any Assigned Contract pursuant to <u>Section 1.5(c)</u>, the Sellers, the Purchaser and the applicable non-Seller counterparty to such Assigned Contract may agree to a post-Closing payment schedule pursuant to which the Purchaser will make agreed upon Cure Cost payments to the applicable non-Seller counterparty (any such agreement, a "**Post-Closing Cure Payment Arrangement**").  To the extent any Post-Closing Cure Payment Arrangements are made, the aggregate amount payable under all Post-Closing Cure Payment Arrangements shall be included in the Closing Payments Schedule as if it is an Assumed Liability that is payable at the Closing.

(g)     <u>Designation of Seller Plans</u>.  The Purchaser may, at any time and from time to time through (and including) the Closing Date, include in the definition of Assumed Seller Plans and exclude from the definition of Excluded Assets any Seller Plan not otherwise included in the definition of Assumed Seller Plans; <u>provided</u>, that no such change of the definitions of Assumed Seller Plans or Excluded Assets referred to in this sentence shall reduce or increase the amount of the Purchase Price, except to the extent of any increase in the assumption of the Assumed Liabilities (subject to the limitations set forth in <u>Section 1.3</u>) as a result of Seller Plans being added to the Assumed Seller Plans by the Purchaser pursuant to this <u>Section 1.5(g)</u>.  The Purchaser may, at any time and from time to time through (and including) the Closing Date, exclude from the definition of Assumed Seller Plans and include in the definition of Excluded Assets, any Seller Plan otherwise included in the definition of Assumed Seller Plans; <u>provided</u>, that no such change of the definitions of Assumed Seller Plans or Excluded Assets referred to in this sentence shall reduce or increase the amount of the Purchase Price, except to the extent of any reduction in the assumption of the Assumed Liabilities as a result of Seller Plans being excluded from the Assumed Seller Plans by the Purchaser pursuant to this <u>Section 1.5(g)</u>.  To exercise its rights under this <u>Section 1.5(g)</u> to include Seller Plans in, or exclude Seller Plans from, the Assumed Seller Plans and the Excluded Assets, as applicable, the Purchaser shall deliver, at least three Business Days immediately preceding the Closing Date, one or more written notices to the Sellers specifying the Seller Plan(s) to be so included or excluded.  If any Seller Plan is added to (or excluded from) the Assumed Seller Plans and the Excluded Assets as permitted by this <u>Section 1.5(g)</u>, then <u>Schedule 1.1(n)</u> shall be deemed amended to reflect such addition, deletion or other change automatically (without any further action on the part of, or notice to, any Person) upon the delivery by the Purchaser of the notice referred to in the immediately preceding sentence and, as an administrative matter only, the Purchaser and the Sellers shall make appropriate additions, deletions or other changes to <u>Schedule 1.1(n)</u> to reflect such addition or exclusion.

(h)     <u>Designation of Purchased Assets and Excluded Assets</u>.  The Purchaser may, at any time and from time to time through (and including) the Closing Date, include in the definition of Purchased Assets and exclude from the definition of Excluded Assets any Excluded Asset that is included on <u>Schedule 1.2(l)</u>; <u>provided</u>, that no such change of the definitions of Excluded Assets or Purchased Assets referred to in this sentence shall reduce or increase the amount of the Purchase Price, except to the extent of any increase in the assumption of the Assumed Liabilities as a result of any Excluded Asset being added to the Purchased Assets by the

Purchaser pursuant to this <u>Section 1.5(h)</u>. The Purchaser may, at any time and from time to time through (and including) the Closing Date, exclude from the definition of Purchased Assets and include in the definition of Excluded Assets, any Purchased Asset otherwise included in the definition of Purchased Assets; <u>provided</u>, that no such change of the definitions of Purchased Assets or Excluded Assets referred to in this sentence shall reduce or increase the amount of the Purchase Price, except to the extent of any reduction in the assumption of the Assumed Liabilities as a result of Purchased Assets being excluded from the Purchased Assets by the Purchaser pursuant to this <u>Section 1.5(h)</u>. To exercise its rights under this <u>Section 1.5(h)</u> to add or exclude assets to or from the Excluded Assets and the Purchased Assets, as applicable, the Purchaser shall deliver one or more written notices to the Sellers specifying the asset(s) to be so included or excluded. If any Excluded Asset is added to (or excluded from) the Purchased Assets and the Excluded Assets, or if any Purchased Asset is added to (or excluded from) the Excluded Assets and the Purchased Assets, in any such case as permitted by this <u>Section 1.5(h)</u>, then <u>Schedule 1.2(l)</u> and any applicable Schedule referenced in <u>Section 1.1</u> shall be deemed amended to reflect such addition, deletion or other change automatically (without any further action on the part of, or notice to, any Person) upon the delivery by the Purchaser of the notice referred to in the immediately preceding sentence and, as an administrative matter only, the Purchaser and the Sellers agree to make appropriate additions, deletions or other changes to <u>Schedule 1.2(l)</u> and any other applicable Schedule to reflect such addition or exclusion.

## ARTICLE 2

## CONSIDERATION

2.1     <u>Consideration</u>. In consideration for the transfer of the Purchased Assets to the Purchaser and the other undertakings set forth herein, the purchase price (the "**Purchase Price**") for the Purchased Assets shall be (i) the assumption of the Assumed Liabilities by the Purchaser at Closing, <u>plus</u> (ii) $225,000,000 (as may be increased by the Purchaser in writing from time to time prior to the end of the Auction, the "**Prepetition Debt Bid Amount**"), which such amount will be satisfied by way of (A) an amount to be offset against the Prepetition Secured Obligations held by the Prepetition Secured Lenders pursuant to section 363(k) of the Bankruptcy Code (the "**Credit Bid Amount**") and (B) the assumption of the Restructured Indebtedness (if any) by the Purchaser at the Closing (it being understood and agreed that the portion of the Prepetition Secured Obligations in excess of the Prepetition Debt Bid Amount (if any) will remain outstanding as a claim against the Sellers that is secured to the extent of the Prepetition Agent's, on behalf of itself and the Prepetition Secured Lenders, security interest in the Excluded Assets), <u>plus</u>, (iii) if the Sellers' Cash and Cash Equivalents immediately prior to the Closing are insufficient to fund the amount of "Total Disbursements" in the Wind-Down Budget, an amount of Cash and Cash Equivalents equal to the amount of such deficiency (the "**Cash Deficiency Amount**"). Notwithstanding anything to the contrary herein, (a) under no circumstances shall any portion of the Prepetition Debt Bid Amount be converted into or otherwise require a cash payment and (b) Purchaser, in its sole and absolute discretion, may elect at the Closing to designate a portion of the Prepetition Debt Bid Amount, in lieu of such portion being included in the Credit Bid Amount, to be a portion of the Prepetition Secured Obligations assumed and restructured as secured indebtedness of Purchaser (or any of its designees hereunder, as applicable) under a financing agreement to be entered into at Closing by the Purchaser (or any of its designees hereunder, as applicable), the Prepetition Agent and the Prepetition Secured Lenders (such designated portion,

the "**Restructured Indebtedness**"), which such financing agreement shall be on terms satisfactory to each of the parties thereto (it being understood and agreed that if such designation occurs, the "Credit Bid Amount" shall, for all purposes under this Agreement, not include the Restructured Indebtedness).

2.2    Wind-Down; Delivery of Surplus Cash to Purchaser.  At the Closing, the Sellers shall retain an outside professional that is reasonably acceptable to the Purchaser to serve as a responsible officer of each Seller during the period from the Closing until one Business Day following the closure, conversion or dismissal of the Chapter 11 Cases or the appointment of a Chapter 11 trustee (if applicable), and during such period, the Sellers shall pay such responsible officer's remuneration in accordance with the Wind-Down Budget.  From and after the Closing, the Sellers shall (a) not use Excluded Cash except in accordance with the Wind-Down Budget on a line-item basis and any unused amount in one line item may not be applied or carried over to any other line item (any such unused amount shall constitute Surplus Cash), (b) keep a detailed accounting of all uses of Excluded Cash, and (c) make such accounting available to the Purchaser from time to time promptly upon the Purchaser's request.  Promptly upon the determination of what portion of the Excluded Cash constitutes Surplus Cash, the Sellers shall transfer such Surplus Cash in immediately available funds to the Purchaser.  For the avoidance of doubt, any Tax cash refund of the Sellers with respect to any Tax paid after the Closing Date may be used in accordance with the Wind-Down Budget as if the amount of such refund were added back to the line-item from which such Tax was paid, but may not be used for any other purpose.

2.3    Allocation of Purchase Price.  The Purchaser shall, not later than 90 days after the Closing Date, prepare and deliver to the Sellers a schedule allocating the purchase price for U.S. federal income Tax purposes, including Assumed Liabilities to the extent that such Liabilities are required to be treated as part of the purchase price for U.S. federal income Tax purposes, and any other relevant items among the Purchased Assets of each Seller (such schedule, the "**Allocation**"). The Allocation shall be prepared in accordance with Section 1060 of the Code and the applicable Treasury Regulations promulgated thereunder; provided the amount of the purchase price that is allocated to the Chinese Shares and Indian Shares shall be determined in good faith by Purchaser based on a valuation report obtained by Purchaser from an independent accounting firm.  The Allocation prepared by the Purchaser shall be considered final and binding on the parties unless, within 30 days after the delivery of the Allocation by the Purchaser, a Seller notifies the Purchaser that it has an objection to the allocation set forth in the Allocation.  If a Seller timely make such an objection, the Purchaser and such Seller shall work in good faith to resolve such dispute within 20 days from the date such Seller delivers the objection to the Purchaser.  The Purchaser will consider in good faith and incorporate any reasonable comments provided by a Seller.  The Sellers and the Purchaser shall report and file all Tax Returns (including amended Tax Returns and claims for refund) consistent with the Allocation as finally determined pursuant to this Section 2.3, and shall take no position contrary thereto or inconsistent therewith (including in any audits or examinations by any Governmental Body or any other proceeding), unless otherwise required by a final determination within the meaning of Section 1313 of the Code or any equivalent provisions of non-U.S., state or local Tax Law.  The Purchaser and each of the Sellers shall cooperate in the filing of any forms, Tax Returns or other documents with respect to the Allocation, including any amendments to such forms, Tax Returns or other documents required pursuant to this Agreement with respect to any adjustment to the purchase price.

17

2.4     Bulk Sales Laws.  The Purchaser hereby waives compliance by the Sellers with the requirements and provisions of any "bulk-transfer" Law of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Purchased Assets to the Purchaser.  Pursuant to Section 363(f) of the Bankruptcy Code, the sale of the Purchased Assets shall be free and clear of any and all Encumbrances and Liabilities in the Purchased Assets (other than Permitted Encumbrances), including any Encumbrances or claims arising out of any bulk transfer Laws, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.

## ARTICLE 3

## CLOSING AND TERMINATION

3.1     Closing.  Subject to the satisfaction of the conditions set forth in Section 9.1, Section 9.2 and Section 9.3, or the waiver thereof by the party or parties entitled to waive the applicable condition, the closing of the transactions contemplated by this Agreement (the "**Closing**") will take place by telephone conference and electronic exchange of documents (or, if the parties hereto agree to hold a physical closing, at such place as the parties may mutually designate in writing) on a date that is no later than the second Business Day following the date on which all of the conditions set forth in Section 9.1, Section 9.2 and Section 9.3 are satisfied or waived by the party entitled to waive the applicable condition (other than conditions that by their nature are to be satisfied at the Closing).

3.2     Closing Deliveries by Sellers.  At the Closing, the Sellers shall deliver to the Purchaser:

(a)     a duly executed bill of sale and assignment and assumption agreement with respect to the Purchased Assets and Assumed Liabilities, in substantially the form attached hereto as Exhibit A (the "**Assignment and Assumption Agreement**");

(b)     a duly executed patent assignment, in substantially the form attached hereto as Exhibit B (the "**Patent Assignment Agreement**");

(c)     a duly executed copyright assignment, in substantially the form attached hereto as Exhibit C (the "**Copyright Assignment Agreement**");

(d)     a duly executed trademark assignment, in substantially the form attached hereto Exhibit D (the "**Trademark Assignment Agreement**");

(e)     a duly executed domain name assignment, in substantially the form attached hereto as Exhibit E (the "**Domain Name Assignment**" and, together with the Patent Assignment Agreement, the Copyright Assignment Agreement, and the Trademark Assignment Agreement, the "**IP Assignment Agreements**");

(f)     duly executed general warranty deeds or equivalent form in each applicable jurisdiction (and other customary documents or instruments to transfer real property in the applicable jurisdictions, including CT Transfer Act Forms, solely if the Windsor, CT Property is a Purchased Asset and transferred to Purchaser) with respect to the Owned Real Property included

in the Purchased Assets, in form and substance reasonably satisfactory to the Purchaser and the Sellers (collectively, the "**Owned Real Property Transfer Documents**");

(g)    duly executed equity transfer documents (or other customary documents or instruments to transfer equity in the applicable jurisdictions) with respect to the equity of Stanadyne Changshu Corporation, a Chinese corporation, and Stanadyne India Private Ltd., an Indian limited company, in form and substance reasonably satisfactory to the Purchaser and the Sellers;

(h)    a Section 281 report from Deloitte Haskins & Sells Chartered Accountants LLP confirming that there are no notices, demands, claims, legal actions, proceedings, suits, litigation, prosecutions, enquiries, assessments, or re-assessments issued or initiated by any Governmental Body, in relation to any Tax payable by or recoverable by the Purchaser or the Prepetition Secured Lenders on purchase of the equity of Stanadyne India Private Ltd. in respect of any Tax or any ongoing Tax proceedings against the Sellers that may render the transfer of such equity by Sellers to Purchaser as void;

(i)    a true and correct copy of the Sale Order;

(j)    an Internal Revenue Service Form W-9 from each Seller;

(k)    the officer's certificates required to be delivered pursuant to Section 9.3(a), Section 9.3(b), and Section 9.3(c);

(l)    such documentation as may be necessary to change the authorized signatories on any bank accounts or powers of attorney relating (directly or indirectly) to the Purchased Assets;

(m)    documentation in form and substance reasonably satisfactory to the Purchaser to effect the required name changes of the Sellers as more fully set forth in Section 8.10;

(n)    such other bills of sale, deeds, endorsements, assignments, acknowledgments and other good and sufficient instruments of conveyance and transfer, all in form and substance reasonably satisfactory to the Purchaser, that are necessary to vest in the Purchaser all of the right, title and interest of the Sellers in, to and under all of the Purchased Assets;

(o)    a certificate of the Secretary (or similar officer) of each Seller certifying as to: (A) the full force and effect of such Seller's organizational documents (as applicable) attached thereto as exhibits, (B) the full force and effect of the resolutions of each Sellers' board of directors (or equivalent body) authorizing such Seller to enter into this Agreement and the other Ancillary Agreements to which such Seller is a party and (C) the incumbency of each officer of each Seller who executes this Agreement and any Ancillary Agreement to which such Seller is a party; and

(p)    all other previously undelivered Seller Ancillary Agreements required by this Agreement to be executed or delivered by the Sellers at or prior to the Closing in connection with the transactions contemplated by this Agreement.

3.3    <u>Closing Deliveries by the Purchaser</u>.  At the Closing, the Purchaser shall deliver to the Sellers:

(a)    evidence of a credit against the Prepetition Secured Obligations pursuant to section 363(k) of the Bankruptcy Code equal to the Credit Bid Amount and the release of the Sellers of any obligation with respect to the Restructured Indebtedness, if any;

(b)    a duly executed Assignment and Assumption Agreement;

(c)    duly executed IP Assignment Agreements;

(d)    the officer's certificates required to be delivered pursuant to <u>Section 9.2(a)</u> and <u>Section 9.2(b)</u>;

(e)    all other previously undelivered Purchaser Ancillary Agreements required by this Agreement to be executed or delivered by the Purchaser at or prior to the Closing in connection with the transactions contemplated by this Agreement;

(f)    a certificate of the Secretary (or similar officer) of Purchaser certifying as to: (A) the full force and effect of the certificate of formation and the limited liability company agreement of Purchaser attached thereto as exhibits, (B) the full force and effect of the resolutions of Purchaser's board of directors (or equivalent body) authorizing Purchaser to enter into this Agreement and the other Ancillary Agreements to which Purchaser is a party and (C) the incumbency of the officer of each officer of Purchaser who executes this Agreement and any Ancillary Agreement to which Purchaser is a party;

(g)    duly executed Owned Real Property Transfer Documents, to the extent required to be executed by the Purchaser in the applicable jurisdiction (including the CT Transfer Act Forms as "Transferee" and "Certifying Party" solely if the Windsor, CT Property is a Purchased Asset and transferred to Purchaser); and

(h)    by wire transfer of immediately available funds, an amount equal to the Cash Deficiency Amount, if any.

3.4    <u>Termination of Agreement</u>.  This Agreement may be terminated as follows:

(a)    by the mutual written consent of the Sellers and the Purchaser at any time prior to the Closing;

(b)    by either the Purchaser or the Sellers, if the Closing shall not have been consummated on or prior to July 25, 2023 (the "**Outside Date**"); <u>provided</u>, <u>further</u>, that the right to terminate this Agreement under this <u>Section 3.4(b)</u> shall not be available to the Purchaser or the Sellers, as applicable, if the Purchaser or any Seller, as applicable, is then in material breach or violation of any of their respective representations, warranties, covenants or agreements under this Agreement and the delay is caused by such breaching party;

(c)     by either the Purchaser or the Sellers, if there shall be a permanent injunction, restraining order or decree of any nature of any Governmental Body that is in effect that prevents or prohibits the consummation of the transactions contemplated hereby;

(d)     by the Purchaser, if any of the Sellers seek an order of the Bankruptcy Court dismissing the Chapter 11 Cases or converting the Chapter 11 Cases to a case or cases under Chapter 7 of the Bankruptcy Code, or the Bankruptcy Court enters such an order for any reason (except with the Purchaser's prior written consent), or if any of the Sellers seek an order of the Bankruptcy Court appointing a trustee or examiner with expanded powers to operate or manage the financial affairs, the business or the reorganization of any Seller in the Chapter 11 Cases, or if any such appointment occurs for any reason;

(e)     by the Purchaser, if any Seller has entered into, or shall have publicly announced its intention (including by means of any filings made with the Bankruptcy Court or any other Governmental Body) to enter into, an agreement in principle, letter of intent, memorandum of understanding, definitive agreement or other arrangement, whether binding or non-binding, or whether subject to terms and conditions, with any Person (other than the Purchaser or its Affiliates) with respect to an Alternative Transaction except, subject to the terms of the Bidding Procedures, in the event that the entering into such agreement or document, or such announcement, relates to an Alternative Transaction with the Successful Bidder and the Purchaser elects to be, and is identified by the Sellers as, the Back-Up Bidder; provided, however, that the Purchaser shall have the right to terminate this Agreement pursuant to this Section 3.4(e) on or at any time after the 20th day following the date which is 20 days after the date of the entry of the Sale Order unless the Purchaser becomes the Successful Bidder on or prior to such date;

(f)     automatically, upon consummation of an Alternative Transaction;

(g)     by the Purchaser, (i) if any Seller shall have breached or failed to perform any of its representations, warranties, covenants or other obligations contained in this Agreement, or if any representation or warranty of any Seller in this Agreement shall have become untrue, and (ii) any such breach, failure to perform or occurrence referred to in clause (i) (A) would result in a failure of any condition set forth in Sections 9.1 or 9.3 and (B) is not curable or able to be performed, or, if curable or able to be performed, is not cured or performed prior to the later of (x) the Outside Date and (y) 10 Business Days after written notice of such breach, failure or occurrence is given to the Sellers by the Purchaser;

(h)     by the Sellers, (i) if the Purchaser shall have breached or failed to perform any of its representations, warranties, covenants or other obligations contained in this Agreement, or if any representation or warranty of the Purchaser in this Agreement shall have become untrue, and (ii) any such breach, failure to perform or occurrence referred to in clause (i) (A) would result in a failure of a condition set forth in Sections 9.1 or 9.2 and (B) is not curable or able to be performed, or, if curable or able to be performed, is not cured or performed prior to the later of (x) the Outside Date and (y) 10 Business Days after written notice of such breach, failure or occurrence is given to the Purchaser by the Sellers;

(i)     by the Purchaser, if all the conditions set forth in Section 9.1, Section 9.2 and Section 9.3 have been satisfied (other than conditions that by their nature are to be satisfied at

the Closing) or waived in writing and the Sellers fail to consummate the transactions contemplated hereby at the Closing;

(j)     by the Sellers, if all of the conditions set forth in Section 9.1, Section 9.2 and Section 9.3 have been satisfied (other than conditions that by their nature are to be satisfied at the Closing) or waived and the Purchaser fails to satisfy any portion of the Purchase Price;

(k)     by either the Purchaser or the Sellers, if, following the Sale Hearing, the Purchaser is not the Successful Bidder or the Back-Up Bidder;

(l)     by the Purchaser, if (i) following entry by the Bankruptcy Court of the Bidding Procedures Order, such order is (A) amended, modified or supplemented in any way without the Purchaser's prior written consent or (B) voided, reversed or vacated or is subject to a stay or (ii) following entry by the Bankruptcy Court of the Sale Order, the Sale Order is (A) amended, modified or supplemented in any way without the Purchaser's prior written consent or (B) voided, reversed or vacated or is subject to a stay;

(m)     by the Purchaser if for any reason the Purchaser is unable, pursuant to section 363(k) of the Bankruptcy Code, to credit bid the Credit Bid Amount in payment of clause (ii)(A) of the Purchase Price or to assume the Restructured Indebtedness in payment of clause (ii)(B) of the Purchase Price, in each case, as set forth in Section 2.1;

(n)     by the Purchaser if, prior to the earlier to occur of the Bid Deadline and the acceptance by Purchaser of the Disclosure Schedules and Wind-Down Budget pursuant to Section 8.18, Purchaser or the Prepetition Agent in their sole and absolute discretion shall have determined that the results of their legal, tax, accounting and business due diligence of the Sellers are not satisfactory;

(o)     by the Purchaser, if an "Event of Default" under the Cash Collateral Order shall have occurred and not have been waived in accordance with the terms of the Cash Collateral Order, subject to any applicable cure period; or

(p)     by the Purchaser, if any of the Bankruptcy Court Milestones are not met, unless otherwise extended by the Purchaser.

3.5     Procedure Upon Termination.  In the event of a termination of this Agreement by the Purchaser or the Sellers, or both, pursuant to Section 3.4, (a) written notice of such termination shall be given promptly by the terminating party to the other parties hereto, specifying the provision hereof pursuant to which such termination is made, (b) except as set forth in Section 3.6, this Agreement shall thereupon terminate and become void and of no further force or effect and (c) the consummation of the transactions contemplated by this Agreement shall be abandoned without further action of the parties hereto.  Any termination of this Agreement by the Purchaser or the Sellers, or both, pursuant to Section 3.4 shall be effective on the date that written notice of such termination is given by the terminating party to the other parties hereto, and any automatic termination of this Agreement pursuant to Section 3.4(f) shall be effective on the date that an Alternative Transaction is consummated.

