# EXHIBIT A

**Further Revised Proposed Sale Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| *In re* | **Chapter 11** |
| **STANADYNE LLC, *et al.*,**[1] | **Case No. 23-10207 (TMH)** |
| **Debtors.** | **(Jointly Administered)** |

### ORDER (I) APPROVING ASSET PURCHASE AGREEMENT, (II) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL ENCUMBRANCES, (III) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (IV) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors-in-possession (the "Debtors") for entry of an order (this "Sale Order"): (i) approving that certain asset purchase agreement, dated as of May 8, 2023, by and among Debtors Stanadyne PPT Holdings, Inc., Stanadyne LLC, and Pure Power Technologies, Inc.,[3] as Sellers, and Stanadyne Operating Company LLC (formerly known as S-PPT Acquisition Company LLC) (together with its designees, successors or assigns, as applicable, as provided in the Asset Purchase Agreement referred to below, the "Purchaser"), as Purchaser (including all exhibits, annexes and schedules related thereto, and as the same may be amended from time to time in accordance with the terms thereof, including Paragraph 5.1 hereof, the "Asset Purchase Agreement"), a copy of which is

---

1. The Debtors in the above-captioned Chapter 11 cases (the "Cases"), along with the last four digits of each Debtor's federal tax identification number are:  Stanadyne LLC (0378); Pure Power Technologies, Inc. (5202); Stanadyne PPT Holdings, Inc. (2594); and Stanadyne PPT Group Holdings, Inc. (1734).  The Debtors' headquarters are located at 405 White Street, Jacksonville, North Carolina 28546.

2. Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

3. Debtor Stanadyne PPT Group Holdings, Inc. is not a party to the Asset Purchase Agreement  As used herein, the terms "Debtor" and "Debtors" refer to all Debtors in the Cases or only those Debtors who are Sellers under the Asset Purchase Agreement, in each case as the context shall require.

attached hereto as **<u>Exhibit A</u>**, (ii) authorizing and approving the sale of substantially all of the assets of the Debtors (as more precisely defined in the Asset Purchase Agreement, the "<u>Purchased Assets</u>") free and clear of all Encumbrances (as defined below) and the consummation of all other transactions contemplated by the Asset Purchase Agreement (collectively, the "<u>Sale</u>") and the fulfillment of the Debtors' obligations thereunder, (iii) authorizing the assumption of those executory contracts and unexpired leases of the Debtors that constitute Assigned Contracts (as defined in the Asset Purchase Agreement) and the assignment and sale of the Assigned Contracts to Purchaser, and (iv) granting related relief; the Court having entered on May 16, 2023 that certain *Order (I) Approving Bidding Procedures, (II) Scheduling an Auction and a Sale Hearing, (III) Approving the Form and Manner of Notice Thereof, (IV) Establishing Notice and Procedures for the Assumption and Assignment and Sale of Contracts and Leases, and (V) Granting Related Relief* [Docket No. 276] (the "<u>Bidding Procedures Order</u>"); the Debtors having determined that the highest or otherwise best offer for the Purchased Assets was made by the Purchaser pursuant to the Asset Purchase Agreement; the Court having conducted a hearing on July 10, 2023 at 10:00 a.m. (ET) (the "<u>Sale Hearing</u>"), at which all parties in interest were offered an opportunity to be heard with respect to the Motion, to consider approval of the Sale pursuant to the terms and conditions of the Asset Purchase Agreement; and the Court having considered (i) the Motion, all objections thereto, and all replies in support thereof, (ii) the arguments of counsel made, and evidence proffered or adduced, related to the Motion, and (iii) the full record in these Cases, including the record related to the Sale Hearing; all parties in interest having been heard, or having had the opportunity to be heard, regarding the approval of the Asset Purchase Agreement and the Sale and the related relief granted herein; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their

estates, their creditors, and other parties in interest; and it further appearing that the legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein; and after due deliberation thereon and good and sufficient cause appearing therefor;

**IT IS HEREBY FOUND, CONCLUDED, AND DETERMINED THAT:**

A.      <u>Findings of Fact and Conclusions of Law</u>.  The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to these Cases pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.      <u>Jurisdiction; Venue</u>.  This Court has jurisdiction over the Motion and over the property of the Debtors, including the Purchased Assets, pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of the Cases and the Motion in this district and Court is proper under 28 U.S.C. §§ 1408 and 1409.

C.      <u>Final Order</u>.  This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to the extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, this Court expressly finds that there is no just reason for delay in the implementation of this Sale Order and expressly directs entry of judgment as set forth herein.

D.      Statutory Bases for Relief.  The statutory bases for the relief requested in the

Motion are sections 105(a), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002,

6004, 6006, 9013 and 9014.

E.      Notice.  As evidenced by the affidavits of service and publication filed with the

Court [Docket Nos. 256, 265, 269, 279, 282, 287, 299, 319, 321, 322, 331, 339, 356, 385, 417],

and based on the representations of counsel at the Sale Hearing, due, proper, timely, adequate,

and sufficient notice of the Motion, the Bidding Procedures (as defined below), the Sale Hearing,

the Sale, and the assumption, assignment, and sale of the Assigned Contracts has been provided

in accordance with sections 102(1), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules

2002, 6004, 6006, 9007, 9013, and 9014 and in compliance with the Bidding Procedures Order

to each party entitled to such notice.  The Debtors have complied with all obligations to provide

notice of the Motion as set forth in the Bidding Procedures Order, and such notice was

reasonably calculated to provide all interested parties with timely and proper notice of the

Bidding Procedures, the Sale Hearing, the Sale, and the assumption, assignment, and sale of the

Assigned Contracts.  Actual notice of the Motion and the relief requested therein (the "Sale

Notice") was provided to the following parties: (i) the Office of the United States Trustee for the

District of Delaware, (ii) counsel to the Committee, (iii) counsel to the Prepetition Agent (as

defined below), (iv) counsel to the Purchaser, (v) all parties to Potential Assigned Contracts (as

defined in the Bidding Procedures Order), (vi) all parties who had expressed a written interest in

some or all of the Purchased Assets, (vii) all known holders of Encumbrances in, on, to, or

against the Purchased Assets, (viii) the Internal Revenue Service, (ix) all applicable state and

local taxing authorities, (x) the state attorneys general for all states in which the Debtors conduct

business; and (xi) all parties that have requested or that are required to receive notice pursuant to

Bankruptcy Rule 2002.  With respect to Entities (as defined in the Bankruptcy Code) whose identities or addresses are not reasonable ascertainable by the Debtors, publication of the Sale Notice in the *New York Times – National Edition* on May 26, 2023 (the "Publication Notice") was sufficient and reasonably calculated under the circumstances to reach such Entities.  The Sale Notice and the Publication Notice collectively provided all interested parties with timely and proper notice of the Motion, the Bidding Procedures (including the time and place of the Auction), the Sale, the assumption, assignment, and sale of the Assigned Contracts, and the Sale Hearing.  The notices described above were good, sufficient, and appropriate under the circumstances, and no other or further notice was or is required.

F.    Disclosures.  The disclosures made by the Debtors in the Motion, the Sale Notice, the Publication Notice, and related documents filed with the Court concerning the Asset Purchase Agreement and at the Sale Hearing were sufficient under the circumstances.

G.    Sale and Marketing Process.  As demonstrated by evidence proffered or adduced at the Sale Hearing, the Debtors and their professionals have conducted an adequate marketing process and a fair and open sale process in compliance with the Bidding Procedures Order.  The bidding procedures attached as an exhibit to the Bidding Procedures Order (the "Bidding Procedures") were the result of arm's length negotiations, were substantively and procedurally fair to all parties, were proposed in good faith, and afforded a full, fair, and reasonable opportunity for any interested party to make a higher or otherwise better offer to purchase the Purchased Assets.  The Bidding Procedures and the opportunity to submit a higher or otherwise better bid were duly noticed, the sale process was conducted in a non-collusive, fair, and good-faith manner, and the Debtors and the Purchaser have complied with the Bidding Procedures and the Bidding Procedures Order in all material respects.

H.    <u>Successful Bidder</u>.    The Debtors determined, in accordance with the Bidding Procedures, and in consultation with the Consultation Parties (as defined in the Bidding Procedures Order), that the Purchaser's bid was the sole Qualified Bid and represented the highest or otherwise best offer for the Purchased Assets.  As a result, the Debtors canceled the Auction and declared the Purchaser the Successful Bidder in a notice filed with the Court [Docket No. 394].

I.    <u>Highest and Best Offer</u>.    After a full, fair, and robust sale process, the Debtors appropriately determined that the Asset Purchase Agreement constitutes the highest or otherwise best offer for the Purchased Assets.  Taking into consideration all relevant factors and circumstances, the Asset Purchase Agreement represents the best available alternative for the Debtors' estates.  The total consideration provided by the Purchaser for the Purchased Assets as reflected in the Asset Purchase Agreement (i) is fair and reasonable, (ii) represents the highest and best offer received by the Debtors for the Purchased Assets, and (iii) will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative.  No other Entity or group of Entities has submitted a Qualified Bid or otherwise offered to purchase the Purchased Assets for greater economic value to the Debtors' estates than the Purchaser.

J.    <u>Best Interests of the Estates, Creditors and Parties in Interest</u>.    The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the sale of the Purchased Assets outside the ordinary course of business under section 363(b) of the Bankruptcy Code.  The immediate consummation of the Sale is necessary and appropriate to maximize the value of the Debtors' estates.  Considering all relevant facts and circumstances of these Cases, and the adequacy and fair value of the consideration provided by the Purchaser under the Asset Purchase Agreement, the Sale (i) constitutes a reasonable and

sound exercise of the Debtors' business judgment and a proper exercise of the fiduciary duties of the Debtors and their officers and directors, (ii) is in the best interests of the Debtors, their estates, their creditors, and other parties in interest, and (iii) merits approval.

K.      Good Faith.  The Purchaser is purchasing the Purchased Assets in good faith and is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code.  Neither the Purchaser nor any of its Affiliates (as defined in the Asset Purchase Agreement), officers, directors, members, partners, principals, or shareholders (or equivalent) or any of their respective representatives, successors, or assigns (collectively, "Related Parties") is an "insider" (as defined in section 101(31) of the Bankruptcy Code) of any Debtor and, therefore, each such Entity is entitled to the full protections of section 363(m) and otherwise has proceeded in good faith in all respects in connection with these Cases, including because: (i) the Purchaser recognized that the Debtors were free to deal with any other party interested in acquiring the Purchased Assets, (ii) the Purchaser complied with the provisions of the Bidding Procedures Order, (iii) the Purchaser's bid was subject to the competitive Bidding Procedures set forth in the Bidding Procedures Order, (iv) all payments to be made by the Purchaser and other agreements or arrangements entered into by the Purchaser in connection with the Sale have been disclosed, (v) the Purchaser has not violated section 363(n) of the Bankruptcy Code by any action or inaction, and (vi) the negotiation and execution of the Asset Purchase Agreement were at arm's length and in good faith.  There is no evidence of insider influence or improper conduct by the Purchaser or any of its Related Parties in connection with the negotiation of the Asset Purchase Agreement with the Debtors.

L.      No Collusion.  The Asset Purchase Agreement and the transactions contemplated thereby cannot be avoided under section 363(n) of the Bankruptcy Code.  None of the Debtors,

the Purchaser, or any of their respective Related Parties have engaged in any conduct that would cause or permit the Asset Purchase Agreement or the consummation of the transactions contemplated thereby to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.

M.  <u>Fair Consideration</u>.  The consideration provided by the Purchaser pursuant to the Asset Purchase Agreement is fair and adequate and constitutes reasonably equivalent value, fair consideration, and fair value for the Purchased Assets under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia (including the Uniform Voidable Transactions Act, the Uniform Fraudulent Transfer Act, the Uniform Conveyance Act, and similar laws).

N.  <u>Power and Authority</u>.  The Debtors, each acting by and through their existing agents, representatives, and officers, have full corporate power and authority to perform under the Asset Purchase Agreement and consummate all transactions contemplated thereby and to execute, deliver, and perform under all other documents contemplated thereby.  The Sale has been duly and validly authorized by all necessary corporate actions.  Upon entry of this Sale Order, the Debtors require no further consents or approvals to consummate the transactions contemplated by the Asset Purchase Agreement, except as otherwise set forth in the Asset Purchase Agreement.

O.  <u>Binding Agreement; Survival</u>.  The Asset Purchase Agreement is a valid and binding contract between the Debtors and the Purchaser and shall be enforceable pursuant to its terms.  The Asset Purchase Agreement was not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession, or the District of Columbia.  Neither the Purchaser nor any

Debtor is entering into the transactions contemplated by the Asset Purchase Agreement fraudulently for the purpose of statutory and common law fraudulent conveyance and fraudulent transfer claims.  The Asset Purchase Agreement and the Sale itself, and the consummation thereof, shall be specifically enforceable against and binding upon the Debtors and any Chapter 11 or Chapter 7 trustee appointed with respect to any Debtor and shall not be subject to rejection or avoidance by the foregoing parties or any other Entity.  The rights and interests granted pursuant to this Sale Order and Asset Purchase Agreement shall continue in these or any superseding cases under the Bankruptcy Code (including, without limitation, any case under Chapter 7 of the Bankruptcy Code) (each, a "Superseding Case").  Any trustee appointed for any Debtor under any provision of the Bankruptcy Code shall be authorized and directed to perform under the Asset Purchase Agreement and this Sale Order without the need for further order of the Court.

P.     Property of the Estate; Valid Transfer.  The Debtors are the sole and lawful owner of, and have clear and marketable title to, the Purchased Assets.  The Debtors' right, title, and interest in and to the Purchased Assets constitute property of the Debtors' estates and title thereto is vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code. The transfer of each of the Purchased Assets to the Purchaser pursuant to the Asset Purchase Agreement will be a legal, valid, and effective transfer of such Purchased Assets and will vest the Purchaser with all right, title, and interests of the Debtors to the Purchased Assets free and clear of all Encumbrances accruing or arising at, or related to, any time prior to the Closing (as defined in the Asset Purchase Agreement), unless otherwise expressly assumed or undertaken by the Purchaser under the terms of the Asset Purchase Agreement and with all Encumbrances in, on, to, or against any Purchased Assets to attach to the proceeds (including all amounts paid by

the Purchaser under the Asset Purchase Agreement) of the Sale in the order of their priority and with the same validity, force, and effect that they had against the Purchased Assets immediately prior to the Closing but subject to any claims and defenses that the Debtors may possess with respect thereto.

Q.    <u>Free and Clear Sale</u>.  The sale of the Purchased Assets shall be free and clear of all Encumbrances against the Debtors, their estates, and any of the Purchased Assets because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.  As used in this Sale Order, the term "Encumbrances" means, collectively, any and all: (i) Encumbrances (as defined in the Asset Purchase Agreement) with respect to any Debtor or any Debtor's assets; (ii) Excluded Liabilities (as defined in the Asset Purchase Agreement); (iii) debts arising under, relating to, or in connection with any act of any Debtor; (iv) claims, liabilities, obligations, demands, guaranties, options, rights, contractual commitments, restrictions, restrictive covenants, covenants not to compete, rights to refunds, escheat obligations, and interests and matters of any kind and nature asserted or assertable against any Debtor (whether arising prior to or subsequent to the commencement of the Cases and whether imposed by agreement, applicable law, equity, or otherwise); (v) purported rights of setoff or recoupment against, and rights and options to effect any forfeiture, modification, profit-sharing interest, right of first refusal, purchase or repurchase right or option, or termination of, any Debtor's or any of the Purchaser's interests in the Purchased Assets, or any similar rights; (vi) taxes owed by any Debtor for a period prior to the Closing, including, without limitation, sales, income, use or any other type of tax; (vii) restrictions, charges, and interests of any kind or nature, including any restriction of use, voting, transfer, receipt of income, or other exercise of any attributes of ownership, in each case accruing or arising at, or relating to, any time prior to

the Closing; provided, however, that the term "Encumbrance," as used herein, shall not include any Assumed Liabilities or Permitted Encumbrances (each as defined in the Asset Purchase Agreement), any obligations expressly assumed or undertaken by the Purchaser under the terms of the Asset Purchase Agreement, or any liability or obligation of an entity that is not a Debtor. If the sale of the Purchased Assets were not free and clear of all Encumbrances, or if the Purchaser would, or in the future could, be liable for any Encumbrances, the Purchaser would not have entered into the Asset Purchase Agreement and would not consummate the Sale, thus adversely affecting the Debtors and their estates and creditors. The total consideration to be provided under the Asset Purchase Agreement reflects the Purchaser's reliance on this Sale Order to provide it, pursuant to section 105(a) and 363(f) of the Bankruptcy Code, with title to and possession of the Purchased Assets free and clear of all Encumbrances.

R.    <u>Assigned Contracts</u>.    As set forth herein, and subject only to payment of the Determined Cure Costs (as defined in the Asset Purchase Agreement), all requirements and conditions under the Bankruptcy Code and other applicable law for the Debtors' assumption, assignment, and sale to the Purchaser of the Assigned Contracts have been satisfied. The Debtors have demonstrated that the assumption, assignment, and sale of the Assigned Contracts contemplated by the Asset Purchase Agreement is an exercise of their sound business judgment and is in the best interests of the Debtors, their estates and creditors, and other parties in interest. The Assigned Contracts to be assumed, assigned, and sold to the Purchaser under the terms of the Asset Purchase Agreement are an integral part of the Asset Purchase Agreement and the Sale and, accordingly, such assumption, assignment, and sale are reasonable and enhance the value of the Debtors' estates. All Assigned Contracts are in full force and effect and have not been rejected, and the Debtors' time to assume or reject the Assigned Contracts has not otherwise

expired.  As to each Potential Assigned Contract listed on **Exhibit B** hereto, the Cure Cost (as defined in the Asset Purchase Agreement) listed therein with respect to such Potential Assigned Contract shall constitute the Determined Cure Cost for such Potential Assigned Contract, and payment thereof is sufficient for the Debtors to comply fully with the requirements of Section 365(b) of the Bankruptcy Code as to such Potential Assigned Contract.  As to each Potential Assigned Contract listed on **Exhibit C** hereto, the Determined Cure Cost applicable thereto shall be determined (i) by agreement of the Purchaser, the Debtors, and the non-debtor counterparty to such Potential Assigned Contract (in which case such Potential Assigned Contract shall become an Assigned Contract automatically upon such resolution and, to the extent applicable, payment of the agreed Determined Cure Cost, without the need for any further order of the Court) or (ii) by subsequent order of the Court, and, in each case, the payment of such Determined Cure Cost will be sufficient for the Debtors to comply fully with the requirements of Section 365(b) of the Bankruptcy Code as to such Assigned Contract.

S.      Designation Rights.  Pursuant to Section 1.5 of the Asset Purchase Agreement, the Purchaser shall maintain certain rights to modify the list of Assigned Contracts after the date of this Sale Order and up to the applicable Designation Deadline (as defined in the Asset Purchase Agreement) as set forth in such section.  Such modification rights include, but are not limited to, the right of the Purchaser, prior to the applicable Designation Deadline, to designate certain Designation Rights Assets (as defined in the Asset Purchase Agreement) for assumption by the Debtors and assignment and sale to the Purchaser, or as Excluded Assets (as defined in the Asset Purchase Agreement).  Upon the Purchaser's timely designation of a Designated Rights Asset as a Purchased Asset pursuant to Section 1.5 of the Asset Purchase Agreement, all of the provisions of this Sale Order relating to Purchased Assets shall, without the need for further

order of the Court or action by any party, become applicable to such asset.  The notice and opportunity to object provided to the non-debtor counterparties to Potential Assigned Contracts and to other parties in interest, as set forth in the Bidding Procedures Order and the Asset Purchase Agreement (and as described herein), provides fair, reasonable, and adequate protection of all rights that such non-debtor counterparties and other parties in interest may have with respect to such Contracts (as defined in the Asset Purchase Agreement).  In the event that the Debtors or their estates incur costs or expenses in connection with the operation of any Designation Rights Asset, the Purchaser shall be responsible for all such costs and expenses to the extent set forth in Section 1.5(b) of the Asset Purchase Agreement,

   T. <u>Notice of Assumption, Assignment, and Sale of Executory Contracts and Unexpired Leases</u>.  Good and sufficient notice of the Debtors' assumption, assignment and sale to the Purchaser of the Assigned Contracts has been provided to each non-debtor counterparty to a Potential Assigned Contract.  As reflected in the certificates of service filed on the Court's docket [Docket Nos. 319, 322, 417], the Debtors served (i) the *Notice to Contract Parties to Potentially Assumed, Assigned, and Sold Executory Contracts and Unexpired Leases* [Docket No. 297] (the "<u>Initial Assumption Notice</u>") in the form approved by the Bidding Procedures Order, (ii) the *Notice of Amendment to Exhibit A to Notice to Contract Parties to Potentially Assumed, Assigned, and Sold Executory Contracts and Unexpired Leases* [Docket No. 306] (the "<u>First Supplemental Assumption Notice</u>"), and (iii) *the Supplemental Notice to Notice to Contract Parties to Potentially Assumed, Assigned, and Sold Executory Contracts and Unexpired Leases* [Docket No. 400] (the "<u>Second Supplemental Assumption Notice</u>" and, together with the Initial Assumption Notice and First Supplemental Assumption Notice, the "<u>Assumption Notices</u>"), in which the Debtors identified the dollar amount, if any, that the

Debtors assert is necessary to be paid to cure all defaults, if any (the "Debtor Asserted Cure Amount"), under the Potential Assigned Contracts, on the non-debtor counterparties to the Potential Assigned Contracts.  Pursuant to the Bidding Procedures Order and as set forth in the Assumption Notices, (i) non-debtor counterparties to the Potential Assigned Contracts listed on the Initial Assumption Notice were required to file objections (each, a "Cure Objection"), if any, to the Debtor Asserted Cure Amount by no later than June 12, 2023, at 5:00 p.m. (prevailing Eastern Time), (ii) non-debtor counterparties to the Potential Assigned Contracts listed on the First Supplemental Assumption Notice were required to file a Cure Objection, if any, to the Debtor Asserted Cure Amount by no later than June 13, 2023, at 5:00 p.m. (prevailing Eastern Time), and (iii) non-debtor counterparties to the Potential Assigned Contracts listed on the Second Supplemental Assumption Notice were required to file a Cure Objection, if any, to the Debtor Asserted Cure Amount by no later than July 6, 2023, at 5:00 p.m. (prevailing Eastern Time)  (in each case, except to the extent the Debtors and the Purchaser jointly agreed to an extension of such deadline).  The Bidding Procedures Order provides, and the Assumption Notices explained, that in the absence of a timely filed Cure Objection, the Debtor Asserted Cure Amount set forth in the Assumption Notices with respect to each Potential Assigned Contract would be controlling and fixed as the Cure Cost for such Potential Assigned Contract notwithstanding anything to the contrary in such Potential Assigned Contract or any other document, and the non-debtor counterparty to such Potential Assigned Contract shall be deemed to have consented to the Debtor Asserted Cure Amount.  The provisions of subparagraph 16(c) of the Bidding Procedures Order regarding Supplemental Assumption Notices (as defined in the Bidding Procedures Order) will provide the non-debtor counterparties to Potential Assigned

Contracts listed in any Supplemental Assumption Notice served hereafter with adequate, reasonable, and appropriate notice and opportunity to object.

U.    <u>Adequate Assurance of Future Performance</u>.  On May 25, 2023 [Docket No. 321], the Debtors sent all non-debtor counterparties to Potential Assigned Contracts evidence that the Purchaser has the ability to perform under the non-debtor counterparty's Potential Assigned Contract and otherwise has provided adequate assurance of future performance under section 365(b)(1) of the Bankruptcy Code.  Pursuant to the Bidding Procedures Order, non-debtor counterparties to Potential Assigned Contracts whose executory contracts and unexpired leases were listed on any Assumption Notice were required to file any objections to the Purchaser's ability to provide adequate assurance of future performance as contemplated under sections 365(b)(1)(C), 365(b)(3) (to the extent applicable), and 365(f)(2)(B) of the Bankruptcy Code (any such objection, an "<u>Adequate Assurance Objection</u>") by no later than June 12, 2023, at 5:00 p.m. (prevailing Eastern Time).  Any non-debtor counterparty that failed to file an Adequate Assurance Objection is forever barred from objecting to the assumption, assignment and sale of its Potential Assigned Contract on the grounds of a failure to provide adequate assurance of future performance.

V.    <u>Purchaser Not a Successor</u>.  By consummating the Sale pursuant to the Asset Purchase Agreement (including operating the Purchased Assets under the Debtors' trade names), the Purchaser is not a mere continuation of any Debtor or any Debtor's estate, and there is no continuity, no common identity, and no continuity of enterprise between the Purchaser and any Debtor.  The Purchaser shall not be deemed to be holding itself out as a continuation of any Debtor based on the Sale, the Asset Purchase Agreement, or this Sale Order.  The Purchaser is not a successor to any Debtor or any Debtor's estate by reason of any theory of law or equity,

and the Sale does not amount to a consolidation, merger, or *de facto* merger of the Purchaser and any Debtor.  Neither the Purchaser nor any of its Related Parties shall have assumed or in any way be responsible for any obligation or liability of any Debtor (or any Affiliate thereof) or any Debtor's estate, except to the extent expressly provided in the Asset Purchase Agreement or otherwise agreed in writing by the Purchaser in its sole and absolute discretion.

W.  <u>No Sub Rosa Plan</u>.  The Sale neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates the terms of a Chapter 11 plan of the Debtors.  The Sale does not constitute a *sub rosa* or *de facto* plan of reorganization or liquidation.

X.  <u>Wind-Down</u>.  The Excluded Cash and the Wind-Down Budget (each as defined in the Asset Purchase Agreement) will provide for, among other things and in accordance with the Wind-Down Budget, the payment of certain professional and U.S. trustee fees and other agreed wind-down expenses, and will permit the Debtors to implement an orderly and responsible wind-down of the Debtors' estates.  The Debtors shall deliver any Surplus Cash (as defined in the Asset Purchase Agreement) to Purchaser promptly following the date any such Cash and Cash Equivalents (as defined in the Asset Purchase Agreement) become Surplus Cash pursuant to the Asset Purchase Agreement.

Y.  <u>Single, Integrated Transaction</u>.  Entry of this Sale Order approving the Asset Purchase Agreement and all provisions of this Sale Order and the Asset Purchase Agreement are a necessary condition precedent to the Purchaser consummating the Sale.  The provisions of this Sale Order and the Asset Purchase Agreement and the transactions contemplated hereby and thereby are inextricably linked and technically and collectively constitute a single, integrated transaction.

Z.      <u>Consummation is Legal, Valid, and Authorized</u>.  The consummation of the Sale is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), 365(b), and 365(f) of the Bankruptcy Code, and all of the applicable requirements of such sections have been satisfied.

AA.      <u>Legal and Factual Bases</u>.  The legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED:**

1. **<u>Approval of the Motion</u>**

1.1.      The relief requested in the Motion is granted as set forth herein.

1.2.      Any and all objections and responses to the Motion, the entry of this Sale Order, or the relief granted herein (other than Cure Objections and Adequate Assurance Objections identified in **<u>Exhibit C</u>** hereto, if any) that have not been withdrawn, waived, settled, or resolved, and all reservations of rights included therein, are hereby overruled and denied on the merits. Notwithstanding anything in this Sale Order to the contrary, all Cure Objections and Adequate Assurance Objections listed on **<u>Exhibit C</u>**, if any, are reserved.  All Entities notified or deemed notified of the relief sought in the Motion and set forth in this Sale Order that failed to timely object thereto are deemed to consent to such relief.

1.3.      Notice of the Motion, the Bidding Procedures Order, the Sale Hearing, and the Sale was fair and equitable under the circumstances and complied in all respects with section 102(1) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006.

1.4.      The Court's findings of fact and conclusions of law in the Bidding Procedures Order are incorporated herein by reference.

2. **<u>Approval of the Sale</u>**

2.1.    The Asset Purchase Agreement and all other ancillary documents, all of the terms and conditions thereof, and the Sale are hereby approved in all respects.

2.2.    Pursuant to sections 363 and 365 of the Bankruptcy Code, entry by the Debtors into the Asset Purchase Agreement is hereby authorized and approved as a valid exercise of the Debtors' business judgment.  Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the Debtors are authorized to perform under and make all payments and satisfy all other obligations required by the Asset Purchase Agreement and all other ancillary documents as and when due thereunder without further order of the Court.  Pursuant to section 363(b) of the Bankruptcy Code, the Debtors, acting by and through their existing agents, representatives, and officers, are authorized, without further order of the Court, to take any and all actions necessary or appropriate to: (a) consummate and close the Sale pursuant to and in accordance with the terms and conditions of the Asset Purchase Agreement; (b) transfer and assign all right, title, and interest to and in all Purchased Assets in accordance with the terms and conditions of the Asset Purchase Agreement; and (c) perform under, consummate, and implement the Asset Purchase Agreement and all additional instruments and documents that may be reasonably necessary or desirable to implement the Sale, including any deeds, assignments, bills of sale, stock powers, transfers of membership interests and other instruments of transfer, or other ancillary documents as may be reasonably necessary or appropriate to the performance of the obligations contemplated by the Asset Purchase Agreement.  Neither the Purchaser nor any Debtor shall have any obligation to proceed with the Closing under the Asset Purchase Agreement until all conditions precedent to its obligations to do so have been met, satisfied, or waived in accordance with the terms of the Asset Purchase Agreement.

2.3.     The Debtors are authorized to cause to be filed with the secretary of state of any state or other applicable officials of any Governmental Units (as defined in section 101(27) of the Bankruptcy Code) any and all certificates, agreements, or amendments necessary or appropriate to effectuate the transactions contemplated by the Asset Purchase Agreement, any related agreements, and this Sale Order, including amended and restated certificates or articles of incorporation and by-laws or certificates or articles of amendment, and all such other actions, filings, or recordings as may be required under applicable law or as any officer of any Debtor may determine are necessary or appropriate.  The execution of any such document or the taking of any such action shall be, and hereby is, deemed conclusive evidence of the authority of such person to so act.

2.4.     The terms and provisions of the Asset Purchase Agreement and this Sale Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtors, their estates, and their creditors (whether known or unknown), the Purchaser, and each of their respective Affiliates, successors, and assigns, and any affected third parties, including, without limitation, all Entities asserting Encumbrances in, on, to, or against any of the Purchased Assets (collectively, the "Bound Parties") (provided, however, that no Bound Party other than the Debtors and the Purchaser shall be deemed a party to, or a third-party beneficiary of, the Asset Purchase Agreement or entitled to assert directly any rights thereunder), including, without limitation, following any subsequent appointment of a trustee, examiner, or receiver with respect to any Debtor or its estate, and all terms and provisions of the Asset Purchase Agreement shall likewise be binding on such trustee, examiner, or receiver.  The provisions of this Sale Order and the terms and conditions of the Asset Purchase Agreement shall survive the entry of any order that may be entered confirming or consummating any Chapter 11 plan for any Debtor,

converting any of the Cases to a case under Chapter 7 of the Bankruptcy Code, or dismissing any of the Cases or any Superseding Case, and nothing contained in any such order or plan shall alter, conflict with, or derogate from the provisions of this Sale Order or the Asset Purchase Agreement.  To the extent of any conflict between this Sale Order or the Asset Purchase Agreement, on the one hand, and such future plan or order, on the other hand, the terms of this Sale Order and the Asset Purchase Agreement shall control.

3. **Sale and Transfer of Assets**

3.1.    Pursuant to sections 105(a), 363(b), 363(f), 365(b), and 365(f) of the Bankruptcy Code, and pursuant to and except to the extent otherwise set forth in the Asset Purchase Agreement (including with respect to Assumed Liabilities and Permitted Encumbrances), the Purchased Assets shall be transferred free and clear of all Encumbrances and Excluded Liabilities, with all Encumbrances in, on, to, or against any Purchased Assets to attach to the proceeds (including all amounts paid by Purchaser under the Asset Purchase Agreement) of the Sale in the order of their priority and with the same validity, force, and effect that they had against the Purchased Assets immediately prior to the Closing but subject to any claims and defenses the Debtors may possess with respect thereto.  Those holders of Encumbrances who did not object (or whose objections were withdrawn or consensually resolved) to the Sale are deemed to have consented to the Sale being free and clear of their Encumbrances pursuant to section 363(f)(2) of the Bankruptcy Code.  Those holders of Encumbrances who did object could be compelled in a legal or equitable proceeding to accept money satisfaction of such Encumbrances pursuant to section 363(f)(5) of the Bankruptcy Code or fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and, therefore, are adequately protected by having their Encumbrance attach, pursuant to the terms of this Sale Order, solely to

the proceeds of the Sale ultimately attributable to the Purchased Assets in, on, to, or against which they had, prior to the Closing, an Encumbrance.

3.2.    Notwithstanding anything in the Asset Purchase Agreement to the contrary, (a) the Purchased Assets shall not include (i) Avoidance Actions against any "insider" (as defined in section 101(31) of the Bankruptcy Code) or (ii) other claims or causes of action to be transferred to the Liquidation Trust referred to, and as set forth, in the Committee Settlement Term Sheet attached hereto as **<u>Exhibit D</u>** (the "<u>Committee Settlement Term Sheet</u>") and (b) Purchaser shall not prosecute or assert, and agrees to waive, all non-insider Avoidance Actions that are Purchased Assets except for purposes of set off against claims of customers, vendors, and other creditors who do not continue to do business with the Purchaser after the Closing Date that constitute Assumed Liabilities under the Asset Purchase Agreement, and Purchaser shall not be entitled to any affirmative recovery on account of any such Avoidance Actions.  The sale of all non-insider Avoidance Actions, rights, claims, credits, settlement proceeds, causes of action or rights of setoff against third parties (including for the avoidance of doubt, those arising under, or otherwise relating to, the Assigned Contracts), including all rights under vendors', manufacturers', and contractors' warranties, indemnities, and guarantees, in each case to the extent comprising Purchased Assets pursuant to the Asset Purchase Agreement, is hereby approved.

3.3.    Conditioned upon the occurrence of the Closing, this Sale Order shall be construed and shall constitute for all purposes a full and complete general assignment, conveyance, and transfer of all of the Purchased Assets and a bill of sale transferring all of the Debtors' right, title, and interest in and to such Purchased Assets pursuant to the terms and conditions set forth in the Asset Purchase Agreement.  For the avoidance of doubt, the Excluded

Assets are not among the Purchased Assets, and the Excluded Liabilities are not among the Assumed Liabilities.

3.4.    All Entities are prohibited from taking any action to adversely affect or interfere with the ability of the Debtors to transfer the Purchased Assets to the Purchaser in accordance with the Asset Purchase Agreement and this Sale Order or, following the Closing, the ability of the Purchaser to own, possess, use, or convey the Purchased Assets.

3.5.    Subject to the terms of the Asset Purchase Agreement, the Purchaser is hereby authorized in connection with the consummation of the Sale to transfer or direct the transfer of any or all of the Purchased Assets (including the Assigned Contracts) or any rights to acquire any Purchased Assets (including Assigned Contracts) to its direct and indirect subsidiaries in such manner as the Purchaser, in its sole and absolute discretion, deems appropriate and to assign, sublease, sublicense, transfer, or otherwise dispose of any of the Purchased Assets (including the rights under any Assigned Contract) to its direct and indirect subsidiaries with all of the rights and protections accorded under this Sale Order and the Asset Purchase Agreement.  The Debtors shall cooperate with and take all actions reasonably requested by the Purchaser to effectuate any of the foregoing.

3.6.    The transfer of the Purchased Assets to the Purchaser and/or its designee(s) pursuant to the Asset Purchase Agreement and the consummation of the Sale (a) do not require any consents (beyond entry of this Sale Order) other than as specifically provided for in the Asset Purchase Agreement, (b) constitute a legal, valid, and effective transfer of all of the Debtors' right, title, and interest in and to the Purchased Assets (notwithstanding any requirement for approval or consent by any Entity under or pursuant to any otherwise applicable law, agreement, or governing document), and (c) shall vest the Purchaser with all right, title, and

interest of the Debtors in and to the Purchased Assets as set forth in the Asset Purchase Agreement free and clear of all Encumbrances of any kind or nature whatsoever (except to the extent expressly set forth in the Asset Purchase Agreement).

3.7.    To the maximum extent permitted under applicable law, the Purchaser and/or its designee(s), as applicable, shall be authorized, as of and after the Closing, to operate under any license, permit, registration, and governmental authorization or approval of the Debtors constituting Purchased Assets, and all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been and hereby are directed to be, transferred to the Purchaser or its designee(s) as of the Closing.  To the extent provided by section 525 of the Bankruptcy Code, no Governmental Unit may revoke or suspend any grant, permit, or license relating to the operation of the Purchased Assets sold, transferred, assigned, or conveyed to Purchaser or its designee(s) on account of the filing or pendency of these Cases or the consummation of the Sale.  Each and every federal, state, and local governmental agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the Sale.  This Sale Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department, or office.

3.8.    All Entities that presently or as of the Closing are in possession of some or all of the Purchased Assets (wherever located) are hereby directed to surrender possession of such Purchased Assets to the Purchaser or its designee on the Closing Date.

3.9.    Except as otherwise expressly provided in the Asset Purchase Agreement or this Sale Order, no Entity shall assert or pursue any Encumbrance against the Purchaser or any of its Affiliates, assets, or property, directly or indirectly, in any manner whatsoever.  Without limiting

the foregoing, effective as of the Closing, and except as otherwise expressly provided in the Asset Purchase Agreement, all Entities, including all lenders, debt security holders, equity security holders, governmental, tax and regulatory authorities, non-debtor counterparties to executory contracts and unexpired leases, other contract counterparties, customers, licensors, litigation claimants, employees and former employees, and trade or other creditors, hereby are forever barred and estopped from asserting any claims or other Encumbrances (whether legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or subsequent to the commencement of these Cases, and whether imposed by agreement, understanding, law, equity or otherwise) against the Purchaser or the Purchased Assets, including, without limitation, taking any of the following actions with respect to or based on such claim or other Encumbrance: (a) commencing or continuing in any manner any action or other proceeding against the Purchaser or any of its Affiliates, assets or properties; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against the Purchaser or any of its Affiliates, assets, or properties; (c) creating, perfecting, or enforcing any Encumbrance against the Purchaser or any of its Affiliates, assets or properties; (d) asserting an Encumbrance as a setoff or subrogation of any kind against any obligation due the Purchaser or any of its Affiliates; (e) commencing or continuing any action in any manner or place that does not comply, or is inconsistent, with the provisions of this Sale Order, the Asset Purchase Agreement, or any other agreements or actions contemplated by or taken in respect of the Asset Purchase Agreement; or (f) interfering with, preventing, restricting, prohibiting, or otherwise enjoining the consummation of the Sale. Notwithstanding anything herein to the contrary, the relief provided for in this Paragraph 3.9 shall not include any Assumed Liabilities.

3.10.    Neither the Purchaser nor any of its Related Parties is, has, will be, or will have been, and none shall be deemed: (a) a "successor" in any respect to any Debtor or its estate as a result of the consummation of the Sale or any other event occurring in the Cases under any theory of law or equity; (b) to have, *de facto* or otherwise, merged or consolidated with or into any Debtor or its estate; (c) to have a continuity of enterprise with any Debtor, or (d) a continuation or substantial continuation of any Debtor or any enterprise of any Debtor.  By consummating the Sale, the Purchaser shall not be assuming, nor be deemed to have assumed, or in any way be responsible for any liability or obligation of any Debtor or its estate, including, without limitation, any bulk sale law, successor liability, or liability or responsibility for any claim against any Debtor or its insider, except to the extent otherwise expressly provided in the Asset Purchase Agreement with respect to an Assumed Liability or Permitted Encumbrance and with respect to the Purchaser's obligations with respect to the Designation Rights Assets.  Except to the extent otherwise set forth in the Asset Purchase Agreement with respect to Assumed Liabilities, Permitted Encumbrances, and the Purchaser's obligations with respect to Designation Rights Assets, the transfer of the Purchased Assets (including the Assigned Contracts) to the Purchaser under the Asset Purchase Agreement shall not result in the Purchaser, any of its Related Parties, or the Purchased Assets, having any liability or responsibility whatsoever with respect to, or being required to satisfy in any manner, whether at law or in equity, whether by payment, setoff, or otherwise, directly or indirectly (a) any claim against any Debtor or any insider of a Debtor; (b) any Encumbrance, or (c) any liability or responsibility of any Debtor.

3.11.    Without limiting the effect or scope of the foregoing, except to the extent expressly provided in the Asset Purchase Agreement, as of the Closing, the Purchaser and its Related Parties shall, to the maximum extent permitted by applicable law, have no successor or

vicarious liabilities of any kind or character with respect to any Purchased Assets, including, without limitation any liability related to: (a) any employment or labor agreements or the termination thereof; (b) any pension, welfare, compensation, or other employee benefit plans, agreements, practices, and programs of or related to any Debtor or any Debtor's Affiliates, predecessors, or current or former employees (or the termination of any of the foregoing) (including, without limitation, any claims belonging to or assertable by the Pension Benefit Guaranty Corporation for unfunded benefit liabilities, minimum funding requirements, due and unpaid plan contributions, premiums, and interest, and any other charges on each of the foregoing); (c) any Debtor's business operations or the cessation thereof; (d) any litigation involving one or more of the Debtors; (e) any claims of any former employees of any Debtor or its predecessor; (f) any employee, workers' compensation, occupational disease, unemployment, or temporary disability related law; and (g) any claims that might otherwise arise under or pursuant to (in each case (as applicable), as amended): (i) the Employee Retirement Income Security Act of 1974; (ii) the Fair Labor Standards Act; (iii) Title VII of the Civil Rights Act of 1964; (iv) the Federal Rehabilitation Act of 1973; (v) the National Labor Relations Act; (vi) the Worker Adjustment and Retraining Notification Act of 1988; (vii) the Age Discrimination in Employment Act of 1967; (viii) the Americans with Disabilities Act of 1990; (ix) the Family Medical Leave Act; (x) the Labor Management Relations Act; (xi) the Older Workers Benefit Protection Act; (xii) the Equal Pay Act; (xiii) the Consolidated Omnibus Budget Reconciliation Act of 1985; (xiv) the Multiemployer Pension Plan Amendments Act of 1980; the Pension Protection Act; (xv) state and local discrimination laws; (xvi) state and local unemployment compensation laws or any other similar state and local laws; (xvii) state workers' compensation laws; (xviii) any other state, local or federal employee benefit laws, regulations, or rules or other

state, local, or federal laws, regulations, or rules relating to wages, benefits, employment, or termination of employment with any Debtor or any predecessors; (xix) any antitrust laws; (xx) any product liability or similar laws, whether state or federal or otherwise; (xxi) any environmental laws, rules, or regulations, including, without limitation, under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601, *et seq.*, or similar state statutes; (xxii) any bulk sales or similar laws; (xxiii) any federal, state, or local tax statutes, regulations, or ordinances, including, without limitation, the Internal Revenue Code of 1986; and (xxiv) any common law doctrine of *de facto* merger or successor or transferee liability, in each case now existing or hereafter arising, whether asserted or unasserted, fixed or contingent, liquidated or unliquidated, with respect to any Debtor, any obligation of any Debtor, or the Purchased Assets, including, without limitation, liabilities on account of any taxes arising, accruing, or payable under, out of, or in connection with, or in any way relating to, any Purchased Assets (including any Assigned Contract) or the Asset Purchase Agreement.

3.12.    Except as expressly set forth in the Asset Purchase Agreement with respect to Assumed Liabilities, Permitted Encumbrances, and the Purchaser's obligations with respect to the Designation Rights Assets, it is expressly ordered and directed that the sale of the Purchased Assets is free and clear of any and all unemployment compensation taxes and any related contribution and reimbursement obligations of any Debtor, and all state and labor agencies shall treat the Purchaser as a "new employer" in all respects and for any applicable tax rates and contribution and reimbursement obligations and "experience rates" as of and after the Closing (and each state unemployment compensation law agency or department shall be prohibited from treating the Purchaser as a successor of any Debtor for any contribution rates, benefit charges, benefit rates, experience rates, or similar charges or taxes).

4.  **Assumption, Assignment, and Sale of Executory Contracts and Unexpired Leases**

4.1.    Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, and subject to and conditioned upon the occurrence of the Closing, and subject to Paragraphs 4.8 and 4.16 hereof, the Debtors' assumption, assignment, and sale to the Purchaser, and the Purchaser's assumption and purchase on the terms set forth in the Asset Purchase Agreement of the Assigned Contracts, are hereby approved in their entirety, and the requirements of section 363 and 365 of the Bankruptcy Code with respect thereto are hereby deemed satisfied.  Subject to Paragraphs 4.8 and 4.16 hereof, the Debtors are hereby authorized in accordance with sections 105(a), 363, and 365 of the Bankruptcy Code to (a) assume, assign, and sell to the Purchaser, effective as of the Closing (or thereafter pursuant to the Asset Purchase Agreement) the Assigned Contracts free and clear of all Encumbrances of any kind or nature whatsoever and (b) execute and deliver to the Purchaser such documents or other instruments as may be necessary or reasonably requested by the Purchaser to assign and transfer the Assigned Contracts to the Purchaser.

4.2.    Upon the date that each Assigned Contract is assumed, assigned, and sold pursuant to the Asset Purchase Agreement, the Purchaser shall, in accordance with sections 363 and 365 of the Bankruptcy Code, be fully and irrevocably vested with all right, title, and interest in, to, and under such Assigned Contract.  The Debtors shall cooperate with and take all actions reasonably requested by the Purchaser to effectuate the foregoing, as further provided in the Asset Purchase Agreement.  The Purchaser shall likewise cooperate with the Debtors and otherwise comply with the terms and conditions of the Asset Purchase Agreement in relation to any Designation Rights Assets, including the payment of all costs and expenses in connection with the operation of any Designation Rights Assets to the extent required by Section 1.5(b) of the Asset Purchase Agreement.

4.3.    The Assigned Contracts (including, for the avoidance of doubt, any non-disclosure agreement entered into by any Debtor in connection with the marketing of the Purchased Assets that constitutes an Assigned Contract) shall be transferred to, and remain in full force and effect for the benefit of, the Purchaser notwithstanding any provision in any such Assigned Contract (including those of the type described in sections 365(b)(2) and 365(f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer or requires any non-debtor counterparty to consent thereto.

4.4.    Pursuant to section 365(f) of the Bankruptcy Code, the assignment and sale by the Debtors to the Purchaser of any Assigned Contract shall not be a default thereunder.  Any provisions in any Assigned Contract that prohibit or condition the assignment and sale of such Assigned Contract or allow the non-debtor counterparty to such assigned Contract to terminate, recapture, impose any penalty or condition on renewal or extension, purport to require the consent of any non-debtor counterparty, or modify any term or condition, in each case upon the assignment and sale of such Assigned Contract, constitute unenforceable anti-assignment provisions that are void and of no force and effect with respect to the assignment and sale of the Assigned Contract to the Purchaser.  All Assigned Contracts shall remain in full force and effect following their assignment and sale to the Purchaser, without existing default(s), subject only to payment by the Purchaser of the Determined Cure Cost.

4.5.    Subject to Paragraphs 4.8 and 4.15 hereof, all other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment and sale to the Purchaser of the Assigned Contracts (including the provision of adequate assurance of future performance within the meaning of sections 365(b)(1)(C), 365(b)(3) (to the extent applicable), and 365(f)(2)(B) of the Bankruptcy Code) have been satisfied.

4.6.    The rights of the Purchaser to modify the lists of Assigned Contracts and Non-Assigned Contracts (as defined in the Asset Purchase Agreement) after the date of this Sale Order as set forth in Section 1.5 of the Asset Purchase Agreement are hereby approved and shall survive confirmation of any Chapter 11 plan, notwithstanding sections 365(d)(2) and 365(d)(4) or any similar provision of the Bankruptcy Code.  Without limiting the foregoing, as set forth in Section 1.5 of the Asset Purchase Agreement, the Purchaser may (a) designate any Potential Assigned Contract as an Assigned Contract at any point, including following Closing, prior to the earlier of (i) the applicable Designation Deadline and (ii) the entry of an order of the Court approving the rejection of such contract, and (b) designate any Potential Assigned Contract as a Non-Assigned Contract at any point, including following Closing, prior to the earlier of (i) the applicable Designation Deadline and (ii) the assumption, assignment, and sale of such contract. Any Potential Assigned Contract that is not designated as either an Assigned Contract or a Non-Assigned Contract at least one Business Day (as defined in the Asset Purchase Agreement) prior to the Closing shall constitute a Designation Rights Asset until the earliest of the Purchaser's designation of such contract as an Assigned Contract or Non-Assigned Contract, the applicable Designation Deadline, the entry of an order of the Court approving the rejection of such contract, or the assumption and assignment of such contract.  Following Closing, with respect to any Designation Rights Asset that has not been rejected by the Debtors post-Closing and as to which the Designation Deadline has not passed, upon written notice(s) from the Purchaser to the Debtors, the Debtors are hereby authorized and directed to take all actions reasonably necessary to assume, assign, and sell to the Purchaser all such executory contracts and unexpired leases as set forth in the notice(s).  Notwithstanding anything in this Sale Order to the contrary, on the date any Designation Rights Asset is assumed, assigned, and sold to the Purchaser, such Contract

shall thereafter be deemed a Purchased Asset for all purposes under this Sale Order and the Asset Purchase Agreement.

4.7.    **Exhibit B** attached hereto lists Potential Assigned Contracts for which either (a) no Cure Objections were timely filed with the Court, (b) a Cure Objection was filed but has since been withdrawn or resolved, or (c) informal responses were received and resolved by mutual written agreement among the Purchaser, the Debtors, and the applicable non-debtor counterparty. The Determined Cure Costs for the Potential Assigned Contracts listed on **Exhibit B** are hereby fixed at the amounts set forth therein, and the non-debtor counterparties to such Potential Assigned Contracts are forever bound by such Determined Cure Costs. For the avoidance of doubt, the inclusion of a Potential Assigned Contract on **Exhibit B** shall not limit the rights of the Purchaser under the Asset Purchase Agreement to designate such Potential Assigned Contract as an Assigned Contract or a Non-Assigned Contract at any time prior to the applicable Designation Deadline.

4.8.    Any Potential Assigned Contract for which there is an unresolved Adequate Assurance Objection or Cure Objection set forth on **Exhibit C** hereto shall not be assumed, assigned, and sold to the Purchaser unless and until all such objections relating to such Potential Assigned Contract are withdrawn or resolved by order of the Court or the applicable non-debtor counterparty consents. Upon resolution of such Adequate Assurance Objection and/or Cure Objection among the Purchaser, the Debtors, and the non-debtor counterparty to the applicable Potential Assigned Contract, the Purchaser may, in its sole and absolute discretion and pursuant to the provisions of the Asset Purchase Agreement, designate such Potential Assigned Contract as an Assigned Contract or a Non-Assigned Contract, and the Debtors shall be authorized, pursuant to this Sale Order and subject only to payment of the Determined Cure Cost, to assume,

assign, and sell to the Purchaser any such Potential Assigned Contract so designated as an Assigned Contract without the need for further order of the Court.

4.9.    Unless the Purchaser and the applicable non-debtor counterparty agree to different terms, pursuant to sections 365(b)(1)(A) and (B) of the Bankruptcy Code, the Purchaser shall pay to the applicable non-debtor counterparty the Determined Cure Costs relating to any Assigned Contracts within seven (7) days following the assumption, assignment, and sale thereof as set forth in Section 1.5 of the Asset Purchase Agreement.   The payment of the Determined Cure Cost for any given Assigned Contract shall effect a cure of all defaults existing as of the date that such Assigned Contract is assumed, assigned, and sold and shall compensate for any actual pecuniary loss to the non-debtor counterparty to such Assigned Contract resulting from such default.   Upon payment of the applicable Determined Cure Costs, the non-debtor counterparties to Assigned Contracts shall be enjoined from taking any action against the Purchaser or the Purchased Assets with respect to any claim for cure.   After the payment of the Determined Cure Cost applicable to any Assigned Contract, the Debtors and the Purchaser shall not have any further liabilities to the non-debtor counterparty to such Assigned Contract, other than the Purchaser's obligations under the Assigned Contract that become due and payable on or after the date that such Assigned Contract is assumed, assigned, and sold to Purchaser.

4.10.    Subject to Paragraph 4.15 hereof, any party that has not filed with the Court, and served on the parties entitled to notice thereof, an objection to the assumption, assignment, and sale of any Potential Assigned Contract by the applicable deadline specified in the Bidding Procedures Order (as such date may have been modified or extended in accordance with the terms of the Bidding Procedures Order or with the consent of the Debtors and the Purchaser) is deemed to have consented to such assumption, assignment, and sale.

4.11.    As of the date of assignment and sale of an Assigned Contract to the Purchaser, the Purchaser shall be deemed to be substituted for the applicable Debtor(s) as a party to the Assigned Contract, and the Debtors shall be relieved, pursuant to section 365(k) of the Bankruptcy Code, from any liability under the Assigned Contract arising from and after the date of the assignment and sale.

4.12.    All non-debtor counterparties to the Assigned Contracts shall cooperate and expeditiously execute and deliver, upon the reasonable request of the Purchaser, and shall not charge the Purchaser for, any instruments, applications, consents, or other documents that may be required or requested by any public or quasi-public authority or other Entity to effectuate the applicable transfers in connection with the Sale.

4.13.    Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, all non-debtor counterparties to the Assigned Contracts are forever barred and permanently enjoined from raising or asserting against the Debtors or the Purchaser any assignment fee, rent acceleration, rent increase on account of assignment, default, breach, claim, pecuniary loss, or condition to assignment arising under or relating to any Assigned Contract by reason of the assumption, assignment, and/or sale of such Assigned Contract.

4.14.    Notwithstanding any term of any Assigned Contract to the contrary, any extension or renewal options or other rights contained in such Assigned Contract that purport to be personal only to, or exercisable only by, the Debtor(s), a named Entity, or an Entity operating under a specific trade name may, in each case, be freely exercised to their full extent by the Purchaser, subject to the other applicable terms of the Assigned Contract.    Any extension or renewal options in connection with any Assigned Contract that the applicable Debtor(s) have

sought to exercise prior to the entry of this Sale Order are deemed to have been timely and validly exercised by the Purchaser.

4.15.    Neither the Purchaser nor any successor of the Purchaser shall be responsible for any Encumbrances or obligations arising out of any of the Potential Assigned Contracts that are not ultimately assumed, assigned, and sold to the Purchaser (whether at Closing or thereafter) under the terms of the Asset Purchase Agreement.

4.16.    In the case of any Potential Assigned Contract that the Debtors seek to assume, assign, and sell pursuant to the Asset Purchase Agreement that was not included in the Assumption Notice or any Supplemental Assumption Notice served prior to the date hereof, within three Business Days following receipt of a written notice by the Purchaser (email shall suffice) that such Potential Assigned Contract is designated for assumption, assignment, and sale, the Debtors shall file with the Court a Supplemental Assumption Notice and serve it on each of the following parties (each, a "Supplemental Assumption Notice Service Party"): (a) each non-debtor counterparty to any Potential Assigned Contract (and their counsel, if known) listed on such Supplemental Assumption Notice, (b) the U.S. Trustee, (iii) counsel to the Committee, and (iv) counsel to the Purchaser.  The Debtors shall also serve on affected non-debtor counterparties and their respective counsel, if known, by electronic mail (if available) or overnight mail adequate assurance information for the Purchaser.  Any non-debtor counterparty to a Potential Assigned Contract listed on such Supplemental Assumption Notice may object to the assumption, assignment, and sale of the Potential Assigned Contract solely with respect to the Debtor Asserted Cure Amount contained therein or adequate assurance of future performance but, in each case, only to the extent such objection could not have been raised prior to the Cure Objection Deadline (as defined in the Bidding Procedures Order).  Any such objection must be in

writing and filed and served so that it is actually received by the Debtors and the Supplemental Assumption Notice Service Parties no later than 14 calendar days after the date the Debtors served the applicable Supplemental Assumption Notice.   Any non-debtor counterparty to a Potential Assigned Contract included on a Supplemental Assumption Notice that does not timely file and serve on the Supplemental Assumption Notice Service Parties a permitted objection thereto shall be deemed to have consented to the assumption, assignment, and sale of such Potential Assigned Contract and the Debtor Asserted Cure Amount set forth with respect to such Potential Assigned Contract in the Supplemental Assumption Notice.   If an objection to a Supplemental Assumption Notice permitted by this Paragraph is timely filed and served on the Supplemental Assumption Notice Service Parties in the manner specified above, and unless the parties agree otherwise in writing, a hearing will be scheduled by the Court to consider that objection.   With respect to any Potential Assigned Contract set forth in a Supplemental Assumption Notice that is ultimately assumed, assigned, and sold to the Purchaser pursuant to the terms of the Asset Purchase Agreement and this Sale Order, the date of such assumption, assignment, and sale shall be deemed to have occurred as of the date of filing of the Supplemental Assumption Notice, unless otherwise agreed to by the Purchaser and the non-debtor counterparty to such Assigned Contract.

4.17.   Notwithstanding anything herein to the contrary, in the event and to the extent that any amounts come due under any Potential Assigned Contracts constituting a Designation Rights Asset between the Closing and the designation of such Potential Assigned Contract for assumption, assignment and sale, or rejection, the Purchaser shall be liable for such amounts to the extent required by Section 1.5(b) of the Asset Purchase Agreement.

5.  **Additional Provisions**

5.1.  <u>Committee Settlement; Amendments to Asset Purchase Agreement</u>.    The Committee Settlement Term Sheet, including the amendments to the Asset Purchase Agreement set forth therein, is hereby approved.  The Debtors consent and agree to the terms of such Committee Settlement Term Sheet.  To the extent of any inconsistency with the terms herein and the Committee Settlement Term Sheet, the Committee Settlement Term Sheet shall control. Further, the Wind-Down Funding Amount (as defined in the Committee Settlement Term Sheet) shall fund the Wind-Down Budget (as defined in the Asset Purchase Agreement and as attached as Exhibit 1 to the Committee Settlement Term Sheet) and be used on a line-item basis except for such variances as may be agreed to in writing by the Purchaser and the Committee or, after the effective date of a Plan (as defined in the Committee Settlement Term Sheet), the Purchaser and the Trustee (as defined in the Committee Settlement Term Sheet).  With respect to the consent of the Purchaser or the Committee for such variances, such consent shall not be unreasonably withheld, conditioned or delayed.  For the avoidance of doubt, the aggregate Wind-Down Funding Amount shall not be increased under any circumstances.  In addition to the foregoing in this Paragraph 5.1, the Asset Purchase Agreement is amended as follows: the reference to "July 25, 2023" in the definition of Outside Date in Section 3.4(b) of the Asset Purchase Agreement is amended to "August 1, 2023" and (b) the reference to "$225,000,000" in the definition of Prepetition Debt Bid Amount in Section 2.1(ii) of the Asset Purchase Agreement is amended to "$205,000,000".

5.2.  <u>PBGC Settlement</u>.  Subject to the occurrence of the Closing: (a) The Debtors, the Purchaser, the Committee, and the Pension Benefit Guaranty Corporation (the "<u>PBGC</u>") shall reasonably cooperate in connection with the termination of the Stanadyne LLC Pension Plan (the

"Pension Plan"), which, for the avoidance of doubt, is not an Assumed Liability under the Asset Purchase Agreement. The Debtors shall store and preserve all documents and records relating to the Pension Plan ("Pension Plan Documents") until PBGC has completed its investigation regarding the Pension Plan. If any Pension Plan Documents are transferred to the Purchaser either (i) the Debtors shall retain copies to comply with this provision of this Sale Order or (ii) the Purchaser shall store and preserve all transferred documents and records relating to the Pension Plan until PBGC has completed its investigation regarding the Pension Plan. Pension Plan Documents may be in hard copy or electronic form and may include, but are not limited to, any Pension Plan governing documents, actuarial documents, records and statements of the Pension Plan's assets, board resolutions relating to the Pension Plan, and employee and personnel records of the employees who participate in the Pension Plan. The Debtors and/or Purchaser, as the case may be, shall not abandon or destroy any Pension Plan Documents and shall make the Pension Plan Documents available to PBGC for inspection and copying until PBGC has completed its investigation regarding the Pension Plan. For the avoidance of doubt, the Purchaser's obligation to store and preserve Pension Plan Documents pursuant to this paragraph shall only be with respect to Pension Plan Documents actually transferred to the Purchaser; (b) The Purchaser shall pay (or cause to be paid) $750,000 to the PBGC within five (5) Business Days following the Closing; (c) The PBGC shall release (i) Purchaser, (ii) Cerberus Business Finance, LLC as administrative agent and collateral agent (in such capacity, the "Prepetition Agent") under the Financing Agreement[4], (iii) the lenders under the Financing Agreement (the "Prepetition Secured Lenders" and with the Prepetition Agent, the "Prepetition

---

[4] "Financing Agreement" means that certain Financing Agreement dated as of May 2, 2017, as amended from time to time, by and among the Debtors, the Prepetition Agent and the lenders thereunder.

Secured Parties"), and (iv) each of their respective affiliates, from all current and future liabilities under Title IV of the Employee Retirement Income Security Act of 1974 arising from or related to the Pension Plan, including, without limitation, the unfunded benefit liabilities, due and unpaid minimum funding contributions, premiums, and interest and any other charges on each of the foregoing; (d) If the Purchaser or the Prepetition Secured Parties enter into a transaction, or series of transactions, selling the Purchaser, or all or substantially all of the assets of the Purchaser to an unaffiliated third party at any time prior to the fifth (5th) anniversary of the Closing (a "Subsequent Sale Transaction"), the Purchaser shall pay the Additional Payment (as defined below), if any, to the PBGC within five (5) Business Days following the closing date of such Subsequent Sale Transaction.   If the Additional Payment amount calculated is zero or negative, then no Additional Payment shall be due.   For purposes of this paragraph, (i) "Additional Payment" means the lesser of (x) 10% of all Net Proceeds (as defined below) received by the Purchaser or Prepetition Secured Parties on account of a Subsequent Sale Transaction(s), and (y) $2,500,000; and (ii) "Net Proceeds" means the amount of aggregate cash proceeds actually received by the Purchaser (net of any customary transactions costs, expenses or taxes paid therefrom) in excess of: (1) the outstanding principal, interest and other obligations owed by the Debtors to the Prepetition Secured Parties pursuant to the Financing Agreement as of immediately prior to the Closing, plus (2) an amount accruing thereon at an annual rate of 7.5% from and after the Closing, plus (3) the amount of any direct or indirect debt or equity financing or other investment by any of the Prepetition Secured Parties or any of their respective affiliates in Purchaser after the Closing, plus (4) an amount accruing thereon at an annual rate of 7.5% from and after date such financing or other investment is made.   The Purchaser will provide PBGC with no less than 5 business days' prior notice of the closing of a Subsequent Sale

Transaction that is likely to result in an Additional Payment to PBGC ("Prior Notice"); provided, that the Purchaser shall not have any liability to PBGC for the failure to give Prior Notice if PBGC is not materially harmed by such failure; provided, further, that Purchaser shall not be required to provide Prior Notice to the extent Purchaser is prohibited from doing so by a confidentiality agreement or applicable law, and if Purchaser does not provide Prior Notice, it shall provide PBGC notice of the Subsequent Sale Transaction no more than three (3) days after the closing date; (e) The PBGC shall have an allowed unsecured claim against the Debtors' estates in the amount of $15,538,178.33; and (f) The Initial GUC Distribution Amount (as defined in the Committee Settlement Term Sheet) shall be paid by the Purchaser as and when provided therein.

5.3.    Consigned Cores.  Notwithstanding anything to the contrary, nothing in this Sale Order or the Asset Purchase Agreement transfers ownership of any Consigned Cores.   For purposes hereof, "Consigned Cores" means cores delivered to one of the Debtors by a customer on a consignment basis in excess of such customer's core eligibility at the time of delivery to the Debtors.

5.4.    Environmental Liabilities.   Nothing in this Sale Order or the Asset Purchase Agreement releases, nullifies, precludes or enjoins the enforcement of any police or regulatory environmental liability to a governmental unit that any entity would be subject to as the post-sale owner or operator of property after the Closing Date; provided, however, that all rights and defenses of the Purchaser under non-bankruptcy law are preserved.  Nothing in this Sale Order or the Asset Purchase Agreement authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and

approvals under police or regulatory law. Nothing in this Sale Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Sale Order or to adjudicate any defense asserted under this Sale Order with respect to any police or regulatory environmental liability to a governmental unit to the extent set forth in this paragraph.

5.5.    <u>GM</u>.    On June 9, 2023, General Motors LLC (together with its applicable affiliates, "<u>GM</u>") filed its *Amended Response and Limited Objection to Debtors' Notice to Contract Parties to Potentially Assumed, Assigned, and Sold Executory Contracts and Unexpired Leases* [Docket No. 354]. Pursuant to 11 U.S.C. §§ 363(f) and 365, as of the Closing, the Debtors are deemed to have assumed all unexpired GM purchase orders and supply agreements (including, without limitation, the Agreement Regarding GM Purchase Contracts, dated May 19, 2023, among GM, Stanadyne LLC, and Stanadyne Diesel Systems) issued by GM to the Debtors (including GM's General Terms and Conditions incorporated therein, the "<u>GM Contracts</u>") and to have assigned and sold such GM Contracts to the Purchaser. The Purchaser agrees, as of the Closing, to assume all liabilities, claims and obligations of the Debtors under the GM Contracts arising prior to and after the Petition Date.

5.6.    <u>Ford - Assignment of Sourcing Agreement</u>.    Ford Customer Service Division, a division of Ford Motor Company (collectively, "<u>Ford</u>") and Debtor Pure Power Technologies, Inc. ("<u>PPT</u>") are parties to that certain Commercial and Program Agreement entered into as of April 26, 2022, which agreement incorporates that certain Core Commercial Agreement entered into between the parties as of March 22, 2022 (the "<u>CCA</u>" and, collectively Commercial and Program Agreement, and together with any associated purchase orders, releases, or other ancillary documents, the "<u>Sourcing Agreement</u>"). The Debtors owe monetary obligations to Ford under the Sourcing Agreement as set forth in that certain Joint Stipulation filed of record on

May 24, 2023 at Docket No. 301 and approved by the Court at Docket No. 303. Notwithstanding anything in this Sale Order or any other order of this Court to the contrary, the Sourcing Agreement shall constitute an Assigned Contract subject to the following terms and conditions of assumption and assignment.  Within ten (10) days following the Closing (or such longer time period as may be agreed in writing among Ford, the Purchaser, and the Debtors), Ford, the Debtors, and the Purchaser shall review their respective books and records and determine in good faith the amount owed to Ford thereunder as of the date of Closing (such amount, the "Outstanding Balance").  The Outstanding Balance shall be payable by the Purchaser to Ford in cash and in three equal monthly installments, with the first payment due on or before the date that is seven months from the date of Closing, the second payment due on or before the date that is eight months from the date of Closing, and the final payment due on or before the date that is nine months from the date of Closing.  In addition, with respect to any cores returned by Ford pursuant to the Sourcing Agreement following the date of Closing, Ford shall be permitted to debit the amount of core refund obligations due to Ford on account of such cores against any obligations due from Ford to the Purchaser in accordance with the terms of the Sourcing Agreement.

5.7.    Professional Fees.  Notwithstanding anything in this Sale Order or in the Asset Purchase Agreement to the contrary, (a) the Debtor Professional Escrow and Professional Fee Reserve (each as defined or used in the *Final Order (i) Authorizing the Use of Cash Collateral, (ii) Granting Adequate Protection to Prepetition Secured Lenders, and (iii) Granting Related Relief* [Docket No. 218] (the "Final Cash Collateral Order")) shall remain in effect following the Closing for the benefit of the Professional Persons (as defined in the Final Cash Collateral Order) with respect to accrued and unpaid Allowed Professional Fees as of the Closing as set forth in

the Approved Budget, and such Professional Persons are authorized to be paid from the Debtor

Professional Escrow and/or Professional Fee Reserve, as applicable, for such Allowed

Professional Fees that are approved by orders entered by this Court authorizing the payment of

such amounts; (b) the accrued and unpaid fees of Ordinary Course Professionals (as defined in

the *Order Pursuant to Sections 105(a), 327, 328 and 330 of the Bankruptcy Code, Bankruptcy*

*Rule 2014 and Local Rule 2014-1 Authorizing the Debtors to Employ Professionals Used in the*

*Ordinary Course of Business Effective as of the Petition Dat*e [Docket No. 153] (the "<u>OCP</u>

<u>Order</u>") as of the Closing and included in the Approved Budget shall be paid into the

Professional Fee Reserve at the Closing by the Debtors out of Cash Collateral (as defined in the

Final Cash Collateral Order) and such Ordinary Course Professionals are authorized to be paid

out of the Professional Fee Reserve for such permitted fees in accordance with the OCP Order;

(c) accrued and unpaid U.S. Trustee fees as of the Closing and included in the Approved Budget

shall be paid into the Professional Fee Reserve at the Closing by the Debtors out of Cash

Collateral and such U.S. Trustee fees are authorized to be paid out of the Professional Fee

Reserve; and (d) the Purchaser shall pay into the Professional Fee Reserve, the Angle Advisor's

"Minimum Fee" (in such amount as determined by order of this Court allowing such fee and

taking into account any monthly credits to such fee) within three (3) Business Days following

entry of an order of this Court approving Angle Advisors' fees on a final basis and Angle

Advisors is authorized to be paid such amount from the Professional Fee Reserve.  If, after

satisfaction in full of the amounts to be paid pursuant to clauses (a) through (d) above, the Debtor

Professional Escrow and/or Professional Fee Reserve have not been reduced to zero, all

remaining funds shall be delivered to the Purchaser.  For the avoidance of doubt, only the

amounts set forth in (x) the Approved Budget for Professional Persons through the earlier of the

Closing and the Cash Collateral Termination Date (as defined in the Final Cash Collateral Order) and (y) clauses (b) through (d) above, in each case, shall be deposited in the Debtor Professional Escrow and/or Professional Fee Reserve, as applicable.  For the avoidance of doubt, neither the Purchaser nor any of the Prepetition Secured Parties (as defined in the Final Cash Collateral Order) shall be responsible for or have any liability for the payment or reimbursement of any fees or expenses of any Professional Person or Ordinary Course Professional, other than such obligations specifically set forth in this paragraph.

5.8.    <u>Stay Relief</u>.  The automatic stay pursuant to section 362 of the Bankruptcy Code is hereby lifted to the extent necessary, without further order of the Court, to allow the Purchaser to (a) deliver any notice provided for in the Asset Purchase Agreement and any ancillary document, (b) enforce the Purchaser's rights and the Debtors' obligations under the terms of the Asset Purchase Agreement, and (c) take any and all actions permitted under this Sale Order, the Asset Purchase Agreement, or any ancillary documents, in each case in accordance with the terms and conditions thereof.

5.9.    <u>Bulk Transfer Laws</u>.  No bulk sales law, bulk transfer law, bulk sales tax law, or similar law of any jurisdiction applies in any way to the Asset Purchase Agreement or the Sale.

5.10.    <u>Non-Interference</u>.  Following the Closing, no holder of an Encumbrance in, on, to, or against any Debtor or Purchased Asset shall interfere with the Purchaser's title to or use and enjoyment of any Purchased Asset based on or related to such Encumbrance or any actions that the Debtors or their successors, including any Chapter 11 or Chapter 7 trustee, may take in these Cases or any Superseding Case.

5.11.    <u>Authorization</u>.  The Debtors, including their respective officers, employees, and agents, are hereby authorized to execute such documents and do such acts as are necessary or

desirable to carry out the Sale. The Debtors are hereby authorized to take all such actions as may be necessary or reasonably requested by Purchaser to effectuate the terms of the Asset Purchase Agreement and this Sale Order and the relief granted herein.

5.12. <u>Good Faith</u>. The Sale contemplated by the Asset Purchase Agreement is undertaken by the Purchaser without collusion and in good faith (as that term is defined in section 363(m) of the Bankruptcy Code) and, accordingly, the reversal or modification on appeal of the authorizations provided herein shall not affect the validity of the Sale (including, for the avoidance of doubt, the assumption, assignment, and sale to the Purchaser of the Assigned Contracts and the sale of the Purchased Assets free and clear of all Encumbrances). The Purchaser is a good-faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code. The Purchaser has not colluded with any of the other bidders, potential bidders, or any other parties interested in the Purchased Assets and, therefore, the sale of the Purchased Assets may not be avoided pursuant to section 363(n) of the Bankruptcy Code.

5.13. <u>Cooperation</u>. From time to time, as and when requested by the Purchaser or any Debtor, each party to the Asset Purchase Agreement shall execute and deliver, or cause to be executed and delivered, all such documents and instruments and shall take, or cause to be taken, all such further or other actions as such other party may reasonably deem necessary or desirable to consummate the Sale, including such actions as may be necessary to vest, perfect, confirm, or record the Purchaser's right, title, and interest in and to the Purchased Assets.

5.14. <u>Scope of Approval</u>. The failure specifically to include or reference any particular provisions of the Asset Purchase Agreement, including any of the documents, agreements, or instruments contemplated thereby or executed in connection therewith, in this Sale Order shall

not diminish or impair the efficacy, approval, or effectiveness of such provision, document, agreement, or instrument, it being the intent of the Court that the Asset Purchase Agreement and each such document, agreement, or instrument be authorized and approved in its entirety.

5.15.   <u>Post-Closing Claims Administration</u>.   After the Closing Date: (a) no Debtor nor any successor in interest to any Debtor, including any Chapter 11 or Chapter 7 trustee appointed in any of the Cases or any Superseding Case, shall consent to the allowance of any claim to the extent it would constitute an Assumed Liability or Permitted Encumbrance without the prior written consent of the Purchaser, and (b) the Purchaser shall have standing to object to any claim against the Debtors and their estates to the extent that, if allowed, such claim would constitute an Assumed Liability or Permitted Encumbrance, and the Court will retain jurisdiction to hear and determine any such objections.

5.16.   <u>Notice of Sale Closing</u>.   Within one Business Day of the occurrence of the Closing, the Debtors shall file and serve a notice of the Closing.

5.17.   <u>Computation of Time Periods</u>.   All time periods set forth in this Sale Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

5.18.   <u>Sale Order Governs in Event of Inconsistencies</u>.   To the extent that this Sale Order is inconsistent with any prior order or pleading with respect to the Motion in these Cases, the terms of this Sale Order shall govern.   To the extent there are any inconsistencies between the terms of this Sale Order and the Asset Purchase Agreement (including all ancillary documents executed in connection therewith), the terms of this Sale Order shall govern.

5.19.   <u>Modifications</u>.   The parties to the Asset Purchase Agreement may make any non-material modifications, amendments, or supplements to the Asset Purchase Agreement and any

related agreements, documents, or other instruments in accordance with the terms thereof without further order of the Court.

5.20.   <u>Non-Severability</u>.   The provisions of this Sale Order are non-severable and mutually dependent.

5.21.   <u>No Stay</u>.   Notwithstanding the provisions of the Bankruptcy Rules, including Bankruptcy Rules 6004(h) and 6006(d), this Sale Order shall not be stayed after the entry hereof but shall be effective and enforceable immediately upon entry, and the fourteen-day stay provided in Bankruptcy Rules 6004(h) and 6006(d) is waived and shall not apply.

5.22.   <u>Retention of Jurisdiction</u>.   The Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Sale Order and the Asset Purchase Agreement and all related agreements, documents, and other instruments, and all amendments thereto and waivers and consents thereunder, and to adjudicate if necessary any and all disputes concerning or relating in any way to the Sale.

# EXHIBIT A

## ASSET PURCHASE AGREEMENT

**EXECUTION VERSION**

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**S-PPT ACQUISITION COMPANY LLC,**

**as Purchaser,**

**and**

**STANADYNE PPT HOLDINGS, INC.**

**and**

**THE OTHER SELLERS NAMED HEREIN,**

**as Sellers,**

**Dated as of May 8, 2023**

# TABLE OF CONTENTS

**Page**

ARTICLE 1 PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES ............5

  1.1    Purchase and Sale of Assets ....................................................................................5
  1.2    Excluded Assets ......................................................................................................7
  1.3    Assumption of Liabilities ........................................................................................9
  1.4    Excluded Liabilities ..............................................................................................10
  1.5    Cure Costs; Schedule Updates; Designation Rights .............................................12

ARTICLE 2 CONSIDERATION ....................................................................................................16

  2.1    Consideration .........................................................................................................16
  2.2    Wind-Down; Delivery of Surplus Cash to Purchaser ...........................................17
  2.3    Allocation of Purchase Price .................................................................................17
  2.4    Bulk Sales Laws ...................................................................................................18

ARTICLE 3 CLOSING AND TERMINATION ..............................................................................18

  3.1    Closing ..................................................................................................................18
  3.2    Closing Deliveries by Sellers ................................................................................18
  3.3    Closing Deliveries by the Purchaser .....................................................................20
  3.4    Termination of Agreement ....................................................................................20
  3.5    Procedure Upon Termination .................................................................................22
  3.6    Effect of Termination ............................................................................................23

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF THE SELLERS .......................23

  4.1    Organization and Qualification .............................................................................23
  4.2    Subsidiaries ...........................................................................................................23
  4.3    Authority Relative to this Agreement ...................................................................23
  4.4    Conflicts; Consents and Approvals .......................................................................24
  4.5    Ordinary Course of Business ................................................................................24
  4.6    Litigation ...............................................................................................................25
  4.7    Intellectual Property ..............................................................................................25
  4.8    Material Contracts .................................................................................................27
  4.9    Permits ..................................................................................................................29
  4.10  Brokers and Finders ..............................................................................................29
  4.11  Title to Assets .......................................................................................................29
  4.12  [Reserved]. ............................................................................................................29
  4.13  Real Property ........................................................................................................29
  4.14  Compliance with Law ...........................................................................................30
  4.15  Tax Returns; Taxes ...............................................................................................31
  4.16  Benefit Plans .........................................................................................................32
  4.17  Labor Matters .......................................................................................................33
  4.18  Insurance Policies .................................................................................................33
  4.19  Environmental Matters ..........................................................................................34
  4.20  Vendors and Suppliers ..........................................................................................34
  4.21  Inventory ...............................................................................................................34
  4.22  Product Liability ...................................................................................................34

i

4.23    Financial Statements; Group Holdings. ............................................................35
4.24    Wind-Down Budget ............................................................................................36
4.25    Affiliate Transactions.........................................................................................36
4.26    Sole Representations; Non-Reliance ..................................................................36

ARTICLE 5 REPRESENTATIONS AND WARRANTIES OF THE PURCHASER .................37

5.1    Organization and Qualification..........................................................................37
5.2    Authority Relative to This Agreement ...............................................................37
5.3    Conflicts; Consents and Approvals....................................................................37
5.4    Litigation............................................................................................................38
5.5    Brokers and Finders ...........................................................................................38
5.6    Financial Ability; Solvency ...............................................................................38
5.7    Sole Representations ..........................................................................................38

ARTICLE 6 EMPLOYEES ...................................................................................................39

6.1    Employee Offers ................................................................................................39
6.2    Assumed Seller Plans .........................................................................................40
6.3    WARN Act Liability ..........................................................................................40
6.4    No Third-Party Beneficiaries .............................................................................41

ARTICLE 7 BANKRUPTCY COURT MATTERS ...............................................................41

7.1    Competing Bids ..................................................................................................41
7.2    Bankruptcy Court Filings....................................................................................41
7.3    Bankruptcy Court Milestones .............................................................................42

ARTICLE 8 COVENANTS AND AGREEMENTS ...............................................................42

8.1    Conduct of Business of the Sellers ....................................................................42
8.2    Access to Information .........................................................................................45
8.3    Notice of Certain Events ....................................................................................45
8.4    Assignability of Certain Purchased Assets .........................................................46
8.5    Contracts and Permits ........................................................................................47
8.6    Further Agreements ............................................................................................47
8.7    Insurance Cooperation ........................................................................................48
8.8    Preservation of Records .....................................................................................48
8.9    Publicity .............................................................................................................48
8.10   Prohibition on Use of Purchased Names ............................................................49
8.11   Taxes ..................................................................................................................49
8.12   Further Assurances.............................................................................................50
8.13   Delivery of Certain Financial Information .........................................................52
8.14   Personally Identifiable Information ....................................................................53
8.15   Confidential Information ....................................................................................53
8.16   Transition Services.............................................................................................54
8.17   The Connecticut Transfer Act ............................................................................54
8.18   Delivery of Wind-Down Budget and Schedules.................................................54
8.19   Insurance ............................................................................................................55

ARTICLE 9 CONDITIONS TO CLOSING............................................................................55

9.1    Conditions Precedent to the Obligations of the Purchaser and the Sellers ....................55
9.2    Conditions Precedent to the Obligations of the Sellers ...........................................................55
9.3    Conditions Precedent to the Obligations of the Purchaser...........................................56

ARTICLE 10 ADDITIONAL DEFINITIONS ...........................................................................58

10.1    Certain Definitions........................................................................................................58
10.2    Additional Defined Terms .............................................................................................67

ARTICLE 11 MISCELLANEOUS ...........................................................................................68

11.1    Payment of Expenses ....................................................................................................68
11.2    Survival of Representations and Warranties; Survival of Post-Closing
          Covenants.......................................................................................................................69
11.3    Entire Agreement; Amendments and Waivers ..............................................................69
11.4    Schedules .......................................................................................................................69
11.5    Counterparts ..................................................................................................................70
11.6    Governing Law ..............................................................................................................70
11.7    Jurisdiction, Waiver of Jury Trial .................................................................................70
11.8    Notices ...........................................................................................................................71
11.9    Binding Effect; Assignment...........................................................................................72
11.10  Severability ....................................................................................................................72
11.11  Injunctive Relief.............................................................................................................72
11.12  Third Party Beneficiaries ...............................................................................................73
11.13  Non-Recourse ................................................................................................................73
11.14  No Effect Upon Lending Relationship ..........................................................................73
11.15  Time of the Essence .......................................................................................................73
11.16  Certain Interpretations ...................................................................................................73

## ANNEX AND EXHIBITS

Annex I          Wind-Down Budget

Exhibit A        Assignment and Assumption Agreement
Exhibit B        Patent Assignment Agreement
Exhibit C        Copyright Assignment Agreement
Exhibit D        Trademark Assignment Agreement
Exhibit E        Domain Name Assignment Agreement

## ASSET PURCHASE AGREEMENT

ASSET PURCHASE AGREEMENT (as amended, supplemented, amended and restated or otherwise modified from time to time, this "**Agreement**"), dated as of May 8, 2023 (the "**Execution Date**"), by and among (a) Stanadyne PPT Holdings, Inc., a Delaware corporation ("**Holdings**"), and the direct and indirect subsidiaries of Holdings party hereto as set forth on the signature pages attached hereto (together with Holdings, each a "**Seller**" and, collectively, the "**Sellers**"), and (b) S-PPT Acquisition Company LLC, a Delaware limited liability company (and together with its designees, successors or assigns, as applicable, as provided under Section 11.9, the "**Purchaser**"). Article 10 contains definitions of certain terms used in this Agreement and also provides cross-references to certain terms defined elsewhere in this Agreement.

## RECITALS

WHEREAS, on February 16, 2023 (the "**Petition Date**"), the Sellers filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), which cases are being jointly administered under Case No. 23-10207 (collectively, the "**Chapter 11 Cases**");

WHEREAS, each Seller continues in possession of its assets and is authorized under the Bankruptcy Code to continue the operation of its businesses as a debtor in possession;

WHEREAS, the Sellers are party to the Prepetition Financing Agreement with the Prepetition Secured Lenders and the Prepetition Agent;

WHEREAS, the Purchaser has been formed at the direction of the Prepetition Secured Lenders and the Prepetition Agent for the purpose of entering into this Agreement and, subject to the terms and conditions hereof, consummating the transactions contemplated hereby;

WHEREAS, subject to the terms and conditions hereof, (a) the Sellers desire to sell and transfer to the Purchaser, and the Purchaser desires to purchase and acquire from the Sellers, all of the Sellers' right, title and interest in and to the Purchased Assets, and (b) the Sellers desire to transfer and assign to the Purchaser, and the Purchaser desires to assume from the Sellers, all of the Assumed Liabilities;

WHEREAS, the Sellers and the Purchaser have agreed that the sale, transfer and assignment of the Purchased Assets and the Assumed Liabilities from the Sellers to the Purchaser shall be effected pursuant to sections 105, 363 and 365 of chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (as amended, the "**Bankruptcy Code**"); and

WHEREAS, in connection with the Chapter 11 Cases and subject to the terms and conditions contained herein, following entry of the Sale Order finding the Purchaser as the Successful Bidder, the Sellers shall sell and transfer to the Purchaser, and the Purchaser shall purchase and acquire from the Sellers, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, the Purchased Assets, and the Purchaser shall assume from the Sellers the Assumed Liabilities, all as more specifically provided herein and in the Sale Order.

4

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Purchaser and the Sellers hereby agree as follows:

## ARTICLE 1

## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

1.1     <u>Purchase and Sale of Assets</u>.   Pursuant to sections 105, 363 and 365 of the Bankruptcy Code and on the terms and subject to the conditions set forth in this Agreement and the Sale Order, each Seller shall sell, transfer, assign, convey and deliver to the Purchaser, and the Purchaser shall purchase, acquire and accept from each Seller, on the Closing Date, all of such Seller's right, title and interest in, to and under, free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances), all of the assets, properties, rights and interests of any nature, tangible or intangible, real or personal, wherever located, of such Seller related to, associated with or used, or held for use, in connection with the Business, now existing or hereafter acquired on or prior to the Closing Date, whether or not reflected on the books or financial statements of such Seller, as the same shall exist on the Closing Date, but in all cases excluding the Excluded Assets (as amended or modified by the Purchaser in accordance with <u>Section 1.5</u>, collectively, the "**Purchased Assets**"), including the following assets, properties, rights and interests of such Seller:

(a)     all Accounts Receivable;

(b)     all Documents not constituting an Excluded Asset;

(c)     (i) all Contracts of such Seller to which such Seller is a party or is otherwise bound or to which it is a beneficiary, and all rights pursuant thereto, set forth on <u>Schedule 1.1(c)</u>; (ii) Customer Purchase Orders; and (iii) any other Contract of such Seller added as a Purchased Asset in accordance with <u>Section 1.5</u> (including any Contract added as a Purchased Asset on or prior to the applicable Designation Deadline in accordance with <u>Section 1.5</u>) (the Contracts referred to in this <u>Section 1.1(c)</u>, together with the Assumed Real Property Leases, collectively, the "**Assigned Contracts**"), subject to the right of the Purchaser to cause any Assigned Contract to be a Non-Assigned Contract in accordance with <u>Section 1.5</u>;

(d)     all deposits and all prepaid charges and expenses of such Seller, including (i) security deposits with third party suppliers, vendors, service providers or landlords, and lease and rental payments, (ii) deposits in transit, (iii) rebates, (iv) tenant reimbursements, and (v) pre-payments, but excluding any Tax assets of the Sellers, except as set forth in <u>Section 1.1(m)</u>;

(e)     all Furniture and Equipment;

(f)     the names "Stanadyne" and "Pure Power Technologies", the names of the Sellers, all other trade names listed on <u>Schedule 1.1(f)</u> and, in all cases, any derivations thereof (collectively, the "**Purchased Names**");

(g)      (i) all leases and subleases for the Leased Real Property to which such Seller is a party or is otherwise bound or to which it is a beneficiary, and all rights pursuant thereto, set forth on Schedule 1.1(g) and (ii) any other lease or sublease for Leased Real Property added as a Purchased Asset in accordance with Section 1.5 (including any lease or sublease for Leased Real Property added as a Purchased Asset on or prior to the applicable Designation Deadline in accordance with Section 1.5) (such leases and subleases referred to in this Section 1.1(g), collectively, the "**Assumed Real Property Leases**" and, the underlying Leased Real Property, the "**Assumed Leased Real Property**"), subject to the right of the Purchaser to cause any Assumed Real Property Lease to be a Non-Assigned Contract in accordance with Section 1.5;

(h)      all Permits and all pending applications or filings therefor and renewals thereof and all rights and incidents of interest therein, subject to the right of the Purchaser to cause any Permit or pending applications or filings therefor or renewals thereof to be a Designation Rights Asset or Excluded Asset in accordance with Section 1.5;

(i)      all rights under non-disclosure or confidentiality, non-compete, or non-solicitation agreements to which such Seller is a party with current or former directors, officers, employees or agents, or with third parties, or any such agreement to which such Seller is a beneficiary;

(j)      (i) all rights, claims, credits, settlement proceeds, causes of action or rights of set off against third parties (including, for the avoidance of doubt, those arising under, or otherwise relating to, the Assigned Contracts), including all rights under vendors', manufacturers' and contractors' warranties, indemnities and guarantees, and (ii) all Avoidance Actions;

(k)      any claims, counterclaims, setoffs, rights of recoupment, equity rights or defenses that such Seller may have with respect to any Assumed Liabilities;

(l)      except as contemplated by Section 1.2(e), all of the Insurance Policies (including any environmental or pollution insurance policies) and rights and benefits thereunder (including (i) all rights pursuant to and proceeds from the Insurance Policies, (ii) all claims, demands, proceedings and causes of action asserted by such Seller under the Insurance Policies, (iii) all proceeds payable to such Seller in respect of life insurance policies that are owned by such Seller or for which such Seller is a beneficiary and (iv) any letters of credit related thereto);

(m)      any Tax cash refund of such Seller (other than any refund with respect to any Tax paid after the Closing Date except to the extent constituting Surplus Cash);

(n)      (i) all Seller Plans set forth on Schedule 1.1(n) and (ii) any other Seller Plan added as a Purchased Asset in accordance with Section 1.5 (such Seller Plans referred to in this Section 1.1(n), collectively, the "**Assumed Seller Plans**"), and any associated Contracts, funding media, assets, reserves, credits and service agreements, and all Documents created, filed or maintained in connection with the Assumed Seller Plans and any applicable insurance policies, subject to the right of the Purchaser to cause any Assumed Seller Plan to be an Excluded Asset in accordance with Section 1.5;

(o)      all Seller Intellectual Property and IT Assets;

(p)     all Inventory;

(q)     all Owned Real Property other than any Owned Real Property set forth on Schedule 1.2(l);

(r)     all bank, securities, commodity, deposit and lock box accounts;

(s)     except to the extent that any transfer or assignment is prohibited by applicable Law, all personnel files for Transferred Employees;

(t)     all goodwill and other intangible assets associated with, or relating to, the Business or the Purchased Assets;

(u)     all ownership interests in other entities owned by Sellers (except for equity of any Seller and any ownership interests set forth on Schedule 1.2(l)), together with any certificates evidencing ownership thereof, including in Stanadyne Changshu Corporation, a Chinese corporation, and Stanadyne India Private Ltd., an Indian limited company (collectively, the "**Acquired Entities**");

(v)     subject to section 363(b)(1)(A) of the Bankruptcy Code, all rights to the websites, domain names, telephone and facsimile numbers and e-mail addresses used by such Seller, as well as rights to receive mail and other communications addressed to such Seller (including mail and communications from customers, vendors, suppliers, distributors and agents);

(w)     all Cash and Cash Equivalents (other than Excluded Cash), whether on hand, in transit or in banks or other financial institutions, security entitlements, securities accounts, commodity contracts and commodity accounts and including any cash collateral that is collateralizing any letters of credit or insurance policies, or any obligations with respect thereto;

(x)     all consideration or proceeds received by the Sellers in respect of, and other benefits deriving from, any Designation Rights Asset;

(y)     all Surplus Cash;

(z)     all other assets, interests, properties, rights and claims and causes of action of any Seller of any kind or nature whatsoever not otherwise described above but that are not expressly designated as Excluded Assets; and

(aa)     the proceeds of any of the Purchased Assets described in the foregoing clauses (a) through (z).

1.2     Excluded Assets.  Notwithstanding anything to the contrary in this Agreement or any of the Ancillary Agreements, in no event shall any Seller be deemed to sell, transfer, assign, convey or deliver, and each Seller shall retain all right, title and interest to, in and under, the following assets, properties, rights and interests of such Seller (as amended or modified by the Purchaser in accordance with Section 1.5, collectively, the "**Excluded Assets**"):

(a)     all Contracts that are not Assigned Contracts (subject to <u>Section 1.5</u>, the "**Non-Assigned Contracts**");

(b)     all Documents (whether copies or originals) (i) to the extent they relate solely to any of the Excluded Assets or the Excluded Liabilities, (ii) that such Seller is required by Law to retain and is prohibited by Law from providing a copy of to the Purchaser or (iii) to the extent they relate solely to any employee of such Seller who is not a Transferred Employee and does not relate to an Assumed Seller Plan;

(c)     all Permits that relate solely to any of the Excluded Assets or the Excluded Liabilities;

(d)     all shares of capital stock or other equity interests of a Seller, or securities convertible into or exchangeable or exercisable for any such shares of capital stock or other equity interests;

(e)     all of such Seller's director and officer insurance policies, fiduciary policies or employment practices policies (in each case of the foregoing, including any tail policies or coverage thereon), and any of such Seller's rights, claims, demands, proceedings, credits, causes of action or rights of set off thereunder;

(f)     all rights under this Agreement and the Ancillary Agreements (including the right to receive the Purchase Price);

(g)     all Documents (whether copies or originals) relating to organization, formation, qualifications to conduct business as a foreign corporation or other legal entity, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, corporate seals, minute books, stock transfer books, stock ledgers, stock certificates and bylaws (together with analogous documentation);

(h)     all of the Seller Plans other than the Assumed Seller Plans, and any associated funding media, assets, reserves, credits and service agreements, and all Documents created, filed or maintained in connection with such Seller Plans and any applicable insurance policies;

(i)     all Tax Returns, related workpapers, Tax information and Tax records of any of the Sellers or their Affiliates (other than the Acquired Entities);

(j)     Cash and Cash Equivalents equal to the total amount of "Total Disbursements" in the wind-down budget to be set forth on <u>Annex I</u> hereto in accordance with <u>Section 8.18</u>, as may be amended from time to time with the prior written consent of the Purchaser in its sole and absolute discretion (such Cash and Cash Equivalents, the "**Excluded Cash**" and, such wind-down budget, the "**Wind-Down Budget**"), except to the extent constituting Surplus Cash;

(k)     except as set forth in <u>Section 1.1(m)</u>, all Tax assets of the Sellers, including Tax losses, credits, refunds (except to the extent constituting Surplus Cash), credit carry forwards and other Tax attributes, all deposits, prepaid or advance payments with respect to Taxes, and any

claims, rights, and interest in and to any Tax asset, refund (except to the extent constituting Surplus Cash),  credit, deduction or reduction of Taxes; and

(l)      the properties and assets set forth on Schedule 1.2(l), as amended or modified by Section 1.5.

1.3      Assumption of Liabilities.  On the terms and subject to the conditions set forth in this Agreement and the Sale Order, on the Closing Date, the Purchaser shall assume only the following Liabilities expressly set forth in this Section 1.3 (collectively, the "**Assumed Liabilities**"):

(a)      all Liabilities of any of the Sellers under each Assigned Contract arising after the Closing Date and which relate solely to events, facts, circumstances and periods of time occurring after the Closing Date;

(b)      all Determined Cure Costs with respect to any Assigned Contract;

(c)      (i) other than administrative claims arising under section 503(b)(9) of the Bankruptcy Code, undisputed post-Petition Date accrued trade payables of the Sellers incurred in the Ordinary Course of Business with respect to the Purchased Assets or Designation Rights Assets to the extent not paid by the Sellers at or prior to Closing and in an amount no greater in the aggregate than an amount equal to (1) $12,000,000, *less* (2) any amounts paid by the Sellers for such Liabilities at or prior to the Closing, and (ii) administrative claims arising under section 503(b)(9) of the Bankruptcy Code to the extent not paid by the Sellers at or prior to Closing and in an amount no greater in the aggregate than an amount equal to (1) $1,500,000, *less* (2) any amounts paid by the Sellers for such Liabilities at or prior to the Closing, except, in the case of each of the foregoing clauses (i) and (ii), expressly excluding all Liabilities set forth on Schedule 1.3(c);

(d)      sponsorship of and all Liabilities arising under or otherwise in respect of the Assumed Seller Plans arising after the Closing Date and which relate solely to events, facts and circumstances occurring after the Closing Date or that are in combination with events, facts or circumstance occurring after the Closing Date;

(e)      all Liabilities arising from the ownership and operation of the Purchased Assets by the Purchaser from and after the Closing Date, but solely to the extent that such Liabilities relate to events, facts, circumstances and periods of time occurring after the Closing Date;

(f)      (A) any Taxes with respect to the Business or the Purchased Assets relating to the taxable period (or portion thereof) beginning on or after the Closing Date and (B) the Transfer Taxes;

(g)      solely in the event the Windsor, CT Property is a Purchased Asset and transferred to Purchaser, all Liabilities pursuant to the CT Transfer Act with respect to the Windsor, CT Property, that are solely and exclusively related to the transfer of the Windsor, CT Property pursuant to this Agreement; and

(h)      all Liabilities arising after the Petition Date with respect to wages and salaries, in each case, earned and accrued in the Ordinary Course of Business with respect to the Sellers' employees as of the Closing Date to the extent not previously paid by the Sellers and not in excess of an amount equal to $3,500,000, but expressly excluding all Liabilities described in Section 1.4(l).

Notwithstanding anything to the contrary herein, the Purchaser's assumption of the Assumed Liabilities shall in no way expand the rights or remedies of third parties against the Purchaser as compared to the rights and remedies which such parties would have had against Sellers had this Agreement not been consummated.

1.4      Excluded Liabilities.  Except for the Assumed Liabilities expressly set forth in Section 1.3, the Purchaser shall not assume, or become liable for the payment or performance of, any Liabilities of any Seller of any nature whatsoever, whether accrued or unaccrued, known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, liquidated or unliquidated, or due or to become due (collectively, the "**Excluded Liabilities**"), including the following Liabilities, all of which shall remain Liabilities of the Sellers for which the Sellers shall remain solely and exclusively liable:

(a)      all Liabilities of any of the Sellers relating to any of the Excluded Assets (including the Non-Assigned Contracts);

(b)      except as set forth in Section 1.3(g) (solely if the Windsor, CT Property is a Purchased Asset and transferred to Purchaser), all Liabilities relating to any environmental, health or safety matters (including any Liability under any Environmental Law), in any way arising out of or relating to any Seller's or its Affiliates operation of its business or its leasing, ownership, use or operation of real property prior to the Closing Date, no matter when raised and no matter whether raised prior to or after the Closing Date;

(c)      all Liabilities of any Seller in respect of Indebtedness, whether or not relating to the Business;

(d)      all Liabilities of any Seller to any current, former or prospective shareholder or other direct or indirect holder of equity securities or equity-linked securities of any Seller or Affiliate, including all Liabilities of any Seller or Affiliate related to the right to or issuance of any capital stock or other equity securities or the payment of any dividend or other distribution on or in respect of any capital stock or other equity securities;

(e)      all Liabilities arising out of any breach or default of the Assigned Contracts on or prior to the Closing Date or arising out of any event, fact, circumstance or period of time that occurs on or prior to the Closing Date which with the passage of time or giving of notice, or both, would constitute or give rise to such a breach or default, other than any Determined Cure Costs;

(f)      (i) sponsorship of and all Liabilities arising under or otherwise in respect of any Seller Plan that is not an Assumed Seller Plan and (ii) all Liabilities arising out of any breach or default of the Assumed Seller Plans on or prior to the Closing Date or arising out of any event, fact, circumstance or period that occurs on or prior to the Closing Date which, solely and not in combination with any event, fact, circumstance or period that occurs following the Closing Date,

10

with the passage of time or after giving notice, or both, would constitute or give rise to such a breach or default;

(g)     all Liabilities for Taxes of any Seller or its Affiliates and any for Taxes with respect to the Business or the Purchased Assets relating to the Pre-Closing Tax Period, in each case, excluding any Taxes of the Acquired Entities (other than, for the avoidance of doubt, any liability of Sellers for Taxes relating to the sale or assignment of the Acquired Entities) and any Taxes described in <u>Section 1.3(f)</u>;

(h)     all Liabilities of any Seller or its Affiliates (other than the Acquired Entities) for the unpaid Taxes of any Person under Treas. Reg. § 1.1502-6 (or any similar provision of state, local, or non-U.S. Law), as a transferee or successor, or by contract (other than a contract the primary purpose of which is unrelated to Tax);

(i)     except to the extent that any such Liabilities are specifically assumed by the Purchaser pursuant to <u>Section 1.3(g)</u>, all Liabilities of any Seller with respect to current or former employees that are not Transferred Employees, regardless of when arising;

(j)     all Liabilities of any Seller for pending or threatened Actions against such Seller or Affiliate, any of its assets, properties, rights or interests, the Business or such Seller's or Affiliate's operations or activities arising out of or relating to any matter, occurrence, action, omission or circumstance that occurred or existed on or prior to the Closing Date;

(k)     all Liabilities (whether civil or criminal) occurring, arising out of or relating to acts or omissions of any Seller, or any of their respective current or former directors, officers, employees, agents or independent contractors, in respect of any claimed violation of any Law at any time;

(l)     except to the extent that any such Liabilities are specifically assumed by the Purchaser pursuant to <u>Section 1.3(h)</u>, all Liabilities of any Seller for any and all claims by or on behalf of such Seller's current or former employees relating to periods ending on or prior to the Closing Date, including employment practices, terms and conditions of employment, labor relations, union organizing, employee safety and health, wages and hours, fair labor standards, child labor, employee leaves of absence, unemployment insurance, disability rights or benefits, immigration, plant closings and layoffs, equal employment opportunity, discrimination, harassment, affirmative action (to the extent applicable), breach of contract and wrongful discharge, employee grievances and liability for any pension, profit sharing, deferred compensation (and the funding of any such benefits relating to all income earned by such Seller's current or former employees relating to periods ending on or prior to the Closing Date), workers' compensation or any other employee health, welfare or other benefit plans;

(m)     all Liabilities of any Seller or Affiliate's under any collective bargaining agreement or any agreement with any labor union;

(n)     all Liabilities for any legal, accounting, investment banking, financial advisory, reorganization, restructuring (including bankruptcy administrative expenses), brokerage or similar fees or expenses incurred by any Seller in connection with, resulting from or attributable to, the transactions contemplated by this Agreement, the Chapter 11 Cases or otherwise;

(o)    all Liabilities incurred in connection with charitable contributions from customers and amounts owed to charitable organizations; and

(p)    all Liabilities relating to or arising under any escheatment, abandoned property, unclaimed property or similar Laws of any jurisdiction.

1.5    Cure Costs; Schedule Updates; Designation Rights.

(a)    Contract and Cure Schedules.  Prior to the Execution Date, the Sellers have delivered to Purchaser a list (the "**Original Contract & Cure Schedule**") of each Contract of the Sellers and the Sellers' good faith estimate of the amount of Cure Costs applicable to each such Contract or indicating "$0.00" if no Cure Cost is estimated to be applicable for such Contract. From the Execution Date through (and including) the applicable Designation Deadline, promptly upon Purchaser's written consent or promptly following any material changes to the information set forth on the Original Contract & Cure Schedule (including any new Contracts to which any Seller becomes a party and any change in the Cure Cost of any Contract), the Sellers shall provide the Purchaser with a schedule that updates and corrects such information (as such schedule may be amended, supplemented or otherwise modified from time to time prior to the applicable Designation Deadline in accordance with the terms of this Agreement, the "**Contract & Cure Update Schedule**").  Without limiting the foregoing, if, following the Closing, it is discovered that a Contract that should have been listed on the Original Contract & Cure Schedule or any Contract & Cure Update Schedule was not so listed, the Sellers shall, promptly following the discovery thereof, notify the Purchaser in writing of any such Contract and the Sellers' good faith estimate of the amount of Cure Costs applicable to each such Contract or indicating "$0.00" if no Cure Cost is estimated to be applicable for such Contract.  Any Contract not designated by the Purchaser in writing as either an Assigned Contract or a Non-Assigned Contract, and any Permits and other assets designated in writing by the Purchaser, in each case at least one Business Day prior to the Closing, shall constitute "**Designation Rights Assets**."  Promptly after the date hereof, if the Sellers have not already done so, the Sellers shall seek to obtain an order of the Bankruptcy Court, in form and substance acceptable to the Purchaser, extending the deadline under section 365(d)(4) of the Bankruptcy Code for the assumption of all unexpired leases of nonresidential real property to the date that is the 210th day following the Petition Date.  The Purchaser may, at any time and from time to time through (and including) the applicable Designation Deadline and prior to the entry of an order of the Bankruptcy Court approving the rejection of such Contracts, include in the definition of Assigned Contracts and exclude from the definition of Non-Assigned Contracts any Contract of any of the Sellers not otherwise included in the definition of Assigned Contracts and require such Seller to give not less than five Business Days' notice to the non-Seller parties to any such Contract of the Sellers' proposed assumption and assignment thereof to the Purchaser and the amount of Cure Costs associated with such Contract; provided, that no such change of the definitions of Assigned Contracts or Non-Assigned Contracts referred to in this sentence shall reduce or increase the amount of the Purchase Price, except to the extent of any increase in the assumption of the Assumed Liabilities as a result of Contracts being added to the Assigned Contracts by the Purchaser pursuant to this Section 1.5(a).  The Purchaser may, at any time and from time to time through (and including) the applicable Designation Deadline and prior to the assumption and assignment of such Contracts, exclude from the definition of Assigned Contracts and include in the definition of Non-Assigned Contracts, any Contract of any of the Sellers otherwise included in the definition of Assigned Contracts; provided, that no such change of the

12

definitions of Assigned Contracts or Non-Assigned Contracts referred to in this sentence shall reduce or increase the amount of the Purchase Price, except to the extent of any reduction in the assumption of the Assumed Liabilities as a result of Contracts being excluded from the Assigned Contracts by the Purchaser pursuant to this Section 1.5(a). To exercise its rights under this Section 1.5(a) to include Contracts in, or exclude Contracts from, the Assigned Contracts and the Non-Assigned Contracts, as applicable, the Purchaser shall deliver one or more written notices to the Sellers specifying the Contract(s) to be so included or excluded. If any Contract is added to (or excluded from) the Assigned Contracts and the Non-Assigned Contracts as permitted by this Section 1.5(a), then Schedule 1.1(c) or Schedule 1.1(g), as applicable, shall be deemed amended to reflect such addition, deletion or other change automatically (without any further action on the part of, or notice to, any Person) upon the delivery by the Purchaser of the notice referred to in the immediately preceding sentence and, as an administrative matter only, the Purchaser and the Sellers shall make appropriate additions, deletions or other changes to Schedule 1.1(c) or Schedule 1.1(g), as applicable, to reflect such addition or exclusion. In addition, if any Contract is added to (or excluded from) the Assigned Contracts and the Non-Assigned Contracts as permitted by this Section 1.5(a), the Sellers shall promptly take such steps as are reasonably necessary, including, if applicable, prompt delivery of notice to the non-Seller counterparty to such Contract, to cause such Contract to be assumed by the applicable Seller, and assigned to the Purchaser, or excluded and rejected, as applicable. As to each Designation Rights Asset that is not an Assigned Contract, promptly after receiving written notice from the Purchaser at any time between Closing and the applicable Designation Deadline requesting assumption, assignment and sale of any Designation Rights Asset to the Purchaser, Sellers shall take all steps necessary to assume, assign and sell to the Purchaser the applicable Designation Rights Asset.

        (b)    Designation Rights Assets. With respect to any Designation Rights Asset, (i) the Purchaser shall have sole and complete authority and control over such Designation Rights Asset for the period from the Closing until the earlier of (A) the applicable Designation Deadline and (B) the date such Designation Rights Asset is assumed by the applicable Seller and assigned to the Purchaser or excluded and rejected, as applicable, (ii) the Purchaser shall, at its option, directly pay or reimburse (for reimbursement the Sellers shall provide all invoices and other supporting documentation requested by the Purchaser and afford the Purchaser and its Representatives access to all related books and records) Seller for any costs, expenses and any other liabilities incurred by the Sellers in the Ordinary Course of Business solely in connection with the operation of such Designation Rights Asset for the period from the Closing until the earlier of (A) the applicable Designation Deadline, (B) the date such Designation Rights Asset is assumed by the applicable Seller and assigned to the Purchaser and (C) the date Sellers receive written notice from Purchaser designating the exclusion of such Designation Rights Asset from the Purchased Assets, in each case other than costs, expenses or liabilities arising from or incurred in connection with (x) the administration of the Chapter 11 Cases or (y) the gross negligence, bad faith or willful misconduct of Sellers or any of their Affiliates or Representatives, (iii) all consideration or proceeds received by the Sellers in respect of, and other benefits deriving from, such Designation Rights Asset shall constitute Purchased Assets and be promptly delivered to the Purchaser, and (iv) the foregoing shall not affect the validity of the transfer to the Purchaser of any other Purchased Asset whether or not related to such Designation Rights Asset. Any Designation Rights Asset not designated as a Purchased Asset prior to the applicable Designation Deadline or that the Purchaser designates in writing to the Sellers for exclusion from the Purchased Assets shall, in each case, be an Excluded Asset for all purposes under this Agreement.

13

(c)     Cure Costs.  The Sellers shall be responsible for the verification of all Cure Costs for each Assigned Contract and shall, in consultation with and subject to the consent of the Purchaser, use commercially reasonable efforts to establish the proper Cure Costs, if any, for each Assigned Contract prior to the Closing Date.  To the extent that any Assigned Contract requires the payment of Cure Costs in order to be assumed pursuant to section 365 of the Bankruptcy Code, whether determined prior to or after the Closing, the Determined Cure Costs related to such Assigned Contract, or any portion thereof, shall be paid by the Purchaser within seven days after the date such Assigned Contract is assumed by the applicable Seller and assigned to the Purchaser. Notwithstanding the foregoing, (A) no prepetition Cure Costs with respect to any Designation Rights Asset shall be due until the permanent assumption thereof pursuant to this Section 1.5 and (B) the Purchaser shall not be required to make any payment for Cure Costs for, or otherwise have any Liabilities with respect to, any Non-Assigned Contract.

(d)     Disputed Cure Costs.  If any Contract requires the payment of Cure Costs in order to be assumed pursuant to section 365 of the Bankruptcy Code, and such Cure Costs will be Undetermined Cure Costs on the Closing Date because a non-Seller counterparty to such Contract proposed Cure Costs in an amount that is different than the amount of Cure Costs proposed by the Sellers and such difference will not be resolved prior to the Closing Date (each such Contract, a "**Disputed Amount Contract**"), then the Sellers shall provide the Purchaser, not less than three Business Days prior to the Closing Date, with a schedule that lists each such Disputed Amount Contract and the amount of Cure Costs that has been proposed by each such non-Seller counterparty.  If the Sellers, with the consent of the Purchaser, and the non-Seller counterparty with respect to any Disputed Amount Contract, are unable to agree on Cure Costs for such Disputed Amount Contract such that the Undetermined Cure Cost for such Disputed Amount Contract does not become a Determined Cure Cost, solely upon the Purchaser's written request, the Sellers shall seek to have the amount of Cure Costs related to such Disputed Amount Contract determined by the Bankruptcy Court.  With respect to (i) any Disputed Amount Contract for which the Cure Cost becomes a Determined Cure Cost and which becomes an Assigned Contract after the Closing Date in accordance with Section 1.5(a) and (ii) any Contract that is first disclosed to the Purchaser on or after the Closing Date and which becomes an Assigned Contract after the Closing Date in accordance with Section 1.5(a), (x) the applicable Sellers shall promptly take such steps as are reasonably necessary, including, if applicable, prompt delivery of no less than five Business Days' notice to the non-Seller counterparty to such Contract, to cause such Contract to be assumed by the applicable Seller and assigned to the Purchaser, and (y) the Purchaser shall pay the Determined Cure Costs with respect to such Assigned Contract within seven days after the date such Assigned Contract is assumed by the applicable Seller and assigned to the Purchaser.  Any reasonable and document out-of-pocket costs incurred by the Sellers in complying with this subsection shall be borne by Purchaser.

(e)     Assumption and Assignment of Assigned Contracts.  The Sellers shall take all actions required to assume and assign the Assigned Contracts to the Purchaser (other than payment of the Determined Cure Costs, which shall be the sole responsibility of the Purchaser), including taking all reasonable actions required to obtain a Bankruptcy Court order containing a finding that the proposed assumption and assignment of the Assigned Contracts to the Purchaser satisfies all applicable requirements of section 365 of the Bankruptcy Code.

(f)      Post-Closing Cure Payment Arrangements.  Notwithstanding the foregoing, the Purchaser may, in lieu of paying any Determined Cure Costs (or any portion thereof) with respect to any Assigned Contract directly to the applicable non-Seller counterparty, pay such Determined Cure Cost (or portion thereof) to the Sellers who shall promptly deliver such Determined Cure Cost to the applicable non-Seller counterparty.  In addition, notwithstanding anything herein to the contrary, in lieu of paying any Determined Cure Costs (or any portion thereof) with respect to any Assigned Contract pursuant to Section 1.5(c), the Sellers, the Purchaser and the applicable non-Seller counterparty to such Assigned Contract may agree to a post-Closing payment schedule pursuant to which the Purchaser will make agreed upon Cure Cost payments to the applicable non-Seller counterparty (any such agreement, a "**Post-Closing Cure Payment Arrangement**").  To the extent any Post-Closing Cure Payment Arrangements are made, the aggregate amount payable under all Post-Closing Cure Payment Arrangements shall be included in the Closing Payments Schedule as if it is an Assumed Liability that is payable at the Closing.

(g)      Designation of Seller Plans.  The Purchaser may, at any time and from time to time through (and including) the Closing Date, include in the definition of Assumed Seller Plans and exclude from the definition of Excluded Assets any Seller Plan not otherwise included in the definition of Assumed Seller Plans; provided, that no such change of the definitions of Assumed Seller Plans or Excluded Assets referred to in this sentence shall reduce or increase the amount of the Purchase Price, except to the extent of any increase in the assumption of the Assumed Liabilities (subject to the limitations set forth in Section 1.3) as a result of Seller Plans being added to the Assumed Seller Plans by the Purchaser pursuant to this Section 1.5(g).  The Purchaser may, at any time and from time to time through (and including) the Closing Date, exclude from the definition of Assumed Seller Plans and include in the definition of Excluded Assets, any Seller Plan otherwise included in the definition of Assumed Seller Plans; provided, that no such change of the definitions of Assumed Seller Plans or Excluded Assets referred to in this sentence shall reduce or increase the amount of the Purchase Price, except to the extent of any reduction in the assumption of the Assumed Liabilities as a result of Seller Plans being excluded from the Assumed Seller Plans by the Purchaser pursuant to this Section 1.5(g).  To exercise its rights under this Section 1.5(g) to include Seller Plans in, or exclude Seller Plans from, the Assumed Seller Plans and the Excluded Assets, as applicable, the Purchaser shall deliver, at least three Business Days immediately preceding the Closing Date, one or more written notices to the Sellers specifying the Seller Plan(s) to be so included or excluded.  If any Seller Plan is added to (or excluded from) the Assumed Seller Plans and the Excluded Assets as permitted by this Section 1.5(g), then Schedule 1.1(n) shall be deemed amended to reflect such addition, deletion or other change automatically (without any further action on the part of, or notice to, any Person) upon the delivery by the Purchaser of the notice referred to in the immediately preceding sentence and, as an administrative matter only, the Purchaser and the Sellers shall make appropriate additions, deletions or other changes to Schedule 1.1(n) to reflect such addition or exclusion.

(h)      Designation of Purchased Assets and Excluded Assets.  The Purchaser may, at any time and from time to time through (and including) the Closing Date, include in the definition of Purchased Assets and exclude from the definition of Excluded Assets any Excluded Asset that is included on Schedule 1.2(l); provided, that no such change of the definitions of Excluded Assets or Purchased Assets referred to in this sentence shall reduce or increase the amount of the Purchase Price, except to the extent of any increase in the assumption of the Assumed Liabilities as a result of any Excluded Asset being added to the Purchased Assets by the

Purchaser pursuant to this <u>Section 1.5(h)</u>.  The Purchaser may, at any time and from time to time through (and including) the Closing Date, exclude from the definition of Purchased Assets and include in the definition of Excluded Assets, any Purchased Asset otherwise included in the definition of Purchased Assets; <u>provided</u>, that no such change of the definitions of Purchased Assets or Excluded Assets referred to in this sentence shall reduce or increase the amount of the Purchase Price, except to the extent of any reduction in the assumption of the Assumed Liabilities as a result of Purchased Assets being excluded from the Purchased Assets by the Purchaser pursuant to this <u>Section 1.5(h)</u>.  To exercise its rights under this <u>Section 1.5(h)</u> to add or exclude assets to or from the Excluded Assets and the Purchased Assets, as applicable, the Purchaser shall deliver one or more written notices to the Sellers specifying the asset(s) to be so included or excluded.  If any Excluded Asset is added to (or excluded from) the Purchased Assets and the Excluded Assets, or if any Purchased Asset is added to (or excluded from) the Excluded Assets and the Purchased Assets, in any such case as permitted by this <u>Section 1.5(h)</u>, then <u>Schedule 1.2(l)</u> and any applicable Schedule referenced in <u>Section 1.1</u> shall be deemed amended to reflect such addition, deletion or other change automatically (without any further action on the part of, or notice to, any Person) upon the delivery by the Purchaser of the notice referred to in the immediately preceding sentence and, as an administrative matter only, the Purchaser and the Sellers agree to make appropriate additions, deletions or other changes to <u>Schedule 1.2(l)</u> and any other applicable Schedule to reflect such addition or exclusion.

## ARTICLE 2

## CONSIDERATION

2.1    <u>Consideration</u>.  In consideration for the transfer of the Purchased Assets to the Purchaser and the other undertakings set forth herein, the purchase price (the "**Purchase Price**") for the Purchased Assets shall be (i) the assumption of the Assumed Liabilities by the Purchaser at Closing, <u>plus</u> (ii) $225,000,000 (as may be increased by the Purchaser in writing from time to time prior to the end of the Auction, the "**Prepetition Debt Bid Amount**"), which such amount will be satisfied by way of (A) an amount to be offset against the Prepetition Secured Obligations held by the Prepetition Secured Lenders pursuant to section 363(k) of the Bankruptcy Code (the "**Credit Bid Amount**") and (B) the assumption of the Restructured Indebtedness (if any) by the Purchaser at the Closing (it being understood and agreed that the portion of the Prepetition Secured Obligations in excess of the Prepetition Debt Bid Amount (if any) will remain outstanding as a claim against the Sellers that is secured to the extent of the Prepetition Agent's, on behalf of itself and the Prepetition Secured Lenders, security interest in the Excluded Assets), <u>plus</u>, (iii) if the Sellers' Cash and Cash Equivalents immediately prior to the Closing are insufficient to fund the amount of "Total Disbursements" in the Wind-Down Budget, an amount of Cash and Cash Equivalents equal to the amount of such deficiency (the "**Cash Deficiency Amount**"). Notwithstanding anything to the contrary herein, (a) under no circumstances shall any portion of the Prepetition Debt Bid Amount be converted into or otherwise require a cash payment and (b) Purchaser, in its sole and absolute discretion, may elect at the Closing to designate a portion of the Prepetition Debt Bid Amount, in lieu of such portion being included in the Credit Bid Amount, to be a portion of the Prepetition Secured Obligations assumed and restructured as secured indebtedness of Purchaser (or any of its designees hereunder, as applicable) under a financing agreement to be entered into at Closing by the Purchaser (or any of its designees hereunder, as applicable), the Prepetition Agent and the Prepetition Secured Lenders (such designated portion,

the "**Restructured Indebtedness**"), which such financing agreement shall be on terms satisfactory to each of the parties thereto (it being understood and agreed that if such designation occurs, the "Credit Bid Amount" shall, for all purposes under this Agreement, not include the Restructured Indebtedness).

2.2    Wind-Down; Delivery of Surplus Cash to Purchaser.    At the Closing, the Sellers shall retain an outside professional that is reasonably acceptable to the Purchaser to serve as a responsible officer of each Seller during the period from the Closing until one Business Day following the closure, conversion or dismissal of the Chapter 11 Cases or the appointment of a Chapter 11 trustee (if applicable), and during such period, the Sellers shall pay such responsible officer's remuneration in accordance with the Wind-Down Budget.    From and after the Closing, the Sellers shall (a) not use Excluded Cash except in accordance with the Wind-Down Budget on a line-item basis and any unused amount in one line item may not be applied or carried over to any other line item (any such unused amount shall constitute Surplus Cash), (b) keep a detailed accounting of all uses of Excluded Cash, and (c) make such accounting available to the Purchaser from time to time promptly upon the Purchaser's request.    Promptly upon the determination of what portion of the Excluded Cash constitutes Surplus Cash, the Sellers shall transfer such Surplus Cash in immediately available funds to the Purchaser.    For the avoidance of doubt, any Tax cash refund of the Sellers with respect to any Tax paid after the Closing Date may be used in accordance with the Wind-Down Budget as if the amount of such refund were added back to the line-item from which such Tax was paid, but may not be used for any other purpose.

2.3    Allocation of Purchase Price.    The Purchaser shall, not later than 90 days after the Closing Date, prepare and deliver to the Sellers a schedule allocating the purchase price for U.S. federal income Tax purposes, including Assumed Liabilities to the extent that such Liabilities are required to be treated as part of the purchase price for U.S. federal income Tax purposes, and any other relevant items among the Purchased Assets of each Seller (such schedule, the "**Allocation**"). The Allocation shall be prepared in accordance with Section 1060 of the Code and the applicable Treasury Regulations promulgated thereunder; provided the amount of the purchase price that is allocated to the Chinese Shares and Indian Shares shall be determined in good faith by Purchaser based on a valuation report obtained by Purchaser from an independent accounting firm.    The Allocation prepared by the Purchaser shall be considered final and binding on the parties unless, within 30 days after the delivery of the Allocation by the Purchaser, a Seller notifies the Purchaser that it has an objection to the allocation set forth in the Allocation.    If a Seller timely make such an objection, the Purchaser and such Seller shall work in good faith to resolve such dispute within 20 days from the date such Seller delivers the objection to the Purchaser.    The Purchaser will consider in good faith and incorporate any reasonable comments provided by a Seller.    The Sellers and the Purchaser shall report and file all Tax Returns (including amended Tax Returns and claims for refund) consistent with the Allocation as finally determined pursuant to this Section 2.3, and shall take no position contrary thereto or inconsistent therewith (including in any audits or examinations by any Governmental Body or any other proceeding), unless otherwise required by a final determination within the meaning of Section 1313 of the Code or any equivalent provisions of non-U.S., state or local Tax Law.    The Purchaser and each of the Sellers shall cooperate in the filing of any forms, Tax Returns or other documents with respect to the Allocation, including any amendments to such forms, Tax Returns or other documents required pursuant to this Agreement with respect to any adjustment to the purchase price.

2.4     Bulk Sales Laws.  The Purchaser hereby waives compliance by the Sellers with the requirements and provisions of any "bulk-transfer" Law of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Purchased Assets to the Purchaser.  Pursuant to Section 363(f) of the Bankruptcy Code, the sale of the Purchased Assets shall be free and clear of any and all Encumbrances and Liabilities in the Purchased Assets (other than Permitted Encumbrances), including any Encumbrances or claims arising out of any bulk transfer Laws, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.

## ARTICLE 3

## CLOSING AND TERMINATION

3.1     Closing.  Subject to the satisfaction of the conditions set forth in Section 9.1, Section 9.2 and Section 9.3, or the waiver thereof by the party or parties entitled to waive the applicable condition, the closing of the transactions contemplated by this Agreement (the "**Closing**") will take place by telephone conference and electronic exchange of documents (or, if the parties hereto agree to hold a physical closing, at such place as the parties may mutually designate in writing) on a date that is no later than the second Business Day following the date on which all of the conditions set forth in Section 9.1, Section 9.2 and Section 9.3 are satisfied or waived by the party entitled to waive the applicable condition (other than conditions that by their nature are to be satisfied at the Closing).

3.2     Closing Deliveries by Sellers.  At the Closing, the Sellers shall deliver to the Purchaser:

(a)     a duly executed bill of sale and assignment and assumption agreement with respect to the Purchased Assets and Assumed Liabilities, in substantially the form attached hereto as Exhibit A (the "**Assignment and Assumption Agreement**");

(b)     a duly executed patent assignment, in substantially the form attached hereto as Exhibit B (the "**Patent Assignment Agreement**");

(c)     a duly executed copyright assignment, in substantially the form attached hereto as Exhibit C (the "**Copyright Assignment Agreement**");

(d)     a duly executed trademark assignment, in substantially the form attached hereto Exhibit D (the "**Trademark Assignment Agreement**");

(e)     a duly executed domain name assignment, in substantially the form attached hereto as Exhibit E (the "**Domain Name Assignment**" and, together with the Patent Assignment Agreement, the Copyright Assignment Agreement, and the Trademark Assignment Agreement, the "**IP Assignment Agreements**");

(f)     duly executed general warranty deeds or equivalent form in each applicable jurisdiction (and other customary documents or instruments to transfer real property in the applicable jurisdictions, including CT Transfer Act Forms, solely if the Windsor, CT Property is a Purchased Asset and transferred to Purchaser) with respect to the Owned Real Property included

in the Purchased Assets, in form and substance reasonably satisfactory to the Purchaser and the Sellers (collectively, the "**Owned Real Property Transfer Documents**");

(g)   duly executed equity transfer documents (or other customary documents or instruments to transfer equity in the applicable jurisdictions) with respect to the equity of Stanadyne Changshu Corporation, a Chinese corporation, and Stanadyne India Private Ltd., an Indian limited company, in form and substance reasonably satisfactory to the Purchaser and the Sellers;

(h)   a Section 281 report from Deloitte Haskins & Sells Chartered Accountants LLP confirming that there are no notices, demands, claims, legal actions, proceedings, suits, litigation, prosecutions, enquiries, assessments, or re-assessments issued or initiated by any Governmental Body, in relation to any Tax payable by or recoverable by the Purchaser or the Prepetition Secured Lenders on purchase of the equity of Stanadyne India Private Ltd. in respect of any Tax or any ongoing Tax proceedings against the Sellers that may render the transfer of such equity by Sellers to Purchaser as void;

(i)   a true and correct copy of the Sale Order;

(j)   an Internal Revenue Service Form W-9 from each Seller;

(k)   the officer's certificates required to be delivered pursuant to Section 9.3(a), Section 9.3(b), and Section 9.3(c);

(l)   such documentation as may be necessary to change the authorized signatories on any bank accounts or powers of attorney relating (directly or indirectly) to the Purchased Assets;

(m)   documentation in form and substance reasonably satisfactory to the Purchaser to effect the required name changes of the Sellers as more fully set forth in Section 8.10;

(n)   such other bills of sale, deeds, endorsements, assignments, acknowledgments and other good and sufficient instruments of conveyance and transfer, all in form and substance reasonably satisfactory to the Purchaser, that are necessary to vest in the Purchaser all of the right, title and interest of the Sellers in, to and under all of the Purchased Assets;

(o)   a certificate of the Secretary (or similar officer) of each Seller certifying as to: (A) the full force and effect of such Seller's organizational documents (as applicable) attached thereto as exhibits, (B) the full force and effect of the resolutions of each Sellers' board of directors (or equivalent body) authorizing such Seller to enter into this Agreement and the other Ancillary Agreements to which such Seller is a party and (C) the incumbency of each officer of each Seller who executes this Agreement and any Ancillary Agreement to which such Seller is a party; and

(p)   all other previously undelivered Seller Ancillary Agreements required by this Agreement to be executed or delivered by the Sellers at or prior to the Closing in connection with the transactions contemplated by this Agreement.

19

3.3    <u>Closing Deliveries by the Purchaser</u>.  At the Closing, the Purchaser shall deliver to the Sellers:

(a)    evidence of a credit against the Prepetition Secured Obligations pursuant to section 363(k) of the Bankruptcy Code equal to the Credit Bid Amount and the release of the Sellers of any obligation with respect to the Restructured Indebtedness, if any;

(b)    a duly executed Assignment and Assumption Agreement;

(c)    duly executed IP Assignment Agreements;

(d)    the officer's certificates required to be delivered pursuant to <u>Section 9.2(a)</u> and <u>Section 9.2(b)</u>;

(e)    all other previously undelivered Purchaser Ancillary Agreements required by this Agreement to be executed or delivered by the Purchaser at or prior to the Closing in connection with the transactions contemplated by this Agreement;

(f)    a certificate of the Secretary (or similar officer) of Purchaser certifying as to: (A) the full force and effect of the certificate of formation and the limited liability company agreement of Purchaser attached thereto as exhibits, (B) the full force and effect of the resolutions of Purchaser's board of directors (or equivalent body) authorizing Purchaser to enter into this Agreement and the other Ancillary Agreements to which Purchaser is a party and (C) the incumbency of the officer of each officer of Purchaser who executes this Agreement and any Ancillary Agreement to which Purchaser is a party;

(g)    duly executed Owned Real Property Transfer Documents, to the extent required to be executed by the Purchaser in the applicable jurisdiction (including the CT Transfer Act Forms as "Transferee" and "Certifying Party" solely if the Windsor, CT Property is a Purchased Asset and transferred to Purchaser); and

(h)    by wire transfer of immediately available funds, an amount equal to the Cash Deficiency Amount, if any.

3.4    <u>Termination of Agreement</u>.  This Agreement may be terminated as follows:

(a)    by the mutual written consent of the Sellers and the Purchaser at any time prior to the Closing;

(b)    by either the Purchaser or the Sellers, if the Closing shall not have been consummated on or prior to July 25, 2023 (the "**Outside Date**"); <u>provided</u>, <u>further</u>, that the right to terminate this Agreement under this <u>Section 3.4(b)</u> shall not be available to the Purchaser or the Sellers, as applicable, if the Purchaser or any Seller, as applicable, is then in material breach or violation of any of their respective representations, warranties, covenants or agreements under this Agreement and the delay is caused by such breaching party;

(c)     by either the Purchaser or the Sellers, if there shall be a permanent injunction, restraining order or decree of any nature of any Governmental Body that is in effect that prevents or prohibits the consummation of the transactions contemplated hereby;

(d)     by the Purchaser, if any of the Sellers seek an order of the Bankruptcy Court dismissing the Chapter 11 Cases or converting the Chapter 11 Cases to a case or cases under Chapter 7 of the Bankruptcy Code, or the Bankruptcy Court enters such an order for any reason (except with the Purchaser's prior written consent), or if any of the Sellers seek an order of the Bankruptcy Court appointing a trustee or examiner with expanded powers to operate or manage the financial affairs, the business or the reorganization of any Seller in the Chapter 11 Cases, or if any such appointment occurs for any reason;

(e)     by the Purchaser, if any Seller has entered into, or shall have publicly announced its intention (including by means of any filings made with the Bankruptcy Court or any other Governmental Body) to enter into, an agreement in principle, letter of intent, memorandum of understanding, definitive agreement or other arrangement, whether binding or non-binding, or whether subject to terms and conditions, with any Person (other than the Purchaser or its Affiliates) with respect to an Alternative Transaction except, subject to the terms of the Bidding Procedures, in the event that the entering into such agreement or document, or such announcement, relates to an Alternative Transaction with the Successful Bidder and the Purchaser elects to be, and is identified by the Sellers as, the Back-Up Bidder; provided, however, that the Purchaser shall have the right to terminate this Agreement pursuant to this Section 3.4(e) on or at any time after the 20th day following the date which is 20 days after the date of the entry of the Sale Order unless the Purchaser becomes the Successful Bidder on or prior to such date;

(f)     automatically, upon consummation of an Alternative Transaction;

(g)     by the Purchaser, (i) if any Seller shall have breached or failed to perform any of its representations, warranties, covenants or other obligations contained in this Agreement, or if any representation or warranty of any Seller in this Agreement shall have become untrue, and (ii) any such breach, failure to perform or occurrence referred to in clause (i) (A) would result in a failure of any condition set forth in Sections 9.1 or 9.3 and (B) is not curable or able to be performed, or, if curable or able to be performed, is not cured or performed prior to the later of (x) the Outside Date and (y) 10 Business Days after written notice of such breach, failure or occurrence is given to the Sellers by the Purchaser;

(h)     by the Sellers, (i) if the Purchaser shall have breached or failed to perform any of its representations, warranties, covenants or other obligations contained in this Agreement, or if any representation or warranty of the Purchaser in this Agreement shall have become untrue, and (ii) any such breach, failure to perform or occurrence referred to in clause (i) (A) would result in a failure of a condition set forth in Sections 9.1 or 9.2 and (B) is not curable or able to be performed, or, if curable or able to be performed, is not cured or performed prior to the later of (x) the Outside Date and (y) 10 Business Days after written notice of such breach, failure or occurrence is given to the Purchaser by the Sellers;

(i)     by the Purchaser, if all the conditions set forth in Section 9.1, Section 9.2 and Section 9.3 have been satisfied (other than conditions that by their nature are to be satisfied at

21

the Closing) or waived in writing and the Sellers fail to consummate the transactions contemplated hereby at the Closing;

(j)     by the Sellers, if all of the conditions set forth in <u>Section 9.1</u>, <u>Section 9.2</u> and <u>Section 9.3</u> have been satisfied (other than conditions that by their nature are to be satisfied at the Closing) or waived and the Purchaser fails to satisfy any portion of the Purchase Price;

(k)     by either the Purchaser or the Sellers, if, following the Sale Hearing, the Purchaser is not the Successful Bidder or the Back-Up Bidder;

(l)     by the Purchaser, if (i) following entry by the Bankruptcy Court of the Bidding Procedures Order, such order is (A) amended, modified or supplemented in any way without the Purchaser's prior written consent or (B) voided, reversed or vacated or is subject to a stay or (ii) following entry by the Bankruptcy Court of the Sale Order, the Sale Order is (A) amended, modified or supplemented in any way without the Purchaser's prior written consent or (B) voided, reversed or vacated or is subject to a stay;

(m)     by the Purchaser if for any reason the Purchaser is unable, pursuant to section 363(k) of the Bankruptcy Code, to credit bid the Credit Bid Amount in payment of clause (ii)(A) of the Purchase Price or to assume the Restructured Indebtedness in payment of clause (ii)(B) of the Purchase Price, in each case, as set forth in <u>Section 2.1</u>;

(n)     by the Purchaser if, prior to the earlier to occur of the Bid Deadline and the acceptance by Purchaser of the Disclosure Schedules and Wind-Down Budget pursuant to <u>Section 8.18</u>, Purchaser or the Prepetition Agent in their sole and absolute discretion shall have determined that the results of their legal, tax, accounting and business due diligence of the Sellers are not satisfactory;

(o)     by the Purchaser, if an "Event of Default" under the Cash Collateral Order shall have occurred and not have been waived in accordance with the terms of the Cash Collateral Order, subject to any applicable cure period; or

(p)     by the Purchaser, if any of the Bankruptcy Court Milestones are not met, unless otherwise extended by the Purchaser.

3.5     <u>Procedure Upon Termination</u>.  In the event of a termination of this Agreement by the Purchaser or the Sellers, or both, pursuant to <u>Section 3.4</u>, (a) written notice of such termination shall be given promptly by the terminating party to the other parties hereto, specifying the provision hereof pursuant to which such termination is made, (b) except as set forth in <u>Section 3.6</u>, this Agreement shall thereupon terminate and become void and of no further force or effect and (c) the consummation of the transactions contemplated by this Agreement shall be abandoned without further action of the parties hereto.  Any termination of this Agreement by the Purchaser or the Sellers, or both, pursuant to <u>Section 3.4</u> shall be effective on the date that written notice of such termination is given by the terminating party to the other parties hereto, and any automatic termination of this Agreement pursuant to <u>Section 3.4(f)</u> shall be effective on the date that an Alternative Transaction is consummated.

3.6    <u>Effect of Termination</u>.  In the event that this Agreement is validly terminated in accordance with <u>Section 3.4</u>, then this Agreement shall become null and void and of no further force or effect, and there shall be no Liability hereunder on the part of the Sellers, any of the Seller Parties, the Purchaser or any of the Purchaser Parties, except that the provisions of this <u>Section 3.6</u> and <u>Article 11</u>, and any defined terms used in such Section or Article, shall survive the termination of this Agreement for any reason indefinitely; <u>provided</u>, <u>however</u>, that if such termination shall have been caused by, or shall have resulted from, the material breach by a party of any of its representations, warranties, covenants or obligations set forth in this Agreement, then any such termination shall not relieve any such breaching or failing party for damages incurred or suffered by any other party as a result of any such breach or failure.  For the avoidance of doubt, if this Agreement is terminated in accordance with <u>Section 3.4</u>, the Purchaser shall not be obligated to (a) pay or assume any portion of the Purchase Price or (b) pay or make any other payments described herein that would be required to be paid or made if the transactions contemplated herein were consummated.

## ARTICLE 4

## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

Except as set forth in the Schedules referred to in this <u>Article 4</u>, the Sellers hereby, jointly and severally, make the representations and warranties in this <u>Article 4</u> to the Purchaser as of the Execution Date (except with respect to representations and warranties made as of a particular date, which shall be deemed to be made only as of such date).

4.1    <u>Organization and Qualification</u>.  Each Seller is a corporation or limited liability company (as applicable) duly incorporated or organized (as applicable), validly existing and in good standing under the Laws of its jurisdiction of incorporation or organization (as applicable). Each Seller is qualified and in good standing as a foreign corporation or limited liability company (as applicable) in each jurisdiction where the properties owned, leased or operated or the conduct of its Business require such qualification, except where the failure to be so qualified or licensed does not, individually or in the aggregate, have a Material Adverse Effect.  Each Seller has all requisite power and authority to own, lease and operate its properties and to carry on its Business as it is now being conducted, subject to the provisions of the Bankruptcy Code.

4.2    <u>Subsidiaries</u>.  <u>Schedule 4.2</u> sets forth each corporation, association or other entity in which Holdings owns, of record or beneficially, any direct or indirect equity interest or any right (contingent or otherwise) to acquire any equity interest.

4.3    <u>Authority Relative to this Agreement</u>.  Except for such authorization as is required from the Bankruptcy Court, each Seller has all requisite power and authority to (a) execute and deliver this Agreement, (b) execute and deliver each of the Seller Ancillary Agreements to be executed and delivered by such Seller, and (c) perform its obligations hereunder and under each of the Seller Ancillary Agreements to be executed and delivered by such Seller, and to consummate the transactions contemplated hereby and thereby.  The execution and delivery by each Seller of this Agreement and each of the Seller Ancillary Agreements to be executed and delivered by such Seller, and the consummation of the transactions contemplated hereby and thereby, have been duly authorized by all requisite action on the part of such Seller subject to the approval of the

23

Bankruptcy Court.  This Agreement has been, and at or prior to the Closing each of the Seller Ancillary Agreements will be, duly and validly executed and delivered by each Seller and (assuming the due authorization, execution and delivery by the other parties hereto and thereto, and the entry of the Sale Order) this Agreement constitutes, and each of the Seller Ancillary Agreements when so executed and delivered will constitute, legal, valid and binding obligations of each Seller, enforceable against such Seller in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at Law or in equity) (the "**Bankruptcy Exceptions**").

4.4     Conflicts; Consents and Approvals.

(a)     Except (x) as set forth on Schedule 4.4(a), (y) with respect to the CT Transfer Act (solely if the Windsor, CT Property is a Purchased Asset and transferred to Purchaser), and (z) assuming any applicable waiting period under the HSR Act has expired or been terminated, none of the execution and delivery by any Seller of this Agreement or any of the Seller Ancillary Agreements, the consummation of the transactions contemplated hereby or thereby, or compliance by any Seller with any of the provisions hereof or thereof will conflict with or result in a breach of any provision of (i) the Seller Organizational Documents, (ii) subject to and assuming entry of the Bidding Procedures Order and the Sale Order, any Material Contract to which such Seller is a party or by which such Seller or any of the Purchased Assets is bound, or (iii) subject to and assuming entry of the Bidding Procedures and the Sale Order, any applicable Law, other than, in the case of clauses (ii) and (iii) such conflicts or breaches that do not, individually or in the aggregate, have a Material Adverse Effect.

(b)     Except (x) as set forth on Schedule 4.4(b), (y) with respect to the CT Transfer Act (solely if the Windsor, CT Property is a Purchased Asset and transferred to Purchaser), and (z) and assuming any applicable waiting period under the HSR Act has expired or been terminated, no approval, order or Permit from, consent by, or registration, declaration, notification or filing with, any Governmental Body is required on the part of any Seller in connection with the execution and delivery by any Seller of this Agreement or any of the Seller Ancillary Agreements, or the consummation by any Seller of the transactions contemplated hereby or thereby (including the assumption by the Sellers of the Assigned Contracts and the assignment thereof to the Purchaser, but excluding the transfer of any Permit from a Seller to the Purchaser pursuant to this Agreement to the extent such transfer is prohibited by the terms of any such Permit or the Law governing the issuance of such Permit to such Seller and such prohibition cannot overridden by the Sale Order or other related order of the Bankruptcy Court), except for (i) the entry of the Bidding Procedures Order and the Sale Order and (ii) such other approvals, orders, Permits, consents, registrations, declarations, notifications or filings, the failure of which to obtain or make would not, individually or in the aggregate, reasonably be expected to be adverse in any material respect to the Purchased Assets or such Seller's or the Purchaser's ability to conduct the Business in the Ordinary Course of Business, in each case, taken as a whole.

4.5     Ordinary Course of Business.  Except (a) as required by the Bankruptcy Court, the Bankruptcy Code or applicable law, (b) as contemplated or expressly required or permitted by this Agreement, (c) as disclosed in the Unaudited Financial Statements, or (d) as set forth on Schedule

4.5, since the Balance Sheet Date, (i) the Business has been conducted in the Ordinary Course of Business, and (ii) other than the Chapter 11 Cases, no Material Adverse Effect has occurred.

4.6    Litigation.  Except for the Chapter 11 Cases, or as set forth on Schedule 4.6, there is no material litigation, action, claim, suit, proceeding, investigation, examination, hearing, arbitration, inquiry, subpoena or audit, whether in law or equity, or whether civil, criminal, regulatory, arbitral or administrative (collectively, "**Actions**"), pending or, to the Knowledge of the Sellers, threatened against any Seller or any property or asset of any Seller.  Except with respect to orders issued in the Chapter 11 Cases or as set forth on Schedule 4.6, no Seller is subject to any judgment, decree, injunction, subpoena, order, ruling, writ, assessment or award of any court, arbitration panel or other Governmental Body that relates to the Business, the Purchased Assets or the Assumed Liabilities.

4.7    Intellectual Property.

(a)    Schedule 4.7(a) lists (i) all of the patents, registered trademarks, registered copyrights, Internet domain names, and applications for any of the foregoing, in each case that constitute the Owned Intellectual Property, (ii) a list of all other material Owned Intellectual Property and (iii) a list of all Licensed Intellectual Property (except for Intellectual Property licensed pursuant to off the shelf software and licenses implied in the sale of such software).

(b)    Except as set forth on Schedule 4.7(b), (i)  the Sellers exclusively own all right, title and interest in and to the Owned Intellectual Property, free and clear from any Encumbrances (other than Permitted Encumbrances) and free from any requirement of any present or future royalty payments, license fees, charges or other payments, or conditions or restrictions whatsoever; and (ii) no Action is pending, or, to the Knowledge of the Sellers, threatened challenging the validity, enforceability, registration, ownership or use of any Seller Intellectual Property.

(c)    To the Knowledge of the Sellers, none of the Sellers nor any of their respective products or services are infringing upon, misappropriating, diluting or otherwise violating, the Intellectual Property of any third party and, to the Knowledge of the Sellers, no Person is infringing upon, misappropriating, diluting or otherwise violating, any Seller Intellectual Property.  Except as set forth on Schedule 4.7(c), there is no pending Action alleging that any Seller or any of its products or services is infringing, misappropriating, diluting or otherwise violating the Intellectual Property rights of any Person and, to the Knowledge of the Sellers, no such Actions are threatened.

(d)    To the Knowledge of the Sellers, all Seller Intellectual Property is valid and enforceable and has not been adjudged invalid or unenforceable, in whole or in part, and the Sellers have paid all renewal, maintenance, and other fees and taxes when due as required to maintain, protect, and enforce (as applicable) each and every registration and application of any applicable Seller Intellectual Property in full force and effect.  Schedule 4.7(d) lists all actions (including the payment of any fees) that are required to be made within 120 days of the date hereof to maintain or continue to prosecute all Seller Intellectual Property.

(e)      Except as set forth on <u>Schedule 4.7(e)</u>, to the Knowledge of the Sellers, the Sellers have the right to use the Licensed Intellectual Property as used in the conduct of the Business as currently conducted, free and clear of any Encumbrances (other than Permitted Encumbrances).  To the Knowledge of the Sellers, the Seller Intellectual Property together with the other Purchased Assets comprises all the Intellectual Property necessary for the Sellers to conduct and operate the Business in the Ordinary Course of Business.  The Sellers have not used open source licenses in a manner that would require the Sellers to make available or license the source for its proprietary software (if any) under the terms of an open source license.

(f)      The Sellers have taken all commercially reasonable actions to maintain and protect all of the Seller Intellectual Property and IT Assets and to protect and preserve the confidentiality of all trade secrets and other confidential information included in the Seller Intellectual Property, including requiring all Persons having access thereto to execute written non-disclosure agreements.  The Sellers have obtained from all employees and consultants who provide or provided services to the Sellers related to the creation, development, modification or ownership of trade secrets used in the Business, executed agreements under which such employees or consultants are or were required to convey to the Sellers ownership of all inventions and developments conceived or created by them in the course of their work for any of the Sellers.

(g)      The IT Assets are adequate in all material respects for the operation of the Business as currently operated and are in good working condition (normal wear and tear excepted). There has not been any material malfunction with respect to any of the IT Assets in the last three years that has not been remedied or replaced in all material respects.  The IT Assets include all of the information technology equipment necessary to operate the Business as presently conducted or proposed to be conducted.   To the Knowledge of the Sellers, the consummation of the transactions contemplated hereby will not result in the loss or impairment of or payment of additional amounts with respect to, nor require the consent of any other Person in respect of, the Purchaser's right to own, use or hold for use any of the IT Assets as owned, used or held for use in the conduct of the Business as currently conducted.

(h)      In connection with its collection, retention, storage, transfer (including any transfer across national borders) or use of any personally identifiable information from any individuals, including any customers, prospective customers, employees or other third parties (collectively, "**Personal Information**"), to the Knowledge of the Sellers, the Sellers have been in compliance with all Laws in all relevant jurisdictions, all applicable privacy policies and the requirements of any Contract or codes of conduct to which a Seller is a party or to which a Seller is bound or subject.  Each Seller has commercially reasonable physical, technical, organizational and administrative security measures and policies in place to protect all Personal Information collected or stored by it or on its behalf in connection with the Business from and against unauthorized access, use or disclosure.  In connection with the operation of the Business, each Seller is and has been in compliance in all material respects with its securities and policies regarding the collection and storage of Personal Information and all Laws relating to data loss, theft and breach of security notification obligations.  The Sellers have at all times contractually required all third parties, including vendors, Affiliates, and other persons providing services to the Sellers in connection with the Business that have access to or receive Personal Information from or on behalf of the Sellers to comply with all Laws relating to data loss, theft and breach of security notification obligations.  No Person (including any Governmental Body) has made any written

26

claim or commenced any Action relating to the Sellers' information privacy or data security practices, including with respect to the access, disclosure or use of Personal Information maintained by or on behalf of any Seller in connection with operation of the Business or, to the Knowledge of the Sellers, threatened any such Action or conducted investigation or inquiry thereof.  The Sellers have not, in the past three years, experienced any loss, damage, or unauthorized access, disclosure, use or breach of security of any Personal Information in its possession, custody or control, or otherwise held or processed on its behalf.

4.8     Material Contracts.

(a)     Schedule 4.8(a) sets forth, as of the Execution Date, the following types of Contracts that are unexpired as of the Execution Date to which a Seller is a party or a beneficiary or by which any of the Purchased Assets are bound (such Contracts set forth below are collectively referred to as the "**Material Contracts**"):

(i)     except for purchase orders, all Contracts requiring payments by or to a Seller in excess of $500,000 during (A) any 12-month period or (B) during the term of the Contract, if such term is less than 12 months, in each case, which Contract is not set forth in the following clauses (ii) through (xvii);

(ii)     all Accommodation Agreements;

(iii)     all collective bargaining agreements (and any other Contract with any labor organization, union or association);

(iv)     except for purchase orders, Contracts to which any Significant Vendor/Supplier is a party;

(v)     Each employment agreement, consulting agreement, severance agreement, change of control agreement and retention agreement, in each case requiring payments by a Seller in excess of $200,000 in any 12-month period;

(vi)     Contracts to which any officer, director or equity holder of a Seller, or any Affiliate of any such Person is a party;

(vii)     each Contract for the lease, sublease, license or use of any real property or any material Furniture and Equipment used or held for use in the Business, in each case requiring payments by a Seller in excess of $250,000 in any 12-month period;

(viii)     Contracts that (A) limit or restrict a Seller from engaging in any business or other activity in any jurisdiction or (B) create any exclusive relationship or arrangement;

(ix)     Contracts granting to any Person an option or a right of first refusal, first-offer or similar preferential right to purchase or acquire any of the Purchased Assets;

(x)     Contracts for the granting or receiving of a license, sublicense or franchise or under which any Person is obligated to pay or has the right to receive a royalty,

27

license fee, franchise fee or similar payment, in each case requiring payments by a Seller in excess of $250,000 in any 12-month period;

(xi)    Contracts (other than for commercially available off the shelf software) where a Seller is a licensor or licensee of Intellectual Property used in the operation of the Business, in each case requiring payments by a Seller in excess of $250,000 in any 12-month period;

(xii)    joint venture or partnership Contracts;

(xiii)    each Contract for capital expenditures or the acquisition or construction of fixed assets relating to the Business, the performance of which involves consideration in excess of $250,000 that is unpaid as of the Execution Date;

(xiv)    each Contract that provides for an increased payment or benefit, or accelerated vesting of any benefit, to any current or former employee of a Seller solely (and not in combination with any other event) as a result of the execution of this Agreement or the consummation of the transactions contemplated hereby;

(xv)    Contracts relating to the acquisition (by merger, consolidation or acquisition of stock or assets) of any Person or division thereof or collection of assets constituting all or substantially all of a business or business unit entered into at any time since December 31, 2019;

(xvi)    each Contract that is a requirements contract or other arrangement pursuant to which a Seller is obligated or otherwise required to obtain all or any portion of products or services exclusively from any Person;

(xvii)    each Contract that contains minimum purchase obligations (e.g., take-or-pay) or that contains penalties or repricing provisions if certain minimum quantities of products or services are not purchased; and

(xviii)  Contracts with any Governmental Body.

(b)    Assuming entry of the Bidding Procedures Order and the Sale Order and that all consents, approvals, notices and disclosures described on Schedule 4.4(a) and Schedule 4.4(b) are obtained or made (as applicable), (i) each Material Contract (other than any Material Contract that has expired or terminated in accordance with its terms after the Execution Date or that has been terminated not in violation of this Agreement) (x) constitutes a valid and binding obligation of the Seller party thereto and, to the Knowledge of the Sellers, each other party thereto and (y) is in full force and effect, except in each of the preceding clauses (x) and (y) as limited by Bankruptcy Exceptions, (ii) no Seller is in, or, to the Knowledge of the Sellers, alleged to be in, breach or default under any Material Contract, except for payment defaults for which estimated Cure Costs have been set forth on the Original Contract & Cure Schedule in accordance with Section 1.5(a) and such other breaches or defaults arising as a consequence of the commencement of the Chapter 11 Cases and (iii) assuming entry of the Sale Order, upon consummation of the transactions contemplated by this Agreement, each Material Contract shall continue in full force and effect without penalty or any adverse consequence to the Purchaser.

(c)     The Sellers have heretofore delivered or made available to the Purchaser copies of all Material Contracts that are in writing, including all amendments, modifications, schedules and supplements thereto and all waivers with respect thereto.

4.9     Permits.

(a)     Except as set forth on Schedule 4.9(a)(i), to the Knowledge of the Sellers, all of the material Permits that are necessary for the operation of the Business and the ownership or use of the Purchased Assets (collectively, the "**Material Permits**") are held by the Sellers and are in full force and effect.  Schedule 4.9(a)(ii) sets forth a list of all Material Permits held by the Sellers as of the Execution Date.

(b)     To the Knowledge of the Sellers, each Seller is in compliance with its respective obligations under each of the Material Permits and the rules and regulations of the Governmental Body issuing such Material Permits, and no condition exists that with notice or lapse of time or both would constitute a default under, or a violation of, any Material Permit.

(c)     Each Material Permit is valid and in full force and effect and there is no Action, written notice of violation, order of forfeiture or written complaint or investigation against any Seller relating to any of the Material Permits pending or, to the Knowledge of the Sellers, threatened before any Governmental Body.  To the Knowledge of the Sellers, none of the Material Permits will be terminated or otherwise adversely impacted by the transactions contemplated by this Agreement.

4.10     Brokers and Finders.  Except as set forth on Schedule 4.10, no Seller has employed any investment banker, broker, finder, consultant or intermediary in connection with the transactions contemplated by this Agreement which would be entitled to any investment banking, brokerage, finder's or similar fee or commission in connection with this Agreement or the transactions contemplated hereby.

4.11     Title to Assets.  Upon the entry and effectiveness of the Sale Order, the Sellers will have the power and right to sell, assign, transfer, convey and deliver to the Purchaser good and valid title (or, in the case of leased Purchased Assets, a valid and subsisting leasehold interest in), free and clear of any Encumbrances (except for Permitted Encumbrances), to all of the Purchased Assets, to the fullest extent permissible by Law and subject to the terms of Section 8.4.  The Purchased Assets constitute substantially all of the properties, assets and rights used by the Sellers for the Purchaser to conduct and operate the Business in the Ordinary Course of Business, other than the Excluded Assets.  To the Knowledge of the Sellers, all of the Purchased Assets are in operating condition and repair, reasonable wear and tear excepted and are capable of being used in the Ordinary Course of Business in the manner consistent with past practice.

4.12     [Reserved].

4.13     Real Property.

(a)     Schedule 4.13(a) sets forth a list of each real property owned by the Sellers (together with all buildings, fixtures, structures and improvements situated thereon and all easements, rights-of-way and other rights and privileges appurtenant thereto, collectively, the

"**Owned Real Property**"), including with respect to each property, the address location and use. To the extent in their possession, the Sellers have delivered to the Purchaser copies of the deeds and other instruments (as recorded) by which the applicable Seller acquired such Owned Real Property, and copies of all title insurance policies, opinions, abstracts and surveys in the possession of the Sellers with respect to such Owned Real Property.  With respect to each parcel of Owned Real Property: (i) the applicable Seller has valid fee simple title, free and clear of all Encumbrances, except for Permitted Encumbrances and those Encumbrances set forth on Schedule 4.13(a)(i); (ii) except as set forth on Schedule 4.13(a)(ii), Sellers have not leased or otherwise granted to any Person the right to use or occupy such Owned Real Property or any portion thereof; and (iii) to the Knowledge of the Sellers, there are no unrecorded outstanding options, rights of first offer or rights of first refusal to purchase such Owned Real Property or any portion thereof or interest therein.

(b)    Schedule 4.13(b)(i) sets forth a list of all Leased Real Property specifying the address of all such Leased Real Property and a description of all documents comprising the Assumed Real Property Leases.  Except as set forth on Schedule 4.13(b)(ii), no Seller has assigned, subleased, mortgaged, pledged or otherwise encumbered its interest under any Assumed Real Property Lease and no Seller has leased, subleased or granted to any Person the right to use or occupy any portion of such Seller's interest in the Leased Real Property that is not otherwise a Permitted Encumbrance or that will not otherwise be terminated on or prior to the Closing Date.

(c)    Except as a result of the filing of the Chapter 11 Cases or as set forth on Schedule 4.13(c), Sellers and, to the Knowledge of the Sellers, each of the other parties thereto has performed in all material respects all material obligations required to be performed by it under each Assumed Real Property Lease and each Assumed Real Property Lease is in full force and effect, not subject to any uncured material defaults and has not been amended, except as set forth on Schedule 4.13(b)(i).  No Seller has received any written notice of condemnation or eminent domain proceedings pending or threatened that affect any of the Assumed Leased Real Property or the Owned Real Property.  No Seller has received any written notice of any material zoning, ordinance, building, fire or health code or other material legal violation affecting any of the Assumed Leased Real Property or the Owned Real Property, except where any such violations would not, individually or in the aggregate, reasonably be expected to be adverse in any material respect to the Purchased Assets or to such Seller's or the Purchaser's ability to substantially conduct the Business in the Ordinary Course of Business.

4.14    Compliance with Law.  Except as set forth on Schedule 4.14, each Seller is in compliance in all material respects with all applicable Laws.  No Seller has received any written notice or, to the Knowledge of the Sellers, oral notice of any alleged violation of any Law applicable to it from any Governmental Body or third party, which remains pending or unresolved. No Seller is subject to, or in default in any respect with, any order of any Governmental Body applicable to the Business, the Purchased Assets or the transactions contemplated under this Agreement.  Except as set forth on Schedule 4.14, no investigations, inquiries, reviews or Actions by any Governmental Body with respect to the Business have been commenced nor, to the Knowledge of the Sellers, are any contemplated.

4.15    Tax Returns; Taxes.  Except as set forth on <u>Schedule 4.15</u>:

(a)    All material Tax Returns required to have been filed by the Sellers relating to the Business or the Purchased Assets have been duly and timely filed (taking into account applicable extensions) and are true, correct and complete in all material respects, and no material fact has been omitted therefrom.  No extension of time in which to file any such Tax Returns is currently in effect.

(b)    All material Taxes due and payable by the Sellers (whether or not shown on any Tax Return) relating to the Business or the Purchased Assets have been paid in full.

(c)    No claims have been asserted against the Sellers with respect to Taxes relating to the Business or the Purchased Assets that are being asserted in writing, proposed in writing or, to the Knowledge of the Sellers, threatened.  No proposals or deficiencies for any material amount of Taxes of the Sellers relating to the Business or the Purchased Assets are being asserted in writing, proposed in writing or, to the Knowledge of the Sellers, threatened, and no audit or investigation of any Tax Return of any Seller relating to the Business or the Purchased Assets has occurred in the last five years or is currently underway, or, to the Knowledge of the Sellers, pending or threatened.  No claim has ever been made against any Seller by any Governmental Body in a jurisdiction where such Seller does not file Tax Returns with respect to the Business or the Purchased Assets that such Seller is or may not be subject to taxation in such jurisdiction.

(d)    With respect to the Purchased Assets or the Business, the Sellers have withheld and paid all material Taxes required to have been withheld and paid by them to the appropriate Governmental Body in connection with amounts paid or owing to any current or former employee, independent contractor, creditor or shareholder thereof or other third party, and have substantially complied with their Forms W-2 and 1099 reporting obligations.  There are no Encumbrances for Taxes with respect to the Purchased Assets or the Business, nor is there any such Encumbrance that is, to the Knowledge of the Sellers, pending or threatened, in each case, other than Permitted Encumbrances.

(e)    No Seller has executed or filed with any Governmental Body any agreement or waiver extending the period for assessment, reassessment or collection of any material Taxes with respect to the Business or the Purchased Assets (other than any extension of time in which to file any income Tax Return).

(f)    No Seller is a party to or bound by any written tax sharing, tax indemnity or tax allocation agreement or other similar written arrangement with any other party that is not a Seller or an Affiliate of a Seller (other than any commercial agreement the principal subject matter of which is not Taxes).  No Seller has any Liability for Taxes with respect to the Business or the Purchased Assets of any other Person as a transferee or successor, by Law or by Contract.  No Seller has any liability for the Taxes of any other Person that is not a Seller of an Affiliate of a Seller under Treasury Regulation § 1.1502-6 or any similar provision of state, local or foreign Law (other than any liabilities with respect to being a member of a combined, consolidated, unitary, affiliated or other similar group in which a Seller is the parent).

(g)    No Acquired Entities will be required to include any material item of income in, or exclude any material item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of any: (i) change in method of accounting for a taxable period (or portion thereof) ending on or prior to the Closing Date; (ii) "closing agreement," as described in Code §7121 (or any corresponding provision of state, local, or non-U.S. income Tax Law); (iii) installment sale or open transaction made on or prior to the Closing Date; or (iv) prepaid amount received on or prior to the Closing Date.

(h)    The Sellers have collected all material sales and use Taxes required to be collected with respect to the Business or the Purchased Assets, and has remitted, or will remit on a timely basis, such amounts to the appropriate governmental authorities.

(i)    No Seller is or has been a party to any "listed transaction," as defined in Code §6707A(c)(2) and Treas. Reg. §1.6011-4(b)(2).

The representations set forth above in this Section 4.15 and any other representations that expressly refer to Taxes or Tax Law constitute the sole and exclusive representations and warranties made by the Sellers with respect to the matters set forth herein and no other representation or warranty contained in any other section of this Agreement shall be deemed to be made with respect to the same.

4.16    Benefit Plans.

(a)    Schedule 4.16(a) contains a list of each Seller Plan in effect as of the Execution Date.

(b)    The Sellers have delivered or made available to the Purchaser copies of all Assumed Seller Plans and related trust agreements, annuity contracts or other funding instruments and summary plan descriptions, if applicable.

(c)    Except as listed on Schedule 4.16(c), none of the Seller Plans is a "multiemployer plan" (as defined in Section 3(37) of ERISA), is or has been subject to Sections 4063 or 4064 of ERISA, or is or has been subject to Title IV of ERISA or Section 412 or 430 of the Code.  Neither any Seller nor any of its ERISA Affiliates has any Liability under Title IV of ERISA or Section 412 or 430 of the Code.  None of the Seller Plans is subject to any Laws outside of the United States.

(d)    Each Assumed Seller Plan has been established, administered and invested in accordance with its terms and in material compliance with all applicable Laws, include ERISA and the Code.  Each Seller has performed and complied in all material respects with all of its obligations under or with respect to the Assumed Seller Plans.  Each Assumed Seller Plan that is intended to be a "qualified plan" within the meaning of Section 401(a) of the Code ("**Qualified Plan**") and each trust that is intended to be exempt under Section 501 of the Code ("**Exempt Trust**") has received a determination or opinion letter from the Internal Revenue Service to the effect that such Qualified Plan is so qualified and such Exempt Trust is so exempt, and, to the Knowledge of the Sellers, nothing has occurred since the date of the most recent Internal Revenue Service determination or opinion letter, as applicable, that would adversely affect the tax-qualified status of any Qualified Plan or Exempt Trust.

(e)    There is no Action relating to, or seeking benefits under, any Assumed Seller Plan that is pending or, to the Knowledge of the Sellers, threatened against any Seller (other than any claims for benefits under the Assumed Seller Plans in the Ordinary Course of Business).

(f)    No Assumed Seller Plan provides post-retirement or post-termination employee benefits (including death, medical or health benefits) to or in respect of any current or former employees of any Seller or their beneficiaries, and no Seller has any obligation to provide such benefits other than COBRA continuation coverage.  All contributions or premiums required to be made by any Seller to or under each Assumed Seller Plan have been made in a timely fashion in accordance with applicable Law, and the terms of the applicable Assumed Seller Plan, and no Seller has, and as of the Closing Date will not have, any actual or potential unfunded Liabilities with respect to any Assumed Seller Plans.

(g)    Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby (alone and not in conjunction with any other event) will limit the ability of Purchaser to amend or terminate any Assumed Seller Plan.

4.17    Labor Matters.

(a)    To the extent permitted by applicable Law, a list of all of the employees of the Sellers as of the Execution Date, specifying their position, date of hire, hourly wage rate or annual base salary, bonus opportunity, and accrued vacation, sick leave time and other paid time off has been provided or made available to the Purchaser on or prior to the Execution Date.

(b)    No Seller is a party to or bound by, either directly or by operation of Law, any collective bargaining agreement, labor contract, letter of understanding, letter of intent, voluntary recognition agreement or legally binding commitment to any labor union, trade union or employee organization or group which may qualify as a trade union in respect of or affecting employees of any Seller, nor is any Seller subject to any union organization effort, nor is any Seller engaged in any labor negotiation.  There are no, and within the prior five years there have not been, any (i) strikes, work stoppages, work slowdowns or lockouts pending or, to the Knowledge of the Sellers, threatened against or involving any Seller, or (ii) unfair labor practice charges, grievances or complaints pending or, to the Knowledge of the Sellers, threatened by or on behalf of any current or former employee or group of employees of any Seller, which if adversely determined, would reasonably be expected to be adverse in any material respect to the Purchased Assets or to such Seller's or the Purchaser's ability to conduct the Business in the Ordinary Course of Business.  No Seller has any obligation to make any severance or termination payment to any current or former employees in excess of any amount required to be paid under applicable Law.

4.18    Insurance Policies.  Schedule 4.18 lists all insurance policies owned or held by any Seller that are applicable to the Business, the Purchased Assets or the Assumed Liabilities (the "**Insurance Policies**").  All Insurance Policies (or substitute policies with substantially similar terms) (i) are provided by carriers that are financially solvent, (ii) are in full force and effect, (iii) all premiums with respect thereto covering all periods up to and including the Execution Date have been paid (to the extent any such premium is due and payable), and (iv) no written notice of cancellation or termination (or any other threatened termination) has been received with respect to any such policy.  Except as set forth on Schedule 4.18, there are no pending or, to the Knowledge

33

of the Sellers, threatened claims under any Insurance Policy. Each Seller maintains sufficient insurance with reputable insurers for the Business, properties and assets of such Seller against all risks normally insured against, and in amounts normally carried, by such Seller in the Ordinary Course of Business.

4.19   <u>Environmental Matters</u>. Except as set forth on <u>Schedule 4.19</u>, (a) to the Knowledge of the Sellers, each Seller is in material compliance with all Environmental Laws, (b) to the Knowledge of the Sellers, there is no material investigation, suit, claim, judicial or administrative proceeding or other Action relating to or arising under Environmental Laws that is pending or, to the Knowledge of the Sellers, threatened against any Seller or Owned Real Property or Leased Real Property, (c) to the Knowledge of the Sellers, none of the Leased Real Property or Owned Real Property has been listed on the federal Comprehensive Environmental Response, Compensation Liability Information System (CERCLIS) database or any other similar federal, provincial or state list of known or suspected contaminated sites, (d) to the Knowledge of the Sellers, no Hazardous Materials have been treated, stored or Released by any Seller at the Leased Real Property or Owned Real Property in violation of any applicable Environmental Laws that have had, individually or in the aggregate, a Material Adverse Effect, (e) no Seller has received any notice of or entered into any order, settlement, judgment, injunction or decree with any Governmental Body involving uncompleted, outstanding or unresolved material obligations, Liabilities or requirements relating to or arising under Environmental Laws as of the Execution Date, (f) no consent of any Governmental Body shall be required pursuant to Environmental Laws in connection with the transfer of Owned Real Property pursuant to this Agreement, and (g) Sellers have made available to Purchaser all material environmental assessments, reports or audits that are in Sellers' possession, custody or control regarding environmental matters pertaining to Owned Real Property, Leased Real Property or compliance (or noncompliance) with Environmental Laws.

4.20   <u>Vendors and Suppliers</u>. <u>Schedule 4.20</u> lists all Significant Vendors/Suppliers. Copies of all written Contracts (other than purchase orders issued under a master agreement) with Significant Vendors/Suppliers have been provided or made available to the Purchaser. No Significant Vendor/Supplier has given any Seller written notice or, to the Knowledge of the Sellers, oral notice terminating, canceling or materially reducing, or threatening to terminate, cancel or materially reduce, any Contract or relationship with such Seller.

4.21   <u>Inventory</u>. The Sellers have managed their Inventory in the Ordinary Course of Business in light of the present and anticipated volume of the Business, including with respect to the usability, salability and merchantability thereof.

4.22   <u>Product Liability</u>.

(a)   To the Knowledge of the Sellers, during the three years prior to the date of this Agreement, the Business has not manufactured, sold or supplied products that contained any material defect in the design or manufacturing of such product and that did not comply in all material respects with (i) any express or implied product warranty or (ii) all applicable Laws. During the three years prior to the date of this Agreement, there has not been any material recall conducted by or on behalf of the Business, or, to the Knowledge of the Sellers, any investigation or inquiry by any Governmental Body concerning any product developed, designed, manufactured, processed, installed, sold, provided or placed in the stream of commerce by or on behalf of the

34

Business.  There are no known defects in design, construction or manufacture of products by the Business that would reasonably be expected to create an unusual risk of injury to persons or property and, to the Knowledge of the Sellers, no facts or conditions exist that would reasonably be expected to result in a product recall requirement.

(b)     Sellers have made available to the Purchaser a copy of the Business's standard warranty or warranties for sales of any and all products distributed or sold by the Business and, except as stated therein or as imposed by Law, there are no warranties, contractual commitments or contractual obligations with respect to the return, repair or replacement of any such products.  Schedule 4.22(b) sets forth the aggregate annual cost to the Business of performing warranty obligations for customers since 2019.

4.23    Financial Statements; Group Holdings.

(a)     The Sellers have delivered or made available to the Purchaser the following financial statements: (a) the audited consolidated balance sheet of Stanadyne PPT Group Holdings, Inc. as of December 31, 2021, and the related consolidated statement of operations, consolidated statements of shareholder's deficit, and cash flows for the fiscal year then ended (the "**Audited Financial Statements**"), and (b) the unaudited consolidated balance sheet of Holdings (the "**Most Recent Balance Sheet**") as of March 31, 2023 (the "**Balance Sheet Date**"), and the related unaudited consolidated statements of operations and consolidated statement of cash flows for the three-month period then ended (the "**Unaudited Financial Statements**" and, together with the Audited Financial Statements, the "**Financial Statements**").  Each of the Financial Statements (i) has been prepared in accordance with GAAP applied on a consistent basis throughout the periods covered thereby (subject, in the case of the Unaudited Financial Statements, to normal recurring year-end adjustments and the absence of all footnotes thereto); and (ii) fairly present, in all material respects, the consolidated financial position, results of operations and cash flows of Holdings and its subsidiaries as of the respective dates thereof and for the periods referred to therein.

(b)     Except as set forth on Schedule 4.23(b) no Seller has any Liabilities required by GAAP to be reflected or reserved on a consolidated balance sheet, except (i) Liabilities reflected on the liabilities side of the Most Recent Balance Sheet, (ii) Liabilities that have arisen after the Balance Sheet Date in the Ordinary Course of Business or otherwise in accordance with the terms and conditions of this Agreement, (iii) Liabilities of the type that are not required to be reflected on a balance sheet prepared in accordance with GAAP, (iv) Liabilities arising under the terms of (but not from any breach or default under) any Material Contract to which any Seller is a party; (v) Liabilities fully covered by insurance, indemnification, contribution or comparable arrangements; (vi) Liabilities addressed in any other representations or warranties (or Schedules) made by the Sellers herein (disregarding any thresholds specified therein); and (vii) Liabilities that are Excluded Liabilities.

(c)     Stanadyne PPT Group Holdings, Inc. does not own any assets or properties or engage in any business or activity other than (i) the ownership of the equity interests in Holdings, (ii) maintaining its corporate existence, (iii) participating in tax, accounting and other administrative activities as the parent of the consolidated group of companies, including the

Sellers, and (iv) activities incidental to the business or activities described in the foregoing clauses (i) through (iii).

4.24    Wind-Down Budget.  The Wind-Down Budget will be filed as a supplement to this Agreement and will be attached hereto as Annex I in accordance with Section 8.18.  The Wind-Down Budget will be prepared on a reasonable basis and in good faith and based on the assumptions in respect of the activities and costs and expenses to be incurred by the Seller's in winding down the Chapter 11 Cases believed by the Sellers to be reasonable at the time made and from the information then available to the Sellers.  In addition to the foregoing, the Wind-Down Budget will, among other things, provide for payment of any unpaid professionals' fees through and including the Closing Date in the Approved Budget, as such term is defined in the Cash Collateral Order.

4.25    Affiliate Transactions.  Except as set forth on Schedule 4.25, to the Knowledge of the Sellers, no Affiliate of the Sellers (other than any other Seller or any of their respective subsidiaries), or any officer or director of the Sellers or any of their subsidiaries or any member of their immediate family (a) has any material interest in any of the Purchased Assets, (b) owns any material interest in, or is an officer, director, employee or consultant of, any Person which is, or is engaged in business as, a material supplier or customer of the Business, (c) has any cause of action or other claim whatsoever against or related to the Business or the Purchased Assets, or (d) is party to any agreement or transaction with the Sellers or their subsidiaries, other than employment arrangements in the Ordinary Course of Business.

4.26    Sole Representations; Non-Reliance.  Except as expressly set forth in this Article 4 or any other Ancillary Agreements, the Sellers make no other representation or warranty with respect to the transactions contemplated by this Agreement or any other Ancillary Agreement. EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT (INCLUDING ANY DOCUMENTS, STATEMENTS, INFORMATION OR OTHER MATERIALS REQUIRED TO BE DELIVERED PURSUANT TO THIS AGREEMENT AND ANY OTHER ANCILLARY AGREEMENT), THE SELLERS HEREBY DISCLAIM ALL LIABILTIY AND RESPONSIBILITY FOR, AND THE PURCHASER SHALL NOT BE ENTITLED TO RELY ON, ANY REPRESENTATION, WARRANTY, PROJECTION, FORECAST, STATEMENT OR INFORMATION MADE, COMMUNICATED OR FURNISHED (ORALLY OR IN WRITING) TO PURCHASER OR ITS AFFILIATES OR THEIR RESPECTIVE REPRESENTATIVES (INCLUDING ANY OPINION, INFORMATION, PROJECTION OR ADVICE THAT MAY HAVE BEEN OR MAY BE PROVIDED TO PURCHASER BY ANY REPRESENTATIVE OR THE SELLERS OR ANY OF THEIR RESPECTIVE AFFILIATES). THE SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES TO THE PURCHASER REGARDING THE PROBABLE SUCCESS, PROFITABILITY OR VALUE OF ANY OF THE BUSINESS OR THE PURCHASED ASSETS.

## ARTICLE 5

## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser hereby makes the representations and warranties in this Article 5 to the Sellers as of the Execution Date (except with respect to representations and warranties made as of a particular date, which shall be deemed to be made only as of such date).

5.1     Organization and Qualification.  The Purchaser is a limited liability company, duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization. The Purchaser is qualified and in good standing as a foreign entity in each jurisdiction where the properties owned, leased or operated, or the business conducted by it require such qualification, except where the failure to be so qualified or in good standing would not, individually or in the aggregate, reasonably be expected to be adverse in any material respect to the Purchaser's ability to consummate the transactions contemplated by this Agreement.  The Purchaser has all requisite power and authority to own, lease and operate its properties and to carry on its business as it is now being conducted, except where the failure to have such requisite power or authority does not, individually or in the aggregate, have a material adverse effect on the Purchaser's ability to consummate the transactions contemplated by this Agreement and the Ancillary Agreements.

5.2     Authority Relative to This Agreement.  The Purchaser has the requisite limited liability company power and authority to (a) execute and deliver this Agreement, (b) execute and deliver each of the Purchaser Ancillary Agreements, and (c) perform its obligations hereunder and under each of the Purchaser Ancillary Agreements, and to consummate the transactions contemplated hereby and thereby.  The execution and delivery by the Purchaser of this Agreement and each of the Purchaser Ancillary Agreements, and the consummation of the transactions contemplated hereby and thereby, have been duly authorized by all requisite limited liability company action on behalf of the Purchaser.  This Agreement has been, and at or prior to the Closing each of the Purchaser Ancillary Agreements will be, duly and validly executed and delivered by the Purchaser and (assuming the due authorization, execution and delivery by the other parties hereto and thereto, and the entry of the Sale Order) this Agreement constitutes, and each of the Purchaser Ancillary Agreements when so executed and delivered will constitute, legal, valid and binding obligations of the Purchaser, enforceable against the Purchaser in accordance with their respective terms, subject to the Bankruptcy Exceptions.

5.3     Conflicts; Consents and Approvals.

(a)     Assuming any applicable waiting period under the HSR Act has expired or been terminated, none of the execution and delivery by the Purchaser of this Agreement or any of the Purchaser Ancillary Agreements, the consummation of the transactions contemplated hereby or thereby, or the compliance by the Purchaser with any of the provisions hereof or thereof will conflict with or result in a breach of any provision of (i) the limited liability company agreement (or similar organizational or governing documents) of the Purchaser, (ii) any Contract to which the Purchaser is a party or by which the Purchaser or any of its properties or assets is bound, or (iii) any applicable Law, other than, in the case of clauses (ii) and (iii), such conflicts or breaches that would not, individually or in the aggregate, reasonably be expected to be adverse in any material

respect to the Purchaser's ability to consummate the transactions contemplated by this Agreement and the Ancillary Agreements.

(b)      Assuming any applicable waiting period under the HSR Act has expired or been terminated, no approval, order or Permit from, consent by, or registration, declaration, notification or filing with, any Governmental Body is required on the part of the Purchaser in connection with the execution and delivery by the Purchaser of this Agreement or the Purchaser Ancillary Agreements, or the consummation by the Purchaser of the transactions contemplated hereby or thereby, except for such approvals, orders, Permits, consents, registrations, declarations, notifications or filings the failure of which to obtain or make would not, individually or in the aggregate, reasonably be expected to be adverse in any material respect to the Purchaser's ability to consummate the transactions contemplated by this Agreement and the Ancillary Agreements.

5.4      <u>Litigation</u>.    There are no material Actions pending or, to the knowledge of the Purchaser, threatened against the Purchaser which, if adversely determined, would reasonably be expected to be adverse in any material respect to the Purchaser's ability to consummate the transactions contemplated by this Agreement.   The Purchaser is not subject to any judgment, decree, injunction, subpoena, order, ruling, writ, assessment or award of any court, arbitration panel or other Governmental Body which would reasonably be expected to be adverse in any material respect to the Purchaser's ability to consummate the transactions contemplated by this Agreement.

5.5      <u>Brokers and Finders</u>.    The Purchaser has not employed any investment banker, broker, finder, consultant or intermediary in connection with the transactions contemplated by this Agreement which would be entitled to any investment banking, brokerage, finder's or similar fee or commission in connection with this Agreement or the transactions contemplated hereby.

5.6      <u>Financial Ability; Solvency</u>.    The Purchaser has as of the date hereof and will have at and as of the Closing sufficient cash on hand or other sources of immediately available funds to enable it to make payment of the Cash Deficiency Amount and any other amounts due hereunder when due so as to consummate the transactions contemplated hereby, including satisfaction of all of the Assumed Liabilities and payments of the Determined Cure Costs.   The Purchaser is, and after giving effect to the consummation of the transactions contemplated hereby, will continue to be, solvent.   As of the date hereof, the Purchaser has no reason to believe that the representations contained in this <u>Section 5.6</u> will not be true at and as of the Closing Date.

5.7      <u>Sole Representations</u>.    Except as expressly set forth in this <u>Article 5</u> or any other Ancillary Agreement, the Purchaser makes no other representation or warranty with respect to the transactions contemplated by this Agreement or any other Ancillary Agreement.    THE PURCHASER SPECIFICALLY ACKNOWLEDGES AND AGREES THAT, EXCEPT FOR THE REPRSENTATIONS AND WARRANTIES OF THE SELLERS SET FORTH IN <u>ARTICLE 4</u> HEREOF, THE SCHEDULES AND ANY DOCUMENTS FILED IN THE BANKRUPTCY CASE WHICH HAVE BEEN SIGNED BY AN AUTHORIZED REPRESENTATIVE OF THE SELLERS, (X) THE PURCHASER IS ACQUIRING THE PURCHASED ASSETS ON AN "AS IS, WHERE IS" BASIS, AND (Y) NEITHER THE SELLERS NOR ANY OTHER PERSON IS MAKING, AND THE PURCHASER IS NOT RELYING ON, ANY OTHER REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, WHETHER

38

ORAL OR WRITTEN, EXPRESS OR IMPLIED, STATUTORY OR OTHERWISE, AS TO ANY MATTER CONCERNING THE SELLERS OR THE PURCHASED ASSETS OR ASSUMED LIABILITIES, THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY, OR THE ACCURACY OF COMPLETENESS OF ANY INFORMATION PROVIDED TO (OR OTHERWISE ACQUIRED BY) THE PURCHASER.

## ARTICLE 6

## EMPLOYEES

6.1   <u>Employee Offers</u>.   On or prior to the Closing Date, the Purchaser shall offer employment (on an "at will" basis) with the Purchaser or one of its Affiliates to the employees of the Sellers as determined by the Purchaser in its sole and absolute discretion.   Each such offer of employment to a potential Transferred Employee shall be on terms and conditions satisfactory to the Purchaser and such potential Transferred Employee; <u>provided</u>, <u>however</u>, that with respect to Transferred Employees who enter into written employment Contracts with the Purchaser on or prior to the Closing (the "**New Employment Contracts**"), if any, the terms of such New Employment Contracts shall govern such Transferred Employee's employment.   In addition, any offer of employment to any such employee of the Sellers who is a party to a written employment Contract with a Seller that entitles such employee to severance upon a termination of employment by such Seller will require, as a condition to the acceptance of such offer of employment, that such employee waive in writing his or her right to receive such severance from the Sellers and the Purchaser; <u>provided</u>, <u>however</u>, that the Purchaser shall be entitled to waive such condition if such employee does not agree to provide such waiver.   Notwithstanding the foregoing, nothing in this Agreement will, after the Closing Date, impose on the Purchaser any obligation to retain any Transferred Employee in its employment or the employment of any of its Affiliates.   Except as described in the remaining sentences of this <u>Section 6.1</u>, the employment of each Transferred Employee with the Purchaser or any of its Affiliates will commence immediately upon, and is subject to the occurrence of, the Closing.   In the case of any Transferred Employee who is absent from active employment and receiving short-term disability or workers' compensation benefits, or is otherwise out of work on an approved leave of absence as set forth above, the employment of such Transferred Employee with the Purchaser or its designated Affiliate will commence upon his or her return to active work, and such individual will become a Transferred Employee as of such date (but only if the Closing occurs).   The Sellers shall not and shall not authorize or direct any of their Affiliates, officers, directors or employees to (x) interfere with the Purchaser's right to make offers pursuant to this <u>Section 6.1</u>, (y) solicit or encourage any employees of the Sellers who receive an offer from the Purchaser pursuant to this <u>Section 6.1</u> to not accept or otherwise reject any such offer or (z) voluntarily terminate any employee of Sellers (except for any employee that the Purchaser does not make an offer of employment to on or prior to the Closing Date) without the prior written consent of the Purchaser, except in the case of termination for cause.   The Sellers shall, subject to applicable Law, provide cooperation and information to the Purchaser as reasonably requested by the Purchaser in writing regarding its determination of appropriate terms and conditions of employment for any potential Transferred Employees.   Notwithstanding anything to the contrary herein, subject to applicable Law and except as expressly provided in <u>Section 1.3</u> (but subject to the limitations set forth therein), the Purchaser shall have no Liability with respect to any past, present or future employee of any Seller.

6.2     <u>Assumed Seller Plans</u>.  Except as otherwise set forth in this <u>Section 6.2</u>, the Purchaser shall adopt and assume, as of the Closing Date, each of the Assumed Seller Plans with respect to all benefits to be provided under the provisions of such Assumed Seller Plans that are Assumed Liabilities.  With respect to each Assumed Seller Plan, the Purchaser or any Person designated by the Purchaser, will be substituted for the applicable Seller as the plan sponsor under each such Assumed Seller Plan and the Purchaser shall have all rights of such Seller thereunder, including full authority to maintain, amend or terminate any such Assumed Seller Plan in accordance with its terms at any time, in the Purchaser's sole and absolute discretion.  The Sellers agree to reasonably cooperate with the Purchaser in adopting and effectuating any plan amendments to the Assumed Seller Plans reasonably desired by the Purchaser, so long as such amendments are effective as of, or after, the Closing Date and are consistent with applicable Law.  The parties agree to reasonably cooperate in all respects and take any actions necessary to implement the assumption by the Purchaser of the Assumed Seller Plans.  Without limiting the obligations of the Sellers under <u>Section 1.1</u> or the rights of Purchaser under <u>Section 8.2</u>, before, or as soon as administratively practicable after, the Closing, the Sellers will, or will direct the applicable third-party administrator or recordkeeper to, supply the Purchaser with (a) all records concerning participation, vesting, accrual of benefits, payment of benefits, and election forms of benefits under each Assumed Seller Plan, and (b) any other information reasonably requested in writing by the Purchaser as necessary or appropriate for the administration of each Assumed Seller Plan.  Notwithstanding the foregoing, the Purchaser shall not assume any Liabilities arising out of any acts or omissions of any of the Sellers or any fiduciaries or trustees of any Assumed Seller Plan occurring on or prior to the Closing Date in connection with the operation or administration of such Assumed Seller Plan.  Sellers shall retain all Liabilities for (i) the payment or provision of severance or similar benefits in connection with the termination of employment of any Transferred Employee as of the Closing Date, the termination of employment of any current or former employee of a Seller who is not a Transferred Employee (whether before, as of, or after the Closing Date) and (ii) the payment or provision of any change in control payment, transaction bonus or similar benefits arising as a result of the transactions described herein, and no such Liabilities shall be assumed by the Purchaser under this <u>Section 6.2</u>, <u>Section 1.3</u> or otherwise.

6.3     <u>WARN Act Liability</u>.  Except as set forth on <u>Schedule 6.3</u>, no Seller has, within 90 days prior to the date of this Agreement, terminated any employees for any reason, closed any plant or facility, effectuated any layoffs of employees or implemented any early retirement, separation or similar program (regardless of whether such termination would trigger any obligations under the WARN Act), nor has any Seller announced any such action or program for the future.  The Sellers shall be solely responsible, on a joint and several basis, for any obligations or other Liabilities under the WARN Act, or under any similar provision of any federal, state, provincial, regional, foreign or local Law, that might arise on or prior to the Closing Date, or as a consequence of the transactions contemplated by this Agreement, including providing any notice of layoff or plant closing, or maintaining the employees of any Seller on such Seller's payroll for any period of notice required by the WARN Act, or under any similar provision of any federal, state, provincial, regional, foreign or local Law.  The Sellers shall retain all Liabilities, if any, for any severance or termination costs relating to employees of any Seller who, on or prior to the Closing Date, experience a termination of employment by any Seller as a result of the transactions contemplated by this Agreement.

6.4    No Third-Party Beneficiaries.

(a)    Notwithstanding anything set forth in this Article 6, nothing contained herein, whether express or implied, (i) shall be treated as an amendment or other modification of any Seller Plan or (ii) shall limit the right of the Purchaser or any of its Affiliates to amend, terminate or otherwise modify any Seller Plan or any of the Purchaser's or any of its Affiliate's employee benefit plans or programs following the Closing Date.

(b)    Without limiting the generality of Section 11.12, the Sellers and the Purchaser acknowledge and agree that all provisions contained in this Article 6 with respect to current and former employees of the Sellers are included for the sole benefit of the Sellers and the Purchaser, and that nothing herein, whether express or implied, shall create any third party beneficiary or other rights (i) in any other Person, including any current or former employees, directors, officers or consultants of any Seller, any participant in any Seller Plan, or any dependent or beneficiary thereof, or (ii) to employment or continued employment with the Purchaser or any of its Affiliates.

## ARTICLE 7

## BANKRUPTCY COURT MATTERS

7.1    Competing Bids.  This Agreement and the transactions contemplated hereby are subject to the Sellers' right and ability to consider higher or better competing bids with respect to the Business and the Purchased Assets pursuant to the Bidding Procedures, as approved by the Bidding Procedures Order; provided, that the exercise of such right shall be exercised solely in compliance with, and not in a manner inconsistent with, the Bidding Procedures, as approved by the Bidding Procedures Order.

7.2    Bankruptcy Court Filings.  The Sellers shall use best efforts to obtain entry of the Bidding Procedures Order and the Sale Order.  The Purchaser agrees that it will take such actions as are reasonably requested by the Sellers to assist in obtaining entry of the Bidding Procedures Order and the Sale Order and a finding of adequate assurance of future performance by the Purchaser of the Assigned Contracts, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by the Purchaser under this Agreement and demonstrating that the Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code. Sellers shall consult with the Purchaser and its representatives concerning any order of the Bankruptcy Court relating to this Agreement or the Chapter 11 Cases and provide the Purchaser with copies of all applications, pleadings, notices, proposed orders and other documents relating to such proceedings as soon as reasonably practicable prior to any submission thereof to the Bankruptcy Court and consider in good faith any of the Purchaser's comments thereto.  If any order of the Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or re-argument shall be filed with respect to any such order), Sellers shall diligently defend against such appeal, petition or motion and shall use their best efforts to obtain an expedited resolution of any such appeal, petition or motion; provided, that Sellers shall consult with the Purchaser regarding the status of any such actions.  Any changes to the form of the

Bidding Procedures Order or the Sale Order must be approved by the Purchaser. Sellers further covenant and agree that, after the Closing, the terms of any reorganization plan submitted to the Bankruptcy Court or any other court by or with the support of Sellers for confirmation shall not conflict with, supersede, abrogate, nullify or restrict the terms of this Agreement, or in any way prevent or interfere with the consummation or performance of the transactions contemplated by this Agreement. Without in any way limiting the foregoing, from and after the date hereof until the later to occur of (i) the Designation Deadline latest in time under this Agreement, (ii) the date that is 90 days after the Closing Date and (iii) the expiration or termination of any TSA, no Seller shall voluntarily convert its Chapter 11 Case to a Chapter 7 bankruptcy case, or otherwise cause a liquidation or equivalent event with respect to any Seller, or seek the dismissal of the Chapter 11 Cases or the appointment of a trustee or examiner with expanded powers to operate or manage the financial affairs, the business or the reorganization of any Seller in any of the Chapter 11 Cases, without the Purchaser's prior written consent.

7.3    <u>Bankruptcy Court Milestones</u>. Sellers shall comply with the following timeline ("**Bankruptcy Court Milestones**"):

(a)    as promptly as practicable after the date hereof, but in any event within two Business Days, the Sellers shall have filed the Sale Motion, including this Agreement;

(b)    no later than May 18, 2023, the Bankruptcy Court shall have, each in form and substance acceptable to the Purchaser and the Prepetition Agent, (x) approved the (i) Bidding Procedures and (ii) the form and manner of notice of the sale, assumption and assignment of executory contracts and unexpired leases and (y) scheduled the Auction and Sale Hearing;

(c)    the final date for submitting a qualified bid, as set forth in the approved Bidding Procedures, shall be a date no later than June 21, 2023 (the "**Bid Deadline**");

(d)    so long as at least one qualified bid has been received (other than from Purchaser) the Auction shall be a date no later than June 28, 2023;

(e)    no later than July 10, 2023, the Sale Hearing shall have occurred; and

(f)    no later than July 11, 2023, the Bankruptcy Court shall have approved the transactions contemplated by this Agreement and shall have entered the Sale Order.

# ARTICLE 8

# COVENANTS AND AGREEMENTS

8.1    <u>Conduct of Business of the Sellers</u>.

(a)    During the period from the Execution Date and continuing until the earlier of the termination of this Agreement in accordance with <u>Section 3.4</u> and the Closing Date, except (1) as required by the Bankruptcy Court, the Bankruptcy Code or other applicable Law, (2) as otherwise expressly contemplated by this Agreement or as set forth on <u>Schedule 8.1(a)</u>, or (3) with

the prior written consent of the Purchaser (not to be unreasonably withheld, conditioned or delayed), each Seller shall:

(i)     conduct the Business and operate and maintain its assets and properties in the Ordinary Course of Business (including performing its obligations under the Material Contracts) in all material respects except for such actions as are in accordance with Section 7.1;

(ii)    use commercially reasonable efforts to keep available the services of its employees in the Ordinary Course of Business;

(iii)   maintain and keep its properties and Furniture and Equipment in operating order and condition (normal wear and tear excepted) consistent with past practice;

(iv)    maintain in full force and effect the Insurance Policies;

(v)     use its commercially reasonable efforts to (x) preserve the goodwill of and relationships with Governmental Bodies, customers, suppliers, vendors, lessors, licensors, licensees, contractors, distributors, insurers, agents, employees and others having business dealings with such Seller in connection with the Business; and (y) comply with all applicable Laws (including Environmental Laws) and Permits and, to the extent consistent therewith, preserve its assets (tangible and intangible);

(vi)    comply with the terms and conditions of the Cash Collateral Order; and

(vii)   remain in material compliance with all privacy policies of the Sellers that are in place as of the date of this Agreement.

(b)     During the period from the Execution Date and continuing until the earlier of the termination of this Agreement in accordance with Section 3.4 and the Closing Date, except (1) as required by the Bankruptcy Court, the Bankruptcy Code or other applicable Law, (2) as otherwise expressly contemplated by this Agreement or as set forth on Schedule 8.1(b), or (3) with the prior written consent of the Purchaser (not to be unreasonably withheld, conditioned or delayed), no Seller shall:

(i)     acquire any material assets, tangible or intangible, other than in the Ordinary Course of Business;

(ii)    sell, lease, transfer or assign any material assets or properties, tangible or intangible, other than (x) sales of Inventory in the Ordinary Course of Business, or (y) the disposition of obsolete or immaterial assets not necessary for the conduct of the Business by the Sellers in the Ordinary Course of Business;

(iii)   accelerate, terminate (other than at its stated expiry date), extend, modify or amend in any material respect or cancel any Material Contract, any leases or subleases for Leased Real Property or any Contract that would be a Material Contract if in effect on the Execution Date; waive, release or assign any material rights or claims under any Material Contract,

43

any leases or subleases for Leased Real Property or any Contract that would be a Material Contract if in effect on the Execution Date; or enter into any lease or sublease or any Contract that would have been a Material Contract or lease or sublease for Leased Real Property had it been entered into prior to the Execution Date;

(iv)    impose, suffer or create any Encumbrance (other than Permitted Encumbrances) upon any of the Purchased Assets;

(v)    incur or make any capital expenditures in excess of $3,000,000 in the aggregate;

(vi)    transfer, assign, abandon, dispose, permit to lapse or grant any license or sublicense of, or any rights to use, any rights under or with respect to any Seller Intellectual Property, other than pursuant to license agreements entered into in the Ordinary Course of Business; take any action or knowingly fail to take any action that would reasonably be expected to result in the abandonment, cancellation or unenforceability of any Seller Intellectual Property; or enter into any settlement regarding breach or infringement of any Seller Intellectual Property, or disclose to any Person (not an employee of the Sellers) any Seller Intellectual Property not heretofore a matter of public knowledge;

(vii)    agree to any change in the rate of compensation, commission, bonus or other direct or indirect remuneration payable pay any bonus, incentive, retention or other compensation, retirement, welfare, fringe or severance benefit or vacation pay, to or in respect of, any executive officers or employees of such Seller;

(viii)    adopt, make or agree to (x) any welfare, pension, retirement, profit sharing, incentive compensation or similar plan, program, payment or arrangement for any current or former director, employee or consultant, except pursuant to the existing Seller Plans, or (y) any new employment, severance or change of control agreement;

(ix)    except as required by applicable Law or as expressly contemplated by this Agreement, with respect to the Purchased Assets, (A) make, revoke, amend or change any Tax election; (B) change any Tax accounting elections, methods, principles or practices, except insofar as may be required by GAAP or Law (or any interpretation thereof), (C) settle or otherwise finally resolve any audit or other proceeding with respect to Taxes, (D) amend any Tax Return with respect to a material amount of Taxes; or (E) surrender any right to claim a refund of Taxes, in each case, that would have the effect of increasing the tax liability of the Purchaser or the Acquired Entities;

(x)    make any material addition to, or modification of, any Seller Plan, other than (x) contributions to any Seller Plan made in the Ordinary Course of Business or (y) the extension of coverage to employees of such Seller who became eligible after the Execution Date;

(xi)    make any distributions or dividends of any Cash and Cash Equivalents, assets or properties of the Sellers in respect of outstanding securities of the Sellers;

(xii)    [Reserved];

44

(xiii)   institute, settle or agree to settle any litigation, proceeding or other Action before any court or other Governmental Body;

(xiv)   agree to any limitations on such Seller or any of its subsidiaries from engaging or competing in any line of business or in any geographic area or location or otherwise with any Person or from soliciting or hiring any Person;

(xv)   make any material change in the nature of the Business;

(xvi)   fail to pay when due any material (individually or in the aggregate with all other such unpaid Liabilities) post-Petition Date Liabilities arising out of the operations of the Business, except with respect to any such post-Petition Date Liabilities being contested in good faith and for which adequate reserves have been established in accordance with GAAP;

(xvii)   cancel, terminate or materially modify any insurance policy naming any Seller as an insured, beneficiary or a loss payable payee (except if a separate, substantially similar insurance policy will be entered into);

(xviii)   assume or enter into any labor or collective bargaining agreement;

(xix)   modify any privacy policies, notices or statements in a manner that limits the ability or right of any Seller to sell and transfer the Personal Information or other customer data to the Purchaser as contemplated herein, or limits the use of the Personal Information or other customer data by the Purchaser after the Closing;

(xx)   amend or change, as applicable, any of the Seller Organizational Documents; or

(xxi)   enter into any Contract to take any of the actions prohibited by the foregoing clauses (b)(i) through (b)(xix).

8.2     Access to Information.  From the Execution Date until the earlier of the Closing and the termination of this Agreement in accordance with Section 3.4, each of the Sellers shall afford the officers, directors, employees, auditors and other agents and representatives of the Purchaser (such people, with respect to any Seller or the Purchaser, as applicable, the "**Representatives**") access, during normal business hours and upon advance written notice to (a) the employees, the properties, offices and other facilities of the Sellers and, (b) to the extent not prohibited by Law, all books and records, facilities, Contracts and all financial, operating and other data and information, with respect to the Business that are in the possession of the Sellers, in each case, as the Purchaser may reasonably request.  In exercising its rights hereunder, the Purchaser and its Representatives shall conduct itself so as not to interfere in the conduct of the business of the Sellers prior to the Closing.

8.3     Notice of Certain Events.  Sellers shall notify the Purchaser in writing as promptly as practicable upon becoming aware of, and furnish the Purchaser any information it may reasonably request with respect to, any of the following: (a) the occurrence or nonoccurrence of any event or condition or the existence of any fact that would reasonably be expected or likely to (i) result in, the failure of any of the conditions set forth in Section 3.4 to be satisfied, (ii)

individually or in the aggregate, result in a Material Adverse Effect; provided, however, that the delivery of any notice pursuant to this Section 8.3 shall not limit or otherwise affect the remedies available to the Purchaser under this Agreement; (b) any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement; (c) any notice or other communication from any Governmental Body in connection with the transactions contemplated by this Agreement; and (d) (i) the damage or destruction by fire or other casualty of any Purchased Asset or part thereof; (ii) a Release of Hazardous Material in violation of Environmental Laws at, from or onto any property owned or operated by the Sellers or the Business; (iii) a disclaimer or denial of coverage issued by any insurance company with respect to any claim submitted by the Sellers under any of the Insurance Policies; or (iv) any Purchased Asset or part thereof becoming the subject of any proceeding (or, to the Knowledge of the Sellers, threatened proceeding) for the taking thereof or of any right relating thereto by condemnation, eminent domain or other similar governmental action.

8.4     Assignability of Certain Purchased Assets.

(a)     To the extent that the assignment to the Purchaser of any Purchased Asset (including any Assigned Contracts or any Permits included in the Purchased Assets) pursuant to this Agreement is not permitted without the consent, waiver, confirmation or other approval of a third party or is prohibited by applicable Law and such consent, waiver, confirmation or other approval or waiver of such prohibition in compliance with Law cannot be obtained prior to the Closing or overridden or canceled by the Sale Order or other related order of the Bankruptcy Court (such Purchased Assets, the "**Nonassignable Assets**"), then this Agreement will not be deemed to constitute an assignment of or an undertaking or attempt to assign such Nonassignable Asset or any right or interest therein unless and until such consent, waiver, confirmation or other approval is obtained or such prohibition is waived in compliance with Law.  If any such consent, waiver, confirmation or other approval or waiver of such prohibition is not obtained prior to the Closing Date in respect of a Nonassignable Asset, then, solely to the extent not prohibited under applicable Law (including the Bankruptcy Code) or the terms of such Nonassignable Asset, the Purchaser and the Sellers shall reasonably cooperate with each other, as of and after the Closing Date, in any lawful and feasible arrangement designed to provide the Purchaser with the benefits of, or under, the applicable Nonassignable Asset, including enforcement for the benefit of the Purchaser of any and all rights of the Sellers against any party to the applicable Nonassignable Asset arising out of the breach or cancellation thereof by such party (an "**Interim Arrangement**").  The Purchaser shall be responsible for performing all obligations under each such Nonassignable Asset required to be performed by the Sellers after the Closing Date to the extent that if such Nonassignable Asset were transferred and assigned to the Purchaser as of the Closing Date, the obligations thereunder would have constituted Assumed Liabilities.  Unless the Purchaser elects that it does not desire assignment of a Nonassignable Asset, following the Closing, the Sellers and the Purchaser shall cooperate using their respective commercially reasonable efforts to obtain as expeditiously as possible the applicable consent, waiver, confirmation or other approval with respect to each Nonassignable Asset or a waiver of any prohibition under applicable Law necessary for the assignment thereof to the Purchaser.  Nothing in this Section 8.4(a) shall obligate the Purchaser to waive any right or condition under this Agreement.

(b)    The Sellers shall, prior to and after the Closing, reasonably cooperate and comply with all reasonable requests of the Purchaser and use its commercially reasonable efforts to do any one or more of the following (at the Purchaser's election in its sole and absolute discretion) with respect to any or all of the Permits that are held by the Sellers or that are advisable, necessary, or required by Law to own, lease and operate the Purchased Assets and to own, operate and conduct the Business in the Ordinary Course of Business: (i) transfer or assign such Permits to the Purchaser; (ii) allow the Purchaser to obtain or acquire such Permits; (iii) enter into Interim Arrangements on terms and conditions reasonably satisfactory to the Purchaser to allow the Purchaser to operate the Business under or with respect to the Permits held by or on behalf of any Seller (in which case the Sellers shall keep and maintain the corresponding Permits in accordance therewith); and (iv) make such other arrangements as may be reasonably requested by the Purchaser to accomplish the intentions and objectives of this Agreement.

8.5    <u>Contracts and Permits</u>.

(a)    From the Execution Date until the applicable Designation Deadline, without the prior written consent of the Purchaser, (i) no Seller shall reject any Contract (other than any Contract that is excluded and rejected on or after the Closing Date in accordance with <u>Section 1.5</u>) in the Chapter 11 Cases or any other bankruptcy proceeding or terminate, amend, supplement, modify or waive any rights under, or create any Encumbrance (except for Permitted Encumbrances) with respect to any Contract, or take any affirmative action not required by the terms thereof, and (ii) Sellers shall hold all Permits and other assets (other than any Permit or other asset that is excluded and rejected on or after the Closing Date in accordance with <u>Section 1.5</u>) specified by the Purchaser in writing in abeyance pending designation for assignment or exclusion by the Purchaser in accordance with <u>Section 1.5</u>.

(b)    From the Execution Date the Sellers shall (i) as promptly as practicable disclose to the Purchaser in writing after it becomes Knowledge of the Sellers that there is any material failure of any of the Sellers to comply with or satisfy any of their respective covenants, conditions or agreements to be complied with or satisfied by it under this Agreement in any material respect; <u>provided</u>, <u>however</u>, that the delivery of any notice pursuant to this <u>Section 8.5(b)</u> shall not limit or otherwise affect the remedies available to the Purchaser after receiving such notice under this Agreement; and (ii) without in any way limiting the Purchaser's rights under <u>Section 8.1(b)</u>, keep the Purchaser timely apprised of all communications and inquiries, including all offers and reports, regarding the restructuring, modification, assignment or termination of any of the leases or subleases for the Leased Real Property.

8.6    <u>Further Agreements</u>.  Each Seller shall (a) as promptly as practicable deliver to the Purchaser any mail or other communication received by such Seller after the Closing Date and relating to the Business, the Purchased Assets or the Assumed Liabilities, (b) as promptly as practicable transfer in immediately available funds to the Purchaser any cash, electronic credits or deposits received by such Seller to the extent that such cash, electronic credits or deposits are Purchased Assets, including any Surplus Cash, and (c) as promptly as practicable forward to the Purchaser any checks or other instruments of payment that it receives to the extent that such checks or other instruments are Purchased Assets.  The Purchaser shall (i) as promptly as practicable deliver to the Sellers any mail or other communication received by it after the Closing Date and solely relating to the Excluded Assets or the Excluded Liabilities, (ii) as promptly as practicable

wire transfer in immediately available funds to the Sellers, any cash, electronic credits or deposits received by the Purchaser but solely to the extent that such cash, electronic credits or deposits are Excluded Assets and (iii) as promptly as practicable forward to the Sellers any checks or other instruments of payment that it receives but solely to the extent that such checks or other instruments are Excluded Assets.

8.7     Insurance Cooperation.   Notwithstanding anything to the contrary in this Agreement, from and after the Closing, the Purchaser shall be entitled to the benefits under all of the Insurance Policies in place on or prior to the Closing, including on a non-exclusive basis any constituting an Excluded Asset, but subject to the terms, conditions and limitations set forth therein, with respect to any occurrences that occurred or are alleged to have occurred prior to the Closing Date concerning the Business, the Purchased Assets or the Assumed Liabilities, but in each case excluding any such benefits relating to the Excluded Liabilities.   If the Purchaser is unable make a direct claim for payment under any Insurance Policies, Sellers shall reasonably cooperate with the Purchaser in filing any insurance claims and in the collection of insurance proceeds including, where permitted by law, transferring to the Purchaser the right to pursue insurance proceeds related to such claims.   Any party receiving notice with respect to any such claim shall as promptly as practicable notify the other parties hereto.

8.8     Preservation of Records.   The Sellers and the Purchaser agree that each of them shall preserve and keep the records held by them or their Affiliates relating to the Business, the Purchased Assets and the Assumed Liabilities until the later of the closing of the Chapter 11 Cases and the liquidation and winding up of the Sellers' estates (but in no event later than three years after the Closing Date except, in the case of Tax matters, until 30 days following the expiration of the period of any applicable statute of limitations) and shall make such records available to the other party as may be reasonably required by such other party in connection with, among other things, any insurance claims by, actions or tax audits against or governmental investigations of the Sellers or the Purchaser or any of their respective Affiliates or in order to enable the Sellers or the Purchaser to comply with their respective obligations under this Agreement or any of the Ancillary Agreements and each other agreement, document or instrument contemplated hereby or thereby. In the event the Sellers or the Purchaser wishes to destroy such records at the end of such preservation period, such party shall first give 60 days' prior written notice to the other party and such other party shall have the right at its option and expense, upon prior written notice given to such party within such 60 day period, to take possession of the records within 120 days after the date of such notice, or such shorter period as the liquidation and winding up of the Sellers' estates shall permit.

8.9     Publicity.   The Sellers or the Purchaser may issue a press release or public announcement concerning this Agreement or the transactions contemplated hereby only with the prior written approval of the other parties hereto, which approval will not be unreasonably withheld, conditioned or delayed, unless, in the sole judgment of the disclosing party, such disclosure is otherwise required to comply with applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or the Chapter 11 Cases.   The party intending to make any such release referred to in the immediately preceding sentence shall use its commercially reasonable efforts, consistent with such applicable Law or Bankruptcy Court requirement, to consult with the other parties with respect to the text thereof.

48

8.10    <u>Prohibition on Use of Purchased Names</u>.  Each Seller hereby agrees that, as promptly as reasonably practicable, but in no event later than ten days after the Closing Date, it shall not use and shall cease using, and shall cause its respective Affiliates not to use and to cease using, directly or indirectly, the Purchased Names, any trademarks included in the Owned Intellectual Property and any like names or combinations of words or derivations thereof or any names or marks confusingly similar thereto; <u>provided</u>, <u>however</u>, that each Seller may continue to use as company names the Purchased Names solely for purposes of conducting and administering the Chapter 11 Cases provided that, prior to, on or as promptly as practicable after the Closing Date, the Sellers use reasonable best efforts to change the caption of the Chapter 11 Cases to names that are not similar to any of the Purchased Names.  As promptly as reasonably practicable, but in no event later than ten days after the Closing Date, each Seller shall, at its expense, undertake and as promptly as practicable pursue all necessary action to change its business and corporate names to new names bearing no resemblance to any of its present names so as to permit the use of the Purchased Names by the Purchaser or any of its subsidiaries following Closing.  In furtherance of the foregoing, as promptly as reasonably practicable, but in no event later than ten days after the Closing Date, each Seller will (a) revoke any filing that it may have made heretofore with any Governmental Body relating to its use of the Purchased Names and of any like names or combinations of words or derivations thereof and (b) prepare and file with the appropriate Governmental Bodies appropriate documents, including articles of amendment, changing its name so as to effectuate the same and as promptly as practicable deliver evidence of such name change to the Purchaser.

8.11    <u>Taxes</u>.

(a)    Any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use or other Taxes (including Indian and Chinese withholding and capital gains Taxes) and recording charges which may be payable by reason of the sale of the Purchased Assets or the assumption of the Assumed Liabilities under this Agreement or the transactions contemplated herein (all of the foregoing, "**Transfer Taxes**") shall be borne and timely paid by the Purchaser, the Purchaser shall file, or cause to be filed, any Tax Returns with respect to any Transfer Taxes, and the Purchaser shall indemnify, defend (with counsel reasonably satisfactory to the Sellers), protect, and save and hold the Sellers harmless from and against any and all claims, charges, interest or penalties assessed, imposed or asserted in relation to any such Transfer Taxes. The Purchaser and the Sellers shall use commercially reasonable efforts to minimize any Transfer Taxes to the extent permitted by applicable Law.

(b)    From and after the Closing, the Sellers and the Purchaser shall reasonably cooperate (at the requesting parties' expense) with each other in connection with the filing of any Tax Returns or in connection with any Tax contest, in each case, relating to the Purchased Assets or the Business.  Such cooperation shall include the provision of records and information reasonably requested by the other parties which are reasonably relevant to any such Tax Return or Tax contest and making employees available on a mutually convenient basis to provide assistance, additional information, and explanation of any material provided hereunder.

(c)    The Purchaser and the Sellers agree for all applicable Tax purposes that in the case of any Straddle Period, the amount of any property Taxes (or other Taxes imposed periodically on a similar basis) for the Pre-Closing Tax Period will be deemed to be the amount of

such Tax for the entire taxable period multiplied by a fraction the numerator of which is the number of days in the taxable period ending on the Closing Date and the denominator of which is the number of days in such Straddle Period.  The parties shall cooperate in making elections under Treasury Regulations Section 1.245A-5(e)(3)(i) to close on the Closing Date the U.S. taxable year of each Acquired Entity.

(d)     Any and all existing Tax sharing agreements between any Acquired Entities, on the one hand, and Sellers and any of their Affiliates (other than the any Acquired Entities), on the other hand, shall be terminated as of the Closing Date.  After such date none of the Acquired Entities shall have any further rights or liabilities thereunder.

(e)     The Purchaser shall not make any election with respect to any Acquired Entity pursuant to Section 336(e) or 338 of the Code or any similar provision of state or local tax law without the consent of the Sellers (not to be unreasonably withheld, conditioned or delayed; for the avoidance of doubt, it shall be reasonable for a Seller to withhold, condition or delay consent if such election would subject a Seller or any Affiliate of a Seller to any unreimbursed Tax, cost or expense or result in any economically adverse effect on a Seller or any Affiliate of a Seller).

8.12    Further Assurances.

(a)     Subject to the terms and conditions of this Agreement and applicable Law, each Seller and the Purchaser shall, and shall cause their respective Representatives to, use their respective commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable to ensure that the conditions precedent to the other parties' obligations hereunder set forth in this Agreement are satisfied and to consummate and make effective the transactions contemplated by this Agreement and the Ancillary Agreements as soon as practicable.

(b)     Subject to the terms and conditions of this Agreement, neither the Sellers nor the Purchaser shall take any action or refrain from taking any action the effect of which would be to delay or impede the ability of the Sellers or the Purchaser to consummate the transactions contemplated by this Agreement and the Ancillary Agreements unless taking such action or refraining from taking such action is required by applicable Law.

(c)     Following the Execution Date and until the earlier of the Closing Date and the date on which this Agreement is terminated in accordance with Section 3.4, the Sellers, on the one hand, and the Purchaser, on the other hand, shall keep each other reasonably informed as to the status of matters relating to the completion of the transactions contemplated hereby, including as promptly as practicable furnishing the other with copies of notices or other communications received by the Sellers or the Purchaser or by any of their respective Affiliates (as the case may be), from any third party or any Governmental Body with respect to the transactions contemplated by this Agreement and the Ancillary Agreements.

(d)     Subject to the terms and conditions of this Agreement, at and following the Closing, each of the parties shall execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and acquaintances and such other instruments, including any

assignment and assumption of lease agreements, and reasonably cooperate and to take such further actions, as may be reasonably necessary or appropriate to transfer and assign fully to the Purchaser and its successors and assigns, all of the Purchased Assets, and for the Purchaser and its successors and assigns to assume the Assumed Liabilities, and to otherwise make effective the transactions contemplated hereby.  Nothing in this <u>Section 8.12</u> shall obligate any party hereto to waive any right or condition under this Agreement.

(e)     Without limiting the generality of this <u>Section 8.12</u> and solely to the extent that the Sellers and the Purchaser mutually determine that any filing is required by the HSR Act with respect to the transactions contemplated by this Agreement, the Sellers and the Purchaser shall make all premerger notification and report form filings required by the HSR Act within 10 Business Days after the date on which the Purchaser provides notice to the Sellers that the Purchaser desires to make such filings, but, in any case, within two Business Days following the date that the Sale Order is entered (or, if the Purchaser is not the Successful Bidder, but is the Back-Up Bidder in accordance with the Bidding Procedures, no later than 10 Business Days following the date that the Purchaser, as the Back-Up Bidder, is selected as the new Successful Bidder), and as promptly as practicable file any additional information requested after receipt of such request therefor.  In connection with any filing under the HSR Act, the Sellers and the Purchaser shall (i) cooperate with each other, (ii) furnish to the other party all information necessary or desirable in connection with making such filing and in connection with resolving any investigation or other inquiry by any Governmental Body under the HSR Act with respect to the transactions contemplated by this Agreement, (iii) keep the other party informed of any communication received by such party from, or given by such party to, the Federal Trade Commission, the Antitrust Division of the Department of Justice, or any other Governmental Body and of any material communication received or given in connection with any proceeding by a private party, in each case regarding the transactions contemplated hereby and, unless prohibited by applicable Law, permit the other party to review in advance any proposed communication by such party to any Governmental Body or such private party and (iv) supply such commercially reasonable assistance as may be requested by any other party in connection with the foregoing; <u>provided</u>, <u>however</u>, that notwithstanding anything to the contrary contained herein, neither the Sellers nor the Purchaser (nor their respective ultimate parent entities, as such term is used in the HSR Act) shall be required to disclose to any other party, any information contained in its HSR Notification and Report Form which such party, in its sole and absolute discretion, deems confidential.  Each of the Sellers and the Purchaser shall use commercially reasonable efforts (A) to take such action as may be required to cause the termination or expiration of the waiting periods under the HSR Act as promptly as possible after the date that the filings required by the HSR Act are first made (including specifically requesting early termination of the waiting period prescribed by the HSR Act) and (B) eliminate and resolve any objection that any Governmental Body has to the transactions contemplated by this Agreement and the Ancillary Agreements under applicable antitrust Law, in each case of the preceding clauses <u>(A)</u> and <u>(B)</u>, so as to permit the transactions contemplated by this Agreement to be consummated as promptly as practicable (the actions referred to clauses <u>(A)</u> and <u>(B)</u> are referred to as the "**Regulatory Approvals**").  Notwithstanding the foregoing, the Purchaser is not required to, and the Sellers shall not without the prior written consent of the Purchaser, consent to any divestiture or other structural or conduct relief in order to obtain any Regulatory Approvals.

(f)     The Purchaser shall not enter into any transaction, or any agreement to effect any transaction (including any merger or acquisition) that is reasonably expected to make it more difficult, or to increase the time required, to: (i) obtain the expiration or termination of the waiting period under the HSR Act, or any other applicable antitrust Law; (ii) avoid the entry of, the commencement of litigation seeking the entry of, or to effect the dissolution of, any injunction, temporary restraining order or other order that would materially delay or prevent the consummation of the transactions contemplated by this Agreement and the Ancillary Agreements; or (iii) obtain all authorizations, consents, orders and approvals of the applicable Governmental Bodies necessary for the consummation of the transactions contemplated by this Agreement and the other Ancillary Agreements.

(g)     Subject to applicable Law and except as required by any Governmental Body, neither the Purchaser nor the Sellers shall (i) agree to extend any waiting period under the HSR Act without the prior written consent of the other parties hereto (such consent not to be unreasonably withheld, conditioned or delayed), (ii) enter into any agreement with any Governmental Body not to consummate the transactions contemplated by this Agreement or any other Ancillary Agreement without the prior written consent of the other parties hereto (such consent not to be unreasonably withheld, conditioned of delayed) or (iii) take any other action that would be reasonably likely to prevent or delay the receipt of any Regulatory Approvals, in each case, to the extent necessary for the timely consummation of the transactions contemplated by this Agreement and the other Ancillary Agreements.

(h)     The Purchaser agrees that neither the Sellers or any of their respective Affiliates shall have any liability whatsoever to the Purchaser arising out of or relating to the failure to obtain any such Regulatory Approvals (except to the extent that the Sellers fail to comply with its express obligations under this Section 8.12) that may be required in connection with the transactions contemplated by this Agreement or the other Ancillary Agreements or because of the termination of any Material Contract or Material Permit solely as a result thereof.  the Purchaser further agrees that no representation, warranty or covenant of the Sellers contained herein shall be breached or deemed breached as a result of (i) the failure to obtain any such Regulatory Approvals, (ii) any termination of a Material Contract or Material Permit referred to in the immediately preceding sentence or (iii) any proceeding commenced or threatened by or on behalf of any Person arising out of or relating to the failure to obtain any such Regulatory Approvals or any termination of a Material Contract or Material Permit referred to in the immediately preceding sentence.

(i)     Notwithstanding anything to the contrary herein, each Party shall bear their own respective costs in connection with the preparation or the making of any filing under the HSR Act or resolving any investigation or other inquiry by any Governmental Body under the HSR Act with respect to the transactions contemplated by this Agreement; including the payment of any applicable filing fees under the HSR Act.

8.13    Delivery of Certain Financial Information.  At least two Business Days (but no more than four Business Days) before the anticipated Closing Date (the "**Closing Payments Schedule Delivery Date**"), the Sellers shall deliver, or cause to be delivered, to the Purchaser a schedule setting forth the Sellers' good faith estimate of (i) all Assumed Liabilities that are due and payable in cash at or as of the Closing, (ii) all Cure Costs of the Assigned Contracts, and (iii) the Cash Deficiency Amount (the "**Closing Payments Schedule**"), which Closing Payments

Schedule shall be prepared in good faith based on assumptions believed by the Sellers to be reasonable at the time made and based on the information then available to the Sellers (provided, that any Cure Cost with respect to any Assigned Contract that is an Undetermined Cure Cost as of the Closing Payments Schedule Delivery Date shall be calculated based on the most recent amount asserted with respect to such Assigned Contract by the applicable non-Seller counterparty to such Assigned Contract (if the most recent amount asserted by any such non-Seller counterparty is a range of amounts, then such amount shall be the greatest amount in such range), excluding any indemnity claims and other contingent amounts except to the extent such amounts are reasonably likely to be paid at the Closing).

8.14    <u>Personally Identifiable Information</u>.  The Purchaser hereby agrees to maintain all personally identifiable information obtained by the Purchaser in connection with the transactions contemplated by this Agreement in accordance with the Sellers' existing privacy policies (copies of which have been provided to the Purchaser by the Sellers as of the Execution Date); <u>provided</u>, <u>however</u>, that nothing in this Agreement shall be construed to prevent the Purchaser from modifying any such privacy policies following the Closing Date to the extent permitted under such privacy policies and applicable Law.  The Sellers will reasonably cooperate with the Purchaser in the transfer of Personal Information to the Purchaser in connection with the transactions contemplated by this Agreement and the Ancillary Agreements consistent with such privacy policies.

8.15    <u>Confidential Information</u>.  Following the Closing, Sellers agree to maintain, and shall cause their respective Affiliates to maintain, unless disclosure is required by applicable Law, the confidentiality of any confidential information regarding the Business which is in Sellers' or any of their respective Affiliate's possession or of which Sellers or any of their respective Affiliates are aware.  Sellers hereby further agree, unless disclosure is required by applicable Law, to take all commercially reasonable steps, consistent with Sellers' past practice, and to cause each of their respective Affiliates to take all commercially reasonable steps, consistent with Sellers' past practice, to safeguard such confidential information and to protect it against disclosure.   In furtherance and not in limitation of the foregoing, following the Closing, Sellers shall not, and shall cause their respective Affiliates not to, unless required by applicable Law, disclose to any Person (a) any confidential information regarding the Business, provided, that confidential information shall not include information that becomes generally available to the public other than as a result of the breach of this <u>Section 8.15</u> or information not otherwise known by the Sellers that becomes available to any Seller from a Person other than the Purchaser, a current or former employee of any Seller, or a Person known by any Seller to be bound by an obligation of confidentiality to any Seller, or (b) any of the discussions or negotiations conducted with the Purchaser in connection with this Agreement, <u>provided</u>, that Sellers shall be entitled to disclose (i) any information required to be disclosed by the Sellers to the Bankruptcy Court in the Chapter 11 Cases, (ii) any information required to be disclosed by the Sellers pursuant to any applicable Law (including the Bankruptcy Code) or (iii) any information to the Sellers' counsel and financial advisor; <u>provided</u>, that, in each case, such disclosure shall be limited to the information that is so required to be disclosed and the Person(s) to whom such disclosure is required.  Notwithstanding anything in this <u>Section 8.15</u> to the contrary, unless disclosure is required by applicable Law, the confidentiality of any trade secrets of the Business or the Purchaser shall be maintained for so long as such trade secrets continue to be entitled to protection as trade secrets of the Business and the Purchaser, respectively.

8.16    <u>Transition Services</u>.    If requested by the Purchaser prior to the Designation Deadline latest in time under this Agreement, Purchaser and the Sellers agree to negotiate in good faith the terms of, and enter into effective as of the Closing (or, if such request is made by the Purchaser after the Closing, as promptly as practicable following such request), a transition services agreement (the "**TSA**") acceptable to the Purchaser and the Prepetition Agent; provided, the TSA, if any, shall (a) contain customary terms for transactions of the type contemplated by this Agreement with respect to the provision of services reasonably requested by the Purchaser or the Prepetition Agent for a reasonable period of time post-Closing; and (b) provide that Purchaser shall pay Sellers the Sellers' actual costs for such transition services and actual and direct out-of-pocket expenses incurred by the Sellers in connection with the provision of such transition services; provided, that all actual and direct out-of-pocket expenses for third party advisors must be approved in advance by the Purchaser or the Prepetition Agent (not to be unreasonably withheld, conditioned or delayed); provided, further, that Purchaser shall not be responsible, without Purchaser's or the Prepetition Agent's prior consent, for any severance, retention, bonus, deferred compensation or other non-ordinary course employee compensation.

8.17    <u>The Connecticut Transfer Act</u>.    Purchaser and Seller acknowledge and agree that the Owned Real Property located at 90-92 Deerfield Road, Windsor, CT (the "**Windsor, CT Property**") is an "establishment" as that term is defined in the CT Transfer Act.  Solely if Windsor, CT Property is a Purchased Asset, Purchaser agrees that, as between Purchaser and Seller, Purchaser shall be responsible, at its sole cost and expense, for complying with those requirements of the CT Transfer Act  that arise solely and exclusively as a result of the transfer of the Windsor, CT Property pursuant to this Agreement including, to the extent permitted by applicable law and subject to the approval of the CTDEEP, (i) signing any forms required pursuant to the CT Transfer Act to be filed with the Connecticut Department of Energy & Environmental Protection ("**CTDEEP**") in connection with the Closing (e.g., a Transfer of Establishment - Form III (Real Estate) and Environmental Condition Assessment Form, collectively the "**CT Transfer Act Forms**") as the "Transferee" and "Certifying Party"; (ii) filing the CT Transfer Act Forms with the CTDEEP within ten (10) days of the Closing and paying any associated CTDEEP filing fee; and (iii) completing any required investigation, remediation, monitoring and reporting required after the Closing pursuant to the CT Transfer Act and applicable Environmental Laws, including with respect to any prior CT Transfer Act form filings.

8.18    <u>Delivery of Wind-Down Budget and Schedules</u>.    Sellers' shall deliver (a) the Schedules related to <u>Article 4</u> (the "**Disclosure Schedules**") and (b) Annex I to this Agreement with a wind-down budget, in each case, acceptable to Purchaser in its sole discretion no later than May 16, 2023, or such later date as is consented to in writing by Purchaser.  Such wind-down budget shall be deemed the Wind-Down Budget for purposes of this Agreement.  If Sellers fail to timely deliver the Disclosure Schedules or Annex I in accordance with the foregoing, such failure shall be deemed a material breach of this Agreement.  The Sellers acknowledge and agree that this Agreement does not satisfy the Milestone (as defined in the Cash Collateral Order) in section 8(b)(ii) of the Cash Collateral Order as the Prepetition Agent has advised the Sellers that it is not in form and substance satisfactory to the Prepetition Agent unless and until the Disclosure Schedules are delivered and Annex I is updated in accordance with the foregoing in form and substance satisfactory to the Prepetition Agent in its sole discretion.

8.19   Insurance.  The Purchaser shall use its reasonable best efforts to have in place and ready to be bound such insurance coverage that meets all legal and contractual requirements associated with the Business, on a date no later than two Business Days prior to the Outside Date.

## ARTICLE 9

## CONDITIONS TO CLOSING

9.1   Conditions Precedent to the Obligations of the Purchaser and the Sellers.  The respective obligations of each party to this Agreement to consummate the transactions contemplated by this Agreement are subject to the satisfaction or written waiver, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by the Sellers and the Purchaser, in whole or in part, to the extent permitted by applicable Law and Section 11.3):

(a)    no temporary restraining order, preliminary or permanent injunction or other order issued by any court of competent jurisdiction or other legal restraint or prohibition preventing the consummation of the transactions contemplated hereby shall have been issued, nor shall any proceeding or other Action brought by a domestic or foreign administrative agency or commission or other domestic or foreign Governmental Body seeking any of the foregoing be pending or threatened in writing; nor shall there be any action taken, or any statute, rule, regulation, order or other Law promulgated, enacted, entered, enforced or deemed applicable to the parties hereto which makes the consummation of the transactions contemplated by this Agreement illegal, void or rescinded;

(b)    (i) the Bankruptcy Court shall have entered the Bidding Procedures Order and the Sale Order, and each such order shall not have been stayed or vacated, (ii) no order of any Governmental Body staying, reversing, modifying or amending the Sale Order shall be in effect on the Closing Date and (iii) the Sale Order shall not be subject to any challenge under section 363(m) of the Bankruptcy Code; and

(c)    any required filings under the HSR Act and any other applicable competition Laws, if any, shall have been made and any waiting periods thereunder (and any extensions thereof) shall have expired or been terminated.

9.2   Conditions Precedent to the Obligations of the Sellers.  The obligations of the Sellers to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by the Sellers, in whole or in part, to the extent permitted by applicable Law and Section 11.3):

(a)    the representations and warranties of the Purchaser contained in this Agreement shall be true and correct in all respects (without giving effect to any limitation as to "materiality" set forth therein) as of the Closing Date as if made on and as of the Closing Date (other than for such representations and warranties that are made as of a specific date which shall be true and correct in all respects as of such date), except where the failure of such representations and warranties to be true and correct does not, individually or in the aggregate, have a material

adverse effect on the ability of Purchaser to consummate the transactions contemplated hereby, and the Sellers shall have received a certificate signed by an authorized person of the Purchaser, dated the Closing Date, to the foregoing effect;

(b)  the Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by the Purchaser on or prior to the Closing Date, and the Sellers shall have received a certificate signed by an authorized person of the Purchaser, dated the Closing Date, to the foregoing effect;

(c)  the Purchaser shall have delivered, or caused to be delivered, to the Sellers (or at the direction of the Sellers) or the applicable third party, as applicable, all of the items set forth in Section 3.3; and

(d)  the Purchaser shall have satisfied the Prepetition Debt Bid Amount in accordance with Section 2.1.

9.3  Conditions Precedent to the Obligations of the Purchaser.  The obligations of the Purchaser to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by the Purchaser, in whole or in part, to the extent permitted by applicable Law and Section 11.3):

(a)  (i) except as set forth in clause (ii) below, the representations and warranties of each Seller contained in this Agreement shall be true and correct in all respects (without giving effect to any limitation indicated by the words "Material Adverse Effect", "material" or similar qualifier set forth therein) as of the Closing Date as if made on and as of the Closing Date (other than for such representations and warranties that are made as of a specific date which shall be true and correct in all respects as of such date), except where the failure of such representations and warranties to be true and correct does not, individually or in the aggregate, have a Material Adverse Effect, and (ii) the representations and warranties of each Seller contained in Section 4.1, Section 4.2, Section 4.3, and Section 4.10 shall be true and correct in all material respect (without giving effect to any limitation indicated by the words "Material Adverse Effect", "material" or similar qualifier set forth therein) as of the Closing Date as if made on and as of the Closing Date (other than for such representations and warranties that are made as of a specific date which shall be true and correct in all respects as of such date), in each case, the Purchaser shall have received a certificate signed by an authorized officer of each Seller, dated the Closing Date, to the foregoing effect;

(b)  Since the Execution Date, there shall not have been a Material Adverse Effect, and the Purchaser shall have received a certificate signed by an authorized officer of each Seller, dated the Closing Date, to the forgoing effect;

(c)  each Seller shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by them on or prior to the Closing Date, and the Purchaser shall have received a certificate signed by an authorized officer of each Seller, dated the Closing Date, to the forgoing effect;

(d)     the Sellers shall have delivered, or caused to be delivered, to the Purchaser or the other applicable parties all of the items set forth in <u>Section 3.2</u>;

(e)     no "Event of Default" under the Cash Collateral Order shall have occurred and be continuing;

(f)     Purchaser shall have received an owner's title insurance policy proforma with respect to each Owned Real Property included in the Purchased Assets, issued by a nationally recognized title insurance company reasonably acceptable to the Purchaser, written as of the Closing Date, insuring the Purchaser of fee simple title to each Owned Real Property, subject to Permitted Encumbrances and those Encumbrances set forth on <u>Schedule 4.13(a)(i)</u>, in such amounts as set forth in the Sale Order and together with such customary endorsements, as the Purchaser shall reasonably require;

(g)     Purchaser shall have bound insurance coverage effective on the Closing Date that meets all legal and contractual requirements associated with the Business; <u>provided</u>, <u>however</u>, that this condition shall have no force and effect if Purchaser does not have such insurance coverage in place and ready to be bound three Business Days prior to the Outside Date.

(h)     at the Closing, all Purchased Assets, including all Assigned Contracts and Permits included in the Purchased Assets, shall be validly and lawfully delivered, transferred or assigned by the Sellers to the Purchaser; <u>provided</u>, <u>however</u>, that the condition set forth in this <u>Section 9.3(h)</u> shall not apply to (i) Permits that by their terms cannot be transferred to the Purchaser prior to the Outside Date, <u>provided</u>, that (A) the Sellers and the Purchaser shall have agreed to an Interim Arrangement with respect to any such Permit in accordance with <u>Section 8.4</u> that will allow the Purchaser to receive the benefits of, and to make use of, such Permit in the conduct of the Business in the Ordinary Course of Business, and (B) any such Interim Arrangement referred to in <u>clause (A)</u> shall be (w) on terms, and subject to conditions, that are reasonably acceptable to the Purchaser, (x) in a written agreement executed by the Sellers and the Purchaser, in form and substance reasonably satisfactory to the Purchaser, (y) in effect, and not subject to any unfulfilled conditions and contingencies, as of the Closing, and (z) approved by the Bankruptcy Court pursuant to the Sale Order, and (ii) any Purchased Assets that are not material (either individually or in the aggregate) to the conduct of the Business, which, for the avoidance of doubt, shall not include any Assumed Real Property Leases;

(i)     the period to challenge or contest the validity, amount, perfection, or priority of the claims and liens of the Prepetition Agent and the Prepetition Secured Lenders under the Prepetition Financing Agreement shall have expired with no such challenge or contest having been asserted, or any such challenge or contest having been resolved to the satisfaction of the Purchaser in its sole and absolute discretion; and

(j)     the Prepetition Agent and the Prepetition Secured Lenders and their respective Related Parties shall have received full and final releases from the Sellers' estates by virtue of the Sale Order or otherwise.

## ARTICLE 10
## ADDITIONAL DEFINITIONS

10.1    <u>Certain Definitions</u>.  As used herein:

(a)    "**Accommodation Agreement**" means any amendment, restatement, supplement or other modification of a Contract or other arrangement with a customer of Seller that provides for accelerated payment terms, price accommodations or any other material accommodation in favor of such customer.

(b)    "**Accounts Receivable**" means (i) any and all accounts receivable, trade accounts and other amounts receivable owed to any Seller and any other rights of any Seller to payment from third parties, including those reflected (or required to be reflected under GAAP) in the books and records of such Seller, and the full benefit of all security for such accounts or rights to payment, including all trade accounts receivable representing amounts receivable in respect of goods shipped, products sold or services rendered, in each case owing to such Seller; (ii) all other accounts or notes receivable of any Seller and the full benefit of all security for such accounts or notes receivable; and (iii) any and all claims, remedies or other rights relating to any of the foregoing, together with any interest or unpaid financing charges accrued thereon.

(c)    "**Affiliate**" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

(d)    "**Alternative Transaction**" means a sale or sales of any of the Purchased Assets to a Person other than the Purchaser or an Affiliate of the Purchaser, whether effected pursuant to a merger, consolidation, equity purchase, asset acquisition, share exchange, amalgamation or plan of reorganization, excluding any sales of Inventory in the Ordinary Course of Business.

(e)    "**Ancillary Agreements**" means, collectively, the Purchaser Ancillary Agreements and the Seller Ancillary Agreements.

(f)    "**Auction**" has the meaning ascribed to such term in the Bidding Procedures Order.

(g)    "**Avoidance Actions**" means all causes of action, lawsuits, claims (as defined in section 101(5) of the Bankruptcy Code), rights of recovery and other similar rights of any Seller arising under Chapter 5 of the Bankruptcy Code.

(h)    "**Back-Up Bidder**" has the meaning ascribed to such term in the Bidding Procedures Order.

(i)    "**Bidding Procedures**" has the meaning ascribed to such term in the Bidding Procedures Order.

(j)     "**Bidding Procedures Order**" means an order of the Bankruptcy Court in substantially the form attached as Exhibit A to the *Debtors' Motion for Entry of: (A) An Order (I) Scheduling a Hearing on the Approval of the Sale of All or Substantially All of the Debtors' Assets Free and Clear of All Encumbrances Other than Assumed Liabilities and Permitted Encumbrances, and the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (II) Approving Certain Bidding Procedures and Assumption and Assignment Procedures, and the Form and Manner of Notice Thereof, (III) Authorizing the Debtors to Enter into the Stalking Horse Purchase Agreement, and (IV) Granting Related Relief; and (B) An Order (I) Approving Asset Purchase Agreement, (II) Authorizing the Sale of All or Substantially All of the Debtors' Assets Free and Clear of All Encumbrances Other than Assumed Liabilities and Permitted Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* [Docket No. 0245].

(k)     "**Business**" means any and all business activities of any kind that are conducted by the Sellers as of the Execution Date or at any time through (and including) the Closing Date, including (i) designing and manufacturing fuel injection equipment with products such as fuel pumps and injection equipment for diesel and gasoline engines, (ii) selling engine components to original equipment manufacturers in a variety of applications, including agricultural and construction vehicles and equipment, industrial products, automobiles, light duty trucks and marine equipment, and (iii) selling replacement parts and units to service the Sellers products, including the service organizations of its original equipment manufacturer customers and Sellers own authorized network of distributors and dealers.

(l)     "**Business Day**" means any day other than a Saturday, Sunday or other day on which commercial banks in New York City, New York are authorized or required by Law to be closed.

(m)     "**Cash and Cash Equivalents**" means, collectively, all of the Sellers' cash (including petty cash and checks received prior to the close of business on the Closing Date), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, government securities and other cash equivalents, net of uncleared checks issued by the Sellers that are not yet reflected in the applicable bank account of Sellers.

(n)     "**Cash Collateral Order**" means the *Final Order (I) Authorizing the Use of Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Lenders, and (III) Granting Related Relief* [Docket No. 0218].

(o)     "**Chinese Shares**" means all of the issued and outstanding shares in the capital of Stanadyne Changshu Corporation owned by the Sellers.

(p)     "**Closing Date**" means the date on which the Closing is held.

(q)     "**Code**" means the Internal Revenue Code of 1986, as amended.

(r)     "**Contract**" means any written or oral contract, indenture, note, bond, lease, license, commitment or instrument or other agreement or arrangement.

(s)     "**COVID-19 Measures**" means any quarantine, "shelter in place," "stay at home," workforce reduction, social distancing, shut down, closure, sequester, workplace safety or similar Law promulgated by any Governmental Body, including the Centers for Disease Control and Prevention and the World Health Organization, in each case, in connection with or in response to COVID-19, including the CARES Act and Families First Act.

(t)     "**CT Transfer Act**" means the Connecticut Property Transfer Act, Conn. Gen. Stat. §§ 22a-134, et seq., as amended.

(u)     "**Cure Costs**" means the amounts necessary to cure all defaults, if any, and that must be paid in connection with the assumption of each Assigned Contract pursuant to section 365(b)(1)(A) and section 365(b)(1)(B) of the Bankruptcy Code.

(v)     "**Customer Purchase Order**" means any purchase order from a customer of the Business to purchase products manufactured by or services provided by the Business.

(w)     "**Designation Deadline**" means, with respect to any Designation Rights Asset, the earlier of (i) 5:00 p.m. (prevailing Eastern time) on the date that is 90 days after the Closing Date, (ii) the deadline for assumption or rejection of such Designation Rights Asset if it is a Contract under section 365 of the Bankruptcy Code (or such longer period as may be (x) agreed between the Purchaser and the counterparty of the applicable Contract or (y) set forth in an order of the Bankruptcy Court) and (iii) a date after the Closing Date specified by the Purchaser (upon three Business Days' notice to the Sellers).

(x)     "**Determined Cure Cost**" means, with respect to the Cure Cost of any particular Contract, that such Cure Cost is finally established, by the Bankruptcy Court or by agreement by the parties to such Contract at the date or time in question.

(y)     "**Documents**" means all of the Sellers' written files, documents, instruments, emails, papers, books, reports, records, tapes, microfilms, photographs, letters, correspondence, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies and documents, ledgers, journals, title policies, customer lists and other customer data, supplier lists and other supplier data, vendor lists and other vendor data, regulatory filings, operating data and plans, research material, marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.) and other similar materials, in each case whether or not in electronic form.

(z)     "**Encumbrance**" means any encumbrance, claim (as defined in section 101(5) of the Bankruptcy Code), interest (as used in section 363(f) of the Bankruptcy Code), rights, causes of action, demands, damages, Liability, charge, covenant, easement, encumbrance, pledge, security interest, mortgage, lease, option, right of first refusal, transfer restriction, deed of trust, hypothecation or lien, whether imposed by Contract or Law.

(aa)     "**Environmental Laws**" means all applicable Laws relating to pollution or protection of natural resources or the environment, or the generation, use, treatment, storage, handling, transportation or Release of, or exposure to, Hazardous Materials, including the Federal Water Pollution Control Act (33 U.S.C. §1251 et seq.), Resource Conservation and Recovery Act (42 U.S.C. §6901 et seq.), Safe Drinking Water Act (42 U.S.C. §3000(f) et seq.), Toxic Substances

Control Act (15 U.S.C. §2601 et seq.), Clean Air Act (42 U.S.C. §7401 et seq.), Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. §9601 et seq.) and other similar federal, state, provincial and local statutes.

(bb)    "**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

(cc)    "**ERISA Affiliate**" means any Person that, together with the Sellers, is required to be treated as a "single employer" within the meaning of Section 414(b), (c), (m) or (o) of the Code or Sections 4001(a)(14) or 4001(b) of ERISA.

(dd)    "**Furniture and Equipment**" means all furniture, fixtures, furnishings, leasehold improvements (that are not part of the Leased Real Property owned by landlords), personal property used to display or hold merchandise for retail sale, equipment, machinery, vehicles, storage tanks and other tangible personal property of every kind and description, owned or used, or held for use, in connection with the Business by the Sellers, wherever located, including appliances, fittings, parts, spare parts, lighting fixtures, signs, doors, cabinets, partitions, mantles, motors, pups, screens, plumbing, heating, air conditioning, ovens, refrigerators, freezers, refrigerating and cooling systems, waste disposal and storing, wiring, televisions, monitors, security systems, carpets, floor coverings, wall coverings, office equipment, registers and safes, trash containers, meters and scales, combinations, codes and keys, display cases and tables, artwork, desks, chairs and communications equipment and the IT Assets.

(ee)    "**GAAP**" means United States generally accepted accounting principles as in effect from time to time.

(ff)    "**Governmental Body**" means any applicable federal, state, local or foreign government or any agency, bureau, board, commission, court, department, political subdivision, tribunal or other instrumentality thereof.

(gg)    "**Hazardous Materials**" means petroleum and all derivatives thereof or synthetic substitutes therefor, asbestos and asbestos containing materials, perfluoralkyl and polyfluoralkyl substances, polychlorinated biphenyls and any and all materials now or hereafter defined, listed, designated or classified as, or otherwise determined to be, "hazardous wastes," "hazardous substances," "radioactive," "solid wastes," or "toxic" (or words of similar meaning) under or pursuant to or otherwise listed or regulated pursuant to any Environmental Law.

(hh)    "**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the related regulations and published interpretations.

(ii)    "**Indebtedness**" of any Person means, without duplication, (i) the interest in respect of, principal of and premium (if any) in respect of (x) indebtedness of such Person for money borrowed and (y) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable; (ii) all obligations of such Person issued or assumed as the deferred purchase price of property (other than for services and goods acquired in the Ordinary Course of Business); (iii) all obligations of such Person under leases required to be capitalized in accordance with GAAP prior to the adoption of ASC 842; (iv) all non-contingent obligations of such Person for the reimbursement of any obligor on any letter

61

of credit, banker's acceptance or similar credit transaction (in each case, to the extent actually drawn on); (v) all obligations of the type referred to in <u>clauses (i)</u> through <u>(iv)</u> of any other Person for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, including guarantees of such obligations; and (vi) all obligations of the type referred to in <u>clauses (i)</u> through <u>(v)</u> of other Persons secured by any Encumbrance on any property or asset of such Person (whether or not such obligation is assumed by such Person).

(jj)    "**Indian Shares**" means all of the issued and outstanding shares in the capital of Stanadyne India Private Ltd., an Indian limited company, owned by the Sellers.

(kk)    "**Intellectual Property**" means any and all intellectual property and industrial property rights in any jurisdiction throughout the world (whether or not registered) including: (i) patents, (ii) trademarks, service marks, trade dress, trade names, domain names, logos and corporate names, (iii) copyrights, (iv) registrations and applications for any of the foregoing, (v) trade secrets and confidential information or know-how (including, research and development, formulas, compositions, manufacturing and production processes and techniques, technical data and designs) and (vi) all applications, registrations, renewals and common-law rights associated in connection with any of the foregoing.

(ll)    "**Inventory**" means all of the Sellers' inventories (including supplies, merchandise, work in process, raw materials, spare or replacement parts, subassemblies, promotional materials, packaging and shipping materials, manufacturing supplies, samples, prototypes, displays, and finished goods and all of Sellers' tangible property, materials, supplies, inventories and other related items or that are otherwise included in the Purchased Assets and are permitted to be sold and transferred under applicable Law, together with all rights of Sellers against suppliers thereof) that are used, or held for use, in connection with the Business.

(mm)    "**IT Assets**" means all of the Sellers' computers (including point-of-sale terminals and systems), computer software and databases (including source code, object code and all related documentation), firmware, middleware, servers, workstations, routers, hubs, switches, data communications lines, and all other information technology equipment and elements, and all associated documentation that are used, or held for use, in connection with the Business.

(nn)    "**Knowledge of the Sellers**" means the actual knowledge of John Pinson and Costas P. Loukellis.

(oo)    "**Laws**" means all federal, state, local or foreign laws, statutes, common law, rules, codes, regulations, restrictions, ordinances, orders, decrees, approvals, directives, judgments, rulings, injunctions, writs and awards of, or issued, promulgated, enforced or entered by, any and all Governmental Bodies (including any court of competent jurisdiction), or other requirement or rule of law.

(pp)    "**Leased Real Property**" means all of the real property leased, subleased, licensed, used or occupied by any of the Sellers, together with all buildings, structures, fixtures and improvements erected thereon, and any and all rights, privileges, easements, licenses, hereditaments and other appurtenances relating thereto, and used, or held for use, in connection with the Business.

(qq)    "**Liability**" means, as to any Person, any debt, adverse claim, liability, duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed, including all costs and expenses relating thereto.

(rr)    "**Licensed Intellectual Property**" means any Intellectual Property that is licensed to the Sellers, and used, or held for use, in connection with the Business.

(ss)    "**Material Adverse Effect**" means any event, circumstance, change, occurrence or state of facts that, individually or in the aggregate, has had, or would reasonably be expected to have or result in, a material adverse effect on (i) business, assets, results of operations or financial condition of the Sellers, the Purchased Assets or the Business or (ii) the ability of any Seller to consummate the transactions contemplated by this Agreement and the Ancillary Agreements or perform its obligations under this Agreement except, in each case, for any such effect resulting from any of the following:  (A) changes in the general economic or financial market conditions in the U.S. or global economy, including credit, financial or securities market conditions and changes thereto (including inflation, prevailing interest rates or currency rates), (B) changes in Law, GAAP, regulatory accounting requirements or interpretations thereof that apply to the Business, the Sellers or the Purchased Assets (including the proposal or adoption of any new Law, statute, code, ordinance, rule or regulation, or any change in the interpretation or enforcement of any existing Law), (C) the announcement or pendency or consummation of any of the transactions contemplated hereby, (D) changes caused by regulatory or political conditions, such as the shutdown (whether short-term or long-term) of any governmental services or instrumentalities, acts of war, hostilities, police action sabotage or terrorism, earthquakes, hurricanes, floods, pandemics or disease outbreaks (including COVID-19 Measures or any change in COVID-19 Measures or interpretations of an applicable Governmental Body with respect thereto) or other natural disasters (of a national or regional scale), man-made disasters or acts of God, (E) factors, conditions, trends or other circumstances generally affecting the industry or market in which the Sellers operate, including fluctuations in the pricing of commodities, or seasonal reductions in the revenues or earnings of the Sellers that are consistent with past operating history, (F) any action by the Purchaser or any of its Affiliates or the omission of an action that was required to be taken by the Purchaser or any of its Affiliates, (G) any failure of the Sellers, individually or in the aggregate, to meet any projection or forecast (provided, however, that the exception in the clause shall not prevent or otherwise affect a determination that any change, event, development or effect underlying such failure has resulted in, or contributed to, a Material Adverse Effect), (H) any action(s) taken, or failures to take action, by the Sellers which is required or prohibited by this Agreement or is taken at the request of the Purchaser, (I) the commencement of the Chapter 11 Cases, and (J) any actions taken, or failures to take action, or such other changes or events, in each case, to which the Purchaser has consented in writing; provided, however, that the foregoing clauses (A), (B), (D) and (E) shall not include, and therefore the determination of any "Material Adverse Effect" shall not exclude, any event, change, circumstance or occurrence that affects the Sellers, the Purchased Assets or the Business disproportionately relative to other Persons engaged in the industries in which the Sellers operate.

(tt)    "**Ordinary Course of Business**" means the ordinary and usual course of normal day to day operations of the Business consistent with past practice.

(uu)    "**Owned Intellectual Property**" means all Intellectual Property owned by any Seller, and used, or held for use, in connection with the Business.

(vv)    "**Parties**" means Purchaser and Sellers.

(ww)    "**Permits**" means all permits, approvals, concessions, grants, franchises, licenses and other approvals issued by any Governmental Body.

(xx)    "**Permitted Encumbrances**" means (i) Encumbrances for utilities and current Taxes not yet due and payable, including Taxes that are due but may not be paid as a result of the commencement of the Chapter 11 Cases, or which are being diligently contested in good faith and by appropriate proceedings, and for which adequate reserves have been maintained in accordance with GAAP; (ii) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any of the Purchased Assets which do not, individually or in the aggregate, materially adversely affect the operation of the Business or use and occupancy of the Assumed Leased Real Property or Owned Real Property or materially adversely detract from the value of the Assumed Leased Real Property or Owned Real Property; (iii) rights of Governmental Bodies to require the removal of any vaults, vault spaces, areas, chutes or other spaces or projections beyond the building lines or of any curb out; (iv) easements, covenants, rights-of-way and other similar restrictions or conditions of record on the use of real property; (v) any state of facts which would be shown by an accurate survey of the applicable real property; (vi) applicable zoning Laws, subdivision, regulations, ordinances, resolutions, requirements, orders, landmark, historic or wetlands designations, entitlement, conservation restrictions, building codes, land use restrictions and other similar restrictions imposed by Law (but not restrictions arising from a violation of any such Law); (vii) any Liabilities created by this Agreement or any of the Ancillary Agreements; (viii) such minor imperfections, defects or irregularities in title as do not detract in any material respect from the value or utility of the subject property in the operation of the Business that uses such property; (ix) statutory liens incurred or deposits or pledges made in connection with, or to secure payment of, workers' compensation, unemployment insurance or similar programs; (x) mechanics', construction, materialmen's, warehousemen's, storage, carriers', workers', or repairmen's liens or other similar common law or statutory liens arising in the Ordinary Course of Business which are not delinquent or are being contested in good faith pursuant to appropriate legal proceedings and for which adequate reserves have been taken or securing obligations which are bonded in a reasonable manner; (xi) security given to a public utility or any Governmental Body when required in the Ordinary Course of Business; (xii) Encumbrances arising or resulting from any action taken by the Purchaser or any of its Affiliates; and (xiii) title and other interests of a lessor (including Encumbrances securing rental payments) under a capital or operating lease, real property lease, or of a licensor under a license or royalty agreement.

(yy)    "**Person**" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, estate, Governmental Body or other entity or group.

(zz)    "**Pre-Closing Tax Period**" means (a) any Tax period ending on or before the Closing Date and (b) with respect to a Straddle Period, the portion of such Straddle Period beginning on the first day of the Straddle Period and ending on the Closing Date.

(aaa)    "**Prepetition Agent**" means Cerberus Business Finance, LLC, in its capacity as the "Administrative Agent" and "Collateral Agent" under the Prepetition Financing Agreement.

(bbb)    "**Prepetition Financing Agreement**" means that certain Financing Agreement, dated as of May 2, 2017, as amended from time to time prior to the Petition Date, by and among Holdings, the "Borrowers" and other "Guarantors" party thereto, the Prepetition Secured Lenders, and the Prepetition Agent thereunder, as amended, supplemented, amended and restated or otherwise modified from time to time.

(ccc)    "**Prepetition Secured Lenders**" means the "Lenders" under and as defined in the Prepetition Financing Agreement.

(ddd)    "**Prepetition Secured Obligations**" means all "Obligations" under and as defined in the Prepetition Financing Agreement, including term loans with an aggregate outstanding principal balance of not less than $248,488,344.84 and revolving loans with an aggregate outstanding principal balance of not less than $25,000,000, for a total outstanding principal balance of not less than $273,488,344.84.  For the avoidance of doubt, such principal amount does not include accrued and unpaid interest, fees, costs, expenses, indemnities, and other amounts owing under the Loan Documents (as defined in the Prepetition Financing Agreement), including the Exit Fee (as defined in the Prepetition Financing Agreement) due and owing in connection with entry into that certain Amendment No. 3 to the Prepetition Financing Agreement.

(eee)    "**Purchaser Ancillary Agreements**" means, collectively, the Assignment and Assumption Agreement, each of the other documents or instruments contemplated by Section 3.3 and each other certificate, agreement or document (other than this Agreement) that the Purchaser is required to execute or deliver pursuant to the terms of this Agreement.

(fff)    "**Purchaser Parties**" means, collectively, the Purchaser and its subsidiaries, and any of their respective former, current or future directors, officers, employees, agents, general or limited partners, managers, members, stockholders, investors, lenders, creditors, representatives, Affiliates or assignees or any former, current or future director, officer, employee, agent, general or limited partner, manager, member, stockholder, investor, lender, creditor, representative, Affiliate or assignee of any of the foregoing.

(ggg)    "**Related Parties**" means, with respect to any Person, such Person's past, present and future subsidiaries, parents, divisions, Affiliates, agents, representatives, insurers, attorneys, successors, assigns, and each of its and their respective directors, managers, officers, employees, shareholders, members, agents, representatives, attorneys, contractors, subcontractors, independent contractors, owners, insurance companies and partners.

(hhh)    "**Release**" means, with respect to any Hazardous Material, any releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching,

dumping, disposing or migrating into or through any surface or ground water, drinking water supply, soil, surface or subsurface strata or medium, or the ambient air.

(iii)    "**Sale Hearing**" means the hearing seeking entry of the Sale Order.

(jjj)    "**Sale Motion**" means a motion in form and substance satisfactory to the Sellers and the Purchaser seeking entry of the Sale Order.

(kkk)    "**Sale Order**" means an order in form and substance satisfactory to the Sellers and the Purchaser (it being understood and agreed that if the Sale Order requires the Purchaser to assume, pay or otherwise become responsible for any Liabilities of the Sellers that do not constitute Assumed Liabilities as expressly defined herein, then such Sale Order shall not be satisfactory to the Purchaser).

(lll)    "**Seller Ancillary Agreements**" means, collectively, the Assignment and Assumption Agreement, each of the other documents or instruments contemplated by <u>Section 3.2</u> and each other certificate, agreement or document (other than this Agreement) that any Seller is required to execute or deliver pursuant to the terms of this Agreement.

(mmm)"**Seller Intellectual Property**" means, collectively, Owned Intellectual Property and Licensed Intellectual Property.

(nnn)    "**Seller Organizational Documents**" means, with respect to each Seller, its certificate of incorporation or formation, bylaws, operating agreement, or any other similar organizational or governing documents.

(ooo)    "**Seller Parties**" means, collectively, the Sellers and their respective subsidiaries, and any of their respective former, current or future directors, officers, employees, agents, general or limited partners, managers, members, stockholders, investors, lenders, creditors, representatives, Affiliates or assignees or any former, current or future director, officer, employee, agent, general or limited partner, manager, member, stockholder, investor, lender, creditor, representative, Affiliate or assignee of any of the foregoing.

(ppp)    "**Seller Plans**" means (i) all "employee benefit plans" (as defined in Section 3(3) of ERISA), including all employee benefit plans which are "pension plans" (as defined in Section 3(2) of ERISA) and any other written employee benefit arrangements or payroll practices (including severance pay, vacation pay, company awards, salary continuation for disability, sick leave, death benefit, hospitalization, welfare benefit, group or individual health, dental, medical, life, insurance, survivor benefit, deferred compensation, profit sharing, retirement, retiree medical, supplemental retirement, bonus or other incentive compensation, stock purchase, stock option, stock appreciation rights, restricted stock and phantom stock arrangements or policies) and (ii) all written employment, termination, bonus, severance, change in control or other similar contracts or agreements, in each case to which any Seller is a party, with respect to which any Seller has any Liability or obligation or which are maintained by any Seller and to which any Seller contributes or is obligated to contribute with respect to current or former directors, officers, consultants and employees of any Seller.

66

(qqq)   "**Significant Vendors/Suppliers**" means the 20 vendors or suppliers of the Sellers (on a combined basis) that have sold the most, in terms of dollar value, products or services to the Business during the calendar year ended December 31, 2022.

(rrr)   "**Straddle Period**" means any taxable year or period beginning on or before the Closing Date and ending after the Closing Date.

(sss)   "**Successful Bidder**" has the meaning ascribed to such term by the Bidding Procedures Order.

(ttt)   "**Surplus Cash**" means an amount equal to 100% of the Cash and Cash Equivalents remaining of the Excluded Cash, which Cash and Cash Equivalents were not disbursed in the wind-down of the Sellers' estates in accordance with each line-item of the "Total Disbursements" pursuant to the Wind-Down Budget, and which such amount is held by the Sellers as of the earlier of (i) the substantial completion of the wind-down of the Sellers' estates, and (ii) the later to occur of (A) the Designation Deadline latest in time under this Agreement and (B) the date that is 180 days after the Closing Date.

(uuu)   "**Tax**" and "**Taxes**" means any foreign, federal, state, county, or local income, sales and use, excise, franchise, real and personal property, gross receipt, capital stock, production, business and occupation, disability, employment, payroll, severance, withholding or similar taxes, including all interest, additions, surcharges, fees or penalties related thereto.

(vvv)   "**Tax Return**" means any return, report, information return, declaration, claim for refund or other document (including any schedule or related or supporting information) supplied or required to be supplied to any Governmental Body with respect to Taxes, including amendments thereto.

(www)  "**Transferred Employee**" means each employee of a Seller to whom the Purchaser has made an offer of employment pursuant to <u>Section 6.1</u> and that has accepted such offer and commences employment with the Purchaser or any of its Affiliates on or following the Closing Date.

(xxx)   "**Undetermined Cure Cost**" means, with respect to the Cure Cost of any particular Contract, that such Cure Cost is not finally determined by the Bankruptcy Court or by agreement by the parties to such Contract as of the time or date in question.

(yyy)   "**WARN Act**" means the federal Worker Adjustment Retraining Notification Act, or any similar provision of any federal, state, provincial, regional, foreign or local Law.

10.2    <u>Additional Defined Terms</u>.  The following terms have the meanings set forth in the Sections set forth below:

Acquired Entities ........................................ 7

Actions ...................................................... 25

Agreement................................................... 4

Allocation................................................... 17

Assigned Contracts ...................................... 5

Assignment and Assumption Agreement.. 18

67

Assumed Leased Real Property .................. 6
Assumed Liabilities .................................. 9
Assumed Real Property Leases................. 6
Assumed Seller Plans................................. 6
Audited Financial Statements .................. 35
Balance Sheet Date ................................. 35
Bankruptcy Code ...................................... 4
Bankruptcy Court...................................... 4
Bankruptcy Court Milestones .................. 42
Bankruptcy Exceptions ............................ 24
Bid Deadline ............................................ 42
Cash Deficiency Amount.......................... 16
Chapter 11 Cases...................................... 4
Closing ..................................................... 18
Closing Payments Schedule...................... 52
Closing Payments Schedule Delivery Date
............................................................... 52
Contract & Cure Update Schedule............ 12
Copyright Assignment Agreement ........... 18
Credit Bid Amount.................................... 16
CT Transfer Act Forms ............................. 54
CTDEEP .................................................. 54
Designation Rights Assets ........................ 12
Disclosure Schedules ............................... 54
Disputed Amount Contract ....................... 14
Domain Name Assignment....................... 18
e-mail ....................................................... 70
Excluded Assets ......................................... 7
Excluded Cash ........................................... 8
Excluded Liabilities .................................. 10
Execution Date........................................... 4
Exempt Trust............................................. 32
Financial Statements ................................ 35
Holdings..................................................... 4

Insurance Policies ..................................... 33
Interim Arrangement................................. 46
IP Assignment Agreement ........................ 18
Material Contracts..................................... 27
Material Permits........................................ 29
Most Recent Balance Sheet ...................... 35
New Employment Contracts ..................... 39
Nonassignable Assets................................ 46
Non-Assigned Contracts ............................ 8
Original Contract & Cure Schedule.......... 12
Outside Date.............................................. 20
Owned Real Property................................. 30
Owned Real Property Transfer Documents
............................................................... 18
Patent Assignment Agreement.................. 18
Personal Information................................. 26
Petition Date............................................... 4
Post-Closing Cure Payment Arrangement 15
Prepetition Debt Bid Amount ................... 16
Purchase Price .......................................... 16
Purchased Assets......................................... 5
Purchased Names ........................................ 5
Purchaser.................................................... 4
Qualified Plan ........................................... 32
Regulatory Approvals ............................... 51
Representatives ......................................... 45
Restructured Indebtedness ....................... 17
Seller .......................................................... 4
Trademark Assignment Agreement .......... 18
Transfer Taxes .......................................... 49
TSA ........................................................... 54
Unaudited Financial Statements .............. 35
Wind-Down Budget.................................... 8
Windsor CT, Property............................... 54

# ARTICLE 11

## MISCELLANEOUS

11.1    <u>Payment of Expenses</u>.  Except as otherwise provided in this Agreement and whether or not the transactions contemplated hereby are consummated, Sellers will bear their own and Purchaser's, the Prepetition Agent's and the Prepetition Secured Lenders' costs and expenses (including investment advisory and legal fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby.

11.2    <u>Survival of Representations and Warranties; Survival of Post-Closing Covenants</u>. The representations, warranties, covenants and agreements in this Agreement or the Ancillary Agreements, or in any instrument delivered pursuant to this Agreement or the other Ancillary Agreements, shall terminate on the Closing Date, except that each of the covenants set forth in this Agreement or any of the Ancillary Agreements that are to be performed at or after the Closing shall survive in accordance with the terms of the particular covenant or until fully performed. At and at all times after the Closing, in no event shall the Purchaser, on the one hand, or the Sellers, on the other hand, have any recourse against (a) the Sellers or any of the Seller Parties, or (b) the Purchaser or any of the Purchaser Parties, in each such case, with respect to any representation, warranty, covenant or agreement made by the Sellers or the Purchaser in this Agreement or any of the Ancillary Agreements, except, solely in the case of the Purchaser or the Sellers, as applicable, with respect to breaches of covenants set forth in this Agreement or any of the Ancillary Agreements that are to be performed thereby at or after the Closing.

11.3    <u>Entire Agreement; Amendments and Waivers</u>.    This Agreement (including the Schedules hereto) and the Ancillary Agreements represent the entire understanding and agreement between the parties hereto with respect to the subject matter hereof.    Any provision of this Agreement may be amended or waived if, and only if, such amendment or waiver is in writing and signed, in the case of an amendment, by each party hereto, or in the case of a waiver, by the party against whom the waiver is to be effective.    The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.    No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy. Notwithstanding the foregoing, (a) any modifications to the Schedules that are made from time to time in accordance with and as contemplated by <u>Section 1.5</u> shall not require the consent of the Sellers and (b) the Purchaser shall be permitted to increase the Prepetition Debt Bid Amount, from time to time in accordance with and as contemplated by <u>Section 2.1</u> in its sole and absolute discretion without consent from the Sellers.

11.4    <u>Schedules</u>.    The Disclosure Schedules have been arranged for purposes of convenience in separately numbered sections corresponding to the sections of this Agreement; however, each section of the Disclosure Schedules will be deemed to incorporate by reference all information disclosed in any other section of the Disclosure Schedules to the extent the applicability of such disclosure to such other section is reasonably apparent on its face (and without regard to whether a reference to such section of the Disclosure Schedules is made in any such representation or warranty).    Capitalized terms used in the Disclosure Schedules and not otherwise defined therein have the meanings given to them in this Agreement.    The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement, the Disclosure Schedules or the attached exhibits is not intended to imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed (including whether such amounts or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course of Business, and no party will use the fact of the setting of the amounts or the fact of the inclusion of any item in this Agreement, the Disclosure Schedules, or exhibits in any dispute or controversy between the parties as to whether any obligation, item or matter not set forth or included in this Agreement, the

Disclosure Schedules or exhibits is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course of Business, and any such inclusion shall not be deemed or construed to expand the scope of any representation or warranty hereunder or to establish a standard of disclosure in respect of any representation or warranty.  The disclosures in any section of the Disclosure Schedules are not intended to constitute, and will not be construed as constituting, representations, warranties, covenants or agreements of any Seller or the Purchaser.  In addition, matters reflected in the Disclosure Schedules are not necessarily limited to matters required by this Agreement to be reflected in the Disclosure Schedules.  Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature.  No information set forth in the Disclosure Schedules will be deemed to broaden in any way the scope of the parties' representations and warranties.  The information contained in this Agreement, in the Disclosure Schedules and exhibits hereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein will be deemed to be an admission by any party to any third party of any matter whatsoever, including any violation of Law or breach of Contract or will be deemed shall be to constitute an admission by any Seller or the Purchaser (or any of their respective Affiliates) or to otherwise imply that any such matter is material or would have a Material Adverse Effect (as it relates to the Sellers, as the case may be) for the purposes of this Agreement.

11.5   <u>Counterparts</u>.  For the convenience of the parties hereto, this Agreement may be executed and delivered (by facsimile or PDF signature) in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

11.6   <u>Governing Law</u>.   THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE, AND WHERE STATE LAW IS IMPLICATED, THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF (EXCEPT SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.

11.7   <u>Jurisdiction, Waiver of Jury Trial</u>.  (a) THE BANKRUPTCY COURT WILL HAVE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES HERETO, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY; <u>PROVIDED</u>, <u>HOWEVER</u>, THAT IF THE BANKRUPTCY COURT IS UNWILLING OR UNABLE TO HEAR ANY SUCH DISPUTE, THE COURTS OF THE STATE OF NEW YORK LOCATED IN NEW YORK, NEW YORK AND THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA LOCATED IN THE SOUTHERN DISTRICT OF THE STATE OF NEW YORK WILL HAVE SOLE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES HERETO, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY.

(b)   EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING

ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

11.8    Notices.  All notices (including any notices contemplated by Section 1.5), requests, demands, document deliveries and other communications under this Agreement shall be in writing and shall be deemed to have been duly given, provided, made, received or rescinded (a) on the day of delivery when delivered personally, (b) on the day sent when sent by electronic mail ("e-mail") or facsimile, (c) one Business Day after deposit with an overnight courier service or (d) three Business Days after mailed by certified or registered mail return receipt requested, with postage prepaid to the parties at the following addresses, facsimile numbers or e-mail addresses (or at such other address, facsimile number or e-mail address for a party as shall be specified by like notice):

If to the Sellers:

Stanadyne LLC
405 White Street
Jacksonville, NC 28546
Attn: John Pinson
Email: jpinson@stanadyne.com

with a copy (which shall not constitute effective notice) to:

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, NY 10004
Attn:    Kathryn A. Coleman
          Christopher Gartman
Email:  katie.coleman@hughehubbard.com
          chris.gartman@hugheshubbard.com

If to the Purchaser:

S-PPT Acquisition Company LLC
c/o Cerberus Business Finance, LLC
875 Third Avenue
New York, NY 10022
Attn: Joseph Naccarato
Email:  jnaccarato@cerberus.com

With a copy (which shall not constitute effective notice) to:

KTBS Law LLP
1801 Century Park East
Twenty-Sixth Floor
Los Angeles, CA 90067
Attn:    Michael L. Tuchin
          David A. Fidler

71

Email:  mtuchin@ktbslaw.com
dfidler@ktbslaw.com

11.9    Binding Effect; Assignment.  This Agreement shall be binding upon the Purchaser and, subject to entry of the Bidding Procedures Order and the Sale Order, the Sellers and any trustee or estate representative appointed in the Chapter 11 Cases or any successor Chapter 7 case, and inure to the benefit of such parties and their respective successors and permitted assigns.  No assignment of this Agreement or of any rights or obligations hereunder may be made by the Sellers or the Purchaser (by operation of Law or otherwise) without the prior written consent of the other parties hereto and any attempted assignment without the required consents shall be void; provided, however, that the Purchaser may assign, delegate or transfer, in whole or in part, this Agreement and any of its rights, obligations or interests hereunder, without the consent of the Sellers, to one or more of its designees or Affiliates.  No assignment of any obligations hereunder shall relieve the parties hereto of any such obligations.  Upon any such permitted assignment, the references in this Agreement to the Purchaser shall also apply to any such assignee unless the context requires otherwise.

11.10    Severability.  If any term, condition or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other terms, conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in a manner adverse to any party.  Upon such determination that any term, condition or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the fullest extent possible.

11.11    Injunctive Relief.  The Sellers and the Purchaser acknowledge and agree that (a) irreparable damage would occur in the event that any of the provisions of this Agreement are not performed in accordance with their specific terms or are otherwise breached or threatened to be breached, and (b) remedies at law would not be adequate to compensate the non-breaching party. Accordingly, each of the Sellers and the Purchaser shall have the right, in addition to any other rights and remedies existing in its favor, to an injunction or injunctions to prevent breaches or threatened breaches of the provisions of this Agreement and to enforce its rights hereunder not only by an action or actions for damages but also by an action or actions for specific performance, injunctive or other equitable relief without the necessity of proving the inadequacy of money damages as a remedy.  The right to equitable relief, including specific performance and injunctive relief, shall exist notwithstanding, and shall not be limited by, any other provision of this Agreement.  Each of the Sellers and the Purchaser hereby waives any defense that a remedy at law is adequate and any requirement to post bond or other security in connection with actions instituted for injunctive relief, specific performance or other equitable remedies.  Each of the Sellers and the Purchaser hereby agrees not to assert that specific performance, injunctive and other equitable remedies are unenforceable, violate public policy, invalid, contrary to Law or inequitable for any reason.  The right of specific performance, injunctive and other equitable remedies is an integral part of the transactions contemplated by this Agreement and without that right, neither the Sellers nor the Purchaser would have entered into this Agreement.

11.12   <u>Third Party Beneficiaries</u>.  This Agreement is for the sole benefit of the parties hereto and their permitted assigns and nothing herein express or implied shall give or be construed to give to any Person, other than the parties hereto and such permitted assigns (including, for the avoidance of doubt, any plan administrator administering the Chapter 11 Cases), any legal or equitable rights hereunder, except that each of the Seller Parties and the Purchaser Parties shall be a third party beneficiary of <u>Section 3.6</u>.

11.13   <u>Non-Recourse</u>.  This Agreement may only be enforced against, and any Action based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties to this Agreement.  Except to the extent named as a party to this Agreement, and then only to the extent of the specific obligations of such parties set forth in this Agreement, no past, present or future shareholder, member, partner, manager, director, officer, employee, Affiliate, agent or Representative of any party hereto or any subsidiary of Sellers will have any liability (whether in Contract, tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or Liabilities of any of the parties to this Agreement or for any Action based upon, arising out of or related to this Agreement.

11.14   <u>No Effect Upon Lending Relationship</u>.  Notwithstanding anything contained in this Agreement to the contrary, nothing contained in this Agreement shall affect, limit or impair the rights and remedies of the Prepetition Agent, the Prepetition Secured Lenders or any of their respective Affiliates, funding or financing sources or any other lenders in each case in their capacities as lenders to the Sellers.

11.15   <u>Time of the Essence</u>.  Time is of the essence in the performance of each of the obligations of the parties hereto and with respect to all covenants and conditions to be satisfied by the parties in this Agreement and all documents, acknowledgments and instruments delivered in connection herewith.

11.16   <u>Certain Interpretations</u>.

(a)     Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)     All references in this Agreement to Articles, Sections, clauses, parts and the Disclosure Schedules shall be deemed to refer to Articles, Sections, clauses, parts and the Disclosure Schedules to this Agreement unless otherwise specified.

(ii)    The Disclosure Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any section of the Disclosure Schedules but not otherwise defined therein shall be defined as set forth in this Agreement.

(iii)   The Article, Section and paragraph captions herein are for convenience of reference only, do not constitute part of this Agreement and shall not be deemed to limit or otherwise affect any of the provisions hereof.

(iv)    The words "include," "includes" and "including," when used herein shall be deemed in each case to be followed by the words "without limitation" (regardless of whether such words or similar words actually appear).

(v)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is not a Business Day, the period in question shall end on the next succeeding Business Day.  All references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(vi)    Any reference in this Agreement to "$" or "dollars" shall mean U.S. dollars.

(vii)    The words "to the extent" shall mean "the degree by which" and not "if."

(viii)    The word "will" will be constructed to have the same meaning and effect as the word "shall."  The words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive.

(ix)    Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(x)    The words such as "herein," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(xi)    The term "or" is not exclusive.

(xii)    Any reference to any agreement or Contract will be a reference to such agreement or Contract, as amended, modified, supplemented or waived, except for any agreement or Contract referenced in the Disclosure Schedules which references will be deemed to only refer to the specific agreements or Contracts referenced.

(xiii)    Any reference to any particular Code section or any Law will be interpreted to include any amendment to, revision of or successor to that section or Law regardless of how it is numbered or classified; provided that, for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance, with any Code section or Law, the reference to such Code section or Law means such Code section or Law as in effect at the time of such violation or non-compliance or alleged violation or non-compliance.

(xiv)    A reference to any party to this Agreement or any other agreement or document shall include such party's successors and permitted assigns.

(b)    The parties hereto agree that they have been represented by legal counsel during the negotiation and execution of this Agreement and, therefore, waive the application of

any Law, regulation, holding or rule of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

[*The remainder of this page is intentionally left blank.*]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

<u>**SELLERS:**</u>

**STANADYNE PPT HOLDINGS, INC.**

By: _John Pinson_____

Name:  John Pinson

Title:  Chief Executive Officer

**STANADYNE LLC**

By: _John Pinson_____

Name:  John Pinson

Title:  Chief Executive Officer

**PURE POWER TECHNOLOGIES, INC.**

By: _John Pinson_____

Name:  John Pinson

Title:  Chief Executive Officer

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**<u>PURCHASER</u>:**

**S-PPT ACQUISITION COMPANY LLC**


By: _____
Name:    Joseph Naccarato
Title:    Authorized Signatory

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

## ANNEX I

**WIND-DOWN BUDGET**

(To Be Filed as a Supplement in Accordance with <u>Section 8.18</u>)

## ANNEX I to APA

## WIND-DOWN BUDGET

(As finalized on July 8, 2023 pursuant to Section 8.18 of the APA[1])

*($ in thousands USD)*

| Description | Amount |
|---|---|
| Professional Fees through Plan Effective Date | $250 |
| Wind-down Manager/Trustee Fees (does not include incentive fees) | $80 |
| Professional Support for Wind-down Manager/Trustee: | $560 |
| US Trustee Fees (8/1 - 9/30) | $35 |
| Miscellaneous / Other  (includes items such as claims agent, service of solicitation materials, independent manager, Purchaser assistance with accounting and reconciliation costs, as needed) | $75 |
| **Total Disbursements** | **$1,000** |

Purchaser agrees that it will make its personnel available at no cost to the responsible officer of the Debtors referred to in Section 2.2 of the APA or, after the effective date of a Plan, the Trustee, to provide information and assistance with accounting and claim reconciliation matters, for the following periods and capped personnel hours: (a) 25 hours per month for each of the first two months after the Closing; (b) 20 hours per month for each of the third and fourth months after the Closing; and (c) 10 hours per month for months five through 12 after the Closing.  If additional assistance is requested by such responsible officer or the Trustee, as applicable, the Purchaser shall provide such assistance as is reasonably requested for a reasonable period of time on customary terms for the assistance requested and the requesting party shall pay Purchaser its actual costs for providing such assistance and the out-of-pocket expenses incurred by the Purchaser in connection therewith.

---

[1] "**APA**" means that certain Asset Purchase Agreement, dated as of May 8, 2023, by and among Stanadyne Operating Company LLC (formerly known as S-PPT Acquisition Company LLC), Stanadyne PPT Holdings, Inc. and the direct and indirect subsidiaries of Stanadyne PPT Holdings, Inc. party thereto.  Capitalized terms used but not defined in this Annex I have the meanings given to them in the APA or, if not defined in the APA, that certain Committee Settlement Term Sheet attached as Exhibit D to the Sale Order.

<u>**EXHIBIT A**</u>

**[FORM OF] BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT**

This BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT (this "<u>Agreement</u>") is made and entered into as of [_____], 2023, by and among Stanadyne PPT Holdings, Inc., a Delaware corporation, the other entities identified as "Sellers" on the signature pages hereto (each a "<u>Seller</u>" and collectively, "<u>Sellers</u>") and S-PPT Acquisition Company LLC, a Delaware limited liability company ("<u>Purchaser</u>").

WHEREAS, the Sellers and Purchaser have entered into that certain Asset Purchase Agreement, dated as of May [_], 2023 (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Purchase Agreement</u>"), providing for, among other things, the sale and assignment by the Sellers to Purchaser of the Purchased Assets and the assumption by Purchaser of the Assumed Liabilities;

WHEREAS, the Sellers desire to sell, transfer, assign, convey and deliver to Purchaser, or cause to be sold, transferred, assigned, conveyed and delivered to Purchaser, all of Sellers' right, title, and interest in, to and under the Purchased Assets, pursuant to the terms of, and in consummation of the transactions contemplated by, the Purchase Agreement;

WHEREAS, the execution and delivery of this Agreement is required by Sections 3.2(a) and 3.3(b) of the Purchase Agreement; and

WHEREAS, this Agreement, as duly executed by Purchaser and Sellers, is being delivered as of the date hereof by each party hereto to the other party effective as of the Closing.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements set forth herein, and intending to be legally bound hereby, the Purchaser and the Sellers hereby agree as follows:

1.      <u>Definitions</u>.  Capitalized terms used but not defined herein shall have the respective meanings given to such terms in the Purchase Agreement.

2.      <u>Transfer of Purchased Assets.</u>  Pursuant to sections 105, 363 and 365 of the Bankruptcy Code and on the terms and subject to the conditions of the Purchase Agreement and the Sale Order, each Seller does hereby sell, transfer, assign, convey and deliver to Purchaser, and Purchaser does hereby purchase, acquire and accept from such Seller, all of such Seller's right, title and interest in, to and under all of the Purchased Assets, free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances).

3.      <u>Assignment and Assumption</u>.  Pursuant to sections 105, 363 and 365 of the Bankruptcy Code and on the terms and on the terms and subject to the conditions of the Purchase Agreement and the Sale Order, each Seller does hereby sell, transfer, assign, convey and deliver to Purchaser, and Purchaser does hereby purchase, acquire and accept from such Seller, all of such Seller's right, title and interest in, to and under all of the Contracts that are Assigned Contracts as of the date hereof, free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances).  On the terms and subject to the conditions of the Purchase Agreement and the Sale Order, Purchaser does hereby assume only the Assumed Liabilities.

4.      <u>Excluded Assets</u>.  Notwithstanding anything to the contrary in this Agreement, the Purchase Agreement or the other Ancillary Agreements, each Seller shall not sell, transfer, assign, convey

or deliver to Purchaser, and each Seller shall retain all right, title and interest to, in and under, and Purchaser shall not purchase, acquire or accept, or take assignment of, any of the Excluded Assets or any Non-Assigned Contract included in the Excluded Assets.

5.  Excluded Liabilities.  Notwithstanding anything to the contrary in this Agreement or in the Purchase Agreement, Purchaser shall not assume or otherwise be liable for the payment or performance of any of the Excluded Liabilities, all of which shall remain Liabilities of the Sellers for which the Sellers shall remain solely and exclusively liable.

6.  Terms of the Purchase Agreement.  This Agreement is executed and delivered pursuant to the Purchase Agreement.  The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements and indemnities relating to the Purchased Assets and the Assigned Contracts, are incorporated herein by this reference.  The parties hereto acknowledge and agree that the representations, warranties, covenants, agreements and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein.  In the event of a conflict between the terms and conditions of this Agreement and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede and prevail.  Notwithstanding anything to the contrary in this Agreement, nothing herein is intended to, nor shall it, extend, amplify or otherwise alter any representation, warranty, covenant or obligation contained in the Purchase Agreement.

7.  Governing Law.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE, AND WHERE STATE LAW IS IMPLICATED, THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF (EXCEPT SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.

8.  Counterparts.  For the convenience of the parties hereto, this Agreement may be executed and delivered (by facsimile or PDF signature) in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

*[The remainder of this page is intentionally left blank.]*

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

<u>**SELLERS:**</u>

**STANADYNE PPT HOLDINGS, INC.**

By: _____
Name:
Title:

**STANADYNE LLC**

By: _____
Name:
Title:

**PURE POWER TECHNOLOGIES, INC.**

By: _____
Name:
Title:

**PURCHASER**:

**S-PPT ACQUISITION COMPANY LLC**


By: _____

Name:

Title:

## EXHIBIT B

## [FORM OF] PATENT ASSIGNMENT AGREEMENT

This PATENT ASSIGNMENT AGREEMENT ("Agreement") is made and entered into as of [●], 2023, by and between [Stanadyne PPT Holdings, Inc., Stanadyne LLC, Pure Power Technologies, Inc.][1] ("Assignor") and S-PPT Acquisition Company LLC, a Delaware limited liability company ("Assignee").

WHEREAS, Assignor is the owner of the entire right, title and interest in and to all of its patents and patent applications, including, without limitation, the patents and patent applications identified on Schedule A attached hereto (collectively, the "Patents");

WHEREAS, this Agreement is made and entered into in connection with the Closing of the transactions contemplated by that certain Asset Purchase Agreement, dated as of May [●], 2023 (as amended, restated, supplemented or otherwise modified from time to time, the "Purchase Agreement"), by and among Assignee and each other Person that is a signatory thereto, including, without limitation, Assignor;

WHEREAS, capitalized terms used but not defined herein shall have the respective meanings given to such terms in the Purchase Agreement;

WHEREAS, pursuant to the Purchase Agreement, Assignor has agreed to sell, transfer, assign, convey and deliver to Assignee, and Assignee has agreed to purchase, acquire and accept from Assignor, all of Assignor's right, title and interest in, to and under certain assets (including, without limitation, the Patents);

WHEREAS, the execution and delivery of this Agreement is required by Sections 3.2(b) and 3.3(c) of the Purchase Agreement; and

WHEREAS, this Agreement, as duly executed by Assignee and Assignor, is being delivered as of the date hereof by each party hereto to the other party effective as of the Closing.

NOW, THEREFORE, in consideration of the foregoing, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby sells, transfers, assigns, conveys and delivers to Assignee, Assignor's entire worldwide right, title and interest in and to, including any and all common law rights thereto, the Patents, free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances), as well as any and all issuances, divisions, continuations, continuations-in-part, reissues, extensions, reexaminations, and renewals thereof; all rights of any kind whatsoever of Assignor accruing under any of the foregoing provided by applicable law of any jurisdiction, by international treaties and conventions, and otherwise throughout the world; all income, royalties, fees, damages, payments and other proceeds now and hereafter due and/or payable with respect to any and all of the foregoing; and any and all claims and causes of action with respect to any of the foregoing, whether accruing before, on, or after the date hereof, including all rights to and claims for damages, restitution, and injunctive and other legal and equitable relief for past, present, and

---

[1] Note to Draft: Assignor entities to be updated upon finalization of Patents listed on Schedule A.

future infringement, misappropriation, violation, misuse, breach, or default, with the right but no obligation to sue for such legal and equitable relief and to collect, or otherwise recover, any such damages.

Together with Assignor's worldwide right, title and interest in and to each of the Patents being assigned to Assignee, are the rights to police, monitor and enforce said Patents against any and all past, current and future infringements (including, without limitation, the right to sue for and collect damages caused by any such infringement) which may have occurred at any time in the unlimited past, up to the date of this Agreement, together with any and all further privileges in the United States and throughout the world to establish use, ownership, and registration of the Patents.

In accordance with Section 8.12 of the Purchase Agreement, Assignor will cooperate with Assignee, as may be reasonably necessary or appropriate to assist and/or to enable Assignee to record or perfect the above-described transfer of Patent rights, or to secure registration before the United States Patent and Trademark Office or any foreign patent office, at Assignee's expense.

Assignor hereby further authorizes the Commissioner of Patents and Trademarks of the United States, and the appropriate official in any other country, to issue any and all issuances, divisions, continuations, continuations-in-part, reissues, extensions, reexaminations, and renewals that have been or may be granted upon any application or petition for same with respect to the Patents, to Assignee, and Assignees' successors and/or assigns.

Assignor hereby grants to the designated attorneys of Assignee the authority and power to insert on this instrument any further identification which may be necessary or desirable for purposes of recordation by the United States Patent and Trademark Office or the patent office of any other country throughout the world.

This Agreement is executed and delivered pursuant to the Purchase Agreement.  The parties hereto acknowledge and agree that the representations, warranties, covenants, agreements and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein.  In the event of a conflict between the terms and conditions of this Agreement and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede and prevail.  Notwithstanding anything to the contrary in this Agreement, nothing herein is intended to, nor shall it, extend, amplify or otherwise alter any representation, warranty, covenant or obligation contained in the Purchase Agreement.

THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE, AND WHERE STATE LAW IS IMPLICATED, THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF (EXCEPT SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.

For the convenience of the parties hereto, this Agreement may be executed and delivered (by facsimile or PDF signature) in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

[*The remainder of this page is intentionally left blank.*]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first set forth above.

**<u>ASSIGNOR</u>:**[2]

**STANADYNE PPT HOLDINGS, INC.**

By: _____
Name:
Title:

**STANADYNE LLC**

By: _____
Name:
Title:

**PURE POWER TECHNOLOGIES, INC.**

By: _____
Name:
Title:

---

[2] Note to Draft: Assignor signature blocks to be updated upon finalization of Patents listed on Schedule A.

**ASSIGNEE**:

**S-PPT ACQUISITION COMPANY LLC**


By: _____
     Name:
     Title:

## SCHEDULE A

### Patents

| Patent Number | Country | Title | Issue Date |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

### Patent Applications

| Application / Publication Number | Country | Title | Filing Date |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

## EXHIBIT C

## [FORM OF] COPYRIGHT ASSIGNMENT AGREEMENT

This COPYRIGHT ASSIGNMENT AGREEMENT ("Agreement") is made and entered into as of [●], 2023, by and among [Stanadyne PPT Holdings, Inc., Stanadyne LLC, Pure Power Technologies, Inc.][1], the other Sellers party thereto (each an "Assignor" and collectively, "Assignors") and S-PPT Acquisition Company LLC, a Delaware limited liability company ("Assignee").

WHEREAS, Assignors are the owners, as applicable, of the entire right, title and interest in and to all of their respective rights associated with works of authorship, including exclusive exploitation rights, mask work rights, copyrights, database and design rights, whether or not registered or published, all registrations and recordations thereof and applications in connection therewith, along with all extensions and renewals thereof, including, without limitation, the copyrights identified on Schedule A attached hereto (collectively, the "Copyrights");

WHEREAS, this Agreement is made and entered into in connection with the Closing of the transactions contemplated by that certain Asset Purchase Agreement, dated as of May [●], 2023 (as amended, restated, supplemented or otherwise modified from time to time, the "Purchase Agreement"), by and among Assignee and each other Person that is a signatory thereto, including, without limitation, Assignors;

WHEREAS, capitalized terms used but not defined herein shall have the respective meanings given to such terms in the Purchase Agreement;

WHEREAS, pursuant to the Purchase Agreement, each Assignor has agreed to sell, transfer, assign, convey and deliver to Assignee, and Assignee has agreed to purchase, acquire and accept from each Assignor, all of such Assignor's right, title and interest in, to and under certain assets (including, without limitation, the Copyrights);

WHEREAS, the execution and delivery of this Agreement is required by Sections 3.2(c) and 3.3(c) of the Purchase Agreement; and

WHEREAS, this Agreement, as duly executed by Assignee and each Assignor, is being delivered as of the date hereof by each party hereto to the other party effective as of the Closing.

NOW, THEREFORE, in consideration of the foregoing, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Assignor hereby sells, transfers, assigns, conveys and delivers to Assignee, such Assignor's entire worldwide right, title and interest in and to the Copyrights, free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances), as well as any related copyright registrations and/or applications; all rights of any kind whatsoever of Assignor accruing under any of the foregoing provided by applicable law of any jurisdiction, by international treaties and conventions, and otherwise throughout the world; all income, royalties, fees, damages, payments and other proceeds now and hereafter due and/or payable with respect to any and all of the

---

[1] Note to Draft: Assignor entities to be updated upon finalization of Copyrights listed on Schedule A.

foregoing; any and all claims and causes of action with respect to any of the foregoing, whether accruing before, on, or after the date hereof, including all rights to and claims for damages, restitution, and injunctive and other legal and equitable relief for past, present, and future infringement, misappropriation, violation, misuse, breach, or default, with the right but no obligation to sue for such legal and equitable relief and to collect, or otherwise recover, any such damages; and any and all United States and/or foreign copyright registrations which may be issued on same in the future; provided, however, in relation to each of the foregoing, excluding any copyrights or related rights constituting Excluded Assets.

Together with each Assignor's worldwide right, title and interest in and to each of the Copyrights are the rights to police, monitor and enforce said Copyrights against any and all past, current and future infringements (including, without limitation, the right to sue for and collect damages caused by any such infringement) which may have occurred at any time in the unlimited past, up to the date of this present Agreement, together with any and all further privileges in the United States and throughout the world to establish use, ownership, and registration of the Copyrights.

In accordance with Section 8.12 of the Purchase Agreement, Assignors will cooperate with Assignee, as may be reasonably necessary or appropriate to assist and/or to enable Assignee to obtain and enforce the full benefits from the Copyrights and the interests assigned therewith.

This Agreement is executed and delivered pursuant to the Purchase Agreement.  The parties hereto acknowledge and agree that the representations, warranties, covenants, agreements and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein.  In the event of a conflict between the terms and conditions of this Agreement and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede and prevail.  Notwithstanding anything to the contrary in this Agreement, nothing herein is intended to, nor shall it, extend, amplify or otherwise alter any representation, warranty, covenant or obligation contained in the Purchase Agreement.

THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE, AND WHERE STATE LAW IS IMPLICATED, THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF (EXCEPT SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.

For the convenience of the parties hereto, this Agreement may be executed and delivered (by facsimile or PDF signature) in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

*[The remainder of this page is intentionally left blank.]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first set forth above.

**ASSIGNORS**:[2]

**STANADYNE PPT HOLDINGS, INC.**

By: _____
Name:
Title:

**STANADYNE LLC**

By: _____
Name:
Title:

**PURE POWER TECHNOLOGIES, INC.**

By: _____
Name:
Title:

---

[2]  Note to Draft: Assignor signature blocks to be updated upon finalization of Copyrights listed on Schedule A.

[SIGNATURE PAGE TO COPYRIGHT ASSIGNMENT]

**ASSIGNEE**:

**S-PPT ACQUISITION COMPANY LLC**

By: _____
    Name:
    Title:

## SCHEDULE A

### Copyright Registrations

| Title/Description | Registration Number | Registration Date | Assignor |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

### Copyright Applications

| Title/Description | Application Number | Filing Date | Assignor |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

<u>**EXHIBIT D**</u>

**[FORM OF] TRADEMARK ASSIGNMENT AGREEMENT**

This TRADEMARK ASSIGNMENT AGREEMENT ("<u>Agreement</u>") is made and entered into as of [●], 2023, by and among [Stanadyne PPT Holdings, Inc., Stanadyne LLC, Pure Power Technologies, Inc.][1] (each an "<u>Assignor</u>" and collectively, "<u>Assignors</u>") and S-PPT Acquisition Company LLC, a Delaware limited liability company ("<u>Assignee</u>").

WHEREAS, Assignors are the owners, as applicable, of the entire right, title, interest and goodwill in and to all of their respective trademarks, either registered, pending or at common law, including, without limitation, the trademarks identified on <u>Schedule A</u> attached hereto (collectively, the "<u>Trademarks</u>");

WHEREAS, this Agreement is made and entered into in connection with the Closing of the transactions contemplated by that certain Asset Purchase Agreement, dated as of May [●], 2023 (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Purchase Agreement</u>"), by and among Assignee and each other Person that is a signatory thereto, including, without limitation, Assignors;

WHEREAS, capitalized terms used but not defined herein shall have the respective meanings given to such terms in the Purchase Agreement;

WHEREAS, pursuant to the Purchase Agreement, each Assignor has agreed to sell, transfer, assign, convey and deliver to Assignee, and Assignee has agreed to purchase, acquire and accept from each Assignor, all of such Assignor's right, title and interest in, to and under certain assets (including, without limitation, the Trademarks);

WHEREAS, the execution and delivery of this Agreement is required by Sections 3.2(d) and 3.3(c) of the Purchase Agreement; and

WHEREAS, this Agreement, as duly executed by Assignee and each Assignor, is being delivered as of the date hereof by each party hereto to the other party effective as of the Closing.

NOW, THEREFORE, in consideration of the foregoing, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Assignor hereby sells, transfers, assigns, conveys and delivers to Assignee, such Assignor's entire worldwide right, title and interest in and to, including any and all common law rights thereto, as well as the goodwill of the business connected with the use of, and symbolized by, the Trademarks, free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances), as well as any related trademark registrations, trade names, service marks, and/or trademark applications; together with all renewals thereof; all rights of any kind whatsoever of Assignor accruing under any of the foregoing provided by applicable law of any jurisdiction, by international treaties and conventions, and otherwise throughout the world; all income, royalties, fees, damages, payments and other proceeds now and hereafter due and/or payable with respect to any and all of the foregoing; any and all claims and causes of action with

---

[1] Note to Draft: Assignor entities to be updated upon finalization of Trademarks listed on Schedule A.

respect to any of the foregoing, whether accruing before, on, or after the date hereof, including all rights to and claims for damages, restitution, and injunctive and other legal and equitable relief for past, present, and future infringement, dilution, misappropriation, violation, misuse, breach, or default, with the right but no obligation to sue for such legal and equitable relief and to collect, or otherwise recover, any such damages; and any and all United States and/or foreign trademark (or service mark) registrations which may be issued on same in the future; provided, however, in relation to each of the foregoing, excluding any trademarks or related rights constituting Excluded Assets.

Together with each Assignor's worldwide right, title and interest in and to each of the Trademarks, as well as the goodwill of the business associated with said Trademarks being assigned to Assignee, are the rights to police, monitor and enforce said Trademarks against any and all past, current and future infringements (including, without limitation, the right to sue for and collect damages caused by any such infringement) which may have occurred at any time in the unlimited past, up to the date of this Agreement, together with any and all further privileges in the United States and throughout the world to establish use, ownership, and registration of the Trademarks.

In accordance with Section 8.12 of the Purchase Agreement, Assignors will cooperate with Assignee, as may be reasonably necessary or appropriate to assist and/or to enable Assignee to record or perfect the above-described transfer of Trademark rights, or to secure registration before the United States Patent and Trademark Office or any foreign trademark office, at Assignee's expense.

Each Assignor hereby further authorizes the Commissioner of Patents and Trademarks of the United States, and the appropriate official in any other country, to issue any and all trademark and service mark registrations, amended registrations and renewals that have been or may be granted upon any application or petition for same, to Assignee, and Assignees' successors and/or assigns.

Each assignor hereby grants to the designated attorneys of Assignee the authority and power to insert on this instrument any further identification which may be necessary or desirable for purposes of recordation by the United States Patent and Trademark Office or the trademark office of any other country throughout the world.

This Agreement is executed and delivered pursuant to the Purchase Agreement. The parties hereto acknowledge and agree that the representations, warranties, covenants, agreements and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of a conflict between the terms and conditions of this Agreement and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede and prevail. Notwithstanding anything to the contrary in this Agreement, nothing herein is intended to, nor shall it, extend, amplify or otherwise alter any representation, warranty, covenant or obligation contained in the Purchase Agreement.

THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE,

AND WHERE STATE LAW IS IMPLICATED, THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF (EXCEPT SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.

For the convenience of the parties hereto, this Agreement may be executed and delivered (by facsimile or PDF signature) in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

[*The remainder of this page is intentionally left blank.*]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first set forth above.

<u>**ASSIGNORS**</u>:[2]

**STANADYNE PPT HOLDINGS, INC.**

By: _____
Name:
Title:

**STANADYNE LLC**

By: _____
Name:
Title:

**PURE POWER TECHNOLOGIES, INC.**

By: _____
Name:
Title:

---

[2]  Note to Draft: Assignor signature blocks to be updated upon finalization of Trademarks listed on Schedule A.

**ASSIGNEE**:

**S-PPT ACQUISITION COMPANY LLC**

By:_____
    Name:
    Title:

## SCHEDULE A

### Trademark Registrations

| Trademark | Country | Registration Number | Registration Date | Assignor |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

### Trademark Applications

| Trademark | Country | Application Serial Number | Application Date | Assignor |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**EXHIBIT E**

**[FORM OF] DOMAIN NAME ASSIGNMENT AGREEMENT**

This DOMAIN NAME ASSIGNMENT AGREEMENT ("Agreement") is made and entered into as of [●], 2023, by and among [Stanadyne PPT Holdings, Inc., Stanadyne LLC, and Pure Power Technologies, Inc.][1] (each an "Assignor" and collectively, "Assignors") and S-PPT Acquisition Company LLC, a Delaware limited liability company ("Assignee").

WHEREAS, Assignors are the owners, as applicable, of the internet domain names identified on Schedule A attached hereto (collectively, the "Domain Names"), each of which has been registered with the applicable registrar set forth on such Schedule A;

WHEREAS, this Agreement is made and entered into in connection with the Closing of the transactions contemplated by that certain Asset Purchase Agreement, dated as of May [●], 2023 (as amended, restated, supplemented or otherwise modified from time to time, the "Purchase Agreement"), by and among Assignee and each other Person that is a signatory thereto, including, without limitation, Assignors;

WHEREAS, capitalized terms used but not defined herein shall have the respective meanings given to such terms in the Purchase Agreement;

WHEREAS, pursuant to the Purchase Agreement, each Assignor has agreed to sell, transfer, assign, convey and deliver to Assignee, and Assignee has agreed to purchase, acquire and accept from each Assignor, all of such Assignor's right, title and interest in, to and under certain assets (including, without limitation, the Domain Names);

WHEREAS, the execution and delivery of this Agreement is required by Sections 3.2(e) and 3.3(c) of the Purchase Agreement; and

WHEREAS, this Agreement, as duly executed by Assignee and each Assignor, is being delivered as of the date hereof by each party hereto to the other party effective as of the Closing.

NOW, THEREFORE, in consideration of the foregoing, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Assignor does hereby sell, transfer, assign, convey and deliver to Assignee, effective as of the Closing, all right, title and interest in and to the Domain Names, free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances), except for any rights constituting Excluded Assets.

In accordance with Section 8.12 of the Purchase Agreement, Assignors and Assignee will cooperate to perform all affirmative acts which may be reasonably necessary or appropriate to implement and perfect the above-described transfer of rights and to secure transfer of the Domain Name registrations before the registrars of same as well as to cooperate with Assignee in obtaining and/or providing information required in any proceedings relating to the Domain Names, and Assignors hereby agree to follow Assignee's reasonable instructions in order to effectuate the

---

[1] **Note to Draft**: Assignor entities to be updated upon finalization of Domain Names listed on Schedule A.

transfer of the Domain Name registrations in a timely manner.

This Agreement is executed and delivered pursuant to the Purchase Agreement. The parties hereto acknowledge and agree that the representations, warranties, covenants, agreements and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of a conflict between the terms and conditions of this Agreement and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede and prevail. Notwithstanding anything to the contrary in this Agreement, nothing herein is intended to, nor shall it, extend, amplify or otherwise alter any representation, warranty, covenant or obligation contained in the Purchase Agreement.

THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE, AND WHERE STATE LAW IS IMPLICATED, THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF (EXCEPT SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.

For the convenience of the parties hereto, this Agreement may be executed and delivered (by facsimile or PDF signature) in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

*[The remainder of this page is intentionally left blank.]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first set forth above.

<u>**ASSIGNORS**</u>:[2]

**STANADYNE PPT HOLDINGS, INC.**

By: _____
Name:
Title:

**STANADYNE LLC**

By: _____
Name:
Title:

**PURE POWER TECHNOLOGIES, INC.**

By: _____
Name:
Title:

---

[2] **Note to Draft**: Assignor signature blocks to be updated upon finalization of Domain Names listed on Schedule A.

**<u>ASSIGNEE</u>**:

**S-PPT ACQUISITION COMPANY LLC**

By:_____

    Name:

    Title:

## SCHEDULE A

### Domain Names

| Domain Name | Registrar |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

# EXHIBIT B

**Debtor Entities**

*Potential Assigned Contracts - Exhibit B*
*($USD)*

| | Counterparty | Cure Amount | Debtor Entity | Description | Execution Date |
|---|---|---|---|---|---|
| 1. | AEROSTAR MANUFACTURING | $ - | Stanadyne LLC | Master Supply Agreement dated February 11, 2021 between Stanadyne LLC and AE Group LLC DBA AEROSTAR MANUFACTURING | February 11, 2021 |
| 2. | Alten Technology USA | $ - | Pure Power Technologies, Inc. | Amendment #1 to Engineering Services Proposal dated October 18, 2022 between Alten Technology USA and Pure Power Technologies, Inc. | October 18, 2022 |
| 3. | AMISCO SpA | $ - | Stanadyne LLC | Master Supply Agreement dated July 5, 2019 between Stanadyne LLC and Amisco SpA | July 5, 2019 |
| 4. | AON | $ - | Stanadyne LLC | Scope of Actuarial Services Provided for Calendar Year 2023 dated January 6, 2023 between Aon Consulting, Inc. and Stanadyne Corporation | January 6, 2023 |
| 5. | Arch Insurance Company | $ - | Stanadyne LLC | Cyber (Primary) insurance policy | August 1, 2022 |
| 6. | AT&T | $ 378.39 | Stanadyne LLC | Master Agreement dated August 26, 2013 between Stanadyne Corporation and AT&T Corp; AT&T Audio Teleconference Services Pricing Schedule dated August 26, 2013 between Stanadyne Corporation and AT&T Corp. | August 26, 2013 |
| 7. | ATMatWork | $ - | Pure Power Technologies, Inc. | Placement Processing Service and Maintenance Agreement dated September 27, 2017 between ATMatWork, LLC and Pure Power Technologies, Inc. | September 27, 2017 |
| 8. | ATWORK | $ - | Stanadyne LLC | Order and Acknowledgement dated November 3, 2022 between Plateau Staffing d/b/a AtWork and Stanadyne | November 3, 2022 |
| 9. | AUTOCAM CORPORATION D/B/A MOBILE SOLUTIONS GROUP | $ - | Stanadyne LLC | Master Supply Agreement dated February 22, 2018 between Stanadyne and Autocam Precision Components Group, as amended by that certain Second Amendment to Master Supply Agreement dated as of September 15, 2022 between Autocam Corporation and NN, Inc. and Stanadyne LLC | February 22, 2018 |
| 10. | AUTOCAM PRECISION COMPONENTS GROUP | $ - | Stanadyne LLC | Master Supply Agreement dated January 18, 2017 between Stanadyne LLC and Autocam Precision Components Group | January 18, 2017 |
| 11. | Autocam Precision Components Group of NN, Inc. | $ - | Pure Power Technologies, Inc. | Memorandum of Understanding dated June 25, 2021 between Pure Power Technologies and Autocam Precision Components Group of NN, Inc | June 25, 2021 |
| 12. | Autozone Parts, Inc. | $ - | Pure Power Technologies, Inc. | US Vendor Agreement No. 00029 between AutoZone Parts, Inc. and Pure Power Technologies | December 18, 2019 |
| 13. | BACKUPIFY INC. | $ 3,000.00 | Stanadyne LLC | Product License & Services | |
| 14. | Barefoot CNC | $ - | Stanadyne LLC | Mastercam Software Subscription | |
| 15. | Blue Cross and Blue Shield of South Carolina | $ - | Stanadyne LLC | Employee Plan | |
| 16. | BRIJ IMAGE AND INFORMATION INC | $ 542.86 | Stanadyne LLC | JD Edwards Flex Support Statement of Work for Stanadyne LLC dated February 16, 2020 between Brij and Stanadyne LLC | February 16, 2020 |
| 17. | Cambria Hotels | $ - | Pure Power Technologies, Inc. | Volume Contract Agreement dated January 1st, 2023 between Pure Power Technologies, Inc. and Cambria Hotels | January 1, 2023 |
| 18. | Carolina Industrial Staffing, Inc. | $ 73,648.36 | Pure Power Technologies, Inc. | Service Agreement between Carolina Industrial Staffing, Inc. and Pure Power Technologies, Inc | April 6, 2018 |
| 19. | CARON & BLETZER, PLLC | $ - | Stanadyne LLC | Engagement Letter (Savings Plus Plan) dated January 6, 2023 between Caron & Bletzer, PLLC and Stanadyne LLC | January 6, 2023 |

**Debtor Entities**

*Potential Assigned Contracts - Exhibit B*
(*$USD*)

| | Counterparty | Cure Amount | | Debtor Entity | Description | Execution Date |
|---|---|---|---|---|---|---|
| 20. | CARON & BLETZER, PLLC | $ | - | Stanadyne LLC | Engagement Letter (Pension Plan) dated January 6, 2023 between Caron & Bletzer, PLLC and Stanadyne LLC | January 6, 2023 |
| 21. | Caron & Bletzer, PLLC | $ | 1,830.00 | Pure Power Technologies, Inc. | Engagement Letter (401k Plan) dated January 6, 2023 between Caron & Bletzer, PLLC and Pure Power Technologies, Inc. | January 6, 2023 |
| 22. | CData | $ | - | Pure Power Technologies, Inc. | Cdata Arc Software Maintenance | |
| 23. | Chubb – Federal Insurance Company | $ | - | Stanadyne LLC | Crime insurance policy | July 1, 2022 |
| 24. | Chubb – Federal Insurance Company | $ | - | Stanadyne LLC | Fiduciary Liability insurance policy | July 1, 2022 |
| 25. | Chubb – Federal Insurance Company | $ | - | Stanadyne LLC | Special crime insurance liability | July 1, 2022 |
| 26. | Chubb – Federal Insurance Company | $ | - | Stanadyne LLC | Directors & Officers Liability and Employment Practices Liability insurance policy | July 1, 2022 |
| 27. | CINTAS CORPORATION | $ | 4,866.72 | Pure Power Technologies, Inc. | Standard Rental Service Agreement between Pure Power Technologies, Inc. and Cintas | February 3, 2022 |
| 28. | Citrix | $ | - | Pure Power Technologies, Inc. | Software Maintenance | |
| 29. | Claris | $ | - | Pure Power Technologies, Inc. | FileMaker Pro Software Maintenance | |
| 30. | Clark Equipment Company | $ | - | Pure Power Technologies, Inc. | Supply Agreement Dated June 5, 2020 between Clark Equipment Company and Pure Power Technologies, Inc. | June 5, 2020 |
| 31. | Cleverbridge | $ | - | Pure Power Technologies, Inc. | Lansweeper Software Subscription | |
| 32. | CMT | $ | 50,225.54 | Pure Power Technologies, Inc. | Vending/Commodity Management Agreement dated March 2, 2020 between CMT Industrial Solutions, LLC d/b/a Carolina Machine & Tooling and Stanadyne, LLC/ PurePower Technologies | March 2, 2020 |
| 33. | Columbia Soft | $ | 205.00 | Pure Power Technologies, Inc. | Document Locator Software Maintenance | |
| 34. | COMCAST | $ | - | Stanadyne LLC | Sales Order Form CT-18271127 dated November 16, 2022 between Comcast Enterprise Services and Stanadyne LLC | November 16, 2022 |
| 35. | COMCAST | $ | - | Stanadyne LLC | Sales Order Form dated September 14, 2020 between Stanadyne LLC and Comcast Enterprise Services | September 14, 2020 |
| 36. | COMCAST | $ | 174.17 | Stanadyne LLC | Sales Order Form CT-18271127 dated July 21, 2020 between Comcast Enterprise Services and Stanadyne LLC | July 21, 2020 |
| 37. | Commerce & Industry Insurance Co. (AIG) | $ | - | Stanadyne LLC | Lead Umbrella insurance policy | July 1, 2022 |
| 38. | CONCUR TECHNOLOGIES INC | $ | 846.59 | Stanadyne LLC | Order Form no. 11029067 between Stanadyne Corporation and Concur Technologies, Inc. | December 21, 2021 |
| 39. | Connection Financial Services | $ | - | Pure Power Technologies, Inc. | Master Lease Agreement dated January 26, 2021 between Connection Financial Services and Pure Power Technologies, Inc | January 26, 2021 |
| 40. | CONNECTRIA | $ | - | Stanadyne LLC | Statement of Work dated December 1, 2022 between Connectria, LLC and Stanadyne LLC | December 1, 2022 |
| 41. | CONNECTRIA CORPORATION | $ | 43,265.90 | Stanadyne LLC | Extension Amendment to Statement of Work #1 between Connectria LLC and Stanadyne, LLC | September 18, 2017 |
| 42. | CONSULTECH SERVICES, INC | $ | 5,452.15 | Stanadyne LLC | Contract Consultant Agreement between Consultech Services, Inc. and Stanadyne LLC | March 14, 2019 |
| 43. | CORINTH CORE CENTER | $ | - | Pure Power Technologies, Inc. | Direct to Buy with Navistar MSA per PPT | |
| 44. | Crum & Forster Specialty Insurance Company | $ | - | Stanadyne LLC | Cyber (Excess) insurance policy | July 31, 2022 |

**Debtor Entities**

*Potential Assigned Contracts - Exhibit B*
*($USD)*

| | Counterparty | Cure Amount | | Debtor Entity | Description | Execution Date |
|---|---|---|---|---|---|---|
| 45. | CUMMINS FUEL SYSTEM (WUHAN) CO., LTD. & CUMMINS INC. | $ | - | Stanadyne LLC | Sub-assembly and Tier 2 Supplier Agreement dated May 30, 2012 between Cummins Inc., Cummins Fuel Systems Wuhan Co. Ltd., Stanadyne Corporation and Stanadyne Changsu Corporation | December 21, 2021 |
| 46. | CUMMINS FUEL SYSTEM (WUHAN) CO., LTD. & CUMMINS INC. | $ | - | Stanadyne LLC | Direct Supply Agreement dated April 19, 2012 between Cummins Inc./Cummins Fuel Systems (Wuhan) Co. Ltd. Inc. and Stanadyne Corporation N/K/A Stanadyne LLC/ Stanadyne Changshu Corporation | April 19, 2012 |
| 47. | CUMMINS INC / CUMMINS FUEL SYSTEMS WUHAN CO. LTD. | $ | - | Stanadyne LLC | Amendment 1 to Direct Supply Agreement dated July 1, 2014 between Cummins Inc., Cummins Fuel System Wuhan Co. Ltd., Stanadyne Corporation and Stanadyne Changsu Corporation | July 1, 2014 |
| 48. | CUMMINS INC / CUMMINS FUEL SYSTEMS WUHAN CO. LTD. | $ | - | Stanadyne LLC | Amendment 2 to Direct Supply Agreement dated October 24, 2016 between Cummins Inc./Cummins Fuel Systems (Wuhan) Co. Ltd. Inc. and Stanadyne Corporation N/K/A Stanadyne LLC/Stanadyne Changshu Corporation | October 24, 2016 |
| 49. | CUMMINS INC / CUMMINS FUEL SYSTEMS WUHAN CO. LTD. | $ | - | Stanadyne LLC | Amendment 3 to Direct Supply Agreement dated October 1, 2018 between Cummins Inc./Cummins Fuel Systems (Wuhan) Co. Ltd. Inc. and Stanadyne Corporation N/K/A Stanadyne LLC/Stanadyne Changshu Corporation | October 1, 2018 |
| 50. | CUMMINS INC / CUMMINS FUEL SYSTEMS WUHAN CO. LTD. | $ | - | Stanadyne LLC | Amendment 4 to Direct Supply Agreement dated January 1, 2020 between Cummins Inc./Cummins Fuel Systems (Wuhan) Co. Ltd. Inc. and Stanadyne Corporation N/K/A Stanadyne LLC/Stanadyne Changshu Corporation | January 1, 2020 |
| 51. | CUMMINS INC / CUMMINS FUEL SYSTEMS WUHAN CO. LTD. | $ | - | Stanadyne LLC | Compensation Agreement dated December 21, 2021 between Cummins Inc./Cummins Fuel System (Wuhan) Co., Ltd. and Stanadyne LLC/Stanadyne Changsu Corporation | December 21, 2021 |
| 52. | D&W  Diesel, Inc. | $ | - | Pure Power Technologies, Inc. | Falls under Jasper Holdings agreement per PPT | |
| 53. | DATAMAX SOFTWARE D/B/A RFGEN SOFTWARE | $ | 9,589.00 | Stanadyne LLC | Software license | |
| 54. | DE LAGE LANDEN FINANCIAL SERVICES, INC. | $ | 4,893.93 | Stanadyne LLC | Lease Agreements between SH International Corp and Stanadyne LLC | March 1, 2021; July 26, 2021; June 2, 2022 |
| 55. | DEERE & COMPANY | $ | - | Stanadyne LLC | Material Index Agreement dated April 15, 2022 between Stanadyne Corp. and Deere & Company | April 15, 2022 |
| 56. | DEERE & COMPANY | $ | - | Stanadyne LLC | Terms and Conditions dated October 31, 2011 between Stanadyne and Deere & Company | October 31, 2011 |
| 57. | DEERE & COMPANY | $ | - | Stanadyne LLC | Master Bailment Agreement dated May 21, 2012 between Stanadyne Corporation and Deere & Company | May 21, 2012 |
| 58. | DEERE & COMPANY | $ | - | Stanadyne LLC | Global Long Term Agreement dated January 1, 2020 between Stanadyne Corporation and Deere & Company | January 1, 2020 |
| 59. | DEERE & COMPANY | $ | - | Stanadyne LLC | Global Long Term Agreement dated January 1, 2022 between Stanadyne Corporation and Deere & Company, as amended by that certain Amendment 1 to Long Term Agreement dated July 1, 2022 between Deere & Company and Stanadyne Corporation | January 1, 2022 |
| 60. | DEERE & COMPANY | $ | - | Stanadyne LLC | Warranty Agreement dated January 1, 2021 between Stanadyne LLC and Deere & Company | January 1, 2021 |
| 61. | DEX MPS | $ | - | Stanadyne LLC | Agreement dated April 29, 2021 between Dex MPX and Stanadyne Corporation | April 29, 2021 |

**Debtor Entities**

*Potential Assigned Contracts - Exhibit B*
*($USD)*

| | Counterparty | Cure Amount | Debtor Entity | Description | Execution Date |
|---|---|---|---|---|---|
| 62. | DI Squared | $ 54,900.00 | Pure Power Technologies, Inc. | Statement of Work dated July 30, 2021 pursuant to the Master Services Agreement dated November 26, 2018 between PurePower Technologies and DI Squared LLC | July 30, 2021 |
| 63. | Diesel Forward | $ - | Pure Power Technologies, Inc. | Supply Agreement dated May 15, 2017 between Diesel Forward, Inc. and Pure Power Technologies, Inc., as amended by that certain Amended and Restated Supply Agreement dated November 31, 2018 between Diesel Forward, Inc. and Pure Power Technologies, Inc., and by that certain Amendment no. 1 to Amended and Restated Supply Agreement dated March 15, 2020 between Diesel Forward, Inc. and Pure Power Technologies, Inc. <br><br> Distributor Agreement dated June 1, 2022 between Diesel Forward, Inc. and Pure Power Technologies, Inc. | May 15, 2017 |
| 64. | DIESEL FORWARD, INC. | $ - | Stanadyne LLC | Memorandum of Understanding dated December 22, 2021 between Stanadyne LLC and Diesel Forward, Inc. <br><br> Stanadyne Central Distributor Agreement dated April 1, 2022 between Diesel Forward Inc. and Stanadyne LLC | December 22, 2021 |
| 65. | DIRECT ENERGY | $ - | Stanadyne LLC | Overview of Account dated March 17, 2023 between Direct Energy Business and Stanadyne Corporation | March 17, 2023 |
| 66. | DORCH ENGINEERING LLC | $ - | Stanadyne LLC | Distributor Agreement dated January 3, 2023 between Stanadyne LLC and Dorch Engineering LLC | January 3, 2023 |
| 67. | DSV SOLUTIONS | $ 509.12 | Pure Power Technologies, Inc. | Warehousing and Logistics Services Agreement between Pure Power and DSV Solutions LLC | June 15, 2021 |
| 68. | Post Road Equipment Finance SPV, LLC formerly known as Encina Equipment Finance SPV, LLC | $ 72,310.25 | Pure Power Technologies, Inc. | Master Lease Agreement dated May 26, 2022 between Encina Equipment Finance SPV, LLC, Stanadyne LLC and Pure Power Technologies, Inc., as amended by that certain Equipment Schedule No. 001 to Master Lease Agreement dated May 26, 2022 between Encina Equipment Finance SPV, LLC and Pure Power Technologies, Inc., as further amended by that certain Addendum to the Equipment Schedule No. 001 to Master Lease Agreement dated May 26, 2022 between Encina Equipment Finance SPV, LLC and Pure Power Technologies, Inc., as further amended by that certain Amendment #1 to Equipment Schedule No. 001 to the Master Lease Agreement dated August 29, 2022 between Pure Power Technologies, Inc, Stanadyne LLC, and Encina Equipment Finance SPV, LLC, as further amended by that certain Equipment Schedule No. 002 to Master Lease Agreement dated August 29, 2022 between Encina Equipment Finance SPV, LLC, Stanadyne LLC and Pure Power Technologies, Inc., as further amended by that certain Addendum to Equipment Schedule – Progress Payments dated August 29, 2022 between Encina Equipment Finance SPV, LLC and Stanadyne LLC, and as further amended by that certain Progress Payment Addendum Modification dated August 29, 2022 between Encina Equipment Finance SPV, LLC and Pure Power Technologies, Inc. | May 26, 2022 |

**Debtor Entities**

*Potential Assigned Contracts - Exhibit B*
(*$USD*)

| | Counterparty | Cure Amount | Debtor Entity | Description | Execution Date |
|---|---|---|---|---|---|
| 69. | ENCINA EQUIPMENT FINANCE, LLC | $ 9,281.94 | Stanadyne LLC | o  Equipment Schedule No. 002 dated August 29, 2022 between Encina Equipment Finance SPV, LLC and Stanadyne LLC and Pure Power Technologies, Inc. to Master Lease Agreement dated as of May 26, 2022; <br><br> o  Master Lease Agreement dated May 26, 2022 between Encina Equipment Finance SPV, LLC, Stanadyne LLC and Pure Power Technologies, Inc., and that certain Equipment Schedule No. 001 to Master Lease Agreement dated May 26, 2022 between Encina Equipment Finance SPV, LLC and Pure Power Technologies, Inc., as amended by that certain Addendum to the Equipment Schedule No. 001 to Master Lease Agreement dated May 26, 2022 between Encina Equipment Finance SPV, LLC and Pure Power Technologies, Inc., by that certain Amendment #1 to Equipment Schedule No. 001 to the Master Lease Agreement dated August 29, 2022 between Pure Power Technologies, Inc, Stanadyne LLC, and Encina Equipment Finance SPV, LLC, by that certain Equipment Schedule No. 002 to Master Lease Agreement dated August 29, 2022 between Encina Equipment Finance SPV, LLC, Stanadyne LLC and Pure Power Technologies, Inc., by that certain Addendum to Equipment Schedule – Progress Payments dated August 29, 2022 between Encina Equipment Finance SPV, LLC and Stanadyne LLC, and by that certain Progress Payment Addendum Modification dated August 29, 2022 between Encina Equipment Finance SPV, LLC and Pure Power Technologies, Inc. | May 26, 2022 |
| 70. | Etas | $ - | Pure Power Technologies, Inc. | | |
| 71. | EXPRESS EMPLOYMENT PROFESSIONALS | $ 35,290.42 | Stanadyne LLC | Staffing Agreement between Express Employment Professionals and Stanadyne | November 23, 2022 |
| 72. | Federal Insurance Company | $ - | Stanadyne LLC | Business Travel Accident insurance policy | July 1, 2022 |
| 73. | FGP HR Consulting, LLC | $ 16,250.00 | Pure Power Technologies, Inc. | Contingency Search Agreement between FGP Professional Search and Pure Power Technologies, Inc. (Note slight difference in name) | December 9, 2022 |
| 74. | FIDELITY SUPPLY CHAIN | $ - | Stanadyne LLC | Quotation dated November 1, 2013 between Fidelity Supply Chain Solutions and Stanadyne Corporation | November 1, 2013 |
| 75. | Fireman's Fund (Allianz) | $ - | Stanadyne LLC | Excess Liability insurance policy | July 1, 2022 |
| 76. | First Citizens Bank & Trust Comp | $ 1,646.80 | Pure Power Technologies, Inc. | Master Lease Agreement dated June 22, 2022 between Lenovo Financial Services and Pure Power Technologies | June 22, 2022 |
| 77. | Ford Motor Company | $ - | Pure Power Technologies, Inc. | Sourcing Agreement between Ford Customer Service Division and Pure Power Technologies, Inc. | April 26, 2022 |
| 78. | FULTON BELLOWS LLC | $ 221,199.30 | Stanadyne LLC | Master Supply Agreement dated March 16, 2018 between Stanadyne LLC and Fulton Bellows, LLC, as amended by that certain Addendum (B) to Master Supply Agreement dated September 18, 2018 between Stanadyne LLC and Fulton Bellows, LLC | March 16, 2018 |
| 79. | Gcl Diesel Injection Service Ltd. | $ - | Pure Power Technologies, Inc. | Parts Sales Agreement dated 3/19/19 between Pure Power Technologies, INC. and GCL Diesel | March 19, 2019 |

**Debtor Entities**

*Potential Assigned Contracts - Exhibit B*
*($USD)*

| | Counterparty | Cure Amount | Debtor Entity | Description | Execution Date |
|---|---|---|---|---|---|
| 80. | GENERAL MOTORS LLC | $ - | Stanadyne LLC | Purchase Contract dated June 1, 2018 between Stanadyne LLC and General Motors LLC | June 1, 2018 |
| 81. | GENERAL MOTORS LLC | $ - | Stanadyne LLC | Purchase Contract dated February 7, 2017 between Stanadyne LLC and General Motors LLC | February 7, 2017 |
| 82. | General Motors of Canada Company | $ - | Stanadyne LLC | Purchase Contract dated April 8, 2022 between Stanadyne LLC and General Motors of Canada Company | April 8, 2022 |
| 83. | GHA Technologies | $ - | Pure Power Technologies, Inc. | Palo Alto Networks Software Subscription | |
| 84. | GHA Technologies | $ - | Pure Power Technologies, Inc. | AutoDesk AutoCAD Software Subscription | |
| 85. | GHA Technologies | $ 18,778.94 | Pure Power Technologies, Inc. | Software Subscription: SUSA Linux, VMWare, Veeam | |
| 86. | GLOBAL SYSTEMS INTEGRATION INC. | $ - | Stanadyne LLC | Statement of Work dated February 1, 2021 between Global Systems Integration, Inc. and Stanadyne LLC | February 1, 2021 |
| 87. | GM de Mexico S. de R.L. de C.V. | $ - | Stanadyne LLC | Purchase Contract dated February 7, 2017 between Stanadyne LLC and GM de Mexico S. de R.L. de C.V. | February 7, 2017 |
| 88. | GM DE MEXICO S.DE R.L. DE C.V | $ - | Stanadyne LLC | Purchase Contract dated June 1, 2018 between Stanadyne LLC and GM de Mexico S. de R.L. de C.V | June 1, 2018 |
| 89. | GRANITE TELECOMMUNICATIONS, LLC | $ 2,215.61 | Pure Power Technologies, Inc. | Path to Partnership, Commercial Account Form and Letter of Agency – Analog Replacement Services between Pure Power Technologies, Inc. and Granite Telecommunications, LLC | August 18, 2022 |
| 90. | Hanover | $ - | Stanadyne LLC | Cargo insurance policy | July 1, 2022 |
| 91. | Hanover Commercial Insurance Company | $ - | Stanadyne LLC | General Liability insurance policy | July 1, 2022 |
| 92. | Hanover Insurance Group | $ - | Stanadyne LLC | Foreign Package insurance policy | July 1, 2022 |
| 93. | Highway And Heavy Parts Llc | $ - | Pure Power Technologies, Inc. | Parts Sales Agreement dated 12/30/18 between Pure Power Technologies, INC. and Highway and Heavy Parts | December 30, 2018 |
| 94. | HITACHI ASTEMO, LTD. | $ 52,548.70 | Stanadyne LLC | Patent License Agreement dated January 5, 2018 between Hitachi Automotive Systems, Ltd. and Stanadyne LLC | January 5, 2018 |
| 95. | Holden Richardson | $ - | Pure Power Technologies, Inc. | Confirmation Letter dated June 24, 2022 between Stanadyne | June 24, 2022 |
| 96. | HOLDEN TEMPORARIES, INC | $ 30,045.12 | Stanadyne LLC | Staffing Agreement between Holden Temporaries, Inc. and Stanadyne and Confirmation Letter dated June 24, 2022 between Stanadyne LLC and Holden Richardson | June 11, 2019 |
| 97. | HTT, INC | $ 167,043.53 | Stanadyne LLC | Master Supply Agreement between Stanadyne LLC and HTT, Inc. | August 8, 2018 |
| 98. | INFOR (US) LLC | $ - | Stanadyne LLC | Order Form dated May 30, 2013 between Infor (US), Inc. and Stanadyne Corporation | May 30, 2013 |
| 99. | INFOR (US) LLC | $ - | Stanadyne LLC | Order Form dated October 11, 2021 between Infor (US), Inc. and Stanadyne Corporation | October 11, 2021 |
| 100. | INTRUST BANK, N.A. | $ - | Stanadyne LLC | Premium Finance Agreement dated July 1, 2022 between Stanadyne LLC and Intrust Bank, N.A. and Pure Power Technologies | July 1, 2022 |
| 101. | Ironshore Specialty Insurance Company | $ - | Stanadyne LLC | Pollution liability insurance policy | July 1, 2022 |
| 102. | J ROYAL US INC. | $ 115,617.88 | Stanadyne LLC | Master Supply Agreement dated July 26, 2016 between Stanadyne LLC and J Royal US Inc. d/b/a Hercules OEM | July 26, 2016 |
| 103. | JAMES J PAPPAS | $ 3,380.00 | Stanadyne LLC | Consulting Agreement between Stanadyne LLC and James J. Pappas | December 21, 2022 |
| 104. | JASON MCGUINESS DBA:GRAFIKINC | $ 3,333.33 | Stanadyne LLC | Consulting Agreement between Stanadyne LLC and Jason McGuiness | January 1, 2023 |

**Debtor Entities**

*Potential Assigned Contracts - Exhibit B*
*($USD)*

| | Counterparty | Cure Amount | Debtor Entity | Description | Execution Date |
|---|---|---|---|---|---|
| 105. | Jasper Engine & Transmission | $    - | Pure Power Technologies, Inc. | Distributor Agreement between Pure Power Technologies, Inc and Jasper Holdings | June 20, 2022 |
| 106. | JOHNSON CONTROLS INC | $    2,208.50 | Pure Power Technologies, Inc. | Several Planned Service Proposals between Pure Power Technologies and Johnson Controls | (i) January 8, 2021; (ii) March 17, 2020; (iii) June 18, 2021; (iv) December 14, 2021; (v) September 20, 2022 |
| 107. | JOHNSON CONTROLS SECURITY SOLUTIONS LLC | $    404.82 | Stanadyne LLC | Commercial Sales Agreement between Johnson Controls Security Solutions LLC and Stanadyne | September 20, 2022 |
| 108. | JOSEPH C. SANSONE CO. | $    - | Stanadyne LLC | Real Estate Agreement dated July 30, 2018 between Joseph C. Sansone Co. and Stanadyne LLC | July 30, 2018 |
| 109. | KARL KUEFNER GMBH & CO KG | $    - | Stanadyne LLC | Master Supply Agreement between Stanadyne, LLC and Karl Kuefner GmbH & Co. KG<br><br>Addendum A to Master Supply Agreement dated January 27, 2016 between Stanadyne, LLC and Karl Kuefner GmbH & Co. KG | January 27, 2016 |
| 110. | KENDRION | $    - | Stanadyne LLC | Master Supply Agreement dated August 26, 2011 between Stanadyne Corporation and Kendrion Binder Magnete GmbH, as amended by that certain Addendum to Master Supply Agreement dated May 21, 2014 between Stanadyne Corporation and Kendrion FAS Controls, Inc. | August 26, 2011 |
| 111. | KENDRION (SHELBY) INC. | $    - | Stanadyne LLC | Amendment to Addendum to Master Supply Agreement dated February 24, 2017 between Stanadyne Corporation, Inc. and Kendrion Shelby, Inc<br><br>Kendrion Pricing MSA 202 V12 dated August 10, 2020 between Stanadyne LLC and Kendrion Shelby-Inc.. | February 24, 2017 |
| 112. | KERRY INDEV LOGISTICS PVT LTD. | $    - | Stanadyne LLC | Services Agreement dated November 19, 2020 between Stanadyne LLC and Kerry Indev Logistics Private Limited | November 19, 2020 |
| 113. | KNOWBE4 INC. | $    18,240.60 | Stanadyne LLC | Training software | |
| 114. | KUNSHAN KERSEN SCIENCE & TECHNOLOGY CO. LTD. | $    - | Stanadyne LLC | Master Supply Agreement dated March 22, 2018 between Stanadyne LLC and Kunshan Kersen Science & Technology co., Ltd. and 49.Purchase Order dated October 23, 2020 between Stanadyne LLC and Kunshan Kersen Science & Technology Co. Ltd. | Respectively, March 22, 2018 and October 23, 2020 |
| 115. | Leaf Capital Funding | $    96,379.07 | Pure Power Technologies, Inc. | Rental Agreement dated March 16, 2021 between Pure Power Technologies, Inc. and Leaf Capital Funding, LLC;  Rental Agreement dated May 17, 2021 between Pure Power Technologies, Inc. and Leaf Capital Funding, LLC | March 16, 2021 |
| 116. | Lenovo Financial Services | $    - | Pure Power Technologies, Inc. | Master Lease Agreement dated June 22, 2022 between Lenovo Financial Services and Pure Power Technologies | June 22, 2022 |
| 117. | LIEBHERR COMPONENTS DEGGENDORF GMBH | $    - | Stanadyne LLC | Development and Supply Agreement dated November 1, 2018 among Stanadyne LLC, Stanadyne Changshu Corporation, and Liebherr Components Deggendorf GmbH; | November 1, 2018 |
| 118. | LINDE GAS & EQUIPMENT, INC | $    28,584.54 | Stanadyne LLC | Product Supply Agreement dated July 17, 2019 between Praxair Distribution, Inc. and Stanadyne LLC, and Bulk Supply Rider SK1R11719 dated November 7, 2019 between Praxair Distribution, Inc. and Pure Power Technologies Inc. | Respectively, July 17, 2019 and November 7, 2019 |
| 119. | Lloyd's | $    - | Stanadyne LLC | Automotive product recall insurance policy | June 30, 2022 |

**Debtor Entities**

*Potential Assigned Contracts - Exhibit B*
(*$USD*)

| | Counterparty | Cure Amount | Debtor Entity | Description | Execution Date |
|---|---|---|---|---|---|
| *120.* | Metropolitan Software, Inc. | $ - | Pure Power Technologies, Inc. | Software License and Maintenance Agreement dated October 3, 2022 between Metropolitan Software, Inc. and PurePower | October 3, 2022 |
| *121.* | MIANYANG FULIN PRECISION MACHINING CO., LTD | $ - | Stanadyne LLC | Master Supply Agreement dated November 19, 2015 between Stanadyne LLC and Mianyang FULIN Precision Machining Co., Ltd. | November 19, 2015 |
| *122.* | MIANYANG FULIN PRECISION MACHINING CO., LTD | $ - | Stanadyne LLC | Master Supply Agreement dated May 3, 2017 between Stanadyne LLC and Mianyang Fulin Precision Machining Co., Ltd. | May 3, 2017 |
| *123.* | MIANYANG FULIN PRECISION MACHINING CO., LTD | $ - | Stanadyne LLC | Master Supply Agreement dated March 12, 2018 between Stanadyne LLC and Mianyang FULIN Precision Machining Co., Ltd. | March 12, 2018 |
| *124.* | MICROSOFT | $ - | Stanadyne LLC | Volume Licensing dated August 24, 2022 between Stanadyne LLC and Microsoft Corporation | August 18, 2022 |
| *125.* | Microsoft Licensing | $ - | Pure Power Technologies, Inc. | Software Maintenance | |
| *126.* | MINITAB, LLC. | $ 9,600.00 | Pure Power Technologies, Inc. | Quotation 1048539 between Minitab LLC and Pure Power Technologies, LLC | December 7, 2022 |
| *127.* | ML LUBRICATION USA INC | $ 67,432.59 | Pure Power Technologies, Inc. | Supply Agreement between Pure Power Technologies, Inc. and ML Lubrication USA, Inc. | May 2, 2019 |
| *128.* | MNP CORPORATION | $ 53,673.79 | Stanadyne LLC | Summary of Part Numbers & Piece Price dated 11/8/21 and effective 1/1/22 between MNP Corporation and Stanadyne LLC. | November 8, 2021 |
| *129.* | MOTORPAL A.S | $ - | Stanadyne LLC | Letter of Agreement dated April 14, 2016 between Stanadyne LLC and Motorpal a.s. | April 14, 2016 |
| *130.* | MSC INDUSTRIAL SUPPLY CO, INC | $ 234,681.70 | Stanadyne LLC | Letter of Understanding between Stanadyne LLC and Sid Tool Co., Inc. d/b/a MSC Industrial Supply Co.; | May 18, 2022 |
| *131.* | MSC INDUSTRIAL SUPPLY CO. | $ 15,319.33 | Pure Power Technologies, Inc. | Statement of Work dated June 9, 2022 between Sid Tool Co. Inc. d/b/a/ MSC Industrial Supply Co. and Pure Power Technologies | June 9, 2022 |
| *132.* | MSC INDUSTRIAL SUPPLY COMPANY | $ 8,334.44 | Stanadyne LLC | Letter of Understanding between Stanadyne LLC and Sid Tool Co., Inc. d/b/a MSC Industrial Supply Co. | May 18, 2022 |
| *133.* | MTP | $ - | Pure Power Technologies, Inc. | Lease Agreement dated April 1, 2019 between PPT Real Estate Enterprises, L.P. and Pure Power Technologies, Inc., acquired by MTP – 1410 Northpoint Blvd, LLC as of February 2, 2022 with addresses at 1410 Northpoint Boulevard, Blythewood, SC and 121 Research Drive, Columbia, SC | April 1, 2019 |
| *134.* | National Instruments | $ - | Pure Power Technologies, Inc. | Software Subscription | |
| *135.* | Nationwide Power | $ - | Pure Power Technologies, Inc. | Eaton UPS Hardware Maintenance | |
| *136.* | Navigators Insurance Company | $ - | Stanadyne LLC | Excess Liability insurance policy | July 1, 2022 |

**Debtor Entities**

*Potential Assigned Contracts - Exhibit B*
(*$USD*)

| | Counterparty | Cure Amount | Debtor Entity | Description | Execution Date |
|---|---|---|---|---|---|
| *137.* | NEORIS USA INC. | $ 9,405.00 | Pure Power Technologies, Inc. | Statement of Work No. 001-2018, Pure Power Technologies AMS for QIS and other custom applications, to the Master Consulting Services Agreement between Neoris USA, Inc. and Pure Power Technologies<br><br>Change Order No. 2 dated April 12, 2022 to the Statement of Work No. 001-2018 dated March 13, 2018, to the Master Consulting Services Agreement between Neoris USA, Inc. and Pure Power Technologies, Inc. | March 13, 2018 |
| *138.* | NetBrain | $ - | Pure Power Technologies, Inc. | Software Maintenance | |
| *139.* | Ningbo Huashuo Molding & Machine | $ - | Stanadyne LLC | Master Supply Agreement dated October 28, 2015 between Stanadyne LLC and Ningbo Huashuo Molding & Machine | October 28, 2015 |
| *140.* | Northsmart | $ - | Pure Power Technologies, Inc. | Cisco Server & Switch  Hardware Maintenance | |
| *141.* | OPEN TEXT INC | $ 2,337.43 | Stanadyne LLC | EDI software | |
| *142.* | Open Text Inc. | $ - | Pure Power Technologies, Inc. | EDI software | |
| *143.* | PC CONNECTION SALES CORP | $ 39,474.12 | Pure Power Technologies, Inc. | | |
| *144.* | PC Connections Sales Corp | $ - | Pure Power Technologies, Inc. | Cisco SMARTnet Hardware & Software Maintenance, Dell VxRail Hardware, Microsoft Licensing | |
| *145.* | PENSKE TRUCK LEASING | $ 1,548.14 | Pure Power Technologies, Inc. | Vehicle Lease Service Agreement dated January 10, 2020 between Penske and Stanadyne LLC | |
| *146.* | POPKIN BROTHERS | $ - | Stanadyne LLC | Lease Agreement dated March 6, 2002 between Popkin Brothers Enterprises, Inc. and Stanadyne Corporation, with address at 408 White Street, Jacksonville, NC | March 6, 2022 |
| *147.* | Praxair | $ - | Pure Power Technologies, Inc. | Bulk Supply Rider SK1R11719 dated November 7, 2019 between Praxair Distribution, Inc. and PurePower Technologies Inc.<br><br>Product Supply Agreement dated July 17, 2019 between Praxair Distribution, Inc. and Stanadyne LLC | July 17, 2019; 11/7/2019 |
| *148.* | Prowess Consulting | $ 2,396.00 | Pure Power Technologies, Inc. | SmartDeploy Software Maintenance | |
| *149.* | Randstad North America, Inc. | $ 33,077.46 | Pure Power Technologies, Inc. | | |
| *150.* | RAPID7 LLC | $ - | Stanadyne LLC | Master Services Agreement dated July 6, 2021 between Stanadyne LLC and Rapid7 LLC | July 6, 2021 |
| *151.* | Raymond Carolina Handling | $ - | Pure Power Technologies, Inc. | Renewed Equipment Quote between Pure Power Technology and Raymond Carolina Handling, LLC | August 15, 2022 |
| *152.* | Raymond CAROLINA HANDLING LLC | $ 7,662.45 | Pure Power Technologies, Inc. | (i) Renewed Equipment Quote between Pure Power Technology and Raymond Carolina Handling, LLC; and (ii) MHE by the Month Re-Usage Agreement between Pure Power Technologies Inc. and Raymond Carolina Handling, LLC | Respectively, (i) August 15, 2022; and (ii) August 22, 2022 |
| *153.* | RB Distribution, Inc. | $ - | Pure Power Technologies, Inc. | Contract Manufacturing Agreement dated October 2, 2018 between RB Distribution, Inc. and Pure Power Technologies, Inc.; | October 2, 2018 |
| *154.* | Ricoh | $ 6,585.00 | Pure Power Technologies, Inc. | DocuWare Software Maintenance | |
| *155.* | RISK STRATEGIES COMPANY | $ - | Stanadyne LLC | Client Services Agreement dated July 1, 2020 between Risk Strategies Company and Stanadyne LLC | July 1, 2020 |
| *156.* | Robert Half | $ - | Pure Power Technologies, Inc. | General Conditions of Assignment dated March 16, 2022 between Pure Power Technologies, Inc. and Robert Half | March 16, 2022 |
| *157.* | RSM US LLP | $ - | Stanadyne PPT Group Holdings, Inc | Engagement Letter dated September 23, 2022 between Stanadyne PPT Group Holdings, Inc and RSM US LLP | September 23, 2022 |

**Debtor Entities**

*Potential Assigned Contracts - Exhibit B*
*($USD)*

| | Counterparty | Cure Amount | Debtor Entity | Description | Execution Date |
|---|---|---|---|---|---|
| *158.* | SAP America, Inc. | $ - | Pure Power Technologies, Inc. | Termination Addendum dated October 11, 2022 to the Appendix 1 effective December 18, 2009 to Software License Agreement dated December 18, 2009 between SAP America, Inc. and Pure Power Technologies Inc. | October 11, 2022 |
| *159.* | SearchAmerica | $ - | Pure Power Technologies, Inc. | Search Agreement dated March 16, 2021 between Pure Power Technologies, Inc. and SearchAmerica, Inc. | March 16, 2021 |
| *160.* | SHANGHAI FUTURE HIGH-TECH CO. LTD. | $ - | Stanadyne LLC | Master Supply Agreement dated May 11, 2018 between Stanadyne LLC and Shanghai Future High-tech Co. Ltd. | May 11, 2018 |
| *161.* | SHI INTERNATIONAL CORP | $ 18,152.58 | Stanadyne LLC | Lease Agreement between SHI International Corp and Stanadyne LLC<br><br>Lease Agreement between Stanadyne LLC and SHI International Corp<br><br>Lease Agreement between SHI International Corp and Stanadyne LLC | June 2, 2022 |
| *162.* | SHI INTERNATIONAL CORP. | $ 8,023.39 | Stanadyne LLC | Lease Agreement between SHI International Corp and Stanadyne LLC<br><br>Lease Agreement between Stanadyne LLC and SHI International Corp<br><br>Lease Agreement between SHI International Corp and Stanadyne LLC | March 1, 2021; July 26, 2021; June 2, 2022 |
| *163.* | SMITH DRAY LINE & STORAGE CO. INC | $ 12,898.00 | Pure Power Technologies, Inc. | Service Agreement between Smith Dray Line and Storage Company Inc. and Pure Power Technologies Inc. | July 1, 2022 |
| *164.* | SolarWinds | $ - | Pure Power Technologies, Inc. | Software Maintenance | |
| *165.* | South Carolina Vocational Rehabilitation Department | $ - | Pure Power Technologies, Inc. | On-the-Job and Other Customized Training Agreement dated May 31, 2022 between South Carolina Vocational Rehabilitation Department and Pure Power | May 31, 2022 |
| *166.* | SOUTHEAST INDUSTRIAL EQUIPMENT, INC. | $ - | Pure Power Technologies, Inc. | o  Master Lease Agreement dated May 23, 2017 between Southeast Industrial Equipment, Inc. and Pure Power Technologies, Inc.<br><br>o  Equipment Schedule to Master Lease Agreement dated March 10, 2022 between Southeast Industrial Equipment, Inc. and Pure Power Technologies, Inc.<br><br>o  Notice of Assignment and Maintenance Collection Agreement for Equipment Scheduled between Southeast Industrial Equipment, Inc., Toyota Industries Commercial Finance Inc., and Pure Power Technologies, Inc. | May 23,2017; March 10, 2022 |

**Debtor Entities**

*Potential Assigned Contracts - Exhibit B*
*($USD)*

| | Counterparty | Cure Amount | Debtor Entity | Description | Execution Date |
|---|---|---|---|---|---|
| 167. | SOUTHEAST INDUSTRIAL EQUIPMENT, INC. & TOYOTA INDUS' | $ - | Pure Power Technologies, Inc. | o Master Lease Agreement dated May 23, 2017 between Southeast Industrial Equipment, Inc. and Pure Power Technologies, Inc.<br><br>o Equipment Schedule to Master Lease Agreement dated March 10, 2022 between Southeast Industrial Equipment, Inc. and Pure Power Technologies, Inc.<br><br>o Notice of Assignment and Maintenance Collection Agreement for Equipment Scheduled between Southeast Industrial Equipment, Inc., Toyota Industries Commercial Finance Inc., and Pure Power Technologies, Inc. | May 23,2017; March 10, 2022 |
| 168. | Spherion Staffing and Recruiting | $ - | Pure Power Technologies, Inc. | Service Terms dated May 20, 2021 between Pure Power Technologies, Inc and Spherion Staffing and Recruiting | May 20, 2021 |
| 169. | SPOOL PERFORMANCE LLC | $ - | Stanadyne LLC | Distributor Agreement dated January 3, 2023 between Stanadyne LLC and Spool Performance LLC | January 3, 2023 |
| 170. | Springfield Remanufacturing Corp | $ - | Pure Power Technologies, Inc. | Direct to Buy with Navistar MSA per PPT | |
| 171. | SSS SPRING & WIRE LLC | $ 99,203.50 | Stanadyne LLC | Master Supply Agreement between Stanadyne Corporation and SSS Spring & Wire LLC | March 3, 2013 |
| 172. | Standard Motor Products, Inc. | $ - | Pure Power Technologies, Inc. | Supply Agreement between Standard Motor Products, Inc. and Pure Power Technologies, Inc. | August 9, 2016 |
| 173. | STEVEN STAFFORD | $ - | Stanadyne LLC | Consulting Agreement dated March 29, 2023 between Stanadyne LLC and Steven Stafford | March 29, 2023 |
| 174. | STEWART EFI, LLC | $ - | Stanadyne LLC | Supply Agreement dated February 1, 2013 between Stanadyne Corporation and Stewart EFI, LLC, including Addendum (A) to Master Supply Agreement dated August 6, 2018 | February 1, 2013 |
| 175. | SUMMIT HANDLING SYSTEMS | $ - | Stanadyne LLC | o Master Lease Agreement dated July 14, 2014 between Summit Handling Systems, Inc. and Stanadyne Corporation, includes Equipment Schedule to Master Lease Agreement dated July 14, 2014 between Summit Handling Systems, Inc. and Stanadyne Corporation<br><br>o Equipment Lease Agreement 15254012 dated February 1, 2023 between Stanadyne Corporation and Summit Handling Systems, Inc.<br><br>o Equipment Lease Agreement 25254011 dated February 1, 2023 between Stanadyne Corporation and Summit Handling Systems, Inc | July 14, 2014; February 1, 2023 |

**Debtor Entities**

*Potential Assigned Contracts - Exhibit B*
*($USD)*

| | Counterparty | Cure Amount | Debtor Entity | Description | Execution Date |
|---|---|---|---|---|---|
| 176. | SUMMIT HANDLING SYSTEMS  INC. | $    2,482.12 | Stanadyne LLC | o  Master Lease Agreement dated July 14, 2014 between Summit Handling Systems, Inc. and Stanadyne Corporation, includes Equipment Schedule to Master Lease Agreement dated July 14, 2014 between Summit Handling Systems, Inc. and Stanadyne Corporation<br><br>o  Equipment Lease Agreement 15254012 dated February 1, 2023 between Stanadyne Corporation and Summit Handling Systems, Inc.<br><br>o  Equipment Lease Agreement 25254011 dated February 1, 2023 between Stanadyne Corporation and Summit Handling Systems, Inc | July 14, 2014; February 1, 2023 |
| 177. | Talent Logic Inc. | $    - | Pure Power Technologies, Inc. | Direct Hire Fee Agreement dated February 1st, 2023 between Pure Power Technologies, Inc. and Talent Logic, Inc. | February 1, 2023 |
| 178. | The Hanover American Insurance Company | $    - | Stanadyne LLC | Workers' Compensation insurance policy | July 1, 2022 |
| 179. | The Hanover Insurance  Group | $    - | Stanadyne LLC | Automotive insurance policy | July 1, 2022 |
| 180. | THE MEGA FORCE STAFFING GROUP, INC. | $    13,279.19 | Stanadyne LLC | Agreement to Provide Contract Staffing Services between Mega Force Staffing Services and Stanadyne | August 17, 2022 |

**Debtor Entities**

*Potential Assigned Contracts - Exhibit B*
*($USD)*

| | Counterparty | Cure Amount | Debtor Entity | Description | Execution Date |
|---|---|---|---|---|---|
| 181. | Trimech | $ - | Pure Power Technologies, Inc. | SolidWorks Software Maintenance | |
| 182. | Tristar, Inc. | $ - | Pure Power Technologies, Inc. | PTC Creo/Windchill Software Subscription | |
| 183. | UHY Consulting GA | $ - | Pure Power Technologies, Inc. | Engagement Letter dated June 1st, 2022 between UHY Consulting GA, Inc. and Pure Power Technologies | June 1, 2022 |
| 184. | Vitesco Technologies GmbH | $ 1,000,000.00 | Pure Power Technologies, Inc. | Bill of Sale and Agreement dated October 17, 2022 between Vitesco Technologies USA, LLC and Stanadyne LLC | October 17, 2022 |
| 185. | Vitesco Technologies GmbH | $ - | Pure Power Technologies, Inc. | ○ Schedule Releases between Pure Power Technologies, Inc. and Vitesco Technologies GmbH with the following PO numbers:<br>- 701101190;<br>- 701101178;<br>- 701101194;<br>- 701101183;<br>- 701101181;<br>- 701101180;<br>- 701101185;<br>- 701101186;<br>- 701101184;<br>- 701101189;<br>- 701101188;<br>- 701101191;<br>- 701101192 | Various |
| 186. | Volkswagen | $ - | Pure Power Technologies, Inc. | B2B User Agreement governing the Use of the Volkswagen Group B2B Supplier Platform dated March 15, 2013 between Volkswagen Aktiengesellschaft and Pure Power Technology | March 15, 2013 |
| 187. | Xl Parts Llc | $ - | Pure Power Technologies, Inc. | Purchase Agreement between Pure Power Technologies and XL Parts LLC | September 15, 2020 |
| 188. | ZHEJIANG HUASHUO TECHNOLOGY | $ - | Stanadyne LLC | Master Supply Agreement dated March 12, 2018 between | March 12, 2018 |
| 189. | Zoho Corporation | $ 6,976.00 | Pure Power Technologies, Inc. | Software Maintenance and Subscription: Mange Engine Plus, ManageEngine AD Plus, ManageEngine Central | |
| 190. | Zurich American Insurance Company of Illinois | $ - | Stanadyne LLC | Property insurance policy<br><br>Premium Finance Agreement dated July 1st, 2022 between Zurich American Insurance Company of Illinois and Stanadyne LLC | July 1, 2022 |
| | **TOTAL** | **$ 2,801,629.31** | | | |

**EXHIBIT C**

**Debtor Entities**

*Potential Assigned Contracts - Exhibit C*
($USD)

| | Counterparty | Cure Amount | Debtor Entity | Description | Execution Date |
|---|---|---|---|---|---|
| *1.* | Caterpillar Reman Powertrain | TBD | Pure Power Technologies, Inc. | Direct to Buy with Navistar MSA | |
| *2.* | International Engine Intellectual Property Company, LLC | TBD | Pure Power Technologies, Inc. | Limited Patent License Agreement dated January 29, 2016 | January 29, 2016 |
| *3.* | NAVISTAR, INC | TBD | Pure Power Technologies, Inc. | Amended and Restated Supply Agreement dated January 1, 2017 between Navistar Inc. and Pure Power Technologies, Inc., as amended by that certain First Amendment to Amended and Restated Supply Agreement dated October 9, 2018 between Navistar Inc. and Pure Power Technologies, Inc., as amended by that certain Second Amendment to Amended and Restated Supply Agreement dated January 1, 2020 between Navistar Inc. and Pure Power Technologies, Inc., as amended by that certain Third Amendment to Amended and Restated Supply Agreement dated January 1, 2021 between Navistar Inc. and Pure Power Technologies, Inc. | January 1, 2017 |
| *4.* | ORACLE AMERICA, INC. | TBD | Stanadyne LLC | Oracle License and Services Agreement between Oracle USA, Inc. and Stanadyne Corporation;  OLSAv062606  (Contract # 2875964, Order Document # 8106134); OLSAv020408 (Contract # 2737033, Order Document # 8282421); OLSAv100303 (Contract # 1765745, Order Document # 6887109); US-OMA-WT6200189 (Contract # 14637853; Order Document # 9073281); Universal Credits (Contract # 17212255-3000) | August 31, 2006 |
| *5.* | TOYOTA INDUSTRIES COMMERCIAL FINANCE | TBD | Stanadyne LLC | ○ Master Lease Agreement dated May 23, 2017 between Southeast Industrial Equipment, Inc. and Pure Power Technologies, Inc.<br><br>○ Equipment Schedule to Master Lease dated March 10, 2022 between Southeast Industrial Equipment, Inc. and Pure Power Technologies, Inc.<br><br>○ Notice of Assignment and Maintenance Collection Agreement for Equipment Scheduled between Southeast Industrial Equipment, Inc., Toyota Industries Commercial Finance Inc., and Pure Power Technologies, Inc. | |
| | **TOTAL** | **TBD** | | | |

# EXHIBIT D

## COMMITTEE SETTLEMENT TERM SHEET

*In re Stanadyne LLC, et al.*
**Case No. 23-10207 (Jointly Administered)**
**Bankr. D. Del.**

### SETTLEMENT TERM SHEET

This term sheet (the "Term Sheet") sets forth the terms of a comprehensive settlement in the above-referenced chapter 11 cases (the "Chapter 11 Cases") among the Prepetition Agent (as defined below), the Purchaser (as defined below), and the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases (the "Committee"[1] and, collectively with the Prepetition Agent and the Purchaser, the "Parties") with respect to that certain Asset Purchase Agreement, dated as of May 8, 2023, by and among the debtors in possession in the above-captioned cases (the "Debtors") (other than Stanadyne PPT Group Holdings, Inc.) and Purchaser (as the same may be amended, amended and restated, supplemented, or otherwise modified from time to time, the "APA") and all other matters related to any challenges, claims or causes of actions against the Prepetition Agent, the Prepetition Secured Parties (as defined below) and/or the Purchaser under the Cash Collateral Order, the APA, or otherwise, including such matters set forth in the section titled "Prepetition Obligations and Release of Claims" below. Capitalized terms that are not otherwise defined herein shall have the meanings ascribed to them in the APA.

| | |
|---|---|
| Settling Parties | a) The Prepetition Agent<br>b) The Purchaser<br>c) The Committee<br><br>The term "Prepetition Agent" refers to Cerberus Business Finance, LLC, in its capacity as administrative agent and collateral agent for the lenders (the lenders together with the Prepetition Agent, collectively, the "Prepetition Secured Parties") party to that certain Financing Agreement, dated as of May 2, 2017 (as amended, amended and restated, supplemented, or otherwise modified from time to time).<br><br>The term "Purchaser" refers to Stanadyne Operating Company LLC (formerly known as S-PPT Acquisition Company LLC), in its capacity as Purchaser under the APA. |
| Binding Agreement; Conditions | This Term Sheet shall constitute a binding agreement among the Parties; *provided*, the Parties rights and obligations under this Term Sheet are conditioned upon (a) entry of an order approving the Sale Order modified as necessary to reflect this Term Sheet and attaching this Term Sheet as an exhibit, and (b) the occurrence of the Closing. |

---

[1] The term "Committee" refers to the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases in its capacity as such and not the rights or obligations of any member serving on the Committee in its individual capacity.

| Settlement Amount | The Parties agree that: |
|---|---|
| | a) subject to the terms hereof, the Purchaser will fund (or cause to be funded) $4,000,000 (the "Settlement Amount") comprised of (i) the Wind-Down Funding Amount, (ii) the Trust Funding Amount, and (iii) the Initial GUC Distribution Amount, each as described below; |
| | b) the Trust Funding Amount and the Initial GUC Distribution Amount shall constitute additional "Purchase Price" under the APA; |
| | c) the Settlement Amount shall be allocated and funded as follows: |
| |     i) $1,000,000, which shall be the amount of "Total Disbursements" in the Wind-Down Budget[2] to be finalized pursuant to Section 4.24 of the APA (the "Wind-Down Funding Amount"), and shall be funded at the Closing in accordance with the APA. The Wind-Down Budget, and any transition services agreement entered into pursuant to Section 8.16 of the APA shall be mutually acceptable to the Prepetition Agent, the Purchaser and the Committee, in consultation with the Debtors; |
| |     ii) $375,000 (the "Trust Funding Amount") to fund the operation of the Liquidating Trust (as defined below) consistent with the Liquidating Trust Agreement (as defined below), with such amount to be funded within five (5) business days following the effective date of Chapter 11 plan (a "Plan") establishing the Liquidating Trust. The Plan and documents governing the creation of the Liquidating Trust must be acceptable in form and substance to the Prepetition Agent and the Committee and may not alter or modify the terms of this Settlement Term Sheet, unless agreed to in writing by the Prepetition Agent and the Committee; |
| |     iii) $2,625,000 (as such amount may be adjusted in accordance herewith, the "Initial GUC Distribution Amount") for distribution to general unsecured creditors of the Debtors' estates other than the Prepetition Secured Parties, which amount shall be transferred to the Liquidating Trust within five (5) business days following its creation; *provided,* |

---

[2] The Wind-Down Budget is attached hereto as Exhibit 1.

| | |
|---|---|
| | *however*, that if the actual costs and expenses of the matters set forth in the Wind-Down Budget are less than $1,000,000, such difference shall be delivered to the Liquidating Trust and the amount of the Initial GUC Distribution Amount shall be increased on a dollar-for-dollar basis by the amount of such difference. |
| Purchaser Assumed Liabilities | Each of the following, without duplication, shall constitute "Assumed Liabilities" under the APA:<br><br>a)  Liabilities, including Core Liabilities (as defined below), of the Debtors incurred and outstanding as of the Closing Date with respect to each customer of the Debtors that becomes a customer of the Purchaser from and after the Closing Date;<br><br>b)  Core Liabilities incurred and outstanding as of the Closing Date with respect to customers of the Debtors that do not become customers of the Purchaser from and after the Closing Date solely to the extent such Core Liabilities are known as of the Closing Date as (i) reflected in the Debtors' books and records or filed proofs of claim and (ii) set forth on a schedule of the amounts of such Core Liabilities  acceptable to the Purchaser (or, if not acceptable, subject to objection by the Purchaser after Closing), which schedule shall (A) separately list by customer (x) the amount of such Core Liabilities as of the date that is thirty (30) days prior to the Closing Date and (y) the estimated amount of any incremental Core Liabilities between the date that is thirty (30) days prior to the Closing Date and the Closing Date and (B) be delivered by the Debtors to the Purchaser and the Committee five (5) business days prior to the Closing Date, provided, however, amounts with respect to the foregoing clause (y)  shall be subject to finalization within thirty (30) days after Closing to account for continuing sales and returns during such period through the Closing Date; and<br><br>c)  Each Critical Vendor Claim (as defined in that certain *Final Order (I) Authorizing the Debtors to Pay Prepetition Claims of (A) Domestic Critical Vendors, (B) Shippers, Warehousemen, and other Lienholders, and (C) Foreign Vendors; (II) Authorizing Banks to Honor and Process Related Checks and Electronic Transfers; and (III) Granting Related Relief* [Docket No. 186]) to the extent not paid by the Debtors on or prior to the Closing Date.<br><br>"Core Liabilities" means Liabilities of the Debtors owed to customers of the Debtors as of the Closing Date in connection with |

3

| | |
|---|---|
| | the "core" refund program offered by the Debtors to certain of its customers for applicable products actually and properly returned and sold to the Debtors for remanufacture, provided that Core Liabilities will only be Assumed Liabilities to the extent set forth above in (a) and (b). |
| Estate Claims | Notwithstanding anything in the APA to the contrary, the Parties agree that all Avoidance Actions shall be waived and shall not be pursued by the Parties or any representative of any Debtor's estate, *except that*:<br><br>a) Avoidance Actions against insiders (as that term is defined in 11 U.S.C. § 101(31)) ("<u>Insider Avoidance Actions</u>") shall not be waived and shall comprise Excluded Assets; and<br><br>b) Avoidance Actions against non-insiders other than Go-Forward Creditors (as defined below) (the "<u>Preserved Avoidance Claims</u>") shall not be waived and shall comprise Purchased Assets under the APA; *provided*, *however*, that the Preserved Avoidance Claims shall be preserved solely for the purpose of permitting the Purchaser to set off such Preserved Avoidance Claims against any claims of the applicable creditors (other than Go-Forward Creditors) that constitute Assumed Liabilities under the APA, and Purchaser shall not be entitled to any affirmative recovery on account of any such Preserved Avoidance Claims.<br><br>All commercial tort claims and causes of action belonging to the Debtors' estates (including, without limitation, any and all claims the Debtors' estates may have (i) against any officers and directors of the Debtors and rights of the Debtors' estates to any insurance proceeds applicable thereto or (ii) related to or arising under or in connection with that certain Contribution Agreement, dated as of March 9, 2019, by and among Pure Power Technologies, Inc., Pure Power Technologies, LLC, Stanadyne Parent Holdings, Inc., and Stanadyne LLC, and the transactions contemplated thereby, including, without limitation, any rights of the Debtors' estates to any insurance proceeds applicable thereto) other than such claims against Go-Forward Creditors (as defined below) (collectively, the "<u>Non-Go-Forward Commercial Tort Claims</u>") shall comprise Excluded Assets.<br><br>The Insider Avoidance Actions and the Non-Go-Forward Commercial Tort Claims shall be collectively referred to herein as the "<u>Liquidating Trust Claims</u>".  All Liquidating Trust Claims shall be transferred to the Liquidating Trust on the effective date of the |

|  | Liquidating Trust.  The Trustee shall have authority to pursue all Liquidating Trust Claims as a representative of the Debtors' estates.<br><br>For the avoidance of doubt, the Parties waive all Avoidance Actions and Commercial Tort Claims that the Debtors' estates may have against Go-Forward Creditors, and no Party shall be entitled to any affirmative recovery or right of setoff with respect to any such claims against Go-Forward Creditors.<br><br>The term "Go-Forward Creditors" as used herein means customers, vendors, and other creditors who continue to do business with the Purchaser after the Closing Date. |
|---|---|
| Designation Rights Assets | If and solely to the extent and for so long as the Purchaser requests in writing that any Designation Rights Assets be maintained following the Closing, the Purchaser shall fund any and all maintenance costs, including lease costs and other third party costs, actually incurred by the Debtors in connection with such requested maintenance of the Designation Rights Assets, in accordance with and solely to the extent set forth in Section 1.5(b) of the APA. |
| Windsor, CT Property | If and solely to the extent and for so long as the Purchaser requests in writing that the Windsor, CT Property be maintained following the Closing, the Purchaser shall fund the carrying costs actually incurred by the Debtors in connection with such requested maintenance of the Windsor, CT Property, including without limitation, insurance and real property taxes.<br><br>If, subject to the terms of the APA, the Debtors sell the Windsor, CT Property, the proceeds of such sale, net of only the costs of such sale (as well as any unpaid carrying costs for which Purchaser is responsible as set forth above), and incremental US Trustee fees associated therewith, shall be paid to the Prepetition Agent for the benefit of the Prepetition Secured Parties.  The Debtors' estates shall cause such net proceeds to be delivered directly by the purchaser of the Windsor, CT Property to the Prepetition Agent, and the Deficiency Claim (as defined below) shall be reduced by the amount of such net proceeds. |
| Liquidating Trust | The "Liquidating Trust" shall be:<br><br>a)  a liquidating trust established for the benefit of the Debtors' creditors and governed by a trust agreement in form and substance acceptable to the Prepetition Agent and the Committee (the "Liquidating Trust Agreement"); |

|  | b) administered by Brad Deitz, as trustee (the "Trustee")[3] under the supervision of the Liquidating Trust Board (as defined below) and in accordance with the terms of the Liquidating Trust Agreement;<br><br>c) overseen by an oversight board consisting of two members: (i) one member appointed by the Prepetition Agent and (ii) one member appointed by the Committee (the "Liquidating Trust Board");<br><br>d) administered for the benefit of the Debtors' unsecured creditors with respect to unsatisfied general unsecured claims and the Prepetition Secured Parties with respect to the Deficiency Claim.<br><br>The Trustee shall be compensated as follows: (a) a quarterly fee of $20,000 *plus* (b) cash in an amount equal to 1.5% of the net proceeds of the Liquidating Trust litigation recoveries.<br><br>The Liquidating Trust Agreement shall provide that, in the event of a tie in connection with any decision subject to a vote of the Liquidating Trust Board, the final decision shall be made by the Trustee. |
| Funding and Purpose of Liquidating Trust | Upon the creation of the Liquidating Trust, the Trust Funding Amount, the Initial GUC Distribution Amount, and Liquidating Trust Claims shall be transferred to the Liquidating Trust as set forth above.<br><br>The Trustee shall be empowered to: (i) assert, litigate, settle, and/or otherwise resolve the Liquidating Trust Claims for the benefit of the Liquidating Trust and its beneficiaries and (ii) resolve, litigate, and/or object to claims against the Debtors' estates other than claims allowed hereunder or by the Bankruptcy Court.<br><br>The proceeds of the Liquidating Trust Claims shall be utilized to fund the administration of the Liquidating Trust and the distributions to the beneficiaries of the Liquidating Trust.<br><br>The Initial GUC Distribution Amount shall be distributed pro rata among the beneficiaries of the Liquidating Trust other than the Prepetition Agent, it being agreed among the Parties that the Prepetition Secured Parties shall not recover any amounts from the |

---

[3] In the event that Mr. Deitz is unable or unwilling to serve, the Prepetition Agent shall identify two alternatives for the Committee to select between to serve as the Trustee on substantially the same terms as Mr. Dietz.

| | |
|---|---|
| | Initial GUC Distribution Amount.  Any distributions made by the Liquidating Trust to its beneficiaries from any assets of the Liquidating Trust other than the Initial GUC Distribution Amount shall be distributed pro rata to *all* of the beneficiaries of the Liquidating Trust, including the Prepetition Agent for the benefit of the Prepetition Secured Parties on account of the Deficiency Claim.<br><br>Notwithstanding anything to the contrary herein, the Trustee shall have the authority to create reserves of Liquidating Trust assets (including with respect to the Initial GUC Distribution Amount) for any reason consistent with his duties under the Liquidating Trust Agreement. |
| Prepetition Obligations and Release of Claims | The Committee hereby:<br><br>a)  adopts the admissions, stipulations, acknowledgements and agreements made by the Debtors as reflected in Paragraph E of the Cash Collateral Order;<br><br>b)  reaffirms its agreement under that certain *Stipulation Regarding Unencumbered Assets and Occurrence of Investigation Termination Date* entered into between the Prepetition Agent and the Committee and approved by order of the Bankruptcy Court [Docket No. 293] (the "Prior Stipulation") that the Investigation Termination Date (as defined in the Cash Collateral Order) has passed and the Committee has waived all rights to assert any Challenge (as defined in Cash Collateral Order);<br><br>c)  agrees that, upon the occurrence of the Closing, the Prepetition Agent, on behalf of the Prepetition Secured Parties, will have an allowed deficiency claim (the "Deficiency Claim") in the amount of $87,252,851.11, which shall remain secured by the Excluded Assets, other than the Liquidating Trust Claims, which will not be subject to the security interest of the Prepetition Secured Parties; provided, however, that the amount of the Deficiency Claim shall be reduced on a dollar-for-dollar basis by any net proceeds paid to the Prepetition Agent from any Excluded Assets;<br><br>d)  releases the Prepetition Secured Parties from any and all claims and causes of action related to the Debtors, their estates, the Prepetition Obligations (as defined in the Cash Collateral Order), or these Chapter 11 Cases; and |

|  | e) consents to the APA, the Sale Order and, in each case, the transactions contemplated thereby.<br><br>The foregoing agreements, admissions, stipulations, acknowledgements, reaffirmations, and releases by and of the Committee shall be binding on the Trustee and any chapter 7 trustee, as applicable. |
|---|---|
| Chapter 11 Plan | Any Plan confirmed in the Chapter 11 Cases (a) may not alter or modify the terms of this Settlement Term Sheet, the APA or the Sale Order, unless agreed to in writing by the Prepetition Agent and (b) must incorporate the terms set forth in the section titled "Prepetition Obligations and Release of Claims" above. |
| Implementation | The settlement, including without limitation the payment of the Wind-Down Funding Amount, shall be effective upon entry of the Sale Order.<br><br>The Liquidating Trust shall be implemented via a Plan or such other method as mutually agreed to by the Prepetition Agent and the Committee, after consultation with the Debtors.<br><br>In the event that the Chapter 11 Cases are converted to Chapter 7, the rights of the Liquidating Trust set forth herein shall inure to the benefit of the Chapter 7 Trustee, including without limitation, the Trust Funding Amount and the Initial GUC Distribution Amount. |

## **EXHIBIT 1**

## **WIND-DOWN BUDGET**

*($ in thousands USD)*

| Description | Amount |
|---|---:|
| Professional Fees through Plan Effective Date | $250 |
| Wind-down Manager/Trustee Fees (does not include incentive fees) | $80 |
| Professional Support for Wind-down Manager/Trustee: | $560 |
| US Trustee Fees (8/1 - 9/30) | $35 |
| Miscellaneous / Other  (includes items such as claims agent, service of solicitation materials, independent manager, Purchaser assistance with accounting and reconciliation costs, as needed) | $75 |
| **Total Disbursements** | **$1,000** |

Purchaser agrees that it will make its personnel available at no cost to the responsible officer of the Debtors referred to in Section 2.2 of the APA or, after the effective date of a Plan, the Trustee, to provide information and assistance with accounting and claim reconciliation matters, for the following periods and capped personnel hours: (a) 25 hours per month for each of the first two months after the Closing; (b) 20 hours per month for each of the third and fourth months after the Closing; and (c) 10 hours per month for months five through 12 after the Closing.  If additional assistance is requested by such responsible officer or the Trustee, as applicable, the Purchaser shall provide such assistance as is reasonably requested for a reasonable period of time on customary terms for the assistance requested and the requesting party shall pay Purchaser its actual costs for providing such assistance and the out-of-pocket expenses incurred by the Purchaser in connection therewith.