**<u>EXHIBIT B</u>**

**Blackline**

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re* | **Chapter 11** |
| **STANADYNE LLC, *et al.*,[1]** | **Case No. 23-10207 (TMH)** |
| **Debtors.** | **(Jointly Administered)** |

### ORDER (I) APPROVING ASSET PURCHASE AGREEMENT, (II) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL ENCUMBRANCES, (III) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES,

### AND (IV) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors-in-possession (the "Debtors") for entry of an order (this "Sale Order"): (i) approving that certain asset purchase agreement, dated as of May 8, 2023, by and among Debtors Stanadyne PPT Holdings, Inc., Stanadyne LLC, and Pure Power Technologies, Inc.,[3] as Sellers, and Stanadyne Operating Company LLC (formerly known as S-PPT Acquisition Company LLC) (together with its designees, successors  or assigns, as applicable, as provided in the Asset Purchase Agreement referred to below, the "Purchaser"), as Purchaser (including all exhibits, annexes and schedules related thereto, and as the same may be amended from time to time in

---

[1].  The Debtors in the above-captioned Chapter 11 cases (the "Cases"), along with the last four digits of each Debtor's federal tax identification number are:  Stanadyne LLC (0378); Pure Power Technologies, Inc. (5202); Stanadyne PPT Holdings, Inc. (2594); and Stanadyne PPT Group Holdings, Inc. (1734).  The Debtors' headquarters are located at 405 White Street, Jacksonville, North Carolina 28546.

[2].  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

[3].   Debtor Stanadyne PPT Group Holdings, Inc. is not a party to the Asset Purchase Agreement  As used herein, the terms "Debtor" and "Debtors" refer to all Debtors in the Cases or only those Debtors who are Sellers under the Asset Purchase Agreement, in each case as the context shall require.

186371.7186371.8

accordance with the terms thereof, including Paragraph 5.1 hereof, the "Asset Purchase Agreement"), a copy of which is attached hereto as **Exhibit A**, (ii) authorizing and approving the sale of substantially all of the assets of the Debtors (as more precisely defined in the Asset Purchase Agreement, the "Purchased Assets") free and clear of all Encumbrances (as defined below) and the consummation of all other transactions contemplated by the Asset Purchase Agreement (collectively, the "Sale") and the fulfillment of the Debtors' obligations thereunder, (iii) authorizing the assumption of those executory contracts and unexpired leases of the Debtors that constitute Assigned Contracts (as defined in the Asset Purchase Agreement) and the assignment and sale of the Assigned Contracts to Purchaser, and (iv) granting related relief; the Court having entered on May 16, 2023 that certain *Order (I) Approving Bidding Procedures, (II) Scheduling an Auction and a Sale Hearing, (III) Approving the Form and Manner of Notice Thereof, (IV) Establishing Notice and Procedures for the Assumption and Assignment and Sale of Contracts and Leases, and (V) Granting Related Relief* [Docket No. 276] (the "Bidding Procedures Order"); the Debtors having determined that the highest or otherwise best offer for the Purchased Assets was made by the Purchaser pursuant to the Asset Purchase Agreement; the Court having conducted a hearing on July 10, 2023 at 10:00 a.m. (ET) (the "Sale Hearing"), at which all parties in interest were offered an opportunity to be heard with respect to the Motion, to consider approval of the Sale pursuant to the terms and conditions of the Asset Purchase Agreement; and the Court having considered (i) the Motion, all objections thereto, and all replies in support thereof, (ii) the arguments of counsel made, and evidence proffered or adduced, related to the Motion, and (iii) the full record in these Cases, including the record related to the Sale Hearing; all parties in interest having been heard, or having had the opportunity to be heard, regarding the approval of the Asset Purchase Agreement and the Sale and the related relief

granted herein; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest; and it further appearing that the legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein; and after due deliberation thereon and good and sufficient cause appearing therefor;

**IT IS HEREBY FOUND, CONCLUDED, AND DETERMINED THAT:**

A.      <u>Findings of Fact and Conclusions of Law</u>.  The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to these Cases pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.      <u>Jurisdiction; Venue</u>.  This Court has jurisdiction over the Motion and over the property of the Debtors, including the Purchased Assets, pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of the Cases and the Motion in this district and Court is proper under 28 U.S.C. §§ 1408 and 1409.

C.      <u>Final Order</u>.  This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to the extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, this Court expressly finds that there is no just reason for delay in the implementation of this Sale Order and expressly directs entry of judgment as set forth herein.

D.      Statutory Bases for Relief.  The statutory bases for the relief requested in the Motion are sections 105(a), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9013 and 9014.

E.      Notice.  As evidenced by the affidavits of service and publication filed with the Court [Docket Nos. 256, 265, 269, 279, 282, 287, 299, 319, 321, 322, 331, 339, 356, 385, 417], and based on the representations of counsel at the Sale Hearing, due, proper, timely, adequate, and sufficient notice of the Motion, the Bidding Procedures (as defined below), the Sale Hearing, the Sale, and the assumption, assignment, and sale of the Assigned Contracts has been provided in accordance with sections 102(1), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007, 9013, and 9014 and in compliance with the Bidding Procedures Order to each party entitled to such notice.  The Debtors have complied with all obligations to provide notice of the Motion as set forth in the Bidding Procedures Order, and such notice was reasonably calculated to provide all interested parties with timely and proper notice of the Bidding Procedures, the Sale Hearing, the Sale, and the assumption, assignment, and sale of the Assigned Contracts.  Actual notice of the Motion and the relief requested therein (the "Sale Notice") was provided to the following parties: (i) the Office of the United States Trustee for the District of Delaware, (ii) counsel to the Committee, (iii) counsel to the Prepetition Agent (as defined below), (iv) counsel to the Purchaser, (v) all parties to Potential Assigned Contracts (as defined in the Bidding Procedures Order), (vi) all parties who had expressed a written interest in some or all of the Purchased Assets, (vii) all known holders of Encumbrances in, on, to, or against the Purchased Assets, (viii) the Internal Revenue Service, (ix) all applicable state and local taxing authorities, (x) the state attorneys general for all states in which the Debtors conduct business; and (xi) all parties that have requested or that are required to receive notice pursuant to

Bankruptcy Rule 2002. With respect to Entities (as defined in the Bankruptcy Code) whose identities or addresses are not reasonable ascertainable by the Debtors, publication of the Sale Notice in the *New York Times – National Edition* on May 26, 2023 (the "Publication Notice") was sufficient and reasonably calculated under the circumstances to reach such Entities. The Sale Notice and the Publication Notice collectively provided all interested parties with timely and proper notice of the Motion, the Bidding Procedures (including the time and place of the Auction), the Sale, the assumption, assignment, and sale of the Assigned Contracts, and the Sale Hearing. The notices described above were good, sufficient, and appropriate under the circumstances, and no other or further notice was or is required.

F.     Disclosures. The disclosures made by the Debtors in the Motion, the Sale Notice, the Publication Notice, and related documents filed with the Court concerning the Asset Purchase Agreement and at the Sale Hearing were sufficient under the circumstances.

G.     Sale and Marketing Process. As demonstrated by evidence proffered or adduced at the Sale Hearing, the Debtors and their professionals have conducted an adequate marketing process and a fair and open sale process in compliance with the Bidding Procedures Order. The bidding procedures attached as an exhibit to the Bidding Procedures Order (the "Bidding Procedures") were the result of arm's length negotiations, were substantively and procedurally fair to all parties, were proposed in good faith, and afforded a full, fair, and reasonable opportunity for any interested party to make a higher or otherwise better offer to purchase the Purchased Assets. The Bidding Procedures and the opportunity to submit a higher or otherwise better bid were duly noticed, the sale process was conducted in a non-collusive, fair, and good-faith manner, and the Debtors and the Purchaser have complied with the Bidding Procedures and the Bidding Procedures Order in all material respects.

H.   <u>Successful Bidder</u>.   The Debtors determined, in accordance with the Bidding Procedures, and in consultation with the Consultation Parties (as defined in the Bidding Procedures Order), that the Purchaser's bid was the sole Qualified Bid and represented the highest or otherwise best offer for the Purchased Assets.  As a result, the Debtors canceled the Auction and declared the Purchaser the Successful Bidder in a notice filed with the Court [Docket No. 394].

I.   <u>Highest and Best Offer</u>.   After a full, fair, and robust sale process, the Debtors appropriately determined that the Asset Purchase Agreement constitutes the highest or otherwise best offer for the Purchased Assets.  Taking into consideration all relevant factors and circumstances, the Asset Purchase Agreement represents the best available alternative for the Debtors' estates.  The total consideration provided by the Purchaser for the Purchased Assets as reflected in the Asset Purchase Agreement (i) is fair and reasonable, (ii) represents the highest and best offer received by the Debtors for the Purchased Assets, and (iii) will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative.  No other Entity or group of Entities has submitted a Qualified Bid or otherwise offered to purchase the Purchased Assets for greater economic value to the Debtors' estates than the Purchaser.

J.   <u>Best Interests of the Estates, Creditors and Parties in Interest</u>.   The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the sale of the Purchased Assets outside the ordinary course of business under section 363(b) of the Bankruptcy Code.  The immediate consummation of the Sale is necessary and appropriate to maximize the value of the Debtors' estates.  Considering all relevant facts and circumstances of these Cases, and the adequacy and fair value of the consideration provided by the Purchaser under the Asset Purchase Agreement, the Sale (i) constitutes a reasonable and

sound exercise of the Debtors' business judgment and a proper exercise of the fiduciary duties of the Debtors and their officers and directors, (ii) is in the best interests of the Debtors, their estates, their creditors, and other parties in interest, and (iii) merits approval.

K.    <u>Good Faith</u>.  The Purchaser is purchasing the Purchased Assets in good faith and is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code.  Neither the Purchaser nor any of its Affiliates (as defined in the Asset Purchase Agreement), officers, directors, members, partners, principals, or shareholders (or equivalent) or any of their respective representatives, successors, or assigns (collectively, "<u>Related Parties</u>") is an "insider" (as defined in section 101(31) of the Bankruptcy Code) of any Debtor and, therefore, each such Entity is entitled to the full protections of section 363(m) and otherwise has proceeded in good faith in all respects in connection with these Cases, including because: (i) the Purchaser recognized that the Debtors were free to deal with any other party interested in acquiring the Purchased Assets, (ii) the Purchaser complied with the provisions of the Bidding Procedures Order, (iii) the Purchaser's bid was subject to the competitive Bidding Procedures set forth in the Bidding Procedures Order, (iv) all payments to be made by the Purchaser and other agreements or arrangements entered into by the Purchaser in connection with the Sale have been disclosed, (v) the Purchaser has not violated section 363(n) of the Bankruptcy Code by any action or inaction, and (vi) the negotiation and execution of the Asset Purchase Agreement were at arm's length and in good faith.  There is no evidence of insider influence or improper conduct by the Purchaser or any of its Related Parties in connection with the negotiation of the Asset Purchase Agreement with the Debtors.

L.    <u>No Collusion</u>.  The Asset Purchase Agreement and the transactions contemplated thereby cannot be avoided under section 363(n) of the Bankruptcy Code.  None of the Debtors, the Purchaser, or any of their respective Related Parties have engaged in any conduct that would

186371.7186371.8                        7

cause or permit the Asset Purchase Agreement or the consummation of the transactions contemplated thereby to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.

M.    Fair Consideration.  The consideration provided by the Purchaser pursuant to the Asset Purchase Agreement is fair and adequate and constitutes reasonably equivalent value, fair consideration, and fair value for the Purchased Assets under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia (including the Uniform Voidable Transactions Act, the Uniform Fraudulent Transfer Act, the Uniform Conveyance Act, and similar laws).

N.    Power and Authority.  The Debtors, each acting by and through their existing agents, representatives, and officers, have full corporate power and authority to perform under the Asset Purchase Agreement and consummate all transactions contemplated thereby and to execute, deliver, and perform under all other documents contemplated thereby.  The Sale has been duly and validly authorized by all necessary corporate actions.  Upon entry of this Sale Order, the Debtors require no further consents or approvals to consummate the transactions contemplated by the Asset Purchase Agreement, except as otherwise set forth in the Asset Purchase Agreement.

