IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>STANADYNE L.L.C., *et al.*<br><br>Debtors. | Chapter 11<br><br>Case No. 23-10207 (TMH)<br><br>(Jointly Administered)<br><br>August 17, 2023<br><br>**Hearing Scheduled August 22, 2023<br>11 a.m.** |

### OBJECTION OF THE CONNECTICUT DEPARTMENT OF ENERGY AND ENVIRONMENTAL PROTECTION TO DEBTORS' MOTION FOR ENTRY OF ORDER (I) AUTHORIZING THE DEBTORS TO ABANDON OR, ALTERNATIVELY SELL THE WINDSOR PROPERTY AND (II) FOR RELATED RELIEF (DOCKET NO. 486)

The Connecticut Department of Energy and Environmental Protection (the "Department") objects to the motion and the proposed order of the Debtors to abandon the property at 90-92 Deerfield Road, Windsor, Connecticut (the "Windsor Property"). The Department does not object to the potential sale of the Windsor Property, provided that the purchaser agrees to assume and comply with the current environmental obligations associated with the Windsor Property.

The proposed order authorizing abandonment provides that "the Debtors shall not be liable for any obligations arising out of or related to the Windsor Property after such time." Such an abandonment is improper under 11 U.S.C. § 554(a) because, contrary to Connecticut statutes prohibiting soil and water pollution, the proposed abandonment fails to provide at all for the prevention of the discharge of hazardous waste from an impoundment on the Windsor Property, and fails to provide for the fulfillment of related regulatory requirements. These requirements

include the preparation and filing on the Windsor land records of an Environmental Land Use Restriction, and the establishment of a mechanism for financial assurance to provide for the maintenance, inspection, monitoring, and, if necessary, repair of the impoundment in the future.

In support of this objection, the Department respectfully represents as follows:

1. Stanadyne, Inc. ("Stanadyne") operated a diesel engine parts manufacturing business at the Windsor Property, employing twenty-four metal parts cleaning units, fifteen rust prevention dip tanks, and hand-wiping to degrease metal components.

2. As a consequence of its operations, Stanadyne was subject to the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §6901 *et seq*. The State of Connecticut has been authorized by the United States Environmental Protection Agency (the "EPA") to implement RCRA in Connecticut since April 1992. *See* 55 Fed. Reg. 51,707 (Dec. 17, 1990).

3. In August 1980, Stanadyne notified the EPA of its intention to manage hazardous waste at the Windsor Property as a Large Quantity Generator (generating 1,000 kilograms ("kg") per month or more of hazardous waste or more than one kg per month of acutely hazardous waste).[1] Stanadyne subsequently notified the EPA of its status as a Small Quantity Generator (generating more than 100 kg but less than 1,000 kg of hazardous waste per month) in March 2013.

---

[1] Identified hazardous waste streams in the initial notification were: spent halogenated solvents; spent non-halogenated solvents; wastewater treatment sludges from electroplating operations; spent cyanide plating bath solutions; plating bath residues; spent stripping and cleaning bath solutions; quenching bath residues from oil baths from metal heat treating operations; spent cyanide solutions from slat bath pot cleaning; quenching wastewater treatment sludges from metal heat treating operations; copper cyanide; cyanides (soluble cyanide salts); cyanogen; potassium cyanide; sodium cyanide; 2-propanone; methanol; and methyl chloroform. In February 2002, Stanadyne identified additional hazardous waste streams: ignitable; corrosive; reactive; cadmium, chromium; lead; mercury; selenium; silver; benzene; chloroform; methyl ethyl ketone; tetrachloroethylene, and trichlorethylene.

4.  On September 4, 1987, the Department of Environmental Protection[2] issued Order No. WC4567 to Stanadyne, the then-owner of the Windsor Property.  Expressing the finding "that Stanadyne, Inc. is maintaining a facility or condition which reasonably can be expected to cause pollution of the waters of the state," the order directed Stanadyne to "[i]nstall wastewater treatment system improvements and/or process modifications to the metal finishing operations" and to "[i]nvestigate the extent and degree of groundwater, surface water and soil contamination resulting from chemical storage, handling and disposal activities at [the Windsor Property] and take necessary remedial actions to minimize or eliminate the contamination."

