IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | : | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| STANADYNE, LLC, et al., | : | Case No. 23-10207(TMH) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

**OBJECTION OF THE TOWN OF WINDSOR TO THE
DEBTORS' MOTION FOR ENTRY OF AN ORDER
(I) AUTHORIZING THE DEBTORS TO ABANDON OR, ALTERNATIVELY, SELL
THE WINDSOR PROPERTY AND (II) FOR RELATED RELIEF**

The Town of Windsor (the "Town"), a creditor and party-in-interest in the above-captioned jointly administered Chapter 11 cases, submits this objection to the Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Abandon Or, Alternatively, Sell the Windsor Property and (II) For Related Relief (the "Motion to Abandon") [Dkt. No. 486], and in support thereof avers as follows:

**INTRODUCTION**

1. Pursuant to the Motion to Abandon, the Debtors seek to abandon a 53-acre parcel of property located at 90-92 Deerfield Road, Windsor, Connecticut, including three (3) large industrial buildings (the "Windsor Property"), owned by Debtor Stanadyne, LLC (the "Debtor") and previously used by the Debtor as its corporate headquarters and manufacturing facility prior to its re-location to North Carolina.

2. The Town objects to the proposed abandonment of the Windsor Property as such abandonment is in contravention of state environmental laws designed to protect the public health and safety from identified hazards.

3. The Town also objects to the alternative relief requested by the Debtors, namely, their request for carte blanche approval of the sale of the Windsor Property without disclosing any

1

terms of the sale, including but not limited to, the purchase price, whether the purported sale is free and clear of all liens, claims and encumbrances and interests of the Town and any other lienholder, and in the absence of proper notice to all creditors under Federal Rule of Bankruptcy Procedure 2002(a)(2).

## PROCEDURAL BACKGROUND

4. The Debtors filed the above-captioned cases on February 16, 2023, and an order directing their joint administration was entered shortly thereafter. The Debtors continue to operate as debtors-in-possession.

5. On April 27, 2023, the Debtors filed a motion seeking entry of an order approving procedures for the sale of substantially all of the Debtors' assets (the "Sale Motion"). [Dkt. No. 245].

6. On May 16, 2023, the Court entered that certain Order (I) Approving Bidding Procedures, (II) Scheduling an Auction and a Sale Hearing, (III) Approving the Form and Manner of Notice Thereof, (IV) Establishing Notice Procedures for the Assumption and Assignment and Sale of Contracts and Leases, and (V) Granting Related Relief (the "Bidding Procedures Order") [Dkt No. 276].

7. The Sale Motion and Bidding Procedures Order specifically excluded the Windsor Property from the sale of substantially all of the Debtors' assets.

8. On June 20, 2023, the Debtors filed an Application for Entry of an Order Authorizing the Retention and Employment of Jones Lang Lasalle Americas, Inc. as Broker for the Debtors and Debtors In Possession with respect to the Windsor Property, Effective as of May 25, 2023, and Waiver of Information Requirements Imposed by Local Rule 2016-2(d) and (h) (the "JLL Retention Application") [Dkt No. 383].

9. Pursuant to the JLL Retention Application, the Debtors indicated their intention to separately market and sell the Windsor Property "to maximize value for the Debtors' estates and their creditors" and that the sale of the Windsor Property would likely generate between "$1.5 million and $4.0 million depending on certain potential liabilities assumed by a purchaser and the final sale structure." [Dkt. No. 383 at p.4].

10. The Listing Agreement attached to the JLL Retention Application provides that JLL shall be the Debtors' exclusive listing agent to sell the Windsor Property for a term of 180 days. [Dkt. No. 383 at p.5].

11. On July 10, 2023, the Court approved the JLL Retention Application on the terms proposed by the Debtors (the "JLL Retention Order"). [Dkt No. 439].

12. On July 11, 2023, the Court entered that certain Order (I) Approving Asset Purchase Agreement, (II) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of All Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief (the "Sale Order") [Dkt. No. 443]. Pursuant to the Sale Order, the Court approved the sale to Stanadyne Operating Company LLC f/k/a S-PPT Acquisition Company LLC (the "Purchaser"), an entity formed at the direction of the Debtors' secured lenders.

