**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| *In re* | Chapter 11 |
| **STANADYNE LLC, *et al.*[1]** | Case No. 23-10207 (TMH) |
| **Debtors.** | (Jointly Administered) |
| | **Hearing Date: September 26, 2023 at 1:00 p.m. (ET)**<br>**Obj. Deadline: September 19, 2023 at 4:00 p.m. (ET)** |

**SUPPLEMENT TO DEBTORS' MOTION FOR ENTRY OF AN ORDER
(I) AUTHORIZING THE DEBTORS TO ABANDON OR, ALTERNATIVELY SELL
THE WINDSOR PROPERTY AND (II) FOR RELATED RELIEF**

The debtors and debtors in possession (collectively, the "<u>Debtors</u>") hereby submit this supplement (this "<u>Supplement</u>") to the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Abandon or, Alternatively Sell the Windsor Property and (II) for Related Relief* [Docket No. 486] (the "<u>Motion</u>").[2]  In support of this Supplement, the Debtors respectfully state as follows:

## <u>INTRODUCTION</u>

1.     Through the Motion, the Debtors sought entry of an order authorizing the Debtors to either (a) abandon the Windsor Property or (b) in the alternative, in the event that an actionable offer materialized prior to abandonment, to sell the Windsor Property.  The Debtors retained Jones Lang LaSalle Americas, Inc. ("<u>JLL</u>") as real estate broker to market and sell the Windsor Property.  As a result of JLL's marketing efforts, subsequent to the filing of the Motion, the Debtors received and accepted, subject to Bankruptcy Court approval, an offer on the

---

[1]    The debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are:  Stanadyne LLC (0378); Pure Power Technologies, Inc. (5202); Stanadyne PPT Holdings, Inc. (2594); and Stanadyne PPT Group Holdings, Inc. (1734).  The Debtors' headquarters are located at 405 White Street, Jacksonville, North Carolina 28546.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion or in the Purchase Agreement (as defined below), as applicable.

Windsor Property from Industrial Realty Group, LLC (the "Buyer"). The Debtors are therefore proceeding with the alternative sale relief requested in the Motion.

2.      The Debtors and the Buyer entered into the Purchase and Sale Agreement (the "Purchase Agreement"), a copy of which is attached hereto as Exhibit A, on August 28, 2023. Under the terms of the Purchase Agreement, the Buyer has agreed to purchase the Windsor Property on an "as is" basis. In exchange, the Buyer has agreed to pay the Debtors the sum of $65,000 to be used to cover ordinary and customary operational expenditures from the date of execution of the Purchase Agreement until the Closing Date (as defined in the Purchase Agreement) (the "Operational Expenditure Fee"). Under the Purchase Agreement, the Buyer remains responsible for all actual ordinary and customary operational expenditures during the foregoing period that exceed the Operational Expenditure Fee (the "Excess Operational Costs"). The payment of the Operational Expenditure Fee and Excess Operational Costs is a crucial term of the transaction, as the Debtors do not have the liquidity needed to pay the go forward carrying costs of the Windsor Property. The Purchase Agreement also provides that the Buyer will pay customary closing costs as well as broker fees due to JLL. In addition, the Debtors are seeking to assume the contract listed on Exhibit B attached hereto and assign it to the Purchaser in accordance with the Purchase Agreement.

3.      While the Debtors received an indication of interest from another party, the Debtors determined that the offer from the Buyer was superior as it provided for, among other things, the payment of carrying costs of the Windsor Property. Nevertheless, prior to the execution of the Purchase Agreement, the Debtors requested a best and final offer from the alternative bidder. The Debtors were advised that the alternative bidder was no longer interested in purchasing the Windsor Property, however.

4.      The Debtors believe that the sale of the Windsor Property to the Buyer pursuant to the terms of the Purchase Agreement is in the best interest of the Debtors, their estates, and creditors, and is a sound exercise of their business judgment.  Accordingly, the Debtors request entry of an order approving the sale of the Windsor Property to the Buyer.

## **SUMMARY OF PROPOSED TERMS OF THE SALE[3]**

5.      Pursuant to the terms and conditions of the Purchase Agreement, and subject to the Court's approval, the Debtors propose to sell to the Buyer the Windsor Property free and clear of all liens, claims, encumbrances and other interests.

6.      A summary of the Purchase Agreement, including the terms that are required to be highlighted pursuant to Local Rule 6004-1(b), is set forth as follows:

| **Local Rule 6004-1 Disclosure** | **Terms of the Purchase Agreement** |
| --- | --- |
| **Seller** | Stanadyne, LLC |
| **Buyer** | Industrial Realty Group, LLC |
| **Property Being Sold**<br>Purchase Agreement § 1(a)-(d) | Approximately 52.71 acres located at 90-92 Deerfield Road, Windsor, CT 06095 as well as certain improvements, personal property, and intangible property associated with the Windsor Property. |
| **Purchase Price**<br>Purchase Agreement § 2 | $1.00 |
| **Fees Payable to Debtors**<br>Purchase Agreement § 3(a) | Buyer shall pay to the Seller as directed by the Wind Down Officer the sum of $65,000.00, which shall be used to cover ordinary and customary operational expenditures from the date of execution of the Purchase Agreement until the Closing Date. Buyer shall be responsible for all actual ordinary and customary operational expenditures during the foregoing period that exceed the Operational Expenditure Fee. |

---

[3] This summary of the Purchase Agreement is provided for the Court's convenience only.  To the extent this summary differs in any way from the terms and conditions of the Purchase Agreement, the actual terms of the Purchase Agreement shall control.

