## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re* | Chapter 11 |
| **STANADYNE LLC, *et al.*,**[1] | Case No. 23-10207 (TMH) |
| **Debtors.** | (Jointly Administered) |
| | **Ref. Docket Nos. 486 & 550** |

### NOTICE OF FILING OF PROPOSED SALE ORDER

**PLEASE TAKE NOTICE** that on August 2, 2023, the above-captioned debtors and debtors in possession (collectively, the "Debtors"), filed the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Abandon or, Alternatively Sell the Windsor Property and (II) for Related Relief* [Docket No. 486] (the "Motion") with the United States Bankruptcy Court for the District of Delaware.

**PLEASE TAKE FURTHER NOTICE** that on September 5, 2023, the Debtors filed the *Supplement to Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Abandon or, Alternatively Sell the Windsor Property and (II) for Related Relief* [Docket No. 550] (the "Supplement").[2]

**PLEASE TAKE FURTHER NOTICE** that attached hereto as **Exhibit A** is a proposed form of order approving the sale of the Windsor Property to Industrial Realty Group, LLC (the "Proposed Sale Order").

**PLEASE TAKE FURTHER NOTICE** that the Debtors intend to present the Proposed Sale Order at the hearing scheduled for September 26, 2023 at 1:00 p.m. (ET) (the "Sale Hearing"). The Debtors reserve all rights to modify the Proposed Sale Order at or prior to the Sale Hearing.

---

[1]   The debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are:  Stanadyne LLC (0378); Pure Power Technologies, Inc. (5202); Stanadyne PPT Holdings, Inc. (2594); and Stanadyne PPT Group Holdings, Inc. (1734).  The Debtors' headquarters are located at 405 White Street, Jacksonville, North Carolina 28546.

[2]   Capitalized terms used but not otherwise defined herein shall have the meaning given to them in the Motion or Supplement, as applicable.

Dated:  September 11, 2023
   Wilmington, Delaware

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

*/s/ Ashley E. Jacobs*
Michael R. Nestor (DE Bar No. 3526)
Andrew L. Magaziner (DE Bar No. 5426)
Ashley E. Jacobs (DE Bar No. 5635)
1000 North King Street
Rodney Square
Wilmington, Delaware 19801-6108
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253
Email:  mnestor@ycst.com
   amagaziner@ycst.com
   ajacobs@ycst.com

 -and-

Kathryn A. Coleman
Christopher Gartman
Jeffrey S. Margolin
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, NY 10004-1482
Telephone: (212) 837-6000
Facsimile:  (212) 422-4726
Email:  katie.coleman@hugheshubbard.com
   chris.gartman@hugheshubbard.com
   jeff.margolin@hugheshubbard.com

*Counsel for the Debtors*

30748250.2

## **EXHIBIT A**

**Proposed Sale Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re* | Chapter 11 |
| **STANADYNE LLC, *et al.*[1]** | Case No. 23-10207 (TMH) |
| **Debtors.** | (Jointly Administered) |
| | **Ref. Docket Nos. 486 & 550** |

### ORDER (I) AUTHORIZING THE SALE OF THE WINDSOR PROPERTY TO INDUSTRIAL REALTY GROUP, LLC FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS; (II) APPROVING THE PURCHASE AND SALE AGREEMENT; AND (III) GRANTING RELATED RELIEF

Upon consideration of the motion (the "Motion") of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), as supplemented by the *Supplement to Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Abandon or, Alternatively Sell the Windsor Property and (II) for Related Relief* (the "Supplement"),[2] for entry of an order, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, Bankruptcy Rules 2002, 6004 and 9014, and Local Rule 6004-1, authorizing the sale of the Windsor Property free and clear of liens, claims, encumbrances, and interests to Industrial Realty Group, LLC (the "Purchaser"), pursuant to the terms and conditions of that certain Purchase and Sale Agreement, a copy of which is attached hereto as **Exhibit 1** (the "Purchase Agreement"); and it appearing that due and sufficient notice of the Motion and the Supplement and the relief sought in connection therewith having been provided to all parties in interest; and it further appearing that no other or further

---

[1] The debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are:  Stanadyne LLC (0378); Pure Power Technologies, Inc. (5202); Stanadyne PPT Holdings, Inc. (2594); and Stanadyne PPT Group Holdings, Inc. (1734).  The Debtors' headquarters are located at 405 White Street, Jacksonville, North Carolina 28546.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion, the Supplement, or the Purchase Agreement (defined below), as applicable.

notice hereof is required; and this Court having reviewed and considered the Motion, the Supplement, and any objections thereto; and this Court having heard statements of counsel and the evidence presented at any hearing in support of the relief requested in the Motion and Supplement; and it appearing that the relief requested in the Motion and Supplement is in the best interest of the Debtors' estates, their creditors, and other parties in interest; and it further appearing that the legal and factual bases set forth in the Motion and Supplement establish just cause for the relief granted herein; and after due deliberation and sufficient cause therefor,

**THE COURT HEREBY FINDS THAT:**[3]

**Jurisdiction, Final Order, and Statutory Predicates**

A.       This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief sought in the Motion and Supplement are sections 105(a) and 363(b) of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 9014, and Local Rule 6004-1.

B.       To maximize the value of the Windsor Property while avoiding unnecessary administrative expense and delay, it is essential that the sale of the Windsor Property occur within the time constraints set forth in the Motion and the Purchase Agreement.  Time is of the essence in consummating the sale.  Therefore, notwithstanding Bankruptcy Rule 6004(h), this Court finds that there is no just reason for delay in the implementation of this Order, and that waiver of any applicable waiting period is appropriate.

---

[3]       Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate pursuant to Rule 7052 of the Bankruptcy Rules.

C.      The Windsor Property constitutes property of the Debtors' estates, and title thereto is vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code.

### Notice of Hearing

D.      As evidenced by the affidavits of service previously filed with this Court and the record herein, and based on the representations of counsel, due, proper, timely, adequate, and sufficient notice of the Motion, the Supplement, the sale and the Hearing (as defined below) were provided as set forth in the Motion and Supplement.  Such notice constitutes good and sufficient notice of the Motion, the Supplement, the sale, and the hearing on the Motion and Supplement (the "Hearing"), if any, and no other or further notice of the Motion, the Supplement, the sale, or the Hearing is required.

E.      Notice has been provided to, and a reasonable opportunity to object or to be heard regarding the Motion, the Supplement, the sale, and the Hearing has been afforded to, all interested persons and entities, including, among others:  (i) the Office of the United States Trustee for the District of Delaware; (ii) counsel to the Official Committee of Unsecured Creditors; (iii) counsel for the Prepetition Agent for the Prepetition Secured Lenders; (iv) the Connecticut Department of Energy and Environmental Protection; (v) the Town of Windsor; (vi) any entity known to have expressed an interest during the past six months in acquiring the Windsor Property; (vii) any party asserting a lien on the Windsor Property; and (viii) those parties which, as of the filing of the Motion, had filed formal requests for notice in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002.

