IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re* <br> **STANADYNE LLC, *et al.*** [1] <br> **Debtors.** | Chapter 11 <br> Case No. 23-10207 (TMH) <br> (Jointly Administered) <br> Ref. Docket Nos. 486 & 550 |

**DECLARATION OF JAMES PANCZYKOWSKI IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO ABANDON OR, ALTERNATIVELY SELL THE WINDSOR PROPERTY AND (II) FOR RELATED RELIEF**

I, James Panczykowski, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1. I am a Senior Managing Director at Jones Lang LaSalle Americas, Inc. ("JLL"), a real estate brokerage firm. The above-captioned debtors and debtors in possession (the "Debtors") have retained JLL as their real estate broker in these chapter 11 cases to assist the Debtors market and sell an approximately 53 acre real property parcel located in Windsor, CT (the "Windsor Property").

2. I submit this declaration (this "Declaration") in support of the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Abandon or, Alternatively Sell the Windsor Property and (II) for Related Relief* [Docket No. 486] (the "Motion") and the *Supplement*

---

[1] The debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: Stanadyne LLC (0378); Pure Power Technologies, Inc. (5202); Stanadyne PPT Holdings, Inc. (2594); and Stanadyne PPT Group Holdings, Inc. (1734). The Debtors' headquarters are located at 405 White Street, Jacksonville, North Carolina 28546.

30768309.4

1

*to Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Abandon or, Alternatively Sell the Windsor Property and (II) for Related Relief* [Docket No. 550] (the "Supplement").[2]

3. Except as otherwise indicated herein, all of the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by other JLL professionals involved in advising the Debtors in the chapter 11 cases, or information provided to me by the Debtors or their other advisors. If called upon to testify, I could and would testify to the facts set forth herein on that basis. I am authorized to submit this Declaration.

## Professional Qualifications

4. JLL is a nationally and internationally recognized real estate brokerage firm. JLL and its professionals have extensive experience working with companies from a variety of industries in complex financial restructurings, both out-of-court and in chapter 11 cases. I personally have been employed at JLL for six years and am currently a Senior Managing Director. I have more than seventeen years of experience working in the industrial real estate brokerage industry. Over the course of my real estate career, I have transacted on ~25,000,000 square foot of commercial space in a variety of U.S. and international locations.

## Sale Process

5. The Debtors, with the assistance of JLL, implemented a process to market and sell the Windsor Property (the "Sale Process"). The Sale Process included, among other things, (a) developing marketing materials that described the Windsor Property; (b) maintaining an environmental data room with information about the Debtors and the Windsor Property related to environmental matters, to which potential acquirers were granted access on a confidential basis

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion or Supplement, as applicable.

30768309.4

to conduct diligence; (c) identifying and contacting potential acquirers for the Windsor Property; and (d) facilitating the diligence efforts of potential acquirers, including by holding numerous teleconference and video-conference meetings in connection therewith and in person site visits.

6. Specifically, in connection with the Sale Process, JLL personally contacted approximately twenty potentially interested parties with respect to the sale of the Windsor Property and broadly marketed the offering to numerous other parties. Of the potentially interested parties contacted by JLL, six executed the Debtor-provided non-disclosure agreement. The Debtors, with the assistance of JLL, worked with these parties as they engaged in due diligence with respect to the Windsor Property.

7. As a result of these efforts, the Debtors received letters of intent from two parties: (i) Industrial Realty Group, LLC ("IRG") and (ii) an alternative bidder (the "Alternative Bidder"). The Debtors engaged in extensive negotiations with both IRG and the Alternative Bidder regarding their letters of intent. A key term to the Debtors in the negotiations was the requirement that the purchaser cover the carrying costs of the Windsor Property until the transaction closed. IRG agreed to an "Operational Expenditure Fee" pursuant to which IRG agreed to pay the Sellers the sum of $65,000 to cover ordinary and customary operational expenditures from the date of the execution of a purchase and sale agreement until the closing date of the transaction. IRG also agreed to be responsible for all actual ordinary and customary operational expenditures during the foregoing period that exceed the Operational Expenditure Fee. On the other hand, at that time, the Alternative Bidder ultimately would not agree to pay the carrying costs of the Windsor Property. As a result, the Debtors, in consultation with their professional advisors, determined that IRG's offer was superior to the Alternative Bidder's.

8. Prior to executing a purchase and sale agreement with IRG, I presented the

30768309.4

Alternative Bidder with the opportunity to make a "best and final" offer for the Windsor Property. However, I was informed by the Alternative Bidder at that time that it was not interested in modifying the terms of its previously submitted offer to purchase the Windsor Property, which offer did not provide for the payment of the carrying costs of the Windsor Property.

9. Subsequently, at the Debtors' request, I approached IRG to determine whether they were interested in increasing their offer. IRG agreed to modify its offer to provide for a purchase price of $250,000, conditional acceptance of the property pursuant to paragraph 5(b) of the Purchase Agreement (subject to IRG investment committee approval), and to move closing to three days after entry of an order approving the sale.

10. Given the marketing process and efforts described above, I believe that (a) parties interested in purchasing the Windsor Property were afforded a fair and reasonable opportunity to submit higher or otherwise better offers to acquire the Windsor Property and (b) the transaction with IRG is the best sale transaction presently available to the Debtors under the circumstances.

11. I believe that the negotiations conducted with respect to the IRG transaction were conducted in good faith and on an arm's-length basis. I am also not aware of any collusive conduct between IRG and other potential purchasers of the Windsor Property.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true correct to the best of my knowledge, information and belief.

Dated: September 25, 2023

*/s/ James Panczykowski*
James Panczykowski
Senior Managing Director
Jones Lang LaSalle Americas, Inc.

30768309.4