## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re* | Chapter 11 |
| **STANADYNE LLC,** *et al.*[1] | Case No. 23-10207 (TMH) |
| **Debtors.** | (Jointly Administered) |
| | **Ref. Docket No. 486, 523 & 550** |

### SUPPLEMENTAL DECLARATION OF BRADLEY I. DIETZ IN SUPPORT OF THE DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO ABANDON OR, ALTERNATIVELY SELL THE WINDSOR PROPERTY AND (II) FOR RELATED RELIEF

I, Bradley I. Dietz, hereby declare pursuant to 28 U.S.C § 1746, under penalty of perjury, to the best of my knowledge and belief, that:

1.      I am the Wind Down Manager of the above-captioned affiliated debtors and debtors in possession (collectively, the "Debtors").   I am duly authorized to make this supplemental declaration (this "Supplemental Declaration") on behalf of the Debtors.

2.      I submit this Supplemental Declaration in support of the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Abandon or, Alternatively Sell the Windsor Property and (II) for Related Relief* [Docket No. 486] (the "Motion") and the *Supplement to Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Abandon or, Alternatively Sell the Windsor Property and (II) for Related Relief* [Docket No. 550] (the "Supplement"), and to

---

[1]     The debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are:  Stanadyne LLC (0378); Pure Power Technologies, Inc. (5202); Stanadyne PPT Holdings, Inc. (2594); and Stanadyne PPT Group Holdings, Inc. (1734).  The Debtors' headquarters are located at 405 White Street, Jacksonville, North Carolina 28546.

supplement my original declaration in support of the Motion [Docket No. 523] (the "Declaration").[2]

3.      Except as otherwise set forth herein, all statements in this Supplemental Declaration are based upon my discussions with the Debtors' professionals and consultants and my personal knowledge and experience.  If I were called upon to testify, I could and would testify to each of the facts set forth below.

4.      Debtor Stanadyne LLC owns an approximately 53-acre real property parcel at 90-92 Deerfield Road, Windsor, Connecticut (together with all personal property located thereof, the "Windsor Property").  The Debtors formerly maintained their headquarters and a manufacturing facility at the Windsor Property.  While factory operations at the Windsor Property shut down in 2011, the Debtors maintained operations at the Windsor Property through July 31, 2023.

5.      After the Debtors filed the Motion, the Debtors received and accepted, subject to Bankruptcy Court approval, an offer on the Windsor Property from Industrial Realty Group, LLC ("IRG" or the "Buyer").  The Debtors and the Buyer entered into the Purchase and Sale Agreement (as amended, the "Purchase Agreement") on August 28, 2023.  Under the terms of the Purchase Agreement, the Buyer has agreed to purchase the Windsor Property on an "as is" basis.  In exchange, the Buyer has agreed to pay the Debtors the sum of $65,000 to be used to cover ordinary and customary operational expenditures from the date of execution of the Purchase Agreement until the Closing Date (as defined in the Purchase Agreement) (the "Operational Expenditure Fee").  Under the Purchase Agreement, the Buyer remains responsible for all actual

---

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion, the Supplement, or the Declaration, as applicable.

ordinary and customary operational expenditures during the foregoing period that exceed the Operational Expenditure Fee (the "Excess Operational Costs"). The payment of the Operational Expenditure Fee and Excess Operational Costs is a crucial term of the transaction, as the Debtors do not have the liquidity needed to pay the go forward carrying costs of the Windsor Property.

6.      While the Debtors received an indication of interest from another party prior to executing the Purchase Agreement, the Debtors determined that the offer from the Buyer was superior as it provided for, among other things, the payment of carrying costs of the Windsor Property. This is particularly true in light of the fact that IRG subsequently agreed, at the Debtors' request, to modify its offer to provide for a purchase price of $250,000, conditional acceptance of the property pursuant to paragraph 5(b) of the Purchase Agreement (subject to IRG investment committee approval), and to move closing to three days after entry of an order approving the sale.