3.6     Effect of Termination.  In the event that this Agreement is validly terminated in accordance with Section 3.4, then this Agreement shall become null and void and of no further force or effect, and there shall be no Liability hereunder on the part of the Sellers, any of the Seller Parties, the Purchaser or any of the Purchaser Parties, except that the provisions of this Section 3.6 and Article 11, and any defined terms used in such Section or Article, shall survive the termination of this Agreement for any reason indefinitely; provided, however, that if such termination shall have been caused by, or shall have resulted from, the material breach by a party of any of its representations, warranties, covenants or obligations set forth in this Agreement, then any such termination shall not relieve any such breaching or failing party for damages incurred or suffered by any other party as a result of any such breach or failure.  For the avoidance of doubt, if this Agreement is terminated in accordance with Section 3.4, the Purchaser shall not be obligated to (a) pay or assume any portion of the Purchase Price or (b) pay or make any other payments described herein that would be required to be paid or made if the transactions contemplated herein were consummated.

## ARTICLE 4

## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

Except as set forth in the Schedules referred to in this Article 4, the Sellers hereby, jointly and severally, make the representations and warranties in this Article 4 to the Purchaser as of the Execution Date (except with respect to representations and warranties made as of a particular date, which shall be deemed to be made only as of such date).

4.1     Organization and Qualification.  Each Seller is a corporation or limited liability company (as applicable) duly incorporated or organized (as applicable), validly existing and in good standing under the Laws of its jurisdiction of incorporation or organization (as applicable). Each Seller is qualified and in good standing as a foreign corporation or limited liability company (as applicable) in each jurisdiction where the properties owned, leased or operated or the conduct of its Business require such qualification, except where the failure to be so qualified or licensed does not, individually or in the aggregate, have a Material Adverse Effect.  Each Seller has all requisite power and authority to own, lease and operate its properties and to carry on its Business as it is now being conducted, subject to the provisions of the Bankruptcy Code.

4.2     Subsidiaries.  Schedule 4.2 sets forth each corporation, association or other entity in which Holdings owns, of record or beneficially, any direct or indirect equity interest or any right (contingent or otherwise) to acquire any equity interest.

4.3     Authority Relative to this Agreement.  Except for such authorization as is required from the Bankruptcy Court, each Seller has all requisite power and authority to (a) execute and deliver this Agreement, (b) execute and deliver each of the Seller Ancillary Agreements to be executed and delivered by such Seller, and (c) perform its obligations hereunder and under each of the Seller Ancillary Agreements to be executed and delivered by such Seller, and to consummate the transactions contemplated hereby and thereby.  The execution and delivery by each Seller of this Agreement and each of the Seller Ancillary Agreements to be executed and delivered by such Seller, and the consummation of the transactions contemplated hereby and thereby, have been duly authorized by all requisite action on the part of such Seller subject to the approval of the

Bankruptcy Court. This Agreement has been, and at or prior to the Closing each of the Seller Ancillary Agreements will be, duly and validly executed and delivered by each Seller and (assuming the due authorization, execution and delivery by the other parties hereto and thereto, and the entry of the Sale Order) this Agreement constitutes, and each of the Seller Ancillary Agreements when so executed and delivered will constitute, legal, valid and binding obligations of each Seller, enforceable against such Seller in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at Law or in equity) (the "**Bankruptcy Exceptions**").

4.4     Conflicts; Consents and Approvals.

(a)     Except (x) as set forth on Schedule 4.4(a), (y) with respect to the CT Transfer Act (solely if the Windsor, CT Property is a Purchased Asset and transferred to Purchaser), and (z) assuming any applicable waiting period under the HSR Act has expired or been terminated, none of the execution and delivery by any Seller of this Agreement or any of the Seller Ancillary Agreements, the consummation of the transactions contemplated hereby or thereby, or compliance by any Seller with any of the provisions hereof or thereof will conflict with or result in a breach of any provision of (i) the Seller Organizational Documents, (ii) subject to and assuming entry of the Bidding Procedures Order and the Sale Order, any Material Contract to which such Seller is a party or by which such Seller or any of the Purchased Assets is bound, or (iii) subject to and assuming entry of the Bidding Procedures and the Sale Order, any applicable Law, other than, in the case of clauses (ii) and (iii) such conflicts or breaches that do not, individually or in the aggregate, have a Material Adverse Effect.

(b)     Except (x) as set forth on Schedule 4.4(b), (y) with respect to the CT Transfer Act (solely if the Windsor, CT Property is a Purchased Asset and transferred to Purchaser), and (z) and assuming any applicable waiting period under the HSR Act has expired or been terminated, no approval, order or Permit from, consent by, or registration, declaration, notification or filing with, any Governmental Body is required on the part of any Seller in connection with the execution and delivery by any Seller of this Agreement or any of the Seller Ancillary Agreements, or the consummation by any Seller of the transactions contemplated hereby or thereby (including the assumption by the Sellers of the Assigned Contracts and the assignment thereof to the Purchaser, but excluding the transfer of any Permit from a Seller to the Purchaser pursuant to this Agreement to the extent such transfer is prohibited by the terms of any such Permit or the Law governing the issuance of such Permit to such Seller and such prohibition cannot overridden by the Sale Order or other related order of the Bankruptcy Court), except for (i) the entry of the Bidding Procedures Order and the Sale Order and (ii) such other approvals, orders, Permits, consents, registrations, declarations, notifications or filings, the failure of which to obtain or make would not, individually or in the aggregate, reasonably be expected to be adverse in any material respect to the Purchased Assets or such Seller's or the Purchaser's ability to conduct the Business in the Ordinary Course of Business, in each case, taken as a whole.

4.5     Ordinary Course of Business. Except (a) as required by the Bankruptcy Court, the Bankruptcy Code or applicable law, (b) as contemplated or expressly required or permitted by this Agreement, (c) as disclosed in the Unaudited Financial Statements, or (d) as set forth on Schedule

4.5, since the Balance Sheet Date, (i) the Business has been conducted in the Ordinary Course of Business, and (ii) other than the Chapter 11 Cases, no Material Adverse Effect has occurred.

4.6     <u>Litigation</u>.  Except for the Chapter 11 Cases, or as set forth on <u>Schedule 4.6</u>, there is no material litigation, action, claim, suit, proceeding, investigation, examination, hearing, arbitration, inquiry, subpoena or audit, whether in law or equity, or whether civil, criminal, regulatory, arbitral or administrative (collectively, "**Actions**"), pending or, to the Knowledge of the Sellers, threatened against any Seller or any property or asset of any Seller.  Except with respect to orders issued in the Chapter 11 Cases or as set forth on <u>Schedule 4.6</u>, no Seller is subject to any judgment, decree, injunction, subpoena, order, ruling, writ, assessment or award of any court, arbitration panel or other Governmental Body that relates to the Business, the Purchased Assets or the Assumed Liabilities.

4.7     <u>Intellectual Property</u>.

(a)     <u>Schedule 4.7(a)</u> lists (i) all of the patents, registered trademarks, registered copyrights, Internet domain names, and applications for any of the foregoing, in each case that constitute the Owned Intellectual Property, (ii) a list of all other material Owned Intellectual Property and (iii) a list of all Licensed Intellectual Property (except for Intellectual Property licensed pursuant to off the shelf software and licenses implied in the sale of such software).

(b)     Except as set forth on <u>Schedule 4.7(b)</u>, (i)  the Sellers exclusively own all right, title and interest in and to the Owned Intellectual Property, free and clear from any Encumbrances (other than Permitted Encumbrances) and free from any requirement of any present or future royalty payments, license fees, charges or other payments, or conditions or restrictions whatsoever; and (ii) no Action is pending, or, to the Knowledge of the Sellers, threatened challenging the validity, enforceability, registration, ownership or use of any Seller Intellectual Property.

(c)     To the Knowledge of the Sellers, none of the Sellers nor any of their respective products or services are infringing upon, misappropriating, diluting or otherwise violating, the Intellectual Property of any third party and, to the Knowledge of the Sellers, no Person is infringing upon, misappropriating, diluting or otherwise violating, any Seller Intellectual Property.  Except as set forth on <u>Schedule 4.7(c)</u>, there is no pending Action alleging that any Seller or any of its products or services is infringing, misappropriating, diluting or otherwise violating the Intellectual Property rights of any Person and, to the Knowledge of the Sellers, no such Actions are threatened.

(d)     To the Knowledge of the Sellers, all Seller Intellectual Property is valid and enforceable and has not been adjudged invalid or unenforceable, in whole or in part, and the Sellers have paid all renewal, maintenance, and other fees and taxes when due as required to maintain, protect, and enforce (as applicable) each and every registration and application of any applicable Seller Intellectual Property in full force and effect.  <u>Schedule 4.7(d)</u> lists all actions (including the payment of any fees) that are required to be made within 120 days of the date hereof to maintain or continue to prosecute all Seller Intellectual Property.

(e)     Except as set forth on <u>Schedule 4.7(e)</u>, to the Knowledge of the Sellers, the Sellers have the right to use the Licensed Intellectual Property as used in the conduct of the Business as currently conducted, free and clear of any Encumbrances (other than Permitted Encumbrances).  To the Knowledge of the Sellers, the Seller Intellectual Property together with the other Purchased Assets comprises all the Intellectual Property necessary for the Sellers to conduct and operate the Business in the Ordinary Course of Business.  The Sellers have not used open source licenses in a manner that would require the Sellers to make available or license the source for its proprietary software (if any) under the terms of an open source license.

(f)     The Sellers have taken all commercially reasonable actions to maintain and protect all of the Seller Intellectual Property and IT Assets and to protect and preserve the confidentiality of all trade secrets and other confidential information included in the Seller Intellectual Property, including requiring all Persons having access thereto to execute written non-disclosure agreements.  The Sellers have obtained from all employees and consultants who provide or provided services to the Sellers related to the creation, development, modification or ownership of trade secrets used in the Business, executed agreements under which such employees or consultants are or were required to convey to the Sellers ownership of all inventions and developments conceived or created by them in the course of their work for any of the Sellers.

(g)     The IT Assets are adequate in all material respects for the operation of the Business as currently operated and are in good working condition (normal wear and tear excepted). There has not been any material malfunction with respect to any of the IT Assets in the last three years that has not been remedied or replaced in all material respects.  The IT Assets include all of the information technology equipment necessary to operate the Business as presently conducted or proposed to be conducted.   To the Knowledge of the Sellers, the consummation of the transactions contemplated hereby will not result in the loss or impairment of or payment of additional amounts with respect to, nor require the consent of any other Person in respect of, the Purchaser's right to own, use or hold for use any of the IT Assets as owned, used or held for use in the conduct of the Business as currently conducted.

(h)     In connection with its collection, retention, storage, transfer (including any transfer across national borders) or use of any personally identifiable information from any individuals, including any customers, prospective customers, employees or other third parties (collectively, "**Personal Information**"), to the Knowledge of the Sellers, the Sellers have been in compliance with all Laws in all relevant jurisdictions, all applicable privacy policies and the requirements of any Contract or codes of conduct to which a Seller is a party or to which a Seller is bound or subject.  Each Seller has commercially reasonable physical, technical, organizational and administrative security measures and policies in place to protect all Personal Information collected or stored by it or on its behalf in connection with the Business from and against unauthorized access, use or disclosure.  In connection with the operation of the Business, each Seller is and has been in compliance in all material respects with its securities and policies regarding the collection and storage of Personal Information and all Laws relating to data loss, theft and breach of security notification obligations.  The Sellers have at all times contractually required all third parties, including vendors, Affiliates, and other persons providing services to the Sellers in connection with the Business that have access to or receive Personal Information from or on behalf of the Sellers to comply with all Laws relating to data loss, theft and breach of security notification obligations.  No Person (including any Governmental Body) has made any written

claim or commenced any Action relating to the Sellers' information privacy or data security practices, including with respect to the access, disclosure or use of Personal Information maintained by or on behalf of any Seller in connection with operation of the Business or, to the Knowledge of the Sellers, threatened any such Action or conducted investigation or inquiry thereof. The Sellers have not, in the past three years, experienced any loss, damage, or unauthorized access, disclosure, use or breach of security of any Personal Information in its possession, custody or control, or otherwise held or processed on its behalf.

4.8     Material Contracts.

(a)     Schedule 4.8(a) sets forth, as of the Execution Date, the following types of Contracts that are unexpired as of the Execution Date to which a Seller is a party or a beneficiary or by which any of the Purchased Assets are bound (such Contracts set forth below are collectively referred to as the "**Material Contracts**"):

(i)     except for purchase orders, all Contracts requiring payments by or to a Seller in excess of $500,000 during (A) any 12-month period or (B) during the term of the Contract, if such term is less than 12 months, in each case, which Contract is not set forth in the following clauses (ii) through (xvii);

(ii)     all Accommodation Agreements;

(iii)     all collective bargaining agreements (and any other Contract with any labor organization, union or association);

(iv)     except for purchase orders, Contracts to which any Significant Vendor/Supplier is a party;

(v)     Each employment agreement, consulting agreement, severance agreement, change of control agreement and retention agreement, in each case requiring payments by a Seller in excess of $200,000 in any 12-month period;

(vi)     Contracts to which any officer, director or equity holder of a Seller, or any Affiliate of any such Person is a party;

(vii)     each Contract for the lease, sublease, license or use of any real property or any material Furniture and Equipment used or held for use in the Business, in each case requiring payments by a Seller in excess of $250,000 in any 12-month period;

(viii)     Contracts that (A) limit or restrict a Seller from engaging in any business or other activity in any jurisdiction or (B) create any exclusive relationship or arrangement;

(ix)     Contracts granting to any Person an option or a right of first refusal, first-offer or similar preferential right to purchase or acquire any of the Purchased Assets;

(x)     Contracts for the granting or receiving of a license, sublicense or franchise or under which any Person is obligated to pay or has the right to receive a royalty,

license fee, franchise fee or similar payment, in each case requiring payments by a Seller in excess of $250,000 in any 12-month period;

(xi)    Contracts (other than for commercially available off the shelf software) where a Seller is a licensor or licensee of Intellectual Property used in the operation of the Business, in each case requiring payments by a Seller in excess of $250,000 in any 12-month period;

(xii)    joint venture or partnership Contracts;

(xiii)    each Contract for capital expenditures or the acquisition or construction of fixed assets relating to the Business, the performance of which involves consideration in excess of $250,000 that is unpaid as of the Execution Date;

(xiv)    each Contract that provides for an increased payment or benefit, or accelerated vesting of any benefit, to any current or former employee of a Seller solely (and not in combination with any other event) as a result of the execution of this Agreement or the consummation of the transactions contemplated hereby;

(xv)    Contracts relating to the acquisition (by merger, consolidation or acquisition of stock or assets) of any Person or division thereof or collection of assets constituting all or substantially all of a business or business unit entered into at any time since December 31, 2019;

(xvi)    each Contract that is a requirements contract or other arrangement pursuant to which a Seller is obligated or otherwise required to obtain all or any portion of products or services exclusively from any Person;

(xvii)    each Contract that contains minimum purchase obligations (e.g., take-or-pay) or that contains penalties or repricing provisions if certain minimum quantities of products or services are not purchased; and

(xviii)  Contracts with any Governmental Body.

(b)    Assuming entry of the Bidding Procedures Order and the Sale Order and that all consents, approvals, notices and disclosures described on Schedule 4.4(a) and Schedule 4.4(b) are obtained or made (as applicable), (i) each Material Contract (other than any Material Contract that has expired or terminated in accordance with its terms after the Execution Date or that has been terminated not in violation of this Agreement) (x) constitutes a valid and binding obligation of the Seller party thereto and, to the Knowledge of the Sellers, each other party thereto and (y) is in full force and effect, except in each of the preceding clauses (x) and (y) as limited by Bankruptcy Exceptions, (ii) no Seller is in, or, to the Knowledge of the Sellers, alleged to be in, breach or default under any Material Contract, except for payment defaults for which estimated Cure Costs have been set forth on the Original Contract & Cure Schedule in accordance with Section 1.5(a) and such other breaches or defaults arising as a consequence of the commencement of the Chapter 11 Cases and (iii) assuming entry of the Sale Order, upon consummation of the transactions contemplated by this Agreement, each Material Contract shall continue in full force and effect without penalty or any adverse consequence to the Purchaser.

(c)    The Sellers have heretofore delivered or made available to the Purchaser copies of all Material Contracts that are in writing, including all amendments, modifications, schedules and supplements thereto and all waivers with respect thereto.

4.9    Permits.

(a)    Except as set forth on Schedule 4.9(a)(i), to the Knowledge of the Sellers, all of the material Permits that are necessary for the operation of the Business and the ownership or use of the Purchased Assets (collectively, the "**Material Permits**") are held by the Sellers and are in full force and effect.  Schedule 4.9(a)(ii) sets forth a list of all Material Permits held by the Sellers as of the Execution Date.

(b)    To the Knowledge of the Sellers, each Seller is in compliance with its respective obligations under each of the Material Permits and the rules and regulations of the Governmental Body issuing such Material Permits, and no condition exists that with notice or lapse of time or both would constitute a default under, or a violation of, any Material Permit.

(c)    Each Material Permit is valid and in full force and effect and there is no Action, written notice of violation, order of forfeiture or written complaint or investigation against any Seller relating to any of the Material Permits pending or, to the Knowledge of the Sellers, threatened before any Governmental Body.  To the Knowledge of the Sellers, none of the Material Permits will be terminated or otherwise adversely impacted by the transactions contemplated by this Agreement.

4.10    Brokers and Finders.  Except as set forth on Schedule 4.10, no Seller has employed any investment banker, broker, finder, consultant or intermediary in connection with the transactions contemplated by this Agreement which would be entitled to any investment banking, brokerage, finder's or similar fee or commission in connection with this Agreement or the transactions contemplated hereby.

4.11    Title to Assets.  Upon the entry and effectiveness of the Sale Order, the Sellers will have the power and right to sell, assign, transfer, convey and deliver to the Purchaser good and valid title (or, in the case of leased Purchased Assets, a valid and subsisting leasehold interest in), free and clear of any Encumbrances (except for Permitted Encumbrances), to all of the Purchased Assets, to the fullest extent permissible by Law and subject to the terms of Section 8.4.  The Purchased Assets constitute substantially all of the properties, assets and rights used by the Sellers for the Purchaser to conduct and operate the Business in the Ordinary Course of Business, other than the Excluded Assets.  To the Knowledge of the Sellers, all of the Purchased Assets are in operating condition and repair, reasonable wear and tear excepted and are capable of being used in the Ordinary Course of Business in the manner consistent with past practice.

4.12    [Reserved].

4.13    Real Property.

(a)    Schedule 4.13(a) sets forth a list of each real property owned by the Sellers (together with all buildings, fixtures, structures and improvements situated thereon and all easements, rights-of-way and other rights and privileges appurtenant thereto, collectively, the

"**Owned Real Property**"), including with respect to each property, the address location and use. To the extent in their possession, the Sellers have delivered to the Purchaser copies of the deeds and other instruments (as recorded) by which the applicable Seller acquired such Owned Real Property, and copies of all title insurance policies, opinions, abstracts and surveys in the possession of the Sellers with respect to such Owned Real Property.  With respect to each parcel of Owned Real Property: (i) the applicable Seller has valid fee simple title, free and clear of all Encumbrances, except for Permitted Encumbrances and those Encumbrances set forth on Schedule 4.13(a)(i); (ii) except as set forth on Schedule 4.13(a)(ii), Sellers have not leased or otherwise granted to any Person the right to use or occupy such Owned Real Property or any portion thereof; and (iii) to the Knowledge of the Sellers, there are no unrecorded outstanding options, rights of first offer or rights of first refusal to purchase such Owned Real Property or any portion thereof or interest therein.

(b)      Schedule 4.13(b)(i) sets forth a list of all Leased Real Property specifying the address of all such Leased Real Property and a description of all documents comprising the Assumed Real Property Leases.  Except as set forth on Schedule 4.13(b)(ii), no Seller has assigned, subleased, mortgaged, pledged or otherwise encumbered its interest under any Assumed Real Property Lease and no Seller has leased, subleased or granted to any Person the right to use or occupy any portion of such Seller's interest in the Leased Real Property that is not otherwise a Permitted Encumbrance or that will not otherwise be terminated on or prior to the Closing Date.

(c)      Except as a result of the filing of the Chapter 11 Cases or as set forth on Schedule 4.13(c), Sellers and, to the Knowledge of the Sellers, each of the other parties thereto has performed in all material respects all material obligations required to be performed by it under each Assumed Real Property Lease and each Assumed Real Property Lease is in full force and effect, not subject to any uncured material defaults and has not been amended, except as set forth on Schedule 4.13(b)(i).  No Seller has received any written notice of condemnation or eminent domain proceedings pending or threatened that affect any of the Assumed Leased Real Property or the Owned Real Property.  No Seller has received any written notice of any material zoning, ordinance, building, fire or health code or other material legal violation affecting any of the Assumed Leased Real Property or the Owned Real Property, except where any such violations would not, individually or in the aggregate, reasonably be expected to be adverse in any material respect to the Purchased Assets or to such Seller's or the Purchaser's ability to substantially conduct the Business in the Ordinary Course of Business.

4.14    Compliance with Law.  Except as set forth on Schedule 4.14, each Seller is in compliance in all material respects with all applicable Laws.  No Seller has received any written notice or, to the Knowledge of the Sellers, oral notice of any alleged violation of any Law applicable to it from any Governmental Body or third party, which remains pending or unresolved. No Seller is subject to, or in default in any respect with, any order of any Governmental Body applicable to the Business, the Purchased Assets or the transactions contemplated under this Agreement.  Except as set forth on Schedule 4.14, no investigations, inquiries, reviews or Actions by any Governmental Body with respect to the Business have been commenced nor, to the Knowledge of the Sellers, are any contemplated.

4.15   Tax Returns; Taxes.  Except as set forth on Schedule 4.15:

(a)   All material Tax Returns required to have been filed by the Sellers relating to the Business or the Purchased Assets have been duly and timely filed (taking into account applicable extensions) and are true, correct and complete in all material respects, and no material fact has been omitted therefrom.  No extension of time in which to file any such Tax Returns is currently in effect.

(b)   All material Taxes due and payable by the Sellers (whether or not shown on any Tax Return) relating to the Business or the Purchased Assets have been paid in full.

(c)   No claims have been asserted against the Sellers with respect to Taxes relating to the Business or the Purchased Assets that are being asserted in writing, proposed in writing or, to the Knowledge of the Sellers, threatened.  No proposals or deficiencies for any material amount of Taxes of the Sellers relating to the Business or the Purchased Assets are being asserted in writing, proposed in writing or, to the Knowledge of the Sellers, threatened, and no audit or investigation of any Tax Return of any Seller relating to the Business or the Purchased Assets has occurred in the last five years or is currently underway, or, to the Knowledge of the Sellers, pending or threatened.  No claim has ever been made against any Seller by any Governmental Body in a jurisdiction where such Seller does not file Tax Returns with respect to the Business or the Purchased Assets that such Seller is or may not be subject to taxation in such jurisdiction.

(d)   With respect to the Purchased Assets or the Business, the Sellers have withheld and paid all material Taxes required to have been withheld and paid by them to the appropriate Governmental Body in connection with amounts paid or owing to any current or former employee, independent contractor, creditor or shareholder thereof or other third party, and have substantially complied with their Forms W-2 and 1099 reporting obligations.  There are no Encumbrances for Taxes with respect to the Purchased Assets or the Business, nor is there any such Encumbrance that is, to the Knowledge of the Sellers, pending or threatened, in each case, other than Permitted Encumbrances.

(e)   No Seller has executed or filed with any Governmental Body any agreement or waiver extending the period for assessment, reassessment or collection of any material Taxes with respect to the Business or the Purchased Assets (other than any extension of time in which to file any income Tax Return).