O.    Binding Agreement; Survival.  The Asset Purchase Agreement is a valid and binding contract between the Debtors and the Purchaser and shall be enforceable pursuant to its terms.  The Asset Purchase Agreement was not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession, or the District of Columbia.  Neither the Purchaser nor any Debtor is entering into the transactions contemplated by the Asset Purchase Agreement

fraudulently for the purpose of statutory and common law fraudulent conveyance and fraudulent transfer claims. The Asset Purchase Agreement and the Sale itself, and the consummation thereof, shall be specifically enforceable against and binding upon the Debtors and any Chapter 11 or Chapter 7 trustee appointed with respect to any Debtor and shall not be subject to rejection or avoidance by the foregoing parties or any other Entity. The rights and interests granted pursuant to this Sale Order and Asset Purchase Agreement shall continue in these or any superseding cases under the Bankruptcy Code (including, without limitation, any case under Chapter 7 of the Bankruptcy Code) (each, a "Superseding Case"). Any trustee appointed for any Debtor under any provision of the Bankruptcy Code shall be authorized and directed to perform under the Asset Purchase Agreement and this Sale Order without the need for further order of the Court.

P.    Property of the Estate; Valid Transfer. The Debtors are the sole and lawful owner of, and have clear and marketable title to, the Purchased Assets. The Debtors' right, title, and interest in and to the Purchased Assets constitute property of the Debtors' estates and title thereto is vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code. The transfer of each of the Purchased Assets to the Purchaser pursuant to the Asset Purchase Agreement will be a legal, valid, and effective transfer of such Purchased Assets and will vest the Purchaser with all right, title, and interests of the Debtors to the Purchased Assets free and clear of all Encumbrances accruing or arising at, or related to, any time prior to the Closing (as defined in the Asset Purchase Agreement), unless otherwise expressly assumed or undertaken by the Purchaser under the terms of the Asset Purchase Agreement and with all Encumbrances in, on, to, or against any Purchased Assets to attach to the proceeds (including all amounts paid by the Purchaser under the Asset Purchase Agreement) of the Sale in the order of their priority and with

the same validity, force, and effect that they had against the Purchased Assets immediately prior to the Closing but subject to any claims and defenses that the Debtors may possess with respect thereto.

Q.    <u>Free and Clear Sale</u>.  The sale of the Purchased Assets shall be free and clear of all Encumbrances against the Debtors, their estates, and any of the Purchased Assets because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.  As used in this Sale Order, the term "Encumbrances" means, collectively, any and all: (i) Encumbrances (as defined in the Asset Purchase Agreement) with respect to any Debtor or any Debtor's assets; (ii) Excluded Liabilities (as defined in the Asset Purchase Agreement); (iii) debts arising under, relating to, or in connection with any act of any Debtor; (iv) claims, liabilities, obligations, demands, guaranties, options, rights, contractual commitments, restrictions, restrictive covenants, covenants not to compete, rights to refunds, escheat obligations, and interests and matters of any kind and nature asserted or assertable against any Debtor (whether arising prior to or subsequent to the commencement of the Cases and whether imposed by agreement, applicable law, equity, or otherwise); (v) purported rights of setoff or recoupment against, and rights and options to effect any forfeiture, modification, profit-sharing interest, right of first refusal, purchase or repurchase right or option, or termination of, any Debtor's or any of the Purchaser's interests in the Purchased Assets, or any similar rights; (vi) taxes owed by any Debtor for a period prior to the Closing, including, without limitation, sales, income, use or any other type of tax; (vii) restrictions, charges, and interests of any kind or nature, including any restriction of use, voting, transfer, receipt of income, or other exercise of any attributes of ownership, in each case accruing or arising at, or relating to, any time prior to the Closing; provided, however, that the term "Encumbrance," as used herein, shall not include

any Assumed Liabilities or Permitted Encumbrances (each as defined in the Asset Purchase Agreement), any obligations expressly assumed or undertaken by the Purchaser under the terms of the Asset Purchase Agreement, or any liability or obligation of an entity that is not a Debtor. If the sale of the Purchased Assets were not free and clear of all Encumbrances, or if the Purchaser would, or in the future could, be liable for any Encumbrances, the Purchaser would not have entered into the Asset Purchase Agreement and would not consummate the Sale, thus adversely affecting the Debtors and their estates and creditors.  The total consideration to be provided under the Asset Purchase Agreement reflects the Purchaser's reliance on this Sale Order to provide it, pursuant to section 105(a) and 363(f) of the Bankruptcy Code, with title to and possession of the Purchased Assets free and clear of all Encumbrances.

R.    _Assigned Contracts_.  As set forth herein, and subject only to payment of the Determined Cure Costs (as defined in the Asset Purchase Agreement), all requirements and conditions under the Bankruptcy Code and other applicable law for the Debtors' assumption, assignment, and sale to the Purchaser of the Assigned Contracts have been satisfied.  The Debtors have demonstrated that the assumption, assignment, and sale of the Assigned Contracts contemplated by the Asset Purchase Agreement is an exercise of their sound business judgment and is in the best interests of the Debtors, their estates and creditors, and other parties in interest. The Assigned Contracts to be assumed, assigned, and sold to the Purchaser under the terms of the Asset Purchase Agreement are an integral part of the Asset Purchase Agreement and the Sale and, accordingly, such assumption, assignment, and sale are reasonable and enhance the value of the Debtors' estates.  All Assigned Contracts are in full force and effect and have not been rejected, and the Debtors' time to assume or reject the Assigned Contracts has not otherwise expired.  As to each Potential Assigned Contract listed on **Exhibit B** hereto, the Cure Cost (as

defined in the Asset Purchase Agreement) listed therein with respect to such Potential Assigned Contract shall constitute the Determined Cure Cost for such Potential Assigned Contract, and payment thereof is sufficient for the Debtors to comply fully with the requirements of Section 365(b) of the Bankruptcy Code as to such Potential Assigned Contract.  As to each Potential Assigned Contract listed on **Exhibit C** hereto, the Determined Cure Cost applicable thereto shall be determined (i) by agreement of the Purchaser, the Debtors, and the non-debtor counterparty to such Potential Assigned Contract (in which case such Potential Assigned Contract shall become an Assigned Contract automatically upon such resolution and, to the extent applicable, payment of the agreed Determined Cure Cost, without the need for any further order of the Court) or (ii) by subsequent order of the Court, and, in each case, the payment of such Determined Cure Cost will be sufficient for the Debtors to comply fully with the requirements of Section 365(b) of the Bankruptcy Code as to such Assigned Contract.

S.    <u>Designation Rights</u>.  Pursuant to Section 1.5 of the Asset Purchase Agreement, the Purchaser shall maintain certain rights to modify the list of Assigned Contracts after the date of this Sale Order and up to the applicable Designation Deadline (as defined in the Asset Purchase Agreement) as set forth in such section.  Such modification rights include, but are not limited to, the right of the Purchaser, prior to the applicable Designation Deadline, to designate certain Designation Rights Assets (as defined in the Asset Purchase Agreement) for assumption by the Debtors and assignment and sale to the Purchaser, or as Excluded Assets (as defined in the Asset Purchase Agreement).  Upon the Purchaser's timely designation of a Designated Rights Asset as a Purchased Asset pursuant to Section 1.5 of the Asset Purchase Agreement, all of the provisions of this Sale Order relating to Purchased Assets shall, without the need for further order of the Court or action by any party, become applicable to such asset.  The notice and opportunity to

object provided to the non-debtor counterparties to Potential Assigned Contracts and to other parties in interest, as set forth in the Bidding Procedures Order and the Asset Purchase Agreement (and as described herein), provides fair, reasonable, and adequate protection of all rights that such non-debtor counterparties and other parties in interest may have with respect to such Contracts (as defined in the Asset Purchase Agreement).  In the event that the Debtors or their estates incur costs or expenses in connection with the operation of any Designation Rights Asset, the Purchaser shall be responsible for all such costs and expenses to the extent set forth in Section 1.5(b) of the Asset Purchase Agreement,

T.  <u>Notice of Assumption, Assignment, and Sale of Executory Contracts and Unexpired Leases</u>.  Good and sufficient notice of the Debtors' assumption, assignment and sale to the Purchaser of the Assigned Contracts has been provided to each non-debtor counterparty to a Potential Assigned Contract.  As reflected in the certificates of service filed on the Court's docket [Docket Nos. 319, 322, 417], the Debtors served (i) the *Notice to Contract Parties to Potentially Assumed, Assigned, and Sold Executory Contracts and Unexpired Leases* [Docket No. 297] (the "<u>Initial Assumption Notice</u>") in the form approved by the Bidding Procedures Order, (ii) the *Notice of Amendment to Exhibit A to Notice to Contract Parties to Potentially Assumed, Assigned, and Sold Executory Contracts and Unexpired Leases* [Docket No. 306] (the "<u>First Supplemental Assumption Notice</u>"), and (iii) *the Supplemental Notice to Notice to Contract Parties to Potentially Assumed, Assigned, and Sold Executory Contracts and Unexpired Leases* [Docket No. 400] (the "<u>Second Supplemental Assumption Notice</u>" and, together with the Initial Assumption Notice and First Supplemental Assumption Notice, the "<u>Assumption Notices</u>"), in which the Debtors identified the dollar amount, if any, that the Debtors assert is necessary to be paid to cure all defaults, if any (the "<u>Debtor Asserted Cure</u>

Amount"), under the Potential Assigned Contracts, on the non-debtor counterparties to the Potential Assigned Contracts. Pursuant to the Bidding Procedures Order and as set forth in the Assumption Notices, (i) non-debtor counterparties to the Potential Assigned Contracts listed on the Initial Assumption Notice were required to file objections (each, a "Cure Objection"), if any, to the Debtor Asserted Cure Amount by no later than June 12, 2023, at 5:00 p.m. (prevailing Eastern Time), (ii) non-debtor counterparties to the Potential Assigned Contracts listed on the First Supplemental Assumption Notice were required to file a Cure Objection, if any, to the Debtor Asserted Cure Amount by no later than June 13, 2023, at 5:00 p.m. (prevailing Eastern Time), and (iii) non-debtor counterparties to the Potential Assigned Contracts listed on the Second Supplemental Assumption Notice were required to file a Cure Objection, if any, to the Debtor Asserted Cure Amount by no later than July 6, 2023, at 5:00 p.m. (prevailing Eastern Time) (in each case, except to the extent the Debtors and the Purchaser jointly agreed to an extension of such deadline). The Bidding Procedures Order provides, and the Assumption Notices explained, that in the absence of a timely filed Cure Objection, the Debtor Asserted Cure Amount set forth in the Assumption Notices with respect to each Potential Assigned Contract would be controlling and fixed as the Cure Cost for such Potential Assigned Contract notwithstanding anything to the contrary in such Potential Assigned Contract or any other document, and the non-debtor counterparty to such Potential Assigned Contract shall be deemed to have consented to the Debtor Asserted Cure Amount. The provisions of subparagraph 16(c) of the Bidding Procedures Order regarding Supplemental Assumption Notices (as defined in the Bidding Procedures Order) will provide the non-debtor counterparties to Potential Assigned Contracts listed in any Supplemental Assumption Notice served hereafter with adequate, reasonable, and appropriate notice and opportunity to object.