5.  In June 1995, the Department of Environmental Protection and Stanadyne Automotive Corporation ("Stanadyne Automotive"), the successor-in-interest to Stanadyne, entered into Consent Order HM-786.  The Consent Order acknowledged that Stanadyne Automotive certified on February 8, 1989 pursuant to the Connecticut's Transfer Act, CONN. GEN. STAT. § 22a-134 *et seq.*, "that, to the extent necessary to minimize or mitigate a threat to human health or the environment, [Stanadyne Automotive] would contain, remove, or otherwise mitigate the effects of any discharge or spillage of hazardous waste" on the Windsor Property. In addition, the Consent Order noted that Stanadyne Automotive conducted an investigation that revealed that the groundwater at the Windsor Property was contaminated by tetrachloroethane; trichloroethene; 1,1,1 trichloroethane; and cis-1,2 dichloroethane.  The Consent Order required further investigation of contamination, "the expeditious removal and disposal of all wastes," compliance with Order No. WC4567, and correction of thirty-two violations.

6.  Based on subsequent investigation and reporting, the Department concluded that approximately 11,500 cubic yards of the soil of the Windsor Property, located in five distinct

---

[2] Before July 1, 2011, the Department was known as the Department of Environmental Protection.

release areas, was contaminated with volatile organic compounds (VOC), polycyclic aromatic hydrocarbons (PAH), extractable total petroleum hydrocarbons (ETPH), and metals above the applicable Industrial/Commercial Direct Exposure Criteria and/or GA Groundwater Class Pollutant Mobility Criteria.  *See* CONN. AGENCIES REGS. § 22a-133k-1 *et seq*.

7.Rather than requiring removal of the contaminated soil, the Department approved the construction and maintenance of an Engineered Control, at which the contaminated soil would be consolidated into a single location.  The Department's approval was founded, at least in part, on the economic efficiency of the cost of constructing the Engineered Control (estimated to be $210,750) compared with cost of excavating, characterizing, transporting, and disposing of the contaminated soil and backfilling with clean fill (estimated to be $1,666,500).

8.The Engineered Control as constructed consists of subsurface containment of the contaminated soil, overlain by, from the ground surface: an impermeable barrier, at least six inches of sand, a brightly colored demarcation layer, at least fourteen inches of clean fill, topped by four inches of vegetated topsoil.  Maintenance and monitoring of the Engineered Control includes bi-weekly mowing during the growing season, visual inspections to confirm stability conducted quarterly and following precipitation events of over one inch, and the annual sampling of two monitoring wells for VOC, PAH, ETPH, and metals.

9.A long-term financial assurance mechanism is required to permit the Department to implement maintenance, inspection, and monitoring activities on behalf of the Debtors should they fail to fulfill their obligations.

**ARGUMENT**

It is well settled that a trustee or a debtor-in-possession "may not abandon property in contravention of a state statute or regulation that is reasonably designed to protect the public health or safety from identified hazards." *Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Protection*, 474 U.S. 494, 507 (1986).

The Connecticut General Assembly has found "that improper management of hazardous wastes has contaminated the water, soil and air of the state thereby threatening the health and safety of Connecticut citizens." CONN. GEN. STAT. § 22a-144. The General Assembly has further "found and declared that the pollution of the waters of the state is inimical to the public health, safety and welfare of the inhabitants of the state [and] is a public nuisance." CONN. GEN. STAT. § 22a-422. Section 22a-427 of the General Statutes provides "[n]o person . . . shall cause pollution of any of the waters of the state." Section 22a-430 of the General States says, in part, "No person[3] . . . shall initiate, create, originate or maintain any discharge of water, substance or material into the waters of the state without a permit . . . issued by the commissioner."

Clearly, these statutes are "designed to protect the public health or safety from identified hazards." *See Midlantic*, 474 U.S. at 507. Therefore, as in *Midlantic*, the condition of the Windsor Property is such that abandonment without precautions simply cannot be permitted. In *Midlantic*, the debtor operated as a waste oil processor, and had accepted tens of thousands of gallons of toxic PCB-laden waste oil at its facilities in New York and New Jersey, which were housed in deteriorating and leaking containers. Although the New Jersey bankruptcy court approved the abandonment of both sites, the Third Circuit Court of Appeals reversed and the Supreme Court affirmed, noting that "the trustee's abandonment at both sites aggravated already

---

[3] "Person" is defined to encompass corporate entities. CONN. GEN. STAT. § 22a-423.

existing dangers by halting security measures that prevented public entry, vandalism, and fire." *Id.* at 499 n.3.