13. Among other things, the Sale Order incorporates and approves the Settlement Term Sheet by and among Cerberus Business Finance, LLC (the "Prepetition Agent"), in its capacity as administrative agent and collateral agent for the lenders (the "Prepetition Secured Parties"), the Purchaser and the Official Committee of Unsecured Creditors appointed in these Chapter 11 cases (the "Committee"), and attached to the Sale Order as Exhibit D.

14. Pursuant to the Settlement Term Sheet, "if and solely to the extent and for so long as the Purchaser requests in writing that the Windsor, CT Property be maintained following the Closing, the Purchaser shall fund the carrying costs actually incurred by the Debtors in connection with such requested maintenance of the Windsor, CT Property, including without limitation, insurance and real property taxes." [Dkt. No. 433-1 at p. 129].

15. According to the Debtors, the sale to the Purchaser closed on July 31, 2023. [Dkt. No. 486 at p.4].

16. On August 2, 2023, the Debtors filed their Motion to Abandon, pursuant to which they seek to either abandon the Windsor Property pursuant to Section 554 of the Bankruptcy Code, or alternatively, to sell the Windsor Property in the event "an actionable sale materializes prior to abandonment." [Dkt. No. 486 at p.8].

## FACTUAL BACKGROUND

17. As described above, the Debtors previously maintained their corporate headquarters and manufacturing facilities at the Windsor Property.

18. During that time, the Debtors manufactured various fuel injectors and pumps and other related products necessary for diesel and gasoline internal combustion engines.

19. As early as 1987, the Connecticut Department of Energy & Environmental Protection ("CT DEEP"), f/k/a the Connecticut Department of Environmental Protection, cited the Debtors for improper discharges associated with metal finishing operations and environmental contamination associated with chemical storage, handling and disposal.

20. In conjunction therewith, the Debtors entered into two (2) consent orders with the State of CT DEEP relating to the release of hazardous materials (Consent Order HM-786 issued June 21, 1995) and water contamination (Consent Order WC4567 issued September 4, 1987).

21.     In Consent Order HM-786, CT DEEP noted thirty-two (32) violations of various federal hazardous waste regulations, which were incorporated by reference into Connecticut's hazardous waste regulations. In order to rectify these violations as well as the violations noted in Consent Order WC4567, the Debtors were required to undertake a variety of investigations and remedial steps at the site. Attached hereto as **Exhibit A** is a true and correct copy of Consent Order HM-786.

22.     Additionally, the Windsor Property is subject to three (3) different filings under the Connecticut Property Transfer Act, Conn. Gen. Stat. §22a-134 *et seq.* (the "CT Transfer Act"), which is administered by the CT DEEP. The CT Transfer Act governs property that is likely to be contaminated with hazardous substances and allocates responsibility for the investigation and/or remediation of any contamination at a Transfer Act site to an entity known as a "Certifying Party."

23.     As a result of the CT Transfer Act filings, the Debtors have entered into a Remedial Action Plan with CT DEEP that required the Debtors to investigate and remediate the Windsor Property. The Debtors have yet to finalize that remediation, and in order to do so, the Debtors will be required to develop, implement and maintain an engineered control program at the site and place certain environmental land use restrictions on the site as well. The Remedial Action Plan is not yet complete and requires on-going monitoring to protect the public and prevent human contact with the contaminated groundwater and soil.

## ARGUMENT

**I.     The Debtors Have Not Satisfied the Standards for Abandonment under Section 554 of the Bankruptcy Code**

24.     Section 554(a) of the Bankruptcy Code provides that, "[a]fter notice and a hearing the trustee may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate." 11 U.S.C. §554(a). "In order to grant a motion

5

to abandon property, the bankruptcy court must find either that: (1) the property is burdensome to the estate or (2) of inconsequential value and inconsequential benefit to the estate." *In re Galloway*, 2014 WL 4212621, at *6 (9th Cir. B.A.P. Aug. 27, 2014). "And in evaluating a proposal to abandon property, it is the interests of the estate and the creditors that have primary consideration, not the interests of the debtor." *Id. citing In re Johnson*, 49 F.3d 538, 541 (9th Cir. 1995).