| Local Rule 6004-1 Disclosure | Terms of the Purchase Agreement |
|---|---|
| **Sale to Insider** | The Buyer is not an insider of the Debtors. |
| **Agreements with Management** | None. |
| **Releases** | None. |
| **Private Sale / No Competitive Bidding** | For the reasons set forth herein, the Debtors are seeking approval of a private sale, without an auction process. |
| **Closing and Other Deadlines** <br> Purchase Agreement § 10 | Five days after expiration of the Review Period, or such earlier date as Seller and Buyer may agree upon. |
| **Good Faith Deposit** | None. |
| **Interim Arrangements with Proposed Buyer** | None. |
| **Use of Proceeds** | Not applicable. |
| **Tax Exemption** | Not applicable. |
| **Record Retention** | Not applicable. |
| **Sale of Avoidance Actions** | None. |
| **Requested Findings as to Successor Liability** | The Debtors are seeking to sell the Windsor Property free and clear of successor liability claims. |
| **Sale Free and Clear of Unexpired Leases** | The Debtors are seeking to sell the Windsor Property free and clear of all liens, interests, and claims (other than any permitted exceptions under the Purchase Agreement) to the fullest extent permitted by sections 363 and 365 of the Bankruptcy Code. |
| **Assumption and Assignment of Contracts** | The Debtors seek to assume the contract listed on Exhibit B and assign it to the Purchaser. |

| Local Rule 6004-1 Disclosure | Terms of the Purchase Agreement |
|---|---|
| **Closing Costs**<br><br>Purchase Agreement § 11 | Seller shall pay for Seller's attorneys' fees and its portion of the prorated property taxes. Buyer shall pay the escrow fees, the premium for Owner's Policy, cost of the Survey, realty transfer taxes and any special title endorsements requested by Buyer, the recording fees, Buyer's attorneys' fees, and any other costs of Buyer under the Purchase Agreement. |
| **Real Estate Broker**<br><br>Purchase Agreement § 19(f) | Buyer shall pay the Broker pursuant to a separate agreement in the event the transaction contemplated by the Purchase Agreement closes. Seller shall have no liability for the Broker's fees. |
| **Credit Bid** | None. |
| **Relief from Bankruptcy Rule 6004(h)** | The Debtors are seeking a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h). |

## RELIEF REQUESTED

7.       Through the Motion, as supplemented by this Supplement, the Debtors request the Court enter an order authorizing the sale of the Windsor Property pursuant to the terms of the Purchase Agreement.

## BASIS FOR RELIEF REQUESTED

8.       Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). In pertinent part, Bankruptcy Rule 6004 states that "all sales not in the ordinary course of business may be by private sale or by public auction." Fed. R. Bankr. P. 6004(f)(1). With respect to the notice required in connection with a private sale, Bankruptcy Rule 2002(c)(1) states, in pertinent part, that:

> [T]he notice of a proposed use, sale or lease of property . . . shall include . . . the terms and conditions of any private sale and the deadline for filing objections. The notice of a proposed use, sale or lease of property, including real estate, is sufficient if it generally describes the property.

Fed. R. Bankr. P. 2002(c)(1).  In addition, section 105(a) of the Bankruptcy Code provides that the Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

9.      To approve the use, sale, or lease of property out of the ordinary course of business, the Court must find some articulated business justification for the proposed action.  *See In re Abbotts Dairies of Pa. Inc.*, 788 F.2d 143, 145–47 (3d Cir. 1986) (implicitly adopting the articulated business justification and good faith tests of *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983)); *see also In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 175–76 (D. Del. 1991) (concluding that the Third Circuit had adopted a "sound business purpose" test in *Abbotts Dairies*).

10.     Generally, courts have applied four factors in determining whether a sale of a debtor's assets should be approved: (i) whether a sound business reason exists for the proposed transaction; (ii) whether fair and reasonable consideration is provided; (iii) whether the transaction has been proposed and negotiated in good faith; and (iv) whether adequate and reasonable notice is provided.  *See Lionel*, 722 F.2d at 1071 (setting forth the "sound business purpose" test); *Abbotts Dairies*, 788 F.2d at 145–57 (implicitly adopting the articulated business justification test and adding the "good faith" requirement); *Del. & Hudson Ry.*, 124 B.R. at 176 ("Once a court is satisfied that there is a sound business reason or an emergency justifying the pre-confirmation sale, the court must also determine that the trustee has provided the interested parties with adequate and reasonable notice, that the sale price is fair and reasonable and that the purchaser is proceeding in good faith.").

11.     This fundamental analysis does not change if the proposed sale is private, rather than public.  *See, e.g., In re Ancor Expl. Co.*, 30 B.R. 802, 808 (Bankr. N.D. Okla. 1983) ("[T]he

bankruptcy court should have wide latitude in approving even a private sale of all or substantially all of the estate assets not in the ordinary course of business under § 363(b)."). The bankruptcy court "has ample discretion to administer the estate, including authority to conduct public or private sales of estate property." *In re WPRV-TV, Inc.*, 143 B.R. 315, 319 (D.P.R. 1991), *vacated on other grounds*, 165 B.R. 1 (D.P.R. 1992); *accord In re Canyon P'ship*, 55 B.R. 520, 524 (Bankr. S.D. Cal. 1985). Here, the proposed private sale of the Windsor Property to the Buyer meets all of these requirements and should be approved.

**A.    Proceeding with a Private Sale of the Windsor Property to the Buyer Reflects a Prudent Exercise of the Debtors' Business Judgment**

12.    The Debtors believe that a strong business justification exists for the private sale of the Windsor Property. A private sale of the Windsor Property under the terms and conditions of the Purchase Agreement—as opposed to a lengthy auction process—will allow the Debtors to avoid incurring operating expenses associated with the Windsor Property, thereby preserving value for the Debtors' estates and stakeholders. Further, despite a thorough marketing process led by JLL and spanning approximately three months, the Debtors did not receive any other actionable offers. Thus, the Debtors' advisors do not believe that there is a sufficient likelihood of attracting other bids, such that incurring the additional expenses of a more expansive sale process would be justified.

13.    Given the Debtors no longer have a need for the Windsor Property, and given that the Debtors have not received any other actionable offers for the Windsor Property, the Debtors believe that proceeding through a private sale represents the best opportunity to maximize the value of the Windsor Property. As a result of the Buyer's interest in the Windsor Property, and its willingness to provide fair and reasonable consideration based on that interest, the Debtors believe that their estates and creditors will benefit from the approval of the sale without the

added delay, energy, and expenses associated with an auction process. Finally, there is no guarantee that the Buyer would hold the offer open during an auction process.