**Sound Business Judgment**

F.      The Debtors have articulated good and sufficient reasons for this Court to grant the relief requested in the Motion regarding the sale, the approval of the Purchase Agreement, and all other matters related to the sale or the Motion.  Such business reasons include, but are not limited to, the facts that (i) the Purchase Agreement constitutes the highest or best offer for the Windsor Property, (ii) no other person or entity or group of persons or entities has offered to purchase the Windsor Property for greater economic value to the Debtors' estates than the Purchaser, and (iii) the sale pursuant to the terms of the Purchase Agreement presents the best opportunity to realize the value of the Windsor Property.  For these reasons, the relief provided for herein is within the reasonable business judgment of the Debtors, and is in the best interests of the Debtors, their estates and creditors, and other parties in interest.

G.      The Debtors have demonstrated a good, sufficient, and sound business purpose, and justification and compelling circumstances, for entry into the Purchase Agreement and the consummation of the sale pursuant to section 363(b) of the Bankruptcy Code, in that the immediate consummation of the sale to the Purchaser is necessary and appropriate to maximize the value to the Debtors' estates and, thereby, is in the best interests of the Debtors, their estates, their creditors, and other parties in interest.

**Good Faith of Purchaser**

H.      The Purchaser is not an "insider" of any of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code.  The Purchase Agreement was negotiated, proposed, and entered into by the Debtors and the Purchaser without collusion, in good faith, from arm's length bargaining positions, and is substantively and procedurally fair to all parties.  The Purchaser is, therefore, a good faith purchaser within the meaning of section 363(m) of the

Bankruptcy Code and, therefore, entitled to the protections and immunities afforded thereby. Neither the Debtors nor the Purchaser have engaged in any conduct that would prevent the application of section 363(m) of the Bankruptcy Code or cause the application of, or implicate, section 363(n) of the Bankruptcy Code to the Purchase Agreement, or to otherwise prevent the consummation of the sale.  In the absence of a stay pending appeal, the Purchaser will be acting in good faith within the meaning of section 363(m) of the Bankruptcy Code in closing the transactions set forth in the Purchase Agreement at any time after entry of this Order.

## Highest and Best Offer

I.      The offer of the Purchaser, upon the terms and conditions set forth in the Purchase Agreement:  (i) is the highest or otherwise best offer received by the Debtors with respect to the Windsor Property; (ii) is fair and reasonable; (iii) is in the best interest of the Debtors, their estates, and their creditors; and (iv) constitutes full, fair, and adequate consideration and reasonably equivalent value for the Windsor Property under the Bankruptcy Code and under the laws of the United States, any state, territory, or possession.

## Validity and Free and Clear Nature of Transfers

J.      The transfer of the Windsor Property to the Purchaser pursuant to the Purchase Agreement will be, as of the closing, a legal, valid, and effective transfer of good and marketable title of the Windsor Property, and will vest the Purchaser with all right, title, and interest of the Debtors to the Windsor Property, free and clear of all liens, claims, encumbrances, and interests of any kind or nature, on an "as is, where is" basis, as set forth in the Purchase Agreement, arising or relating thereto at any time prior to the closing, except as otherwise provided for under the Purchase Agreement, because one or more of the standards set forth in section 363(f) of the Bankruptcy Code have been satisfied.

30699360.3

K.    The Debtors may sell the Windsor Property free and clear of all liens, claims, encumbrances, and interests, except as otherwise provided for under the Purchase Agreement, because, in each case, one or more of the standards set forth in section 363(f)(1)–(5) of the Bankruptcy Code has been satisfied.  Those non-Debtor parties with interests in the Windsor Property which did not object, or which withdrew their objections, to the sale, the Motion, or the Supplement are deemed to have consented to the sale pursuant to sections 363(f)(2) and 365 of the Bankruptcy Code.  Those non-Debtor parties with interests in the Windsor Property which did object fall within one or more of the other subsections of sections 363(f) and 365 of the Bankruptcy Code, and such objections are expressly overruled.  Accordingly, all persons having such liens, claims, encumbrances, and interests of any kind or nature whatsoever against or in any of the Windsor Property, except as otherwise provided for under the Purchase Agreement, shall be forever barred, estopped, and permanently enjoined from pursuing or asserting such liens, claims, encumbrances, and interests against the Purchaser or any of its respective assets, property, successors, or assigns.

L.    Except as otherwise provided for under the Purchase Agreement, the transfer of the Windsor Property to the Purchaser will not subject the Purchaser to any liability for claims against the Debtors by reason of such transfers under the laws of the United States, any state, territory, or possession thereof.

M.    The Debtors have demonstrated (i) good, sufficient, and sound business purposes and justifications and (ii) compelling circumstances for the sale pursuant to section 363(b) of the Bankruptcy Code in that, among other things, absent the sale the value of the Debtors' estates would be harmed.

**Assigned Contract**

N.      As set forth herein, and subject only to payment of cure costs, all requirements and conditions under the Bankruptcy Code and other applicable law for the Debtors' assumption, assignment, and sale to the Purchaser of the contract identified on <u>Exhibit B</u> to the Supplement (the "<u>Assigned Contract</u>") have been satisfied.    The Debtors have demonstrated that the assumption, assignment, and sale of the Assigned Contract contemplated by the Purchase Agreement is an exercise of their sound business judgment and is in the best interests of the Debtors, their estates and creditors, and other parties in interest.    The Assigned Contract to be assumed, assigned, and sold to the Purchaser under the terms of the Purchase Agreement is an integral part of the Purchase Agreement and the sale of the Windsor Property, and, accordingly, such assumption, assignment, and sale is reasonable and enhances the value of the Debtors' estates.    The Assigned Contract is in full force and effect and has not been rejected, and the Debtors' time to assume or reject the Assigned Contract has not otherwise expired.    The cure cost listed on <u>Exhibit B</u> to the supplement (the "<u>Cure Cost</u>") shall constitute the cure cost for the Assigned Contract, and payment thereof is sufficient for the Debtors to comply fully with the requirements of section 365(b) of the Bankruptcy Code.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

**General Provisions**

1.      The Motion is hereby GRANTED as set forth herein.

2.      Any and all objections to the Motion or the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are hereby overruled on the merits.

30699360.3

## Approval of the Purchase Agreement

3.      The Purchase Agreement and the transactions contemplated thereby shall be, and hereby are, approved.

4.      The consideration provided by the Purchaser for the Windsor Property under the Purchase Agreement is fair and reasonable and shall be deemed for all purposes to constitute value under the Bankruptcy Code or any other applicable law.