**A.      Proceeding with a Private Sale of the Windsor Property to the Buyer Reflects a Prudent Exercise of the Debtors' Business Judgment.**

7.      I believe that a sound business reason exists for the sale of the Windsor Property to the Buyer. The sale will relieve the estates of the administrative costs of the Windsor Property and any obligations remaining under the Remedial Action Plan. If not for the sale, the Debtors would be forced to seek to abandon the Windsor Property on a contested basis, over the objections of the Connecticut Department of Energy and Environmental Protection and Town of Windsor. Accordingly, I believe that the sale is in the best interests of the Debtors' estates and represents a fair, reasonable, and advantageous disposition of the Windsor Property.

8.      In addition, I believe that a strong business justification exists for the private sale of the Windsor Property. A private sale of the Windsor Property under the terms and conditions of the Purchase Agreement—as opposed to a lengthy auction process—will allow the Debtors to avoid incurring operating expenses associated with the Windsor Property, thereby

preserving value for the Debtors' estates and stakeholders.  Further, despite a thorough marketing process led by JLL and spanning approximately three months, the Debtors did not receive any other actionable offers.  Thus, I do not believe that there is a sufficient likelihood of attracting other bids, such that incurring the additional expenses of a more expansive sale process would be justified.

9.      Given the Debtors no longer have a need for the Windsor Property, and given that the Debtors have not received any other actionable offers for the Windsor Property, I believe that proceeding through a private sale represents the best opportunity to maximize the value of the Windsor Property.  As a result of the Buyer's interest in the Windsor Property, and its willingness to provide fair and reasonable consideration based on that interest, I believe that the Debtors' estates and creditors will benefit from the approval of the sale without the added delay, energy, and expenses associated with an auction process.

10.      In light of the limited universe of potential purchasers and the lack of interest in the Windsor Property expressed during the marketing process, I believe that the Purchase Agreement presents the highest and best offer for the Windsor Property.  Proceeding by private sale is warranted under the circumstances and will maximize the value realized by the Debtors' estates for the Windsor Property for the benefit of stakeholders.

**B.      The Buyer's Consideration for the Windsor Property is Fair and Reasonable**

11.      I believe that the Buyer has offered fair and reasonable consideration for the Windsor Property.  In addition to the increased purchase price of $250,000, the Purchase Agreement contains many favorable conditions for the Debtors.  Notably, the Buyer is paying the Debtors the Operational Expenditure Fee and the Excess Operational Costs, which will result in the Buyer paying for the carrying costs of the Windsor Property through closing.  The Buyer has also agreed to pay customary closing costs and JLL's broker fees.

4

12.     After careful evaluation of the Buyer's offer, the Debtors concluded that the private sale will maximize the realizable value of the Windsor Property, and is in the best interests of their estates and creditors.  The Purchase Agreement is the result of good-faith, arms'-length negotiations.  In consideration of the foregoing, I believe that the purchase consideration provides fair and reasonable value for the Windsor Property

### C.      The Proposed Sale is Proposed in Good Faith

13.     I believe that the private sale contemplated by the Supplement and in the Purchase Agreement has been proposed in good faith.  The Buyer is not an insider of the Debtors, and the Purchase Agreement was the product of arm's-length negotiations between the Debtors, on the one hand, and the Buyer, on the other.  I believe and submit that the proposed sale pursuant to the terms and conditions of the Purchase Agreement is not the product of fraud, collusion, or bad faith, and nothing suggests that the Purchase Agreement is anything but the product of arm's-length negotiations between the Debtors, the Buyer, and their respective professionals.

14.     In light of the foregoing, I believe that selling the Windsor Property through a private sale is appropriate under the circumstances and beneficial to the Debtors' estates.

Dated:  September 25, 2023

_/s/  Bradley I. Dietz_____
Bradley I. Dietz
Wind Down Manager of the Debtors

5