(f)   No Seller is a party to or bound by any written tax sharing, tax indemnity or tax allocation agreement or other similar written arrangement with any other party that is not a Seller or an Affiliate of a Seller (other than any commercial agreement the principal subject matter of which is not Taxes).  No Seller has any Liability for Taxes with respect to the Business or the Purchased Assets of any other Person as a transferee or successor, by Law or by Contract.  No Seller has any liability for the Taxes of any other Person that is not a Seller of an Affiliate of a Seller under Treasury Regulation § 1.1502-6 or any similar provision of state, local or foreign Law (other than any liabilities with respect to being a member of a combined, consolidated, unitary, affiliated or other similar group in which a Seller is the parent).

31

(g)     No Acquired Entities will be required to include any material item of income in, or exclude any material item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of any: (i) change in method of accounting for a taxable period (or portion thereof) ending on or prior to the Closing Date; (ii) "closing agreement," as described in Code §7121 (or any corresponding provision of state, local, or non-U.S. income Tax Law); (iii) installment sale or open transaction made on or prior to the Closing Date; or (iv) prepaid amount received on or prior to the Closing Date.

(h)     The Sellers have collected all material sales and use Taxes required to be collected with respect to the Business or the Purchased Assets, and has remitted, or will remit on a timely basis, such amounts to the appropriate governmental authorities.

(i)     No Seller is or has been a party to any "listed transaction," as defined in Code §6707A(c)(2) and Treas. Reg. §1.6011-4(b)(2).

The representations set forth above in this Section 4.15 and any other representations that expressly refer to Taxes or Tax Law constitute the sole and exclusive representations and warranties made by the Sellers with respect to the matters set forth herein and no other representation or warranty contained in any other section of this Agreement shall be deemed to be made with respect to the same.

4.16    Benefit Plans.

(a)     Schedule 4.16(a) contains a list of each Seller Plan in effect as of the Execution Date.

(b)     The Sellers have delivered or made available to the Purchaser copies of all Assumed Seller Plans and related trust agreements, annuity contracts or other funding instruments and summary plan descriptions, if applicable.

(c)     Except as listed on Schedule 4.16(c), none of the Seller Plans is a "multiemployer plan" (as defined in Section 3(37) of ERISA), is or has been subject to Sections 4063 or 4064 of ERISA, or is or has been subject to Title IV of ERISA or Section 412 or 430 of the Code.  Neither any Seller nor any of its ERISA Affiliates has any Liability under Title IV of ERISA or Section 412 or 430 of the Code.  None of the Seller Plans is subject to any Laws outside of the United States.

(d)     Each Assumed Seller Plan has been established, administered and invested in accordance with its terms and in material compliance with all applicable Laws, include ERISA and the Code.  Each Seller has performed and complied in all material respects with all of its obligations under or with respect to the Assumed Seller Plans.  Each Assumed Seller Plan that is intended to be a "qualified plan" within the meaning of Section 401(a) of the Code ("**Qualified Plan**") and each trust that is intended to be exempt under Section 501 of the Code ("**Exempt Trust**") has received a determination or opinion letter from the Internal Revenue Service to the effect that such Qualified Plan is so qualified and such Exempt Trust is so exempt, and, to the Knowledge of the Sellers, nothing has occurred since the date of the most recent Internal Revenue Service determination or opinion letter, as applicable, that would adversely affect the tax-qualified status of any Qualified Plan or Exempt Trust.

32

(e)      There is no Action relating to, or seeking benefits under, any Assumed Seller Plan that is pending or, to the Knowledge of the Sellers, threatened against any Seller (other than any claims for benefits under the Assumed Seller Plans in the Ordinary Course of Business).

(f)      No Assumed Seller Plan provides post-retirement or post-termination employee benefits (including death, medical or health benefits) to or in respect of any current or former employees of any Seller or their beneficiaries, and no Seller has any obligation to provide such benefits other than COBRA continuation coverage.  All contributions or premiums required to be made by any Seller to or under each Assumed Seller Plan have been made in a timely fashion in accordance with applicable Law, and the terms of the applicable Assumed Seller Plan, and no Seller has, and as of the Closing Date will not have, any actual or potential unfunded Liabilities with respect to any Assumed Seller Plans.

(g)      Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby (alone and not in conjunction with any other event) will limit the ability of Purchaser to amend or terminate any Assumed Seller Plan.

4.17    Labor Matters.

(a)      To the extent permitted by applicable Law, a list of all of the employees of the Sellers as of the Execution Date, specifying their position, date of hire, hourly wage rate or annual base salary, bonus opportunity, and accrued vacation, sick leave time and other paid time off has been provided or made available to the Purchaser on or prior to the Execution Date.

(b)      No Seller is a party to or bound by, either directly or by operation of Law, any collective bargaining agreement, labor contract, letter of understanding, letter of intent, voluntary recognition agreement or legally binding commitment to any labor union, trade union or employee organization or group which may qualify as a trade union in respect of or affecting employees of any Seller, nor is any Seller subject to any union organization effort, nor is any Seller engaged in any labor negotiation.  There are no, and within the prior five years there have not been, any (i) strikes, work stoppages, work slowdowns or lockouts pending or, to the Knowledge of the Sellers, threatened against or involving any Seller, or (ii) unfair labor practice charges, grievances or complaints pending or, to the Knowledge of the Sellers, threatened by or on behalf of any current or former employee or group of employees of any Seller, which if adversely determined, would reasonably be expected to be adverse in any material respect to the Purchased Assets or to such Seller's or the Purchaser's ability to conduct the Business in the Ordinary Course of Business.  No Seller has any obligation to make any severance or termination payment to any current or former employees in excess of any amount required to be paid under applicable Law.

4.18    Insurance Policies.  Schedule 4.18 lists all insurance policies owned or held by any Seller that are applicable to the Business, the Purchased Assets or the Assumed Liabilities (the "**Insurance Policies**").  All Insurance Policies (or substitute policies with substantially similar terms) (i) are provided by carriers that are financially solvent, (ii) are in full force and effect, (iii) all premiums with respect thereto covering all periods up to and including the Execution Date have been paid (to the extent any such premium is due and payable), and (iv) no written notice of cancellation or termination (or any other threatened termination) has been received with respect to any such policy.  Except as set forth on Schedule 4.18, there are no pending or, to the Knowledge

of the Sellers, threatened claims under any Insurance Policy. Each Seller maintains sufficient insurance with reputable insurers for the Business, properties and assets of such Seller against all risks normally insured against, and in amounts normally carried, by such Seller in the Ordinary Course of Business.

4.19    Environmental Matters. Except as set forth on Schedule 4.19, (a) to the Knowledge of the Sellers, each Seller is in material compliance with all Environmental Laws, (b) to the Knowledge of the Sellers, there is no material investigation, suit, claim, judicial or administrative proceeding or other Action relating to or arising under Environmental Laws that is pending or, to the Knowledge of the Sellers, threatened against any Seller or Owned Real Property or Leased Real Property, (c) to the Knowledge of the Sellers, none of the Leased Real Property or Owned Real Property has been listed on the federal Comprehensive Environmental Response, Compensation Liability Information System (CERCLIS) database or any other similar federal, provincial or state list of known or suspected contaminated sites, (d) to the Knowledge of the Sellers, no Hazardous Materials have been treated, stored or Released by any Seller at the Leased Real Property or Owned Real Property in violation of any applicable Environmental Laws that have had, individually or in the aggregate, a Material Adverse Effect, (e) no Seller has received any notice of or entered into any order, settlement, judgment, injunction or decree with any Governmental Body involving uncompleted, outstanding or unresolved material obligations, Liabilities or requirements relating to or arising under Environmental Laws as of the Execution Date, (f) no consent of any Governmental Body shall be required pursuant to Environmental Laws in connection with the transfer of Owned Real Property pursuant to this Agreement, and (g) Sellers have made available to Purchaser all material environmental assessments, reports or audits that are in Sellers' possession, custody or control regarding environmental matters pertaining to Owned Real Property, Leased Real Property or compliance (or noncompliance) with Environmental Laws.

4.20    Vendors and Suppliers. Schedule 4.20 lists all Significant Vendors/Suppliers. Copies of all written Contracts (other than purchase orders issued under a master agreement) with Significant Vendors/Suppliers have been provided or made available to the Purchaser. No Significant Vendor/Supplier has given any Seller written notice or, to the Knowledge of the Sellers, oral notice terminating, canceling or materially reducing, or threatening to terminate, cancel or materially reduce, any Contract or relationship with such Seller.

4.21    Inventory. The Sellers have managed their Inventory in the Ordinary Course of Business in light of the present and anticipated volume of the Business, including with respect to the usability, salability and merchantability thereof.

4.22    Product Liability.

(a)    To the Knowledge of the Sellers, during the three years prior to the date of this Agreement, the Business has not manufactured, sold or supplied products that contained any material defect in the design or manufacturing of such product and that did not comply in all material respects with (i) any express or implied product warranty or (ii) all applicable Laws. During the three years prior to the date of this Agreement, there has not been any material recall conducted by or on behalf of the Business, or, to the Knowledge of the Sellers, any investigation or inquiry by any Governmental Body concerning any product developed, designed, manufactured, processed, installed, sold, provided or placed in the stream of commerce by or on behalf of the

Business.  There are no known defects in design, construction or manufacture of products by the Business that would reasonably be expected to create an unusual risk of injury to persons or property and, to the Knowledge of the Sellers, no facts or conditions exist that would reasonably be expected to result in a product recall requirement.

(b)    Sellers have made available to the Purchaser a copy of the Business's standard warranty or warranties for sales of any and all products distributed or sold by the Business and, except as stated therein or as imposed by Law, there are no warranties, contractual commitments or contractual obligations with respect to the return, repair or replacement of any such products.  Schedule 4.22(b) sets forth the aggregate annual cost to the Business of performing warranty obligations for customers since 2019.

4.23    Financial Statements; Group Holdings.

(a)    The Sellers have delivered or made available to the Purchaser the following financial statements: (a) the audited consolidated balance sheet of Stanadyne PPT Group Holdings, Inc. as of December 31, 2021, and the related consolidated statement of operations, consolidated statements of shareholder's deficit, and cash flows for the fiscal year then ended (the "**Audited Financial Statements**"), and (b) the unaudited consolidated balance sheet of Holdings (the "**Most Recent Balance Sheet**") as of March 31, 2023 (the "**Balance Sheet Date**"), and the related unaudited consolidated statements of operations and consolidated statement of cash flows for the three-month period then ended (the "**Unaudited Financial Statements**" and, together with the Audited Financial Statements, the "**Financial Statements**").  Each of the Financial Statements (i) has been prepared in accordance with GAAP applied on a consistent basis throughout the periods covered thereby (subject, in the case of the Unaudited Financial Statements, to normal recurring year-end adjustments and the absence of all footnotes thereto); and (ii) fairly present, in all material respects, the consolidated financial position, results of operations and cash flows of Holdings and its subsidiaries as of the respective dates thereof and for the periods referred to therein.

(b)    Except as set forth on Schedule 4.23(b) no Seller has any Liabilities required by GAAP to be reflected or reserved on a consolidated balance sheet, except (i) Liabilities reflected on the liabilities side of the Most Recent Balance Sheet, (ii) Liabilities that have arisen after the Balance Sheet Date in the Ordinary Course of Business or otherwise in accordance with the terms and conditions of this Agreement, (iii) Liabilities of the type that are not required to be reflected on a balance sheet prepared in accordance with GAAP, (iv) Liabilities arising under the terms of (but not from any breach or default under) any Material Contract to which any Seller is a party; (v) Liabilities fully covered by insurance, indemnification, contribution or comparable arrangements; (vi) Liabilities addressed in any other representations or warranties (or Schedules) made by the Sellers herein (disregarding any thresholds specified therein); and (vii) Liabilities that are Excluded Liabilities.

(c)    Stanadyne PPT Group Holdings, Inc. does not own any assets or properties or engage in any business or activity other than (i) the ownership of the equity interests in Holdings, (ii) maintaining its corporate existence, (iii) participating in tax, accounting and other administrative activities as the parent of the consolidated group of companies, including the

35

Sellers, and (iv) activities incidental to the business or activities described in the foregoing clauses (i) through (iii).

4.24    <u>Wind-Down Budget</u>.  The Wind-Down Budget will be filed as a supplement to this Agreement and will be attached hereto as Annex I in accordance with <u>Section 8.18</u>.  The Wind-Down Budget will be prepared on a reasonable basis and in good faith and based on the assumptions in respect of the activities and costs and expenses to be incurred by the Seller's in winding down the Chapter 11 Cases believed by the Sellers to be reasonable at the time made and from the information then available to the Sellers.  In addition to the foregoing, the Wind-Down Budget will, among other things, provide for payment of any unpaid professionals' fees through and including the Closing Date in the Approved Budget, as such term is defined in the Cash Collateral Order.

4.25    <u>Affiliate Transactions</u>.  Except as set forth on <u>Schedule 4.25</u>, to the Knowledge of the Sellers, no Affiliate of the Sellers (other than any other Seller or any of their respective subsidiaries), or any officer or director of the Sellers or any of their subsidiaries or any member of their immediate family (a) has any material interest in any of the Purchased Assets, (b) owns any material interest in, or is an officer, director, employee or consultant of, any Person which is, or is engaged in business as, a material supplier or customer of the Business, (c) has any cause of action or other claim whatsoever against or related to the Business or the Purchased Assets, or (d) is party to any agreement or transaction with the Sellers or their subsidiaries, other than employment arrangements in the Ordinary Course of Business.

4.26    <u>Sole Representations; Non-Reliance</u>.  Except as expressly set forth in this <u>Article 4</u> or any other Ancillary Agreements, the Sellers make no other representation or warranty with respect to the transactions contemplated by this Agreement or any other Ancillary Agreement. EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT (INCLUDING ANY DOCUMENTS, STATEMENTS, INFORMATION OR OTHER MATERIALS REQUIRED TO BE DELIVERED PURSUANT TO THIS AGREEMENT AND ANY OTHER ANCILLARY AGREEMENT), THE SELLERS HEREBY DISCLAIM ALL LIABILTIY AND RESPONSIBILITY FOR, AND THE PURCHASER SHALL NOT BE ENTITLED TO RELY ON, ANY REPRESENTATION, WARRANTY, PROJECTION, FORECAST, STATEMENT OR INFORMATION MADE, COMMUNICATED OR FURNISHED (ORALLY OR IN WRITING) TO PURCHASER OR ITS AFFILIATES OR THEIR RESPECTIVE REPRESENTATIVES (INCLUDING ANY OPINION, INFORMATION, PROJECTION OR ADVICE THAT MAY HAVE BEEN OR MAY BE PROVIDED TO PURCHASER BY ANY REPRESENTATIVE OR THE SELLERS OR ANY OF THEIR RESPECTIVE AFFILIATES). THE SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES TO THE PURCHASER REGARDING THE PROBABLE SUCCESS, PROFITABILITY OR VALUE OF ANY OF THE BUSINESS OR THE PURCHASED ASSETS.

## ARTICLE 5

## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser hereby makes the representations and warranties in this Article 5 to the Sellers as of the Execution Date (except with respect to representations and warranties made as of a particular date, which shall be deemed to be made only as of such date).

5.1     Organization and Qualification.  The Purchaser is a limited liability company, duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization. The Purchaser is qualified and in good standing as a foreign entity in each jurisdiction where the properties owned, leased or operated, or the business conducted by it require such qualification, except where the failure to be so qualified or in good standing would not, individually or in the aggregate, reasonably be expected to be adverse in any material respect to the Purchaser's ability to consummate the transactions contemplated by this Agreement.  The Purchaser has all requisite power and authority to own, lease and operate its properties and to carry on its business as it is now being conducted, except where the failure to have such requisite power or authority does not, individually or in the aggregate, have a material adverse effect on the Purchaser's ability to consummate the transactions contemplated by this Agreement and the Ancillary Agreements.

5.2     Authority Relative to This Agreement.  The Purchaser has the requisite limited liability company power and authority to (a) execute and deliver this Agreement, (b) execute and deliver each of the Purchaser Ancillary Agreements, and (c) perform its obligations hereunder and under each of the Purchaser Ancillary Agreements, and to consummate the transactions contemplated hereby and thereby.  The execution and delivery by the Purchaser of this Agreement and each of the Purchaser Ancillary Agreements, and the consummation of the transactions contemplated hereby and thereby, have been duly authorized by all requisite limited liability company action on behalf of the Purchaser.  This Agreement has been, and at or prior to the Closing each of the Purchaser Ancillary Agreements will be, duly and validly executed and delivered by the Purchaser and (assuming the due authorization, execution and delivery by the other parties hereto and thereto, and the entry of the Sale Order) this Agreement constitutes, and each of the Purchaser Ancillary Agreements when so executed and delivered will constitute, legal, valid and binding obligations of the Purchaser, enforceable against the Purchaser in accordance with their respective terms, subject to the Bankruptcy Exceptions.

5.3     Conflicts; Consents and Approvals.

(a)     Assuming any applicable waiting period under the HSR Act has expired or been terminated, none of the execution and delivery by the Purchaser of this Agreement or any of the Purchaser Ancillary Agreements, the consummation of the transactions contemplated hereby or thereby, or the compliance by the Purchaser with any of the provisions hereof or thereof will conflict with or result in a breach of any provision of (i) the limited liability company agreement (or similar organizational or governing documents) of the Purchaser, (ii) any Contract to which the Purchaser is a party or by which the Purchaser or any of its properties or assets is bound, or (iii) any applicable Law, other than, in the case of clauses (ii) and (iii), such conflicts or breaches that would not, individually or in the aggregate, reasonably be expected to be adverse in any material

respect to the Purchaser's ability to consummate the transactions contemplated by this Agreement and the Ancillary Agreements.

(b)    Assuming any applicable waiting period under the HSR Act has expired or been terminated, no approval, order or Permit from, consent by, or registration, declaration, notification or filing with, any Governmental Body is required on the part of the Purchaser in connection with the execution and delivery by the Purchaser of this Agreement or the Purchaser Ancillary Agreements, or the consummation by the Purchaser of the transactions contemplated hereby or thereby, except for such approvals, orders, Permits, consents, registrations, declarations, notifications or filings the failure of which to obtain or make would not, individually or in the aggregate, reasonably be expected to be adverse in any material respect to the Purchaser's ability to consummate the transactions contemplated by this Agreement and the Ancillary Agreements.

5.4    <u>Litigation</u>.    There are no material Actions pending or, to the knowledge of the Purchaser, threatened against the Purchaser which, if adversely determined, would reasonably be expected to be adverse in any material respect to the Purchaser's ability to consummate the transactions contemplated by this Agreement.    The Purchaser is not subject to any judgment, decree, injunction, subpoena, order, ruling, writ, assessment or award of any court, arbitration panel or other Governmental Body which would reasonably be expected to be adverse in any material respect to the Purchaser's ability to consummate the transactions contemplated by this Agreement.

5.5    <u>Brokers and Finders</u>.    The Purchaser has not employed any investment banker, broker, finder, consultant or intermediary in connection with the transactions contemplated by this Agreement which would be entitled to any investment banking, brokerage, finder's or similar fee or commission in connection with this Agreement or the transactions contemplated hereby.

5.6    <u>Financial Ability; Solvency</u>.    The Purchaser has as of the date hereof and will have at and as of the Closing sufficient cash on hand or other sources of immediately available funds to enable it to make payment of the Cash Deficiency Amount and any other amounts due hereunder when due so as to consummate the transactions contemplated hereby, including satisfaction of all of the Assumed Liabilities and payments of the Determined Cure Costs.    The Purchaser is, and after giving effect to the consummation of the transactions contemplated hereby, will continue to be, solvent.    As of the date hereof, the Purchaser has no reason to believe that the representations contained in this <u>Section 5.6</u> will not be true at and as of the Closing Date.

5.7    <u>Sole Representations</u>.    Except as expressly set forth in this <u>Article 5</u> or any other Ancillary Agreement, the Purchaser makes no other representation or warranty with respect to the transactions contemplated by this Agreement or any other Ancillary Agreement.    THE PURCHASER SPECIFICALLY ACKNOWLEDGES AND AGREES THAT, EXCEPT FOR THE REPRSENTATIONS AND WARRANTIES OF THE SELLERS SET FORTH IN <u>ARTICLE 4</u> HEREOF, THE SCHEDULES AND ANY DOCUMENTS FILED IN THE BANKRUPTCY CASE WHICH HAVE BEEN SIGNED BY AN AUTHORIZED REPRESENTATIVE OF THE SELLERS, (X) THE PURCHASER IS ACQUIRING THE PURCHASED ASSETS ON AN "AS IS, WHERE IS" BASIS, AND (Y) NEITHER THE SELLERS NOR ANY OTHER PERSON IS MAKING, AND THE PURCHASER IS NOT RELYING ON, ANY OTHER REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, WHETHER

ORAL OR WRITTEN, EXPRESS OR IMPLIED, STATUTORY OR OTHERWISE, AS TO ANY MATTER CONCERNING THE SELLERS OR THE PURCHASED ASSETS OR ASSUMED LIABILITIES, THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY, OR THE ACCURACY OF COMPLETENESS OF ANY INFORMATION PROVIDED TO (OR OTHERWISE ACQUIRED BY) THE PURCHASER.

## ARTICLE 6

## EMPLOYEES

6.1     <u>Employee Offers</u>.  On or prior to the Closing Date, the Purchaser shall offer employment (on an "at will" basis) with the Purchaser or one of its Affiliates to the employees of the Sellers as determined by the Purchaser in its sole and absolute discretion.  Each such offer of employment to a potential Transferred Employee shall be on terms and conditions satisfactory to the Purchaser and such potential Transferred Employee; <u>provided</u>, <u>however</u>, that with respect to Transferred Employees who enter into written employment Contracts with the Purchaser on or prior to the Closing (the "**New Employment Contracts**"), if any, the terms of such New Employment Contracts shall govern such Transferred Employee's employment.  In addition, any offer of employment to any such employee of the Sellers who is a party to a written employment Contract with a Seller that entitles such employee to severance upon a termination of employment by such Seller will require, as a condition to the acceptance of such offer of employment, that such employee waive in writing his or her right to receive such severance from the Sellers and the Purchaser; <u>provided</u>, <u>however</u>, that the Purchaser shall be entitled to waive such condition if such employee does not agree to provide such waiver.  Notwithstanding the foregoing, nothing in this Agreement will, after the Closing Date, impose on the Purchaser any obligation to retain any Transferred Employee in its employment or the employment of any of its Affiliates.  Except as described in the remaining sentences of this <u>Section 6.1</u>, the employment of each Transferred Employee with the Purchaser or any of its Affiliates will commence immediately upon, and is subject to the occurrence of, the Closing.  In the case of any Transferred Employee who is absent from active employment and receiving short-term disability or workers' compensation benefits, or is otherwise out of work on an approved leave of absence as set forth above, the employment of such Transferred Employee with the Purchaser or its designated Affiliate will commence upon his or her return to active work, and such individual will become a Transferred Employee as of such date (but only if the Closing occurs).  The Sellers shall not and shall not authorize or direct any of their Affiliates, officers, directors or employees to (x) interfere with the Purchaser's right to make offers pursuant to this <u>Section 6.1</u>, (y) solicit or encourage any employees of the Sellers who receive an offer from the Purchaser pursuant to this <u>Section 6.1</u> to not accept or otherwise reject any such offer or (z) voluntarily terminate any employee of Sellers (except for any employee that the Purchaser does not make an offer of employment to on or prior to the Closing Date) without the prior written consent of the Purchaser, except in the case of termination for cause.  The Sellers shall, subject to applicable Law, provide cooperation and information to the Purchaser as reasonably requested by the Purchaser in writing regarding its determination of appropriate terms and conditions of employment for any potential Transferred Employees.  Notwithstanding anything to the contrary herein, subject to applicable Law and except as expressly provided in <u>Section 1.3</u> (but subject to the limitations set forth therein), the Purchaser shall have no Liability with respect to any past, present or future employee of any Seller.