186371.7186371.8

14

Case 23-10207-TMH    Doc 434-2    Filed 07/09/23    Page 16 of 61

U.      <u>Adequate Assurance of Future Performance</u>.  On May 25, 2023 [Docket No. 321], the Debtors sent all non-debtor counterparties to Potential Assigned Contracts evidence that the Purchaser has the ability to perform under the non-debtor counterparty's Potential Assigned Contract and otherwise has provided adequate assurance of future performance under section 365(b)(1) of the Bankruptcy Code.  Pursuant to the Bidding Procedures Order, non-debtor counterparties to Potential Assigned Contracts whose executory contracts and unexpired leases were listed on any Assumption Notice were required to file any objections to the Purchaser's ability to provide adequate assurance of future performance as contemplated under sections 365(b)(1)(C), 365(b)(3) (to the extent applicable), and 365(f)(2)(B) of the Bankruptcy Code (any such objection, an "<u>Adequate Assurance Objection</u>") by no later than June 12, 2023, at 5:00 p.m. (prevailing Eastern Time).  Any non-debtor counterparty that failed to file an Adequate Assurance Objection is forever barred from objecting to the assumption, assignment and sale of its Potential Assigned Contract on the grounds of a failure to provide adequate assurance of future performance.

V.      <u>Purchaser Not a Successor</u>.  By consummating the Sale pursuant to the Asset Purchase Agreement (including operating the Purchased Assets under the Debtors' trade names), the Purchaser is not a mere continuation of any Debtor or any Debtor's estate, and there is no continuity, no common identity, and no continuity of enterprise between the Purchaser and any Debtor.  The Purchaser shall not be deemed to be holding itself out as a continuation of any Debtor based on the Sale, the Asset Purchase Agreement, or this Sale Order.  The Purchaser is not a successor to any Debtor or any Debtor's estate by reason of any theory of law or equity, and the Sale does not amount to a consolidation, merger, or *de facto* merger of the Purchaser and any Debtor.  Neither the Purchaser nor any of its Related Parties shall have assumed or in any way be

186371.7186371.8                    15

responsible for any obligation or liability of any Debtor (or any Affiliate thereof) or any Debtor's estate, except to the extent expressly provided in the Asset Purchase Agreement or otherwise agreed in writing by the Purchaser in its sole and absolute discretion.

W.    No Sub Rosa Plan.  The Sale neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates the terms of a Chapter 11 plan of the Debtors.  The Sale does not constitute a *sub rosa* or *de facto* plan of reorganization or liquidation.

X.    Wind-Down.  The Excluded Cash and the Wind-Down Budget (each as defined in the Asset Purchase Agreement) will provide for, among other things and in accordance with the Wind-Down Budget, the payment of certain professional and U.S. trustee fees and other agreed wind-down expenses, and will permit the Debtors to implement an orderly and responsible wind-down of the Debtors' estates.  The Debtors shall deliver any Surplus Cash (as defined in the Asset Purchase Agreement) to Purchaser promptly following the date any such Cash and Cash Equivalents (as defined in the Asset Purchase Agreement) become Surplus Cash pursuant to the Asset Purchase Agreement.

Y.    Single, Integrated Transaction.  Entry of this Sale Order approving the Asset Purchase Agreement and all provisions of this Sale Order and the Asset Purchase Agreement are a necessary condition precedent to the Purchaser consummating the Sale.  The provisions of this Sale Order and the Asset Purchase Agreement and the transactions contemplated hereby and thereby are inextricably linked and technically and collectively constitute a single, integrated transaction.

Z.    Consummation is Legal, Valid, and Authorized.  The consummation of the Sale is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code,

including, without limitation, sections 105(a), 363(b), 363(f), 363(m), 365(b), and 365(f) of the Bankruptcy Code, and all of the applicable requirements of such sections have been satisfied.

AA.    <u>Legal and Factual Bases</u>.  The legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED:**

**1.  <u>Approval of the Motion</u>**

1.1.    The relief requested in the Motion is granted as set forth herein.

1.2.    Any and all objections and responses to the Motion, the entry of this Sale Order, or the relief granted herein (other than Cure Objections and Adequate Assurance Objections identified in **<u>Exhibit C</u>** hereto, if any) that have not been withdrawn, waived, settled, or resolved, and all reservations of rights included therein, are hereby overruled and denied on the merits. Notwithstanding anything in this Sale Order to the contrary, all Cure Objections and Adequate Assurance Objections listed on **<u>Exhibit C</u>**, if any, are reserved.  All Entities notified or deemed notified of the relief sought in the Motion and set forth in this Sale Order that failed to timely object thereto are deemed to consent to such relief.

1.3.    Notice of the Motion, the Bidding Procedures Order, the Sale Hearing, and the Sale was fair and equitable under the circumstances and complied in all respects with section 102(1) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006.

1.4.    The Court's findings of fact and conclusions of law in the Bidding Procedures Order are incorporated herein by reference.

**2.  <u>Approval of the Sale</u>**

2.1.    The Asset Purchase Agreement and all other ancillary documents, all of the terms and conditions thereof, and the Sale are hereby approved in all respects.

186371.7186371.8                                    17

2.2.     Pursuant to sections 363 and 365 of the Bankruptcy Code, entry by the Debtors into the Asset Purchase Agreement is hereby authorized and approved as a valid exercise of the Debtors' business judgment.  Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the Debtors are authorized to perform under and make all payments and satisfy all other obligations required by the Asset Purchase Agreement and all other ancillary documents as and when due thereunder without further order of the Court.  Pursuant to section 363(b) of the Bankruptcy Code, the Debtors, acting by and through their existing agents, representatives, and officers, are authorized, without further order of the Court, to take any and all actions necessary or appropriate to: (a) consummate and close the Sale pursuant to and in accordance with the terms and conditions of the Asset Purchase Agreement; (b) transfer and assign all right, title, and interest to and in all Purchased Assets in accordance with the terms and conditions of the Asset Purchase Agreement; and (c) perform under, consummate, and implement the Asset Purchase Agreement and all additional instruments and documents that may be reasonably necessary or desirable to implement the Sale, including any deeds, assignments, bills of sale, stock powers, transfers of membership interests and other instruments of transfer, or other ancillary documents as may be reasonably necessary or appropriate to the performance of the obligations contemplated by the Asset Purchase Agreement.  Neither the Purchaser nor any Debtor shall have any obligation to proceed with the Closing under the Asset Purchase Agreement until all conditions precedent to its obligations to do so have been met, satisfied, or waived in accordance with the terms of the Asset Purchase Agreement.

2.3.     The Debtors are authorized to cause to be filed with the secretary of state of any state or other applicable officials of any Governmental Units (as defined in section 101(27) of the Bankruptcy Code) any and all certificates, agreements, or amendments necessary or appropriate

to effectuate the transactions contemplated by the Asset Purchase Agreement, any related agreements, and this Sale Order, including amended and restated certificates or articles of incorporation and by-laws or certificates or articles of amendment, and all such other actions, filings, or recordings as may be required under applicable law or as any officer of any Debtor may determine are necessary or appropriate. The execution of any such document or the taking of any such action shall be, and hereby is, deemed conclusive evidence of the authority of such person to so act.

2.4.    The terms and provisions of the Asset Purchase Agreement and this Sale Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtors, their estates, and their creditors (whether known or unknown), the Purchaser, and each of their respective Affiliates, successors, and assigns, and any affected third parties, including, without limitation, all Entities asserting Encumbrances in, on, to, or against any of the Purchased Assets (collectively, the "Bound Parties") (provided, however, that no Bound Party other than the Debtors and the Purchaser shall be deemed a party to, or a third-party beneficiary of, the Asset Purchase Agreement or entitled to assert directly any rights thereunder), including, without limitation, following any subsequent appointment of a trustee, examiner, or receiver with respect to any Debtor or its estate, and all terms and provisions of the Asset Purchase Agreement shall likewise be binding on such trustee, examiner, or receiver. The provisions of this Sale Order and the terms and conditions of the Asset Purchase Agreement shall survive the entry of any order that may be entered confirming or consummating any Chapter 11 plan for any Debtor, converting any of the Cases to a case under Chapter 7 of the Bankruptcy Code, or dismissing any of the Cases or any Superseding Case, and nothing contained in any such order or plan shall alter, conflict with, or derogate from the provisions of this Sale Order or the Asset Purchase

186371.7186371.8                                   19

Agreement.    To the extent of any conflict between this Sale Order or the Asset Purchase
Agreement, on the one hand, and such future plan or order, on the other hand, the terms of this
Sale Order and the Asset Purchase Agreement shall control.

**3.    Sale and Transfer of Assets**

      3.1.    Pursuant to sections 105(a), 363(b), 363(f), 365(b), and 365(f) of the Bankruptcy
Code, and pursuant to and except to the extent otherwise set forth in the Asset Purchase
Agreement (including with respect to Assumed Liabilities and Permitted Encumbrances), the
Purchased Assets shall be transferred free and clear of all Encumbrances and Excluded
Liabilities, with all Encumbrances in, on, to, or against any Purchased Assets to attach to the
proceeds (including all amounts paid by Purchaser under the Asset Purchase Agreement) of the
Sale in the order of their priority and with the same validity, force, and effect that they had
against the Purchased Assets immediately prior to the Closing but subject to any claims and
defenses the Debtors may possess with respect thereto.    Those holders of Encumbrances who did
not object (or whose objections were withdrawn or consensually resolved) to the Sale are deemed
to have consented to the Sale being free and clear of their Encumbrances pursuant to section
363(f)(2) of the Bankruptcy Code.    Those holders of Encumbrances who did object could be
compelled in a legal or equitable proceeding to accept money satisfaction of such Encumbrances
pursuant to section 363(f)(5) of the Bankruptcy Code or fall within one or more of the other
subsections of section 363(f) of the Bankruptcy Code and, therefore, are adequately protected by
having their Encumbrance attach, pursuant to the terms of this Sale Order, solely to the proceeds
of the Sale ultimately attributable to the Purchased Assets in, on, to, or against which they had,
prior to the Closing, an Encumbrance.

3.2.    Notwithstanding anything in the Asset Purchase Agreement to the contrary, (a) the Purchased Assets shall not include (i) Avoidance Actions against any "insider" (as defined in section 101(31) of the Bankruptcy Code) or (ii) other claims or causes of action to be transferred to the Liquidation Trust referred to, and as set forth, in the Committee Settlement Term Sheet attached hereto as **Exhibit D** (the "Committee Settlement Term Sheet") and (b) Purchaser shall not prosecute or assert, and agrees to waive, all non-insider Avoidance Actions that are Purchased Assets except for purposes of set off against claims of customers, vendors, and other creditors who do not continue to do business with the Purchaser after the Closing Date that constitute Assumed Liabilities under the Asset Purchase Agreement, and Purchaser shall not be entitled to any affirmative recovery on account of any such Avoidance Actions.  The sale of all non-insider Avoidance Actions, rights, claims, credits, settlement proceeds, causes of action or rights of setoff against third parties (including for the avoidance of doubt, those arising under, or otherwise relating to, the Assigned Contracts), including all rights under vendors', manufacturers', and contractors' warranties, indemnities, and guarantees, in each case to the extent comprising Purchased Assets pursuant to the Asset Purchase Agreement, is hereby approved.

3.3.    Conditioned upon the occurrence of the Closing, this Sale Order shall be construed and shall constitute for all purposes a full and complete general assignment, conveyance, and transfer of all of the Purchased Assets and a bill of sale transferring all of the Debtors' right, title, and interest in and to such Purchased Assets pursuant to the terms and conditions set forth in the Asset Purchase Agreement.  For the avoidance of doubt, the Excluded Assets are not among the Purchased Assets, and the Excluded Liabilities are not among the Assumed Liabilities.

3.4.    All Entities are prohibited from taking any action to adversely affect or interfere with the ability of the Debtors to transfer the Purchased Assets to the Purchaser in accordance with the Asset Purchase Agreement and this Sale Order or, following the Closing, the ability of the Purchaser to own, possess, use, or convey the Purchased Assets.

3.5.    Subject to the terms of the Asset Purchase Agreement, the Purchaser is hereby authorized in connection with the consummation of the Sale to transfer or direct the transfer of any or all of the Purchased Assets (including the Assigned Contracts) or any rights to acquire any Purchased Assets (including Assigned Contracts) to its direct and indirect subsidiaries in such manner as the Purchaser, in its sole and absolute discretion, deems appropriate and to assign, sublease, sublicense, transfer, or otherwise dispose of any of the Purchased Assets (including the rights under any Assigned Contract) to its direct and indirect subsidiaries with all of the rights and protections accorded under this Sale Order and the Asset Purchase Agreement.  The Debtors shall cooperate with and take all actions reasonably requested by the Purchaser to effectuate any of the foregoing.