Although the conditions at the Windsor Property are not as clearly threatening as at the sites in *Midlantic*, under the authority of *Midlantic* and the cases that follow it, the Debtors cannot be permitted to abandon the Windsor Property without fulfilling their obligations under Connecticut environmental law. Environmental compliance obligations, implemented through the Transfer Act and the statutes and regulations prohibiting soil and water contamination pursuant to Connecticut's sovereign authority, are designed to protect public health or safety from identified hazards, such as the thousands of cubic yards of contaminated soil located at the Windsor Property.

Under *Midlantic*, abandonment must be denied unless and until the Debtor complies with conditions necessary to adequately protect public health and safety, such as the maintenance of the Engineered Control and the establishment of financial assurance here. *See id.* at 506-07. Failure to require such compliance as a condition of abandonment may result in an unpermitted discharge to the soil and waters of the state, in violation of Connecticut law. As the Debtors seek court permission to abandon the Windsor Property without ensuring adequate protection of public health and safety, the Department objects to their motion and asks the court to sustain the Department's objection.

Respectfully submitted,

**CONNECTICUT DEPARTMENT OF ENERGY AND ENVIRONMENTAL PROTECTION**

By: WILLIAM TONG
     ATTORNEY GENERAL

*/s/ Scott N. Koschwitz*

By : Scott N. Koschwitz, *pro hac vice*
     Assistant Attorney General
     Office of the Attorney General
     165 Capitol Avenue
     Hartford, Connecticut 06106
     Tel: (860) 808-5274
     Fax: (860) 808-5386
     scott.koschwitz@ct.gov

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: ) | Chapter 11 |
| ) | |
| STANADYNE L.L.C., *et al.* ) | Case No. 23-10207 (TMH) |
| ) | |
| Debtors. ) | (Jointly Administered) |
| ) | |
| ) | August 17, 2023 |
| ) | |
| ) | **Hearing Scheduled August 22, 2023** |
| ) | **11 a.m.** |

## CERTIFICATE OF SERVICE

This is to certify that the Objection of the Connecticut Department of Energy and Environmental Protection to Debtors' Motion for Entry of Order (I) Authorizing the Debtors to Abandon or, Alternatively Sell the Windsor Property and (II) for Related Relief (Docket No. 486) was electronically filed on August 17, 2023, and will be sent via e-mail to all appearing parties by operation of the Court's electronic filing system.  In addition, on August 17, 2023, the undersigned caused to be sent by first-class mail, postage prepaid, a copy of the foregoing Objection to the following:

3B Supply
Attn: Jonathan Leissler
11470 Euclid Avenue
#470
Cleveland, OH 44106

Argo Partners
12 West 37th Street, Ste. 900
New York, NY 10018

Elizabeth A. Beitler
Hughes Hubbard & Reed LLP
One Battery Park Plaza
16th Fl.
New York, NY 10004

Kathryn A. Coleman
Hughes Hubbard & Reed LLP
One Battery Park Plaza
16th Floor
New York, NY 10004-1482

Erin E. Diers
Hughes Hubbard & Reed LLP
One Battery Park Plaza
16th FLOOR
New York, NY 10004

Christopher Gartman
Hughes Hubbard & Reed LLP
One Battery Park Plaza
16th FLOOR
New York, NY 10004-1482

Samuel M. Kidder
KTBS Law LLP
1801 Century Park East, 26th Floor
Los Angeles, CA 90067

Jean S. McCarthy
1839 New Britain Avenue
Farmington, CT 06032

Adam C. Rogoff
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036

Ariella T Simonds
KTBS LAW LLP
1801 Century Park East
26th Floor
Los Angeles, CA 90067

Thomas Moers Mayer
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036

Pension Benefit Guaranty Corporation
Office of the General Counsel
445 12th Street, SW
Washington, DC 20024-2101

Allison Selick
Kelley Drye & Warren LLP
3 World Trade Center
175 Greenwich Street
New York, NY 10007

*/s/ Scott N. Koschwitz*

Scott N. Koschwitz, *pro hac vice*
Assistant Attorney General
Office of the Attorney General
165 Capitol Avenue
Hartford, Connecticut 06106
Tel: (860) 808-5274
Fax: (860) 808-5386
scott.koschwitz@ct.gov