25. The Debtors have neither demonstrated that the Windsor Property is burdensome to the estate nor have they demonstrated that the Windsor Property is of inconsequential benefit and value to the estate.

26. In support of their abandonment argument, the Debtors submit that they incur approximately $1 million per year with respect to the Windsor Property in the form of real estate taxes, utilities, maintenance and insurance. [Dkt. No. 486 at p.5]. And yet, pursuant to the Settlement Term Sheet attached to the Sale Order, it is the Purchaser of the Debtors' assets (excluding the Windsor Property) who is funding the carrying costs of the Windsor Property including without limitation, maintenance, insurance and real property taxes. As such, the Debtors are not presently incurring these costs in light of their agreement with the Purchaser and the Committee.

27. Nor have the Debtors demonstrated that the Windsor Property is of inconsequential value and inconsequential benefit to the estate. The Debtors submit that despite their extensive marketing efforts, and the "subsequent marketing effort by JLL, during which the Debtors thoroughly marketed the Windsor Property for sale, the Debtors have not yet found acceptable purchasers for the Windsor Property." [Dkt. No. 486 at p.8].

28. Notwithstanding the Debtors' representations, it appears that JLL only marketed the Windsor Property for sixty (60) days notwithstanding the terms of the Listing Agreement that provides for a listing term of 180 days. The Debtors provide no explanation as to why JLL has given up its marketing efforts after only two (2) short months. Given the environmental concerns at the property, it is likely that any potential purchaser would need to undertake significant due diligence prior to making an offer and thus, more than two months would be needed for the marketing of a property of this type.

29. In addition, even if the Windsor Property is abandoned, any clean-up costs that are incurred by the CT DEEP as a result of the Debtors' failure to remediate as required by the consent orders will likely constitute an administrative expense of these estates notwithstanding abandonment. *See Com. Of Pa, Dept. of Environmental Resources v. Conroy*, 24 F.3d 568, 570 (3d Cir. 1994) (agreeing with decisions holding that "response costs incurred by environmental agencies should be classified as administrative expenses" [citing authorities], reasoning "that since the estate could not avoid such costs through abandonment, the 'expenses to remove the threat posed by such substances are necessary to preserve the estate'.") (quoting *In re Chateaugay Corp.*, 944 F.2d 997, 1010 (2d Cir.1991)). Thus, it would make more sense to continue to market the Windsor Property for sale in order to attempt to alleviate these potential administrative expenses.

30. Moreover, it appears that the Debtors' counsel responsible for all legal services relating to the Windsor Property has received multiple expressions of interest as to the Windsor Property and, in some instances, the execution of non-disclosure agreements by prospective purchasers as late as mid-July. [Dkt. No. 490-3, at pp. 3, 4, 13, 17, 23, 25, 27, 28].

31. The Debtors have failed to explain why the marketing efforts have ceased and/or why the negotiations with the potential purchasers have not come to fruition, instead, providing

only a generalized statement to the Court and the creditors that they have been unable to find an acceptable purchaser.

32. For these reasons, the Debtors have not met their burden of proof in support of their Motion to Abandon the Windsor Property.

## II. The Proposed Abandonment Poses a Threat of Imminent and Identifiable Harm to the Public Health and Safety

33. As the Supreme Court has made clear, "[n]either the Court nor Congress has granted a trustee in bankruptcy powers that would lend support to a right to abandon property in contravention of state or local laws designed to protect public health or safety." *Midlantic Nat. Bank v. New Jersey Dept. of Environmental Protection*, 474 U.S. 494, 502 (1986). "Congress has repeatedly expressed its legislative determination that the trustee is not to have *carte blanche* to ignore nonbankruptcy law. Where the Bankruptcy Code has conferred special powers upon the trustee and where there was no common-law limitation on that power, Congress has expressly provided that the efforts of the trustee to marshal and distribute the assets of the estate must yield to governmental interest in public health and safety." *Id.*

34. Moreover, the "Bankruptcy Court does not have the power to authorize an abandonment without formulating conditions that will adequately protect the public's health and safety." *Id.* at 507-08. *See also*, *In re American Coastal Energy, Inc.*, 399 B.R. 805 (Bankr. S.D. Tex. 2009); *In re Wall Tube & Metal Products Co.*, 831 F.2d 118 (6th Cir. 1987); and *In re Microfab, Inc.*, 105 B.R. 161 (Bankr. D. Mass. 1989).