14. In light of the limited universe of potential purchasers and the lack of interest in the Windsor Property expressed during the marketing process, the Purchase Agreement presents the highest and best offer for the Windsor Property. Thus, the Debtors submit that proceeding by private sale is warranted under the circumstances, and will maximize the value realized by the Debtors' estates for the Windsor Property for the benefit of all stakeholders.

**B.     The Buyer's Consideration for the Windsor Property is Fair and Reasonable**

15. The Debtors believe that the Buyer has provided fair and reasonable consideration for the Windsor Property. In addition to the purchase price, the Purchase Agreement contains many favorable conditions for the Debtors. Notably, the Buyer is paying the Debtors the Operational Expenditure Fee and Excess Operational Costs, which will result in the Buyer paying for the carrying costs of the Windsor Property through closing. The Buyer has also agreed to pay customary closing costs and JLL's broker fees.

16. The Debtors have carefully considered and analyzed the Buyer's offer and, in consultation with their professional advisors, concluded that the contemplated private sale will maximize the realizable value of the Windsor Property, and is in the best interests of their estates and creditors. The Purchase Agreement was the result of good-faith, arms'-length negotiations. In consideration of the foregoing, the Debtors believe that the purchase consideration provides fair and reasonable value for the Windsor Property.

**C.     The Proposed Sale is Proposed in Good Faith**

17. While the Bankruptcy Code does not define "good faith," the Third Circuit has held that "the phrase encompasses one who purchases in 'good faith' and for 'value.'" *In re Abbotts Dairies*, 788 F.2d at 147 (to constitute lack of good faith, a party's conduct in connection

with the sale must usually amount to fraud, collusion between the purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders); *see also In re Bedford Springs Hotel, Inc.*, 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989); *In re Perona Bros., Inc.*, 186 B.R. 833, 839 (D.N.J. 1995).

18.     The Debtors submit that the private sale contemplated herein and in the Purchase Agreement has been proposed in good faith.  The Buyer is not an insider of the Debtors, and the Purchase Agreement was the product of arm's-length negotiations between the Debtors, on the one hand, and the Buyer, on the other.  The Debtors believe and submit that the proposed sale pursuant to the terms and conditions of the Purchase Agreement is not the product of collusion or bad faith, and nothing suggests that the Purchase Agreement is anything but the product of arm's-length negotiations between the Debtors, the Buyer, and their respective professionals.

**D.     Adequate and Reasonable Notice of the Sale Has Been Provided**

19.     The Debtors intend to provide notice of the sale in accordance with the applicable procedural rules.  *See* Fed. R. Bankr. P. 2002(c)(1) (stating that the notice must contain "the terms and conditions of any private sale and the time fixed for filing objections."); *see also Del. & Hudson Ry.*, 124 B.R. at 180 (stating that the disclosures necessary in such a sale notice need only include the terms of the sale and the reasons why such a sale is in the best interests of the estate and do not need to include the functional equivalent of a disclosure statement).  Moreover, the Debtors will serve the Motion and this Supplement on any known parties that have indicated an interest in purchasing the Windsor Property during the past six months.  If any interested party desires to submit a competing offer for the Windsor Property, such offer should be submitted to the Debtors prior to the hearing scheduled for consideration of the Motion and Supplement.

**E.      The Private Sale Should be Free and Clear of Liens, Claims, and Interests**

20.      The private sale also meets the requirements to be a sale free and clear of liens, claims, interests, and encumbrances.  Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests, and encumbrances if either:

> (1)      applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2)      such entity consents;
>
> (3)      such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4)      such interest is in bona fide dispute; or
>
> (5)      such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

21.      As section 363(f) of the Bankruptcy Code is stated in the disjunctive, when proceeding pursuant to section 363(b), it is only necessary to meet one of the five conditions of section 363(f).  *See Citicorp Homeowners Servs., Inc. v. Elliot*, 94 B.R. 343, 345 (Bankr. E.D. Pa. 1988) (stating that section 363(f) of the Bankruptcy Code is written in the disjunctive and holding that if any of the five conditions of section 363(f) are met, the trustee has the authority to conduct the sale free and clear of all liens).  In addition, various bankruptcy courts have held that they have the equitable power to authorize sales free and clear of interests that are not specifically covered by section 363(f).  *See, e.g.*, *In re Trans World Airlines, Inc.*, 2001 WL 1820325, at *3, 6 (Bankr. D. Del. Mar. 27, 2001); *Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987).

22.      The Debtors submit that the sale of the Windsor Property free and clear of all liens, claims, interests, and encumbrances will satisfy one or more of the requirements under

section 363(f) of the Bankruptcy Code.  Moreover, the Debtors will send notice of the private sale to purported lienholders.  If such lienholders do not object to the proposed private sale, then their consent should be presumed.  Accordingly, the Debtors request that, unless a party asserting a prepetition lien, claim, or encumbrance on the Windsor Property timely objects to this Supplement, such party shall be deemed to have consented to the sale of the Windsor Property.

**F.**     **The Buyer Should be Entitled to the Protections Afforded by Section 363(m) of the Bankruptcy Code**

23.     In connection with the sale, the Buyer should be afforded the protections provided by section 363(m) of the Bankruptcy Code to a good-faith purchaser.  A good-faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims.  *See Abbotts Dairies*, 788 F.2d at 147 (3d Cir. 1986).  To constitute lack of good faith, a party's conduct in connection with the sale must usually amount to "fraud, collusion between the purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders." *Id.*  (citing *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978); *see also In re Bedford Springs Hotel, Inc.*, 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989); *In re Perona Bros., Inc.*, 186 B.R. 833, 839 (D.N.J. 1995).  Due to the absence of a bright line test for good faith, the determination is based on the facts of each case, concentrating on the "integrity of [an actor's] conduct during the sale proceedings." *In re Pisces Leasing Corp.*, 66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting *Rock Indus.*, 572 F.2d at 1198).

24.     Both the Debtors and the Buyer have acted in good faith in negotiating the Purchase Agreement.  There is no evidence of fraud or collusion in the terms of the Purchase Agreement, and the Buyer is not an insider of the Debtors.  As previously discussed, the Purchase Agreement is the culmination of negotiations conducted on an arm's-length, good-faith basis, in which the parties were ably represented by sophisticated advisors.