5.      Pursuant to sections 363(b) and (f) of the Bankruptcy Code, the Debtors are authorized and empowered to take any and all actions necessary or appropriate to: (a) consummate the sale of the Windsor Property to the Purchaser pursuant to, and in accordance with, the terms and conditions of the Purchase Agreement; (b) close the sale as contemplated in the Purchase Agreement and this Order; and (c) execute and deliver, perform under, consummate, implement, and close fully the Purchase Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Purchase Agreement and the sale, all without further order of this Court.

## Transfer of the Windsor Property

6.      The Debtors are authorized to sell the Windsor Property to the Purchaser upon the terms and conditions set forth in the Purchase Agreement and, upon consummation of the transaction contemplated by the Purchase Agreement, the Windsor Property shall be transferred to the Purchaser on an "as is, where is" basis as provided for under the Purchase Agreement and free and clear of any liens, claims, encumbrances, and interests (collectively, the "Interests") on the Windsor Property other than any permitted exceptions provided for in the Purchase Agreement; provided, that any such Interests on the Windsor Property shall attach to the proceeds of the sale with the same priority, validity, force and effect as they attached to the

Windsor Property immediately before the closing date of the sale (such closing, the "Closing" and such date, the "Closing Date").

7.      The Purchaser shall close on the sale of the Windsor Property on or before the Closing Date, in accordance with the terms and conditions of the Purchase Agreement.

8.      The transfer of the Windsor Property to the Purchaser pursuant to the Purchase Agreement constitutes a legal, valid, and effective transfer of good and marketable title of the Windsor Property, and vests, or will vest, the Purchaser with all right, title, and interest to the Windsor Property, free and clear of all interests, except as otherwise expressly stated as obligations of the Purchaser under the Purchase Agreement.  All entities holding interests or claims of any kind or nature whatsoever against the Debtors or the Windsor Property are hereby and forever barred, estopped, and permanently enjoined from asserting against the Purchaser, its successors or assigns, its property, or the Windsor Property any claim, interest or liability existing, accrued, or arising prior to the Closing.

9.      On the Closing Date, and subject to the terms and conditions of the Purchase Agreement, this Order shall be construed and shall constitute for any and all purposes a full and complete assignment, conveyance, and transfer of the Windsor Property or a bill of sale transferring good and marketable title of the Windsor Property to Purchaser.  This Order is and shall be effective as a determination that, on the Closing Date, all Interests of any kind or nature whatsoever existing as to the Windsor Property prior to the Closing Date, other than any permitted exceptions provided for in the Purchase Agreement, or as otherwise provided in this Order, shall have been unconditionally released, discharged, and terminated, and that the conveyances described herein have been affected.  This Order is and shall be binding upon and govern the acts of all persons, including, without limitation, all filing agents, filing officers, title

30699360.3

agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other persons who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement. Each and every federal, state, and local governmental agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement. A certified copy of this Order may be: (a) filed with the appropriate clerk; (b) recorded with the recorder; or (c) filed or recorded with any other governmental agency to act to cancel any Interests against the Windsor Property, other than any permitted exceptions provided for in the Purchase Agreement.

10. If any person or entity which has filed statements or other documents or agreements evidencing Interests on or in all or any portion of the Windsor Property (other than with respect to any permitted exceptions provided for in the Purchase Agreement) has not delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all Interests which such person or entity has or may assert with respect to all or a portion of the Windsor Property, the Debtors and the Purchaser are authorized to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with

respect to the Windsor Property; provided that, notwithstanding the foregoing, the provisions of this Order authorizing the transfer of the Windsor Property free and clear of all Interests (except only for any permitted exceptions provided for in the Purchase Agreement) shall be self-executing, and it shall not be, or be deemed, necessary for any person or entity to execute or file releases, termination statements, assignments, consents, or other instruments in order for the provisions of this Order to be implemented.

11.    Except with respect to any permitted exceptions set forth in the Purchase Agreement, or as otherwise permitted by the Purchase Agreement or this Order, all persons and entities, including, without limitation, all debt security holders, equity security holders, governmental, tax, and regulatory authorities, lenders, trade creditors, litigation claimants, and other creditors, holding interests of any kind or nature whatsoever against, or in, all or any portion of the Windsor Property, arising under, out of, in connection with, or in any way relating to, the Debtors, the Windsor Property, the operation of the Debtors' business prior to the Closing Date, or the transfer of the Windsor Property to Purchaser, are hereby forever barred, estopped, and permanently enjoined from asserting against Purchaser, or any of its affiliates, successors, or assigns, or their property or the Windsor Property, such persons' or entities' interests in and to the Windsor Property, including, without limitation, the following actions against the Purchaser or its affiliates, or their successors, assets, or properties:  (a) commencing or continuing in any manner any action or other proceeding; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or other order; (c) creating, perfecting, or enforcing any lien or other claim; (d) asserting any set off, right of subrogation, or recoupment of any kind; (e) commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the provisions of this Order or any other order of this Court, or the agreements

30699360.3

or actions contemplated or taken in respect thereof; or (f) revoking, terminating, or failing or refusing to transfer or renew any license, permit, or authorization to operate upon the Windsor Property or conduct any of the business operated upon the Windsor Property.

12.     Neither the Purchaser nor any of its affiliates are successors to the Debtors or their estates by reason of any theory of law or equity, and neither the Purchaser nor any of its affiliates shall assume or in any way be responsible for any liability or obligation of any of the Debtors and/or their estates, except as otherwise expressly provided in the Purchase Agreement.  The Purchaser (i) has not, de facto or otherwise, merged with or into one or more of the Debtors, (ii) is not a continuation or substantial continuation, and is not holding itself out as mere continuations, of any of the Debtors or of their respective estates, businesses or operations, or any enterprise of the Debtors, and (iii) do not have a common identity of incorporators, directors, or equity holders with any of the Debtors.

**Assumption, Assignment, and Sale of Assumed Contract**

13.     Pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code, and subject to and conditioned upon the occurrence of the Closing, the Debtors' assumption, assignment and sale to the Purchaser, and the Purchaser's assumption and purchase on the terms set forth in the Purchase Agreement of the Assigned Contract, is hereby approved in its entirety, and the requirements of section 363 and 365 of the Bankruptcy Code with respect thereto are hereby deemed satisfied.  The Debtors are hereby authorized in accordance with sections 105(a), 363, and 365 of the Bankruptcy Code to (a) assume, assign, and sell to the Purchaser, effective as of the Closing (or thereafter pursuant to the Purchase Agreement), the Assigned Contract free and clear of all encumbrances of any kind or nature whatsoever and (b) execute and deliver to the

Purchaser such documents or other instruments as may be necessary or reasonably requested by the Purchaser to assign and transfer the Assigned Contract to the Purchaser.