6.2    <u>Assumed Seller Plans</u>.    Except as otherwise set forth in this <u>Section 6.2</u>, the Purchaser shall adopt and assume, as of the Closing Date, each of the Assumed Seller Plans with respect to all benefits to be provided under the provisions of such Assumed Seller Plans that are Assumed Liabilities.   With respect to each Assumed Seller Plan, the Purchaser or any Person designated by the Purchaser, will be substituted for the applicable Seller as the plan sponsor under each such Assumed Seller Plan and the Purchaser shall have all rights of such Seller thereunder, including full authority to maintain, amend or terminate any such Assumed Seller Plan in accordance with its terms at any time, in the Purchaser's sole and absolute discretion.   The Sellers agree to reasonably cooperate with the Purchaser in adopting and effectuating any plan amendments to the Assumed Seller Plans reasonably desired by the Purchaser, so long as such amendments are effective as of, or after, the Closing Date and are consistent with applicable Law. The parties agree to reasonably cooperate in all respects and take any actions necessary to implement the assumption by the Purchaser of the Assumed Seller Plans.   Without limiting the obligations of the Sellers under <u>Section 1.1</u> or the rights of Purchaser under <u>Section 8.2</u>, before, or as soon as administratively practicable after, the Closing, the Sellers will, or will direct the applicable third-party administrator or recordkeeper to, supply the Purchaser with (a) all records concerning participation, vesting, accrual of benefits, payment of benefits, and election forms of benefits under each Assumed Seller Plan, and (b) any other information reasonably requested in writing by the Purchaser as necessary or appropriate for the administration of each Assumed Seller Plan.   Notwithstanding the foregoing, the Purchaser shall not assume any Liabilities arising out of any acts or omissions of any of the Sellers or any fiduciaries or trustees of any Assumed Seller Plan occurring on or prior to the Closing Date in connection with the operation or administration of such Assumed Seller Plan.   Sellers shall retain all Liabilities for (i) the payment or provision of severance or similar benefits in connection with the termination of employment of any Transferred Employee as of the Closing Date, the termination of employment of any current or former employee of a Seller who is not a Transferred Employee (whether before, as of, or after the Closing Date) and (ii) the payment or provision of any change in control payment, transaction bonus or similar benefits arising as a result of the transactions described herein, and no such Liabilities shall be assumed by the Purchaser under this <u>Section 6.2</u>, <u>Section 1.3</u> or otherwise.

6.3    <u>WARN Act Liability</u>.    Except as set forth on <u>Schedule 6.3</u>, no Seller has, within 90 days prior to the date of this Agreement, terminated any employees for any reason, closed any plant or facility, effectuated any layoffs of employees or implemented any early retirement, separation or similar program (regardless of whether such termination would trigger any obligations under the WARN Act), nor has any Seller announced any such action or program for the future.   The Sellers shall be solely responsible, on a joint and several basis, for any obligations or other Liabilities under the WARN Act, or under any similar provision of any federal, state, provincial, regional, foreign or local Law, that might arise on or prior to the Closing Date, or as a consequence of the transactions contemplated by this Agreement, including providing any notice of layoff or plant closing, or maintaining the employees of any Seller on such Seller's payroll for any period of notice required by the WARN Act, or under any similar provision of any federal, state, provincial, regional, foreign or local Law.   The Sellers shall retain all Liabilities, if any, for any severance or termination costs relating to employees of any Seller who, on or prior to the Closing Date, experience a termination of employment by any Seller as a result of the transactions contemplated by this Agreement.

6.4    <u>No Third-Party Beneficiaries</u>.

(a)    Notwithstanding anything set forth in this <u>Article 6</u>, nothing contained herein, whether express or implied, (i) shall be treated as an amendment or other modification of any Seller Plan or (ii) shall limit the right of the Purchaser or any of its Affiliates to amend, terminate or otherwise modify any Seller Plan or any of the Purchaser's or any of its Affiliate's employee benefit plans or programs following the Closing Date.

(b)    Without limiting the generality of <u>Section 11.12</u>, the Sellers and the Purchaser acknowledge and agree that all provisions contained in this <u>Article 6</u> with respect to current and former employees of the Sellers are included for the sole benefit of the Sellers and the Purchaser, and that nothing herein, whether express or implied, shall create any third party beneficiary or other rights (i) in any other Person, including any current or former employees, directors, officers or consultants of any Seller, any participant in any Seller Plan, or any dependent or beneficiary thereof, or (ii) to employment or continued employment with the Purchaser or any of its Affiliates.

## ARTICLE 7

## BANKRUPTCY COURT MATTERS

7.1    <u>Competing Bids</u>.  This Agreement and the transactions contemplated hereby are subject to the Sellers' right and ability to consider higher or better competing bids with respect to the Business and the Purchased Assets pursuant to the Bidding Procedures, as approved by the Bidding Procedures Order; <u>provided</u>, that the exercise of such right shall be exercised solely in compliance with, and not in a manner inconsistent with, the Bidding Procedures, as approved by the Bidding Procedures Order.

7.2    <u>Bankruptcy Court Filings</u>.  The Sellers shall use best efforts to obtain entry of the Bidding Procedures Order and the Sale Order.  The Purchaser agrees that it will take such actions as are reasonably requested by the Sellers to assist in obtaining entry of the Bidding Procedures Order and the Sale Order and a finding of adequate assurance of future performance by the Purchaser of the Assigned Contracts, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by the Purchaser under this Agreement and demonstrating that the Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code. Sellers shall consult with the Purchaser and its representatives concerning any order of the Bankruptcy Court relating to this Agreement or the Chapter 11 Cases and provide the Purchaser with copies of all applications, pleadings, notices, proposed orders and other documents relating to such proceedings as soon as reasonably practicable prior to any submission thereof to the Bankruptcy Court and consider in good faith any of the Purchaser's comments thereto.  If any order of the Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or re-argument shall be filed with respect to any such order), Sellers shall diligently defend against such appeal, petition or motion and shall use their best efforts to obtain an expedited resolution of any such appeal, petition or motion; <u>provided</u>, that Sellers shall consult with the Purchaser regarding the status of any such actions.  Any changes to the form of the

Bidding Procedures Order or the Sale Order must be approved by the Purchaser. Sellers further covenant and agree that, after the Closing, the terms of any reorganization plan submitted to the Bankruptcy Court or any other court by or with the support of Sellers for confirmation shall not conflict with, supersede, abrogate, nullify or restrict the terms of this Agreement, or in any way prevent or interfere with the consummation or performance of the transactions contemplated by this Agreement. Without in any way limiting the foregoing, from and after the date hereof until the later to occur of (i) the Designation Deadline latest in time under this Agreement, (ii) the date that is 90 days after the Closing Date and (iii) the expiration or termination of any TSA, no Seller shall voluntarily convert its Chapter 11 Case to a Chapter 7 bankruptcy case, or otherwise cause a liquidation or equivalent event with respect to any Seller, or seek the dismissal of the Chapter 11 Cases or the appointment of a trustee or examiner with expanded powers to operate or manage the financial affairs, the business or the reorganization of any Seller in any of the Chapter 11 Cases, without the Purchaser's prior written consent.

7.3     Bankruptcy Court Milestones. Sellers shall comply with the following timeline ("**Bankruptcy Court Milestones**"):

(a)     as promptly as practicable after the date hereof, but in any event within two Business Days, the Sellers shall have filed the Sale Motion, including this Agreement;

(b)     no later than May 18, 2023, the Bankruptcy Court shall have, each in form and substance acceptable to the Purchaser and the Prepetition Agent, (x) approved the (i) Bidding Procedures and (ii) the form and manner of notice of the sale, assumption and assignment of executory contracts and unexpired leases and (y) scheduled the Auction and Sale Hearing;

(c)     the final date for submitting a qualified bid, as set forth in the approved Bidding Procedures, shall be a date no later than June 21, 2023 (the "**Bid Deadline**");

(d)     so long as at least one qualified bid has been received (other than from Purchaser) the Auction shall be a date no later than June 28, 2023;

(e)     no later than July 10, 2023, the Sale Hearing shall have occurred; and

(f)     no later than July 11, 2023, the Bankruptcy Court shall have approved the transactions contemplated by this Agreement and shall have entered the Sale Order.

## ARTICLE 8

## COVENANTS AND AGREEMENTS

8.1     Conduct of Business of the Sellers.

(a)     During the period from the Execution Date and continuing until the earlier of the termination of this Agreement in accordance with Section 3.4 and the Closing Date, except (1) as required by the Bankruptcy Court, the Bankruptcy Code or other applicable Law, (2) as otherwise expressly contemplated by this Agreement or as set forth on Schedule 8.1(a), or (3) with

the prior written consent of the Purchaser (not to be unreasonably withheld, conditioned or delayed), each Seller shall:

(i)    conduct the Business and operate and maintain its assets and properties in the Ordinary Course of Business (including performing its obligations under the Material Contracts) in all material respects except for such actions as are in accordance with Section 7.1;

(ii)    use commercially reasonable efforts to keep available the services of its employees in the Ordinary Course of Business;

(iii)    maintain and keep its properties and Furniture and Equipment in operating order and condition (normal wear and tear excepted) consistent with past practice;

(iv)    maintain in full force and effect the Insurance Policies;

(v)    use its commercially reasonable efforts to (x) preserve the goodwill of and relationships with Governmental Bodies, customers, suppliers, vendors, lessors, licensors, licensees, contractors, distributors, insurers, agents, employees and others having business dealings with such Seller in connection with the Business; and (y) comply with all applicable Laws (including Environmental Laws) and Permits and, to the extent consistent therewith, preserve its assets (tangible and intangible);

(vi)    comply with the terms and conditions of the Cash Collateral Order; and

(vii)    remain in material compliance with all privacy policies of the Sellers that are in place as of the date of this Agreement.

(b)    During the period from the Execution Date and continuing until the earlier of the termination of this Agreement in accordance with Section 3.4 and the Closing Date, except (1) as required by the Bankruptcy Court, the Bankruptcy Code or other applicable Law, (2) as otherwise expressly contemplated by this Agreement or as set forth on Schedule 8.1(b), or (3) with the prior written consent of the Purchaser (not to be unreasonably withheld, conditioned or delayed), no Seller shall:

(i)    acquire any material assets, tangible or intangible, other than in the Ordinary Course of Business;

(ii)    sell, lease, transfer or assign any material assets or properties, tangible or intangible, other than (x) sales of Inventory in the Ordinary Course of Business, or (y) the disposition of obsolete or immaterial assets not necessary for the conduct of the Business by the Sellers in the Ordinary Course of Business;

(iii)    accelerate, terminate (other than at its stated expiry date), extend, modify or amend in any material respect or cancel any Material Contract, any leases or subleases for Leased Real Property or any Contract that would be a Material Contract if in effect on the Execution Date; waive, release or assign any material rights or claims under any Material Contract,

any leases or subleases for Leased Real Property or any Contract that would be a Material Contract if in effect on the Execution Date; or enter into any lease or sublease or any Contract that would have been a Material Contract or lease or sublease for Leased Real Property had it been entered into prior to the Execution Date;

(iv)     impose, suffer or create any Encumbrance (other than Permitted Encumbrances) upon any of the Purchased Assets;

(v)     incur or make any capital expenditures in excess of $3,000,000 in the aggregate;

(vi)     transfer, assign, abandon, dispose, permit to lapse or grant any license or sublicense of, or any rights to use, any rights under or with respect to any Seller Intellectual Property, other than pursuant to license agreements entered into in the Ordinary Course of Business; take any action or knowingly fail to take any action that would reasonably be expected to result in the abandonment, cancellation or unenforceability of any Seller Intellectual Property; or enter into any settlement regarding breach or infringement of any Seller Intellectual Property, or disclose to any Person (not an employee of the Sellers) any Seller Intellectual Property not heretofore a matter of public knowledge;

(vii)     agree to any change in the rate of compensation, commission, bonus or other direct or indirect remuneration payable pay any bonus, incentive, retention or other compensation, retirement, welfare, fringe or severance benefit or vacation pay, to or in respect of, any executive officers or employees of such Seller;

(viii)     adopt, make or agree to (x) any welfare, pension, retirement, profit sharing, incentive compensation or similar plan, program, payment or arrangement for any current or former director, employee or consultant, except pursuant to the existing Seller Plans, or (y) any new employment, severance or change of control agreement;

(ix)     except as required by applicable Law or as expressly contemplated by this Agreement, with respect to the Purchased Assets, (A) make, revoke, amend or change any Tax election; (B) change any Tax accounting elections, methods, principles or practices, except insofar as may be required by GAAP or Law (or any interpretation thereof), (C) settle or otherwise finally resolve any audit or other proceeding with respect to Taxes, (D) amend any Tax Return with respect to a material amount of Taxes; or (E) surrender any right to claim a refund of Taxes, in each case, that would have the effect of increasing the tax liability of the Purchaser or the Acquired Entities;

(x)     make any material addition to, or modification of, any Seller Plan, other than (x) contributions to any Seller Plan made in the Ordinary Course of Business or (y) the extension of coverage to employees of such Seller who became eligible after the Execution Date;

(xi)     make any distributions or dividends of any Cash and Cash Equivalents, assets or properties of the Sellers in respect of outstanding securities of the Sellers;

(xii)     [Reserved];

44

(xiii)   institute, settle or agree to settle any litigation, proceeding or other Action before any court or other Governmental Body;

(xiv)   agree to any limitations on such Seller or any of its subsidiaries from engaging or competing in any line of business or in any geographic area or location or otherwise with any Person or from soliciting or hiring any Person;

(xv)   make any material change in the nature of the Business;

(xvi)   fail to pay when due any material (individually or in the aggregate with all other such unpaid Liabilities) post-Petition Date Liabilities arising out of the operations of the Business, except with respect to any such post-Petition Date Liabilities being contested in good faith and for which adequate reserves have been established in accordance with GAAP;

(xvii)   cancel, terminate or materially modify any insurance policy naming any Seller as an insured, beneficiary or a loss payable payee (except if a separate, substantially similar insurance policy will be entered into);

(xviii)   assume or enter into any labor or collective bargaining agreement;

(xix)   modify any privacy policies, notices or statements in a manner that limits the ability or right of any Seller to sell and transfer the Personal Information or other customer data to the Purchaser as contemplated herein, or limits the use of the Personal Information or other customer data by the Purchaser after the Closing;

(xx)   amend or change, as applicable, any of the Seller Organizational Documents; or

(xxi)   enter into any Contract to take any of the actions prohibited by the foregoing clauses (b)(i) through (b)(xix).

8.2   Access to Information.  From the Execution Date until the earlier of the Closing and the termination of this Agreement in accordance with Section 3.4, each of the Sellers shall afford the officers, directors, employees, auditors and other agents and representatives of the Purchaser (such people, with respect to any Seller or the Purchaser, as applicable, the "**Representatives**") access, during normal business hours and upon advance written notice to (a) the employees, the properties, offices and other facilities of the Sellers and, (b) to the extent not prohibited by Law, all books and records, facilities, Contracts and all financial, operating and other data and information, with respect to the Business that are in the possession of the Sellers, in each case, as the Purchaser may reasonably request.  In exercising its rights hereunder, the Purchaser and its Representatives shall conduct itself so as not to interfere in the conduct of the business of the Sellers prior to the Closing.

8.3   Notice of Certain Events.  Sellers shall notify the Purchaser in writing as promptly as practicable upon becoming aware of, and furnish the Purchaser any information it may reasonably request with respect to, any of the following: (a) the occurrence or nonoccurrence of any event or condition or the existence of any fact that would reasonably be expected or likely to (i) result in, the failure of any of the conditions set forth in Section 3.4 to be satisfied, (ii)

individually or in the aggregate, result in a Material Adverse Effect; provided, however, that the delivery of any notice pursuant to this Section 8.3 shall not limit or otherwise affect the remedies available to the Purchaser under this Agreement; (b) any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement; (c) any notice or other communication from any Governmental Body in connection with the transactions contemplated by this Agreement; and (d) (i) the damage or destruction by fire or other casualty of any Purchased Asset or part thereof; (ii) a Release of Hazardous Material in violation of Environmental Laws at, from or onto any property owned or operated by the Sellers or the Business; (iii) a disclaimer or denial of coverage issued by any insurance company with respect to any claim submitted by the Sellers under any of the Insurance Policies; or (iv) any Purchased Asset or part thereof becoming the subject of any proceeding (or, to the Knowledge of the Sellers, threatened proceeding) for the taking thereof or of any right relating thereto by condemnation, eminent domain or other similar governmental action.

8.4    Assignability of Certain Purchased Assets.

(a)    To the extent that the assignment to the Purchaser of any Purchased Asset (including any Assigned Contracts or any Permits included in the Purchased Assets) pursuant to this Agreement is not permitted without the consent, waiver, confirmation or other approval of a third party or is prohibited by applicable Law and such consent, waiver, confirmation or other approval or waiver of such prohibition in compliance with Law cannot be obtained prior to the Closing or overridden or canceled by the Sale Order or other related order of the Bankruptcy Court (such Purchased Assets, the "**Nonassignable Assets**"), then this Agreement will not be deemed to constitute an assignment of or an undertaking or attempt to assign such Nonassignable Asset or any right or interest therein unless and until such consent, waiver, confirmation or other approval is obtained or such prohibition is waived in compliance with Law.  If any such consent, waiver, confirmation or other approval or waiver of such prohibition is not obtained prior to the Closing Date in respect of a Nonassignable Asset, then, solely to the extent not prohibited under applicable Law (including the Bankruptcy Code) or the terms of such Nonassignable Asset, the Purchaser and the Sellers shall reasonably cooperate with each other, as of and after the Closing Date, in any lawful and feasible arrangement designed to provide the Purchaser with the benefits of, or under, the applicable Nonassignable Asset, including enforcement for the benefit of the Purchaser of any and all rights of the Sellers against any party to the applicable Nonassignable Asset arising out of the breach or cancellation thereof by such party (an "**Interim Arrangement**").  The Purchaser shall be responsible for performing all obligations under each such Nonassignable Asset required to be performed by the Sellers after the Closing Date to the extent that if such Nonassignable Asset were transferred and assigned to the Purchaser as of the Closing Date, the obligations thereunder would have constituted Assumed Liabilities.  Unless the Purchaser elects that it does not desire assignment of a Nonassignable Asset, following the Closing, the Sellers and the Purchaser shall cooperate using their respective commercially reasonable efforts to obtain as expeditiously as possible the applicable consent, waiver, confirmation or other approval with respect to each Nonassignable Asset or a waiver of any prohibition under applicable Law necessary for the assignment thereof to the Purchaser.  Nothing in this Section 8.4(a) shall obligate the Purchaser to waive any right or condition under this Agreement.

(b)     The Sellers shall, prior to and after the Closing, reasonably cooperate and comply with all reasonable requests of the Purchaser and use its commercially reasonable efforts to do any one or more of the following (at the Purchaser's election in its sole and absolute discretion) with respect to any or all of the Permits that are held by the Sellers or that are advisable, necessary, or required by Law to own, lease and operate the Purchased Assets and to own, operate and conduct the Business in the Ordinary Course of Business: (i) transfer or assign such Permits to the Purchaser; (ii) allow the Purchaser to obtain or acquire such Permits; (iii) enter into Interim Arrangements on terms and conditions reasonably satisfactory to the Purchaser to allow the Purchaser to operate the Business under or with respect to the Permits held by or on behalf of any Seller (in which case the Sellers shall keep and maintain the corresponding Permits in accordance therewith); and (iv) make such other arrangements as may be reasonably requested by the Purchaser to accomplish the intentions and objectives of this Agreement.

8.5     <u>Contracts and Permits</u>.

(a)     From the Execution Date until the applicable Designation Deadline, without the prior written consent of the Purchaser, (i) no Seller shall reject any Contract (other than any Contract that is excluded and rejected on or after the Closing Date in accordance with <u>Section 1.5</u>) in the Chapter 11 Cases or any other bankruptcy proceeding or terminate, amend, supplement, modify or waive any rights under, or create any Encumbrance (except for Permitted Encumbrances) with respect to any Contract, or take any affirmative action not required by the terms thereof, and (ii) Sellers shall hold all Permits and other assets (other than any Permit or other asset that is excluded and rejected on or after the Closing Date in accordance with <u>Section 1.5</u>) specified by the Purchaser in writing in abeyance pending designation for assignment or exclusion by the Purchaser in accordance with <u>Section 1.5</u>.

(b)     From the Execution Date the Sellers shall (i) as promptly as practicable disclose to the Purchaser in writing after it becomes Knowledge of the Sellers that there is any material failure of any of the Sellers to comply with or satisfy any of their respective covenants, conditions or agreements to be complied with or satisfied by it under this Agreement in any material respect; <u>provided</u>, <u>however</u>, that the delivery of any notice pursuant to this <u>Section 8.5(b)</u> shall not limit or otherwise affect the remedies available to the Purchaser after receiving such notice under this Agreement; and (ii) without in any way limiting the Purchaser's rights under <u>Section 8.1(b)</u>, keep the Purchaser timely apprised of all communications and inquiries, including all offers and reports, regarding the restructuring, modification, assignment or termination of any of the leases or subleases for the Leased Real Property.

8.6     <u>Further Agreements</u>.  Each Seller shall (a) as promptly as practicable deliver to the Purchaser any mail or other communication received by such Seller after the Closing Date and relating to the Business, the Purchased Assets or the Assumed Liabilities, (b) as promptly as practicable transfer in immediately available funds to the Purchaser any cash, electronic credits or deposits received by such Seller to the extent that such cash, electronic credits or deposits are Purchased Assets, including any Surplus Cash, and (c) as promptly as practicable forward to the Purchaser any checks or other instruments of payment that it receives to the extent that such checks or other instruments are Purchased Assets.  The Purchaser shall (i) as promptly as practicable deliver to the Sellers any mail or other communication received by it after the Closing Date and solely relating to the Excluded Assets or the Excluded Liabilities, (ii) as promptly as practicable

wire transfer in immediately available funds to the Sellers, any cash, electronic credits or deposits received by the Purchaser but solely to the extent that such cash, electronic credits or deposits are Excluded Assets and (iii) as promptly as practicable forward to the Sellers any checks or other instruments of payment that it receives but solely to the extent that such checks or other instruments are Excluded Assets.

      8.7    <u>Insurance Cooperation</u>.  Notwithstanding anything to the contrary in this Agreement, from and after the Closing, the Purchaser shall be entitled to the benefits under all of the Insurance Policies in place on or prior to the Closing, including on a non-exclusive basis any constituting an Excluded Asset, but subject to the terms, conditions and limitations set forth therein, with respect to any occurrences that occurred or are alleged to have occurred prior to the Closing Date concerning the Business, the Purchased Assets or the Assumed Liabilities, but in each case excluding any such benefits relating to the Excluded Liabilities.  If the Purchaser is unable make a direct claim for payment under any Insurance Policies, Sellers shall reasonably cooperate with the Purchaser in filing any insurance claims and in the collection of insurance proceeds including, where permitted by law, transferring to the Purchaser the right to pursue insurance proceeds related to such claims.  Any party receiving notice with respect to any such claim shall as promptly as practicable notify the other parties hereto.