3.6.    The transfer of the Purchased Assets to the Purchaser and/or its designee(s) pursuant to the Asset Purchase Agreement and the consummation of the Sale (a) do not require any consents (beyond entry of this Sale Order) other than as specifically provided for in the Asset Purchase Agreement, (b) constitute a legal, valid, and effective transfer of all of the Debtors' right, title, and interest in and to the Purchased Assets (notwithstanding any requirement for approval or consent by any Entity under or pursuant to any otherwise applicable law, agreement, or governing document), and (c) shall vest the Purchaser with all right, title, and interest of the Debtors in and to the Purchased Assets as set forth in the Asset Purchase Agreement free and

clear of all Encumbrances of any kind or nature whatsoever (except to the extent expressly set forth in the Asset Purchase Agreement).

3.7.    To the maximum extent permitted under applicable law, the Purchaser and/or its designee(s), as applicable, shall be authorized, as of and after the Closing, to operate under any license, permit, registration, and governmental authorization or approval of the Debtors constituting Purchased Assets, and all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been and hereby are directed to be, transferred to the Purchaser or its designee(s) as of the Closing.  To the extent provided by section 525 of the Bankruptcy Code, no Governmental Unit may revoke or suspend any grant, permit, or license relating to the operation of the Purchased Assets sold, transferred, assigned, or conveyed to Purchaser or its designee(s) on account of the filing or pendency of these Cases or the consummation of the Sale.  Each and every federal, state, and local governmental agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the Sale.  This Sale Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department, or office.

3.8.    All Entities that presently or as of the Closing are in possession of some or all of the Purchased Assets (wherever located) are hereby directed to surrender possession of such Purchased Assets to the Purchaser or its designee on the Closing Date.

3.9.    Except as otherwise expressly provided in the Asset Purchase Agreement or this Sale Order, no Entity shall assert or pursue any Encumbrance against the Purchaser or any of its Affiliates, assets, or property, directly or indirectly, in any manner whatsoever.  Without limiting the foregoing, effective as of the Closing, and except as otherwise expressly provided in the

Asset Purchase Agreement, all Entities, including all lenders, debt security holders, equity security holders, governmental, tax and regulatory authorities, non-debtor counterparties to executory contracts and unexpired leases, other contract counterparties, customers, licensors, litigation claimants, employees and former employees, and trade or other creditors, hereby are forever barred and estopped from asserting any claims or other Encumbrances (whether legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or subsequent to the commencement of these Cases, and whether imposed by agreement, understanding, law, equity or otherwise) against the Purchaser or the Purchased Assets, including, without limitation, taking any of the following actions with respect to or based on such claim or other Encumbrance: (a) commencing or continuing in any manner any action or other proceeding against the Purchaser or any of its Affiliates, assets or properties; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against the Purchaser or any of its Affiliates, assets, or properties; (c) creating, perfecting, or enforcing any Encumbrance against the Purchaser or any of its Affiliates, assets or properties; (d) asserting an Encumbrance as a setoff or subrogation of any kind against any obligation due the Purchaser or any of its Affiliates; (e) commencing or continuing any action in any manner or place that does not comply, or is inconsistent, with the provisions of this Sale Order, the Asset Purchase Agreement, or any other agreements or actions contemplated by or taken in respect of the Asset Purchase Agreement; or (f) interfering with, preventing, restricting, prohibiting, or otherwise enjoining the consummation of the Sale. Notwithstanding anything herein to the contrary, the relief provided for in this Paragraph 3.9 shall not include any Assumed Liabilities.

3.10.    Neither the Purchaser nor any of its Related Parties is, has, will be, or will have been, and none shall be deemed: (a) a "successor" in any respect to any Debtor or its estate as a result of the consummation of the Sale or any other event occurring in the Cases under any theory of law or equity; (b) to have, *de facto* or otherwise, merged or consolidated with or into any Debtor or its estate; (c) to have a continuity of enterprise with any Debtor, or (d) a continuation or substantial continuation of any Debtor or any enterprise of any Debtor.  By consummating the Sale, the Purchaser shall not be assuming, nor be deemed to have assumed, or in any way be responsible for any liability or obligation of any Debtor or its estate, including, without limitation, any bulk sale law, successor liability, or liability or responsibility for any claim against any Debtor or its insider, except to the extent otherwise expressly provided in the Asset Purchase Agreement with respect to an Assumed Liability or Permitted Encumbrance and with respect to the Purchaser's obligations with respect to the Designation Rights Assets.  Except to the extent otherwise set forth in the Asset Purchase Agreement with respect to Assumed Liabilities, Permitted Encumbrances, and the Purchaser's obligations with respect to Designation Rights Assets, the transfer of the Purchased Assets (including the Assigned Contracts) to the Purchaser under the Asset Purchase Agreement shall not result in the Purchaser, any of its Related Parties, or the Purchased Assets, having any liability or responsibility whatsoever with respect to, or being required to satisfy in any manner, whether at law or in equity, whether by payment, setoff, or otherwise, directly or indirectly (a) any claim against any Debtor or any insider of a Debtor; (b) any Encumbrance, or (c) any liability or responsibility of any Debtor.

3.11.    Without limiting the effect or scope of the foregoing, except to the extent expressly provided in the Asset Purchase Agreement, as of the Closing, the Purchaser and its Related Parties shall, to the maximum extent permitted by applicable law, have no successor or

vicarious liabilities of any kind or character with respect to any Purchased Assets, including, without limitation any liability related to: (a) any employment or labor agreements or the termination thereof; (b) any pension, welfare, compensation, or other employee benefit plans, agreements, practices, and programs of or related to any Debtor or any Debtor's Affiliates, predecessors, or current or former employees (or the termination of any of the foregoing) (including, without limitation, any claims belonging to or assertable by the Pension Benefit Guaranty Corporation for unfunded benefit liabilities, minimum funding requirements, due and unpaid plan contributions, premiums, and interest, and any other charges on each of the foregoing); (c) any Debtor's business operations or the cessation thereof; (d) any litigation involving one or more of the Debtors; (e) any claims of any former employees of any Debtor or its predecessor; (f) any employee, workers' compensation, occupational disease, unemployment, or temporary disability related law; and (g) any claims that might otherwise arise under or pursuant to (in each case (as applicable), as amended): (i) the Employee Retirement Income Security Act of 1974; (ii) the Fair Labor Standards Act; (iii) Title VII of the Civil Rights Act of 1964; (iv) the Federal Rehabilitation Act of 1973; (v) the National Labor Relations Act; (vi) the Worker Adjustment and Retraining Notification Act of 1988; (vii) the Age Discrimination in Employment Act of 1967; (viii) the Americans with Disabilities Act of 1990; (ix) the Family Medical Leave Act; (x) the Labor Management Relations Act; (xi) the Older Workers Benefit Protection Act; (xii) the Equal Pay Act; (xiii) the Consolidated Omnibus Budget Reconciliation Act of 1985; (xiv) the Multiemployer Pension Plan Amendments Act of 1980; the Pension Protection Act; (xv) state and local discrimination laws; (xvi) state and local unemployment compensation laws or any other similar state and local laws; (xvii) state workers' compensation laws; (xviii) any other state, local or federal employee benefit laws, regulations, or rules or other

state, local, or federal laws, regulations, or rules relating to wages, benefits, employment, or termination of employment with any Debtor or any predecessors; (xix) any antitrust laws; (xx) any product liability or similar laws, whether state or federal or otherwise; (xxi) any environmental laws, rules, or regulations, including, without limitation, under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601, *et seq.*, or similar state statutes; (xxii) any bulk sales or similar laws; (xxiii) any federal, state, or local tax statutes, regulations, or ordinances, including, without limitation, the Internal Revenue Code of 1986; and (xxiv) any common law doctrine of *de facto* merger or successor or transferee liability, in each case now existing or hereafter arising, whether asserted or unasserted, fixed or contingent, liquidated or unliquidated, with respect to any Debtor, any obligation of any Debtor, or the Purchased Assets, including, without limitation, liabilities on account of any taxes arising, accruing, or payable under, out of, or in connection with, or in any way relating to, any Purchased Assets (including any Assigned Contract) or the Asset Purchase Agreement.

3.12.   Except as expressly set forth in the Asset Purchase Agreement with respect to Assumed Liabilities, Permitted Encumbrances, and the Purchaser's obligations with respect to the Designation Rights Assets, it is expressly ordered and directed that the sale of the Purchased Assets is free and clear of any and all unemployment compensation taxes and any related contribution and reimbursement obligations of any Debtor, and all state and labor agencies shall treat the Purchaser as a "new employer" in all respects and for any applicable tax rates and contribution and reimbursement obligations and "experience rates" as of and after the Closing (and each state unemployment compensation law agency or department shall be prohibited from treating the Purchaser as a successor of any Debtor for any contribution rates, benefit charges, benefit rates, experience rates, or similar charges or taxes).

**4.  Assumption, Assignment, and Sale of Executory Contracts and Unexpired Leases**

4.1.    Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, and subject to and conditioned upon the occurrence of the Closing, and subject to Paragraphs 4.8 and 4.16 hereof, the Debtors' assumption, assignment, and sale to the Purchaser, and the Purchaser's assumption and purchase on the terms set forth in the Asset Purchase Agreement of the Assigned Contracts, are hereby approved in their entirety, and the requirements of section 363 and 365 of the Bankruptcy Code with respect thereto are hereby deemed satisfied.  Subject to Paragraphs 4.8 and 4.16 hereof, the Debtors are hereby authorized in accordance with sections 105(a), 363, and 365 of the Bankruptcy Code to (a) assume, assign, and sell to the Purchaser, effective as of the Closing (or thereafter pursuant to the Asset Purchase Agreement) the Assigned Contracts free and clear of all Encumbrances of any kind or nature whatsoever and (b) execute and deliver to the Purchaser such documents or other instruments as may be necessary or reasonably requested by the Purchaser to assign and transfer the Assigned Contracts to the Purchaser.

4.2.    Upon the date that each Assigned Contract is assumed, assigned, and sold pursuant to the Asset Purchase Agreement, the Purchaser shall, in accordance with sections 363 and 365 of the Bankruptcy Code, be fully and irrevocably vested with all right, title, and interest in, to, and under such Assigned Contract.  The Debtors shall cooperate with and take all actions reasonably requested by the Purchaser to effectuate the foregoing, as further provided in the Asset Purchase Agreement.  The Purchaser shall likewise cooperate with the Debtors and otherwise comply with the terms and conditions of the Asset Purchase Agreement in relation to any Designation Rights Assets, including the payment of all costs and expenses in connection with the operation of any Designation Rights Assets to the extent required by Section 1.5(b) of the Asset Purchase Agreement.

4.3.    The Assigned Contracts (including, for the avoidance of doubt, any non-disclosure agreement entered into by any Debtor in connection with the marketing of the Purchased Assets that constitutes an Assigned Contract) shall be transferred to, and remain in full force and effect for the benefit of, the Purchaser notwithstanding any provision in any such Assigned Contract (including those of the type described in sections 365(b)(2) and 365(f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer or requires any non-debtor counterparty to consent thereto.

4.4.    Pursuant to section 365(f) of the Bankruptcy Code, the assignment and sale by the Debtors to the Purchaser of any Assigned Contract shall not be a default thereunder.  Any provisions in any Assigned Contract that prohibit or condition the assignment and sale of such Assigned Contract or allow the non-debtor counterparty to such assigned Contract to terminate, recapture, impose any penalty or condition on renewal or extension, purport to require the consent of any non-debtor counterparty, or modify any term or condition, in each case upon the assignment and sale of such Assigned Contract, constitute unenforceable anti-assignment provisions that are void and of no force and effect with respect to the assignment and sale of the Assigned Contract to the Purchaser.  All Assigned Contracts shall remain in full force and effect following their assignment and sale to the Purchaser, without existing default(s), subject only to payment by the Purchaser of the Determined Cure Cost.