35. Here, it is undisputed that the Windsor Property has long been environmentally contaminated and that it poses a risk to the public health and safety.

36. In the absence of the completion of the Remedial Action Plan as required by the CT DEEP, there is a significant risk that the contamination could spread and infiltrate the groundwater, nearby wetlands and the Connecticut River.

37. In addition to the environmental concerns that the Town faces, in the event of abandonment, the Debtor will no longer be responsible for maintaining the property, providing security on the premises or otherwise ensuring that the buildings on the property adhere to the local building code requirements, and, in particular, fire safety codes. These issues raise serious safety concerns.

38. In the absence of proper maintenance of the Windsor Property, the property will fall into disrepair and become blighted. Moreover, the Windsor Property abuts the Windsor Meadows State Park and in the absence of security, the buildings on the property may become an attractive nuisance to passersby. However, the biggest concern is the potential that the unprotected buildings will become a fire hazard. The Town should not be saddled with a 53-acre environmentally contaminated parcel of property that threatens the well-being of the Town's citizens.

### III. The Debtors Request for Approval to Sell the Windsor Property Should Be Denied In the Absence of the Disclosure of the Sale Terms and Proper Notice

39. The Debtors seek alternative relief in their Motion to Abandon "in order to provide maximum flexibility to the estates." [Dkt. No. 486 at p.8]. That alternative relief is permission to sell the Windsor Property pursuant to Section 363(b) of the Bankruptcy Code in the exercise of the Debtors' business judgment. Moreover, while it is not expressly stated, it is presumed that the Debtors seek permission to sell the Windsor Property free and clear of all liens, claims, interests and encumbrances.

40. The Town objects to the Debtors attempt to sell the Windsor Property without giving proper notice to all of the creditors and disclosing the sale terms and without complying with Fed. R. Bankr. P. 6004(c), which requires a separate motion for a sale free and clear of liens and other interests to "be made in accordance with Rule 9014 and … served on the parties who have liens or other interests in the property to be sold."

41. The Debtors state that if an acceptable purchaser materializes, that they will seek approval "on the return date of this Motion" and provide a supplement to the Motion. [Dkt. No. 486 at p. 10]. However, providing such information at the 11th hour fails to satisfy basic requirements of due process and notice to the affected parties who have interests in the property, such as the Town.

42. Moreover, the Town has inchoate liens on the Windsor Property for future real estate taxes arising under Connecticut state law, Connecticut General Statues § 12-172. The Debtors simply cannot sell the Windsor Property free and clear without satisfying the requirements of Section 363(f) of the Bankruptcy Code and Fed. R. Bankr. 6004(c).

WHEREFORE, for all of the foregoing reasons, the Town of Windsor respectfully requests that the Court deny the Debtors' Motion to Abandon and for such other and further relief as is necessary and just.

[SIGNATURE ON FOLLOWING PAGE]

Respectfully submitted,

**MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP**

Dated: August 17, 2023     */s/ David P. Primack*
David P. Primack (#4449)
300 Delaware Ave., Suite 1014
Wilmington, DE 19801
Telephone: (302) 300-4515
Facsimile: (302) 654-4031
E-mail: dprimack@mdmc-law.com

-and-

Kristin B. Mayhew (*pro hac vice* admission pending)
PULLMAN & COMLEY, LLC
850 Main Street
Bridgeport, Connecticut 06601-7006
Telephone: (203) 330-2198
Facsimile: (203) 576-8888
Email: kmayhew@pullcom.com

*Attorneys for the Town of Windsor*