## REQUEST FOR WAIVER OF STAY

25.    To implement the foregoing immediately, the Debtors seek a waiver of the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h). Promptly closing the private sale is of critical importance to the Buyer and to the Debtors' efforts to preserve and maximize the value of their estates through, among other things, minimizing the ongoing costs associated with the Windsor Property.  Accordingly, the Debtors request that the Court waive the 14-day stay period under Bankruptcy Rule 6004(h).

## NOTICE

26.    Notice of this Supplement shall be provided to (i) the U.S. Trustee; (ii) counsel for the Committee; (iii) counsel for the Prepetition Agent for the Prepetition Secured Lenders; (iv) the Connecticut Department of Energy & Environmental Protection; (v) the United States Environmental Protection Agency; (vi) the Town of Windsor; (vii) Hartford County; (viii) the State of Connecticut; (ix) any entity known to have expressed an interest during the past six months in acquiring the Windsor Property; (x) any party asserting a lien on the Windsor Property; (xi) the counterparty listed on Exhibit B; and (xii) all parties that have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

*[Remainder of page intentionally left blank]*

## CONCLUSION

WHEREFORE, the Debtors respectfully request entry of an order granting the relief requested herein and such other and further relief as the Court may deem just and proper.

Dated:  September 5, 2023                    YOUNG CONAWAY STARGATT &
        Wilmington, Delaware                    TAYLOR, LLP

                                        */s/ Ashley E. .Jacobs*
                                        Michael R. Nestor (DE Bar No. 3526)
                                        Andrew L. Magaziner (DE Bar No. 5426)
                                        Ashley E. Jacobs (DE Bar No. 5635)
                                        Andrew A. Mark (DE Bar No. 6861)
                                        1000 North King Street
                                        Rodney Square
                                        Wilmington, Delaware 19801-6108
                                        Telephone:  (302) 571-6600
                                        Facsimile:  (302) 571-1253
                                        Email:  mnestor@ycst.com
                                                amagaziner@ycst.com
                                                ajacobs@ycst.com
                                                amark@ycst.com

                                          -and-

                                        Kathryn A. Coleman
                                        Christopher Gartman
                                        HUGHES HUBBARD & REED LLP
                                        One Battery Park Plaza
                                        New York, NY 10004-1482
                                        Telephone: (212) 837-6000
                                        Facsimile:  (212) 422-4726
                                        Email:  katie.coleman@hugheshubbard.com
                                                chris.gartman@hugheshubbard.com

                                        *Counsel for the Debtors*

## **EXHIBIT A**

**Purchase Agreement**

## PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT ("**Agreement**"), dated August 28, 2023, for reference purposes only, is entered into by and between STANADYNE LLC, a Delaware limited liability company ("**Seller**"), and INDUSTRIAL REALTY GROUP, LLC, a Nevada limited liability company ("**Buyer**"), with reference to the following facts:

### RECITALS:

A.      Seller filed bankruptcy in the United States Bankruptcy Court for the District of Delaware (the "**Court**").  In connection therewith, and under the supervision of the Court, Seller is seeking to sell certain of its assets.  Seller is the fee simple owner of the Property, as hereinafter defined, consisting of approximately 52.71 acres of real property improved with one or more buildings containing warehouse/industrial/office space and located at 90-92 Deerfield Road, Windsor, CT 06095.

B.      Buyer desires to bid on the Property.  In the event that Buyer's bid is accepted by Seller and approved by the Court, Buyer wishes to purchase the Property from Seller and Seller is willing to sell the Property to Buyer on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      **Purchase and Sale**.

Seller agrees to sell the Property to Buyer and Buyer agrees to purchase the Property from Seller, all on the terms, covenants and conditions set forth in this Agreement.  The "**Property**" includes the following:

A.      Land.  The land ("**Land**") consisting of approximately 52.71 acres and located at 90-92 Deerfield Road, Windsor, CT 06095 and legally described as set forth on Exhibit "A" attached to this Agreement and made a part hereof, together with all of Seller's right, title and interest in and to all easements, utility reservations, mineral rights, rights of way, strips of land, tenements, hereditaments, privileges, licenses, appurtenances, reversions, remainders in any way belonging, remaining or appertaining thereto;

B.      Improvements.  The buildings, and all other structures and improvements (collectively, "**Improvements**") now situated on the Land including, but not limited to, fixtures and equipment, elevators, heating, air conditioning, plumbing, mechanical, electrical, drainage, security, life safety and fire alarm systems, and their component parts;

C.      Personal Property.  All of Seller's interest in fixtures, furnishings, equipment, appliances, machinery, tools and other personal property of every kind and character (collectively, "**Personal Property**") owned by Seller and currently attached to, located on or used in connection with the ownership, management, maintenance and operation of the Improvements and the Land;

30693219.5

S:\JAM\LICHTER\Windsor (Stanadyne), CT\Acquisition\PSA\Stanadyne - IRG PSA (final).doc

and

     D.    <u>Intangible Property</u>.  Any and all right, title and interest of Seller in all (i) development rights and entitlements and other intangible property owned by Seller (including without limitation, any environmental or other indemnities); (ii) guaranties and warranties issued to Seller and with respect to the Improvements or the Personal Property; and (iii) any reports, studies, surveys and other comparable analysis, depictions or examinations of the Land or the Improvements, or pertaining to the Land, the Improvements or the Personal Property or use thereof and which in anyway relates to the ownership, management or operation of the Property (collectively, "**Intangible Property**").  Seller agrees to assign to Buyer any and all Intangible Property at the Closing (defined herein).

**2.**    **<u>Purchase Price</u>.**

     The purchase price for the Property shall be $1.00 ("**Purchase Price**").