14.     Upon the date that the Assigned Contract is assumed, assigned, and sold, the Purchaser shall, in accordance with sections 363 and 365 of the Bankruptcy Code, be fully and irrevocably vested with all right, title, and interest in, to, and under such Assigned Contract.  The Debtors shall cooperate with and take all actions reasonably requested by the Purchaser to effectuate the foregoing.  The Purchaser shall likewise cooperate with the Debtors.

15.     The Assigned Contract shall be transferred to, and remain in full force and effect for the benefit of, the Purchaser notwithstanding any provision in any such Assigned Contract (including those of the type described in sections 365(b)(2) and 365(f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer or requires any non-debtor counterparty to consent thereto.

16.     Pursuant to section 365(f) of the Bankruptcy Code, the assignment and sale by the Debtors to the Purchaser of the Assigned Contract shall not be a default thereunder.  Any provisions in the Assigned Contract that prohibit or condition the assignment and sale of such Assigned Contract or allow the non-debtor counterparty to such Assigned Contract to terminate, recapture, impose any penalty or condition on renewal or extension, purport to require the consent of any non-debtor counterparty, or modify any term or condition, in each case upon the assignment and sale of such Assigned Contract, constitute unenforceable anti-assignment provisions that are void and of no force and effect with respect to the assignment and sale of the Assigned Contract to the Purchaser.  The Assigned Contract shall remain in full force and effect following its assignment and sale to the Purchaser, without existing default(s), subject only to payment by the Purchaser of the Cure Cost.

30699360.3

17.     To the extent there is an unresolved objection with respect to the Assigned Contract, the Assigned Contract shall not be assumed, assigned, and sold to the Purchaser unless and until all such objections relating to such Assigned Contract are withdrawn or resolved by order of the Court or the non-debtor counterparty consents.

18.     The Cure Cost for the Assigned Contract is $0.  The non-debtor counterparty to the Assigned Contract shall be enjoined from taking any action against the Purchaser or the purchased assets with respect to any claim for cure.  The Debtors and the Purchaser shall not have any liabilities to the non-debtor counterparty to the Assigned Contract.

19.     If the non-debtor counterparty to the Assigned Contract has not filed with the Court, and served on the parties entitled to notice thereof, an objection to the assumption, assignment, and sale of the Assigned Contract by the deadline specified in the Supplement, such non-debtor counterparty is deemed to have consented to such assumption, assignment, and sale.

20.     As of the date of assignment and sale of the Assigned Contract to the Purchaser, the Purchaser shall be deemed to be substituted for the applicable Debtor as a party to the Assigned Contract, and the Debtors shall be relieved, pursuant to section 363(k) of the Bankruptcy Code, from any liability under the Assigned Contract arising from and after the date of the assignment and sale.

21.     The non-debtor counterparty to the Assigned Contract shall cooperate and expeditiously execute and deliver, upon the reasonable request of the Purchaser, and shall not charge the Purchaser for, any instruments, applications, consents, or other documents that may be required or requested by any public or quasi-public authority or other entity to effectuate the applicable transfers in connection with the sale.

30699360.3

22.     Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, the non-debtor counterparty to the Assigned Contract is forever barred and permanently enjoined from raising or asserting against the Debtors or the Purchaser any assignment fee, rent acceleration, rent increase on account of assignment, default, breach, claim, pecuniary loss, or condition to assignment arising under or relating to the Assigned Contract by reason of the assumption, assignment, and/or sale of such Assigned Contract.

23.     Notwithstanding any term of the Assigned Contract to the contrary, any extension or renewal options or other rights contained in such Assigned Contract that purport to be personal only, or exercisable only by, the Debtor(s), a named entity, or an entity operating under a specific trade name may, in each case, be freely exercised to their full extent by the Purchaser, subject to the other applicable terms of the Assigned Contract.  Any extension or renewal options in connection with any Assigned Contract that the applicable Debtor(s) have sought to exercise prior to the entry of this Order are deemed to have been timely and validly exercised by the Purchaser.

### Additional Provisions

24.     Pursuant to section 363(m) of the Bankruptcy Code, the Purchaser shall be, and hereby is, deemed to have purchased the Windsor Property in "good faith."

25.     The Debtors are authorized to take such actions as are necessary to implement the terms of this Order.

26.     Notwithstanding the provisions of Bankruptcy Rule 6004 or otherwise, this Order shall be effective and enforceable immediately upon entry, and the 14-day stay provided in such rules is hereby expressly waived and shall not apply.

27.     The terms and provisions of this Order shall be binding in all respects upon the Debtors, their estates, all creditors, officers, directors, advisors, members, managers, and all holders of equity in the Debtors, all holders of any claim(s) (whether known or unknown) against the Debtors, any holders of liens, claims, encumbrances, or interest against or on all or any portion of the Windsor Property, the Purchaser, and all successors and assigns of the Purchaser, and any trustees, if any, subsequently appointed in the Chapter 11 Cases or upon a conversion to chapter 7 under the Bankruptcy Code of the Chapter 11 Cases.

28.     Nothing contained in any chapter 11 plan confirmed in the Chapter 11 Cases, an order confirming a chapter 11 plan in these Chapter 11 Cases, any order approving the wind down or dismissal of the Chapter 11 Cases, or any order entered upon the conversion of the Chapter 11 Cases to one or more cases under chapter 7 of the Bankruptcy Code or otherwise shall conflict with or derogate from the provisions of the Purchase Agreement or this Order.  In the event there is a conflict between the terms of any subsequent chapter 11 plan or any order to be entered in the Chapter 11 Cases (including any order entered after conversion of the Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code), the terms of this Order shall control.

29.     The Purchase Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto, in a writing signed by such parties, and in accordance with the terms thereof, without further order of the Court, provided that such modification, amendment, or supplement does not have a material adverse effect on the Debtors' estates.

30.     This Court shall retain jurisdiction over the parties for the purpose of enforcing the terms and provisions of this Order.

30699360.3

**<u>EXHIBIT 1</u>**

**Purchase Agreement**

## PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT ("**Agreement**"), dated August 28, 2023, for reference purposes only, is entered into by and between STANADYNE LLC, a Delaware limited liability company ("**Seller**"), and INDUSTRIAL REALTY GROUP, LLC, a Nevada limited liability company ("**Buyer**"), with reference to the following facts:

### RECITALS:

A.        Seller filed bankruptcy in the United States Bankruptcy Court for the District of Delaware (the "**Court**").  In connection therewith, and under the supervision of the Court, Seller is seeking to sell certain of its assets.  Seller is the fee simple owner of the Property, as hereinafter defined, consisting of approximately 52.71 acres of real property improved with one or more buildings containing warehouse/industrial/office space and located at 90-92 Deerfield Road, Windsor, CT 06095.

B.        Buyer desires to bid on the Property.  In the event that Buyer's bid is accepted by Seller and approved by the Court, Buyer wishes to purchase the Property from Seller and Seller is willing to sell the Property to Buyer on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.        **Purchase and Sale**.