      8.8    <u>Preservation of Records</u>.  The Sellers and the Purchaser agree that each of them shall preserve and keep the records held by them or their Affiliates relating to the Business, the Purchased Assets and the Assumed Liabilities until the later of the closing of the Chapter 11 Cases and the liquidation and winding up of the Sellers' estates (but in no event later than three years after the Closing Date except, in the case of Tax matters, until 30 days following the expiration of the period of any applicable statute of limitations) and shall make such records available to the other party as may be reasonably required by such other party in connection with, among other things, any insurance claims by, actions or tax audits against or governmental investigations of the Sellers or the Purchaser or any of their respective Affiliates or in order to enable the Sellers or the Purchaser to comply with their respective obligations under this Agreement or any of the Ancillary Agreements and each other agreement, document or instrument contemplated hereby or thereby. In the event the Sellers or the Purchaser wishes to destroy such records at the end of such preservation period, such party shall first give 60 days' prior written notice to the other party and such other party shall have the right at its option and expense, upon prior written notice given to such party within such 60 day period, to take possession of the records within 120 days after the date of such notice, or such shorter period as the liquidation and winding up of the Sellers' estates shall permit.

      8.9    <u>Publicity</u>.  The Sellers or the Purchaser may issue a press release or public announcement concerning this Agreement or the transactions contemplated hereby only with the prior written approval of the other parties hereto, which approval will not be unreasonably withheld, conditioned or delayed, unless, in the sole judgment of the disclosing party, such disclosure is otherwise required to comply with applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or the Chapter 11 Cases.  The party intending to make any such release referred to in the immediately preceding sentence shall use its commercially reasonable efforts, consistent with such applicable Law or Bankruptcy Court requirement, to consult with the other parties with respect to the text thereof.

8.10   <u>Prohibition on Use of Purchased Names</u>.  Each Seller hereby agrees that, as promptly as reasonably practicable, but in no event later than ten days after the Closing Date, it shall not use and shall cease using, and shall cause its respective Affiliates not to use and to cease using, directly or indirectly, the Purchased Names, any trademarks included in the Owned Intellectual Property and any like names or combinations of words or derivations thereof or any names or marks confusingly similar thereto; <u>provided</u>, <u>however</u>, that each Seller may continue to use as company names the Purchased Names solely for purposes of conducting and administering the Chapter 11 Cases provided that, prior to, on or as promptly as practicable after the Closing Date, the Sellers use reasonable best efforts to change the caption of the Chapter 11 Cases to names that are not similar to any of the Purchased Names.  As promptly as reasonably practicable, but in no event later than ten days after the Closing Date, each Seller shall, at its expense, undertake and as promptly as practicable pursue all necessary action to change its business and corporate names to new names bearing no resemblance to any of its present names so as to permit the use of the Purchased Names by the Purchaser or any of its subsidiaries following Closing.  In furtherance of the foregoing, as promptly as reasonably practicable, but in no event later than ten days after the Closing Date, each Seller will (a) revoke any filing that it may have made heretofore with any Governmental Body relating to its use of the Purchased Names and of any like names or combinations of words or derivations thereof and (b) prepare and file with the appropriate Governmental Bodies appropriate documents, including articles of amendment, changing its name so as to effectuate the same and as promptly as practicable deliver evidence of such name change to the Purchaser.

8.11   <u>Taxes</u>.

(a)   Any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use or other Taxes (including Indian and Chinese withholding and capital gains Taxes) and recording charges which may be payable by reason of the sale of the Purchased Assets or the assumption of the Assumed Liabilities under this Agreement or the transactions contemplated herein (all of the foregoing, "**Transfer Taxes**") shall be borne and timely paid by the Purchaser, the Purchaser shall file, or cause to be filed, any Tax Returns with respect to any Transfer Taxes, and the Purchaser shall indemnify, defend (with counsel reasonably satisfactory to the Sellers), protect, and save and hold the Sellers harmless from and against any and all claims, charges, interest or penalties assessed, imposed or asserted in relation to any such Transfer Taxes. The Purchaser and the Sellers shall use commercially reasonable efforts to minimize any Transfer Taxes to the extent permitted by applicable Law.

(b)   From and after the Closing, the Sellers and the Purchaser shall reasonably cooperate (at the requesting parties' expense) with each other in connection with the filing of any Tax Returns or in connection with any Tax contest, in each case, relating to the Purchased Assets or the Business.  Such cooperation shall include the provision of records and information reasonably requested by the other parties which are reasonably relevant to any such Tax Return or Tax contest and making employees available on a mutually convenient basis to provide assistance, additional information, and explanation of any material provided hereunder.

(c)   The Purchaser and the Sellers agree for all applicable Tax purposes that in the case of any Straddle Period, the amount of any property Taxes (or other Taxes imposed periodically on a similar basis) for the Pre-Closing Tax Period will be deemed to be the amount of

49

such Tax for the entire taxable period multiplied by a fraction the numerator of which is the number of days in the taxable period ending on the Closing Date and the denominator of which is the number of days in such Straddle Period.  The parties shall cooperate in making elections under Treasury Regulations Section 1.245A-5(e)(3)(i) to close on the Closing Date the U.S. taxable year of each Acquired Entity.

(d)    Any and all existing Tax sharing agreements between any Acquired Entities, on the one hand, and Sellers and any of their Affiliates (other than the any Acquired Entities), on the other hand, shall be terminated as of the Closing Date.  After such date none of the Acquired Entities shall have any further rights or liabilities thereunder.

(e)    The Purchaser shall not make any election with respect to any Acquired Entity pursuant to Section 336(e) or 338 of the Code or any similar provision of state or local tax law without the consent of the Sellers (not to be unreasonably withheld, conditioned or delayed; for the avoidance of doubt, it shall be reasonable for a Seller to withhold, condition or delay consent if such election would subject a Seller or any Affiliate of a Seller to any unreimbursed Tax, cost or expense or result in any economically adverse effect on a Seller or any Affiliate of a Seller).

8.12    <u>Further Assurances</u>.

(a)    Subject to the terms and conditions of this Agreement and applicable Law, each Seller and the Purchaser shall, and shall cause their respective Representatives to, use their respective commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable to ensure that the conditions precedent to the other parties' obligations hereunder set forth in this Agreement are satisfied and to consummate and make effective the transactions contemplated by this Agreement and the Ancillary Agreements as soon as practicable.

(b)    Subject to the terms and conditions of this Agreement, neither the Sellers nor the Purchaser shall take any action or refrain from taking any action the effect of which would be to delay or impede the ability of the Sellers or the Purchaser to consummate the transactions contemplated by this Agreement and the Ancillary Agreements unless taking such action or refraining from taking such action is required by applicable Law.

(c)    Following the Execution Date and until the earlier of the Closing Date and the date on which this Agreement is terminated in accordance with <u>Section 3.4</u>, the Sellers, on the one hand, and the Purchaser, on the other hand, shall keep each other reasonably informed as to the status of matters relating to the completion of the transactions contemplated hereby, including as promptly as practicable furnishing the other with copies of notices or other communications received by the Sellers or the Purchaser or by any of their respective Affiliates (as the case may be), from any third party or any Governmental Body with respect to the transactions contemplated by this Agreement and the Ancillary Agreements.

(d)    Subject to the terms and conditions of this Agreement, at and following the Closing, each of the parties shall execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and acquaintances and such other instruments, including any

50

assignment and assumption of lease agreements, and reasonably cooperate and to take such further actions, as may be reasonably necessary or appropriate to transfer and assign fully to the Purchaser and its successors and assigns, all of the Purchased Assets, and for the Purchaser and its successors and assigns to assume the Assumed Liabilities, and to otherwise make effective the transactions contemplated hereby.  Nothing in this <u>Section 8.12</u> shall obligate any party hereto to waive any right or condition under this Agreement.

(e)     Without limiting the generality of this <u>Section 8.12</u> and solely to the extent that the Sellers and the Purchaser mutually determine that any filing is required by the HSR Act with respect to the transactions contemplated by this Agreement, the Sellers and the Purchaser shall make all premerger notification and report form filings required by the HSR Act within 10 Business Days after the date on which the Purchaser provides notice to the Sellers that the Purchaser desires to make such filings, but, in any case, within two Business Days following the date that the Sale Order is entered (or, if the Purchaser is not the Successful Bidder, but is the Back-Up Bidder in accordance with the Bidding Procedures, no later than 10 Business Days following the date that the Purchaser, as the Back-Up Bidder, is selected as the new Successful Bidder), and as promptly as practicable file any additional information requested after receipt of such request therefor.  In connection with any filing under the HSR Act, the Sellers and the Purchaser shall (i) cooperate with each other, (ii) furnish to the other party all information necessary or desirable in connection with making such filing and in connection with resolving any investigation or other inquiry by any Governmental Body under the HSR Act with respect to the transactions contemplated by this Agreement, (iii) keep the other party informed of any communication received by such party from, or given by such party to, the Federal Trade Commission, the Antitrust Division of the Department of Justice, or any other Governmental Body and of any material communication received or given in connection with any proceeding by a private party, in each case regarding the transactions contemplated hereby and, unless prohibited by applicable Law, permit the other party to review in advance any proposed communication by such party to any Governmental Body or such private party and (iv) supply such commercially reasonable assistance as may be requested by any other party in connection with the foregoing; provided, however, that notwithstanding anything to the contrary contained herein, neither the Sellers nor the Purchaser (nor their respective ultimate parent entities, as such term is used in the HSR Act) shall be required to disclose to any other party, any information contained in its HSR Notification and Report Form which such party, in its sole and absolute discretion, deems confidential.  Each of the Sellers and the Purchaser shall use commercially reasonable efforts (A) to take such action as may be required to cause the termination or expiration of the waiting periods under the HSR Act as promptly as possible after the date that the filings required by the HSR Act are first made (including specifically requesting early termination of the waiting period prescribed by the HSR Act) and (B) eliminate and resolve any objection that any Governmental Body has to the transactions contemplated by this Agreement and the Ancillary Agreements under applicable antitrust Law, in each case of the preceding clauses <u>(A)</u> and <u>(B)</u>, so as to permit the transactions contemplated by this Agreement to be consummated as promptly as practicable (the actions referred to clauses <u>(A)</u> and <u>(B)</u> are referred to as the "**Regulatory Approvals**").  Notwithstanding the foregoing, the Purchaser is not required to, and the Sellers shall not without the prior written consent of the Purchaser, consent to any divestiture or other structural or conduct relief in order to obtain any Regulatory Approvals.

(f)     The Purchaser shall not enter into any transaction, or any agreement to effect any transaction (including any merger or acquisition) that is reasonably expected to make it more difficult, or to increase the time required, to: (i) obtain the expiration or termination of the waiting period under the HSR Act, or any other applicable antitrust Law; (ii) avoid the entry of, the commencement of litigation seeking the entry of, or to effect the dissolution of, any injunction, temporary restraining order or other order that would materially delay or prevent the consummation of the transactions contemplated by this Agreement and the Ancillary Agreements; or (iii) obtain all authorizations, consents, orders and approvals of the applicable Governmental Bodies necessary for the consummation of the transactions contemplated by this Agreement and the other Ancillary Agreements.

(g)     Subject to applicable Law and except as required by any Governmental Body, neither the Purchaser nor the Sellers shall (i) agree to extend any waiting period under the HSR Act without the prior written consent of the other parties hereto (such consent not to be unreasonably withheld, conditioned or delayed), (ii) enter into any agreement with any Governmental Body not to consummate the transactions contemplated by this Agreement or any other Ancillary Agreement without the prior written consent of the other parties hereto (such consent not to be unreasonably withheld, conditioned of delayed) or (iii) take any other action that would be reasonably likely to prevent or delay the receipt of any Regulatory Approvals, in each case, to the extent necessary for the timely consummation of the transactions contemplated by this Agreement and the other Ancillary Agreements.

(h)     The Purchaser agrees that neither the Sellers or any of their respective Affiliates shall have any liability whatsoever to the Purchaser arising out of or relating to the failure to obtain any such Regulatory Approvals (except to the extent that the Sellers fail to comply with its express obligations under this <u>Section 8.12</u>) that may be required in connection with the transactions contemplated by this Agreement or the other Ancillary Agreements or because of the termination of any Material Contract or Material Permit solely as a result thereof.  the Purchaser further agrees that no representation, warranty or covenant of the Sellers contained herein shall be breached or deemed breached as a result of (i) the failure to obtain any such Regulatory Approvals, (ii) any termination of a Material Contract or Material Permit referred to in the immediately preceding sentence or (iii) any proceeding commenced or threatened by or on behalf of any Person arising out of or relating to the failure to obtain any such Regulatory Approvals or any termination of a Material Contract or Material Permit referred to in the immediately preceding sentence.

(i)     Notwithstanding anything to the contrary herein, each Party shall bear their own respective costs in connection with the preparation or the making of any filing under the HSR Act or resolving any investigation or other inquiry by any Governmental Body under the HSR Act with respect to the transactions contemplated by this Agreement; including the payment of any applicable filing fees under the HSR Act.

8.13    <u>Delivery of Certain Financial Information</u>.  At least two Business Days (but no more than four Business Days) before the anticipated Closing Date (the "**Closing Payments Schedule Delivery Date**"), the Sellers shall deliver, or cause to be delivered, to the Purchaser a schedule setting forth the Sellers' good faith estimate of (i) all Assumed Liabilities that are due and payable in cash at or as of the Closing, (ii) all Cure Costs of the Assigned Contracts, and (iii) the Cash Deficiency Amount (the "**Closing Payments Schedule**"), which Closing Payments

Schedule shall be prepared in good faith based on assumptions believed by the Sellers to be reasonable at the time made and based on the information then available to the Sellers (provided, that any Cure Cost with respect to any Assigned Contract that is an Undetermined Cure Cost as of the Closing Payments Schedule Delivery Date shall be calculated based on the most recent amount asserted with respect to such Assigned Contract by the applicable non-Seller counterparty to such Assigned Contract (if the most recent amount asserted by any such non-Seller counterparty is a range of amounts, then such amount shall be the greatest amount in such range), excluding any indemnity claims and other contingent amounts except to the extent such amounts are reasonably likely to be paid at the Closing).

8.14    Personally Identifiable Information.  The Purchaser hereby agrees to maintain all personally identifiable information obtained by the Purchaser in connection with the transactions contemplated by this Agreement in accordance with the Sellers' existing privacy policies (copies of which have been provided to the Purchaser by the Sellers as of the Execution Date); provided, however, that nothing in this Agreement shall be construed to prevent the Purchaser from modifying any such privacy policies following the Closing Date to the extent permitted under such privacy policies and applicable Law.  The Sellers will reasonably cooperate with the Purchaser in the transfer of Personal Information to the Purchaser in connection with the transactions contemplated by this Agreement and the Ancillary Agreements consistent with such privacy policies.

8.15    Confidential Information.  Following the Closing, Sellers agree to maintain, and shall cause their respective Affiliates to maintain, unless disclosure is required by applicable Law, the confidentiality of any confidential information regarding the Business which is in Sellers' or any of their respective Affiliate's possession or of which Sellers or any of their respective Affiliates are aware.  Sellers hereby further agree, unless disclosure is required by applicable Law, to take all commercially reasonable steps, consistent with Sellers' past practice, and to cause each of their respective Affiliates to take all commercially reasonable steps, consistent with Sellers' past practice, to safeguard such confidential information and to protect it against disclosure.  In furtherance and not in limitation of the foregoing, following the Closing, Sellers shall not, and shall cause their respective Affiliates not to, unless required by applicable Law, disclose to any Person (a) any confidential information regarding the Business, provided, that confidential information shall not include information that becomes generally available to the public other than as a result of the breach of this Section 8.15 or information not otherwise known by the Sellers that becomes available to any Seller from a Person other than the Purchaser, a current or former employee of any Seller, or a Person known by any Seller to be bound by an obligation of confidentiality to any Seller, or (b) any of the discussions or negotiations conducted with the Purchaser in connection with this Agreement, provided, that Sellers shall be entitled to disclose (i) any information required to be disclosed by the Sellers to the Bankruptcy Court in the Chapter 11 Cases, (ii) any information required to be disclosed by the Sellers pursuant to any applicable Law (including the Bankruptcy Code) or (iii) any information to the Sellers' counsel and financial advisor; provided, that, in each case, such disclosure shall be limited to the information that is so required to be disclosed and the Person(s) to whom such disclosure is required.  Notwithstanding anything in this Section 8.15 to the contrary, unless disclosure is required by applicable Law, the confidentiality of any trade secrets of the Business or the Purchaser shall be maintained for so long as such trade secrets continue to be entitled to protection as trade secrets of the Business and the Purchaser, respectively.

8.16    <u>Transition Services</u>.  If requested by the Purchaser prior to the Designation Deadline latest in time under this Agreement, Purchaser and the Sellers agree to negotiate in good faith the terms of, and enter into effective as of the Closing (or, if such request is made by the Purchaser after the Closing, as promptly as practicable following such request), a transition services agreement (the "**TSA**") acceptable to the Purchaser and the Prepetition Agent; provided, the TSA, if any, shall (a) contain customary terms for transactions of the type contemplated by this Agreement with respect to the provision of services reasonably requested by the Purchaser or the Prepetition Agent for a reasonable period of time post-Closing; and (b) provide that Purchaser shall pay Sellers the Sellers' actual costs for such transition services and actual and direct out-of-pocket expenses incurred by the Sellers in connection with the provision of such transition services; provided, that all actual and direct out-of-pocket expenses for third party advisors must be approved in advance by the Purchaser or the Prepetition Agent (not to be unreasonably withheld, conditioned or delayed); provided, further, that Purchaser shall not be responsible, without Purchaser's or the Prepetition Agent's prior consent, for any severance, retention, bonus, deferred compensation or other non-ordinary course employee compensation.

8.17    <u>The Connecticut Transfer Act</u>.  Purchaser and Seller acknowledge and agree that the Owned Real Property located at 90-92 Deerfield Road, Windsor, CT (the "**Windsor, CT Property**") is an "establishment" as that term is defined in the CT Transfer Act.  Solely if Windsor, CT Property is a Purchased Asset, Purchaser agrees that, as between Purchaser and Seller, Purchaser shall be responsible, at its sole cost and expense, for complying with those requirements of the CT Transfer Act  that arise solely and exclusively as a result of the transfer of the Windsor, CT Property pursuant to this Agreement including, to the extent permitted by applicable law and subject to the approval of the CTDEEP, (i) signing any forms required pursuant to the CT Transfer Act to be filed with the Connecticut Department of Energy & Environmental Protection ("**CTDEEP**") in connection with the Closing (e.g., a Transfer of Establishment - Form III (Real Estate) and Environmental Condition Assessment Form, collectively the "**CT Transfer Act Forms**") as the "Transferee" and "Certifying Party"; (ii) filing the CT Transfer Act Forms with the CTDEEP within ten (10) days of the Closing and paying any associated CTDEEP filing fee; and (iii) completing any required investigation, remediation, monitoring and reporting required after the Closing pursuant to the CT Transfer Act and applicable Environmental Laws, including with respect to any prior CT Transfer Act form filings.

8.18    <u>Delivery of Wind-Down Budget and Schedules</u>.  Sellers' shall deliver (a) the Schedules related to <u>Article 4</u> (the "**Disclosure Schedules**") and (b) Annex I to this Agreement with a wind-down budget, in each case, acceptable to Purchaser in its sole discretion no later than May 16, 2023, or such later date as is consented to in writing by Purchaser.  Such wind-down budget shall be deemed the Wind-Down Budget for purposes of this Agreement.  If Sellers fail to timely deliver the Disclosure Schedules or Annex I in accordance with the foregoing, such failure shall be deemed a material breach of this Agreement.  The Sellers acknowledge and agree that this Agreement does not satisfy the Milestone (as defined in the Cash Collateral Order) in section 8(b)(ii) of the Cash Collateral Order as the Prepetition Agent has advised the Sellers that it is not in form and substance satisfactory to the Prepetition Agent unless and until the Disclosure Schedules are delivered and Annex I is updated in accordance with the foregoing in form and substance satisfactory to the Prepetition Agent in its sole discretion.

8.19   <u>Insurance</u>.  The Purchaser shall use its reasonable best efforts to have in place and ready to be bound such insurance coverage that meets all legal and contractual requirements associated with the Business, on a date no later than two Business Days prior to the Outside Date.

## ARTICLE 9

## CONDITIONS TO CLOSING

9.1   <u>Conditions Precedent to the Obligations of the Purchaser and the Sellers</u>.  The respective obligations of each party to this Agreement to consummate the transactions contemplated by this Agreement are subject to the satisfaction or written waiver, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by the Sellers and the Purchaser, in whole or in part, to the extent permitted by applicable Law and <u>Section 11.3</u>):

(a)   no temporary restraining order, preliminary or permanent injunction or other order issued by any court of competent jurisdiction or other legal restraint or prohibition preventing the consummation of the transactions contemplated hereby shall have been issued, nor shall any proceeding or other Action brought by a domestic or foreign administrative agency or commission or other domestic or foreign Governmental Body seeking any of the foregoing be pending or threatened in writing; nor shall there be any action taken, or any statute, rule, regulation, order or other Law promulgated, enacted, entered, enforced or deemed applicable to the parties hereto which makes the consummation of the transactions contemplated by this Agreement illegal, void or rescinded;

(b)   (i) the Bankruptcy Court shall have entered the Bidding Procedures Order and the Sale Order, and each such order shall not have been stayed or vacated, (ii) no order of any Governmental Body staying, reversing, modifying or amending the Sale Order shall be in effect on the Closing Date and (iii) the Sale Order shall not be subject to any challenge under section 363(m) of the Bankruptcy Code; and

(c)   any required filings under the HSR Act and any other applicable competition Laws, if any, shall have been made and any waiting periods thereunder (and any extensions thereof) shall have expired or been terminated.

9.2   <u>Conditions Precedent to the Obligations of the Sellers</u>.  The obligations of the Sellers to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by the Sellers, in whole or in part, to the extent permitted by applicable Law and <u>Section 11.3</u>):

(a)   the representations and warranties of the Purchaser contained in this Agreement shall be true and correct in all respects (without giving effect to any limitation as to "materiality" set forth therein) as of the Closing Date as if made on and as of the Closing Date (other than for such representations and warranties that are made as of a specific date which shall be true and correct in all respects as of such date), except where the failure of such representations and warranties to be true and correct does not, individually or in the aggregate, have a material

adverse effect on the ability of Purchaser to consummate the transactions contemplated hereby, and the Sellers shall have received a certificate signed by an authorized person of the Purchaser, dated the Closing Date, to the foregoing effect;

(b)     the Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by the Purchaser on or prior to the Closing Date, and the Sellers shall have received a certificate signed by an authorized person of the Purchaser, dated the Closing Date, to the foregoing effect;

(c)     the Purchaser shall have delivered, or caused to be delivered, to the Sellers (or at the direction of the Sellers) or the applicable third party, as applicable, all of the items set forth in Section 3.3; and

(d)     the Purchaser shall have satisfied the Prepetition Debt Bid Amount in accordance with Section 2.1.