4.5.    Subject to Paragraphs 4.8 and 4.16 hereof, all other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment and sale to the Purchaser of the Assigned Contracts (including the provision of adequate assurance of future performance within the meaning of sections 365(b)(1)(C), 365(b)(3) (to the extent applicable), and 365(f)(2)(B) of the Bankruptcy Code) have been satisfied.

4.6.    The rights of the Purchaser to modify the lists of Assigned Contracts and Non-Assigned Contracts (as defined in the Asset Purchase Agreement) after the date of this Sale Order as set forth in Section 1.5 of the Asset Purchase Agreement are hereby approved and shall survive confirmation of any Chapter 11 plan, notwithstanding sections 365(d)(2) and 365(d)(4) or any similar provision of the Bankruptcy Code.  Without limiting the foregoing, as set forth in Section 1.5 of the Asset Purchase Agreement, the Purchaser may (a) designate any Potential Assigned Contract as an Assigned Contract at any point, including following Closing, prior to the earlier of (i) the applicable Designation Deadline and (ii) the entry of an order of the Court approving the rejection of such contract, and (b) designate any Potential Assigned Contract as a Non-Assigned Contract at any point, including following Closing, prior to the earlier of (i) the applicable Designation Deadline and (ii) the assumption, assignment, and sale of such contract. Any Potential Assigned Contract that is not designated as either an Assigned Contract or a Non-Assigned Contract at least one Business Day (as defined in the Asset Purchase Agreement) prior to the Closing shall constitute a Designation Rights Asset until the earliest of the Purchaser's designation of such contract as an Assigned Contract or Non-Assigned Contract, the applicable Designation Deadline, the entry of an order of the Court approving the rejection of such contract, or the assumption and assignment of such contract.  Following Closing, with respect to any Designation Rights Asset that has not been rejected by the Debtors post-Closing and as to which the Designation Deadline has not passed, upon written notice(s) from the Purchaser to the Debtors, the Debtors are hereby authorized and directed to take all actions reasonably necessary to assume, assign, and sell to the Purchaser all such executory contracts and unexpired leases as set forth in the notice(s).  Notwithstanding anything in this Sale Order to the contrary, on the date any Designation Rights Asset is assumed, assigned, and sold to the

186371.7186371.8                                   30

Purchaser, such Contract shall thereafter be deemed a Purchased Asset for all purposes under this Sale Order and the Asset Purchase Agreement.

4.7.    **Exhibit B** attached hereto lists Potential Assigned Contracts for which either (a) no Cure Objections were timely filed with the Court, (b) a Cure Objection was filed but has since been withdrawn or resolved, or (c) informal responses were received and resolved by mutual written agreement among the Purchaser, the Debtors, and the applicable non-debtor counterparty. The Determined Cure Costs for the Potential Assigned Contracts listed on **Exhibit B** are hereby fixed at the amounts set forth therein, and the non-debtor counterparties to such Potential Assigned Contracts are forever bound by such Determined Cure Costs. For the avoidance of doubt, the inclusion of a Potential Assigned Contract on **Exhibit B** shall not limit the rights of the Purchaser under the Asset Purchase Agreement to designate such Potential Assigned Contract as an Assigned Contract or a Non-Assigned Contract at any time prior to the applicable Designation Deadline.

4.8.    Any Potential Assigned Contract for which there is an unresolved Adequate Assurance Objection or Cure Objection set forth on **Exhibit C** hereto shall not be assumed, assigned, and sold to the Purchaser unless and until all such objections relating to such Potential Assigned Contract are withdrawn or resolved by order of the Court or the applicable non-debtor counterparty consents. Upon resolution of such Adequate Assurance Objection and/or Cure Objection among the Purchaser, the Debtors, and the non-debtor counterparty to the applicable Potential Assigned Contract, the Purchaser may, in its sole and absolute discretion and pursuant to the provisions of the Asset Purchase Agreement, designate such Potential Assigned Contract as an Assigned Contract or a Non-Assigned Contract, and the Debtors shall be authorized, pursuant to this Sale Order and subject only to payment of the Determined Cure Cost, to assume,

assign, and sell to the Purchaser any such Potential Assigned Contract so designated as an Assigned Contract without the need for further order of the Court.

4.9.     Unless the Purchaser and the applicable non-debtor counterparty agree to different terms, pursuant to sections 365(b)(1)(A) and (B) of the Bankruptcy Code, the Purchaser shall pay to the applicable non-debtor counterparty the Determined Cure Costs relating to any Assigned Contracts within seven (7) days following the assumption, assignment, and sale thereof as set forth in Section 1.5 of the Asset Purchase Agreement.   The payment of the Determined Cure Cost for any given Assigned Contract shall effect a cure of all defaults existing as of the date that such Assigned Contract is assumed, assigned, and sold and shall compensate for any actual pecuniary loss to the non-debtor counterparty to such Assigned Contract resulting from such default.   Upon payment of the applicable Determined Cure Costs, the non-debtor counterparties to Assigned Contracts shall be enjoined from taking any action against the Purchaser or the Purchased Assets with respect to any claim for cure.   After the payment of the Determined Cure Cost applicable to any Assigned Contract, the Debtors and the Purchaser shall not have any further liabilities to the non-debtor counterparty to such Assigned Contract, other than the Purchaser's obligations under the Assigned Contract that become due and payable on or after the date that such Assigned Contract is assumed, assigned, and sold to Purchaser.

4.10.    Subject to Paragraph 4.16 hereof, any party that has not filed with the Court, and served on the parties entitled to notice thereof, an objection to the assumption, assignment, and sale of any Potential Assigned Contract by the applicable deadline specified in the Bidding Procedures Order (as such date may have been modified or extended in accordance with the terms of the Bidding Procedures Order or with the consent of the Debtors and the Purchaser) is deemed to have consented to such assumption, assignment, and sale.

4.11.    As of the date of assignment and sale of an Assigned Contract to the Purchaser, the Purchaser shall be deemed to be substituted for the applicable Debtor(s) as a party to the Assigned Contract, and the Debtors shall be relieved, pursuant to section 365(k) of the Bankruptcy Code, from any liability under the Assigned Contract arising from and after the date of the assignment and sale.

4.12.    All non-debtor counterparties to the Assigned Contracts shall cooperate and expeditiously execute and deliver, upon the reasonable request of the Purchaser, and shall not charge the Purchaser for, any instruments, applications, consents, or other documents that may be required or requested by any public or quasi-public authority or other Entity to effectuate the applicable transfers in connection with the Sale.

4.13.    Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, all non-debtor counterparties to the Assigned Contracts are forever barred and permanently enjoined from raising or asserting against the Debtors or the Purchaser any assignment fee, rent acceleration, rent increase on account of assignment, default, breach, claim, pecuniary loss, or condition to assignment arising under or relating to any Assigned Contract by reason of the assumption, assignment, and/or sale of such Assigned Contract.

4.14.    Notwithstanding any term of any Assigned Contract to the contrary, any extension or renewal options or other rights contained in such Assigned Contract that purport to be personal only to, or exercisable only by, the Debtor(s), a named Entity, or an Entity operating under a specific trade name may, in each case, be freely exercised to their full extent by the Purchaser, subject to the other applicable terms of the Assigned Contract.  Any extension or renewal options in connection with any Assigned Contract that the applicable Debtor(s) have

sought to exercise prior to the entry of this Sale Order are deemed to have been timely and validly exercised by the Purchaser.

4.15.    Neither the Purchaser nor any successor of the Purchaser shall be responsible for any Encumbrances or obligations arising out of any of the Potential Assigned Contracts that are not ultimately assumed, assigned, and sold to the Purchaser (whether at Closing or thereafter) under the terms of the Asset Purchase Agreement.

4.16.    In the case of any Potential Assigned Contract that the Debtors seek to assume, assign, and sell pursuant to the Asset Purchase Agreement that was not included in the Assumption Notice or any Supplemental Assumption Notice served prior to the date hereof, within three Business Days following receipt of a written notice by the Purchaser (email shall suffice) that such Potential Assigned Contract is designated for assumption, assignment, and sale, the Debtors shall file with the Court a Supplemental Assumption Notice and serve it on each of the following parties (each, a "Supplemental Assumption Notice Service Party"): (a) each non-debtor counterparty to any Potential Assigned Contract (and their counsel, if known) listed on such Supplemental Assumption Notice, (b) the U.S. Trustee, (iii) counsel to the Committee, and (iv) counsel to the Purchaser.  The Debtors shall also serve on affected non-debtor counterparties and their respective counsel, if known, by electronic mail (if available) or overnight mail adequate assurance information for the Purchaser.  Any non-debtor counterparty to a Potential Assigned Contract listed on such Supplemental Assumption Notice may object to the assumption, assignment, and sale of the Potential Assigned Contract solely with respect to the Debtor Asserted Cure Amount contained therein or adequate assurance of future performance but, in each case, only to the extent such objection could not have been raised prior to the Cure Objection Deadline (as defined in the Bidding Procedures Order).  Any such objection must be in

writing and filed and served so that it is actually received by the Debtors and the Supplemental Assumption Notice Service Parties no later than 14 calendar days after the date the Debtors served the applicable Supplemental Assumption Notice.   Any non-debtor counterparty to a Potential Assigned Contract included on a Supplemental Assumption Notice that does not timely file and serve on the Supplemental Assumption Notice Service Parties a permitted objection thereto shall be deemed to have consented to the assumption, assignment, and sale of such Potential Assigned Contract and the Debtor Asserted Cure Amount set forth with respect to such Potential Assigned Contract in the Supplemental Assumption Notice.   If an objection to a Supplemental Assumption Notice permitted by this Paragraph is timely filed and served on the Supplemental Assumption Notice Service Parties in the manner specified above, and unless the parties agree otherwise in writing, a hearing will be scheduled by the Court to consider that objection.   With respect to any Potential Assigned Contract set forth in a Supplemental Assumption Notice that is ultimately assumed, assigned, and sold to the Purchaser pursuant to the terms of the Asset Purchase Agreement and this Sale Order, the date of such assumption, assignment, and sale shall be deemed to have occurred as of the date of filing of the Supplemental Assumption Notice, unless otherwise agreed to by the Purchaser and the non-debtor counterparty to such Assigned Contract.

4.17.   Notwithstanding anything herein to the contrary, in the event and to the extent that any amounts come due under any Potential Assigned Contracts constituting a Designation Rights Asset between the Closing and the designation of such Potential Assigned Contract for assumption, assignment and sale, or rejection, the Purchaser shall be liable for such amounts to the extent required by Section 1.5(b) of the Asset Purchase Agreement.

**5.  Additional Provisions**

5.1.  <u>Committee Settlement; Amendments to Asset Purchase Agreement</u>.  The Committee Settlement Term Sheet, including the amendments to the Asset Purchase Agreement set forth therein, is hereby approved.  The Debtors consent and agree to the terms of such Committee Settlement Term Sheet.  To the extent of any inconsistency with the terms herein and the Committee Settlement Term Sheet, the Committee Settlement Term Sheet shall control.  Further, the Wind-Down Funding Amount (as defined in the Committee Settlement Term Sheet) shall fund the Wind-Down Budget (as defined in the Asset Purchase Agreement and as attached as Exhibit 1 to the Committee Settlement Term Sheet) and be used on a line-item basis except for such variances as may be agreed to in writing by the Purchaser and the Committee or, after the effective date of a Plan (as defined in the Committee Settlement Term Sheet), the Purchaser and the Trustee (as defined in the Committee Settlement Term Sheet).  With respect to the consent of the Purchaser or the Committee for such variances, such consent shall not be unreasonably withheld, conditioned or delayed.  For the avoidance of doubt, the aggregate Wind-Down Funding Amount shall not be increased under any circumstances.  ~~Further, the final amount of the~~<u>In addition to the foregoing in this Paragraph 5.1, the Asset Purchase Agreement is amended as follows: the reference to "July 25, 2023" in the definition of Outside Date in Section 3.4(b) of the Asset Purchase Agreement is amended to "August 1, 2023" and (b) the reference to "$225,000,000" in the definition of</u> Prepetition Debt Bid Amount ~~(as defined~~ <u>in</u> Section 2.1(ii) of the Asset Purchase Agreement~~) and any resulting deficiency claim of the Prepetition Secured Parties may be adjusted up or down as agreed upon by the Purchaser and the Committee, after consultation with the Debtors, to reflect the fair market value of the Purchased Assets, for tax purposes~~ <u>is amended to "$205,000,000"</u>.