**3.**    **<u>Payment of Purchase Price</u>.**

     The Purchase Price shall be paid to Seller by Buyer as follows:

     A.    <u>Operational Expenditure Fee</u>.  Upon payment of the Operational Expenditure Fee, Seller will postpone the abandonment hearing with respect to the Property to a date that is after both (i) the date the Review Period expires, as defined in <u>Paragraph 5.B.</u> and (ii) the Closing Date, as defined in <u>Paragraph 10</u>.  On August 29, 2023, Buyer shall pay to the Seller as directed by the Wind Down Officer the sum of $65,000.00 ("**Operational Expenditure Fee**").  The Operational Expenditure Fee shall be used to cover ordinary and customary operational expenditures from the date of execution of this Agreement until the Closing Date.  Buyer shall be responsible for all actual ordinary and customary operational expenditures during the foregoing period that exceed the Operational Expenditure Fee ("**Excess Operational Costs**").  The Operational Expenditure Fee as well as any Excess Operational Costs shall be non-refundable.

     B.    <u>Balance of Purchase Price</u>.  Buyer shall pay the balance of the Purchase Price, plus or minus Buyer's share of closing costs, prorations and other charges or amounts payable pursuant to this Agreement, to Seller in immediately available funds at the Closing Date.

**4.**    **<u>Title</u>**.

     A.    <u>Title Policy</u>.  Seller shall convey good and clear record and marketable title to the Property to Buyer by warranty deed, subject only to the following exceptions to title ("**Permitted Exceptions**"):

         (1)    A lien to secure payment of real estate taxes and assessments not yet due and payable; and

         (2)    Such other exceptions to title as may be approved by Buyer pursuant to the provisions of <u>Paragraph 4.B</u>.

Any mortgage or other monetary liens on the Property ("**Monetary Liens**") shall be discharged and paid by Seller at Closing. On the Closing Date (as defined in <u>Paragraph 10</u>), First American Title Insurance Company, 385 E. Colorado Blvd. Suite 205, Pasadena, CA 91101 ("**Title Company**") shall issue to Buyer its ALTA extended coverage owner's policy of title insurance ("**Owner's Policy**") in the face amount of the Purchase Price, showing title to the Property vested of record in Buyer, subject only to the Permitted Exceptions.

B.    <u>Survey and Title Documents</u>.   Within five (5) days after the full execution of this Agreement, Buyer shall order a current ALTA survey covering the Land and all improvements on the Land and otherwise in form sufficient to permit deletion of the survey exception from the Owner's Policy ("**Survey**") and a preliminary title report or title commitment for the issuance of the Owner's Policy ("**Title Report**") together with legible copies of all title exception documents shown thereon ("**Title Documents**"). Buyer's approval of exceptions to title and the Survey shall be a condition precedent to Buyer's obligation to purchase the Property. Prior to the expiration of the Review Period, as defined in <u>Paragraph 5.B.</u>, below, Buyer shall furnish to Seller a written list of any objections to matters shown on the Title Report or the Survey, stating the items to which Buyer objects and the reasons therefor ("**Disapproval Notice**"). Seller shall then have fourteen (14) days after the date of such Disapproval Notice to make such arrangements or take such steps to satisfy Buyer's objection(s) ("**Title Cure Period**"). If (i) Seller is unable to remove or correct such objection(s) within the Title Cure Period and (ii) Buyer does not waive, in writing, its disapproval, then this Agreement shall terminate and the parties shall have no further obligations to each other except for such provisions that specifically survive the termination of this Agreement. If Buyer fails to timely give the Disapproval Notice as set forth herein, the condition in this <u>Paragraph 4.B</u> shall be deemed satisfied, and Buyer shall be deemed to have accepted all matters contained in the Title Report and the Survey.

**5.    <u>Inspection</u>.**

A.    <u>Property Information</u>.   Seller shall use its best efforts to obtain customary due diligence materials specifically requested by Buyer and in the possession of Stanadyne Operating Company LLC or its affiliates ("<u>Stanadyne Operating</u>") from Stanadyne Operating.

B.    <u>Review Period</u>.   During the period commencing with the date of execution of this Agreement and expiring thirty (30) days thereafter ("**Review Period**"), Buyer shall have the opportunity to review the Property Information and perform such investigations, inquiries, and feasibility studies, as it deems appropriate to decide whether the Property is acceptable to Buyer. All costs and expenses in connection with any such study or investigation shall be borne solely by Buyer. Buyer's obligation to purchase the Property as herein provided shall be subject to Buyer's approval of the Property in its sole discretion. Seller shall provide access to the Property to Buyer and Buyer's agents and consultants during normal business hours for the purpose of conducting any such investigations, inquiries or feasibility studies. Buyer shall indemnify and hold Seller harmless from and against all liability, claims, demands, damages or costs, including reasonable attorneys' fees, arising from or connected with Buyer's inspection of the Property. If before the end of the Review Period Buyer sends written notice to Seller that the Property is acceptable to Buyer ("**Acceptance Notice**"), Buyer shall be obligated to close the transaction as provided herein. If Buyer fails to send an Acceptance Notice to Seller before the end of the Review Period, Buyer shall

be deemed to have decided that the Property is not acceptable to Buyer, the obligation of Seller to sell and Buyer to buy the Property shall automatically terminate.

C.    <u>Sale Order</u>.  During the Review Period, Buyer and Seller shall work in good faith to agree upon a mutually acceptable form of a sale order (the "**Sale Order**") to be entered by the Court, with such changes as are required by the Court to which Seller and Buyer have consented (such consent not to be unreasonably withheld, delayed or conditioned), confirming Seller's title to the Property free and clear of liens and encumbrances, and Seller's authority to sell the Property pursuant to this Agreement.

D.    <u>Environmental Matters</u>.  Buyer and Seller shall work in good faith in connection with compliance with the Connecticut Transfer Act with respect to the transfer of the Property, it being understood that Seller shall have no liability post-Closing with respect to any remaining remediation or compliance work with the Connecticut Department of Energy and Environmental Protection relating to the Property.  Seller will assign to Buyer, to the extent assignable, any existing environmental indemnities with respect to the Property, or rights that Seller has based upon the Connecticut Transfer Act, to the extent transferrable.

**6.    <u>As-Is Sale</u>**.  Buyer will purchase the Property in an "AS-IS" condition.

**7.    <u>Reserved</u>**.

**8.    <u>Conditions Precedent to Buyer's Obligation</u>**.

The obligation of Buyer to buy the Property shall be subject to full satisfaction of the following conditions precedent:

A.    Buyer's approval of the conditions of title in accordance with <u>Paragraph 4</u>.

B.    Seller's postponement of the abandonment hearing with respect to the Property.

C.    The Title Company's irrevocable commitment to issue the Owner's Policy in the form provided in <u>Paragraph 4.A</u>.