Seller agrees to sell the Property to Buyer and Buyer agrees to purchase the Property from Seller, all on the terms, covenants and conditions set forth in this Agreement.  The "**Property**" includes the following:

A.        Land.  The land ("**Land**") consisting of approximately 52.71 acres and located at 90-92 Deerfield Road, Windsor, CT 06095 and legally described as set forth on Exhibit "A" attached to this Agreement and made a part hereof, together with all of Seller's right, title and interest in and to all easements, utility reservations, mineral rights, rights of way, strips of land, tenements, hereditaments, privileges, licenses, appurtenances, reversions, remainders in any way belonging, remaining or appertaining thereto;

B.        Improvements.  The buildings, and all other structures and improvements (collectively, "**Improvements**") now situated on the Land including, but not limited to, fixtures and equipment, elevators, heating, air conditioning, plumbing, mechanical, electrical, drainage, security, life safety and fire alarm systems, and their component parts;

C.        Personal Property.  All of Seller's interest in fixtures, furnishings, equipment, appliances, machinery, tools and other personal property of every kind and character (collectively, "**Personal Property**") owned by Seller and currently attached to, located on or used in connection with the ownership, management, maintenance and operation of the Improvements and the Land;

and

D.    <u>Intangible Property</u>.    Any and all right, title and interest of Seller in all (i) development rights and entitlements and other intangible property owned by Seller (including without limitation, any environmental or other indemnities); (ii) guaranties and warranties issued to Seller and with respect to the Improvements or the Personal Property; and (iii) any reports, studies, surveys and other comparable analysis, depictions or examinations of the Land or the Improvements, or pertaining to the Land, the Improvements or the Personal Property or use thereof and which in anyway relates to the ownership, management or operation of the Property (collectively, "**Intangible Property**").  Seller agrees to assign to Buyer any and all Intangible Property at the Closing (defined herein).

**2.    <u>Purchase Price</u>.**

The purchase price for the Property shall be $1.00 ("**Purchase Price**").

**3.    <u>Payment of Purchase Price</u>.**

The Purchase Price shall be paid to Seller by Buyer as follows:

A.    <u>Operational Expenditure Fee</u>.  Upon payment of the Operational Expenditure Fee, Seller will postpone the abandonment hearing with respect to the Property to a date that is after both (i) the date the Review Period expires, as defined in <u>Paragraph 5.B.</u> and (ii) the Closing Date, as defined in <u>Paragraph 10</u>.  On August 29, 2023, Buyer shall pay to the Seller as directed by the Wind Down Officer the sum of $65,000.00 ("**Operational Expenditure Fee**").  The Operational Expenditure Fee shall be used to cover ordinary and customary operational expenditures from the date of execution of this Agreement until the Closing Date.  Buyer shall be responsible for all actual ordinary and customary operational expenditures during the foregoing period that exceed the Operational Expenditure Fee ("**Excess Operational Costs**").  The Operational Expenditure Fee as well as any Excess Operational Costs shall be non-refundable.

B.    <u>Balance of Purchase Price</u>.  Buyer shall pay the balance of the Purchase Price, plus or minus Buyer's share of closing costs, prorations and other charges or amounts payable pursuant to this Agreement, to Seller in immediately available funds at the Closing Date.

**4.    <u>Title</u>.**

A.    <u>Title Policy</u>.  Seller shall convey good and clear record and marketable title to the Property to Buyer by warranty deed, subject only to the following exceptions to title ("**Permitted Exceptions**"):

(1)    A lien to secure payment of real estate taxes and assessments not yet due and payable; and

(2)    Such other exceptions to title as may be approved by Buyer pursuant to the provisions of <u>Paragraph 4.B.</u>

Any mortgage or other monetary liens on the Property ("**Monetary Liens**") shall be discharged and paid by Seller at Closing. On the Closing Date (as defined in <u>Paragraph 10</u>), First American Title Insurance Company, 385 E. Colorado Blvd. Suite 205, Pasadena, CA 91101 ("**Title Company**") shall issue to Buyer its ALTA extended coverage owner's policy of title insurance ("**Owner's Policy**") in the face amount of the Purchase Price, showing title to the Property vested of record in Buyer, subject only to the Permitted Exceptions.

        B.    <u>Survey and Title Documents</u>.  Within five (5) days after the full execution of this Agreement, Buyer shall order a current ALTA survey covering the Land and all improvements on the Land and otherwise in form sufficient to permit deletion of the survey exception from the Owner's Policy ("**Survey**") and a preliminary title report or title commitment for the issuance of the Owner's Policy ("**Title Report**") together with legible copies of all title exception documents shown thereon ("**Title Documents**"). Buyer's approval of exceptions to title and the Survey shall be a condition precedent to Buyer's obligation to purchase the Property. Prior to the expiration of the Review Period, as defined in <u>Paragraph 5.B.</u>, below, Buyer shall furnish to Seller a written list of any objections to matters shown on the Title Report or the Survey, stating the items to which Buyer objects and the reasons therefor ("**Disapproval Notice**"). Seller shall then have fourteen (14) days after the date of such Disapproval Notice to make such arrangements or take such steps to satisfy Buyer's objection(s) ("**Title Cure Period**"). If (i) Seller is unable to remove or correct such objection(s) within the Title Cure Period and (ii) Buyer does not waive, in writing, its disapproval, then this Agreement shall terminate and the parties shall have no further obligations to each other except for such provisions that specifically survive the termination of this Agreement. If Buyer fails to timely give the Disapproval Notice as set forth herein, the condition in this <u>Paragraph 4.B</u> shall be deemed satisfied, and Buyer shall be deemed to have accepted all matters contained in the Title Report and the Survey.

**5.**    <u>**Inspection**</u>.

        A.    <u>Property Information</u>.  Seller shall use its best efforts to obtain customary due diligence materials specifically requested by Buyer and in the possession of Stanadyne Operating Company LLC or its affiliates ("<u>Stanadyne Operating</u>") from Stanadyne Operating.

        B.    <u>Review Period</u>.  During the period commencing with the date of execution of this Agreement and expiring thirty (30) days thereafter ("**Review Period**"), Buyer shall have the opportunity to review the Property Information and perform such investigations, inquiries, and feasibility studies, as it deems appropriate to decide whether the Property is acceptable to Buyer. All costs and expenses in connection with any such study or investigation shall be borne solely by Buyer. Buyer's obligation to purchase the Property as herein provided shall be subject to Buyer's approval of the Property in its sole discretion. Seller shall provide access to the Property to Buyer and Buyer's agents and consultants during normal business hours for the purpose of conducting any such investigations, inquiries or feasibility studies. Buyer shall indemnify and hold Seller harmless from and against all liability, claims, demands, damages or costs, including reasonable attorneys' fees, arising from or connected with Buyer's inspection of the Property. If before the end of the Review Period Buyer sends written notice to Seller that the Property is acceptable to Buyer ("**Acceptance Notice**"), Buyer shall be obligated to close the transaction as provided herein. If Buyer fails to send an Acceptance Notice to Seller before the end of the Review Period, Buyer shall

be deemed to have decided that the Property is not acceptable to Buyer, the obligation of Seller to sell and Buyer to buy the Property shall automatically terminate.