9.3     Conditions Precedent to the Obligations of the Purchaser.  The obligations of the Purchaser to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by the Purchaser, in whole or in part, to the extent permitted by applicable Law and Section 11.3):

(a)     (i) except as set forth in clause (ii) below, the representations and warranties of each Seller contained in this Agreement shall be true and correct in all respects (without giving effect to any limitation indicated by the words "Material Adverse Effect", "material" or similar qualifier set forth therein) as of the Closing Date as if made on and as of the Closing Date (other than for such representations and warranties that are made as of a specific date which shall be true and correct in all respects as of such date), except where the failure of such representations and warranties to be true and correct does not, individually or in the aggregate, have a Material Adverse Effect, and (ii) the representations and warranties of each Seller contained in Section 4.1, Section 4.2, Section 4.3, and Section 4.10 shall be true and correct in all material respect (without giving effect to any limitation indicated by the words "Material Adverse Effect", "material" or similar qualifier set forth therein) as of the Closing Date as if made on and as of the Closing Date (other than for such representations and warranties that are made as of a specific date which shall be true and correct in all respects as of such date), in each case, the Purchaser shall have received a certificate signed by an authorized officer of each Seller, dated the Closing Date, to the foregoing effect;

(b)     Since the Execution Date, there shall not have been a Material Adverse Effect, and the Purchaser shall have received a certificate signed by an authorized officer of each Seller, dated the Closing Date, to the forgoing effect;

(c)     each Seller shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by them on or prior to the Closing Date, and the Purchaser shall have received a certificate signed by an authorized officer of each Seller, dated the Closing Date, to the forgoing effect;

(d)     the Sellers shall have delivered, or caused to be delivered, to the Purchaser or the other applicable parties all of the items set forth in Section 3.2;

(e)     no "Event of Default" under the Cash Collateral Order shall have occurred and be continuing;

(f)     Purchaser shall have received an owner's title insurance policy proforma with respect to each Owned Real Property included in the Purchased Assets, issued by a nationally recognized title insurance company reasonably acceptable to the Purchaser, written as of the Closing Date, insuring the Purchaser of fee simple title to each Owned Real Property, subject to Permitted Encumbrances and those Encumbrances set forth on Schedule 4.13(a)(i), in such amounts as set forth in the Sale Order and together with such customary endorsements, as the Purchaser shall reasonably require;

(g)     Purchaser shall have bound insurance coverage effective on the Closing Date that meets all legal and contractual requirements associated with the Business; provided, however, that this condition shall have no force and effect if Purchaser does not have such insurance coverage in place and ready to be bound three Business Days prior to the Outside Date.

(h)     at the Closing, all Purchased Assets, including all Assigned Contracts and Permits included in the Purchased Assets, shall be validly and lawfully delivered, transferred or assigned by the Sellers to the Purchaser; provided, however, that the condition set forth in this Section 9.3(h) shall not apply to (i) Permits that by their terms cannot be transferred to the Purchaser prior to the Outside Date, provided, that (A) the Sellers and the Purchaser shall have agreed to an Interim Arrangement with respect to any such Permit in accordance with Section 8.4 that will allow the Purchaser to receive the benefits of, and to make use of, such Permit in the conduct of the Business in the Ordinary Course of Business, and (B) any such Interim Arrangement referred to in clause (A) shall be (w) on terms, and subject to conditions, that are reasonably acceptable to the Purchaser, (x) in a written agreement executed by the Sellers and the Purchaser, in form and substance reasonably satisfactory to the Purchaser, (y) in effect, and not subject to any unfulfilled conditions and contingencies, as of the Closing, and (z) approved by the Bankruptcy Court pursuant to the Sale Order, and (ii) any Purchased Assets that are not material (either individually or in the aggregate) to the conduct of the Business, which, for the avoidance of doubt, shall not include any Assumed Real Property Leases;

(i)     the period to challenge or contest the validity, amount, perfection, or priority of the claims and liens of the Prepetition Agent and the Prepetition Secured Lenders under the Prepetition Financing Agreement shall have expired with no such challenge or contest having been asserted, or any such challenge or contest having been resolved to the satisfaction of the Purchaser in its sole and absolute discretion; and

(j)     the Prepetition Agent and the Prepetition Secured Lenders and their respective Related Parties shall have received full and final releases from the Sellers' estates by virtue of the Sale Order or otherwise.

## ARTICLE 10
## ADDITIONAL DEFINITIONS

10.1    <u>Certain Definitions</u>.  As used herein:

(a)    "**Accommodation Agreement**" means any amendment, restatement, supplement or other modification of a Contract or other arrangement with a customer of Seller that provides for accelerated payment terms, price accommodations or any other material accommodation in favor of such customer.

(b)    "**Accounts Receivable**" means (i) any and all accounts receivable, trade accounts and other amounts receivable owed to any Seller and any other rights of any Seller to payment from third parties, including those reflected (or required to be reflected under GAAP) in the books and records of such Seller, and the full benefit of all security for such accounts or rights to payment, including all trade accounts receivable representing amounts receivable in respect of goods shipped, products sold or services rendered, in each case owing to such Seller; (ii) all other accounts or notes receivable of any Seller and the full benefit of all security for such accounts or notes receivable; and (iii) any and all claims, remedies or other rights relating to any of the foregoing, together with any interest or unpaid financing charges accrued thereon.

(c)    "**Affiliate**" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

(d)    "**Alternative Transaction**" means a sale or sales of any of the Purchased Assets to a Person other than the Purchaser or an Affiliate of the Purchaser, whether effected pursuant to a merger, consolidation, equity purchase, asset acquisition, share exchange, amalgamation or plan of reorganization, excluding any sales of Inventory in the Ordinary Course of Business.

(e)    "**Ancillary Agreements**" means, collectively, the Purchaser Ancillary Agreements and the Seller Ancillary Agreements.

(f)    "**Auction**" has the meaning ascribed to such term in the Bidding Procedures Order.

(g)    "**Avoidance Actions**" means all causes of action, lawsuits, claims (as defined in section 101(5) of the Bankruptcy Code), rights of recovery and other similar rights of any Seller arising under Chapter 5 of the Bankruptcy Code.

(h)    "**Back-Up Bidder**" has the meaning ascribed to such term in the Bidding Procedures Order.

(i)    "**Bidding Procedures**" has the meaning ascribed to such term in the Bidding Procedures Order.

58

(j)    "**Bidding Procedures Order**" means an order of the Bankruptcy Court in substantially the form attached as Exhibit A to the *Debtors' Motion for Entry of: (A) An Order (I) Scheduling a Hearing on the Approval of the Sale of All or Substantially All of the Debtors' Assets Free and Clear of All Encumbrances Other than Assumed Liabilities and Permitted Encumbrances, and the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (II) Approving Certain Bidding Procedures and Assumption and Assignment Procedures, and the Form and Manner of Notice Thereof, (III) Authorizing the Debtors to Enter into the Stalking Horse Purchase Agreement, and (IV) Granting Related Relief; and (B) An Order (I) Approving Asset Purchase Agreement, (II) Authorizing the Sale of All or Substantially All of the Debtors' Assets Free and Clear of All Encumbrances Other than Assumed Liabilities and Permitted Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* [Docket No. 0245].

(k)    "**Business**" means any and all business activities of any kind that are conducted by the Sellers as of the Execution Date or at any time through (and including) the Closing Date, including (i) designing and manufacturing fuel injection equipment with products such as fuel pumps and injection equipment for diesel and gasoline engines, (ii) selling engine components to original equipment manufacturers in a variety of applications, including agricultural and construction vehicles and equipment, industrial products, automobiles, light duty trucks and marine equipment, and (iii) selling replacement parts and units to service the Sellers products, including the service organizations of its original equipment manufacturer customers and Sellers own authorized network of distributors and dealers.

(l)    "**Business Day**" means any day other than a Saturday, Sunday or other day on which commercial banks in New York City, New York are authorized or required by Law to be closed.

(m)    "**Cash and Cash Equivalents**" means, collectively, all of the Sellers' cash (including petty cash and checks received prior to the close of business on the Closing Date), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, government securities and other cash equivalents, net of uncleared checks issued by the Sellers that are not yet reflected in the applicable bank account of Sellers.

(n)    "**Cash Collateral Order**" means the *Final Order (I) Authorizing the Use of Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Lenders, and (III) Granting Related Relief* [Docket No. 0218].

(o)    "**Chinese Shares**" means all of the issued and outstanding shares in the capital of Stanadyne Changshu Corporation owned by the Sellers.

(p)    "**Closing Date**" means the date on which the Closing is held.

(q)    "**Code**" means the Internal Revenue Code of 1986, as amended.

(r)    "**Contract**" means any written or oral contract, indenture, note, bond, lease, license, commitment or instrument or other agreement or arrangement.

(s)     "**COVID-19 Measures**" means any quarantine, "shelter in place," "stay at home," workforce reduction, social distancing, shut down, closure, sequester, workplace safety or similar Law promulgated by any Governmental Body, including the Centers for Disease Control and Prevention and the World Health Organization, in each case, in connection with or in response to COVID-19, including the CARES Act and Families First Act.

(t)     "**CT Transfer Act**" means the Connecticut Property Transfer Act, Conn. Gen. Stat. §§ 22a-134, et seq., as amended.

(u)     "**Cure Costs**" means the amounts necessary to cure all defaults, if any, and that must be paid in connection with the assumption of each Assigned Contract pursuant to section 365(b)(1)(A) and section 365(b)(1)(B) of the Bankruptcy Code.

(v)     "**Customer Purchase Order**" means any purchase order from a customer of the Business to purchase products manufactured by or services provided by the Business.

(w)     "**Designation Deadline**" means, with respect to any Designation Rights Asset, the earlier of (i) 5:00 p.m. (prevailing Eastern time) on the date that is 90 days after the Closing Date, (ii) the deadline for assumption or rejection of such Designation Rights Asset if it is a Contract under section 365 of the Bankruptcy Code (or such longer period as may be (x) agreed between the Purchaser and the counterparty of the applicable Contract or (y) set forth in an order of the Bankruptcy Court) and (iii) a date after the Closing Date specified by the Purchaser (upon three Business Days' notice to the Sellers).

(x)     "**Determined Cure Cost**" means, with respect to the Cure Cost of any particular Contract, that such Cure Cost is finally established, by the Bankruptcy Court or by agreement by the parties to such Contract at the date or time in question.

(y)     "**Documents**" means all of the Sellers' written files, documents, instruments, emails, papers, books, reports, records, tapes, microfilms, photographs, letters, correspondence, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies and documents, ledgers, journals, title policies, customer lists and other customer data, supplier lists and other supplier data, vendor lists and other vendor data, regulatory filings, operating data and plans, research material, marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.) and other similar materials, in each case whether or not in electronic form.

(z)     "**Encumbrance**" means any encumbrance, claim (as defined in section 101(5) of the Bankruptcy Code), interest (as used in section 363(f) of the Bankruptcy Code), rights, causes of action, demands, damages, Liability, charge, covenant, easement, encumbrance, pledge, security interest, mortgage, lease, option, right of first refusal, transfer restriction, deed of trust, hypothecation or lien, whether imposed by Contract or Law.

(aa)    "**Environmental Laws**" means all applicable Laws relating to pollution or protection of natural resources or the environment, or the generation, use, treatment, storage, handling, transportation or Release of, or exposure to, Hazardous Materials, including the Federal Water Pollution Control Act (33 U.S.C. §1251 et seq.), Resource Conservation and Recovery Act (42 U.S.C. §6901 et seq.), Safe Drinking Water Act (42 U.S.C. §3000(f) et seq.), Toxic Substances

Control Act (15 U.S.C. §2601 et seq.), Clean Air Act (42 U.S.C. §7401 et seq.), Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. §9601 et seq.) and other similar federal, state, provincial and local statutes.

(bb)    "**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

(cc)    "**ERISA Affiliate**" means any Person that, together with the Sellers, is required to be treated as a "single employer" within the meaning of Section 414(b), (c), (m) or (o) of the Code or Sections 4001(a)(14) or 4001(b) of ERISA.

(dd)    "**Furniture and Equipment**" means all furniture, fixtures, furnishings, leasehold improvements (that are not part of the Leased Real Property owned by landlords), personal property used to display or hold merchandise for retail sale, equipment, machinery, vehicles, storage tanks and other tangible personal property of every kind and description, owned or used, or held for use, in connection with the Business by the Sellers, wherever located, including appliances, fittings, parts, spare parts, lighting fixtures, signs, doors, cabinets, partitions, mantles, motors, pups, screens, plumbing, heating, air conditioning, ovens, refrigerators, freezers, refrigerating and cooling systems, waste disposal and storing, wiring, televisions, monitors, security systems, carpets, floor coverings, wall coverings, office equipment, registers and safes, trash containers, meters and scales, combinations, codes and keys, display cases and tables, artwork, desks, chairs and communications equipment and the IT Assets.

(ee)    "**GAAP**" means United States generally accepted accounting principles as in effect from time to time.

(ff)    "**Governmental Body**" means any applicable federal, state, local or foreign government or any agency, bureau, board, commission, court, department, political subdivision, tribunal or other instrumentality thereof.

(gg)    "**Hazardous Materials**" means petroleum and all derivatives thereof or synthetic substitutes therefor, asbestos and asbestos containing materials, perfluoralkyl and polyfluoralkyl substances, polychlorinated biphenyls and any and all materials now or hereafter defined, listed, designated or classified as, or otherwise determined to be, "hazardous wastes," "hazardous substances," "radioactive," "solid wastes," or "toxic" (or words of similar meaning) under or pursuant to or otherwise listed or regulated pursuant to any Environmental Law.

(hh)    "**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the related regulations and published interpretations.

(ii)    "**Indebtedness**" of any Person means, without duplication, (i) the interest in respect of, principal of and premium (if any) in respect of (x) indebtedness of such Person for money borrowed and (y) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable; (ii) all obligations of such Person issued or assumed as the deferred purchase price of property (other than for services and goods acquired in the Ordinary Course of Business); (iii) all obligations of such Person under leases required to be capitalized in accordance with GAAP prior to the adoption of ASC 842; (iv) all non-contingent obligations of such Person for the reimbursement of any obligor on any letter

61

of credit, banker's acceptance or similar credit transaction (in each case, to the extent actually drawn on); (v) all obligations of the type referred to in <u>clauses (i)</u> through <u>(iv)</u> of any other Person for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, including guarantees of such obligations; and (vi) all obligations of the type referred to in <u>clauses (i)</u> through <u>(v)</u> of other Persons secured by any Encumbrance on any property or asset of such Person (whether or not such obligation is assumed by such Person).

(jj)    "**Indian Shares**" means all of the issued and outstanding shares in the capital of Stanadyne India Private Ltd., an Indian limited company, owned by the Sellers.

(kk)    "**Intellectual Property**" means any and all intellectual property and industrial property rights in any jurisdiction throughout the world (whether or not registered) including: (i) patents, (ii) trademarks, service marks, trade dress, trade names, domain names, logos and corporate names, (iii) copyrights, (iv) registrations and applications for any of the foregoing, (v) trade secrets and confidential information or know-how (including, research and development, formulas, compositions, manufacturing and production processes and techniques, technical data and designs) and (vi) all applications, registrations, renewals and common-law rights associated in connection with any of the foregoing.

(ll)    "**Inventory**" means all of the Sellers' inventories (including supplies, merchandise, work in process, raw materials, spare or replacement parts, subassemblies, promotional materials, packaging and shipping materials, manufacturing supplies, samples, prototypes, displays, and finished goods and all of Sellers' tangible property, materials, supplies, inventories and other related items or that are otherwise included in the Purchased Assets and are permitted to be sold and transferred under applicable Law, together with all rights of Sellers against suppliers thereof) that are used, or held for use, in connection with the Business.

(mm)    "**IT Assets**" means all of the Sellers' computers (including point-of-sale terminals and systems), computer software and databases (including source code, object code and all related documentation), firmware, middleware, servers, workstations, routers, hubs, switches, data communications lines, and all other information technology equipment and elements, and all associated documentation that are used, or held for use, in connection with the Business.

(nn)    "**Knowledge of the Sellers**" means the actual knowledge of John Pinson and Costas P. Loukellis.

(oo)    "**Laws**" means all federal, state, local or foreign laws, statutes, common law, rules, codes, regulations, restrictions, ordinances, orders, decrees, approvals, directives, judgments, rulings, injunctions, writs and awards of, or issued, promulgated, enforced or entered by, any and all Governmental Bodies (including any court of competent jurisdiction), or other requirement or rule of law.

(pp)    "**Leased Real Property**" means all of the real property leased, subleased, licensed, used or occupied by any of the Sellers, together with all buildings, structures, fixtures and improvements erected thereon, and any and all rights, privileges, easements, licenses, hereditaments and other appurtenances relating thereto, and used, or held for use, in connection with the Business.

(qq)  "**Liability**" means, as to any Person, any debt, adverse claim, liability, duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed, including all costs and expenses relating thereto.

(rr)  "**Licensed Intellectual Property**" means any Intellectual Property that is licensed to the Sellers, and used, or held for use, in connection with the Business.

(ss)  "**Material Adverse Effect**" means any event, circumstance, change, occurrence or state of facts that, individually or in the aggregate, has had, or would reasonably be expected to have or result in, a material adverse effect on (i) business, assets, results of operations or financial condition of the Sellers, the Purchased Assets or the Business or (ii) the ability of any Seller to consummate the transactions contemplated by this Agreement and the Ancillary Agreements or perform its obligations under this Agreement except, in each case, for any such effect resulting from any of the following:  (A) changes in the general economic or financial market conditions in the U.S. or global economy, including credit, financial or securities market conditions and changes thereto (including inflation, prevailing interest rates or currency rates), (B) changes in Law, GAAP, regulatory accounting requirements or interpretations thereof that apply to the Business, the Sellers or the Purchased Assets (including the proposal or adoption of any new Law, statute, code, ordinance, rule or regulation, or any change in the interpretation or enforcement of any existing Law), (C) the announcement or pendency or consummation of any of the transactions contemplated hereby, (D) changes caused by regulatory or political conditions, such as the shutdown (whether short-term or long-term) of any governmental services or instrumentalities, acts of war, hostilities, police action sabotage or terrorism, earthquakes, hurricanes, floods, pandemics or disease outbreaks (including COVID-19 Measures or any change in COVID-19 Measures or interpretations of an applicable Governmental Body with respect thereto) or other natural disasters (of a national or regional scale), man-made disasters or acts of God, (E) factors, conditions, trends or other circumstances generally affecting the industry or market in which the Sellers operate, including fluctuations in the pricing of commodities, or seasonal reductions in the revenues or earnings of the Sellers that are consistent with past operating history, (F) any action by the Purchaser or any of its Affiliates or the omission of an action that was required to be taken by the Purchaser or any of its Affiliates, (G) any failure of the Sellers, individually or in the aggregate, to meet any projection or forecast (provided, however, that the exception in the clause shall not prevent or otherwise affect a determination that any change, event, development or effect underlying such failure has resulted in, or contributed to, a Material Adverse Effect), (H) any action(s) taken, or failures to take action, by the Sellers which is required or prohibited by this Agreement or is taken at the request of the Purchaser, (I) the commencement of the Chapter 11 Cases, and (J) any actions taken, or failures to take action, or such other changes or events, in each case, to which the Purchaser has consented in writing; provided, however, that the foregoing clauses (A), (B), (D) and (E) shall not include, and therefore the determination of any "Material Adverse Effect" shall not exclude, any event, change, circumstance or occurrence that affects the Sellers, the Purchased Assets or the Business disproportionately relative to other Persons engaged in the industries in which the Sellers operate.

63

(tt)    "**Ordinary Course of Business**" means the ordinary and usual course of normal day to day operations of the Business consistent with past practice.

(uu)    "**Owned Intellectual Property**" means all Intellectual Property owned by any Seller, and used, or held for use, in connection with the Business.

(vv)    "**Parties**" means Purchaser and Sellers.

(ww)    "**Permits**" means all permits, approvals, concessions, grants, franchises, licenses and other approvals issued by any Governmental Body.

(xx)    "**Permitted Encumbrances**" means (i) Encumbrances for utilities and current Taxes not yet due and payable, including Taxes that are due but may not be paid as a result of the commencement of the Chapter 11 Cases, or which are being diligently contested in good faith and by appropriate proceedings, and for which adequate reserves have been maintained in accordance with GAAP; (ii) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any of the Purchased Assets which do not, individually or in the aggregate, materially adversely affect the operation of the Business or use and occupancy of the Assumed Leased Real Property or Owned Real Property or materially adversely detract from the value of the Assumed Leased Real Property or Owned Real Property; (iii) rights of Governmental Bodies to require the removal of any vaults, vault spaces, areas, chutes or other spaces or projections beyond the building lines or of any curb out; (iv) easements, covenants, rights-of-way and other similar restrictions or conditions of record on the use of real property; (v) any state of facts which would be shown by an accurate survey of the applicable real property; (vi) applicable zoning Laws, subdivision, regulations, ordinances, resolutions, requirements, orders, landmark, historic or wetlands designations, entitlement, conservation restrictions, building codes, land use restrictions and other similar restrictions imposed by Law (but not restrictions arising from a violation of any such Law); (vii) any Liabilities created by this Agreement or any of the Ancillary Agreements; (viii) such minor imperfections, defects or irregularities in title as do not detract in any material respect from the value or utility of the subject property in the operation of the Business that uses such property; (ix) statutory liens incurred or deposits or pledges made in connection with, or to secure payment of, workers' compensation, unemployment insurance or similar programs; (x) mechanics', construction, materialmen's, warehousemen's, storage, carriers', workers', or repairmen's liens or other similar common law or statutory liens arising in the Ordinary Course of Business which are not delinquent or are being contested in good faith pursuant to appropriate legal proceedings and for which adequate reserves have been taken or securing obligations which are bonded in a reasonable manner; (xi) security given to a public utility or any Governmental Body when required in the Ordinary Course of Business; (xii) Encumbrances arising or resulting from any action taken by the Purchaser or any of its Affiliates; and (xiii) title and other interests of a lessor (including Encumbrances securing rental payments) under a capital or operating lease, real property lease, or of a licensor under a license or royalty agreement.

(yy)    "**Person**" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, estate, Governmental Body or other entity or group.

(zz)    "**Pre-Closing Tax Period**" means (a) any Tax period ending on or before the Closing Date and (b) with respect to a Straddle Period, the portion of such Straddle Period beginning on the first day of the Straddle Period and ending on the Closing Date.

(aaa)    "**Prepetition Agent**" means Cerberus Business Finance, LLC, in its capacity as the "Administrative Agent" and "Collateral Agent" under the Prepetition Financing Agreement.

(bbb)    "**Prepetition Financing Agreement**" means that certain Financing Agreement, dated as of May 2, 2017, as amended from time to time prior to the Petition Date, by and among Holdings, the "Borrowers" and other "Guarantors" party thereto, the Prepetition Secured Lenders, and the Prepetition Agent thereunder, as amended, supplemented, amended and restated or otherwise modified from time to time.

(ccc)    "**Prepetition Secured Lenders**" means the "Lenders" under and as defined in the Prepetition Financing Agreement.