5.2.  <u>PBGC Settlement</u>.  Subject to the occurrence of the Closing: (a) The Debtors, the Purchaser, the Committee, and the Pension Benefit Guaranty Corporation (the "<u>PBGC</u>") shall reasonably cooperate in connection with the termination of the Stanadyne LLC Pension Plan (the "<u>Pension Plan</u>"), which, for the avoidance of doubt, is not an Assumed Liability under the Asset Purchase Agreement.  The Debtors shall store and preserve all documents and records relating to the Pension Plan ("<u>Pension Plan Documents</u>") until PBGC has completed its investigation regarding the Pension Plan.  If any Pension Plan Documents are transferred to the Purchaser either (i) the Debtors shall retain copies to comply with this provision of this Sale Order or (ii) the Purchaser shall store and preserve all transferred documents and records relating to the Pension Plan until PBGC has completed its investigation regarding the Pension Plan.  Pension Plan Documents may be in hard copy or electronic form and may include, but are not limited to, any Pension Plan governing documents, actuarial documents, records and statements of the Pension Plan's assets, board resolutions relating to the Pension Plan, and employee and personnel records of the employees who participate in the Pension Plan.  The Debtors and/or Purchaser, as the case may be, shall not abandon or destroy any Pension Plan Documents and shall make the Pension Plan Documents available to PBGC for inspection and copying until PBGC has completed its investigation regarding the Pension Plan.  For the avoidance of doubt, the Purchaser's obligation to store and preserve Pension Plan Documents pursuant to this paragraph shall only be with respect to Pension Plan Documents actually transferred to the Purchaser; (b) The Purchaser shall pay (or cause to be paid) $750,000 to the PBGC within five (5) Business Days following the Closing; (c) The PBGC shall release (i) Purchaser, (ii) Cerberus Business Finance, LLC as administrative agent and collateral agent (in such capacity, the

"Prepetition Agent") under the Financing Agreement[4], (iii) the lenders under the Financing Agreement (the "Prepetition Secured Lenders" and with the Prepetition Agent, the "Prepetition Secured Parties"), and (iv) each of their respective affiliates, from all current and future liabilities under Title IV of the Employee Retirement Income Security Act of 1974 arising from or related to the Pension Plan, including, without limitation, the unfunded benefit liabilities, due and unpaid minimum funding contributions, premiums, and interest and any other charges on each of the foregoing; (d) If the Purchaser or the Prepetition Secured Parties enter into a transaction, or series of transactions, selling the Purchaser, or all or substantially all of the assets of the Purchaser to an unaffiliated third party at any time prior to the fifth (5th) anniversary of the Closing (a "Subsequent Sale Transaction"), the Purchaser shall pay the Additional Payment (as defined below), if any, to the PBGC within five (5) Business Days following the closing date of such Subsequent Sale Transaction. If the Additional Payment amount calculated is zero or negative, then no Additional Payment shall be due. For purposes of this paragraph, (i) "Additional Payment" means the lesser of (x) 10% of all Net Proceeds (as defined below) received by the Purchaser or Prepetition Secured Parties on account of a Subsequent Sale Transaction(s), and (y) $2,500,000; and (ii) "Net Proceeds" means the amount of aggregate cash proceeds actually received by the Purchaser (net of any customary transactions costs, expenses or taxes paid therefrom) in excess of: (1) the outstanding principal, interest and other obligations owed by the Debtors to the Prepetition Secured Parties pursuant to the Financing Agreement as of immediately prior to the Closing, plus (2) an amount accruing thereon at an annual rate of 7.5% from and after the Closing, plus (3) the amount of any direct or indirect debt or equity financing or other investment by any of the Prepetition Secured Parties or any of their respective

---

[4] "Financing Agreement" means that certain Financing Agreement dated as of May 2, 2017, as amended from time to time, by and among the Debtors, the Prepetition Agent and the lenders thereunder.

affiliates in Purchaser after the Closing, plus (4) an amount accruing thereon at an annual rate of 7.5% from and after date such financing or other investment is made.  The Purchaser will provide PBGC with no less than 5 business days' prior notice of the closing of a Subsequent Sale Transaction that is likely to result in an Additional Payment to PBGC ("Prior Notice"); provided, that the Purchaser shall not have any liability to PBGC for the failure to give Prior Notice if PBGC is not materially harmed by such failure; provided, further, that Purchaser shall not be required to provide Prior Notice to the extent Purchaser is prohibited from doing so by a confidentiality agreement or applicable law, and if Purchaser does not provide Prior Notice, it shall provide PBGC notice of the Subsequent Sale Transaction no more than three (3) days after the closing date; (e) The PBGC shall have an allowed unsecured claim against the Debtors' estates in the amount of $15,538,178.33; and (f) The Initial GUC Distribution Amount (as defined in the Committee Settlement Term Sheet) shall be paid by the Purchaser as and when provided therein.

5.3.    Consigned Cores.  Notwithstanding anything to the contrary, nothing in this Sale Order or the Asset Purchase Agreement transfers ownership of any Consigned Cores.  For purposes hereof, "Consigned Cores" means cores delivered to one of the Debtors by a customer on a consignment basis in excess of such customer's core eligibility at the time of delivery to the Debtors.

5.4.    Environmental Liabilities.  Nothing in this Sale Order or the Asset Purchase Agreement releases, nullifies, precludes or enjoins the enforcement of any police or regulatory environmental liability to a governmental unit that any entity would be subject to as the post-sale owner or operator of property after the Closing Date; provided, however, that all rights and defenses of the Purchaser under non-bankruptcy law are preserved.  Nothing in this Sale Order or

the Asset Purchase Agreement authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law.  Nothing in this Sale Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Sale Order or to adjudicate any defense asserted under this Sale Order with respect to any police or regulatory environmental liability to a governmental unit to the extent set forth in this paragraph.

5.5.   <u>GM</u>.   On June 9, 2023, General Motors LLC (together with its applicable affiliates, "<u>GM</u>") filed its *Amended Response and Limited Objection to Debtors' Notice to Contract Parties to Potentially Assumed, Assigned, and Sold Executory Contracts and Unexpired Leases* [Docket No. 354].  Pursuant to 11 U.S.C. §§ 363(f) and 365, as of the Closing, the Debtors are deemed to have assumed all unexpired GM purchase orders and supply agreements (including, without limitation, the Agreement Regarding GM Purchase Contracts, dated May 19, 2023, among GM, Stanadyne LLC, and Stanadyne Diesel Systems) issued by GM to the Debtors (including GM's General Terms and Conditions incorporated therein, the "<u>GM Contracts</u>") and to have assigned and sold such GM Contracts to the Purchaser.  The Purchaser agrees, as of the Closing, to assume all liabilities, claims and obligations of the Debtors under the GM Contracts arising prior to and after the Petition Date.

5.6.   <u>Ford - Assignment of Sourcing Agreement</u>.  Ford Customer Service Division, a division of Ford Motor Company (collectively, "<u>Ford</u>") and Debtor Pure Power Technologies, Inc. ("<u>PPT</u>") are parties to that certain Commercial and Program Agreement entered into as of April 26, 2022, which agreement incorporates that certain Core Commercial Agreement entered into between the parties as of March 22, 2022 (the "<u>CCA</u>" and, collectively Commercial and

Program Agreement, and together with any associated purchase orders, releases, or other ancillary documents, the "Sourcing Agreement").  The Debtors owe monetary obligations to Ford under the Sourcing Agreement as set forth in that certain Joint Stipulation filed of record on May 24, 2023 at Docket No. 301 and approved by the Court at Docket No. 303.  Notwithstanding anything in this Sale Order or any other order of this Court to the contrary, the Sourcing Agreement shall constitute an Assigned Contract subject to the following terms and conditions of assumption and assignment.  Within ten (10) days following the Closing (or such longer time period as may be agreed in writing among Ford, the Purchaser, and the Debtors), Ford, the Debtors, and the Purchaser shall review their respective books and records and determine in good faith the amount owed to Ford thereunder as of the date of Closing (such amount, the "Outstanding Balance").  The Outstanding Balance shall be payable by the Purchaser to Ford in cash and in three equal monthly installments, with the first payment due on or before the date that is seven months from the date of Closing, the second payment due on or before the date that is eight months from the date of Closing, and the final payment due on or before the date that is nine months from the date of Closing.  In addition, with respect to any cores returned by Ford pursuant to the Sourcing Agreement following the date of Closing, Ford shall be permitted to debit the amount of core refund obligations due to Ford on account of such cores against any obligations due from Ford to the Purchaser in accordance with the terms of the Sourcing Agreement.

      5.7.   Professional Fees.  Notwithstanding anything in this Sale Order or in the Asset Purchase Agreement to the contrary, (a) the Debtor Professional Escrow and Professional Fee Reserve (each as defined or used in the *Final Order (i) Authorizing the Use of Cash Collateral, (ii) Granting Adequate Protection to Prepetition Secured Lenders, and (iii) Granting Related*

*Relief* [Docket No. 218] (the "Final Cash Collateral Order")) shall remain in effect following the Closing for the benefit of the Professional Persons (as defined in the Final Cash Collateral Order) with respect to accrued and unpaid Allowed Professional Fees as of the Closing as set forth in the Approved Budget, and such Professional Persons are authorized to be paid from the Debtor Professional Escrow and/or Professional Fee Reserve, as applicable, for such Allowed Professional Fees that are approved by orders entered by this Court authorizing the payment of such amounts; (b) the accrued and unpaid fees of Ordinary Course Professionals (as defined in the *Order Pursuant to Sections 105(a), 327, 328 and 330 of the Bankruptcy Code, Bankruptcy Rule 2014 and Local Rule 2014-1 Authorizing the Debtors to Employ Professionals Used in the Ordinary Course of Business Effective as of the Petition Date* [Docket No. 153] (the "OCP Order") as of the Closing and included in the Approved Budget shall be paid into the Professional Fee Reserve at the Closing by the Debtors out of Cash Collateral (as defined in the Final Cash Collateral Order) and such Ordinary Course Professionals are authorized to be paid out of the Professional Fee Reserve for such permitted fees in accordance with the OCP Order; and (c(c) accrued and unpaid U.S. Trustee fees as of the Closing and included in the Approved Budget shall be paid into the Professional Fee Reserve at the Closing by the Debtors out of Cash Collateral and such U.S. Trustee fees are authorized to be paid out of the Professional Fee Reserve; and (d) the Purchaser shall pay into the Professional Fee Reserve, the Angle Advisor's "Minimum Fee" (in such amount as determined by order of this Court allowing such fee and taking into account any monthly credits to such fee) within three (3) Business Days following entry of an order of this Court approving Angle Advisors' fees on a final basis and Angle Advisors is authorized to be paid such amount from the Professional Fee Reserve.  If, after satisfaction in full of the amounts to be paid pursuant to clauses (a) through (cd) above, the

Debtor Professional Escrow and/or Professional Fee Reserve have not been reduced to zero, all remaining funds shall be delivered to the Purchaser. For the avoidance of doubt, only the amounts set forth in (x) the Approved Budget for Professional Persons through the earlier of the Closing and the Cash Collateral Termination Date (as defined in the Final Cash Collateral Order) and (y) clauses (b) ~~and~~through (~~e~~d) above, in each case, shall be deposited in the Debtor Professional Escrow and/or Professional Fee Reserve, as applicable. For the avoidance of doubt, neither the Purchaser nor any of the Prepetition Secured Parties (as defined in the Final Cash Collateral Order) shall be responsible for or have any liability for the payment or reimbursement of any fees or expenses of any Professional Person or Ordinary Course Professional, other than such obligations specifically set forth in this paragraph.