D.    Buyer's approval of the Property within the Review Period in accordance with <u>Paragraph 5</u>.

E.    No material adverse change in the Property before the Closing Date.

F.    The truth and accuracy of each representation and warranty of Seller contained herein as if made on and as of the Closing Date.

G.    The Court shall have issued the Sale Order, after notice and opportunity for a hearing, which Sale Order shall be a Final Order in full force and effect and will not have been stayed or vacated.

Buyer may waive any of the conditions precedent to Buyer's obligation to perform under this

4

Agreement. If the conditions set forth in <u>Paragraphs 8.A</u> through <u>8.G</u> are not satisfied or waived by Buyer, then this Agreement shall terminate, and the parties shall have no further obligations to each other except for such provisions that specifically survive the termination of this Agreement.

**9.**    **<u>Conditions Precedent to Seller's Obligation to Close</u>.**

The obligation of Seller to sell the Property shall be subject to timely satisfaction or waiver of the following conditions precedent:

A.    Buyer's timely payment to the Seller of the Operational Expenditure Fee and any Excess Operational Costs.

B.    Buyer's timely delivery of the balance of the Purchase Price and any other funds required of Buyer.

C.    The truth and accuracy of each representation and warranty of Buyer contained herein as if made on and as of the Closing Date.

D.    Buyer shall not then be in default of any covenant or agreement to be performed by Buyer under this Agreement.

E.    The Court shall have issued the Sale Order, after notice and opportunity for a hearing, which Sale Order shall be a Final Order in full force and effect and will not have been stayed or vacated.

Seller may waive any of the conditions precedent to Seller's obligation to perform under this Agreement. If the conditions set forth in <u>Paragraphs 9.A</u> through <u>9.E</u> are not satisfied or waived by Seller, then this Agreement shall terminate, the Operational Expenditure Fee and any Excess Operational Costs shall be paid to Seller to the extent not already paid, and the parties shall have no further obligations to each other except for such provisions that specifically survive the termination of this Agreement.

**10.**    **<u>Closing</u>.**

The sale and purchase of the Property provided herein shall be consummated at a closing ("**Closing**"), which shall be held on the Closing Date at the offices of Young Conaway Stargatt & Taylor, LLP or at such other time and place as Seller and Buyer may agree upon. As used herein, "**Closing Date**" means five (5) days after the expiration of the Review Period, or such earlier date as Seller and Buyer may agree upon. At the Closing, Seller and Buyer shall deliver to the other party such documents as are typical and customary for transactions involving properties of similar size, type and location as the Property, and as may be necessary or appropriate to consummate the transactions contemplated in this Agreement.

**11.**    **<u>Closing Costs and Prorations</u>.**

Seller shall pay for Seller's attorneys' fees and their portion of the prorated property taxes, as detailed below. Buyer shall pay the escrow fees, the premium for Owner's Policy, cost of the Survey, realty transfer taxes and any special title endorsements requested by Buyer, the recording

5

fees, Buyer's attorneys' fees, and any other costs of Buyer hereunder.  The unused portion of any deposits or prepayments held in connection with the Property shall be returned to the Seller.  Utility charges shall be prorated as of the Closing Date.  Real property taxes shall be prorated as of the Closing Date based upon the latest tax bill available.  Buyer and Seller agree to prorate as of the Closing Date any taxes assessed against the Property by a supplemental bill levied by reason of an event occurring prior to the Closing.  It is the intent of the parties that all property taxes attributable to the period prior to Closing be the responsibility of Seller and all property taxes attributable to the period after Closing be the responsibility of Buyer.  All prorations as of the Closing Date shall be made as of 12:01 a.m. on the Closing Date.

## 12.    <u>Representations and Warranties by Seller</u>.

Effective as of the date of this Agreement and as of the Closing Date, and after receipt of approval of the Bankruptcy Court after notice and an opportunity for hearing, Seller hereby represents and warrants to Buyer, which representations and warranties shall be accurate and true in all material respects on the Closing Date as if made on the Closing Date, and acknowledges that Buyer is relying upon such representations and warranties in purchasing the Property, as follows:

A.    Seller is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Delaware.  Seller has full power and authority to execute and deliver this Agreement and all of Seller's closing documents, to engage in the transactions contemplated by this Agreement, and to perform and observe all of Seller's obligations under this Agreement.

B.    Seller and the persons signing this Agreement for Seller have the authority and power to sign this Agreement, to perform all of Seller's obligations under this Agreement and to sign and deliver all of the documents required to be signed and delivered by Seller without the consent or approval of any other person other than the Court.

C.    This Agreement has been duly executed and delivered by Seller and is a legal, valid and binding instrument, enforceable against Seller in accordance with its terms, except as such enforceability may be limited by (i) bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally, and (ii) general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

D.    Seller has and on the Closing Date will have good and marketable fee simple title to the Property; Seller shall not do, commit, or allow to be done, anything that would have a material adverse effect on Seller's title to or condition of the Property.

E.    Seller's entry into this Agreement is subject to Court approval, after notice and opportunity for a hearing.

F.    Seller is not a "foreign person" and is not subject to withholding within the meaning of 26 U.S.C. § 1445.  Seller shall execute and deliver to Buyer through and at the Close of escrow a non-foreign affidavit in form acceptable to Buyer.

13.     **Representations and Warranties by Buyer**.

Effective as of the date of this Agreement and as of the Closing Date, Buyer hereby represents and warrants to Seller, which representations and warranties shall be accurate and true in all material respects on the Closing Date as if made on the Closing Date, and acknowledges that Seller is relying upon such representations and warranties in purchasing the Property, as follows:

A.      Buyer is a limited liability company, duly organized, validly existing, and in good standing under the laws of the State of Nevada.  Buyer has full power and authority to execute and deliver this Agreement and all of Buyer's closing documents, to engage in the transactions contemplated by this Agreement, and to perform and observe all of Buyer's obligations under this Agreement.