C.    <u>Sale Order</u>.  During the Review Period, Buyer and Seller shall work in good faith to agree upon a mutually acceptable form of a sale order (the "**Sale Order**") to be entered by the Court, with such changes as are required by the Court to which Seller and Buyer have consented (such consent not to be unreasonably withheld, delayed or conditioned), confirming Seller's title to the Property free and clear of liens and encumbrances, and Seller's authority to sell the Property pursuant to this Agreement.

D.    <u>Environmental Matters</u>.  Buyer and Seller shall work in good faith in connection with compliance with the Connecticut Transfer Act with respect to the transfer of the Property, it being understood that Seller shall have no liability post-Closing with respect to any remaining remediation or compliance work with the Connecticut Department of Energy and Environmental Protection relating to the Property.  Seller will assign to Buyer, to the extent assignable, any existing environmental indemnities with respect to the Property, or rights that Seller has based upon the Connecticut Transfer Act, to the extent transferrable.

**6.    <u>As-Is Sale</u>**.  Buyer will purchase the Property in an "AS-IS" condition.

**7.    <u>Reserved</u>**.

**8.    <u>Conditions Precedent to Buyer's Obligation</u>**.

The obligation of Buyer to buy the Property shall be subject to full satisfaction of the following conditions precedent:

A.    Buyer's approval of the conditions of title in accordance with <u>Paragraph 4</u>.

B.    Seller's postponement of the abandonment hearing with respect to the Property.

C.    The Title Company's irrevocable commitment to issue the Owner's Policy in the form provided in <u>Paragraph 4.A</u>.

D.    Buyer's approval of the Property within the Review Period in accordance with <u>Paragraph 5</u>.

E.    No material adverse change in the Property before the Closing Date.

F.    The truth and accuracy of each representation and warranty of Seller contained herein as if made on and as of the Closing Date.

G.    The Court shall have issued the Sale Order, after notice and opportunity for a hearing, which Sale Order shall be a Final Order in full force and effect and will not have been stayed or vacated.

Buyer may waive any of the conditions precedent to Buyer's obligation to perform under this

30693219.5

S:\JAM\LICHTER\Windsor (Stanadyne), CT\Acquisition\PSA\Stanadyne - IRG PSA (final).doc

Agreement. If the conditions set forth in <u>Paragraphs 8.A</u> through <u>8.G</u> are not satisfied or waived by Buyer, then this Agreement shall terminate, and the parties shall have no further obligations to each other except for such provisions that specifically survive the termination of this Agreement.

**9.**   <u>**Conditions Precedent to Seller's Obligation to Close**</u>.

The obligation of Seller to sell the Property shall be subject to timely satisfaction or waiver of the following conditions precedent:

A.   Buyer's timely payment to the Seller of the Operational Expenditure Fee and any Excess Operational Costs.

B.   Buyer's timely delivery of the balance of the Purchase Price and any other funds required of Buyer.

C.   The truth and accuracy of each representation and warranty of Buyer contained herein as if made on and as of the Closing Date.

D.   Buyer shall not then be in default of any covenant or agreement to be performed by Buyer under this Agreement.

E.   The Court shall have issued the Sale Order, after notice and opportunity for a hearing, which Sale Order shall be a Final Order in full force and effect and will not have been stayed or vacated.

Seller may waive any of the conditions precedent to Seller's obligation to perform under this Agreement. If the conditions set forth in <u>Paragraphs 9.A</u> through <u>9.E</u> are not satisfied or waived by Seller, then this Agreement shall terminate, the Operational Expenditure Fee and any Excess Operational Costs shall be paid to Seller to the extent not already paid, and the parties shall have no further obligations to each other except for such provisions that specifically survive the termination of this Agreement.

**10.**   <u>**Closing**</u>.

The sale and purchase of the Property provided herein shall be consummated at a closing ("**Closing**"), which shall be held on the Closing Date at the offices of Young Conaway Stargatt & Taylor, LLP or at such other time and place as Seller and Buyer may agree upon. As used herein, "**Closing Date**" means five (5) days after the expiration of the Review Period, or such earlier date as Seller and Buyer may agree upon. At the Closing, Seller and Buyer shall deliver to the other party such documents as are typical and customary for transactions involving properties of similar size, type and location as the Property, and as may be necessary or appropriate to consummate the transactions contemplated in this Agreement.

**11.**   <u>**Closing Costs and Prorations**</u>.

Seller shall pay for Seller's attorneys' fees and their portion of the prorated property taxes, as detailed below. Buyer shall pay the escrow fees, the premium for Owner's Policy, cost of the Survey, realty transfer taxes and any special title endorsements requested by Buyer, the recording

fees, Buyer's attorneys' fees, and any other costs of Buyer hereunder.  The unused portion of any deposits or prepayments held in connection with the Property shall be returned to the Seller.  Utility charges shall be prorated as of the Closing Date.  Real property taxes shall be prorated as of the Closing Date based upon the latest tax bill available.  Buyer and Seller agree to prorate as of the Closing Date any taxes assessed against the Property by a supplemental bill levied by reason of an event occurring prior to the Closing.  It is the intent of the parties that all property taxes attributable to the period prior to Closing be the responsibility of Seller and all property taxes attributable to the period after Closing be the responsibility of Buyer.  All prorations as of the Closing Date shall be made as of 12:01 a.m. on the Closing Date.

**12.    <u>Representations and Warranties by Seller</u>**.

Effective as of the date of this Agreement and as of the Closing Date, and after receipt of approval of the Bankruptcy Court after notice and an opportunity for hearing, Seller hereby represents and warrants to Buyer, which representations and warranties shall be accurate and true in all material respects on the Closing Date as if made on the Closing Date, and acknowledges that Buyer is relying upon such representations and warranties in purchasing the Property, as follows:

A.    Seller is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Delaware.  Seller has full power and authority to execute and deliver this Agreement and all of Seller's closing documents, to engage in the transactions contemplated by this Agreement, and to perform and observe all of Seller's obligations under this Agreement.

B.    Seller and the persons signing this Agreement for Seller have the authority and power to sign this Agreement, to perform all of Seller's obligations under this Agreement and to sign and deliver all of the documents required to be signed and delivered by Seller without the consent or approval of any other person other than the Court.