(ddd)    "**Prepetition Secured Obligations**" means all "Obligations" under and as defined in the Prepetition Financing Agreement, including term loans with an aggregate outstanding principal balance of not less than $248,488,344.84 and revolving loans with an aggregate outstanding principal balance of not less than $25,000,000, for a total outstanding principal balance of not less than $273,488,344.84. For the avoidance of doubt, such principal amount does not include accrued and unpaid interest, fees, costs, expenses, indemnities, and other amounts owing under the Loan Documents (as defined in the Prepetition Financing Agreement), including the Exit Fee (as defined in the Prepetition Financing Agreement) due and owing in connection with entry into that certain Amendment No. 3 to the Prepetition Financing Agreement.

(eee)    "**Purchaser Ancillary Agreements**" means, collectively, the Assignment and Assumption Agreement, each of the other documents or instruments contemplated by Section 3.3 and each other certificate, agreement or document (other than this Agreement) that the Purchaser is required to execute or deliver pursuant to the terms of this Agreement.

(fff)    "**Purchaser Parties**" means, collectively, the Purchaser and its subsidiaries, and any of their respective former, current or future directors, officers, employees, agents, general or limited partners, managers, members, stockholders, investors, lenders, creditors, representatives, Affiliates or assignees or any former, current or future director, officer, employee, agent, general or limited partner, manager, member, stockholder, investor, lender, creditor, representative, Affiliate or assignee of any of the foregoing.

(ggg)    "**Related Parties**" means, with respect to any Person, such Person's past, present and future subsidiaries, parents, divisions, Affiliates, agents, representatives, insurers, attorneys, successors, assigns, and each of its and their respective directors, managers, officers, employees, shareholders, members, agents, representatives, attorneys, contractors, subcontractors, independent contractors, owners, insurance companies and partners.

(hhh)    "**Release**" means, with respect to any Hazardous Material, any releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching,

dumping, disposing or migrating into or through any surface or ground water, drinking water supply, soil, surface or subsurface strata or medium, or the ambient air.

(iii)    "**Sale Hearing**" means the hearing seeking entry of the Sale Order.

(jjj)    "**Sale Motion**" means a motion in form and substance satisfactory to the Sellers and the Purchaser seeking entry of the Sale Order.

(kkk)    "**Sale Order**" means an order in form and substance satisfactory to the Sellers and the Purchaser (it being understood and agreed that if the Sale Order requires the Purchaser to assume, pay or otherwise become responsible for any Liabilities of the Sellers that do not constitute Assumed Liabilities as expressly defined herein, then such Sale Order shall not be satisfactory to the Purchaser).

(lll)    "**Seller Ancillary Agreements**" means, collectively, the Assignment and Assumption Agreement, each of the other documents or instruments contemplated by Section 3.2 and each other certificate, agreement or document (other than this Agreement) that any Seller is required to execute or deliver pursuant to the terms of this Agreement.

(mmm)"**Seller Intellectual Property**" means, collectively, Owned Intellectual Property and Licensed Intellectual Property.

(nnn)    "**Seller Organizational Documents**" means, with respect to each Seller, its certificate of incorporation or formation, bylaws, operating agreement, or any other similar organizational or governing documents.

(ooo)    "**Seller Parties**" means, collectively, the Sellers and their respective subsidiaries, and any of their respective former, current or future directors, officers, employees, agents, general or limited partners, managers, members, stockholders, investors, lenders, creditors, representatives, Affiliates or assignees or any former, current or future director, officer, employee, agent, general or limited partner, manager, member, stockholder, investor, lender, creditor, representative, Affiliate or assignee of any of the foregoing.

(ppp)    "**Seller Plans**" means (i) all "employee benefit plans" (as defined in Section 3(3) of ERISA), including all employee benefit plans which are "pension plans" (as defined in Section 3(2) of ERISA) and any other written employee benefit arrangements or payroll practices (including severance pay, vacation pay, company awards, salary continuation for disability, sick leave, death benefit, hospitalization, welfare benefit, group or individual health, dental, medical, life, insurance, survivor benefit, deferred compensation, profit sharing, retirement, retiree medical, supplemental retirement, bonus or other incentive compensation, stock purchase, stock option, stock appreciation rights, restricted stock and phantom stock arrangements or policies) and (ii) all written employment, termination, bonus, severance, change in control or other similar contracts or agreements, in each case to which any Seller is a party, with respect to which any Seller has any Liability or obligation or which are maintained by any Seller and to which any Seller contributes or is obligated to contribute with respect to current or former directors, officers, consultants and employees of any Seller.

66

(qqq)    "**Significant Vendors/Suppliers**" means the 20 vendors or suppliers of the Sellers (on a combined basis) that have sold the most, in terms of dollar value, products or services to the Business during the calendar year ended December 31, 2022.

(rrr)    "**Straddle Period**" means any taxable year or period beginning on or before the Closing Date and ending after the Closing Date.

(sss)    "**Successful Bidder**" has the meaning ascribed to such term by the Bidding Procedures Order.

(ttt)    "**Surplus Cash**" means an amount equal to 100% of the Cash and Cash Equivalents remaining of the Excluded Cash, which Cash and Cash Equivalents were not disbursed in the wind-down of the Sellers' estates in accordance with each line-item of the "Total Disbursements" pursuant to the Wind-Down Budget, and which such amount is held by the Sellers as of the earlier of (i) the substantial completion of the wind-down of the Sellers' estates, and (ii) the later to occur of (A) the Designation Deadline latest in time under this Agreement and (B) the date that is 180 days after the Closing Date.

(uuu)    "**Tax**" and "**Taxes**" means any foreign, federal, state, county, or local income, sales and use, excise, franchise, real and personal property, gross receipt, capital stock, production, business and occupation, disability, employment, payroll, severance, withholding or similar taxes, including all interest, additions, surcharges, fees or penalties related thereto.

(vvv)    "**Tax Return**" means any return, report, information return, declaration, claim for refund or other document (including any schedule or related or supporting information) supplied or required to be supplied to any Governmental Body with respect to Taxes, including amendments thereto.

(www)  "**Transferred Employee**" means each employee of a Seller to whom the Purchaser has made an offer of employment pursuant to <u>Section 6.1</u> and that has accepted such offer and commences employment with the Purchaser or any of its Affiliates on or following the Closing Date.

(xxx)    "**Undetermined Cure Cost**" means, with respect to the Cure Cost of any particular Contract, that such Cure Cost is not finally determined by the Bankruptcy Court or by agreement by the parties to such Contract as of the time or date in question.

(yyy)    "**WARN Act**" means the federal Worker Adjustment Retraining Notification Act, or any similar provision of any federal, state, provincial, regional, foreign or local Law.

10.2    <u>Additional Defined Terms</u>.  The following terms have the meanings set forth in the Sections set forth below:

Acquired Entities ........................................ 7

Actions .................................................... 25

Agreement.................................................. 4

Allocation................................................. 17

Assigned Contracts .................................... 5

Assignment and Assumption Agreement.. 18

Assumed Leased Real Property .................. 6
Assumed Liabilities ................................... 9
Assumed Real Property Leases.................. 6
Assumed Seller Plans................................. 6
Audited Financial Statements ................. 35
Balance Sheet Date .................................. 35
Bankruptcy Code ....................................... 4
Bankruptcy Court....................................... 4
Bankruptcy Court Milestones .................. 42
Bankruptcy Exceptions ............................ 24
Bid Deadline ............................................ 42
Cash Deficiency Amount.......................... 16
Chapter 11 Cases........................................ 4
Closing .................................................... 18
Closing Payments Schedule...................... 52
Closing Payments Schedule Delivery Date
............................................................... 52
Contract & Cure Update Schedule............ 12
Copyright Assignment Agreement ........... 18
Credit Bid Amount................................... 16
CT Transfer Act Forms ............................ 54
CTDEEP .................................................. 54
Designation Rights Assets ....................... 12
Disclosure Schedules ............................... 54
Disputed Amount Contract ...................... 14
Domain Name Assignment ...................... 18
e-mail ...................................................... 70
Excluded Assets ......................................... 7
Excluded Cash ........................................... 8
Excluded Liabilities ................................. 10
Execution Date........................................... 4
Exempt Trust............................................ 32
Financial Statements ................................ 35
Holdings..................................................... 4

Insurance Policies .................................... 33
Interim Arrangement................................ 46
IP Assignment Agreement ....................... 18
Material Contracts.................................... 27
Material Permits....................................... 29
Most Recent Balance Sheet ..................... 35
New Employment Contracts .................... 39
Nonassignable Assets............................... 46
Non-Assigned Contracts ............................ 8
Original Contract & Cure Schedule.......... 12
Outside Date............................................. 20
Owned Real Property ............................... 30
Owned Real Property Transfer Documents
............................................................... 18
Patent Assignment Agreement................. 18
Personal Information................................ 26
Petition Date.............................................. 4
Post-Closing Cure Payment Arrangement 15
Prepetition Debt Bid Amount .................. 16
Purchase Price ......................................... 16
Purchased Assets........................................ 5
Purchased Names ....................................... 5
Purchaser................................................... 4
Qualified Plan .......................................... 32
Regulatory Approvals .............................. 51
Representatives ........................................ 45
Restructured Indebtedness ....................... 17
Seller ......................................................... 4
Trademark Assignment Agreement .......... 18
Transfer Taxes ......................................... 49
TSA .......................................................... 54
Unaudited Financial Statements .............. 35
Wind-Down Budget ................................... 8
Windsor CT, Property .............................. 54

# ARTICLE 11

## MISCELLANEOUS

11.1    <u>Payment of Expenses</u>.  Except as otherwise provided in this Agreement and whether or not the transactions contemplated hereby are consummated, Sellers will bear their own and Purchaser's, the Prepetition Agent's and the Prepetition Secured Lenders' costs and expenses (including investment advisory and legal fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby.

11.2    <u>Survival of Representations and Warranties; Survival of Post-Closing Covenants</u>. The representations, warranties, covenants and agreements in this Agreement or the Ancillary Agreements, or in any instrument delivered pursuant to this Agreement or the other Ancillary Agreements, shall terminate on the Closing Date, except that each of the covenants set forth in this Agreement or any of the Ancillary Agreements that are to be performed at or after the Closing shall survive in accordance with the terms of the particular covenant or until fully performed. At and at all times after the Closing, in no event shall the Purchaser, on the one hand, or the Sellers, on the other hand, have any recourse against (a) the Sellers or any of the Seller Parties, or (b) the Purchaser or any of the Purchaser Parties, in each such case, with respect to any representation, warranty, covenant or agreement made by the Sellers or the Purchaser in this Agreement or any of the Ancillary Agreements, except, solely in the case of the Purchaser or the Sellers, as applicable, with respect to breaches of covenants set forth in this Agreement or any of the Ancillary Agreements that are to be performed thereby at or after the Closing.

11.3    <u>Entire Agreement; Amendments and Waivers</u>.  This Agreement (including the Schedules hereto) and the Ancillary Agreements represent the entire understanding and agreement between the parties hereto with respect to the subject matter hereof.  Any provision of this Agreement may be amended or waived if, and only if, such amendment or waiver is in writing and signed, in the case of an amendment, by each party hereto, or in the case of a waiver, by the party against whom the waiver is to be effective.  The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy. Notwithstanding the foregoing, (a) any modifications to the Schedules that are made from time to time in accordance with and as contemplated by <u>Section 1.5</u> shall not require the consent of the Sellers and (b) the Purchaser shall be permitted to increase the Prepetition Debt Bid Amount, from time to time in accordance with and as contemplated by <u>Section 2.1</u> in its sole and absolute discretion without consent from the Sellers.

11.4    <u>Schedules</u>.  The Disclosure Schedules have been arranged for purposes of convenience in separately numbered sections corresponding to the sections of this Agreement; however, each section of the Disclosure Schedules will be deemed to incorporate by reference all information disclosed in any other section of the Disclosure Schedules to the extent the applicability of such disclosure to such other section is reasonably apparent on its face (and without regard to whether a reference to such section of the Disclosure Schedules is made in any such representation or warranty).  Capitalized terms used in the Disclosure Schedules and not otherwise defined therein have the meanings given to them in this Agreement.  The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement, the Disclosure Schedules or the attached exhibits is not intended to imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed (including whether such amounts or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course of Business, and no party will use the fact of the setting of the amounts or the fact of the inclusion of any item in this Agreement, the Disclosure Schedules, or exhibits in any dispute or controversy between the parties as to whether any obligation, item or matter not set forth or included in this Agreement, the

Disclosure Schedules or exhibits is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course of Business, and any such inclusion shall not be deemed or construed to expand the scope of any representation or warranty hereunder or to establish a standard of disclosure in respect of any representation or warranty. The disclosures in any section of the Disclosure Schedules are not intended to constitute, and will not be construed as constituting, representations, warranties, covenants or agreements of any Seller or the Purchaser. In addition, matters reflected in the Disclosure Schedules are not necessarily limited to matters required by this Agreement to be reflected in the Disclosure Schedules. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. No information set forth in the Disclosure Schedules will be deemed to broaden in any way the scope of the parties' representations and warranties. The information contained in this Agreement, in the Disclosure Schedules and exhibits hereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein will be deemed to be an admission by any party to any third party of any matter whatsoever, including any violation of Law or breach of Contract or will be deemed shall be to constitute an admission by any Seller or the Purchaser (or any of their respective Affiliates) or to otherwise imply that any such matter is material or would have a Material Adverse Effect (as it relates to the Sellers, as the case may be) for the purposes of this Agreement.

11.5     <u>Counterparts</u>.  For the convenience of the parties hereto, this Agreement may be executed and delivered (by facsimile or PDF signature) in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

11.6     <u>Governing Law</u>.   THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE, AND WHERE STATE LAW IS IMPLICATED, THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF (EXCEPT SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.

11.7     <u>Jurisdiction, Waiver of Jury Trial</u>.  (a) THE BANKRUPTCY COURT WILL HAVE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES HERETO, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY; <u>PROVIDED</u>, <u>HOWEVER</u>, THAT IF THE BANKRUPTCY COURT IS UNWILLING OR UNABLE TO HEAR ANY SUCH DISPUTE, THE COURTS OF THE STATE OF NEW YORK LOCATED IN NEW YORK, NEW YORK AND THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA LOCATED IN THE SOUTHERN DISTRICT OF THE STATE OF NEW YORK WILL HAVE SOLE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES HERETO, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY.

(b)     EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING

ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

11.8   Notices.  All notices (including any notices contemplated by Section 1.5), requests, demands, document deliveries and other communications under this Agreement shall be in writing and shall be deemed to have been duly given, provided, made, received or rescinded (a) on the day of delivery when delivered personally, (b) on the day sent when sent by electronic mail ("e-mail") or facsimile, (c) one Business Day after deposit with an overnight courier service or (d) three Business Days after mailed by certified or registered mail return receipt requested, with postage prepaid to the parties at the following addresses, facsimile numbers or e-mail addresses (or at such other address, facsimile number or e-mail address for a party as shall be specified by like notice):

If to the Sellers:

> Stanadyne LLC
> 405 White Street
> Jacksonville, NC 28546
> Attn: John Pinson
> Email: jpinson@stanadyne.com

with a copy (which shall not constitute effective notice) to:

> Hughes Hubbard & Reed LLP
> One Battery Park Plaza
> New York, NY 10004
> Attn:   Kathryn A. Coleman
>           Christopher Gartman
> Email:  katie.coleman@hughehubbard.com
>           chris.gartman@hugheshubbard.com

If to the Purchaser:

> S-PPT Acquisition Company LLC
> c/o Cerberus Business Finance, LLC
> 875 Third Avenue
> New York, NY 10022
> Attn: Joseph Naccarato
> Email:  jnaccarato@cerberus.com

With a copy (which shall not constitute effective notice) to:

> KTBS Law LLP
> 1801 Century Park East
> Twenty-Sixth Floor
> Los Angeles, CA 90067
> Attn:   Michael L. Tuchin
>           David A. Fidler

Email: mtuchin@ktbslaw.com
dfidler@ktbslaw.com

11.9    Binding Effect; Assignment.  This Agreement shall be binding upon the Purchaser and, subject to entry of the Bidding Procedures Order and the Sale Order, the Sellers and any trustee or estate representative appointed in the Chapter 11 Cases or any successor Chapter 7 case, and inure to the benefit of such parties and their respective successors and permitted assigns.  No assignment of this Agreement or of any rights or obligations hereunder may be made by the Sellers or the Purchaser (by operation of Law or otherwise) without the prior written consent of the other parties hereto and any attempted assignment without the required consents shall be void; provided, however, that the Purchaser may assign, delegate or transfer, in whole or in part, this Agreement and any of its rights, obligations or interests hereunder, without the consent of the Sellers, to one or more of its designees or Affiliates.  No assignment of any obligations hereunder shall relieve the parties hereto of any such obligations.  Upon any such permitted assignment, the references in this Agreement to the Purchaser shall also apply to any such assignee unless the context requires otherwise.

11.10    Severability.  If any term, condition or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other terms, conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in a manner adverse to any party.  Upon such determination that any term, condition or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the fullest extent possible.

11.11    Injunctive Relief.  The Sellers and the Purchaser acknowledge and agree that (a) irreparable damage would occur in the event that any of the provisions of this Agreement are not performed in accordance with their specific terms or are otherwise breached or threatened to be breached, and (b) remedies at law would not be adequate to compensate the non-breaching party.  Accordingly, each of the Sellers and the Purchaser shall have the right, in addition to any other rights and remedies existing in its favor, to an injunction or injunctions to prevent breaches or threatened breaches of the provisions of this Agreement and to enforce its rights hereunder not only by an action or actions for damages but also by an action or actions for specific performance, injunctive or other equitable relief without the necessity of proving the inadequacy of money damages as a remedy.  The right to equitable relief, including specific performance and injunctive relief, shall exist notwithstanding, and shall not be limited by, any other provision of this Agreement.  Each of the Sellers and the Purchaser hereby waives any defense that a remedy at law is adequate and any requirement to post bond or other security in connection with actions instituted for injunctive relief, specific performance or other equitable remedies.  Each of the Sellers and the Purchaser hereby agrees not to assert that specific performance, injunctive and other equitable remedies are unenforceable, violate public policy, invalid, contrary to Law or inequitable for any reason.  The right of specific performance, injunctive and other equitable remedies is an integral part of the transactions contemplated by this Agreement and without that right, neither the Sellers nor the Purchaser would have entered into this Agreement.

11.12    Third Party Beneficiaries.  This Agreement is for the sole benefit of the parties hereto and their permitted assigns and nothing herein express or implied shall give or be construed to give to any Person, other than the parties hereto and such permitted assigns (including, for the avoidance of doubt, any plan administrator administering the Chapter 11 Cases), any legal or equitable rights hereunder, except that each of the Seller Parties and the Purchaser Parties shall be a third party beneficiary of Section 3.6.

11.13    Non-Recourse.  This Agreement may only be enforced against, and any Action based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties to this Agreement.  Except to the extent named as a party to this Agreement, and then only to the extent of the specific obligations of such parties set forth in this Agreement, no past, present or future shareholder, member, partner, manager, director, officer, employee, Affiliate, agent or Representative of any party hereto or any subsidiary of Sellers will have any liability (whether in Contract, tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or Liabilities of any of the parties to this Agreement or for any Action based upon, arising out of or related to this Agreement.

11.14    No Effect Upon Lending Relationship.  Notwithstanding anything contained in this Agreement to the contrary, nothing contained in this Agreement shall affect, limit or impair the rights and remedies of the Prepetition Agent, the Prepetition Secured Lenders or any of their respective Affiliates, funding or financing sources or any other lenders in each case in their capacities as lenders to the Sellers.

11.15    Time of the Essence.  Time is of the essence in the performance of each of the obligations of the parties hereto and with respect to all covenants and conditions to be satisfied by the parties in this Agreement and all documents, acknowledgments and instruments delivered in connection herewith.

11.16    Certain Interpretations.

(a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)    All references in this Agreement to Articles, Sections, clauses, parts and the Disclosure Schedules shall be deemed to refer to Articles, Sections, clauses, parts and the Disclosure Schedules to this Agreement unless otherwise specified.

(ii)    The Disclosure Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any section of the Disclosure Schedules but not otherwise defined therein shall be defined as set forth in this Agreement.

(iii)    The Article, Section and paragraph captions herein are for convenience of reference only, do not constitute part of this Agreement and shall not be deemed to limit or otherwise affect any of the provisions hereof.

(iv)    The words "include," "includes" and "including," when used herein shall be deemed in each case to be followed by the words "without limitation" (regardless of whether such words or similar words actually appear).

(v)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is not a Business Day, the period in question shall end on the next succeeding Business Day.  All references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(vi)    Any reference in this Agreement to "$" or "dollars" shall mean U.S. dollars.

(vii)    The words "to the extent" shall mean "the degree by which" and not "if."

(viii)    The word "will" will be constructed to have the same meaning and effect as the word "shall."  The words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive.

(ix)    Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(x)    The words such as "herein," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(xi)    The term "or" is not exclusive.

(xii)    Any reference to any agreement or Contract will be a reference to such agreement or Contract, as amended, modified, supplemented or waived, except for any agreement or Contract referenced in the Disclosure Schedules which references will be deemed to only refer to the specific agreements or Contracts referenced.

(xiii)    Any reference to any particular Code section or any Law will be interpreted to include any amendment to, revision of or successor to that section or Law regardless of how it is numbered or classified; provided that, for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance, with any Code section or Law, the reference to such Code section or Law means such Code section or Law as in effect at the time of such violation or non-compliance or alleged violation or non-compliance.

(xiv)    A reference to any party to this Agreement or any other agreement or document shall include such party's successors and permitted assigns.

(b)    The parties hereto agree that they have been represented by legal counsel during the negotiation and execution of this Agreement and, therefore, waive the application of

any Law, regulation, holding or rule of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

[*The remainder of this page is intentionally left blank.*]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

<u>**SELLERS:**</u>

**STANADYNE PPT HOLDINGS, INC.**

By: _John Pinson_____

Name: John Pinson

Title: Chief Executive Officer

**STANADYNE LLC**

By: _John Pinson_____

Name: John Pinson

Title: Chief Executive Officer

**PURE POWER TECHNOLOGIES, INC.**

By: _John Pinson_____

Name: John Pinson

Title: Chief Executive Officer

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**PURCHASER:**

**S-PPT ACQUISITION COMPANY LLC**


By:      _____
Name:    Joseph Naccarato
Title:   Authorized Signatory

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

## <u>ANNEX I</u>

**WIND-DOWN BUDGET**

(To Be Filed as a Supplement in Accordance with <u>Section 8.18</u>)

## EXHIBIT A

## [FORM OF] BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT

This BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement") is made and entered into as of [_____], 2023, by and among Stanadyne PPT Holdings, Inc., a Delaware corporation, the other entities identified as "Sellers" on the signature pages hereto (each a "Seller" and collectively, "Sellers") and S-PPT Acquisition Company LLC, a Delaware limited liability company ("Purchaser").

WHEREAS, the Sellers and Purchaser have entered into that certain Asset Purchase Agreement, dated as of May [_], 2023 (as amended, restated, supplemented or otherwise modified from time to time, the "Purchase Agreement"), providing for, among other things, the sale and assignment by the Sellers to Purchaser of the Purchased Assets and the assumption by Purchaser of the Assumed Liabilities;

WHEREAS, the Sellers desire to sell, transfer, assign, convey and deliver to Purchaser, or cause to be sold, transferred, assigned, conveyed and delivered to Purchaser, all of Sellers' right, title, and interest in, to and under the Purchased Assets, pursuant to the terms of, and in consummation of the transactions contemplated by, the Purchase Agreement;

WHEREAS, the execution and delivery of this Agreement is required by Sections 3.2(a) and 3.3(b) of the Purchase Agreement; and

WHEREAS, this Agreement, as duly executed by Purchaser and Sellers, is being delivered as of the date hereof by each party hereto to the other party effective as of the Closing.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements set forth herein, and intending to be legally bound hereby, the Purchaser and the Sellers hereby agree as follows:

1.      Definitions.  Capitalized terms used but not defined herein shall have the respective meanings given to such terms in the Purchase Agreement.