5.8.    <u>Stay Relief</u>.  The automatic stay pursuant to section 362 of the Bankruptcy Code is hereby lifted to the extent necessary, without further order of the Court, to allow the Purchaser to (a) deliver any notice provided for in the Asset Purchase Agreement and any ancillary document, (b) enforce the Purchaser's rights and the Debtors' obligations under the terms of the Asset Purchase Agreement, and (c) take any and all actions permitted under this Sale Order, the Asset Purchase Agreement, or any ancillary documents, in each case in accordance with the terms and conditions thereof.

5.9.    <u>Bulk Transfer Laws</u>.  No bulk sales law, bulk transfer law, bulk sales tax law, or similar law of any jurisdiction applies in any way to the Asset Purchase Agreement or the Sale.

5.10.    <u>Non-Interference</u>.  Following the Closing, no holder of an Encumbrance in, on, to, or against any Debtor or Purchased Asset shall interfere with the Purchaser's title to or use and enjoyment of any Purchased Asset based on or related to such Encumbrance or any actions that

the Debtors or their successors, including any Chapter 11 or Chapter 7 trustee, may take in these Cases or any Superseding Case.

5.11.  <u>Authorization</u>.  The Debtors, including their respective officers, employees, and agents, are hereby authorized to execute such documents and do such acts as are necessary or desirable to carry out the Sale.  The Debtors are hereby authorized to take all such actions as may be necessary or reasonably requested by Purchaser to effectuate the terms of the Asset Purchase Agreement and this Sale Order and the relief granted herein.

5.12.  <u>Good Faith</u>.  The Sale contemplated by the Asset Purchase Agreement is undertaken by the Purchaser without collusion and in good faith (as that term is defined in section 363(m) of the Bankruptcy Code) and, accordingly, the reversal or modification on appeal of the authorizations provided herein shall not affect the validity of the Sale (including, for the avoidance of doubt, the assumption, assignment, and sale to the Purchaser of the Assigned Contracts and the sale of the Purchased Assets free and clear of all Encumbrances).  The Purchaser is a good-faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code. The Purchaser has not colluded with any of the other bidders, potential bidders, or any other parties interested in the Purchased Assets and, therefore, the sale of the Purchased Assets may not be avoided pursuant to section 363(n) of the Bankruptcy Code.

5.13.  <u>Cooperation</u>.  From time to time, as and when requested by the Purchaser or any Debtor, each party to the Asset Purchase Agreement shall execute and deliver, or cause to be executed and delivered, all such documents and instruments and shall take, or cause to be taken, all such further or other actions as such other party may reasonably deem necessary or desirable

to consummate the Sale, including such actions as may be necessary to vest, perfect, confirm, or record the Purchaser's right, title, and interest in and to the Purchased Assets.

5.14.    <u>Scope of Approval</u>.  The failure specifically to include or reference any particular provisions of the Asset Purchase Agreement, including any of the documents, agreements, or instruments contemplated thereby or executed in connection therewith, in this Sale Order shall not diminish or impair the efficacy, approval, or effectiveness of such provision, document, agreement, or instrument, it being the intent of the Court that the Asset Purchase Agreement and each such document, agreement, or instrument be authorized and approved in its entirety.

5.15.    <u>Post-Closing Claims Administration</u>.  After the Closing Date: (a) no Debtor nor any successor in interest to any Debtor, including any Chapter 11 or Chapter 7 trustee appointed in any of the Cases or any Superseding Case, shall consent to the allowance of any claim to the extent it would constitute an Assumed Liability or Permitted Encumbrance without the prior written consent of the Purchaser, and (b) the Purchaser shall have standing to object to any claim against the Debtors and their estates to the extent that, if allowed, such claim would constitute an Assumed Liability or Permitted Encumbrance, and the Court will retain jurisdiction to hear and determine any such objections.

5.16.    <u>Notice of Sale Closing</u>.  Within one Business Day of the occurrence of the Closing, the Debtors shall file and serve a notice of the Closing.

5.17.    <u>Computation of Time Periods</u>.  All time periods set forth in this Sale Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

5.18.    <u>Sale Order Governs in Event of Inconsistencies</u>.  To the extent that this Sale Order is inconsistent with any prior order or pleading with respect to the Motion in these Cases, the terms of this Sale Order shall govern.  To the extent there are any inconsistencies between the

terms of this Sale Order and the Asset Purchase Agreement (including all ancillary documents executed in connection therewith), the terms of this Sale Order shall govern.

5.19.   <u>Modifications</u>.   The parties to the Asset Purchase Agreement may make any non-material modifications, amendments, or supplements to the Asset Purchase Agreement and any related agreements, documents, or other instruments in accordance with the terms thereof without further order of the Court.

5.20.   <u>Non-Severability</u>.   The provisions of this Sale Order are non-severable and mutually dependent.

5.21.   <u>No Stay</u>.   Notwithstanding the provisions of the Bankruptcy Rules, including Bankruptcy Rules 6004(h) and 6006(d), this Sale Order shall not be stayed after the entry hereof but shall be effective and enforceable immediately upon entry, and the fourteen-day stay provided in Bankruptcy Rules 6004(h) and 6006(d) is waived and shall not apply.

5.22.   <u>Retention of Jurisdiction</u>.   The Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Sale Order and the Asset Purchase Agreement and all related agreements, documents, and other instruments, and all amendments thereto and waivers and consents thereunder, and to adjudicate if necessary any and all disputes concerning or relating in any way to the Sale.

**EXHIBIT A**

**ASSET PURCHASE AGREEMENT**

**<u>EXHIBIT B</u>**

**[To come]**

# EXHIBIT C

**[To come]**

**EXHIBIT D**

**COMMITTEE SETTLEMENT TERM SHEET**

DRAFT 07.06.2023

*In re Stanadyne LLC, et al.*
**Case No. 23-10207 (Jointly Administered)**
**Bankr. D. Del.**

## SETTLEMENT TERM SHEET

This term sheet (the "Term Sheet") sets forth the terms of a comprehensive settlement in the above-referenced chapter 11 cases (the "Chapter 11 Cases") among the Prepetition Agent (as defined below), the Purchaser (as defined below), and the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases (the "Committee"[1] and, collectively with the Prepetition Agent and the Purchaser, the "Parties") with respect to that certain Asset Purchase Agreement, dated as of May 8, 2023, by and among the debtors in possession in the above-captioned cases (the "Debtors") (other than Stanadyne PPT Group Holdings, Inc.) and Purchaser (as the same may be amended, amended and restated, supplemented, or otherwise modified from time to time, the "APA") and all other matters related to any challenges, claims or causes of actions against the Prepetition Agent, the Prepetition Secured Parties (as defined below) and/or the Purchaser under the Cash Collateral Order, the APA, or otherwise, including such matters set forth in the section titled "Prepetition Obligations and Release of Claims" below.  Capitalized terms that are not otherwise defined herein shall have the meanings ascribed to them in the APA.

| | |
|---|---|
| Settling Parties | a) The Prepetition Agent<br>b) The Purchaser<br>c) The Committee<br><br>The term "Prepetition Agent" refers to Cerberus Business Finance, LLC, in its capacity as administrative agent and collateral agent for the lenders (the lenders together with the Prepetition Agent, collectively, the "Prepetition Secured Parties") party to that certain Financing Agreement, dated as of May 2, 2017 (as amended, amended and restated, supplemented, or otherwise modified from time to time).<br><br>The term "Purchaser" refers to Stanadyne Operating Company LLC (formerly known as S-PPT Acquisition Company LLC), in its capacity as Purchaser under the APA. |
| Binding Agreement; Conditions | This Term Sheet shall constitute a binding agreement among the Parties; *provided*, the Parties rights and obligations under this Term Sheet are conditioned upon (a) entry of an order approving the Sale Order modified as necessary to reflect this Term Sheet and attaching this Term Sheet as an exhibit, and (b) the occurrence of the Closing. |

---

[1] The term "Committee" refers to the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases in its capacity as such and not the rights or obligations of any member serving on the Committee in its individual capacity.

| | |
|---|---|
| Settlement Amount | The Parties agree that:<br><br>a) subject to the terms hereof, the Purchaser will fund (or cause to be funded) $4,000,000 (the "<u>Settlement Amount</u>") comprised of (i) the Wind-Down Funding Amount, (ii) the Trust Funding Amount, and (iii) the Initial GUC Distribution Amount, each as described below;<br><br>b) the Trust Funding Amount and the Initial GUC Distribution Amount shall constitute additional "Purchase Price" under the APA;<br><br>c) the Settlement Amount shall be allocated and funded as follows:<br><br>    i) $1,000,000, which shall be the amount of "Total Disbursements" in the Wind-Down Budget[2] to be finalized pursuant to Section 4.24 of the APA (the "<u>Wind-Down Funding Amount</u>"), and shall be funded at the Closing in accordance with the APA. The Wind-Down Budget, and any transition services agreement entered into pursuant to Section 8.16 of the APA shall be mutually acceptable to the Prepetition Agent, the Purchaser and the Committee, in consultation with the Debtors;<br><br>    ii) $375,000 (the "<u>Trust Funding Amount</u>") to fund the operation of the Liquidating Trust (as defined below) consistent with the Liquidating Trust Agreement (as defined below), with such amount to be funded within five (5) business days following the effective date of Chapter 11 plan (a "<u>Plan</u>") establishing the Liquidating Trust. The Plan and documents governing the creation of the Liquidating Trust must be acceptable in form and substance to the Prepetition Agent and the Committee and may not alter or modify the terms of this Settlement Term Sheet, unless agreed to in writing by the Prepetition Agent and the Committee;<br><br>    iii) $2,625,000 (as such amount may be adjusted in accordance herewith, the "<u>Initial GUC Distribution Amount</u>") for distribution to general unsecured creditors of the Debtors' estates other than the Prepetition Secured Parties, which amount shall be transferred to the Liquidating Trust within five (5) business days following its creation; *provided,* |

---

[2] The Wind-Down Budget is attached hereto as <u>Exhibit 1</u>.

| | |
|---|---|
| | *however*, that if the actual costs and expenses of the matters set forth in the Wind-Down Budget are less than $1,000,000, such difference shall be delivered to the Liquidating Trust and the amount of the Initial GUC Distribution Amount shall be increased on a dollar-for-dollar basis by the amount of such difference. |
| Purchaser Assumed Liabilities | Each of the following, without duplication, shall constitute "Assumed Liabilities" under the APA: <br><br> a) Liabilities, including Core Liabilities (as defined below), of the Debtors incurred and outstanding as of the Closing Date with respect to each customer of the Debtors that becomes a customer of the Purchaser from and after the Closing Date; <br><br> b) Core Liabilities incurred and outstanding as of the Closing Date with respect to customers of the Debtors that do not become customers of the Purchaser from and after the Closing Date solely to the extent such Core Liabilities are known as of the Closing Date as (i) reflected in the Debtors' books and records or filed proofs of claim and (ii) set forth on a schedule of the amounts of such Core Liabilities acceptable to the Purchaser (or, if not acceptable, subject to objection by the Purchaser after Closing), which schedule shall (A) separately list by customer (x) the amount of such Core Liabilities as of the date that is thirty (30) days prior to the Closing Date and (y) the estimated amount of any incremental Core Liabilities between the date that is thirty (30) days prior to the Closing Date and the Closing Date and (B) be delivered by the Debtors to the Purchaser and the Committee five (5) business days prior to the Closing Date, provided, however, amounts with respect to the foregoing clause (y) shall be subject to finalization within thirty (30) days after Closing to account for continuing sales and returns during such period through the Closing Date; and <br><br> c) Each Critical Vendor Claim (as defined in that certain *Final Order (I) Authorizing the Debtors to Pay Prepetition Claims of (A) Domestic Critical Vendors, (B) Shippers, Warehousemen, and other Lienholders, and (C) Foreign Vendors; (II) Authorizing Banks to Honor and Process Related Checks and Electronic Transfers; and (III) Granting Related Relief* [Docket No. 186]) to the extent not paid by the Debtors on or prior to the Closing Date. <br><br> "Core Liabilities" means Liabilities of the Debtors owed to customers of the Debtors as of the Closing Date in connection with |

186592.9

3

| | |
|---|---|
| | the "core" refund program offered by the Debtors to certain of its customers for applicable products actually and properly returned and sold to the Debtors for remanufacture, provided that Core Liabilities will only be Assumed Liabilities to the extent set forth above in (a) and (b). |
| Estate Claims | Notwithstanding anything in the APA to the contrary, the Parties agree that all Avoidance Actions shall be waived and shall not be pursued by the Parties or any representative of any Debtor's estate, *except that*:<br><br>a)  Avoidance Actions against insiders (as that term is defined in 11 U.S.C. § 101(31)) ("Insider Avoidance Actions") shall not be waived and shall comprise Excluded Assets; and<br><br>b)  Avoidance Actions against non-insiders other than Go-Forward Creditors (as defined below) (the "Preserved Avoidance Claims") shall not be waived and shall comprise Purchased Assets under the APA; *provided*, *however*, that the Preserved Avoidance Claims shall be preserved solely for the purpose of permitting the Purchaser to set off such Preserved Avoidance Claims against any claims of the applicable creditors (other than Go-Forward Creditors) that constitute Assumed Liabilities under the APA, and Purchaser shall not be entitled to any affirmative recovery on account of any such Preserved Avoidance Claims.<br><br>All commercial tort claims and causes of action belonging to the Debtors' estates (including, without limitation, any and all claims the Debtors' estates may have (i) against any officers and directors of the Debtors and rights of the Debtors' estates to any insurance proceeds applicable thereto or (ii) related to or arising under or in connection with that certain Contribution Agreement, dated as of March 9, 2019, by and among Pure Power Technologies, Inc., Pure Power Technologies, LLC, Stanadyne Parent Holdings, Inc., and Stanadyne LLC, and the transactions contemplated thereby, including, without limitation, any rights of the Debtors' estates to any insurance proceeds applicable thereto) other than such claims against Go-Forward Creditors (as defined below) (collectively, the "Non-Go-Forward Commercial Tort Claims") shall comprise Excluded Assets.<br><br>The Insider Avoidance Actions and the Non-Go-Forward Commercial Tort Claims shall be collectively referred to herein as the "Liquidating Trust Claims".  All Liquidating Trust Claims shall be transferred to the Liquidating Trust on the effective date of the |

| | |
|---|---|
| | Liquidating Trust.  The ~~Liquidating~~ Trustee shall have authority to pursue all Liquidating Trust Claims as a representative of the Debtors' estates.<br><br>For the avoidance of doubt, the Parties waive all Avoidance Actions and Commercial Tort Claims that the Debtors' estates may have against Go-Forward Creditors, and no Party shall be entitled to any affirmative recovery or right of setoff with respect to any such claims against Go-Forward Creditors.<br><br>The term "<u>Go-Forward Creditors</u>" as used herein means customers, vendors, and other creditors who continue to do business with the Purchaser after the Closing Date. |
| Designation Rights Assets | If and solely to the extent and for so long as the Purchaser requests in writing that any Designation Rights Assets be maintained following the Closing, the Purchaser shall fund any and all maintenance costs, including lease costs and other third party costs, actually incurred by the Debtors in connection with such requested maintenance of the Designation Rights Assets, in accordance with and solely to the extent set forth in Section 1.5(b) of the APA. |
| Windsor, CT Property | If and solely to the extent and for so long as the Purchaser requests in writing that the Windsor, CT Property be maintained following the Closing, the Purchaser shall fund the carrying costs actually incurred by the Debtors in connection with such requested maintenance of the Windsor, CT Property, including without limitation, insurance and real property taxes.<br><br>If, subject to the terms of the APA, the Debtors sell the Windsor, CT Property, the proceeds of such sale, net of only the costs of such sale (as well as any unpaid carrying costs for which Purchaser is responsible as set forth above), and incremental US Trustee fees associated therewith, shall be paid to the Prepetition Agent for the benefit of the Prepetition Secured Parties.  The Debtors' estates shall cause such net proceeds to be delivered directly by the purchaser of the Windsor, CT Property to the Prepetition Agent, and the Deficiency Claim (as defined below) shall be reduced by the amount of such net proceeds. |
| Liquidating Trust | The "<u>Liquidating Trust</u>" shall be:<br><br>a) a liquidating trust established for the benefit of the Debtors' creditors and governed by a trust agreement in form and substance acceptable to the Prepetition Agent and the Committee (the "<u>Liquidating Trust Agreement</u>"); |

| | |
|---|---|
| | b) administered by Brad Deitz, as trustee (the "Trustee")[3] under the supervision of the Liquidating Trust Board (as defined below) and in accordance with the terms of the Liquidating Trust Agreement; |
| | c) overseen by an oversight board consisting of two members: (i) one member appointed by the Prepetition Agent and (ii) one member appointed by the Committee (the "Liquidating Trust Board"); |
| | d) administered for the benefit of the Debtors' unsecured creditors with respect to unsatisfied general unsecured claims and the Prepetition Secured Parties with respect to the Deficiency Claim. |
| | The Trustee shall be compensated as follows: (a) a quarterly fee of $20,000 *plus* (b) cash in an amount equal to 1.5% of the net proceeds of the Liquidating Trust litigation recoveries. |
| | The Liquidating Trust Agreement shall provide that, in the event of a tie in connection with any decision subject to a vote of the Liquidating Trust Board, the final decision shall be made by the Trustee. |
| Funding and Purpose of Liquidating Trust | Upon the creation of the Liquidating Trust, the Trust Funding Amount, the Initial GUC Distribution Amount, and Liquidating Trust Claims shall be transferred to the Liquidating Trust as set forth above. |
| | The Trustee shall be empowered to: (i) assert, litigate, settle, and/or otherwise resolve the Liquidating Trust Claims for the benefit of the Liquidating Trust and its beneficiaries and (ii) resolve, litigate, and/or object to claims against the Debtors' estates other than claims allowed hereunder or by the Bankruptcy Court. |
| | The proceeds of the Liquidating Trust Claims shall be utilized to fund the administration of the Liquidating Trust and the distributions to the beneficiaries of the Liquidating Trust. |
| | The Initial GUC Distribution Amount shall be distributed pro rata among the beneficiaries of the Liquidating Trust other than the Prepetition Agent, it being agreed among the Parties that the Prepetition Secured Parties shall not recover any amounts from the |

---

[3] In the event that Mr. Deitz is unable or unwilling to serve, the Prepetition Agent shall identify two alternatives for the Committee to select between to serve as the ~~Liquidating~~ Trustee on substantially the same terms as Mr. Dietz.

<table>
<tr>
<td></td>
<td>Initial GUC Distribution Amount.  Any distributions made by the Liquidating Trust to its beneficiaries from any assets of the Liquidating Trust other than the Initial GUC Distribution Amount shall be distributed pro rata to *all* of the beneficiaries of the Liquidating Trust, including the Prepetition Agent for the benefit of the Prepetition Secured Parties on account of the Deficiency Claim.

Notwithstanding anything to the contrary herein, the ~~Liquidating~~ Trustee shall have the authority to create reserves of Liquidating Trust assets (including with respect to the Initial GUC Distribution Amount) for any reason consistent with his duties under the Liquidating Trust Agreement.</td>
</tr>
<tr>
<td>Prepetition Obligations and Release of Claims</td>
<td>The Committee hereby:

a)  adopts the admissions, stipulations, acknowledgements and agreements made by the Debtors as reflected in Paragraph E of the Cash Collateral Order;

b)  reaffirms its agreement under that certain *Stipulation Regarding Unencumbered Assets and Occurrence of Investigation Termination Date* entered into between the Prepetition Agent and the Committee and approved by order of the Bankruptcy Court [Docket No. 293] (the "Prior Stipulation") that the Investigation Termination Date (as defined in the Cash Collateral Order) has passed and the Committee has waived all rights to assert any Challenge (as defined in Cash Collateral Order);

c)  agrees that, upon the occurrence of the Closing, the Prepetition Agent, on behalf of the Prepetition Secured Parties, will have an allowed deficiency claim (the "Deficiency Claim") in the amount of $~~67,252,851.11~~87,252,851.11, which shall remain secured by the Excluded Assets, other than the Liquidating Trust Claims, which will not be subject to the security interest of the Prepetition Secured Parties; provided, however, that the amount of the Deficiency Claim shall be reduced on a dollar-for-dollar basis by any net proceeds paid to the Prepetition Agent from any Excluded Assets;

d)  releases the Prepetition Secured Parties from any and all claims and causes of action related to the Debtors, their estates, the Prepetition Obligations (as defined in the Cash Collateral Order), or these Chapter 11 Cases; and

e)  consents to the APA, the Sale Order and, in each case, the</td>
</tr>
</table>

| | |
|---|---|
| | transactions contemplated thereby.<br><br>The foregoing agreements, admissions, stipulations, acknowledgements, reaffirmations, and releases by and of the Committee shall be binding on the ~~Liquidating~~ Trustee and any chapter 7 trustee, as applicable. |
| Chapter 11 Plan | Any Plan confirmed in the Chapter 11 Cases (a) may not alter or modify the terms of this Settlement Term Sheet, the APA or the Sale Order, unless agreed to in writing by the Prepetition Agent and (b) must incorporate the terms set forth in the section titled "Prepetition Obligations and Release of Claims" above. |
| Implementation | The settlement, including without limitation the payment of the Wind-Down Funding Amount, shall be effective upon entry of the Sale Order.<br><br>The Liquidating Trust shall be implemented via a Plan or such other method as mutually agreed to by the Prepetition Agent and the Committee, after consultation with the Debtors.<br><br>In the event that the Chapter 11 Cases are converted to Chapter 7, the rights of the Liquidating Trust set forth herein shall inure to the benefit of the Chapter 7 Trustee, including without limitation, the Trust Funding Amount and the Initial GUC Distribution Amount. |

DRAFT 07.06.2023

**EXHIBIT 1**

**WIND-DOWN BUDGET**

**[To come.]**

*($ in thousands USD)*

| Description | Amount |
|---|---|
| Professional Fees through Plan Effective Date | $250 |
| Wind-down Manager/Trustee Fees (does not include incentive fees) | $80 |
| Professional Support for Wind-down Manager/Trustee: | $560 |
| US Trustee Fees (8/1 - 9/30) | $35 |
| Miscellaneous / Other (includes items such as claims agent, service of solicitation materials, independent manager, Purchaser assistance with accounting and reconciliation costs, as needed) | $75 |
| **Total Disbursements** | **$1,000** |

Purchaser agrees that it will make its personnel available at no cost to the responsible officer of the Debtors referred to in Section 2.2 of the APA or, after the effective date of a Plan, the Trustee, to provide information and assistance with accounting and claim reconciliation matters, for the following periods and capped personnel hours: (a) 25 hours per month for each of the first two months after the Closing; (b) 20 hours per month for each of the third and fourth months after the Closing; and (c) 10 hours per month for months five through 12 after the Closing.  If additional assistance is requested by such responsible officer or the Trustee, as applicable, the Purchaser shall provide such assistance as is reasonably requested for a reasonable period of time on customary terms for the assistance requested and the requesting party shall pay Purchaser its actual costs for providing such assistance and the out-of-pocket expenses incurred by the Purchaser in connection therewith.

Document comparison by Workshare 9.5 on Sunday, July 9, 2023 10:19:50 AM

| Input: | |
|---|---|
| Document 1 ID | interwovenSite://DMS.KTBSLAW.COM/iManage/186592/9 |
| Description | #186592v9<iManage> - Stanadyne - UCC Settlement Term Sheet |
| Document 2 ID | interwovenSite://DMS.KTBSLAW.COM/iManage/186592/10 |
| Description | #186592v10<iManage> - Stanadyne - UCC Settlement Term Sheet |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 18 |
| Deletions | 11 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 29 |