B.      Buyer and the persons signing this Agreement for Buyer have the authority and power to sign this Agreement, to perform all of Buyer's obligations under this Agreement and to sign and deliver all of the documents required to be signed and delivered by Buyer without the consent or approval of any other person.

C.      This Agreement has been duly executed and delivered by Buyer and is a legal, valid and binding instrument, enforceable against Buyer in accordance with its terms, except as such enforceability may be limited by (i) bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally, and (ii) general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

14.     **Destruction of Property**.

If the Property is materially damaged or destroyed between the date of this Agreement and the Closing Date, Buyer shall have the right, exercisable in Buyer's sole discretion, to:

A.      Terminate this Agreement and neither party shall have any further obligation or liability to the other;

B.      Accept the Property in its then condition, in which event there shall be credited against the Purchase Price any deductible which is payable under all applicable insurance policies which provide insurance coverage for the Property or Improvements and all proceeds of insurance payable to Seller by reason of such damage shall be assigned and paid by Seller to Buyer; or

C.      Notify Seller of Buyer's intent to purchase the Property and direct Seller to correct the damage or destruction to the Property, in which event Seller shall diligently correct such matters at Seller's sole expense, unless such damage or destruction can't reasonably be completed within six (6) months after the damage or destruction.  If Buyer elects to proceed pursuant to this Paragraph 14.C, the Closing Date shall be extended for such time as reasonably necessary to allow for completion of such repairs.  If Seller does not correct the matters within that time, Buyer shall still be entitled to exercise any other option available hereunder.  Following notification of the existence of any damage or destruction, Buyer's failure to affirmatively elect shall be considered an election to terminate this Agreement under Paragraph 14.A above.

15.    **Condemnation**.

If, prior to the Closing Date, all or a material portion of the Property or the means of ingress or egress thereon is taken by eminent domain (or is the subject of a pending or contemplated taking which has not been consummated), including, but not limited to, any land donation or public space requirements or encumbrances on the Property requiring contributions by Seller, Seller shall promptly notify Buyer of such fact. Buyer shall then have the option to terminate this Agreement upon notice to Seller given not later than twenty (20) days after receipt of Seller's notice. If Buyer elects to terminate this Agreement and the parties shall have no further obligations to each other except for such provisions that specifically survive the termination of this Agreement. If Buyer does not elect to terminate this Agreement, Seller shall assign and turn over to Buyer, and Buyer shall be entitled to receive and keep, all awards for the taking by eminent domain and shall be obligated to proceed to Closing with no reduction in the Purchase Price.

16.    **Reserved**.

17.    **Specific Performance**.

A.    If Buyer fails to consummate the purchase of the Property as and when contemplated by this Agreement, the Operational Expenditure Fee and Excess Operational Costs, to the extent not already paid, shall be paid to Seller. Seller may pursue all remedies provided at law or in equity, including specific performance.

B.    If Seller shall be in material breach of any obligation of Seller under this Agreement and shall not have cured such breach on or prior to the Closing Date, Buyer may terminate this Agreement and/or pursue all remedies provided at law or in equity, including specific performance. In the event that the Property is sold to another party (an "**Alternative Sale**"), whether by Court order or otherwise, Buyer shall be entitled to receive the return of 50% of (a) the Operational Expenditure Fee and (b) any Excess Operational Costs, which amounts shall be paid solely from the proceeds of the Alternative Sale.

18.    **Possession**.

Possession of the Property, subject to the rights of tenants under existing leases, and all keys to the Property (properly tagged) shall be delivered to Buyer at the Closing.

19.    **Miscellaneous**.

A.    Final and Entire Agreement; Integration. This Agreement is the final, entire and exclusive agreement between the parties and supersedes any and all prior agreements, negotiations and communications, oral or written. No representation, promise, inducement or statement of intention has been made by any of the parties not embodied in this Agreement or in the documents referred to herein, and no party shall be bound by or liable for any alleged representation, promise, inducement or statements of intention not set forth or referred to in this Agreement. No supplement, modification, or amendment to this Agreement shall be binding or effective unless executed in writing by the parties and by no other means.

B.    <u>Successors and Assigns</u>.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective shareholders, partners, directors, officers, heirs, beneficiaries, successors, representatives and assigns.

C.    <u>Assignment</u>.  No party to this Agreement may assign its rights or delegate its duties hereunder without the prior written consent of all parties to this Agreement; <u>provided, however</u>, that either Buyer or Seller may assign its rights or delegate its duties hereunder to an affiliated entity, but any such assignment shall not relieve the party assigning its rights of its obligations hereunder.

D.    <u>Notices</u>.  Any notice, demand, consent, approval or documents which any party is required or may desire to give or deliver to the other shall be given in writing by (i) personal delivery; (ii) certified mail, return receipt requested, postage prepaid; (iii) a national overnight courier service that provides written evidence of delivery; or (iv) facsimile or email transmission and addressed as follows:

|  |  |
|---|---|
| To Buyer: | Industrial Realty Group, LLC |
|  | 11111 Santa Monica Boulevard, Suite 800 |
|  | Los Angeles, California 90025 |
|  | Attention: John A. Mase |
|  | Phone:  (310) 806-4434 |
|  | Fax:  (310) 473-8702 |
|  |  |
| With a copy to: | Fainsbert Mase Brown & Sussman, LLP |
|  | 11111 Santa Monica Boulevard, Suite 810 |
|  | Los Angeles, California 90025 |
|  | Attention:  Jerry A. Brown, Esq. |
|  | Email:  jbrown@fms-law.com |
|  | Phone:  (310) 473-6400 |
|  | Fax:  (310) 473-8702 |
|  |  |
| To Seller: | Stanadyne LLC |
|  | C/O Young Conaway Stargatt & Taylor |
|  | Rodney Square, 1000 N. King Street |
|  | Wilmington, DE 19801 |
|  | Attn: Ashley E. Jacobs |
|  | Email: ajacobs@ycst.com |
|  | Phone: 302-571-6634 |

Any party may change its notice or email address, and/or facsimile number by giving written notice thereof in accordance with this Paragraph.  All notices hereunder shall be deemed given: (a) if delivered personally, when delivered; (b) if sent by certified mail, return receipt requested, postage prepaid, on the third day after deposit in the U.S. mail; (c) if sent by overnight courier, on the first business day after delivery to the courier; and (d) if sent by facsimile or email, on the date of transmission if sent on a business day before 5:00 p.m. Pacific time, or on the next business day; if sent on a day other than a business day or if sent after 5:00 p.m. Pacific time, provided that a hard copy of such notice is also sent by either a nationally recognized overnight courier or by U.S. mail, first class, postage prepaid.

E.    <u>Attorneys' Fees</u>.  In the event any suit, action or proceeding is instituted by any party in connection with the breach, enforcement or interpretation of this Agreement, the prevailing party therein shall be entitled to the award of reasonable attorneys' fees and related costs in addition to whatever relief the prevailing party may be awarded.

F.    <u>Real Estate Commission</u>.  Buyer represents and warrants to Seller and Seller represents and warrants to Buyer that no broker has been engaged by it in connection with the transaction contemplated by this Agreement, other than JLL ("**Broker**").  Buyer has agreed to pay Broker pursuant to a separate agreement in the event that the transaction contemplated herein closes.  Seller shall have no liability for the Broker's fees.  Buyer covenants and agrees to pay any and all commissions due to any broker or finder claiming a commission or fee through the Buyer other than Broker.  Each party shall indemnify, protect, defend and hold harmless the other party, including reasonable attorneys' fees, in respect of any breach of such representation and warranty, which indemnity shall survive the Closing or earlier termination of this Agreement.

G.    <u>Severability</u>.  The invalidity, illegality, or unenforceability of any provision of this Agreement shall in no way affect the validity of any other provision of this Agreement.  In the event that any provision of this Agreement is contrary to any present or future statute, law, ordinance, or regulation, the latter shall prevail, but in any such event the provisions of this Agreement affected shall be curtailed and limited only to the extent necessary to bring it within the requirements of the law.

H.    <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of Connecticut.  In the event of any legal action arising from this Agreement, the parties agree that venue shall be proper in any state or federal court located in Hartford County, Connecticut, or the nearest location having jurisdiction.

I.    <u>Waiver</u>.  The waiver or failure to enforce any provision of this Agreement shall not operate as a waiver of any future breach of such provision or any other provision hereof. No waiver shall be binding unless executed in writing by the party making the waiver.  The failure of either party to insist on strict compliance with any of the terms, covenants, or conditions of this Agreement by the other party shall not be deemed a waiver of that term, covenant, or condition.

J.    <u>Counterparts and Electronic Signatures</u>.  This Agreement may be executed in any number of counterparts, each of which so executed shall be deemed to be an original, and such counterparts shall together constitute but one and the same Agreement. The parties shall be entitled to sign and transmit an electronic signature of this Agreement (whether by facsimile, PDF or other email transmission), which signature shall be binding on the party whose name is contained therein. Any party providing an electronic signature agrees to promptly execute and deliver to the other parties an original signed Agreement.

K.    <u>Review; Interpretation</u>.  Each party to this Agreement has carefully reviewed this Agreement, is familiar with the terms and conditions herein, and was advised by legal counsel of his or its own choice with respect thereto.  This Agreement is the product of negotiation among the parties hereto and is not to be interpreted or construed against any party hereto.

L.    <u>Headings; Constructions</u>.  The headings which have been used throughout this

Agreement have been inserted for convenience of reference only and do not constitute matter to be construed in interpreting this Agreement. The words "herein", "hereof", "hereunder" and other similar compounds of the word "here" when used in this Agreement shall refer to the entire Agreement and not to any particular provision or section. If the last day of any time period stated herein shall fall on a Saturday, Sunday or legal holiday, then the duration of such time period shall be extended so that it shall end on the next succeeding day which is not a Saturday, Sunday or legal holiday.

      M.    <u>Survival</u>.  All of the representations, warranties, covenants, indemnities and agreements set forth herein shall survive the closing of the transaction and the delivery of the deed.

      N.    <u>Number, Gender and Tense</u>. All words used in this Agreement shall be construed to include the plural as well as the singular number unless the context requires otherwise, the present tense shall include the past and future tense, and words of any gender used in this Agreement shall be held and construed to include any other gender.

      O.    <u>Independent Counsel</u>. Each party to this Agreement represents and warrants that he has carefully reviewed and understands this Agreement, acknowledges that he has been advised to seek his own independent legal counsel with respect to this Agreement and the transactions contemplated hereby, has sought the advice of independent counsel of his own choosing or has knowingly and voluntarily declined the opportunity to obtain such counsel and signs this Agreement freely, knowingly and voluntarily. Buyer hereby represents and warrants to Seller that: (i) Buyer is not in a significantly disparate bargaining position in relation to Seller, and (ii) Buyer is purchasing the Property for business, commercial, investment or other similar purpose.

      P.    <u>Time of Essence</u>. Time is of the essence with respect to all matters contained in this Agreement.

      Q.    <u>Further Acts</u>. The parties agree to cooperate with each other to effectuate this Agreement. In addition to the acts recited in this Agreement to be performed by Seller and Buyer, Seller and Buyer agree to perform or cause to be performed before or after the Closing any and all such further acts as may be reasonably necessary or appropriate to accomplish the intent and purposes of this Agreement and to consummate the transaction contemplated hereby.

***[Remainder of page intentionally left blank; Signatures on the following page]***

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

**BUYER**:

INDUSTRIAL REALTY GROUP, LLC,
a Nevada limited liability company

By: _____
John A. Mase
Chief Executive Officer

**SELLER**:

STANADYNE, LLC,
a Delaware limited liability company

By: _____
Name: Bradley Dietz
Title:   Wind Down Manager

30693219.5

S:\JAM\LICHTER\Windsor (Stanadyne), CT\Acquisition\PSA\Stanadyne - IRG PSA (final).doc

**EXHIBIT "A"**

**LEGAL DESCRIPTION**

**[To be inserted]**

**<u>EXHIBIT B</u>**

**Contract to be Assumed and Assigned**

| Counterparty | Contract Description | Cure Amount |
|---|---|---|
| Metromedia Company | Stock Purchase Agreement dated November 7, 1997 and any amendments or modifications related thereto | $0 |