C.    This Agreement has been duly executed and delivered by Seller and is a legal, valid and binding instrument, enforceable against Seller in accordance with its terms, except as such enforceability may be limited by (i) bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally, and (ii) general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

D.    Seller has and on the Closing Date will have good and marketable fee simple title to the Property; Seller shall not do, commit, or allow to be done, anything that would have a material adverse effect on Seller's title to or condition of the Property.

E.    Seller's entry into this Agreement is subject to Court approval, after notice and opportunity for a hearing.

F.    Seller is not a "foreign person" and is not subject to withholding within the meaning of 26 U.S.C. § 1445.  Seller shall execute and deliver to Buyer through and at the Close of escrow a non-foreign affidavit in form acceptable to Buyer.

13.    **Representations and Warranties by Buyer**.

Effective as of the date of this Agreement and as of the Closing Date, Buyer hereby represents and warrants to Seller, which representations and warranties shall be accurate and true in all material respects on the Closing Date as if made on the Closing Date, and acknowledges that Seller is relying upon such representations and warranties in purchasing the Property, as follows:

A.    Buyer is a limited liability company, duly organized, validly existing, and in good standing under the laws of the State of Nevada.  Buyer has full power and authority to execute and deliver this Agreement and all of Buyer's closing documents, to engage in the transactions contemplated by this Agreement, and to perform and observe all of Buyer's obligations under this Agreement.

B.    Buyer and the persons signing this Agreement for Buyer have the authority and power to sign this Agreement, to perform all of Buyer's obligations under this Agreement and to sign and deliver all of the documents required to be signed and delivered by Buyer without the consent or approval of any other person.

C.    This Agreement has been duly executed and delivered by Buyer and is a legal, valid and binding instrument, enforceable against Buyer in accordance with its terms, except as such enforceability may be limited by (i) bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally, and (ii) general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

14.    **Destruction of Property**.

If the Property is materially damaged or destroyed between the date of this Agreement and the Closing Date, Buyer shall have the right, exercisable in Buyer's sole discretion, to:

A.    Terminate this Agreement and neither party shall have any further obligation or liability to the other;

B.    Accept the Property in its then condition, in which event there shall be credited against the Purchase Price any deductible which is payable under all applicable insurance policies which provide insurance coverage for the Property or Improvements and all proceeds of insurance payable to Seller by reason of such damage shall be assigned and paid by Seller to Buyer; or

C.    Notify Seller of Buyer's intent to purchase the Property and direct Seller to correct the damage or destruction to the Property, in which event Seller shall diligently correct such matters at Seller's sole expense, unless such damage or destruction can't reasonably be completed within six (6) months after the damage or destruction.  If Buyer elects to proceed pursuant to this Paragraph 14.C, the Closing Date shall be extended for such time as reasonably necessary to allow for completion of such repairs.  If Seller does not correct the matters within that time, Buyer shall still be entitled to exercise any other option available hereunder.  Following notification of the existence of any damage or destruction, Buyer's failure to affirmatively elect shall be considered an election to terminate this Agreement under Paragraph 14.A above.

15. **Condemnation**.

        If, prior to the Closing Date, all or a material portion of the Property or the means of ingress or egress thereon is taken by eminent domain (or is the subject of a pending or contemplated taking which has not been consummated), including, but not limited to, any land donation or public space requirements or encumbrances on the Property requiring contributions by Seller, Seller shall promptly notify Buyer of such fact. Buyer shall then have the option to terminate this Agreement upon notice to Seller given not later than twenty (20) days after receipt of Seller's notice. If Buyer elects to terminate this Agreement and the parties shall have no further obligations to each other except for such provisions that specifically survive the termination of this Agreement. If Buyer does not elect to terminate this Agreement, Seller shall assign and turn over to Buyer, and Buyer shall be entitled to receive and keep, all awards for the taking by eminent domain and shall be obligated to proceed to Closing with no reduction in the Purchase Price.

16. **Reserved**.

17. **Specific Performance**.

        A.      If Buyer fails to consummate the purchase of the Property as and when contemplated by this Agreement, the Operational Expenditure Fee and Excess Operational Costs, to the extent not already paid, shall be paid to Seller. Seller may pursue all remedies provided at law or in equity, including specific performance.

        B.      If Seller shall be in material breach of any obligation of Seller under this Agreement and shall not have cured such breach on or prior to the Closing Date, Buyer may terminate this Agreement and/or pursue all remedies provided at law or in equity, including specific performance. In the event that the Property is sold to another party (an "**Alternative Sale**"), whether by Court order or otherwise, Buyer shall be entitled to receive the return of 50% of (a) the Operational Expenditure Fee and (b) any Excess Operational Costs, which amounts shall be paid solely from the proceeds of the Alternative Sale.

18. **Possession**.

        Possession of the Property, subject to the rights of tenants under existing leases, and all keys to the Property (properly tagged) shall be delivered to Buyer at the Closing.

19. **Miscellaneous**.

        A.      <u>Final and Entire Agreement; Integration</u>. This Agreement is the final, entire and exclusive agreement between the parties and supersedes any and all prior agreements, negotiations and communications, oral or written. No representation, promise, inducement or statement of intention has been made by any of the parties not embodied in this Agreement or in the documents referred to herein, and no party shall be bound by or liable for any alleged representation, promise, inducement or statements of intention not set forth or referred to in this Agreement. No supplement, modification, or amendment to this Agreement shall be binding or effective unless executed in writing by the parties and by no other means.

S:\JAM\LICHTER\Windsor (Stanadyne), CT\Acquisition\PSA\Stanadyne - IRG PSA (final).doc

B.    <u>Successors and Assigns</u>.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective shareholders, partners, directors, officers, heirs, beneficiaries, successors, representatives and assigns.

C.    <u>Assignment</u>.  No party to this Agreement may assign its rights or delegate its duties hereunder without the prior written consent of all parties to this Agreement; <u>provided, however</u>, that either Buyer or Seller may assign its rights or delegate its duties hereunder to an affiliated entity, but any such assignment shall not relieve the party assigning its rights of its obligations hereunder.

D.    <u>Notices</u>.  Any notice, demand, consent, approval or documents which any party is required or may desire to give or deliver to the other shall be given in writing by (i) personal delivery; (ii) certified mail, return receipt requested, postage prepaid; (iii) a national overnight courier service that provides written evidence of delivery; or (iv) facsimile or email transmission and addressed as follows:

|  |  |
|---|---|
| To Buyer: | Industrial Realty Group, LLC |
|  | 11111 Santa Monica Boulevard, Suite 800 |
|  | Los Angeles, California 90025 |
|  | Attention: John A. Mase |
|  | Phone:  (310) 806-4434 |
|  | Fax:  (310) 473-8702 |
|  |  |
| With a copy to: | Fainsbert Mase Brown & Sussman, LLP |
|  | 11111 Santa Monica Boulevard, Suite 810 |
|  | Los Angeles, California 90025 |
|  | Attention:  Jerry A. Brown, Esq. |
|  | Email:  jbrown@fms-law.com |
|  | Phone:  (310) 473-6400 |
|  | Fax:  (310) 473-8702 |
|  |  |
| To Seller: | Stanadyne LLC |
|  | C/O Young Conaway Stargatt & Taylor |
|  | Rodney Square, 1000 N. King Street |
|  | Wilmington, DE 19801 |
|  | Attn: Ashley E. Jacobs |
|  | Email: ajacobs@ycst.com |
|  | Phone: 302-571-6634 |

Any party may change its notice or email address, and/or facsimile number by giving written notice thereof in accordance with this Paragraph.  All notices hereunder shall be deemed given: (a) if delivered personally, when delivered; (b) if sent by certified mail, return receipt requested, postage prepaid, on the third day after deposit in the U.S. mail; (c) if sent by overnight courier, on the first business day after delivery to the courier; and (d) if sent by facsimile or email, on the date of transmission if sent on a business day before 5:00 p.m. Pacific time, or on the next business day; if sent on a day other than a business day or if sent after 5:00 p.m. Pacific time, provided that a hard copy of such notice is also sent by either a nationally recognized overnight courier or by U.S. mail, first class, postage prepaid.

E.    <u>Attorneys' Fees</u>.  In the event any suit, action or proceeding is instituted by any party in connection with the breach, enforcement or interpretation of this Agreement, the prevailing party therein shall be entitled to the award of reasonable attorneys' fees and related costs in addition to whatever relief the prevailing party may be awarded.

F.    <u>Real Estate Commission</u>.  Buyer represents and warrants to Seller and Seller represents and warrants to Buyer that no broker has been engaged by it in connection with the transaction contemplated by this Agreement, other than JLL ("**Broker**").  Buyer has agreed to pay Broker pursuant to a separate agreement in the event that the transaction contemplated herein closes.  Seller shall have no liability for the Broker's fees.  Buyer covenants and agrees to pay any and all commissions due to any broker or finder claiming a commission or fee through the Buyer other than Broker.  Each party shall indemnify, protect, defend and hold harmless the other party, including reasonable attorneys' fees, in respect of any breach of such representation and warranty, which indemnity shall survive the Closing or earlier termination of this Agreement.

G.    <u>Severability</u>.  The invalidity, illegality, or unenforceability of any provision of this Agreement shall in no way affect the validity of any other provision of this Agreement.  In the event that any provision of this Agreement is contrary to any present or future statute, law, ordinance, or regulation, the latter shall prevail, but in any such event the provisions of this Agreement affected shall be curtailed and limited only to the extent necessary to bring it within the requirements of the law.

H.    <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of Connecticut.  In the event of any legal action arising from this Agreement, the parties agree that venue shall be proper in any state or federal court located in Hartford County, Connecticut, or the nearest location having jurisdiction.

I.    <u>Waiver</u>.  The waiver or failure to enforce any provision of this Agreement shall not operate as a waiver of any future breach of such provision or any other provision hereof. No waiver shall be binding unless executed in writing by the party making the waiver.  The failure of either party to insist on strict compliance with any of the terms, covenants, or conditions of this Agreement by the other party shall not be deemed a waiver of that term, covenant, or condition.

J.    <u>Counterparts and Electronic Signatures</u>.  This Agreement may be executed in any number of counterparts, each of which so executed shall be deemed to be an original, and such counterparts shall together constitute but one and the same Agreement. The parties shall be entitled to sign and transmit an electronic signature of this Agreement (whether by facsimile, PDF or other email transmission), which signature shall be binding on the party whose name is contained therein. Any party providing an electronic signature agrees to promptly execute and deliver to the other parties an original signed Agreement.

K.    <u>Review; Interpretation</u>.  Each party to this Agreement has carefully reviewed this Agreement, is familiar with the terms and conditions herein, and was advised by legal counsel of his or its own choice with respect thereto.  This Agreement is the product of negotiation among the parties hereto and is not to be interpreted or construed against any party hereto.

L.    <u>Headings; Constructions</u>.  The headings which have been used throughout this

Agreement have been inserted for convenience of reference only and do not constitute matter to be construed in interpreting this Agreement.  The words "herein", "hereof", "hereunder" and other similar compounds of the word "here" when used in this Agreement shall refer to the entire Agreement and not to any particular provision or section.  If the last day of any time period stated herein shall fall on a Saturday, Sunday or legal holiday, then the duration of such time period shall be extended so that it shall end on the next succeeding day which is not a Saturday, Sunday or legal holiday.

M.     <u>Survival</u>.   All of the representations, warranties, covenants, indemnities and agreements set forth herein shall survive the closing of the transaction and the delivery of the deed.

N.     <u>Number, Gender and Tense</u>.  All words used in this Agreement shall be construed to include the plural as well as the singular number unless the context requires otherwise, the present tense shall include the past and future tense, and words of any gender used in this Agreement shall be held and construed to include any other gender.

O.     <u>Independent Counsel</u>.  Each party to this Agreement represents and warrants that he has carefully reviewed and understands this Agreement, acknowledges that he has been advised to seek his own independent legal counsel with respect to this Agreement and the transactions contemplated hereby, has sought the advice of independent counsel of his own choosing or has knowingly and voluntarily declined the opportunity to obtain such counsel and signs this Agreement freely, knowingly and voluntarily. Buyer hereby represents and warrants to Seller that: (i) Buyer is not in a significantly disparate bargaining position in relation to Seller, and (ii) Buyer is purchasing the Property for business, commercial, investment or other similar purpose.

P.     <u>Time of Essence</u>.  Time is of the essence with respect to all matters contained in this Agreement.

Q.     <u>Further Acts</u>.  The parties agree to cooperate with each other to effectuate this Agreement.  In addition to the acts recited in this Agreement to be performed by Seller and Buyer, Seller and Buyer agree to perform or cause to be performed before or after the Closing any and all such further acts as may be reasonably necessary or appropriate to accomplish the intent and purposes of this Agreement and to consummate the transaction contemplated hereby.

***[Remainder of page intentionally left blank; Signatures on the following page]***

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

**BUYER:**

INDUSTRIAL REALTY GROUP, LLC,
a Nevada limited liability company

By: _____
John A. Mase
Chief Executive Officer

**SELLER:**

STANADYNE, LLC,
a Delaware limited liability company

By: _____
Name: Bradley Dietz
Title:   Wind Down Manager

30693219.5

S:\JAM\LICHTER\Windsor (Stanadyne), CT\Acquisition\PSA\Stanadyne - IRG PSA (final).doc

**EXHIBIT "A"**

**LEGAL DESCRIPTION**

**[To be inserted]**