2.      Transfer of Purchased Assets.  Pursuant to sections 105, 363 and 365 of the Bankruptcy Code and on the terms and subject to the conditions of the Purchase Agreement and the Sale Order, each Seller does hereby sell, transfer, assign, convey and deliver to Purchaser, and Purchaser does hereby purchase, acquire and accept from such Seller, all of such Seller's right, title and interest in, to and under all of the Purchased Assets, free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances).

3.      Assignment and Assumption.  Pursuant to sections 105, 363 and 365 of the Bankruptcy Code and on the terms and on the terms and subject to the conditions of the Purchase Agreement and the Sale Order, each Seller does hereby sell, transfer, assign, convey and deliver to Purchaser, and Purchaser does hereby purchase, acquire and accept from such Seller, all of such Seller's right, title and interest in, to and under all of the Contracts that are Assigned Contracts as of the date hereof, free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances).  On the terms and subject to the conditions of the Purchase Agreement and the Sale Order, Purchaser does hereby assume only the Assumed Liabilities.

4.      Excluded Assets.  Notwithstanding anything to the contrary in this Agreement, the Purchase Agreement or the other Ancillary Agreements, each Seller shall not sell, transfer, assign, convey

or deliver to Purchaser, and each Seller shall retain all right, title and interest to, in and under, and Purchaser shall not purchase, acquire or accept, or take assignment of, any of the Excluded Assets or any Non-Assigned Contract included in the Excluded Assets.

5.    Excluded Liabilities.  Notwithstanding anything to the contrary in this Agreement or in the Purchase Agreement, Purchaser shall not assume or otherwise be liable for the payment or performance of any of the Excluded Liabilities, all of which shall remain Liabilities of the Sellers for which the Sellers shall remain solely and exclusively liable.

6.    Terms of the Purchase Agreement.  This Agreement is executed and delivered pursuant to the Purchase Agreement.  The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements and indemnities relating to the Purchased Assets and the Assigned Contracts, are incorporated herein by this reference.  The parties hereto acknowledge and agree that the representations, warranties, covenants, agreements and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein.  In the event of a conflict between the terms and conditions of this Agreement and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede and prevail.  Notwithstanding anything to the contrary in this Agreement, nothing herein is intended to, nor shall it, extend, amplify or otherwise alter any representation, warranty, covenant or obligation contained in the Purchase Agreement.

7.    Governing Law.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE, AND WHERE STATE LAW IS IMPLICATED, THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF (EXCEPT SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.

8.    Counterparts.  For the convenience of the parties hereto, this Agreement may be executed and delivered (by facsimile or PDF signature) in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

*[The remainder of this page is intentionally left blank.]*

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

<u>**SELLERS:**</u>

**STANADYNE PPT HOLDINGS, INC.**

By: _____
Name:
Title:

**STANADYNE LLC**

By: _____
Name:
Title:

**PURE POWER TECHNOLOGIES, INC.**

By: _____
Name:
Title:

**PURCHASER**:

**S-PPT ACQUISITION COMPANY LLC**

By: _____

Name:

Title:

## <u>EXHIBIT B</u>

## [FORM OF] PATENT ASSIGNMENT AGREEMENT

This PATENT ASSIGNMENT AGREEMENT ("<u>Agreement</u>") is made and entered into as of [●], 2023, by and between [Stanadyne PPT Holdings, Inc., Stanadyne LLC, Pure Power Technologies, Inc.][1] ("<u>Assignor</u>") and S-PPT Acquisition Company LLC, a Delaware limited liability company ("<u>Assignee</u>").

WHEREAS, Assignor is the owner of the entire right, title and interest in and to all of its patents and patent applications, including, without limitation, the patents and patent applications identified on <u>Schedule A</u> attached hereto (collectively, the "<u>Patents</u>");

WHEREAS, this Agreement is made and entered into in connection with the Closing of the transactions contemplated by that certain Asset Purchase Agreement, dated as of May [●], 2023 (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Purchase Agreement</u>"), by and among Assignee and each other Person that is a signatory thereto, including, without limitation, Assignor;

WHEREAS, capitalized terms used but not defined herein shall have the respective meanings given to such terms in the Purchase Agreement;

WHEREAS, pursuant to the Purchase Agreement, Assignor has agreed to sell, transfer, assign, convey and deliver to Assignee, and Assignee has agreed to purchase, acquire and accept from Assignor, all of Assignor's right, title and interest in, to and under certain assets (including, without limitation, the Patents);

WHEREAS, the execution and delivery of this Agreement is required by Sections 3.2(b) and 3.3(c) of the Purchase Agreement; and

WHEREAS, this Agreement, as duly executed by Assignee and Assignor, is being delivered as of the date hereof by each party hereto to the other party effective as of the Closing.

NOW, THEREFORE, in consideration of the foregoing, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby sells, transfers, assigns, conveys and delivers to Assignee, Assignor's entire worldwide right, title and interest in and to, including any and all common law rights thereto, the Patents, free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances), as well as any and all issuances, divisions, continuations, continuations-in-part, reissues, extensions, reexaminations, and renewals thereof; all rights of any kind whatsoever of Assignor accruing under any of the foregoing provided by applicable law of any jurisdiction, by international treaties and conventions, and otherwise throughout the world; all income, royalties, fees, damages, payments and other proceeds now and hereafter due and/or payable with respect to any and all of the foregoing; and any and all claims and causes of action with respect to any of the foregoing, whether accruing before, on, or after the date hereof, including all rights to and claims for damages, restitution, and injunctive and other legal and equitable relief for past, present, and

---

[1] Note to Draft: Assignor entities to be updated upon finalization of Patents listed on Schedule A.

future infringement, misappropriation, violation, misuse, breach, or default, with the right but no obligation to sue for such legal and equitable relief and to collect, or otherwise recover, any such damages.

Together with Assignor's worldwide right, title and interest in and to each of the Patents being assigned to Assignee, are the rights to police, monitor and enforce said Patents against any and all past, current and future infringements (including, without limitation, the right to sue for and collect damages caused by any such infringement) which may have occurred at any time in the unlimited past, up to the date of this Agreement, together with any and all further privileges in the United States and throughout the world to establish use, ownership, and registration of the Patents.

In accordance with Section 8.12 of the Purchase Agreement, Assignor will cooperate with Assignee, as may be reasonably necessary or appropriate to assist and/or to enable Assignee to record or perfect the above-described transfer of Patent rights, or to secure registration before the United States Patent and Trademark Office or any foreign patent office, at Assignee's expense.

Assignor hereby further authorizes the Commissioner of Patents and Trademarks of the United States, and the appropriate official in any other country, to issue any and all issuances, divisions, continuations, continuations-in-part, reissues, extensions, reexaminations, and renewals that have been or may be granted upon any application or petition for same with respect to the Patents, to Assignee, and Assignees' successors and/or assigns.

Assignor hereby grants to the designated attorneys of Assignee the authority and power to insert on this instrument any further identification which may be necessary or desirable for purposes of recordation by the United States Patent and Trademark Office or the patent office of any other country throughout the world.

This Agreement is executed and delivered pursuant to the Purchase Agreement.  The parties hereto acknowledge and agree that the representations, warranties, covenants, agreements and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein.  In the event of a conflict between the terms and conditions of this Agreement and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede and prevail.  Notwithstanding anything to the contrary in this Agreement, nothing herein is intended to, nor shall it, extend, amplify or otherwise alter any representation, warranty, covenant or obligation contained in the Purchase Agreement.

THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE, AND WHERE STATE LAW IS IMPLICATED, THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF (EXCEPT SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.

186093.3

For the convenience of the parties hereto, this Agreement may be executed and delivered (by facsimile or PDF signature) in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

*[The remainder of this page is intentionally left blank.]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first set forth above.

<u>**ASSIGNOR**</u>:[2]

**STANADYNE PPT HOLDINGS, INC.**

By: _____
Name:
Title:

**STANADYNE LLC**

By: _____
Name:
Title:

**PURE POWER TECHNOLOGIES, INC.**

By: _____
Name:
Title:

---

[2] Note to Draft: Assignor signature blocks to be updated upon finalization of Patents listed on Schedule A.

**ASSIGNEE**:

**S-PPT ACQUISITION COMPANY LLC**

By: _____

    Name:

    Title:

## SCHEDULE A

### Patents

| Patent Number | Country | Title | Issue Date |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

### Patent Applications

| Application / Publication Number | Country | Title | Filing Date |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

## EXHIBIT C

## [FORM OF] COPYRIGHT ASSIGNMENT AGREEMENT

This COPYRIGHT ASSIGNMENT AGREEMENT ("Agreement") is made and entered into as of [●], 2023, by and among [Stanadyne PPT Holdings, Inc., Stanadyne LLC, Pure Power Technologies, Inc.][1], the other Sellers party thereto (each an "Assignor" and collectively, "Assignors") and S-PPT Acquisition Company LLC, a Delaware limited liability company ("Assignee").

WHEREAS, Assignors are the owners, as applicable, of the entire right, title and interest in and to all of their respective rights associated with works of authorship, including exclusive exploitation rights, mask work rights, copyrights, database and design rights, whether or not registered or published, all registrations and recordations thereof and applications in connection therewith, along with all extensions and renewals thereof, including, without limitation, the copyrights identified on Schedule A attached hereto (collectively, the "Copyrights");

WHEREAS, this Agreement is made and entered into in connection with the Closing of the transactions contemplated by that certain Asset Purchase Agreement, dated as of May [●], 2023 (as amended, restated, supplemented or otherwise modified from time to time, the "Purchase Agreement"), by and among Assignee and each other Person that is a signatory thereto, including, without limitation, Assignors;

WHEREAS, capitalized terms used but not defined herein shall have the respective meanings given to such terms in the Purchase Agreement;

WHEREAS, pursuant to the Purchase Agreement, each Assignor has agreed to sell, transfer, assign, convey and deliver to Assignee, and Assignee has agreed to purchase, acquire and accept from each Assignor, all of such Assignor's right, title and interest in, to and under certain assets (including, without limitation, the Copyrights);

WHEREAS, the execution and delivery of this Agreement is required by Sections 3.2(c) and 3.3(c) of the Purchase Agreement; and

WHEREAS, this Agreement, as duly executed by Assignee and each Assignor, is being delivered as of the date hereof by each party hereto to the other party effective as of the Closing.

NOW, THEREFORE, in consideration of the foregoing, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Assignor hereby sells, transfers, assigns, conveys and delivers to Assignee, such Assignor's entire worldwide right, title and interest in and to the Copyrights, free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances), as well as any related copyright registrations and/or applications; all rights of any kind whatsoever of Assignor accruing under any of the foregoing provided by applicable law of any jurisdiction, by international treaties and conventions, and otherwise throughout the world; all income, royalties, fees, damages, payments and other proceeds now and hereafter due and/or payable with respect to any and all of the

---

[1] Note to Draft: Assignor entities to be updated upon finalization of Copyrights listed on Schedule A.

foregoing; any and all claims and causes of action with respect to any of the foregoing, whether accruing before, on, or after the date hereof, including all rights to and claims for damages, restitution, and injunctive and other legal and equitable relief for past, present, and future infringement, misappropriation, violation, misuse, breach, or default, with the right but no obligation to sue for such legal and equitable relief and to collect, or otherwise recover, any such damages; and any and all United States and/or foreign copyright registrations which may be issued on same in the future; provided, however, in relation to each of the foregoing, excluding any copyrights or related rights constituting Excluded Assets.

Together with each Assignor's worldwide right, title and interest in and to each of the Copyrights are the rights to police, monitor and enforce said Copyrights against any and all past, current and future infringements (including, without limitation, the right to sue for and collect damages caused by any such infringement) which may have occurred at any time in the unlimited past, up to the date of this present Agreement, together with any and all further privileges in the United States and throughout the world to establish use, ownership, and registration of the Copyrights.

In accordance with Section 8.12 of the Purchase Agreement, Assignors will cooperate with Assignee, as may be reasonably necessary or appropriate to assist and/or to enable Assignee to obtain and enforce the full benefits from the Copyrights and the interests assigned therewith.

This Agreement is executed and delivered pursuant to the Purchase Agreement.  The parties hereto acknowledge and agree that the representations, warranties, covenants, agreements and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein.  In the event of a conflict between the terms and conditions of this Agreement and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede and prevail.  Notwithstanding anything to the contrary in this Agreement, nothing herein is intended to, nor shall it, extend, amplify or otherwise alter any representation, warranty, covenant or obligation contained in the Purchase Agreement.

THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE, AND WHERE STATE LAW IS IMPLICATED, THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF (EXCEPT SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.

For the convenience of the parties hereto, this Agreement may be executed and delivered (by facsimile or PDF signature) in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

*[The remainder of this page is intentionally left blank.]*

2

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first set forth above.

**ASSIGNORS**:[2]

**STANADYNE PPT HOLDINGS, INC.**

By: _____
Name:
Title:

**STANADYNE LLC**

By: _____
Name:
Title:

**PURE POWER TECHNOLOGIES, INC.**

By: _____
Name:
Title:

---

[2] Note to Draft: Assignor signature blocks to be updated upon finalization of Copyrights listed on Schedule A.

**<u>ASSIGNEE</u>**:

**S-PPT ACQUISITION COMPANY LLC**

By: _____
    Name:
    Title:

**SCHEDULE A**

**Copyright Registrations**

| Title/Description | Registration Number | Registration Date | Assignor |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

**Copyright Applications**

| Title/Description | Application Number | Filing Date | Assignor |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

## EXHIBIT D

## [FORM OF] TRADEMARK ASSIGNMENT AGREEMENT

This TRADEMARK ASSIGNMENT AGREEMENT ("Agreement") is made and entered into as of [●], 2023, by and among [Stanadyne PPT Holdings, Inc., Stanadyne LLC, Pure Power Technologies, Inc.][1] (each an "Assignor" and collectively, "Assignors") and S-PPT Acquisition Company LLC, a Delaware limited liability company ("Assignee").

WHEREAS, Assignors are the owners, as applicable, of the entire right, title, interest and goodwill in and to all of their respective trademarks, either registered, pending or at common law, including, without limitation, the trademarks identified on Schedule A attached hereto (collectively, the "Trademarks");

WHEREAS, this Agreement is made and entered into in connection with the Closing of the transactions contemplated by that certain Asset Purchase Agreement, dated as of May [●], 2023 (as amended, restated, supplemented or otherwise modified from time to time, the "Purchase Agreement"), by and among Assignee and each other Person that is a signatory thereto, including, without limitation, Assignors;

WHEREAS, capitalized terms used but not defined herein shall have the respective meanings given to such terms in the Purchase Agreement;

WHEREAS, pursuant to the Purchase Agreement, each Assignor has agreed to sell, transfer, assign, convey and deliver to Assignee, and Assignee has agreed to purchase, acquire and accept from each Assignor, all of such Assignor's right, title and interest in, to and under certain assets (including, without limitation, the Trademarks);

WHEREAS, the execution and delivery of this Agreement is required by Sections 3.2(d) and 3.3(c) of the Purchase Agreement; and

WHEREAS, this Agreement, as duly executed by Assignee and each Assignor, is being delivered as of the date hereof by each party hereto to the other party effective as of the Closing.

NOW, THEREFORE, in consideration of the foregoing, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Assignor hereby sells, transfers, assigns, conveys and delivers to Assignee, such Assignor's entire worldwide right, title and interest in and to, including any and all common law rights thereto, as well as the goodwill of the business connected with the use of, and symbolized by, the Trademarks, free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances), as well as any related trademark registrations, trade names, service marks, and/or trademark applications; together with all renewals thereof; all rights of any kind whatsoever of Assignor accruing under any of the foregoing provided by applicable law of any jurisdiction, by international treaties and conventions, and otherwise throughout the world; all income, royalties, fees, damages, payments and other proceeds now and hereafter due and/or payable with respect to any and all of the foregoing; any and all claims and causes of action with

---

[1] Note to Draft: Assignor entities to be updated upon finalization of Trademarks listed on Schedule A.

respect to any of the foregoing, whether accruing before, on, or after the date hereof, including all rights to and claims for damages, restitution, and injunctive and other legal and equitable relief for past, present, and future infringement, dilution, misappropriation, violation, misuse, breach, or default, with the right but no obligation to sue for such legal and equitable relief and to collect, or otherwise recover, any such damages; and any and all United States and/or foreign trademark (or service mark) registrations which may be issued on same in the future; provided, however, in relation to each of the foregoing, excluding any trademarks or related rights constituting Excluded Assets.

Together with each Assignor's worldwide right, title and interest in and to each of the Trademarks, as well as the goodwill of the business associated with said Trademarks being assigned to Assignee, are the rights to police, monitor and enforce said Trademarks against any and all past, current and future infringements (including, without limitation, the right to sue for and collect damages caused by any such infringement) which may have occurred at any time in the unlimited past, up to the date of this Agreement, together with any and all further privileges in the United States and throughout the world to establish use, ownership, and registration of the Trademarks.

In accordance with Section 8.12 of the Purchase Agreement, Assignors will cooperate with Assignee, as may be reasonably necessary or appropriate to assist and/or to enable Assignee to record or perfect the above-described transfer of Trademark rights, or to secure registration before the United States Patent and Trademark Office or any foreign trademark office, at Assignee's expense.

Each Assignor hereby further authorizes the Commissioner of Patents and Trademarks of the United States, and the appropriate official in any other country, to issue any and all trademark and service mark registrations, amended registrations and renewals that have been or may be granted upon any application or petition for same, to Assignee, and Assignees' successors and/or assigns.

Each assignor hereby grants to the designated attorneys of Assignee the authority and power to insert on this instrument any further identification which may be necessary or desirable for purposes of recordation by the United States Patent and Trademark Office or the trademark office of any other country throughout the world.

This Agreement is executed and delivered pursuant to the Purchase Agreement. The parties hereto acknowledge and agree that the representations, warranties, covenants, agreements and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of a conflict between the terms and conditions of this Agreement and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede and prevail. Notwithstanding anything to the contrary in this Agreement, nothing herein is intended to, nor shall it, extend, amplify or otherwise alter any representation, warranty, covenant or obligation contained in the Purchase Agreement.

THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE,

186095.3                                                2

AND WHERE STATE LAW IS IMPLICATED, THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF (EXCEPT SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.

For the convenience of the parties hereto, this Agreement may be executed and delivered (by facsimile or PDF signature) in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

*[The remainder of this page is intentionally left blank.]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first set forth above.

<u>**ASSIGNORS**</u>:[2]

**STANADYNE PPT HOLDINGS, INC.**

By: _____
Name:
Title:

**STANADYNE LLC**

By: _____
Name:
Title:

**PURE POWER TECHNOLOGIES, INC.**

By: _____
Name:
Title:

---

[2] Note to Draft: Assignor signature blocks to be updated upon finalization of Trademarks listed on Schedule A.

**<u>ASSIGNEE</u>**:

**S-PPT ACQUISITION COMPANY LLC**

By:_____

    Name:

    Title:

[SIGNATURE PAGE TO TRADEMARK ASSIGNMENT]

## SCHEDULE A

## Trademark Registrations

| Trademark | Country | Registration Number | Registration Date | Assignor |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

## Trademark Applications

| Trademark | Country | Application Serial Number | Application Date | Assignor |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

## EXHIBIT E

## [FORM OF] DOMAIN NAME ASSIGNMENT AGREEMENT

This DOMAIN NAME ASSIGNMENT AGREEMENT ("Agreement") is made and entered into as of [●], 2023, by and among [Stanadyne PPT Holdings, Inc., Stanadyne LLC, and Pure Power Technologies, Inc.][1] (each an "Assignor" and collectively, "Assignors") and S-PPT Acquisition Company LLC, a Delaware limited liability company ("Assignee").

WHEREAS, Assignors are the owners, as applicable, of the internet domain names identified on Schedule A attached hereto (collectively, the "Domain Names"), each of which has been registered with the applicable registrar set forth on such Schedule A;

WHEREAS, this Agreement is made and entered into in connection with the Closing of the transactions contemplated by that certain Asset Purchase Agreement, dated as of May [●], 2023 (as amended, restated, supplemented or otherwise modified from time to time, the "Purchase Agreement"), by and among Assignee and each other Person that is a signatory thereto, including, without limitation, Assignors;

WHEREAS, capitalized terms used but not defined herein shall have the respective meanings given to such terms in the Purchase Agreement;

WHEREAS, pursuant to the Purchase Agreement, each Assignor has agreed to sell, transfer, assign, convey and deliver to Assignee, and Assignee has agreed to purchase, acquire and accept from each Assignor, all of such Assignor's right, title and interest in, to and under certain assets (including, without limitation, the Domain Names);

WHEREAS, the execution and delivery of this Agreement is required by Sections 3.2(e) and 3.3(c) of the Purchase Agreement; and

WHEREAS, this Agreement, as duly executed by Assignee and each Assignor, is being delivered as of the date hereof by each party hereto to the other party effective as of the Closing.

NOW, THEREFORE, in consideration of the foregoing, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Assignor does hereby sell, transfer, assign, convey and deliver to Assignee, effective as of the Closing, all right, title and interest in and to the Domain Names, free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances), except for any rights constituting Excluded Assets.

In accordance with Section 8.12 of the Purchase Agreement, Assignors and Assignee will cooperate to perform all affirmative acts which may be reasonably necessary or appropriate to implement and perfect the above-described transfer of rights and to secure transfer of the Domain Name registrations before the registrars of same as well as to cooperate with Assignee in obtaining and/or providing information required in any proceedings relating to the Domain Names, and Assignors hereby agree to follow Assignee's reasonable instructions in order to effectuate the

---

[1] **Note to Draft**: Assignor entities to be updated upon finalization of Domain Names listed on Schedule A.

transfer of the Domain Name registrations in a timely manner.

This Agreement is executed and delivered pursuant to the Purchase Agreement. The parties hereto acknowledge and agree that the representations, warranties, covenants, agreements and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of a conflict between the terms and conditions of this Agreement and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede and prevail. Notwithstanding anything to the contrary in this Agreement, nothing herein is intended to, nor shall it, extend, amplify or otherwise alter any representation, warranty, covenant or obligation contained in the Purchase Agreement.

THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE, AND WHERE STATE LAW IS IMPLICATED, THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF (EXCEPT SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.

For the convenience of the parties hereto, this Agreement may be executed and delivered (by facsimile or PDF signature) in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

*[The remainder of this page is intentionally left blank.]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first set forth above.

**ASSIGNORS**:[2]

**STANADYNE PPT HOLDINGS, INC.**

By: _____
Name:
Title:

**STANADYNE LLC**

By: _____
Name:
Title:

**PURE POWER TECHNOLOGIES, INC.**

By: _____
Name:
Title:

---

[2] **Note to Draft**: Assignor signature blocks to be updated upon finalization of Domain Names listed on Schedule A.

**<u>ASSIGNEE</u>**:

**S-PPT ACQUISITION COMPANY LLC**

By: _____
    Name:
    Title:

## SCHEDULE A

## Domain Names

| Domain Name | Registrar |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |