**<u>EXHIBIT 1</u>**

Blackline

**THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE COMBINED DISCLOSURE STATEMENT AND PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS COMBINED DISCLOSURE STATEMENT AND PLAN IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| STANADYNE LLC, *et al.*,[1] | Case No. 23-10207 (TMH) |
| Debtors. | (Jointly Administered) |

**COMBINED DISCLOSURE STATEMENT AND**
**PLAN OF LIQUIDATION DATED SEPTEMBER 8 25, 2023**

---

[1]. The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: Stanadyne LLC (0378); Pure Power Technologies, Inc. (5202); Stanadyne PPT Holdings, Inc. (2594); and Stanadyne PPT Group Holdings, Inc. (1734). The Debtors' headquarters are located at 405 White Street, Jacksonville, North Carolina 28546.

i

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 3

ARTICLE I. ........................................................................................................... 3

DEFINITION AND CONSTRUCTION OF TERMS ......................................... 3

ARTICLE II. ......................................................................................................... 15

BACKGROUND ................................................................................................... 15
    2.01    General Background ................................................................. 15

ARTICLE III. CONFIRMATION PROCEDURES ............................................. 26
    3.01    Confirmation Hearing Procedures ........................................ 26
    3.02    Procedure for Objections ...................................................... 26
    3.03    Requirements for Confirmation ........................................... 27
    3.04    Classification of Claims and Equity Interests ..................... 27
    3.05    Impaired Claims or Equity Interests .................................... 28
    3.06    Confirmation Without Necessary Acceptances; Cramdown ............................... 29
    3.07    Feasibility .............................................................................. 30
    3.08    Best Interests Test and Liquidation Analysis ...................... 30
    3.09    Acceptance of the Plan ......................................................... 31

ARTICLE IV. CLASSIFICATION OF CLAIMS AND INTERESTS AND
EXPECTED RECOVERIES ................................................................................. 32
    4.01    Overview of Classification. .................................................. 32
    4.02    Identification and Treatment of Unclassified Claims .......... 32
    4.03    Identification of and Treatment of Classes of Claims ......... 33
    4.04    Unsecured Creditors' Rights to Opt In/Out of Classes 4 and 5. .......................... 35
    4.05    Classification of Classes, Rights to Vote, and Estimated
Distributions............................................................................................... 35
    4.06    Elimination of Vacant Classes for Voting Purposes ........... 39
    4.07    Controversy Concerning Classification, Impairment or Voting
Rights ......................................................................................................... 39
    4.08    Insurance ............................................................................... 39

ARTICLE V. CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO
VOTING ............................................................................................................... 39
    5.01    The Plan May Not Be Accepted. .......................................... 40

**5.02**   The Plan May Not Be Confirmed. ........................................................ 40

**5.03**   Distributions to Holders of Allowed Claims under the Plan May Be Inconsistent with Projections. .......................................................................... 40

**5.04**   Objections to Classification of Claims. ............................................... 40

**5.05**   Failure to Consummate the Plan. ........................................................ 41

**5.06**   Allowance of Claims May Substantially Dilute the Recovery to Holders of Claims under the Plan ...................................................................... 41

**5.07**   Reserved ............................................................................................... 41

**5.08**   Certain Tax Considerations .................................................................. 41

**ARTICLE VI.** MEANS FOR IMPLEMENTATION OF THE PLAN ..................................... 42

**6.01**   Liquidation of Debtors' Assets through the Creation of the Liquidating Trust ............................................................................................. 42

**6.02**   Effectuation of the Term Sheet ........................................................... 46

**6.03**   Release of Liens .................................................................................. 47

**6.04**   Effectuating Documents; Further Transactions ................................... 47

**6.05**   Records ................................................................................................ 47

**6.06**   Deemed Substantive Consolidation .................................................... 48

**6.07**   Transfer of Privilege/No Waiver ........................................................ 48

**6.08**   Final Decree ........................................................................................ 48

**ARTICLE VII.** EXECUTORY CONTRACTS ............................................................... 48

**7.01**   Executory Contract(s) and Unexpired Leases ..................................... 48

**7.02**   Insurance Policies Are Executory Contracts ....................................... 49

**7.03**   Bar Date for Rejection Damages ......................................................... 49

**7.04**   Pre-Existing Obligations to a Debtor Under Executory Contracts and Unexpired Leases .......................................................................................... 50

**ARTICLE VIII.** PROVISIONS GOVERNING RESOLUTION OF  CLAIMS AND DISTRIBUTIONS OF PROPERTY UNDER THE PLAN ............................................... 50

**8.01**   Claim Objections ................................................................................ 50

    (a)   Right to Object to Claims. ......................................................... 50
    (b)   Claims Objection Deadline. ....................................................... 50
    (c)   Claim Estimation. ...................................................................... 50

**8.02**   Distribution Provisions ...................................................................... 51

    (a)   Distributions to be Made ............................................................ 51
    (b)   On the Effective Date amount as may be agreed upon by the Holder of such Disputed Claim and the Liquidating Trustee. ..................... 51
    (c)   No Liability. ............................................................................... 51
    (d)   Distributions on Account of Disputed Claims. .......................... 51

16211856/7
16211856/7

(e)    No Distributions Pending Allowance. ..................................................... 51
(a)    Distributions in Cash. ......................................................................... 52
(b)    Timing of Distributions. ...................................................................... 52
(c)    Unclaimed Distributions. .................................................................... 52
(d)    Delivery of Distributions to Holders of Claims. ................................. 52
(e)    Undeliverable Distributions. ............................................................... 52
(f)    De Minimis Distributions. ................................................................... 53
(g)    Remainder Amounts After Final Distribution. ................................... 53

**ARTICLE IX.** RELEASES, INJUNCTION, AND RELATED PROVISIONS ..................... 53

**9.01**    Releases ......................................................................................................... 53

**9.02**    [Reserved] ..................................................................................................... 53

**9.03**    Exculpation and Limitation of Liability ...................................................... 53

**9.04**    Injunction ..................................................................................................... 53

**ARTICLE X.** CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE ................... 55

**10.01**    Conditions Precedent to Confirmation ....................................................... 55

**10.02**    Conditions Precedent to the Effective Date ............................................... 55

**10.03**    Waiver of Conditions .................................................................................. 55

**10.04**    Effect of Failure of Conditions .................................................................. 55

**10.05**    Filing of Notice of the Effective Date ........................................................ 56

**ARTICLE XI.** MODIFICATION, REVOCATION OR WITHDRAWAL OF
PLAN ..................................................................................................................... 56

**11.01**    Modification and Amendments ................................................................... 56

**11.02**    Effect of Confirmation on Modifications .................................................. 56

**11.03**    Revocation or Withdrawal of the Plan ....................................................... 56

**ARTICLE XII.** JURISDICTION ......................................................................................... 57

**12.01**    Bankruptcy Court Jurisdiction ................................................................... 57

**12.02**    Limitation on Jurisdiction .......................................................................... 58

**ARTICLE XIII.** MISCELLANEOUS .................................................................................. 59

**13.01**    Exemption from Taxes ................................................................................ 59

**13.02**    Compliance with Tax Requirements ........................................................... 59

**13.03**    Defenses and Setoff .................................................................................... 60

**13.04**    Governing Law ............................................................................................ 60

**13.05**    Successors and Assigns ............................................................................... 60

**13.06**    Transfer of Claims ...................................................................................... 60

**13.07**    Post-Effective Date Service List ................................................................ 60

**13.08**    Preservation of Rights of PBGC. ..........................**Error! Bookmark not defined.**

**13.09**    Notices ................................................................................................ 61

      (a)      If to the Debtors: .................................................................. 61

      (b)      If to the Committee: ............................................................. 62

      (d)      If to the U.S. Trustee: .......................................................... 62

**13.10**    Immediate Binding Effect ................................................................. 63

**13.11**    Severability of Plan Provisions ........................................................ 63

**13.12**    Exhibits ............................................................................................ 63

**13.13**    Votes Solicited in Good Faith .......................................................... 63

**13.14**    Conflicts ........................................................................................... 64

**13.15**    U.S. Trustee Fees ............................................................................. 64

**13.16**    Implementation ................................................................................ 64

**13.17**    No Admissions .................................................................................. 65

v

## DISCLAIMER

**EACH HOLDER OF A CLAIM AGAINST ONE OR MORE OF THE DEBTORS ENTITLED TO VOTE TO ACCEPT OR REJECT THIS COMBINED PLAN AND DISCLOSURE STATEMENT (THE "<u>PLAN</u>") SHOULD READ THE PLAN IN ITS ENTIRETY BEFORE VOTING. NO SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN MAY BE MADE EXCEPT PURSUANT TO THE TERMS HEREOF AND SECTIONS 1121 AND 1125 OF THE BANKRUPTCY CODE. IF YOU ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN, YOU ARE RECEIVING A BALLOT WITH YOUR NOTICE OF THE PLAN. <u>THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, AS THE PLAN PROPONENT, URGES YOU TO VOTE TO ACCEPT THE PLAN.</u>**

**THE PLAN HAS BEEN PREPARED IN ACCORDANCE WITH SECTIONS 1121 AND 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 3016 AND 3017, AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NON-BANKRUPTCY LAW. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING CLAIMS AGAINST OR INTERESTS IN THE DEBTORS SHOULD EVALUATE THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED. THE PLAN SHALL NOT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST OR INTERESTS IN ONE OR MORE OF THE DEBTORS. YOU SHOULD CONSULT YOUR PERSONAL COUNSEL OR TAX ADVISOR ON ANY QUESTIONS OR CONCERNS REGARDING TAX, SECURITIES, OR OTHER LEGAL CONSEQUENCES OF THE PLAN.**

**THE PLAN CONTAINS SUMMARIES OF CERTAIN STATUTORY PROVISIONS, DOCUMENTS RELATED TO THE PLAN, DOCUMENTS PREVIOUSLY FILED ON THE DOCKET IN THE CHAPTER 11 CASES, ANTICIPATED EVENTS IN THE CHAPTER 11 CASES, AND FINANCIAL INFORMATION. ALTHOUGH THE PLAN PROPONENT BELIEVES THAT THE STATEMENTS AND DESCRIPTIONS CONTAINED IN THE PLAN ARE TRUE AND ACCURATE, THE PLAN PROPONENT IS NOT THE DEBTOR AND, IN PREPARING THE PLAN, THE COMMITTEE, AS THE PLAN PROPONENT, HAS RELIED UPON INFORMATION RECEIVED FROM THE DEBTOR AS WELL AS PLEADINGS FILED IN THE BANKRUPTCY CASES AND OTHER PUBLICLY AVAILABLE INFORMATION. FURTHER, STATEMENTS SET FORTH IN THE PLAN, MAY BE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF THE DESCRIBED DOCUMENTS AND APPLICABLE STATUTORY PROVISIONS. THE TERMS OF THE DESCRIBED DOCUMENTS AND APPLICABLE STATUTES GOVERN IN THE EVENT OF ANY DISCREPANCY WITH THE PLAN. CREDITORS AND OTHER INTERESTED PARTIES SHOULD READ THE PLAN, THE DESCRIBED DOCUMENTS, AND THE APPLICABLE STATUTES THEMSELVES FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.**

1

THE FACTUAL STATEMENTS AND REPRESENTATIONS CONTAINED IN THE PLAN ARE MADE BY THE PLAN PROPONENT, WHICH IS NOT THE DEBTORS, AND ARE TO THE BEST OF THE PLAN PROPONENT'S KNOWLEDGE, ACCURATE AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFIED, AND THE PLAN PROPONENT DISCLAIMS ANY OBLIGATION TO UPDATE ANY SUCH STATEMENTS AFTER THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN AND SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF.

THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT NECESSARILY BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

ALL FORWARD-LOOKING STATEMENTS CONTAINED HEREIN OR OTHERWISE MADE BY THE PLAN PROPONENT INVOLVES MATERIAL RISKS AND UNCERTAINTIES AND ARE SUBJECT TO CHANGE BASED ON NUMEROUS FACTORS, INCLUDING FACTORS THAT ARE BEYOND THE PLAN PROPONENT'S CONTROL.  ACCORDINGLY, THE DEBTORS' FUTURE PERFORMANCE AND FINANCIAL RESULTS MAY DIFFER MATERIALLY FROM THOSE EXPRESSED OR IMPLIED IN ANY SUCH FORWARD-LOOKING STATEMENTS.  SUCH FACTORS INCLUDE, BUT ARE NOT LIMITED TO, THOSE DESCRIBED IN THE PLAN.  THE PLAN PROPONENT DOES NOT INTEND TO UPDATE OR REVISE THE FORWARD-LOOKING STATEMENTS EVEN IF EXPERIENCE OR FUTURE CHANGES MAKE IT CLEAR THAT ANY PROJECTED RESULTS EXPRESSED OR IMPLIED HEREIN WILL NOT BE REALIZED.

ANY PROJECTED RECOVERIES TO CREDITORS SET FORTH IN THIS PLAN ARE BASED UPON THE ANALYSES PERFORMED BY THE PLAN PROPONENT AND ITS ADVISORS.  ALTHOUGH THE PLAN PROPONENT AND ITS ADVISORS HAVE MADE EVERY EFFORT TO VERIFY THE ACCURACY OF THE INFORMATION PRESENTED HEREIN, THE PLAN PROPONENT AND ITS ADVISORS CANNOT MAKE ANY REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THIS INFORMATION.

IN CONNECTION WITH THE PLAN PROPONENT'S SOLICITATION OF ACCEPTANCES OF THE PLAN PURSUANT TO SECTION 1126(b) OF THE BANKRUPTCY CODE, THE PLAN PROPONENT IS FURNISHING A SOLICITATION PACKAGE, CONSISTING OF THE PLAN, THE EXHIBITS HERETO, CONFIRMATION NOTICE, AND A BALLOT TO EACH RECORD HOLDER OF CLAIMS ELIGIBLE TO VOTE OR ITS COUNSEL.  THE PLAN IS TO BE USED BY EACH SUCH ELIGIBLE HOLDER SOLELY IN CONNECTION WITH ITS EVALUATION OF THE PLAN; USE OF THE PLAN FOR ANY OTHER PURPOSE IS NOT AUTHORIZED. UNLESS EXPRESSLY PROVIDED, NOTHING STATED IN THE

16211856/7
16211856/7

**PLAN SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY. THE PLAN MAY NOT BE REPRODUCED OR PROVIDED TO ANYONE OTHER THAN ADVISORS TO THE RECIPIENT WITHOUT THE PRIOR WRITTEN CONSENT OF THE PLAN PROPONENT.**

## INTRODUCTION

The official committee of unsecured creditors (the "Committee," or the "Plan Proponent"), hereby proposes this Plan pursuant to sections 1125 and 1129 of the Bankruptcy Code.

This Plan contemplates the establishment of a trust by and through which a Liquidating Trustee will liquidate the Debtors' remaining assets, either through collection, or litigation and collection, for Distribution to holders of Allowed Claims. This Plan contains, among other things, a discussion of (i) the Debtors' history and businesses, (ii) the events leading to these Chapter 11 Cases, (iii) the Chapter 11 Cases, (iv) risk factors, (v) a summary and analysis of this Plan, and (vi) certain other related matters.

ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS ARE ENCOURAGED TO READ THE PLAN IN ITS ENTIRETY, AND TO CONSULT WITH AN ATTORNEY, BEFORE VOTING TO ACCEPT OR REJECT THE PLAN SUBJECT TO CERTAIN RESTRICTIONS AND REQUIREMENTS SET FORTH IN SECTION 1127 OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 3019, AND THE PLAN, THE PLAN PROPONENT RESERVES THE RIGHT TO ALTER, AMEND, MODIFY, REVOKE OR WITHDRAW THE PLAN, OR ANY PART THEREOF, PRIOR TO ITS SUBSTANTIAL CONSUMMATION.

## ARTICLE I.

## DEFINITION AND CONSTRUCTION OF TERMS

For purposes of the Plan, except as expressly provided or unless the context otherwise requires, (i) any capitalized term used in this Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable, (ii) whenever the context requires, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neutral, (iii) any reference in the Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions, (iv) any reference in the Plan to an existing document or exhibit means such document or exhibit as it may be amended, modified, or supplemented from time to time, (v) unless otherwise specified, all references in the Plan to sections, articles, schedules, and exhibits are references to sections, articles, schedules, and exhibits of or to the Plan, (vi) the words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan in its entirety rather than to any particular paragraph, subparagraph, or clause contained in the Plan, (vii) captions and headings to

3

articles and sections are inserted for convenience of reference only and shall not limit or otherwise affect the provisions hereof or the interpretation of the Plan, and (viii) the rules of construction set forth in section 102 of the Bankruptcy Code and in the Bankruptcy Rules shall apply.

As used in the Plan, the following terms have the following meanings:

1.1.    "**503(b)(9) Claims**" means Claims arising under section 503(b)(9) of the Bankruptcy Code against one or more of the Debtors that were to be Filed against the Debtor(s) on or before the General Bar Date.

1.2.    "**Administrative Expense**" means any right to payment constituting a cost or expense of administration of the Chapter 11 Cases against one or more of the Debtors under section 503(b) and 507(a)(2) of the Bankruptcy Code, including any actual and necessary costs and expenses of preserving the Debtors' Estates, any actual and necessary costs and expenses of operating the Debtors' businesses, any indebtedness or obligations incurred by the Debtors after the Petition Date in connection with the conduct of its business, all compensation and reimbursement of expenses awarded or otherwise approved for payment by Final Order of the Bankruptcy Court under section 330, 503(b) or 1129(a)(4) of the Bankruptcy Code, any fees or charges assessed against the Debtors' Estates under section 1930 of chapter 123 of title 28 of the United States Code, all wages, salaries and health and other benefits on account of services rendered after the Petition Date, all post-Petition Date taxes, and all other claims entitled to administrative expense status pursuant to a Final Order of the Bankruptcy Court, in each case relating to the period from the Petition Date to the Effective Date but not beyond.

1.3.    "**Allowed**" means all or a portion of a Claim against one or more of the Debtors  (a) that has been listed by the Debtors in the Schedules as liquidated in an amount other than zero and not "disputed" or "contingent," and with respect to which no contrary Claim has been Filed, (b) as to which no Objection or request for estimation has been Filed on or before the Claims Objection Deadline or the expiration of such other applicable period fixed by the Bankruptcy Court, (c) as to which any Objection has been settled, waived, withdrawn or denied by a Final Order, or (d) that is allowed (i) by a Final Order, (ii) by an agreement between the Holder of such Claim of one or more of the Debtors prior to the Effective Date, or the Liquidating Trustee on behalf of the Debtors' Estates after the Effective Date or (iii) pursuant to the terms of this Plan. For purposes of computing Distributions under this Plan, a Claim that has been deemed "Allowed" shall not include interest, costs, fees or charges on such Claim from and after the Petition Date, except as provided in section 506(b) of the Bankruptcy Code or as otherwise expressly set forth in this Plan.

1.4.    "**Asset Purchase Agreement**" means that certain Asset Purchase Agreement, dated as of May 8, 2023, by and among S-PPT Acquisition Company LLC, now known as Stanadyne Operating Company LLC, as Purchaser, and Stanadyne PPT Holdings, Inc. and the other "Sellers" named therein, as sellers, in the form attached as Exhibit A to the Sale Order and as amended, supplemented, amended and restated, or otherwise modified from time to time.

1.5.    "**Assets**" means all tangible and intangible assets of every kind and nature of the Debtors and their Estates within the meaning of section 541 of the Bankruptcy Code, Cash, Causes of Action (including potential claims against the Debtors' current and former officers, managers, and directors), rights, interests and property, real and personal, tangible and intangible including all

4

remaining files, books, and records of either of the Estates. For the avoidance of doubt, Assets shall not include the Purchased Assets.

1.6. "**Avoidance Actions**" means any and all avoidance, recovery, subordination, or other Claims and Causes of Actions that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under Chapter 5 of the Bankruptcy Code or under similar or related state or federal statutes and common law. Without limiting the foregoing and for the avoidance of doubt, Avoidance Actions shall include all "Avoidance Actions," as that term is defined in the Asset Purchase Agreement

1.7. "**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., and as such title has been, or may be, amended from time to time, to the extent that any such amendment is applicable to the Chapter 11 Cases.

1.8. "**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware.

1.9. "**Bankruptcy Rules**" means, when referenced generally, (i) the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended and promulgated under section 2075 of title 28 of the United States Code, (ii) the applicable Federal Rules of Civil Procedure, as amended and promulgated under section 2072 of title 28 of the United States Code, (iii) the applicable Local Rules of Bankruptcy Practice and Procedures for the United States Bankruptcy Court for the District of Delaware, and (iv) any standing orders governing practice and procedure issues by the Bankruptcy Court, each as in effect on the Petition Date, together with all amendments and modifications thereto that were subsequently made applicable to the Chapter 11 Cases or proceedings therein, as the case may be; provided, however, when a specific Bankruptcy Rule is referenced (*e.g.,* Bankruptcy Rule 9019), such reference shall be to such Rule under the Federal Rules of Bankruptcy Procedure.

1.10. "**Bar Date**" means, with respect to any particular Claim, the specific date set by the Bankruptcy Court as the last day for Filing proofs of Claim against one or more of the Debtors in the Chapter 11 Cases for that specific Claim as set forth in the Bar Date Order.

1.11. "**Bar Date Order**" means the Order (i) Establishing Deadlines for Filing Proofs of Claim and (ii) Approving the Form, Timing, and Manner of Notice Thereof entered by the Bankruptcy Court on April 14, 2023 [Docket No. 191].

1.12. "**Business Day**" means any day, other than a Saturday, Sunday or a legal holiday (as that term is defined in Bankruptcy Rule 9006(a)).

1.13. "**Cash**" or "**$**" means legal tender of the United States of America or the equivalent thereof, including bank deposits, checks and cash equivalents.

1.14. "**Causes of Action**" means all claims, counterclaims, crossclaims, actions, controversies, obligations, suits, judgments, damages, demands, debts, rights, preference actions, fraudulent conveyance actions and other claims or causes of action under Chapter 5 of the Bankruptcy Code and other similar state law claims and causes of action, liens, indemnities,

5

guaranties, suits, liabilities, judgments, accounts, defenses, offsets, powers, or privileges, licenses and franchises of any kind or character whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, suspected or unsuspected, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, arising in law, equity or pursuant to any other theory of law. For the avoidance of doubt, Causes of Action also includes: (a) any right of setoff, counterclaim or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to section 362 or Chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state law fraudulent transfer claim.

1.15.    **"Cerberus"** means Cerberus Business Finance, LLC, as administrative agent and collateral agent for the Prepetition Secured Lenders.

1.16.    **"Cerberus Deficiency Claim"** means the Claim of the Prepetition Secured Lenders in the amount of $87,252,851.11, which claim shall be an Allowed General Unsecured Claim except to the extent provided in Section 4.03(c) herein.

1.17.    **"Chapter 11 Cases"** means the Debtors' Chapter 11 cases, jointly administered under Case No. 23-10207 (TMH) in the Bankruptcy Court.

1.18.    **"Claim"** or **"Claims"** means a claim or claims against one or more of the Debtors, as such term is defined in section 101(5) of the Bankruptcy Code.

1.19.    **"Claims Objection Deadline"** means one hundred eighty (180) days after the Effective Date, or such later date as may be ordered by the Bankruptcy Court, *provided however*, that the Liquidating Trustee may file one or more motions with the Bankruptcy Court on notice and an opportunity for a hearing to extend such deadline from time to time.

1.20.    **"Class"** means each category or group of Holders of Claims or Interests that has been designated as a class in Article IV of this Plan.

1.21.    **"Closing Date"** means July 31, 2023.

1.22.    **"Committee"** means the official committee of unsecured creditors as appointed by the U.S. Trustee pursuant to section 1102(a)(1) of the Bankruptcy Code and set forth in Notice of Appointment of Committee of Unsecured Creditors [Docket No. 78], as may be amended from time to time.

1.23.    **"Confirmation"** means entry of the Confirmation Order on the docket of the Chapter 11 Cases, subject to the conditions set forth in this Plan and the Term Sheet.

1.24.    **"Confirmation Date"** means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

16211856/7
16211856/7

1.25. "**Confirmation Hearing**" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to section 1128(a) of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

1.26. "**Confirmation Order**" means the order of the Bankruptcy Court confirming this Plan pursuant to, among others, sections 1125 and 1129 of the Bankruptcy Code.

1.27. "**Consummation**" means the occurrence of the Effective Date.

1.28. "**Contingent**" means, with reference to a Claim, a Claim that has not accrued or is not otherwise payable and the accrual of which, or the obligation to make payment on which, is dependent upon a future event that may or may not occur.

1.29. "**Convenience Class Claim**" means any General Unsecured Claim in the amount of $20,000 or less, including Holders of General Unsecured Claims who opt into the Class 5 of the Plan prior to the Voting Deadline.

1.30. "**Core Liabilities**" shall have the meaning ascribed in the Term Sheet.

1.31. "**Creditor**" shall have the meaning ascribed to such term in section 101(10) of the Bankruptcy Code.

1.32. "**Debtors**" means Stanadyne LLC, Pure Power Technologies, Inc., Stanadyne PPT Holdings, Inc., and Stanadyne PPT Group Holdings, Inc.

1.33. "**Debtor Professional Escrow and Professional Fee Reserve**" means the "Debtor Professional Escrow" or "Professional Fee Reserve," as applicable, each as defined in the Cash Collateral Order [Docket No. 218].

1.34. "**Designation Rights Assets**" has the meaning assigned to that term in the Asset Purchase Agreement.

1.35. "**Disallowed**" means with respect to any Claim or portion thereof, any Claim against any of the Debtors which: (i) has been disallowed, in whole or part, by a Final Order; (ii) has been withdrawn by the Holder thereof in, whole or in part; (iii) is listed in the Schedules as zero or as Disputed, Contingent or Unliquidated and for which a proof of Claim has not been timely Filed or deemed timely Filed pursuant to the Bar Date Order, the Plan, the Bankruptcy Code or any Final Order or other applicable law; (iv) has been reclassified, expunged, subordinated or estimated to the extent that such reclassification, expungement, subordination or estimation results in a reduction in the Filed amount of any proof of Claim; (v) is a proof of Claim which was not Filed timely and which is not subject to a Final Order which deems the proof of Claim timely; (vi) is unenforceable to the extent provided for in the Bankruptcy Code, including, for the avoidance of doubt, in section 502(b) of the Bankruptcy Code; and (vii) where the Holder of a Claim is a Person or Entity from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, where a complaint for avoidance or an objection to such Claim has been Filed, unless such Person, Entity or transferee has paid the amount, or turned over any such property, for which such Person, Entity or transferee is liable under section 542, 543, 550, or 553

7

of the Bankruptcy Code. In each case a Disallowed Claim is Disallowed only to the extent of disallowance, withdrawal, reclassification, expungement, subordination or estimation.

1.36.    "**Disallowed Claim**" means a Claim, or any portion thereof, that is Disallowed.

1.37.    "**Disbursing Agent**" means the Liquidating Trustee or any third party designated by the Liquidating Trustee to act as disbursing agent.

1.38.    "**Disputed**" means any Claim which has not yet been Allowed or Disallowed in accordance with the terms of this Plan.

1.39.    "**Disputed Administrative Expense, Priority Tax Claim, Priority Non-Tax Claims and Secured Claims Reserves**" means the reserves established pursuant to Section 8.02 of this Plan, which reserve shall contain amounts relating to Disputed Administrative Expenses, Disputed Priority Tax Claims, Disputed Priority Non-Tax Claims, and Disputed Secured Claims.

1.40.    "**Distribution**" means any Distribution made pursuant to the Plan by the Liquidating Trustee or another Entity acting as the Disbursing Agent, to the Holders of Allowed Claims.

1.41.    "**Distribution Record Date**" means the date established for determining the Holders of Allowed Claims entitled to Distributions pursuant to the Plan, which shall be the Confirmation Date, including, for the avoidance of doubt, for Holders of Disputed Claims that are Allowed after the Confirmation Date or the date of the Rejection Bar Date (as defined in the Bar Date Order).

1.42.    "**Effective Date**" means the first Business Day after the date on which both (a) all conditions in Article X of this Plan have been satisfied or waived in accordance with that Article and (b) no stay of the Confirmation Order is in effect.

1.43.    "**Entity**" shall have the meaning ascribed to such term in section 101(15) of the Bankruptcy Code.

1.44.    "**Estates**" means the estates of the Debtors created pursuant to section 541 of the Bankruptcy Code.

1.45.    "**Exculpated Parties**" means in each case in its capacity as such: (i) the Debtors, (ii) the Committee, (iii) the Prepetition Secured Parties, (iv) members of the Committee, solely in their capacity as such, (v) the Debtors' officers and managers who served or were employed by the Debtors during the Chapter 11 Cases, (vi) the Wind-Down Manager, (vii) any professional retained by the foregoing entities, and (viii) with respect to each of the foregoing, such Entities' successors and assigns provided, however, that with respect to any Person identified herein, such Person shall be considered an Exculpated Party solely to the extent that such Person participated in actions to which section 1125(e) of the Bankruptcy Code applies, and such Person shall be exculpated solely for actions taken during the Exculpation Period. Further, and as set forth in Section 9.03 herein, other than with respect to the Wind-Down Manager, the Exculpated Parties shall not be exculpated for any action or inaction related to the commencement of the Chapter 11 Cases, including the filing of the bankruptcy petitions or any decision not to dismiss the Chapter 11 Cases.

8

1.46.    "**Exculpation Period**" means the period between February 17, 2023, and the Effective Date.

1.47.    "**Executory Contract**" means a prepetition contract or unexpired lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.48.    "**File**," "**Filed**," or "**Filing**" means, respectively, file, filed, or filing with the Bankruptcy Court or its authorized designee in these Chapter 11 Cases; provided, however, that with respect to proofs of Claim only, "Filed" means delivered and received in the manner provided by the Bar Date Order or as otherwise established by a Final Order of the Bankruptcy Court.

1.49.    "**Final Administrative Expense Bar Date**" means the date that is 30 days after the Effective Date, which shall be the deadline for Filing requests for payment of Administrative Expenses that arose from the Petition Date and before the Effective Date.

1.50.    "**Final Order**" means an unstayed order, ruling or judgment of the Bankruptcy Court or any other court of competent jurisdiction as to which the time to appeal, petition for certiorari, or request for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending, or as to which any right to appeal, petition for certiorari, reargument, or rehearing shall have been waived in writing in form and substance satisfactory to the Debtors or the Liquidating Trustee on behalf of the Estates (on or after the Effective Date), or, in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been sought, such order of the Bankruptcy Court or other court of competent jurisdiction shall have been determined by the highest court to which such order was appealed, or certiorari, reargument or rehearing shall have been denied and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired; provided, however, that the possibility that a motion under rule 59 or rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state court rules of civil procedure, may be Filed with respect to such order, shall not cause such order not to be a Final Order.

1.51.    "**Financing Agreement**" means that certain financing agreement, dated as of May 2, 2017, by and among Stanadyne PPT Holdings, Inc., the "Borrowers" and other "Guarantors" party thereto, the Prepetition Secured Lenders, and Cerberus as collateral agent and administrative agent for the Prepetition Secured Lenders, as amended, amended and restated, supplemented, or otherwise modified from time to time.

1.52.    "**Foreign Non-Debtor Affiliates**" means the following direct and indirect subsidiaries of Stanadyne LLC:  Stanadyne, S.p.A., Stanadyne Changshu Corporation, Stanadyne India Private Ltd., and Stanadyne Mideast FZE.

1.53.    "**General Bar Date**" means May 14, 2023 at 5:00 p.m. (Prevailing Eastern Time) for certain Claims arising before the Petition Date, including 503(b)(9) Claims, Secured Claims, General Unsecured Claims, or Priority Non-Tax Claims as established by the Bar Date Order.

16211856/7
16211856/7

1.54.    "**General Unsecured Claim**" means any unsecured Claim against a Debtor that arose or is deemed by the Bankruptcy Code or Bankruptcy Court to have arisen before the Petition Date and that is not: (i) an Administrative Expense Claim, including a Professional Fee Claim, (ii) a Priority Tax Claim, (iii) a Secured Claim, (iv) a Priority Non-Tax Claim, or (v) a Convenience Class Claim that has not opted to be treated as a Class 4 General Unsecured Claim.

1.55.    "**Go-Forward Creditors**" has the meaning ascribed to it in the Term Sheet.

1.56.    "**Governmental Unit**" shall have the meaning ascribed to such term in section 101(27) of the Bankruptcy Code.

1.57.    "**Governmental Unit Bar Date**" means August 15, 2023, at 5:00 p.m. (Prevailing Eastern Time) as established by the Bar Date Order.

1.58.    "**Holder**" or "**Holders**" means the legal or beneficial holder of a Claim or Interest (and, when used in conjunction with a Class or type of Claim or Interest, means a Holder of a Claim or Interest in such Class or of such type).

1.59.    "**Impaired**" means, when used in reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of Bankruptcy Code sections 1123(a)(4) and 1124.

1.60.    "**Impaired Class**" means a Class of Claims or Interests that is Impaired.

1.61.    "**Initial Distribution Fund**" means $2,625,000 available for payment on account of all Allowed Claims other than the Cerberus Deficiency Claim.

1.62.    "**Insider**" shall have the meaning ascribed to such term in section 101(31) of the Bankruptcy Code.

1.63.    "**Interests**" means the legal interests, equitable interests, contractual interests, equity interests or ownership interests, or other rights of any Person in one or more of the Debtors including all capital stock, stock certificates, common stock, preferred stock, partnership interests, limited liability company or membership interests, rights, treasury stock, options, warrants, contingent warrants, convertible or exchangeable securities, investment securities, subscriptions or other agreements and contractual rights to acquire or obtain such an interest or share in one or more of the Debtors, partnership interests in the Debtors' stock appreciation rights, conversion rights, repurchase rights, redemption rights, dividend rights, preemptive rights, subscription rights and liquidation preferences, puts, calls, awards or commitments of any character whatsoever relating to any such equity, common stock, preferred stock, ownership interests or other shares of capital stock of one or more of the Debtors or obligating one or more of the Debtors to issue, transfer or sell any shares of capital stock whether or not certificated, transferable, voting or denominated "stock" or a similar security.

1.64.    "**Liquidating Trust**" means the trust established under the Plan, the Confirmation Order, and the Liquidating Trust Agreement.

1.65.   "**Liquidating Trustee**" means Bradley Dietz, who was jointly selected by the Committee and the Prepetition Secured Parties, or, if Mr. Dietz is unable or unwilling to serve in such capacity, the individual selected in accordance with footnote 3 of the Term Sheet.

1.66.   "**Liquidating Trust Agreement**" means the trust agreement, in form and substance acceptable to Cerberus and the Committee, that establishes the Liquidating Trust and governs the powers, duties, and responsibilities of the Liquidating Trustee.  The Liquidating Trust Agreement shall be part of the Plan Supplement.

1.67.   "**Liquidating Trust Assets**" means all of the Estates' Assets transferred to the Liquidating Trust pursuant to section 6.01 hereof, including (i) the $375,000 constituting the "Trust Funding Amount" under the Term Sheet to fund the operation of the Liquidating Trust, (ii) any remaining funds from the Wind-Down Budget, (iii) the Initial Distribution Fund, (iv) the Unsecured Claim Distribution Fund, and (v) all of the Estates' Causes of Action (other than Waived Claims) and any proceeds thereof. For the avoidance of doubt, the Liquidating Trust Assets shall not include any Purchased Assets or Waived Claims but the Liquidating Trust Assets shall include Insider Avoidance Actions and Non-Go-Forward Commercial Tort Claims (each as defined in the Term Sheet).  For the further avoidance of doubt, the Debtor Professional Escrow and Professional Fee Reserve will not be transferred to the Liquidating Trust and do not constitute Liquidating Trust Assets.

1.68.   "**Liquidating Trust Expenses**" means the costs and expenses of administering the Liquidating Trust in accordance with the Plan and the Liquidating Trust Agreement, including (i) the actual and reasonable fees, costs and expenses of the Liquidating Trust's retained professionals, as determined in the reasonable discretion of the Liquidating Trustee, (ii) the Liquidating Trustee's compensation, and (iii) U.S. Trustee Fees.

1.69.   "**Local Rules**" means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

1.70.   "**Oversight Committee**" means the oversight committee consisting of the following (i) a member designated by Cerberus, who shall initially be Joseph Naccarato and (ii) the PBGC.

1.71.   "**PBGC**" means the Pension Benefit Guaranty Corporation.

1.72.   "**PBGC Claim**" means the Claim of the PBGC in the amount of $15,538,178.33, which shall be deemed an Allowed General Unsecured Claim.

1.73.   "**Person**" shall have the meaning ascribed to such term in section 101(41) of the Bankruptcy Code.

1.74.   "**Petition Date**" means February 16, 2023, the date on which each of the Debtors commenced the Chapter 11 Cases in the Bankruptcy Court.

1.75.   "**Pinson Declaration**" means the Declaration of John Pinson, Chief Executive Officer of Stanadyne LLC, in Support of First Day Relief [Docket No. 12].

1.76.   "**Plan**" means this entire Combined Disclosure Statement and Plan of Liquidation, and all exhibits, schedules and related documents, whether annexed hereto or Filed in connection herewith (including, for the avoidance of doubt, the Plan Supplement), as it may be altered, amended, modified or supplemented from time to time including in accordance with any documents submitted in support hereof and the Bankruptcy Code or the Bankruptcy Rules.

1.77.   "**Plan Supplement**" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to this Plan, and which shall be Filed in the Chapter 11 Cases no later than _____, 2023.  For the avoidance of doubt, the Plan Supplement may be filed in one or more filings on a single date or on multiple dates.

1.78.   "**PPT**" means Debtor Pure Power Technologies, Inc.

1.79.   "**Prepetition Secured Lenders**" means the lenders party to the Financing Agreement

1.80.   "**Prepetition Secured Parties**" means, collectively, Cerberus and the Prepetition Secured Lenders.

1.81.   "**Priority Non-Tax Claim**" means any and all Claims accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Expense.

1.82.   "**Priority Tax Claim**" means a Claim or a portion of a Claim for which priority is accorded under section 507(a)(8) of the Bankruptcy Code.

1.83.   "**Pro Rata**" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that respective Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under the Plan, as applicable.

1.84.   "**Professional**" means any professional employed in the Chapter 11 Cases pursuant to Bankruptcy Code sections 327, 328, 363 or 1103 pursuant to a Final Order of the Bankruptcy Court.

1.85.   "**Professional Fee Bar Date**" means the deadline for Filing all applications for Professional Fee Claims, which shall be thirty (30) days after the Effective Date.

1.86.   "**Professional Fee Claims**" means an Administrative Expense of a Professional for compensation for services rendered or reimbursement of costs, expenses, or other charges incurred after the Petition Date and on or before the Effective Date.

1.87.   "**Purchased Assets**" has the meaning assigned to that term in the Asset Purchase Agreement as modified by the terms of the Sale Order and the Term Sheet.

16211856/7
16211856/7

1.88.   "**Purchaser**" means Stanadyne Operating Company LLC (formerly known as S-PPT Acquisition Company LLC) as purchaser of substantially all of the Debtors' assets pursuant to the Asset Purchase Agreement.

1.89.   "**Representative(s)**" means with respect to an Entity, all of that Entity's current and former affiliates, subsidiaries, officers, directors, managers, managing members, principals, members, partners, employees, agents, advisors, attorneys, professionals, accountants, investment bankers, consultants, other representatives and such Entity's respective heirs, executors, estate, servants and nominees, in each case in their capacity as such.

1.90.   "**Reserves**" means, the reserves established pursuant to Section 8.02 of this Plan, which reserves shall contain amounts relating to Disputed Administrative Expenses, Disputed Priority Tax Claims, Disputed Priority Non-Tax Claims, Disputed Secured Claims, Disputed General Unsecured Claims, the Liquidating Trust Expenses, and any other reserves established by the Liquidating Trustee.

1.91.   "**Sale Order**" means the Order of the Bankruptcy Court dated July 11, 2023 approving the sale of substantially all of the Debtors' assets, and approving the Term Sheet [Docket No. 443].[2]

1.92.   "**Schedules**" means the schedules of Assets and Liabilities and Statements of Financial Affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, which were filed on April 17, 2023 [Docket Nos. 200 - 207], as the same may have been amended, modified or supplemented from time to time and which were amended on May 26, 2023 [Docket Nos. 312 and 313].

1.93.   "**Secured Claim**" means, pursuant to Bankruptcy Code section 506, that portion of a Claim that is (a) secured by a valid, perfected and enforceable security interest, lien, mortgage, or other encumbrance, that is not subject to avoidance under applicable bankruptcy or non-bankruptcy law, in or upon any right, title or interest of one or more of the Debtors in and to property of the Estates, to the extent of the value of the Holder's interest in such property as of the relevant determination date, or (b) Allowed as such pursuant to the terms of this Plan (subject to the Confirmation Order becoming a Final Order). The defined term Secured Claim includes any Claim that is (i) subject to an offset right under applicable law as of the Petition Date, and (ii) a secured claim against one or more of the Debtors pursuant to Bankruptcy Code sections 506(a) and 553.

1.94.   "**Solicitation Procedures Order**" means the Bankruptcy Court's Order approving the Plan Proponent's Motion (i) Approving the Adequacy of Disclosures in the Plan of Liquidation, (ii) Scheduling the Confirmation Hearing and Deadline for Filing Objections, (iii) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject the Plan, and Approving the Form of Ballot and Solicitation Package, and (iv) Approving the Notice Provisions entered on _____ , 2023 [Docket No. ___].

---

[2]     In the event of any inconsistency between the Plan and the Sale Order, the Sale Order shall control.

16211856/7
16211856/7

1.95.     **Subordinated Claim**" means any Claim that is subordinated to General Unsecured Claims pursuant to section 510 of the Bankruptcy Code or Final Order of the Bankruptcy Court.

1.96.     "**Tax**" or "**Taxes**" means all income, gross receipts, sales, use, transfer, payroll, employment, franchise, profits, property, excise, or other similar taxes, estimated import duties, fees, stamp taxes, and duties, value added taxes, assessments, or charges of any kind whatsoever (whether payable directly or by withholding), together with any interest and any penalties, additions to tax, or additional amounts imposed by any taxing authority of a Governmental Unit with respect thereto.

1.97.     "**Term Sheet**" means the agreement between the Committee, Cerberus, and the Purchaser approved by the Court as part of the Sale Order and attached to the Sale Order as Exhibit D and attached here as Exhibit C.

1.98.     "**Unclaimed Distributions**" means any undeliverable or unclaimed Distributions.

1.99.     "**Unexpired Lease**" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.100.     "**Unimpaired**" means, when used in reference to a Claim or Interest, any Claim or Interest a Class of Claims or Interest that is not impaired within the meaning of section 1123(a) or 1124 of the Bankruptcy Code.

1.101.     "**Unliquidated**" means, with reference to a Claim, a Claim for which an amount certain has not been fixed, either by agreement of the parties or an Order of a court.

1.102.     "**Unsecured Claim Distribution Fund**," means Cash held by the Liquidating Trust available for payment of all Allowed General Unsecured Claims (including the PBGC Claim) and the Cerberus Deficiency Claim. The Unsecured Claim Distribution Fund shall not include the Initial Distribution Fund but shall include all other Cash held by the Liquidating Trust not required for (i) distribution to Allowed Administrative Expenses, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, and Allowed Secured Claims in accordance with the terms of the Plan or (ii) Liquidating Trust Expenses.

1.103.     "**U.S. Trustee**" means the Office of the United States Trustee for the District of Delaware.

1.104.     "**U.S. Trustee Fees**" means fees payable pursuant to 28 U.S.C. § 1930.

1.105.     "**Voting Agent**" means Kurtzman Carson Consultants LLC or any successor appointed by the Bankruptcy Court.

1.106.     "**Voting Deadline**" means _____, 2023, at 4:00 p.m. (Prevailing Eastern Time), the date and time by which ballots to accept or reject the Plan must be received by the Voting Agent in order to be counted, as set forth by the Solicitation Procedures Order.

1.107.  "**Waived Claims**" means and all Causes of Action (including, for the avoidance of doubt, all other Avoidance Actions and all commercial tort claims) against Go-Forward Creditors.

1.1.    "**Wind-Down Budget**" means that certain budget attached as Exhibit 1 to the Term Sheet and approved as part of the Sale Order.

1.2.    "**Wind-Down Manager**" means Bradley Dietz.

**ARTICLE II.**
BACKGROUND

**2.01    General Background**

**A.      The Debtors' Businesses**

The Debtors are four related entities, two of which (Stanadyne LLC and PPT) had operations as of the Petition Date, and two (Stanadyne PPT Holdings, Inc. and Stanadyne PPT Group Holdings, Inc.) were solely holding companies that did not have any operations.  A copy of the Debtors' organizational chart (the "Organizational Chart") showing the debtor and non-debtor entities and their ownership structure is attached hereto as **Exhibit A**.

For more than 140 years, Stanadyne (and its predecessor companies) designed and manufactured products to address problems in diesel and gasoline fuel systems, including, at various times, a diesel fuel injection pump, fuel filters and additives, electronic governing diesel rotary pumps, diesel common rail pumps and direct injection fuel pumps for modern gasoline engines, gasoline direct injection pumps. As more fully set forth in the Pinson Declaration, as of the Petition Date, the Debtors designed, manufactured and supplied best-in-class powertrain pumping, injection, air and fluid management products and control solutions, and their core products included fuel injectors, pumps, and other components necessary for diesel and gasoline internal combustion engines (ICEs), including gasoline direct injection pumps, diesel common rail pumps, diesel rotary pumps (mechanical and electronic), diesel fuel injectors (new and remanufactured), remanufactured diesel turbochargers and exhaust gas recycling systems, and high-pressure diesel common rail connectors.

In 2014, the company sold the fuel filters and additives business to focus solely on fuel pumps and injectors. Since then, the company sold approximately 10 million gasoline pumps into the U.S. market for popular original equipment manufacturer ("OEMs") pickup and performance passenger car applications, and as of the Petition Date, the Debtors continued to supply these components at a rate of more than 800,000 units per year.

In April 2019, Stanadyne LLC acquired PPT, a leader in the engineering, manufacturing, and remanufacturing of diesel fuel injectors and turbochargers headquartered in Columbia, South Carolina. The combined companies brought together highly complementary product lines that formed a global company delivering broad fuel and air management systems directly to OEMs and original equipment supplier/aftermarket channels.

15

As further set forth in the Pinson Declaration, as of the Petition Date, the Debtors served both the original equipment market and the aftermarket. Within these segments, the Debtors served both the on-road and off-road markets. With respect to the on-road market, the Debtors supplied parts for passenger vehicles, light duty vehicles (e.g., pickup trucks), medium duty vehicles (e.g., delivery trucks), and performance aftermarket vehicles. With respect to the off-road market, the Debtors supplied parts for agriculture (e.g., tractors), construction (e.g., bobcats), and power generation and utility vehicles. Further, as of the Petition Date, the Debtors had a very stable revenue stream, with many longstanding customers. Stanadyne LLC's customers include Tier 1 original equipment manufacturers that are household names in the automotive industry.

Both Stanadyne LLC and PPT perform similar functions, with Stanadyne LLC focusing more on the original equipment market, and PPT focusing more on the aftermarket segment. Specifically, PPT's products service legacy engines that were manufactured in high volumes and installed in a range of commercial vehicles, which have a working life that can equal 20 years or longer.

## B.    The Debtors' and the Non-debtors' operations.

The Debtors operated in several different locations throughout the United States, including the Debtors' headquarters as of the Petition Date located in Jacksonville, North Carolina, the Debtors' former headquarters located in Windsor, Connecticut, and former manufacturing facilities located in Blythewood, South Carolina, Columbia, South Carolina, and Southfield, Michigan. The Windsor, Connecticut and Jacksonville, North Carolina locations were owned by the Debtors on the Petition Date; the rest of the locations were leased.

In addition to serving as the Debtors' corporate headquarters, the Jacksonville, North Carolina facility was used to, among other things, perform gasoline assembly and testing, as well as engineering development and validation. The Blythewood, South Carolina facility was the Debtors' largest manufacturing facility and was used to, among other things, perform remanufacturing and testing of diesel fuel injectors. The Columbia, South Carolina facility was used to, among other things, perform diesel common rail component engineering development and validation. The Southfield, Michigan facility was used to, among other things, perform global engineering, program management, and customer support. The lease for the Southfield, Michigan facility expired by its terms in April 2023 and the Debtors have vacated that facility.

As of the Petition Date, the Debtors' collective workforce in the United States was comprised of approximately 468 employees and approximately 120 temporary employees.

In addition to the operations in the United States, and as more fully set forth in the Organizational Chart, the Debtors had four direct or indirect subsidiaries outside the United States, all of which engaged in intercompany transactions with the Debtors. These Foreign Non-Debtor Affiliates, located in the United Arab Emirates (which is a subsidiary of the Indian subsidiary), India, Italy, and China, were all key suppliers to the Debtors that produced highly customized products for the Debtors that were integral to the Debtors' operations.

As of the Petition Date, the Sharjah, United Arab Emirates facility was used to, among other things, perform diesel rotary pump assembly and testing. The Chennai, India facility was

16211856/7
16211856/7

used to, among other things, perform diesel rotary pump and injector assembly and testing, component manufacturing for other plant sites, and engineering development and validation. The Brescia, Italy facility was used to, among other things, perform sub-micron machining, diesel injector assembly, diesel injector nozzle manufacturing, and testing. The Changshu and Suzhou, China facilities were used to, among other things, perform diesel common rail pump assembly and testing, and diesel common rail engineering development and validation, respectively. As of the Petition Date, the Foreign Non-Debtor Affiliates employed a total of approximately 950 people.

16211856/7
16211856/7

### C.    Prepetition Obligations

On or about May 2, 2017, Stanadyne LLC and Stanadyne PPT Holdings, Inc.'s predecessor, Stanadyne Intermediate Holdings LLC, entered into the Financing Agreement to which Debtors PPT and Stanadyne PPT Holdings, Inc. are guarantors. Pursuant to the Financing Agreement, the Prepetition Secured Lenders made term loans totaling $248,488,344.84 and revolving loans totaling $25,000,000. As of the Petition Date, the Debtors were obligated to the Prepetition Secured Lenders for a total of no less than $293,152,851.11, inclusive of principal, interest, and certain fees, all of which was secured by first priority liens on substantially all assets of the Debtors.

In the months leading up to the Petition Date, the Debtors made all required interest payments to the Prepetition Secured Lenders, through and including the interest payment due at the beginning of November 2022. The dates on which interest and principal were due from December 1, 2022 – February 1, 2023 were consensually extended.

As of the Petition Date, the Debtors also had unsecured debt consisting primarily of trade obligations of approximately $14,961,995.18, Core Liabilities of approximately $20,751,746.29, plus pension and supplemental employee retirement plan obligations.[3]

### 2.02    Events Leading to the Filing of the Chapter 11 Cases

According to the Pinson Declaration, as with many companies, the COVID-19 pandemic negatively impacted the Debtors' operations. Supply chain issues and lockdowns led to an approximately $37 million decrease in revenue for 2020. Subsequent supply chain interruptions for the company and its customer base, including the global chip shortage, constrained the Debtors' sales during the market recovery, which put additional stress on company cash in 2022 and resulted in a loss in revenue of approximately $26 million.

Coupled with the lost revenue attributable to the COVID-19 pandemic, the Debtors were adversely affected by macroeconomic conditions, as the global rise in interest rates caused an increase in interest expenses under the Financing Agreement. With these increases in the Debtors' variable interest rate, the Debtors projected that they would be unable to meet their debt service obligations beyond January 2023. As described more fully in the Pinson Declaration, the Prepetition Secured Parties consensually extended the dates on which interest and principal were due from December 1, 2022 through February 1, 2023.

In November 2022, the Debtors and Cerberus engaged in negotiations, including a scenario by and through which the Prepetition Secured Lenders would restructure their debt and receive a significant majority of the Debtors' equity, while still preserving a minority of equity to then-existing equity.

---

[3]     These amounts are based upon the Debtors' Schedules and are subject to reconciliation and adjustment.

16211856/7
16211856/7

### 2.03    The Chapter 11 Cases

On February 16, 2023, each of the Debtors filed a voluntary bankruptcy petition in the Bankruptcy Court.  On March 6, 2023, the U.S. Trustee appointed four creditors of the Debtors to serve on the Committee.

### A.    The Debtor' First Day Pleadings

On the Petition Date, the Debtors filed a number of motions and applications (collectively, the "First Day Motions").  Among other things, the Debtors sought separate motions seeking the following relief: (i) for joint administration [Docket 2]; (ii) for authority to pay sales and use taxes [Docket No. 3], (iii) to prohibit utilities from discontinuing service [Docket No. 4], (iv) for authority to (a) continue to maintain the existing cash management system, bank accounts, and business forms, (b) honor certain prepetition obligations related thereto, and (c) continue to perform ordinary course intercompany transactions; [Docket No. 5], (v) for authority to continue their workers compensation programs and their liability, property and other insurance programs and pay certain obligations in respect thereof, and authorizing the debtors financial institutions to honor and process checks and transfers related to such obligations [Docket No. 6]; (vi) for authority to pay prepetition employee obligations, prepetition withholding obligations, and postpetition employee obligations in the ordinary course [Docket No. 8]; and (vii) for authority to (a) maintain and administer prepetition customer programs, and (b) pay and honor related prepetition obligations [Docket No. 9].  The Court subsequently entered interim and final orders granting the relief sought by each of the First Day Motions.


Additionally, on the Petition Date, the Debtors filed a motion for authority to pay the claims of certain critical vendors [Docket No. 7] (the "Critical Vendor Motion").  By and through the Critical Vendor Motion, the Debtors sought authority to pay a total of $6,800,000 of prepetition vendor claims, including $3,400,000 on an interim basis.  On February 22, 2023, the Court approved the Critical Vendor Motion on an interim basis [Docket No. 50], and on April 14, 2023, the Court approved the Critical Vendor Motion on a final basis [Docket No. 186], which increased the authorized critical vendor payments to $8,400,000.  As of July 2, 2023, the Debtors remitted payments aggregating approximately $7,914,276.14 to critical vendors on account of their prepetition claims, including claims entitled to administrative priority under 11 U.S.C. § 503(b)(9).

### B.    Schedules and Statements of Financial Affairs and Bar Dates

On April 17, 2023, the Debtors filed the Schedules [Docket Nos. 200-207], and on May 26, 2023, the Debtors filed amended Schedules [Docket Nos. 312 and 313]. The Schedules, as amended, summarize the Debtors' understanding of assets and liabilities.

On April 4, 2023, the Debtors filed a motion to set deadlines for filing proofs of claim [Docket No. 164] (the "Bar Date Motion").  On April 14, 2023, the Bankruptcy Court entered the Bar Date Order [Docket No. 191] which set the Bar Date and the Governmental Unit Bar Date. The Bar Date Order did not set a deadline for filing a request for allowance of postpetition administrative expenses.

## C.  Motion for Use of Cash Collateral

On February 21, 2023, the Debtors filed a motion for use of cash collateral [Docket No. 35] (the "Cash Collateral Motion").  By and through the Cash Collateral Motion, the Debtors sought approval for the consensual use of the Prepetition Secured Lenders' cash collateral on an interim and final basis, pursuant to the terms of an agreed-upon budget.  In exchange for the use of cash collateral, the Debtors agreed to provide the Prepetition Secured Parties certain protections, in the form of (i) replacement liens to the extent of any diminution of value, (ii) superpriority administrative expense claims under section 507(b) of the Bankruptcy Code against the Debtors' Estates to the extent of any diminution of value, (iii) payment of Cerberus's reasonable and documented fees and expenses up to an aggregate amount of $900,000 for the period between the Petition Date and the date of entry of the Final Order, (iv) to the extent it is later determined by an Order of the Court that the Prepetition Obligations (as defined in the Cash Collateral Order) were oversecured as of the Petition Date, payment of postpetition interest at the default rate, and (v) an interim payment in the amount of $300,000. On February 22, 2023, the Bankruptcy Court entered an interim order approving the Cash Collateral Motion [Docket No. 55].

On March 20, 2023 and April 4, 2023, the Bankruptcy Court entered further interim orders approving the Cash Collateral Motion [Docket No. 104 and 160, respectively].  On April 19, 2023, the Bankruptcy Court entered a Final Order approving the Cash Collateral Motion [Docket No. 218] (the "Cash Collateral Order").[4]   The Cash Collateral Order authorized the Debtors to use cash collateral subject to a budget.  Further, by the Cash Collateral Order, the Debtors and Cerberus agreed to the establishment of the Debtor Professional Escrow and Professional Fee Reserve.

## D.  Retention of Investment Banker

On March 14, 2023, the Debtors filed an application to retain Angle Advisors, LLC ("Angle") as investment banker, effective as of March 8, 2023 [Docket No. 97] (the "Angle Retention Application"). As set forth in the Angle Retention Application, the Debtors sought to retain Angle to market substantially all of the Debtors' assets.  Subsequent to the filing of the Angle Retention Application, the Committee negotiated revised terms to Angle's proposed retention, including eliminating certain compensation for the sale of certain assets of the Debtors and fixing the amount of Angle's fees in the event that the Debtors did not receive a bid from any party other than the Prepetition Secured Lenders.  On April 18, 2023, the Bankruptcy Court entered an Order approving the Angle Retention Application, as revised to incorporate the resolution between Angle and the Committee [Docket No. 209].

## E.  Sale of Substantially All of the Debtors' Assets

On April 27, 2023 the Debtors filed a Motion for Entry of: (A) an Order (I) Scheduling a Hearing on the Approval of the Sale of All or Substantially All of the Debtors' Assets Free and Clear of all Encumbrances Other than Assumed Liabilities and Permitted Encumbrances, and the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (II)

---

[4] In the event of any inconsistency between the Plan and the Cash Collateral Order, the Cash Collateral Order shall control.

Approving Certain Bidding Procedures and Assumption and Assignment Procedures, and the Form and Manner of Notice Thereof, (III) Authorizing the Debtors to Enter into the Stalking Horse Purchase Agreement, and (IV) Granting Related Relief; and (B) an Order (I) Approving Asset Purchase Agreement, (II) Authorizing the Sale of All or Substantially All of the Debtors' Assets Free and Clear of All Encumbrances Other than Assumed Liabilities and Permitted Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief [Docket No. 245] (the "Sale Motion").

By and through the Sale Motion, the Debtors sought, among other things, approval of sale procedures, including authorizing the Debtors to enter into a stalking horse agreement with the Prepetition Secured Lenders, setting procedures for submitting bids, and scheduling deadlines for bidding, an auction (if necessary), and a hearing date.

On May 8, 2023, the Debtors (other than Stanadyne PPT Group Holdings, Inc.) and the Prepetition Secured Lenders entered into a proposed asset purchase agreement (the "Stalking Horse Bid") [Docket No. 265]. As set forth in the Stalking Horse Bid, the Purchaser, an affiliate of the Prepetition Secured Lenders offered to purchase substantially all of the Debtors' assets, including the Debtors' equity in the Foreign Non-Debtor Affiliates, free and clear of all claims, liens and encumbrances pursuant to 11 U.S.C. § 363 in exchange for (i) the assumption of certain liabilities; (ii) certain cash consideration to be satisfied (A) in part by way of a credit bid of a portion of the Debtors' obligations under the Financing Agreement and (B) the remainder by the Purchaser's assumption of the Restructured Indebtedness (as defined in the Asset Purchase Agreement) at the Closing; and (iii) the Cash Deficiency Amount (as defined in the Asset Purchase Agreement) if necessary to fund the Wind-Down Budget (all as more specifically set forth in the Asset Purchase Agreement). In addition, the Purchaser agreed to assume certain liabilities and provide the funds for the settlement with the Committee pursuant to the Term Sheet.

Between the filing of the Sale Motion and May 15, 2023, the Committee, the Debtors, and Cerberus negotiated the bidding and sale procedures, and on May 16, 2023, the Bankruptcy Court entered an Order approving the bidding and sale procedures [Docket No. 276] (the "Sale Procedures Order").

Despite extensive marketing, which included Angle contacting more than 150 potentially interested parties and approximately 50 parties expressing further interest, the Debtors did not receive any offers for substantially all (or even less than all) of the Debtors' assets prior to the June 21, 2023 bid deadline in the Sale Procedures Order.

On June 22, 2023, in accordance with the Sale Procedures Order, the Debtors filed a notice of cancellation of the auction, and the Purchaser was designated the successful bidder for substantially all of the Debtors' assets.

### F.  Stipulation of Unencumbered Assets between the Committee and Cerberus

On May 22, 2023, the Committee and Cerberus entered into a stipulation (the "Unencumbered Assets Stipulation") regarding unencumbered assets of the Debtors and the

16211856/7
16211856/7

occurrence of the investigation termination date [Docket No. 292], and the Bankruptcy Court entered an Order approving the Unencumbered Assets Stipulation [Docket No. 293].

As set forth in the Unencumbered Assets Stipulation, the Committee and Cerberus agreed that the following assets were not encumbered by liens in favor of the Prepetition Secured Lenders:

a.      35% of the equity interests owned by Stanadyne LLC in Stanadyne S.p.A.;

b.      35% of the equity interests owned by Stanadyne LLC in Stanadyne India Private Limited;

c.      35% of the equity interests owned by Stanadyne LLC in Stanadyne Changshu Corporation;

d.      any motor vehicle owned by the Debtors for which a security interest was not perfected as required under applicable state law;

e.      the following deposit accounts of certain of the Debtors:

i. Wells Fargo, N.A., account No. xxxxxx2614;

ii. Wells Fargo, N.A., account No. xxxxxx1246;

iii. Bank of America, N.A., account No. xx-xxxx-9824;

iv. Citibank, N.A., account No. xxxx-0706; and

v. Bank of America, N.A., account No. xxxxxx2600; and

f.      certain causes of action consisting of (i) commercial tort claims of the Debtors and their estates, including but not limited to potential claims against the Debtors' current and former officers and directors and (ii) all avoidance actions arising under Sections 544, 547, 548, 548, 549, and 550 of the Bankruptcy Code and similar causes of action arising under applicable nonbankruptcy law.

Additionally, the Committee and Cerberus agreed that the Debtors' prepetition obligations under the Financing Agreement totaled no less than $293,152,851.11.   Nothing in the Unencumbered Assets Stipulation addressed whether the Prepetition Secured Lenders' claims were oversecured under section 506(b) of the Bankruptcy Code or the Cash Collateral Order and thus entitled to postpetition interest and any reasonable fees, costs or charges.   Further, the Committee's and Cerberus' rights with respect to the allowance of the Prepetition Secured Lenders' claims for postpetition interest and any reasonable fees, costs or charges under section 506(b) of the Bankruptcy Code or the Cash Collateral Order were expressly reserved.

16211856/7
16211856/7

**G. Term Sheet between the Committee and Cerberus[5]**

While the Debtors marketed their assets, the Committee and Cerberus negotiated a term sheet for the resolution of certain issues related to, among other things, the sale of the Debtors' unencumbered assets, assumption of liabilities, and the estates' causes of action which were to be sold as part of the Stalking Horse Bid.   The agreement reached among the Committee, Cerberus and the Purchaser was documented in the Term Sheet attached to and approved by  the Sale Order on July 11, 2023.

The Term Sheet provides that, among other things, the Purchaser will fund (or cause to be funded) a total of $4,000,000 comprising (i) a wind-down budget of $1,000,000, which amount is the amount of "Total Disbursements" in the Wind-Down Budget that was finalized pursuant to Section 4.24 of the Asset Purchase Agreement and funded at the Closing in accordance with the Asset Purchase Agreement, (ii) $375,000 to fund the operation of the Liquidating Trust, and (iii) $2,625,000 for Distribution to Holders of Convenience Class Claims and Allowed General Unsecured Claims (which, pursuant to the Term Sheet, does not include any distribution on account of the Cerberus Deficiency Claim).

Pursuant to the Term Sheet, the Purchaser agreed to assume the following additional liabilities, subject to the limitation that Core Liabilities will only be assumed to the extent set forth below in (i) and (ii):

(i)     Liabilities, including Core Liabilities, of the Debtors incurred and outstanding as of the Closing Date with respect to each customer of the Debtors that becomes a customer of the Purchaser from and after the Closing Date;

(ii)    Core Liabilities incurred and outstanding as of the Closing Date with respect to customers of the Debtors that do not become customers of the Purchaser from and after the Closing Date solely to the extent such Core Liabilities are known as of the Closing Date as (i) reflected in the Debtors' books and records or filed proofs of claim and (ii) set forth on a schedule of the amounts of such Core Liabilities acceptable to the Purchaser (or, if not acceptable, subject to objection by the Purchaser after Closing), which schedule shall (A) separately list by customer (x) the amount of such Core Liabilities as of the date that is thirty (30) days prior to the Closing Date and (y) the estimated amount of any incremental Core Liabilities between the date that is thirty (30) days prior to the Closing Date and the Closing Date and (B) be delivered by the Debtors to the Purchaser and the Committee five (5) business days prior to the Closing Date, provided, however, amounts with respect to the foregoing clause (y)  shall be subject to finalization within thirty (30) days after Closing to account for continuing sales and returns during such period through the Closing Date; and

---

[5]     The following is a summary of the Term Sheet.  In the event of any inconsistency between the summary herein and the Term Sheet, the Term Sheet shall control.  A copy of the Term Sheet which is attached hereto as **Exhibit C.**

(iii)     Each Critical Vendor Claim, as defined in the Final Order (I) Authorizing the Debtors to Pay Prepetition Claims of (A) Domestic Critical Vendors, (B) Shippers, Warehousemen, and other Lienholders, and (C) Foreign Vendors; (II) Authorizing Banks to Honor and Process Related Checks and Electronic Transfers; and (III) Granting Related Relief [Docket No. 186] to the extent not paid by the Debtors on or prior to the Closing Date.

Further, as set forth in the Term Sheet, the Committee, Cerberus and the Purchaser agreed that all Avoidance Actions shall be waived and shall not be pursued by the parties or any representative of the Estates, except that:

(i)     Avoidance Actions against insiders ("Insider Avoidance Actions") shall not be waived and do not constitute Purchased Assets; and

(ii)     Avoidance Actions against non-insiders other than Go-Forward Creditors (the "Preserved Avoidance Claims") shall not be waived and shall comprise Purchased Assets under the Sale Order; *provided*, *however*, that the Preserved Avoidance Claims shall be preserved solely for the purpose of permitting the Purchaser to set off such Preserved Avoidance Claims against any claims of the applicable creditors (other than Go-Forward Creditors) that constitute Assumed Liabilities under the Asset Purchase Agreement and Sale Order, and the Purchaser shall not be entitled to any affirmative recovery on account of any such Preserved Avoidance Claims.

With respect to Causes of Action belonging to the Debtors' Estates, the Term Sheet further provides:

(i)     The Non-Go-Forward Commercial Tort Claims shall not comprise Purchased Assets; The Insider Avoidance Actions and the Non-Go-Forward Commercial Tort Claims (collectively, the "Liquidating Trust Claims") shall be transferred to the Liquidating Trust on the Effective Date of the Liquidating Trust. The Liquidating Trustee shall have authority to pursue all Liquidating Trust Claims as a Representative of the Debtors' Estates; and

(ii)     The parties waived claims that the Debtors' Estates may have against Go-Forward Creditors, and no party shall be entitled to any affirmative recovery or right of setoff with respect to any such claims against Go-Forward Creditors.

With respect to the Executory Contracts and Unexpired Leases, the Committee, Cerberus and the Purchaser agreed that if and solely to the extent and for so long as the Purchaser requests in writing that any Designation Rights Assets (as defined in the Asset Purchase Agreement) be maintained following the Closing, the Purchaser shall fund any and all maintenance costs, including lease costs and other third party costs, actually incurred by the Debtors or the Estates in connection with such requested maintenance of the Designation Rights Assets, in accordance with and solely to the extent set forth in Section 1.5(b) of the Asset Purchase Agreement.

24

Significantly, the Committee and Cerberus agreed upon a structure for a plan of liquidation, which would include the appointment of the Liquidating Trustee and his compensation, and establishment of the Oversight Committee.

Because the Term Sheet provided certainty with respect to the assumption of significant liabilities, including all Core Liabilities, the Committee, Cerberus, and the Purchaser agreed to reduce the credit bid portion of the purchase price by $20,000,000 resulting in a Prepetition Debt Bid Amount (as defined in the Asset Purchase Agreement) of $205,000,000, that more closely reflects the fair market value of the Purchased Assets.

The Term Sheet resolved significant issues with respect to the Committee, Cerberus, and the Purchaser, including but not limited to value of the Debtors' unencumbered assets. Had the parties not been able to reach an agreement, it is likely that these Chapter 11 Cases would have been converted to Chapter 7, and the Chapter 7 trustee likely would have been left to engage in highly protracted and expensive litigation over (i) the value of the Debtors' unencumbered assets being acquired by the Purchaser and (ii) any potential claims that the Prepetition Secured Lenders could assert as to adequate protection and diminution of value of its collateral under the Cash Collateral Order, and without any funds for the Chapter 7 trustee to pursue such litigation. Further, there was a possibility that the Prepetition Secured Lenders would not purchase the Debtors' equity in the Foreign Non-Debtor Affiliates which, the Committee believes, would be difficult for a Chapter 7 trustee to monetize efficiently.

On July 11, 2023, the Bankruptcy Court entered the Sale Order approving the sale of substantially all of the Debtors' assets to the Purchaser [Docket No. 443].[6] The Term Sheet was expressly incorporated in and approved by the Sale Order and attached as an exhibit thereto.

On July 31, 2023, the Sale closed. As of the Closing Date, the Purchaser retained the right to designate certain Executory Contracts and Unexpired Leases for assumption, assignment, and sale post-Closing.

### H.    Termination of the Stanadyne Pension Plan

Effective July 7, 2023, the Stanadyne LLC Pension Plan (the "Pension Plan") was terminated and the PBGC was appointed the statutory trustee of the Pension Plan on July 12, 2023.

### I.    Windsor Property

The Purchaser elected not to purchase the Debtors' two adjoining parcels of real property in Windsor, Connecticut owned by Stanadyne LLC (the "Windsor Property") and designated the Windsor Property as an "Excluded Asset" under the Asset Purchase Agreement. The parcels, which are located at 90-92 Deerfield Road, Windsor, CT. The parcels are a combined 53 acres, and includes three buildings totaling approximately 814,000 square feet.

---

[6]    In the event of any inconsistency between the Plan and the Sale Order, the Sale Order shall control.

One of the two parcels of the Windsor Property is subject to ongoing remediation. Prior to the Petition Date, the Debtors entered into an agreement with the former owner of the Windsor Property, Metromedia Company, pursuant to which Metromedia agreed to be responsible for certain remediation liabilities with respect to the Windsor Property.

Before learning that the Purchaser was electing not to take the Windsor Property, the Debtors retained Jones Lang LaSalle Americas, Inc. ("JLL") as broker for the sale of the Windsor Property [Docket No. 383]. On July 10, 2023, JLL's employment as broker for the Windsor Property was approved, effective May 25, 2023 [Docket No. 439].

The Plan Proponent believes that the value of the Windsor Property would not exceed the costs of maintaining the property through a prolonged sale process. Further, the Plan Proponent believes that the costs of remediation would likely render the value of the Debtor's interest in the property de minimis, at best. Accordingly, on August 2, 2023, the Debtors filed a Motion for Entry of an Order (I) Authorizing the Debtors to Abandon or, Alternatively Sell the Windsor Property and (II) for Related Relief [Docket No. 486] (the "Abandonment/Sale Motion"). While the Abandonment Sale Motion was pending, the Debtors continued to seek a buyer for the Windsor Property, and the Debtors were able to reach an agreement contingent on further due diligence with a potential purchaser by and through which the Debtors may realize only $1 from the sale of the Windsor Property, but the potential purchaser agreed to pay the ongoing costs for the Windsor Property as it continues to do its due diligence, and in the event that it elects to move forward with the purchase of the Windsor Property, it will also pay JLL's fees. On September 5, 2023, the Debtors filed a supplement to the Abandonment/Sale Motion [Docket No. 550].

**ARTICLE III.**
CONFIRMATION PROCEDURES

**3.01** Confirmation Hearing Procedures

On _____, 2023, the Plan Proponent filed a motion, by and through which the Plan Proponent sought conditional approval of the Plan for solicitation purposes only and for approval of the procedures for the solicitation of the Plan [Docket No ____]. On _____, 2023, the Bankruptcy Court entered the Solicitation Procedures Order [Docket No. ___]. Among other things, the Solicitation Procedures Order, approved the adequacy of disclosures in the Plan on an interim basis and set certain deadlines for the solicitation of the Plan, voting on the Plan, filing objections to the Plan and scheduling a hearing to consider approval of the Plan. The Confirmation Hearing has been scheduled for _____, **2023 at** _____ **_.m.** (Prevailing Eastern Time) at which the Bankruptcy Court will consider the Plan pursuant to section 1129 of the Bankruptcy Code. The Confirmation Hearing may be adjourned from time to time by the Plan Proponent.

**3.02** Procedure for Objections

Any objection to final approval of the Plan as providing adequate information pursuant to section 1125 of the Bankruptcy Code and/or Confirmation of the Plan must be made in writing and Filed with the Bankruptcy Court and served on the following parties so as to be actually received on or before _____, **2023 at 4:00 p.m. (Prevailing Eastern Time)** upon (a) counsel to the Debtors:  (i) Kathryn A. Coleman, Esquire and Christopher Gartman, Esquire

(email: Katie.coleman@hugheshubbard.com and Chris.gartman@hugheshubbard.com) and (ii) Michael Nestor, Esquire, Andrew Magaziner, Esquire, and Ashley Jacobs, Esquire (email: mnestor@ycst.com, amagaziner@ycst.com, and Ajacobs@ycst.com), (b) counsel to the Committee: (i) Adam C. Rogoff, Esquire and Rose Bagley, Esquire (email: arogoff@kramerlevin.com and rbagley@kramerlevin.com) and (ii) Jeffrey R. Waxman, Esquire and Eric J. Monzo, Esquire (email: jwaxman@morrisjames.com and emonzo@morrisjames.com), (c) counsel to Cerberus: Michael L. Tuchin and David A. Fidler (email: mtuchin@ktbslaw.com and dfidler@ktbslaw.com), and (d) Office of the United States Trustee, Jane Leamy, Esquire (email: jane.m.leamy@usdoj.gov). Unless an objection is timely Filed and served, it may not be considered by the Bankruptcy Court at the Confirmation Hearing.

### 3.03    Requirements for Confirmation

The Bankruptcy Court will confirm the Plan only if it meets all the applicable requirements of section 1129 of the Bankruptcy Code. Among other requirements, the Plan (a) must be accepted by all Impaired Classes of Claims or Interests or, if rejected by an Impaired Class, the Plan must not "discriminate unfairly" against, and must be "fair and equitable" with respect to, such Class; and (b) must be feasible. The Bankruptcy Court must also find that: (i) the Plan has classified Claims and Interests in a permissible manner; (ii) the Plan complies with the technical requirements of Chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith.

### 3.04    Classification of Claims and Equity Interests

Section 1123 of the Bankruptcy Code provides that a plan must classify the claims and interests of a debtor's creditors and equity interest holders. In accordance with section 1123 of the Bankruptcy Code, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than those claims which pursuant to section 1123(a)(1) of the Bankruptcy Code need not be and have not been classified). The Plan Proponent are also required, under section 1122 of the Bankruptcy Code to classify Claims and Interests into Classes that contain Claims or Interests that are substantially similar to the other Claims or Interests in such Class.

The Bankruptcy Code also requires that a plan provide the same treatment for each claim or interest of a particular class unless the claim holder or interest holder agrees to a less favorable treatment of its claim or interest. The Plan Proponent believe that the Plan complies with such standard. If the Bankruptcy Court finds otherwise, however, it could deny Confirmation of the Plan if the Holders of Claims or Interests affected do not consent to the treatment afforded them under the Plan.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim also is placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been Disallowed, paid, released or otherwise settled prior to the Effective Date. The Plan Proponent believes that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law. It is possible that a Holder of a Claim

27

or Interest may challenge the Plan Proponent's classification of Claims or Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. If such a situation develops, the Plan Proponent intends, in accordance with the terms of the Plan, and pursuant to section 1127 of the Bankruptcy Code, to make such permissible modifications to the Plan as may be necessary to permit its Confirmation. Any such reclassification could adversely affect Holders of Claims by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Plan.

EXCEPT AS SET FORTH IN THE PLAN, UNLESS SUCH MODIFICATION OF CLASSIFICATION MATERIALLY ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM AND REQUIRES RE-SOLICITATION, ACCEPTANCE OF THE PLAN BY ANY HOLDER OF A CLAIM PURSUANT TO THIS SOLICITATION WILL BE DEEMED TO BE A CONSENT TO THE PLAN'S TREATMENT OF SUCH HOLDER OF A CLAIM REGARDLESS OF THE ULTIMATE CLASS IN WHICH THE HOLDER IS DEEMED TO BE A MEMBER.

The amount of any Impaired Claim that ultimately is Allowed by the Bankruptcy Court may vary from any estimated Allowed amount of such Claim and, accordingly, the total Claims that are ultimately Allowed by the Bankruptcy Court with respect to each Impaired Class of Claims may vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class. Thus, the actual recovery ultimately received by a particular Holder of an Allowed Claim may be adversely or favorably affected by the aggregate amount of Claims Allowed in the applicable Class. Additionally, any changes to any of the assumptions underlying the estimated Allowed amounts could result in material adjustments to recovery estimates provided herein and/or the actual Distribution received by Creditors. The projected recoveries are based on information available to the Plan Proponent as of the date hereof and reflect the Plan Proponent's views as of the date hereof only.

The classification of Claims and Interests and the nature of Distributions to members of each Class are summarized herein. The Plan Proponent believes that the consideration, if any, provided under the Plan to Holders of Claims reflects an appropriate resolution of their Claims taking into account the differing nature and priority (including applicable contractual subordination) of such Claims and Interests. The Bankruptcy Court must find, however, that a number of statutory tests are met before it may confirm the Plan. Many of these tests are designed to protect the interests of Holders of Claims or Interests who are not entitled to vote on the Plan, or do not vote to accept the Plan, but who will be bound by the provisions of the Plan if it is confirmed by the Bankruptcy Court.

**3.05**    Impaired Claims or Equity Interests

Pursuant to the provisions of the Bankruptcy Code, only classes of claims or interests that are "impaired" (as defined in section 1124 of the Bankruptcy Code) under a plan may vote to accept or reject such plan. Generally, a claim or interest is impaired under a plan if the holder's legal, equitable or contractual rights are changed under such plan. In addition, if the holders of claims or interests in an impaired class do not receive or retain any property under a plan on account of such claims or interests, such impaired class is deemed to have rejected the plan under

28

section 1126(g) of the Bankruptcy Code and, therefore, such holders are not entitled to vote on such plan.

Under the Plan, only Holders of Claims in Classes 3, 4, and 5 are Impaired and are entitled to vote on the Plan. Holders of Claims in Classes 1 and 2 are Unimpaired and, therefore, not entitled to vote on the Plan and are deemed to accept the Plan.

Holders of Interests in Class 6 (Equity Interests) will not receive anything on account of their respective claims and interests and are therefore not entitled to vote on the Plan and are deemed to reject the Plan.

A ballot for acceptance or rejection of the Plan is being provided only to Holders of Claims in Class 3 (Cerberus Deficiency Claim), Class 4 (General Unsecured Claims) and Class 5 (Convenience Class Claims).

**3.06**    Confirmation Without Necessary Acceptances; Cramdown

In the event that any impaired class of claims or interests does not accept a plan, a debtor nevertheless may move for confirmation of the plan. A plan may be confirmed, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of claims, and the plan meets the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code requires that a court find that a plan "does not discriminate unfairly" and (b) is "fair and equitable," with respect to each non-accepting impaired class of claims or interests. Here, because Holders of Interests in Class 6 are deemed to reject the Plan, the Plan Proponent will seek Confirmation of the Plan from the Bankruptcy Court by satisfying the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. The Plan Proponent believes that such requirements are satisfied, as no Holder of a Claim or Interest junior to General Unsecured Claims, will receive or retain any property under the Plan.

A plan does not "discriminate unfairly" if (a) the legal rights of a non-accepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to those of the non-accepting class and (b) no class receives payments in excess of that which it is legally entitled to receive for its claims or interests. The Plan Proponent believes that, under the Plan, all Impaired Classes of Claims or Interests are treated in a manner that is consistent with the treatment of other Classes of Claims or Interests that are similarly situated, if any, and no Class of Claims or Interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims in such Class. Accordingly, the Plan Proponent believes that the Plan does not discriminate unfairly as to any Impaired Class of Claims or Interests.

The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable." In order to determine whether a plan is "fair and equitable," the Bankruptcy Code establishes "cram down" tests for secured creditors, unsecured creditors and equity holders, as follows:

(a) <u>Secured Creditors</u>. Either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred Cash payments having a present value equal to the amount of its allowed secured

16211856/7
16211856/7

claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.

(b) <u>Unsecured Creditors</u>. Either (i) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the Holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

(c) <u>Equity Interests</u>. Either (i) each Holder of an Interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such Holder is entitled, the fixed redemption price to which such Holder is entitled or the value of the interest or (ii) the Holder of an interest that is junior to the non-accepting class will not receive or retain any property under the plan. As discussed above, the Plan Proponent believes that the Distributions provided under the Plan satisfy the absolute priority rule, where required.

**3.07**    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan not be likely to be followed by the liquidation, or the need for further financial reorganization, of the debtors or any successor to the debtors (unless such liquidation or reorganization is proposed in the Plan). Inasmuch as the majority of Debtors' property has been liquidated and the Plan provides for the Distribution of all of the Cash proceeds of the Debtors' property to Holders of Claims that are Allowed as of the Effective Date in accordance with the Plan, for purposes of this test, Plan Proponent has analyzed the ability of the Liquidating Trust to meet its obligations under the Plan. Based on the Plan Proponent's analysis, the Liquidating Trustee will have sufficient assets to accomplish its tasks under the Plan. Therefore, the Plan Proponent believes that the liquidation pursuant to the Plan will meet the feasibility requirements of the Bankruptcy Code.

**3.08**    Best Interests Test and Liquidation Analysis

Even if a plan is accepted by the holders of each class of claims and interests, the Bankruptcy Code requires a court to determine that such plan is in the best interests of all holders of claims or interests that are impaired by that plan and that have not accepted the plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under Chapter 7 of the Bankruptcy Code. To calculate the probable distribution to holders of each impaired class of claims and interests if the debtor was liquidated under Chapter 7, a court must first determine the aggregate dollar amount that would be generated from a debtor's assets if its Chapter 11 cases were converted to Chapter 7 under the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the present value of the distribution from the proceeds of a liquidation of the debtor's unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses and administrative

30

expenses associated with a Chapter 7 liquidation, must be compared with the value offered to such impaired classes under the plan. If the hypothetical liquidation scenario results in a distribution to holders of claims or interests in any impaired class that is greater than the distribution to be received by such parties under the plan, then such plan is not in the best interests of the holders of claims or interests in such impaired class. See Liquidation Analysis attached as **Exhibit B** to this Plan.

Because the Plan is a liquidating plan, the "liquidation value" in the hypothetical Chapter 7 liquidation analysis for purposes of the "best interests" test is substantially similar to the estimates of the results of the Chapter 11 liquidation contemplated by the Plan. However, the Plan Proponent believes that in a Chapter 7 liquidation, there would be additional costs and expenses that the Estates would incur as a result of liquidating the Estates in Chapter 7.

The costs of liquidation under Chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as the costs of counsel and other professionals retained by the trustee. The Plan Proponent believes such amount would exceed the amount of expenses that would be incurred in implementing the Plan and winding up the affairs of the Debtors. The Estates would also be obligated to pay all unpaid expenses incurred by the Debtors during the Chapter 11 Cases (such as compensation for Professionals) that are allowed in the Chapter 7 case. Conversion also would likely delay the liquidation of the assets as well as the Distributions to Holders of Claims.

Accordingly, the Plan Proponent believes that Holders of Allowed Claims would receive less than anticipated under the Plan if the Chapter 11 Cases were converted to Chapter 7, and therefore, the classification and treatment of Claims and Interests in the Plan complies with section 1129(a)(7) of the Bankruptcy Code.

**3.09**    Acceptance of the Plan

The rules and procedures governing eligibility to vote on the Plan, solicitation of votes, and submission of ballots are set forth in the Solicitation Procedures Order. In order for the Plan to be accepted by an Impaired Class of Claims, a majority in number and two-thirds in dollar amount of the Claims voting in such Class must vote to accept the Plan. At least one Class entitled to vote on this plan, excluding the votes of Insiders, must actually vote to accept the Plan.  **THE VOTING AGENT MUST RECEIVE BALLOTS ON OR BEFORE THE VOTING DEADLINE OF 4:00 P.M. (PREVAILING EASTERN TIME) ON _____, 2023.**

IF YOU ARE ENTITLED TO VOTE ON THE PLAN, YOU ARE URGED TO COMPLETE, DATE, SIGN AND PROMPTLY MAIL THE BALLOT YOU RECEIVE OR PROMPTLY USE THE ONLINE VOTING OPTION. PLEASE BE SURE TO COMPLETE THE BALLOT PROPERLY AND LEGIBLY AND TO IDENTIFY THE EXACT AMOUNT OF YOUR CLAIM AND THE NAME OF THE HOLDER. IF YOU ARE A HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN AND YOU DID NOT RECEIVE A BALLOT, YOU RECEIVED A DAMAGED BALLOT OR YOU LOST YOUR BALLOT OR IF YOU HAVE ANY QUESTIONS CONCERNING THE PLAN OR PROCEDURES FOR VOTING ON THE PLAN, CONTACT THE VOTING AGENT AT _____.

16211856/7
16211856/7

## ARTICLE IV.
## CLASSIFICATION OF CLAIMS AND INTERESTS AND EXPECTED RECOVERIES

**4.01**    Overview of Classification.

Pursuant to section 1122 of the Bankruptcy Code, a Claim or Interest is placed in a particular Class for purposes of voting on the Plan and receiving Distributions under the Plan only to the extent (i) the Claim or Interest qualifies within the description of that Class; and (ii) the Claim or Interest has not been paid, released, or otherwise compromised before the Effective Date. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expenses, including Professional Fee Claims, and Priority Tax Claims are not classified under the Plan and are excluded from the Classes.

**4.02**    Identification and Treatment of Unclassified Claims

(a)    Administrative Expenses. On the Effective Date, each Holder of an Allowed Administrative Expense shall receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed Administrative Expense: (a) Cash equal to the amount of such Allowed Administrative Expense; or (b) such other treatment as to which the Plan Proponent or the Liquidating Trustee, as applicable, and the Holder of such Allowed Administrative Expense shall have agreed upon in writing.  Cash distributed to Holders of Allowed Administrative Expenses (other than Professional Fee Claims) shall be paid from the Initial Distribution Fund. Allowed Professional Fee Claims shall be paid from the Debtor Professional Escrow, Professional Fee Reserve, and/or the Wind-Down Budget as set forth in the Sale Order and subject to the limitations therein, which shall, collectively, be the exclusive sources of funds for payment of Allowed Professional Fee Claims. Such amounts may be paid from either the Initial Distribution Fund or the General Unsecured Trust in the Liquidating Trustee's discretion.

(i) Final Administrative Expense Bar Date. Holders of Administrative Expenses accruing from the Petition Date through the Effective Date, other than Professional Fee Claims, shall File with the Bankruptcy Court and serve on the Liquidating Trustee requests for payment, in writing, together with supporting documents, substantially complying with the Bankruptcy Code, the Bankruptcy Rules and the Local Rules, so as to actually be received on or before the Final Administrative Expense Bar Date. Any such Claim not Filed by the Final Administrative Expense Bar Date shall be deemed waived and the Holder of such Administrative Expense Claim shall be forever barred from receiving payment on account thereof. The notice of the Effective Date to be delivered pursuant to Bankruptcy Rules 2002(c)(3) and 2002(f) shall set forth the Final Administrative Expense Bar Date and shall constitute notice of such Bar Date.  The Liquidating Trustee shall have one hundred and eighty (180) days (or such longer period authorized by an Order of the Bankruptcy Court on a motion of the Liquidating Trustee) following the Final Administrative Expense Bar Date to review and object to Administrative Expenses.

(ii) Bar Date for Applications for Professional Fees.  All applications for allowance and payment of Professional Fee Claims shall be Filed with the Bankruptcy Court on or before the Professional Fee Bar Date. If an application for a Professional Fee Claim is

32

not Filed by the Professional Fee Bar Date, such Professional Fee Claim shall be deemed waived and the Holder of such Professional Fee Claim shall be forever barred from receiving payment on account thereof. The notice of Effective Date to be delivered pursuant to Bankruptcy Rules 2002(c)(3) and 2002(f) shall set forth the Professional Fee Bar Date and shall constitute notice of such Bar Date. The Professional Fee Bar Date shall be thirty (30) days after the Effective Date. All Allowed Professional Fees shall be paid from the Debtor Professional Escrow and Professional Fee Reserve and/or the Wind-Down Budget set forth in the Sale Order, subject to the limitations therein.

(iii) <u>Section 503(b)(9) Claims</u>. For the avoidance of doubt, (i) the deadline for Filing requests for payment of 503(b)(9) Claims was the General Bar Date and (ii) the deadline for Filing requests for payment of Administrative Expenses that arose between the Petition Date and the Effective Date is the Final Administrative Expense Bar Date, which is thirty (30) days after the Effective Date.

(b)    <u>Priority Tax Claims</u>. On the Effective Date, each Holder of a Priority Tax Claim that is Allowed shall receive in full and final satisfaction, settlement, and release of and in exchange for such Priority Tax Claim: (a) Cash equal to the amount of such Allowed Priority Tax Claim; or (b) such other treatment as to which the Plan Proponent or the Liquidating Trustee, as applicable, and the Holder of such Allowed Priority Tax Claim shall have agreed upon in writing. Such amounts shall be paid from either the Initial Distribution Fund or the Liquidating Trust in the Liquidating Trustee's discretion.

(c)    <u>Administrative and Priority Claim Reserve.</u>  As set forth in Section 8.02 of this Plan, prior to making any Distributions, the Liquidating Trustee shall establish reserves in Cash, in an amount sufficient for the payment of all Disputed Administrative Expenses, Disputed Priority Tax Claims and other Disputed Claims and expenses (including Liquidating Trust Expenses) as deemed necessary in the reasonable discretion of the Liquidating Trustee.

**4.03**    Identification of and Treatment of Classes of Claims

(a)    <u>Treatment of Priority Non-Tax Claims (Class 1)</u>. Each Holder of an Allowed Priority Non-Tax Claim shall receive in exchange for full and complete settlement and release of such Claim, either Cash equal to the full unpaid amount of such Allowed Priority Non-Tax Claim, or such other treatment as the Debtors or the Liquidating Trustee, as applicable, and the Holder of such Allowed Priority Non-Tax Claim shall have agreed.  Following the Effective Date, Distributions of Cash to Holders of Priority Non-Tax Claims shall be made as soon as reasonably practicable after it is Allowed from the Initial Distribution Fund or the Liquidating Trustee in the Liquidating Trustee's reasonable discretion. **Class 1 Claims are therefore Unimpaired and not entitled to vote.**

(b)    <u>Treatment of Secured Claims (Class 2)</u>. Each Holder of an Allowed Secured Claim against the Debtors shall receive on the Effective Date, on account of and in full and complete settlement, and release and in exchange for, such Allowed Secured Claim, either return of the collateral securing such Allowed Secured Claim or Cash equal to the full unpaid amount of such Allowed Secured Claim, or such other treatment as the Plan Proponent, and the Holder of such

33

Allowed Secured Claim shall have agreed. If the Holder of an Allowed Secured Claim is to receive a Distribution in Cash, such Distribution shall be made from the Initial Distribution Fund or the Liquidating Trust on or as soon after the Effective Date or date such Claim becomes Allowed as is reasonably practicable. **Class 2 Claims are therefore Unimpaired and not entitled to vote.**

(c)    Treatment of Cerberus Deficiency Claim (Class 3). The Cerberus Deficiency Claim shall be Allowed in the amount of $87,252,851.11, which shall remain secured by the Excluded Assets (as defined in the Asset Purchase Agreement), other than the Liquidating Trust Claims (as defined in the Term Sheet), which will not be subject to the security interest of the Prepetition Secured Parties; provided, however, that the amount of the Cerberus Deficiency Claim shall be reduced on a dollar-for-dollar basis by any net proceeds paid to Cerberus from any Excluded Assets. The Holder of the Cerberus Deficiency Claim (as such claim may be reduced pursuant to the prior sentence) shall receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed Class 3 Claim, its Pro Rata share of all Distributions made from the Unsecured Claim Distribution Fund. **The Class 3 Cerberus Deficiency Claim is Impaired and entitled to vote.**

(d)    Treatment of General Unsecured Claims (Class 4). **Subject to the right to opt into Class 5  as set forth below,** each Holder of an Allowed General Unsecured Claim, which shall include the PBGC Claim, shall receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed Class 4 Claim, a Pro Rata Distribution from the Initial Distribution Fund after payment in full of all Allowed Administrative Expenses, Allowed Priority Tax Claims, Allowed Non-Tax Priority Claims, and Allowed Secured Claims, and after the Distribution to Allowed Convenience Class Claims as set forth herein. Following exhaustion of the Initial Distribution Fund, Holders of Allowed Class 4 Claims, shall receive their respective Pro Rata shares (taking into account only such remaining unpaid amounts following the exhaustion of the Initial Distribution Fund) of all subsequent Distributions made to holders of Allowed General Unsecured Claims from the Liquidating Trust. The PBGC shall have no other Claim against the Debtors except for the PBGC Claim, provided however that the foregoing shall not limit, impair or modify the PBGC's rights under Section 5.2 of the Sale Order. **Class 4 Claims are Impaired and entitled to vote.**

(e)    Treatment of Convenience Class Claims (Class 5). **Subject to the right to opt into Class 4 as set forth above,** Convenience Class Claims are unsecured claims that have been asserted in an amount of $20,000 or less. Unless a Convenience Class Claim is the subject of an objection on the Effective Date or has been satisfied, it shall be deemed Allowed and not subject to objection, and the Holder of such Convenience Class Claim shall receive a Distribution of 10% of the amount of its Allowed Convenience Class Claim. Such Distribution will be made from the Initial Distribution Fund as soon after the Effective Date as is reasonably practicable but in no event prior to payment in full (or the establishment of reserves sufficient to allow payment in full) of all Allowed Administrative Expenses, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, and Allowed Secured Claims. In the event that a Convenience Class Claim Holder has opted into Class 5 and an objection to the Claim is pending on the Effective Date, the Holder of such Claim shall receive a Distribution of 10% of the amount of its Allowed Convenience Claim from the Initial Distribution Fund as soon as reasonably practicable after the Claim is Allowed. **Class 5 Claims are Impaired and entitled to vote.**

34

(f)     Treatment of Equity Interests (Class 6).  On the Effective Date, all Interests shall be deemed canceled, extinguished and of no further force or effect, and the Holders of Interests shall not be entitled to receive or retain any property on account of such Interest. **Class 6 Equity Interests are Impaired, and deemed to reject the Plan, and are therefore not entitled to vote.**

**4.04**     Unsecured Creditors' Rights to Opt In/Out of Classes 4 and 5.

At any time prior to the Voting Deadline, any Holder of a General Unsecured Claim in Class 4 may opt into Class 5, and any Holder of a Convenience Class Claim may opt into Class 4. At any time prior to the Voting Deadline, a Holder of a Class 4 General Unsecured Claim (which is, by definition, asserted for more than $20,000) may elect to have its claim treated as a Class 5 Convenience Class Claim.  Upon such election, if no objection to the Allowance is pending on the Effective Date,  the Claim will be reduced in amount to $20,000, and will be deemed an Allowed Convenience Class Claim (i.e., not be subject to an objection if its claim is not the subject of an objection on the Effective Date) in that amount, and the Holder will receive a Distribution of 10% (i.e., $2,000) on or as soon after the Effective Date as is reasonably practicable.  Any Holder of a Class 4 General Unsecured Claim that opts into Class 5 and to have its Claim treated as a Convenience Class Claim will not receive any further distribution regardless of the Distributions made to Allowed Class 4 General Unsecured Claims.

Similarly, at any time prior to the Voting Deadline, any Holder of a Convenience Class Claim (which is, by definition, asserted for $20,000 or less) may opt into Class 4 to have its Claim treated as a General Unsecured Claim.   Upon such election, the amount of the Claim on the Effective Date will be deemed Disputed.  As such, the Holder of such a Claim will not receive a Distribution on the Effective Date and will only receive a Distribution in accordance with the treatment of Class 4 Claims after the Claim is Allowed. For the avoidance of doubt, a Holder of a Claim that is eligible to and does properly opt out of Convenience Class will, after the Claim is Allowed, be entitled to receive a Distribution Pro Rata to other Class 4 Claims.

**4.05**     Classification of Classes, Rights to Vote, and Estimated Distributions

The information in the table below is provided in summary form for illustrative purposes only and is subject to material change based on certain contingencies, including related to the amount of Claims that exist after the claims reconciliation process.  Actual recoveries may widely vary within these ranges, and any changes to any of the assumptions underlying these amounts could result in material adjustments to the estimates provided herein and/or the actual Distributions received by Creditors. The projected recoveries are based on information available to the Plan Proponent as of the date hereof and reflect the Plan Proponent's best estimates as of the date hereof only. In addition to the cautionary notes contained elsewhere in the Plan, it is emphasized that the Plan Proponent makes no representation as to the accuracy of these recovery estimates. The Plan Proponent expressly disclaims any obligation to update any estimates or assumptions after the date hereof on any basis (including new or different information received and/or errors discovered). A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim or Interest is also placed in a particular Class for the purpose of receiving Distributions pursuant to this Plan

35

16211856/7
16211856/7

only to the extent that such Claim or Interest is an Allowed Claim in that Class and such Claim or Interest has not been paid, released or otherwise settled prior to the Effective Date.

All Claims and Interests, except Administrative Expenses and Priority Tax Claims, are placed in the Classes set forth below. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expenses, including Professional Fee Claims, and Priority Tax Claims, as described herein, have not been classified, and the respective treatment of such unclassified Claims is set forth below. The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, Confirmation and Distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

Any Claim that has already been satisfied will not receive a Distribution on account of such Claim.  On the Effective Date, all Interests shall be deemed canceled, extinguished and of no further force or effect, and the Holders of Interests shall not be entitled to receive or retain any property on account of such Interest.

| Class/Designation | Plan Treatment[7] | Voting Status | Estimated Claim Pool /Projected Recovery |
|---|---|---|---|
| Class 1: Priority Non-Tax Claims | Each Holder of an Allowed Priority Non-Tax Claim at the option of the Debtors or the Liquidating Trustee, as applicable, shall receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed Class 1 Claim: (A) Cash equal to the amount of such Allowed Priority Non-Tax Claim; or (B) such other treatment which the Debtors or the Liquidating Trustee, as applicable, and the Holder of such Allowed Priority Non-Tax Claim have agreed upon in writing.  To the extent that such Allowed Claims are satisfied from Cash, such Distributions shall be made from the Initial Distribution Fund. | Unimpaired; **Not entitled to vote** (deemed to accept Plan) | Approx. $0  Recovery: 100% |
| Class 2: Secured Claims | Each Holder of an Allowed Class 2 Claim, at the option of the Liquidating Trustee, as applicable, shall receive in full and final | Unimpaired; **Not entitled to** | Approx. $0 |

---

[7] The following description is provided in summary form and is qualified in all respect by the treatment for such Class set forth in Section 4.03.

16211856/7
16211856/7

| | | | |
|---|---|---|---|
| | satisfaction, settlement, and release of and in exchange for such Allowed Secured Claim: (A) return of the collateral securing such Allowed Secured Claim; or (B) Cash equal to the amount of such Allowed Secured Claim; or (C) such other treatment which the Liquidating Trustee and the Holder of such Secured Claim have agreed upon in writing. To the extent that such Allowed Secured Claims are satisfied from Cash, such Distributions shall be made from the Initial Distribution Fund. | **vote** (deemed to accept Plan) | Recovery: 100% |
| Class 3: Cerberus Deficiency Claim | The Cerberus Deficiency Claim shall be Allowed in the amount of $87,252,851.11, which shall remain secured by the Excluded Assets (as defined in the Asset Purchase Agreement), other than the Liquidating Trust Claims (as defined in the Term Sheet), which will not be subject to the security interest of the Prepetition Secured Parties; provided, however, that the amount of the Cerberus Deficiency Claim shall be reduced on a dollar-for-dollar basis by any net proceeds paid to Cerberus from any Excluded Assets. The Holder of the Cerberus Deficiency Claim shall receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed Class 3 Claim, a Pro Rata Distribution from the Unsecured Claim Distribution Fund. | Impaired; **Entitled to vote** | $87,252,851.11 Recovery: 0-5% |
| Class 4: General Unsecured Claims | Each Holder of an Allowed General Unsecured Claim shall receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed Class 4 Claim a Pro Rata Distribution from the Initial Distribution Fund after payment or reserve of all Allowed Administrative Expenses, Allowed Priority Tax | Impaired; **Entitled to vote** | (subject to opt-in or opt-out) Approx. $34.4 mil. – $23.6 mil. Recovery: 0%-10.6% |

37

| | | | |
|---|---|---|---|
| | Claims, Allowed Priority Non-Tax Claims, and Allowed Secured Claims in full.  To the extent that any portion of an Allowed General Unsecured Claim remains after such payment, Holders of Allowed Class 4 Claims, shall also receive a Pro Rata Distribution from the Unsecured Claim Distribution Fund.<br><br>Right to Opt Into Class 5. Holders of General Unsecured Claims in excess of $20,000 shall have the right to opt into Class 5 as set forth in Section 4.04. | | |
| Class 5: Convenience Claims | Convenience Class Claims are unsecured claims asserted in an amount of $20,000 or less.  Unless a Convenience Claim is the subject of an objection on the Effective Date or has been satisfied, it shall be deemed an Allowed Claim (i.e., not subject to objection), and the Holder of such claim shall receive a Distribution of 10% of the amount of its Allowed Convenience Claim.  Such Distribution will be made from the Initial Distribution Fund as soon after the Effective Date as is reasonably practicable.   In the event that a Convenience Class Claim is the subject of an objection on the Effective Date, the Holder of such claim shall receive a Distribution of 10% of the amount of its Allowed Convenience Claim from the Initial Distribution Fund as soon after the Allowed Convenience Class Claim is deemed Allowed as reasonably practicable.<br><br>Right to Opt Into Class 4. Holders of Convenience Class Claims shall have the right to opt into Class 4 as set forth in Section 4.04. | Impaired; **Entitled to vote** | (subject to opt-in or opt-out) Approx. $1,100,000<br><br>Recovery: 10% |

38

| Class 6: Equity Interests | On the Effective Date, all Interests shall be deemed canceled, extinguished and of no further force or effect, and the Holders of Interests shall not be entitled to receive or retain any property on account of such Interest. | Impaired; **Not entitled to vote** (deemed to reject) | Recovery: 0% |
|---|---|---|---|

**4.06**   Elimination of Vacant Classes for Voting Purposes

Any Class of Claims or Equity Interests that is not occupied as of the date of the commencement of the Confirmation Hearing shall be deemed deleted from the Plan for purposes of voting on acceptance or rejection of the Plan by such Class under section 1129(a)(8) of the Bankruptcy Code.

**4.07**   Controversy Concerning Classification, Impairment or Voting Rights

In the event a controversy or dispute should arise involving issues related to the classification, impairment or voting rights of any Holder of a Claim or Interest under the Plan, whether before or after the Confirmation Date, the Bankruptcy Court may, after notice and a hearing, adjudicate such controversy. Without limiting the foregoing, the Bankruptcy Court may estimate for voting purposes (i) the amount of any contingent or unliquidated Claim the fixing or liquidation of, as the case may be, would unduly delay the administration of the Chapter 11 Cases and (ii) any right to payment arising from an equitable remedy for breach of performance.

**4.08**   Insurance

Notwithstanding anything to the contrary herein, unless elected otherwise by the Liquidating Trustee, if any Allowed Claim is covered by an insurance policy, such Claim shall first be paid from proceeds of such Insurance Policy to the extent such proceeds are available, with the balance, if any, treated in accordance with the provisions of the Plan governing the Class applicable to such Claim.

## ARTICLE V.

<u>CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING</u>

THE PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW. HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH IN THE PLAN AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH OR REFERRED TO OR INCORPORATED BY REFERENCE HEREIN, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.

16211856/7
16211856/7

THESE FACTORS ARE NOT EXCLUSIVE AND DO NOT CONSTITUTE THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

**5.01**    The Plan May Not Be Accepted.

The Plan Proponent can make no assurances that the requisite acceptances of the Plan will be received, and the Plan Proponent may seek to solicit an alternative plan of liquidation for the Debtors, or the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code. There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to Creditors as those proposed in the Plan.

**5.02**    The Plan May Not Be Confirmed.

Even if the Plan Proponent receives the requisite acceptances, there is no assurance that the Bankruptcy Court, which may exercise substantial discretion as a court of equity, will confirm the Plan. Even if the Bankruptcy Court determined that the Plan and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. Moreover, there can be no assurance that modifications to the Plan will not be required for Confirmation or that such modifications would not necessitate the resolicitation of votes. If the Plan is not confirmed, it is unclear what Holders of Claims or Interests would receive under an alternative plan or in a chapter 7 liquidation.

**5.03**    Distributions to Holders of Allowed Claims under the Plan May Be Inconsistent with Projections.

The projected Distributions discussed herein are based upon good faith estimates of the total amount of Claims ultimately Allowed and the funds available for Distribution. There can be no assurance that the estimated Claim amounts set forth in the Plan are correct. These estimated amounts are based on certain assumptions with respect to a variety of factors, including specifically, the amount of Allowed Claims, and the amount to be received by the Liquidating Trust on account of Causes of Action.  Both the actual amount of Allowed Claims in a particular Class and the funds available for Distribution to such Class may differ from the Plan Proponent's estimates. If the total amount of Allowed Claims in a Class is higher than the Plan Proponent's estimates, or the funds available for Distribution to such Class are lower than the Plan Proponent's estimates, the percentage recovery to Holders of Allowed Claims in such Class will be less than projected.

**5.04**    Objections to Classification of Claims.

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims and Interests. The Bankruptcy Code also provides that the Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests of such Class. The Plan Proponent believes that all Claims and Interests have been appropriately classified in the Plan. To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Plan Proponent may seek to (i) modify the Plan to provide for whatever classification might be required for Confirmation and (ii) use the acceptances received

40

from any Holder of Claims pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such Holder ultimately is deemed to be a member. Any such reclassification of Claims, may be subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan. There can be no assurance that the Bankruptcy Court, would approve the Plan as modified in such a scenario.  Except to the extent that a modification to the Plan requires resolicitation, the Plan Proponent may in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any Holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment of such Holder, regardless of the Class as to which such Holder is ultimately deemed to be a member. The Plan Proponent believes that under the Bankruptcy Rules, they would be required to resolicit votes for or against the Plan only when a modification adversely affects the treatment of the Claim or Interest of any Holder. The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Interest of a particular Class unless the Holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest. The Plan Proponent believes that the Plan complies with the requirement of equal treatment. To the extent that the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny Confirmation of the Plan. Issues or disputes relating to classification and/or treatment could result in a delay in the Confirmation and Consummation of the Plan and could increase the risk that the Plan will not be consummated.

5.05    Failure to Consummate the Plan.

The Plan provides for certain conditions that must be satisfied (or waived) prior to Confirmation and for certain other conditions that must be satisfied (or waived) prior to the Effective Date. As of the date of the Plan, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived). Accordingly, there can be no assurance that the Plan will be confirmed by the Bankruptcy Court. Further, if the Plan is confirmed, there can be no assurance that the Plan will be consummated.

5.06    Allowance of Claims May Substantially Dilute the Recovery to Holders of Claims under the Plan

There can be no assurance that the estimated Claim amounts set forth in the Plan are correct, and the actual Allowed amounts of Claims may differ from the estimates. The estimated amounts are based on certain assumptions with respect to a variety of factors, including with respect to the Disputed Administrative Expenses, Disputed Priority Tax Claims, Disputed Priority Non-Tax Claims, and Disputed Secured Claims. Should these underlying assumptions prove incorrect, the actual Allowed amounts of Claims may vary from those estimated herein, thereby materially reducing the recovery to the Holders of General Unsecured Claims under the Plan.

5.07    Reserved

5.08    Certain Tax Considerations.

There are a number of material income tax considerations, risks and uncertainties associated with the liquidation of the Debtors' Assets described in this Plan.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. NOTHING HEREIN SHALL CONSTITUTE TAX ADVICE. IN MANY CASES, THE TAX CONSEQUENCES ARE UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT FEDERAL, STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## ARTICLE VI.
## MEANS FOR IMPLEMENTATION OF THE PLAN

**6.01**   Liquidation of Debtors' Assets through the Creation of the Liquidating Trust

(a)   Liquidating Trust

On the Effective Date the Debtors will be deemed to have transferred all of their remaining Assets (including Insider Avoidance Actions and Non-Go-Forward Creditor Commercial Tort Claims), other than Assets waived pursuant to the Term Sheet and Section 6.02 below and Windsor Property to the Liquidating Trust for Distribution in accordance herewith. The Confirmation Order shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan. Following the Effective Date, the Liquidating Trustee shall take all actions reasonably necessary to dissolve the Debtors under any applicable laws. For the avoidance of doubt, the Debtor Professional Escrow and Professional Fee Reserve will not be transferred to the Liquidating Trust.

(b)   Appointment of Liquidating Trustee

The Liquidating Trustee's duties shall commence as of the Effective Date.  The Liquidating Trustee shall administer the Liquidating Trust and shall serve as a Representative of the Estates under section 1123(b) of the Bankruptcy Code for the purpose of enforcing or pursuing Causes of Action belonging to the Estates.

(c)   Establishment of a Liquidating Trust.

Pursuant to the Confirmation Order and the Liquidating Trust Agreement, the Liquidating Trust will be established on the Effective Date.  The Liquidating Trust qualifies as a "liquidating trust" as described in Treasury Regulations Section 301.7701-4(d) and Revenue Procedure 94-45, 1994-2 C.B. 684, and will be treated for federal income tax purposes as a "grantor trust" under Internal Revenue Code sections 671-677.  The Liquidating Trust shall be managed by the Liquidating Trustee subject to the supervision of the Oversight Committee.  The Liquidating Trust shall be administered in accordance with the terms of the Liquidating Trust Agreement.

Prior to the Effective Date, any and all of the Estates' Assets shall remain Assets of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and on the Effective Date shall be transferred to and vest in the Liquidating Trust (including Insider Avoidance Actions and Non-

42

Go-Forward Creditor Commercial Tort Claims) in accordance with the Liquidating Trust Agreement; provided, however, that no Waived Claims shall be transferred to the Liquidating Trust and the Liquidating Trust shall not have any right to assert any Waived Claim, including for purposes of affirmative recovery, setoff, recoupment, or otherwise. For the avoidance of doubt, but subject to the foregoing proviso, the Liquidating Trustee specifically retains and reserves the right to assert, after the Effective Date, any and all of the claims, Causes of Action and related rights, whether or not asserted as of the Effective Date, and all proceeds of the foregoing, and no preclusion doctrine (including the doctrines of res judicata, collateral estoppel, judicial estoppel, equitable estoppel, issue preclusion, claim preclusion, and laches) shall apply to such claims or Causes of Action as Liquidating Trust Assets on or after the Effective Date. The failure to specifically identify in the Plan any potential or existing Causes of Action as a Liquidating Trust Asset is not intended to and shall not limit the rights of the Liquidating Trust to pursue any such Causes of Action. Moreover, no Person may rely on the absence of a specific reference in the Plan, the Confirmation Order, or the Liquidating Trust Agreement to any claim or Cause of Action against such Person as any indication that the Liquidating Trust will not pursue any and all available transferred claims or Causes of Actions transferred to the Liquidating Trust. The objection to the Allowance of any Claims will not in any way limit the ability or the right of the Liquidating Trust to assert, commence, or prosecute any Cause of Action transferred to the Liquidating Trust.

Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, only the Liquidating Trust and the Liquidating Trustee shall have the right to pursue or not to pursue, or, subject to the terms hereof and the Liquidating Trust Agreement, compromise or settle any Liquidating Trust Assets. From and after the Effective Date, the Liquidating Trust and the Liquidating Trustee may commence, litigate, and settle any Causes of Action or claims relating to the Liquidating Trust Assets or rights to payment or claims that belong to the Debtors or the Estates as of the Effective Date or are instituted by the Liquidating Trust and Liquidating Trustee on or after the Effective Date, except as otherwise expressly provided herein or in the Sale Order, the Term Sheet, or the Liquidating Trust Agreement. The Liquidating Trust shall be entitled to enforce all defenses and counterclaims to all Claims asserted against the Debtors and their Estates, including setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code, in each case other than Avoidance Actions and commercial tort claims against Go-Forward Creditors

Other than as set forth herein, no other Entity may pursue such Liquidating Trust Assets on or after the Effective Date. The Liquidating Trustee shall be deemed hereby substituted as plaintiff, defendant, or in any other capacity for the Debtors in any Causes of Action pending before the Bankruptcy Court or any other court that relates to a Liquidating Trust Asset, without the need for filing any motion for such relief. On the Effective Date, the Debtors and the Liquidating Trustee shall execute the Liquidating Trust Agreement and shall have established the Liquidating Trust pursuant hereto. In the event of any conflict between the terms of this Article VI and the terms of the Liquidating Trust Agreement, the terms of the Liquidating Trust Agreement shall control.

For the avoidance of doubt, the Debtor Professional Escrow and Professional Fee Reserve will not be transferred to the Liquidating Trust and do not constitute Liquidating Trust Assets.

44

(d)    <u>Vesting of Liquidating Trust Assets</u>.

Notwithstanding any prohibition of assignability under applicable non-bankruptcy law, on the Effective Date and periodically thereafter if additional Assets become available, the Debtors shall be deemed, subject to the Liquidating Trust Agreement, to have automatically transferred to the Liquidating Trust all of its right, title, and interest in all of the Estates' Assets, in accordance with section 1141 of the Bankruptcy Code, including the Debtors' attorney-client privilege; provided, however, that no Purchased Assets or Waived Claims shall be transferred to the Liquidating Trust. All such Assets shall automatically vest in the Liquidating Trust free and clear of all Claims, liens, and other interests, subject only to the Allowed Claims as set forth herein and subject to Liquidating Trust Expenses as set forth herein and in the Liquidating Trust Agreement. Thereupon, the Debtors shall have no interest in or with respect to the Liquidating Trust Assets or the Liquidating Trust. For the avoidance of doubt, the Liquidating Trust Expenses shall be paid from the Liquidating Trust Assets.

(e)    <u>Retained Causes of Action</u>

All Causes of Action of any of the Debtors, other than those that constitute claims that were previously waived, exculpated, released, compromised or otherwise settled, or are Purchased Assets under the Sale Order and the Term Sheet, shall be retained by the Estates, and transferred to, and shall vest in the Liquidating Trust (the "<u>Retained Causes of Action</u>"). Such Retained Causes of Action expressly include all potential claims related to the commencement of the Chapter 11 Cases, including the failure to dismiss the Chapter 11 Cases.

The Debtors reserve and, as of the Effective Date, assign to the Liquidating Trust the Retained Causes of Action, which shall include, for the avoidance of doubt and without limitation, all of the Estates' claims against the Debtors' managers, directors and officers, and the Liquidating Trustee's rights to commence, prosecute, or settle such Retained Causes of Action on behalf of and for the benefit of the applicable beneficiaries shall be preserved notwithstanding the occurrence of the Effective Date. The Debtors or the Liquidating Trustee, as applicable, expressly reserve all rights to prosecute any and all Retained Causes of Action against any Entity, except as otherwise expressly provided in the Plan. The Liquidating Trustee expressly reserves all Retained Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Retained Causes of Action upon, after, or as a consequence of the Confirmation or Consummation of the Plan. **No entity may rely on the absence of a specific reference in this Plan or the Plan Supplement to any Retained Cause of Action against it as any indication that the Debtors or the Liquidating Trustee, as applicable, will not pursue any and all available Retained Causes of Action against it**.

The Liquidating Trustee reserves and shall retain all such Retained Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Retained Causes of Action that a Debtor may hold against any Entity shall vest in the Liquidating Trust. The Liquidating Trustee shall retain and may exclusively enforce any and all such Retained Causes of Action. Subject to the oversight of the Oversight Committee,

45

the Liquidating Trustee shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Retained Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

(f)     Responsibilities of the Liquidating Trustee.

Responsibilities of the Liquidating Trustee shall include, but are not limited to:

i.      Administering and the implementation of the Plan, including the making of the Distributions contemplated herein;

ii.     Marshalling, including compelling the turnover of the Assets, and liquidating the Assets;

iii.    Conducting an analysis of any and all Administrative Expenses, Priority Tax Claims, Priority Non-Tax Claims, and General Unsecured Claims and prosecuting objections thereto or settling or otherwise compromising such Claims, if necessary and appropriate;

iv.     Maintaining and administering reasonable and necessary reserves in accordance with the terms hereof;

v.      Commencing, prosecuting, or settling claims and Causes of Action;

vi.     Abandoning any Assets that cannot be sold or otherwise transferred for value and for which Distribution to Holders of Allowed Administrative Expenses, Priority Tax Claims, Priority Non-Tax and General Unsecured Claims would not be feasible or cost-effective in the Liquidating Trustee's reasonable judgment;

vii.    Filing appropriate tax returns in the exercise of the Liquidating Trustee's fiduciary obligations;

viii.   Retaining such professionals as are necessary and appropriate in furtherance of the Liquidating Trustee's fiduciary obligations;

ix.     Paying Liquidating Trust Expenses; and

x.      Taking such actions as are necessary and reasonable to carry out the purposes of the Liquidating Trust, including winding down the Debtors' business affairs.

The Liquidating Trustee's authority shall be subject to the Oversight Committee, as set forth in the Liquidating Trust Agreement.

**6.02**    Effectuation of the Term Sheet

46

16211856/7
16211856/7

(a)      Automatically upon the Effective Date, the Waived Claims shall be deemed waived as and to the extent set forth in the Term Sheet, and no party shall be entitled to any affirmative recovery or right of set off with respect to any Waived Claim.

(b)      From and after the Effective Date, and subject to the oversight of the Oversight Committee, the Liquidating Trustee shall have the sole and exclusive power and authority over all matters related to the Liquidating Trust (including as provided for in the Term Sheet, Section 6.01 of the Plan and the Liquidating Trust Agreement) and shall be authorized to make disbursements (or direct the Wind-Down Manager to make disbursements) from the Wind-Down Budget for expenditures in accordance therewith.

**6.03**     Release of Liens

Except as otherwise provided in the Plan (including in Section 4.03(c)) or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable Distributions made pursuant to the Plan, all liens against the property of any Estate will be fully released, and all of the right, title and interest of any holder of such liens, including any rights to any collateral thereunder, shall attach to and be enforceable solely against any net proceeds of sales of such assets.  For the avoidance of doubt, all mortgages, deeds of trust, liens, pledges or other security interests against any property of the Estates shall be fully released on the Effective Date without any further action of any party, including, but not limited to, further order of the Bankruptcy Court or filing updated schedules or statements typically filed pursuant to the Uniform Commercial Code.

**6.04**     Effectuating Documents; Further Transactions

On and after the Effective Date, the Liquidating Trustee is authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and the transactions contemplated thereby in the name of and on behalf of the Liquidating Trust without the need for any approvals, authorization or consents except those expressly required pursuant to the Plan.

**6.05**     Records

Pursuant to the terms of the Sale Order, the Debtors' transferred their books and records to the Purchaser, subject to the Debtors' rights to reasonable access to information.  On the Effective Date, the Debtors' rights to access to the books and records shall be transferred to the Liquidating Trust.

Further, nothing herein shall modify the obligations to store, preserve, and provide access to all documents and records relating to the Pension Plan ("Pension Plan Documents") as set forth in Section 5.2 of the Sale Order, other than the Liquidating Trustee shall succeed to the Debtors' obligations under Section 5.2 of the Sale Order.

6.06    Deemed Substantive Consolidation

The Plan contemplates and is predicated upon the substantive consolidation of the Estates solely for voting, confirmation, and Distribution purposes. Accordingly, on the Effective Date, each Claim Filed or to be Filed against any Debtor shall be deemed filed only against Stanadyne LLC, and shall be deemed a single Claim against and a single obligation of against Stanadyne LLC, for Distribution purposes, which shall be paid from the Liquidating Trust, and absent an agreement prior to the Effective Date, following the Effective Date any Claim against multiple Debtors shall be disallowed as duplicative. This substantive consolidation of the Estates for Distribution purposes means that the specific Debtor against which a creditor Holds or asserts a Claim will have no effect on the Distribution (if any) provided to such creditor under the Plan.

6.07    Transfer of Privilege/No Waiver

On the Effective Date, all of the Debtors' evidentiary privileges, including but not limited to the attorney/client privilege, shall be deemed transferred to the Liquidating Trustee and the Liquidating Trust.  The Plan shall be considered a motion pursuant to sections 105, 363 and 365 of the Bankruptcy Code for such relief.  Upon such transfer, the Debtors and the Estates shall have no other further rights or obligations with respect thereto.  Nothing herein shall be deemed a waiver of the Debtors' or the Estates' rights of privilege.

6.08    Final Decree

At any time following the Effective Date, the Liquidating Trustee shall be authorized to file a motion for entry of a final decree closing one or more of the Chapter 11 Cases.

**ARTICLE VII.**
EXECUTORY CONTRACTS

7.01    Executory Contract(s) and Unexpired Leases

Except for any Executory Contracts or Unexpired Leases of the Debtors: (i) that was rejected by an Order of the Bankruptcy Court, pursuant to section 365 of the Bankruptcy Code; (ii) that was assumed and assigned or assumed, assigned and sold; or (iii) as to which a motion for approval of the assumption or rejection of such Executory Contract or Unexpired Leases has been Filed and served prior to, and remains pending on the Effective Date, all  Executory Contracts or Unexpired Leases shall be subject to the rights of the Purchaser with respect to the Designation Rights as set forth in the Asset Purchase Agreement and the Sale Order, which shall allow the Purchaser to designate Executory Contracts or Unexpired Leases for assumption, assignment and sale or rejection. After the Effective Date, the Liquidating Trustee shall assume, assign, and sell to the Purchaser those Executory Contracts or Unexpired Leases that the Purchaser designates as Assigned Contracts (as defined in the Asset Purchase Agreement). All costs associated with such Executory Contracts and Unexpired Leases, including amounts that come due thereunder, and the costs incurred in connection with assumption or rejection thereof (including professional fees) shall be borne by the Purchaser. If the Purchaser does not designate an Executory Contract or Unexpired Lease for assumption or rejection by the

48

applicable Designation Deadline (as defined in the Asset Purchase Agreement), the Liquidating Trustee shall have the discretion whether or not to assume or reject the Executory Contract or Unexpired Lease.

**7.02**    Insurance Policies Are Executory Contracts

This paragraph 7.02 shall only apply to such insurance policies and any agreements and instruments related thereto comprising "Excluded Assets" under the Asset Purchase Agreement. With respect to such insurance policies:

- All insurance policies that comprise Excluded Assets are treated as and deemed to be Executory Contracts under the Plan and, on the Effective Date, each of the Debtors or the Liquidating Trust, as applicable, shall be deemed to have assumed all insurance policies;

- The automatic stay of section 362(a) of the Bankruptcy Code and the injunctions set forth in Article IX of the Plan, if and to the extent applicable, shall be deemed lifted without further order of the Bankruptcy Court, solely to permit: (i) claimants with valid workers' compensation claims or direct action claims against an insurer under applicable non-bankruptcy law to proceed with their claims; and (ii) the insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business (A) workers' compensation claims, and (B) claims where a claimant asserts a direct claim against any insurer under applicable non-bankruptcy law, or an order has been entered by the Bankruptcy Court granting a claimant relief from the automatic stay or the injunctions set forth in Article IX of the Plan to proceed with its claim;

- On and after the Effective Date, the Liquidating Trust shall become and remain liable for all obligations under the insurance policies regardless of whether such obligations arose before or after the Effective Date, and without the need or requirement for insurers to file or serve any request, application, claim, proof or motion for payment or allowance of any Administrative Claim; and

- Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the assumption of each of the insurance policies by the Debtors or the Liquidating Trust, as applicable. In addition, on and after the Effective Date, the Liquidating Trust shall not terminate or otherwise reduce, the coverage under any of the directors and officers insurance policies with respect to conduct occurring prior thereto.

**7.03**    Bar Date for Rejection Damages

If the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan or otherwise gives rise to a Claim by the other party or parties thereto, such Claim shall be forever barred and shall not be enforceable against the Debtors, their Estates, or the Liquidating Trust, unless a proof of Claim is Filed no later than 30 days after the rejection date and is in accordance with the Bar Date Order; provided, however, that any party or parties to an Executory Contract or

49

Unexpired Lease with a rejection Claim that arises or becomes Allowed on or after the Effective Date shall have 30 days from the date the Claim arises or becomes Allowed to File a proof of Claim on account of such Claim and in accordance with the Bar Date Order, after which period any such Claim will be forever barred.

       **7.04**    Pre-Existing Obligations to a Debtor Under Executory Contracts and Unexpired Leases

      Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to a Debtor under such Executory Contract or Unexpired Lease. Notwithstanding any applicable non-bankruptcy law to the contrary, the Debtors expressly reserve and do not waive any right against counterparties to rejected Executory Contracts or Unexpired Leases to receive, or any continuing obligation of a counterparty to provide, warranties, indemnifications or continued maintenance obligations on goods or services previously purchased by the contracting Debtor.

**ARTICLE VIII.**
PROVISIONS GOVERNING RESOLUTION OF
<u>CLAIMS AND DISTRIBUTIONS OF PROPERTY UNDER THE PLAN</u>

       **8.01**    Claim Objections

      (a)    **Right to Object to Claims.** Other than with respect to Convenience Class Claims that are not subject to objections on the Effective Date, and subject to the Oversight Committee, as set forth in the Liquidating Trust Agreement, except insofar as a Claim is Allowed under the Plan as of or after the Effective Date, the Liquidating Trustee will have the authority, but not the obligation, to do any of the following with respect to any Claims or Interests: (1) file, withdraw, and/or litigate to judgment objections to and requests for estimation of Claims; (2) settle or compromise any Disputed Claim without any further notice to, action, order or approval by the Bankruptcy Court; and (3) administer and adjust the Claims register to reflect any such settlements or compromises without any further notice to, action, order or approval by the Bankruptcy Court. The Liquidating Trustee shall succeed to any pending objections to Claims filed by the Debtors prior to the Effective Date, and shall have and retain any and all rights and defenses the Debtors had immediately prior to the Effective Date with respect to any Disputed Claim other than the Waived Claims.

      (b)    **Claims Objection Deadline.** Objections to Claims must be Filed with the Bankruptcy Court, and a copy of the objection must be served on the subject Creditor before the expiration of the Claims Objection Deadline; otherwise such Claims shall be deemed Allowed in accordance with section 502 of the Bankruptcy Code. The objection shall notify the Creditor of the deadline for responding to such objection.

      (c)    **Claim Estimation.** Pursuant to section 502(c) of the Bankruptcy Code, the Liquidating Trustee may request estimation or liquidation of any Disputed Claim that is contingent or unliquidated or any Disputed Claim arising from a right to an equitable remedy or breach of performance.

50

**8.02**    Distribution Provisions

(a)    Distributions to be Made.  The Liquidating Trustee or the Disbursing Agent shall be responsible for making Distributions required to be made under the Plan.

(b)    On the Effective Date, and after making all Distributions required to be made on the Effective Date hereunder, the Liquidating Trustee shall establish and maintain a separate reserve for the estimated amount of the Liquidating Trust Expenses, as well as each Class of Claims and Unclassified Claims for each Debtor, which reserve shall be administered by the Liquidating Trustee.  To the extent that Reserves are established and maintained for the benefit of any Holder of a Disputed Claim, such Reserves shall include Cash equal to the Distributions that would have been made to the Holder of such Disputed Claim if it were an Allowed Claim in an amount equal to the lesser of (a) the amount of the Disputed Claim, (b) the asserted amount in which the Disputed Claim shall be estimated by the Bankruptcy Court pursuant to section 502 of the Bankruptcy Code for purposes of allowance, which amount, unless otherwise ordered by the Bankruptcy Court, shall constitute and represent the maximum amount in which such Claim ultimately may become an Allowed Claim, or (c) such other amount as may be agreed upon by the Holder of such Disputed Claim and the Liquidating Trustee.

**None of the Debtors, their Estates, nor the Liquidating Trustee shall be required to reserve any Cash or other assets on account of any Disputed Claim that has been Disallowed by order of the Bankruptcy Court, regardless of whether such Order is subject to a pending appeal, unless the Holder of such Disputed Claim has filed a timely appeal of the Confirmation Order and obtained a stay pending such appeal of the Confirmation Order.**

(c)    No Liability.  The Liquidating Trustee shall only be required to act and make Distributions in accordance with the terms of the Plan.  Except on account of gross negligence, fraud, illegality or willful misconduct, the Liquidating Trustee and the Oversight Committee shall have no (i) liability to any party for actions taken in accordance with the Plan or in reasonable reliance upon information provided to it in accordance with the Plan, or (ii) obligation or liability for Distributions under the Plan to any party who does not hold a Claim against one or more of the Debtors as of the Distribution Record Date or any other date on which a Distribution is made or who does not otherwise comply with the terms of the Plan.

(d)    Distributions on Account of Disputed Claims.  Except as otherwise provided in a Final Order or as agreed by the relevant parties, Distributions on account of Disputed Claims, if any, that become Allowed, shall be made by the Liquidating Trustee at such periodic intervals as the Liquidating Trustee determines to be reasonably prudent.

(e)    No Distributions Pending Allowance.  Notwithstanding anything herein to the contrary: (a) no Distribution shall be made with respect to any Disputed Claim until and only to the extent such Claim becomes an Allowed Claim (as applicable), and (b) unless agreed otherwise by the Liquidating Trustee no Distribution shall be made to any Person that holds both an Allowed Claim and a Disputed Claim until such Person's Disputed Claims have been resolved by settlement or Final Order.

16211856/7
16211856/7

(a)      Distributions in Cash.   Any required Cash payments to the Holders of Allowed Claims shall be made by the Liquidating Trustee: (a) in U.S. dollars by check, draft or warrant, drawn on a domestic bank, or by wire transfer from a domestic bank, and (b) by first-class mail (or by other equivalent or superior means as determined by the Liquidating Trustee).

(b)      Timing of Distributions.   Except as specifically set forth herein, the Liquidating Trustee may determine, in its discretion, the appropriate timing, amount, and cadence for Distributions.

(c)      Unclaimed Distributions.   Any Entity which fails to claim any Cash within 90 days from the date upon which a Distribution is first made to such entity shall forfeit all rights to such Distribution under the Plan, and the Liquidating Trustee shall be authorized to cancel any Distribution that is not timely claimed.   Pursuant to section 347(b) of the Bankruptcy Code, upon forfeiture, such Cash (including interest thereon, if any) shall revert to the Liquidating Trust free of any restrictions under the Plan, the Bankruptcy Code or the Bankruptcy Rules.   Upon forfeiture, the claim of any Creditor or Interest Holder with respect to such funds shall be irrevocably waived and forever barred against the Debtors, their Estates, the Liquidating Trust, and the Liquidating Trustee, notwithstanding any federal or state escheat laws to the contrary, and such Creditor or Interest Holder shall have no claim whatsoever against any of the foregoing or against any Holder of a Claim to whom Distributions are made.

(d)      Delivery of Distributions to Holders of Claims.   Except as otherwise provided in the Plan, Distributions to Holders of Allowed Claims shall be made to Holders of record as of the Distribution Record Date by the Liquidating Trustee, as set forth on the latest date of the following documents: (a) to the address of payment set forth on any of the proofs of Claim Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no proof of Claim is Filed); (b) at the addresses set forth in any written notices of address changes delivered to the Debtors after the date of any related proof of Claim and prior to the Effective Date; and (c) at the addresses reflected in the Schedules if no proof of Claim has been Filed and the Debtors have not received a written notice of a change of address prior to the Effective Date.

(e)      Undeliverable Distributions.   The Liquidating Trustee shall make one attempt to make the Distributions contemplated hereunder in accordance with the procedures set forth herein.   The Liquidating Trustee in its sole discretion may, but shall have no obligation to, attempt to locate Holders of undeliverable Distributions.   Any Distributions returned to the Liquidating Trustee as undeliverable or otherwise shall remain in the possession of the Liquidating Trust, until such time as a Distribution becomes deliverable, and no further Distributions shall be made to such Holder unless such Holder notifies the Liquidating Trustee of its then current address. Any Holder of an Allowed Claim entitled to a Distribution of property under this Plan that does not assert a claim pursuant to the Plan for an undeliverable Distribution, or notify the Liquidating Trustee of such Holder's then current address, within 30 days of such Distribution shall have its claim for such undeliverable Distribution irrevocably waived and shall be forever barred from asserting any such claim against the Debtors, their Estates, the Liquidating Trust, and/or the Liquidating Trustee or their respective property, and such Distribution shall be deemed unclaimed property under Section 8.02(c) of the plan.

(f)     De Minimis Distributions.  If any interim Distribution under the Plan to the Holder of an Allowed Claim would be less than $20.00, the Liquidating Trustee may withhold such Distribution until a final Distribution is made to such Holder.  If any final Distribution under the Plan to the Holder of an Allowed Claim would be less than $20.00, the Liquidating Trustee may cancel such Distribution.  Any unclaimed Distributions pursuant to this provision shall be treated as unclaimed property under Section 8.02(c) of the Plan.

(g)     Remainder Amounts After Final Distribution.  After final Distributions have been made in accordance with the terms of the Plan, if the aggregate amount of Unclaimed Distributions is less than $10,000, the Liquidating Trustee may donate up to such amount to Delaware Pro Se Bankruptcy Foundation.

## ARTICLE IX.
## RELEASES, INJUNCTION, AND RELATED PROVISIONS

**9.01**   Releases

The Plan shall not alter, amend, or otherwise modify any releases granted in connection with the Cash Collateral Order, the Sale Order, the Term Sheet or any other Final Order of the Court.  Further, effective as of the Confirmation Date, but subject to the occurrence of the Effective Date, and in consideration of the services provided, the Debtors and their respective Estates, shall release, waive, and discharge unconditionally and forever the Wind-Down Manager from any and all claims, causes of action, and liabilities whatsoever (including those arising under the Bankruptcy Code), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising in law, equity, or otherwise, based in whole or in part on any act, omission, transaction, event or other occurrence: in connection with or arising from the Debtors' Chapter 11 Cases, the pursuit of confirmation of the Plan, the Consummation thereof, the administration thereof or the property to be distributed thereunder; provided, that the foregoing shall not operate as a waiver of or release from any causes of action resulting from the willful misconduct, actual fraud, or gross negligence.  For the avoidance of doubt, nothing in this Plan or in the Confirmation Order shall be deemed to release the Debtors and their Insiders, members, shareholders, representatives, advisors, employees, agents or other professionals.

**9.02**   [Reserved]

**9.03**   Exculpation and Limitation of Liability

The Exculpated Parties will neither have nor incur any liability to any Entity for any claims or causes of action arising from any act taken or omitted to be taken during the Exculpation Period to the extent section 1125(e) of the Bankruptcy Code applies to such act or omission; *provided, however*, that the foregoing provisions will have no effect on the liability of any entity that results from any such act or omission that is determined in a Final Order of the Bankruptcy Court or other court of competent jurisdiction to have constituted gross negligence or willful misconduct. Further, other than with respect to the Wind-Down Manager, the Exculpated Parties shall **not** be exculpated for any action or inaction related to the commencement of the Chapter 11 Cases, including the filing of the bankruptcy petitions or any decision not to dismiss the Chapter 11 Cases.

9.04    Injunction

(a)    ~~Except~~ In accordance with Bankruptcy Code section 1141(d)(3), the Plan does not discharge the Debtors. Bankruptcy Code section 1141(c) nevertheless provides, among other things, that the property dealt with by the Plan is free and clear of all Claims and Interests against the Debtors. Consistent with the preceding sentence, except as otherwise expressly provided in the Plan, the Plan Supplement, related documents, or for obligations issued pursuant to the Plan, all Entities who have held, hold or may hold Claims or Interests that have been released pursuant to the Plan or as to which the Plan provides for classification and treatment or that are subject to the exculpatory provisions herein, are permanently enjoined from taking any of the following actions from and after the Effective Date: (i) commencing or continuing in any manner any action or other proceeding of any kind  against the Debtors (but solely to the extent such action is brought against the Debtor to directly or indirectly recover upon any Assets of the Estate, including, without limitation, any such Assets that vest in the Liquidation Trust, as applicable, upon the Effective Date), or the Liquidating Trust on account of or in connection with or with respect to any such Claims or Interests; (ii) enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against the Debtors or the Liquidating Trustee on account of or in connection with or with respect to any such Claims or Interests; and (iii) creating, perfecting or enforcing any encumbrance of any kind against any Debtors or the Liquidating Trust or the property of the Estates or the Liquidating Trust on account of in connection with or with respect to any such Claims or Interests.

(b)    Except as otherwise provided in this Plan, or to the extent necessary to enforce the terms and conditions of this Plan, the Confirmation Order or a separate Order of the Bankruptcy Court, all Entities who have held, hold, or may hold Claims against or Interests shall be permanently enjoined from taking any of the following actions against any of the Assets of the Estates or the Liquidating Trust or any other asset or to be distributed under the Plan on account of any such Claims or Interests: (i) commencing or continuing, in any manner or in any place, any action, cause of action, or other proceeding; (ii) enforcing attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting or enforcing any lien; (iv) asserting a setoff (except  to the extent such setoff was exercised prior to the Petition Date), or the right of subrogation of any kind against any debt, liability, or obligation due to the Debtor; and (v) commencing or continuing, in any manner or in any place, any action, cause of action, or other proceeding against any of the Assets or Liquidating Trust's Assets or any other assets to be distributed under this Plan that does not comply with or is inconsistent with the provisions of this Plan.

(c)    Nothing in this section shall prevent the Liquidating Trustee or the Liquidating Trust from prosecuting the Liquidating Trust Assets or commencing any action or other proceeding of any kind against any party other than with respect to conduct after the Petition Date.

(d)    Notwithstanding the foregoing clauses, all Entities shall only be enjoined from commencing or continuing in any manner any action or other proceeding of any kind against an Exculpated Party for any matter expressly covered by Section 9.03 herein.

54

**ARTICLE X.**
<u>CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE</u>

**10.01**    Conditions Precedent to Confirmation

It shall be a condition to Confirmation hereof that the following provisions, terms and conditions shall have been satisfied or waived pursuant to Section 10.03 herein:

(a)    The Bankruptcy Court shall have entered an Order in a form and substance reasonably acceptable to the Plan Proponent and Cerberus approving the Plan on a final basis and determining, with respect to solicitation of the Plan as containing adequate information within the meaning of section 1125 of the Bankruptcy Code.

**10.02**    Conditions Precedent to the Effective Date

It shall be a condition to the Effective Date that the following provisions, terms and conditions shall have been satisfied or waived pursuant to Section 10.03.

(a)    The Bankruptcy Court shall have entered an order, in form and substance acceptable to the Plan Proponent and Cerberus, confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

(b)    All authorizations, consents and regulatory approvals required, if any, in connection with the Plan's effectiveness shall have been obtained.

(c)    No order of a court restraining the Plan Proponent from consummating the Plan and the transactions contemplated therein shall have been entered and remain in effect, and the Confirmation Order shall be in full force and effect.

(d)    All actions, documents (including the Liquidating Trust Agreement), certificates and agreements necessary to implement the Plan shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable Governmental Units in accordance with applicable laws, and are in form and substance, acceptable to the Plan Proponent.

**10.03**    Waiver of Conditions

The conditions to Confirmation of the Plan and to the occurrence of the Effective Date set forth in this Article X may be waived in whole or in part at any time by the Plan Proponent; provided, however, that waiver of any of the conditions set forth in 10.01, 10.02 (a), and (d) (with respect only to the Liquidating Trust Agreement) shall also require the written consent of Cerberus.

**10.04**    Effect of Failure of Conditions

If the Effective Date does not occur prior to December 1, 2023, the Plan shall be null and void in all respects and nothing contained in the Plan shall: (i) constitute a waiver or release of any claims by or Claims against the Debtors or their Estates; (ii) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other entity; or (iii) constitute an admission,

55

acknowledgment, offer or undertaking by the Debtors, any Creditors  or Interest Holders or any other entity in any respect.

**10.05**   Filing of Notice of the Effective Date.

On the Effective Date or as shortly thereafter as reasonably practicable, the Liquidating Trustee shall File a notice of the Effective Date with the Bankruptcy Court.

**ARTICLE XI.**
MODIFICATION, REVOCATION OR WITHDRAWAL OF PLAN

**11.01**   Modification and Amendments

Except as otherwise specifically provided herein, the Plan Proponent reserve the right to modify the Plan as to material terms and seek Confirmation consistent with the Bankruptcy Code and Bankruptcy Rules and, as appropriate, not re-solicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Plan Proponent expressly reserves its right to alter, amend or modify materially the Plan, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend or modify the Plan or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.  Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with this Article.  In addition, prior to the Effective Date, the Plan Proponent may make appropriate technical adjustments and modifications to the Plan, without further order or approval of the Bankruptcy Court; provided, however, that such technical adjustments and modifications do not adversely affect in a material way the treatment of Holders of Allowed Claims or Interests.  Notwithstanding the foregoing, the Plan Proponent's rights to make any modifications to the Plan are subject to the requirement of obtaining Cerberus's prior written consent.

**11.02**   Effect of Confirmation on Modifications

Entry of a Confirmation Order means that all modifications or amendments to the Plan authorized by Section 11.01 above occurring after the commencement of the solicitation of votes on the Plan and prior to entry of the Confirmation Order are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

**11.03**   Revocation or Withdrawal of the Plan

The Plan Proponent reserves the right to revoke or withdraw the Plan before the Effective Date, which will not affect the rights of Cerberus and the Purchaser under the terms of the Asset Purchase Agreement, the Term Sheet, the Sale Order, and any other orders of the Bankruptcy Court.  If the Plan Proponent revokes or withdraws the Plan, or if the Confirmation Date or the Effective Date does not occur, then: (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests but, for the avoidance of doubt,

56

expressly excluding the Term Sheet), assumption or rejection of any Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (iii) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims or Interests or Claims by the Debtors against any other entity; (b) prejudice in any manner the rights of the Debtors, the Holder of any Claim or Interest or any other entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtors or any other entity. For the avoidance of doubt, the Cash Collateral Order, the Sale Order, the Term Sheet and all other orders of the Bankruptcy Court shall remain in effect and binding notwithstanding any revocation or withdrawal of the Plan.

## ARTICLE XII.
## JURISDICTION

**12.01**  Bankruptcy Court Jurisdiction

Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court shall retain and have exclusive jurisdiction over the Chapter 11 Cases to the maximum extent legally permissible, including, without limitation, for the following purposes:

(a)    To allow, disallow, determine, liquidate, classify or establish the priority or secured or unsecured status of or estimate any Claim or Interest not already Allowed hereunder, including, without limitation, the resolution of any request for payment of any Administrative Expense and the resolution of any and all objections to the allowance or priority of Claims or Interests;

(b)    To ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

(c)    To determine any and all applications or motions pending before the Bankruptcy Court on the Effective Date of the Plan, including without limitation any motions for the rejection, assumption or assumption and assignment of any Executory Contract;

(d)    Any litigation commenced by the Liquidating Trustee, including Avoidance Actions and commercial tort claims including, without limitation, any and all claims against the Debtors' managers, officers and directors.

(e)    To consider and approve any modification of the Plan, remedy any defect or omission, or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order;

(f)    To determine all controversies, suits and disputes that may arise in connection with the interpretation, enforcement or consummation of the Plan or any related documents, or any entity's obligations in connection with the Plan or any Plan Documents, or to defend any of the rights, benefits, Estates property transferred, created, or otherwise provided or confirmed by the Plan or the Confirmation Order or to recover damages or other relief for violations thereof;

16211856/7
16211856/7

(g)     To consider and act on the compromise and settlement of any claim or cause of action by or against the Debtors, their Estates, the Liquidating Trust, or the Liquidating Trustee;

(h)     To decide or resolve any and all applications, motions, adversary proceedings, contested or litigated matters, and any other matters, or grant or deny any applications involving the Debtors, or their Estates that may be pending on the Effective Date or that may be brought by the Debtors or the Liquidating Trustee, or any other related proceedings by the Liquidating Trustee, and to enter and enforce any default judgment on any of the foregoing;

(i)     To adjudicate any disputes regarding the Debtors' insurance policies;

(j)     To decide or resolve any and all applications for compensation;

(k)     To issue orders in aid of execution and implementation of the Plan or any Plan Documents to the extent authorized by section 1142 of the Bankruptcy Code or provided by the terms of the Plan;

(l)     To decide issues concerning the federal or state tax liability of the Debtors which may arise in connection with the confirmation or consummation of the Plan or any Plan Documents;

(m)     To interpret and enforce any orders entered by the Bankruptcy Court in the Chapter 11 Cases; and

(n)     To enter an order or orders closing the Chapter 11 Cases.

**12.02**   Limitation on Jurisdiction

In no event shall the provisions of the Plan be deemed to confer in the Bankruptcy Court jurisdiction greater than that established by the provisions of 28 U.S.C. §§ 157 and 1334, as well as the applicable circumstances that continue jurisdiction for defense and enforcement of the Plan and Plan Documents.  For the avoidance of doubt, however, such jurisdiction shall be deemed, by the entry of the Confirmation Order, to:

(a)     Permit entry of a final judgment by the Bankruptcy Court in any core proceeding referenced in 28 U.S.C. § 157(b) and to hear and resolve such proceedings in accordance with 28 U.S.C. § 157(c) and any and all related proceedings, including, without limitation, (i) all proceedings concerning disputes with, or causes of action or other claims against, any Person that the Debtors, the Estates, or the Liquidating Trust or any of their successors or assigns, may have, and (ii) any and all causes of action or other claims against any Person for harm to or with respect to any Asset of the Estate (x) conversion of such property, or (y) any property liened or transferred by the Debtors to any other Person;

(b)     Include jurisdiction over the recovery of any Property of the Estates (or property transferred by the Debtors with Bankruptcy Court approval) from any Person wrongly asserting ownership, possession or control of the same, whether pursuant to sections 542, 543, 549, and/or 550 of the Bankruptcy Code or otherwise, as well as to punish any violation of the automatic

16211856/7
16211856/7

stay under section 362 of the Bankruptcy Code or any other legal rights of the Debtors or their Estates under or related to the Bankruptcy Code; and

        (c)        Permit the taking of any default judgment against any Person who has submitted himself or herself to the jurisdiction of the Bankruptcy Court.

## ARTICLE XIII.
### MISCELLANEOUS

    **13.01**    Exemption from Taxes

        (a)        The Plan and the Confirmation Order provide for (a) the issuance, transfer or exchange of notes, debt instruments and equity securities under or in connection with the Plan; and (b) the creation, execution and delivery of agreements or other documents creating or evidencing the formation of the Liquidating Trust and any right or interest in the Liquidating Trust. Pursuant to section 1146 of the Bankruptcy Code and the Plan, any such act described or contemplated herein will not be subject to any stamp tax, transfer tax, filing or recording tax, or other similar tax.

    **13.02**    Compliance with Tax Requirements

    Notwithstanding anything to the contrary in this Plan, the Liquidating Trustee shall be entitled to deduct any federal, state or local withholding taxes from any Distributions made with respect to Allowed Claims, as appropriate. The Liquidating Trustee shall be authorized to take all actions necessary to comply with applicable withholding and reporting requirements, including, without limitation, applying a portion of any Distribution of Cash to be made under the Plan to pay applicable withholding Taxes. Any amounts withheld pursuant to the immediately preceding sentence will be deemed to have been distributed and received by the applicable recipient for all purposes of the Plan. Notwithstanding any other provision of the Plan, each Holder of an Allowed Claim that has received a Distribution under the Plan shall have sole and exclusive responsibility for the satisfaction or payment of any tax obligation imposed by any Governmental Unit, including income, withholding and other tax obligation, on account of such Distribution. The Liquidating Trustee shall have the right, but not the obligation, to not make a Distribution until the applicable recipient has made arrangements satisfactory for the payment of any Tax obligations. For tax purposes, Distributions received in respect of Allowed Claims will be allocated first to the principal amount of such Claims until such principal amount is paid in full and then to any interest accrued on such Claim prior to the Petition Date, and the remaining portion of such Distributions, if any, will apply to any interest on such Claim after the Petition Date. The Liquidating Trustee shall be authorized to require each Holder of a Claim to provide it with an executed Form W-9, Form W-8, or any other tax form, documentation or certification as may be requested by the Liquidating Trustee as a condition precedent to being sent a Distribution. If a Holder of an Allowed Claim does not provide the Liquidating Trustee with an executed Form W-9, Form W-8 or other requested tax form within 90 days after the date of the Liquidating Trustee's initial request, the Liquidating Trustee may, in its sole discretion (a) make such Distribution net of applicable withholding or (b) reserve such Distribution, in which case (i) such Holder shall be deemed to have forfeited the right to receive any Distribution under the Plan, (ii) any such Distribution shall revert to the Liquidating Trust, for Distribution on account of other Allowed Claims and (iii) the Claim

59

of the Holder originally entitled to such Distribution shall be irrevocably waived and forever barred without further order of the Bankruptcy Court. The rights and obligations of the Liquidating Trustee to allocate and distribute all Distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens and similar encumbrances is expressly preserved.

**13.03**   Defenses and Setoff

Nothing contained in this Plan shall constitute a waiver or release by the Debtors, their Estates, or the Liquidating Trustee, of any rights in respect of legal and equitable objections, defenses, setoffs, or recoupment other than Waived Claims. To the extent permitted by applicable law, and subject to the waiver of the Waived Claims the Liquidating Trustee may, but shall not be required to, set off or recoup against any Claim and the payments or other Distributions to be made under the Plan in respect of such Claim, claims of any nature whatsoever that arose before the Petition Date that the Debtors, their Estates, or the Liquidating Trust may have against the Holder of such Claim or Interest.

**13.04**   Governing Law

Except to the extent the Bankruptcy Code or the Bankruptcy Rules are applicable, the rights and obligations arising under the Plan shall be governed by and construed and enforced in accordance with the laws of the State of Delaware, without giving effect to the principles of conflicts of law thereof.

**13.05**   Successors and Assigns

The rights, benefits and obligations of any Entity named or referred to in the Plan or any related document shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign of such Entity.

**13.06**   Transfer of Claims

Any transfer of a Claim shall be in accordance with Bankruptcy Rule 3001(e) and the terms of this Section. Notice of any such transfer shall be forwarded to counsel for the Debtors and the Liquidating Trustee. Both the transferee and transferor shall execute a notice and the signatures of the parties shall be acknowledged before a notary public. The notice must clearly describe the Claim to be transferred. No partial transfer of a Claim shall be allowed. All transfers must be of one hundred percent (100%) of the transferor's interest in the Claim.

**13.07**   Post-Effective Date Service List

Pursuant to Bankruptcy Rule 2002 and any applicable Local Rule, notice of all post-Confirmation matters for which notice is required to be given shall be deemed sufficient if served upon counsel for the U.S. Trustee, counsel to the Debtors, counsel for the Liquidating Trustee, and all persons on the Bankruptcy Rule 2002 service list as well as any parties who may be affected by the relief sought.. With the exception of the Debtors, Cerberus, and the U.S. Trustee, any Person desiring to remain on the Bankruptcy Rule 2002 service list shall be required to file a request for continued service and to serve such request upon counsel to the Liquidating Trustee

16211856/7
16211856/7

within thirty (30) days subsequent to the Effective Date. Persons shall be notified of such continued notice requirements in the notice of entry of the Confirmation Order. **Persons who do not file a request for continued service within thirty (30) days subsequent to the Effective Date shall be removed from the Bankruptcy Rule 2002 service list.**

**13.08**  [Reserved]

**13.08**  PBGC Reservation of Rights

Nothing in the Chapter 11 Plan or Confirmation Order shall in any way be construed to discharge, release, limit, or relieve any party in interest (as defined in 29 U.S.C. § 1002(14)) or fiduciary (as defined in 29 U.S.C. § 1002(21)) from any liability under Title I of the Employee Retirement Income Security Act of 1974 with respect to the Stanadyne, LLC Pension Plan (the "Pension Plan") or any other defined benefit pension plan under any law, governmental policy, or regulatory provision. Notwithstanding the foregoing (i) nothing herein is intended to modify the Sale Order in any respect, including the PBGC Settlement in section 5.2 of the Sale Order and the releases contained therein, and to the extent of any inconsistency, the Sale Order governs in all respects and (ii) the provisions in Section 4.03(d) of the Chapter 11 Plan shall remain in full force and effect. Nothing in the Chapter 11 Plan or the Confirmation Order shall enjoin the PBGC or the Pension Plan from enforcing any liability or responsibility that has not been released in the Sale Order, the Chapter 11 Plan, or the Confirmation Order.

13.09  Notices

To be effective, any pleading, notice or other document required by the Plan or the Confirmation Order to be served on or delivered to counsel to the Debtors, the Committee, Cerberus, and the U.S. Trustee must be sent by overnight delivery service, facsimile transmission, courier service or messenger to:

(a)       If to the Debtors:

Michael R. Nestor, Esquire
Andrew L. Magaziner, Esquire
Ashley E. Jacobs, Esquire
YOUNG CONAWAY STARGATT &
TAYLOR, LLP
1000 North King Street
Rodney Square
Wilmington, Delaware 19801-6108
Email: mnestor@ycst.com
amagaziner@ycst.com
ajacobs@ycst.com

-and-

Kathryn A. Coleman, Esquire

61

Christopher Gartman, Esquire
Jeffrey S. Margolin, Esquire
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, NY 10004-1482
Email: katie.coleman@hugheshubbard.com
chris.gartman@hugheshubbard.com
jeff.margolin@hugheshubbard.com

(b)     If to the Committee:


Jeffrey R. Waxman, Esquire
Eric J. Monzo, Esquire
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Telephone: (302) 888-6800
Facsimile: (302) 571-1750
E-mail: jwaxman@morrisjames.com
E-mail: emonzo@morrisjames.com

              -and-

Adam C. Rogoff, Esquire
Rose Hill Bagley, Esquire
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, NY  10036
Telephone: (212) 715-9100
E-mail: arogoff@kramerlevin.com
E-mail: rbagley@kramerlevin.com

(c)     If to Cerberus:

Michael L. Tuchin, Esquire
David A. Fidler, Esquire KTBS LAW LLP
1801 Century Park East, 26th Floor
Los Angeles, CA 90067
Telephone: (310) 407-4000
Facsimile: (310) 407-9090
E-mail: mtuchin@ktbslaw.com
E-mail: dfidler@ktbslaw.com

(d)     If to the U.S. Trustee:

Office of the U.S. Trustee

62

16211856/7
16211856/7

844 King St., Suite 2207
Lockbox 35
Wilmington, DE 19801
Attn: Jane Leamy Esquire
E-mail: jane.m.leamy@usdoj.gov

**13.10    Immediate Binding Effect**

Notwithstanding Bankruptcy Rules 3020(e), 6004(h) and 7062 and/or any other Bankruptcy Rule, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Debtors, the Liquidating Trustee, any and all Holders of Claims and Interests (irrespective of whether such Claims or Interests are Allowed or Disallowed or were voted to accept or reject the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges and injunctions described in the Plan, each entity acquiring property under the Plan, and any and all non-debtor parties to Executory Contracts and Unexpired Leases.

**13.11    Severability of Plan Provisions**

If, before the Effective Date of the Plan, any term or provision of the Plan is held by the Bankruptcy Court or any other court exercising jurisdiction to be invalid, void or unenforceable, the Bankruptcy Court or other court exercising jurisdiction shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted so long as such term or provision is acceptable to the Plan Proponent and Cerberus.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.   The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (i) valid and enforceable pursuant to its terms; (ii) integral to the Plan and may not be deleted or modified without the Plan Proponent's consent; and (iii) non-severable and mutually dependent.

**13.12    Exhibits**

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan, to the extent not inconsistent with the Plan.  The Plan Proponent reserves the right to amend the exhibits and schedules to the Plan any time prior to Confirmation.

**13.13    Votes Solicited in Good Faith**

Upon entry of the Confirmation Order, the Plan Proponent will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code and any applicable non- bankruptcy law, and pursuant to section 1125(e), the Plan Proponent and its respective affiliates, agents, representatives, members, principals, shareholders, officers, directors,

employees, advisors and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code, including, if applicable, in the offer, issuance, sale and purchase of any Plan securities (if any) provided under the Plan, and, therefore, will have no liability for the violation of any applicable law, rule or regulation governing the solicitation of votes on the Plan.

**13.14**    Conflicts

If there is a conflict between this Plan and a Plan Supplement document, the Plan Supplement document, as applicable, shall govern and control.  If any provision of this Plan (including a Plan Supplement) conflicts with or is in any way inconsistent with any provision of the Confirmation Order, the Confirmation Order shall govern and control.

In the event of any inconsistency between the Plan and any of: (1) the Sale Order, (2) the Term Sheet and (3) the Cash Collateral Order, the Sale Order, Term Sheet and/or Cash Collateral Order, as applicable, shall control over the Plan.

**13.15**    U.S. Trustee Fees

All U.S. Trustee Fees due and payable prior to the Effective Date pursuant to Section 1930 of Title 28 of the U.S. Code, together with the statutory rate of interest set forth in section 3717 of Title 31 of the U.S. Code to the extent applicable shall be paid by the Debtors on the Effective Date.  The Debtors shall file all monthly operating reports due prior to the Effective Date when they become due.  On and after the Effective Date, neither the Debtors nor the Liquidating Trustee shall remain obligated to pay such U.S. Trustee Fees.  The U.S. Trustee shall not be required to File any Administrative Expense in the case and shall not be treated as providing any release under the Plan.

**13.16**    Implementation

The Plan Proponent shall be authorized to perform all reasonable, necessary and authorized acts to consummate the terms and conditions of the Plan and the Plan Documents, without further order from the Bankruptcy Court.

16211856/7
16211856/7

**13.17**    No Admissions

Unless expressly provided for herein, nothing contained in the Plan shall be deemed an admission by the either the Plan Proponent or the Debtors with respect to any matter set forth herein, including, without limitation, liability on any Claim or Interest or the propriety of the classification of any Claim or Equity.

Dated:  September 825, 2023

| | |
|---|---|
| | **MORRIS JAMES LLP** |
| | |
| | */s/* _____ |
| | Jeffrey R. Waxman (DE Bar No. 4159) |
| | Eric J. Monzo (DE Bar No. 5214) |
| | 500 Delaware Avenue, Suite 1500 |
| | Wilmington, DE 19801 |
| | Telephone: (302) 888-6800 |
| | Facsimile: (302) 571-1750 |
| | E-mail: jwaxman@morrisjames.com |
| | E-mail: emonzo@morrisjames.com |
| | |
| | -and- |
| | |
| | **KRAMER LEVIN NAFTALIS & FRANKEL LLP** |
| | Adam C. Rogoff (admitted *pro hac vice*) |
| | Rose Hill Bagley (admitted *pro hac vice*) |
| | 1177 Avenue of the Americas |
| | New York, NY  10036 |
| | Telephone: (212) 715-9100 |
| | E-mail: arogoff@kramerlevin.com |
| | E-mail: rbagley@kramerlevin.com |
| | |
| | *Counsel to the Official Committee of Unsecured Creditors* |

65

# EXHIBIT A

# STANADYNE LEGAL STRUCTURE



# EXHIBIT B

**Exhibit B**

**Liquidation Analysis**

## I. INTRODUCTION

The Plan Proponents, with the assistance of their restructuring, legal, and financial advisors, have prepared this hypothetical liquidation analysis (the "**Liquidation Analysis**") in connection with the Plan pursuant to chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").[1]

Under the "best interests" of creditors test set forth in section 1129(a)(7) of the Bankruptcy Code, the Bankruptcy Court may not confirm a chapter 11 plan unless the plan provides each holder of an impaired Claim against or Interest in the Debtors either (i) has accepted the Plan or (ii) will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such Person would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. To demonstrate that the proposed Plan satisfies the "best interests" of creditors test under section 1129(a)(7) of the Bankruptcy Code, the following Liquidation Analysis was prepared to compare hypothetical recoveries under a chapter 7 liquidation to the estimated recoveries under the chapter 11 liquidation contemplated in the Plan.

**Statement of Limitations**

The determination of the costs of, and potential litigation proceeds from, both the proposed chapter 11 plan of liquidation and a hypothetical liquidation of the Debtors' assets in a chapter 7 case is an uncertain process involving the extensive use of significant estimates and assumptions that, although considered reasonable by the Plan Proponents together with their legal and financial advisors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Plan Proponents and their advisors. Inevitably, some assumptions in the Liquidation Analysis may not materialize, and unanticipated events and circumstances could materially affect the ultimate results in both scenarios. The Liquidation Analysis was prepared for the sole purpose of generating a reasonable good faith estimate of the creditor recoveries that may result under the Plan and under a hypothetical chapter 7 bankruptcy scenario. The Liquidation Analysis is not intended and should not be used for any other purpose. The underlying financial information in the Liquidation Analysis was not compiled or examined by independent accountants in accordance with standards promulgated by the American Institute of Certified Public Accountants.

THE LIQUIDATION ANALYSIS IS A HYPOTHETICAL EXERCISE THAT HAS BEEN PREPARED FOR THE SOLE PURPOSE OF PRESENTING A REASONABLE GOOD FAITH ESTIMATE OF THE PROCEEDS THAT WOULD BE REALIZED IF THE DEBTORS WERE LIQUIDATED IN ACCORDANCE WITH CHAPTER 7 OF THE BANKRUPTCY CODE AS OF THE PLAN EFFECTIVE DATE. THE LIQUIDATION ANALYSIS IS NOT INTENDED AND SHOULD NOT BE USED FOR ANY OTHER PURPOSE. THE LIQUIDATION ANALYSIS DOES NOT PURPORT TO BE A VALUATION OF THE DEBTORS' ASSETS AS A GOING CONCERN, AND THERE MAY BE A SIGNIFICANT DIFFERENCE BETWEEN THE LIQUIDATION ANALYSIS AND THE VALUES THAT MAY BE REALIZED OR CLAIMS GENERATED IN AN ACTUAL LIQUIDATION. NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE, OR CONSTITUTES, A CONCESSION, ADMISSION, OR ALLOWANCE OF ANY CLAIM AGAINST THE DEBTORS. THE ACTUAL AMOUNT OR PRIORITY OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES ARE CURRENTLY UNKNOWN AND COULD MATERIALLY DIFFER FROM THE AMOUNTS ILLUSTRATED HEREIN. THERE CAN BE NO ASSURANCE THAT ACTUAL

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Jointly Proposed Combined Disclosure Statement and Plan of Liquidation.

RESULTS WOULD NOT VARY MATERIALLY FROM THE HYPOTHETICAL RESULTS PRESENTED IN THE LIQUIDATION ANALYSIS.

**Basis of Presentation**

The Liquidation Analysis is based on an estimate of assets and liabilities as of September 30, 2023 (except as otherwise indicated). As noted above, the actual assets available to the Debtors' Estates and expenses arising under both the Plan scenario and the chapter 7 liquidation scenario may differ from the amounts illustrated in this Liquidation Analysis.

The Plan Proponents have neither fully evaluated all claims filed against the Debtors or adjudicated such claims before the Bankruptcy Court. Accordingly, the amount and priority of the final Allowed Claims against the Debtors' Estates may differ materially from the claim amounts used in the Liquidation Analysis.

In preparing the Liquidation Analysis, the Plan Proponents together with their legal and financial advisors reviewed the Debtors' amended Schedules, various payments made pursuant to court orders (e.g., critical vendor payments), obligations assumed by the Purchaser (e.g., Go-Forward Creditors' claims, 503(b)(9) Claims, contract cures and certain employee claims) and other sources of information in order to assess the potential population of allowed claims against the Debtors. Note that the Liquidation Analysis was prepared prior to the August 15, 2023 Governmental Unit Bar Date, and thus may exclude certain unfiled or unknown governmental claims and such claims maybe material.

The Liquidation Analysis compares the Plan to the hypothetical chapter 7 liquidation under two scenarios: a low recovery scenario (the "**Low**") and a high recovery scenario (the "**High**").

**Conversion Date and Appointment of Chapter 7 Trustee**

The Liquidation Analysis has been prepared assuming that the Debtors' chapter 11 cases are converted to chapter 7 cases on or about September 30, 2023 (the "**Chapter 7 Conversion Date**"). It is assumed that, on the Chapter 7 Conversion Date, the Bankruptcy Court would appoint a chapter 7 trustee who would oversee the liquidation of the Debtors' Estates, during which time any of the Debtors' remaining assets would be monetized, and all of the Debtors' cash proceeds, net of any liquidation-related costs and other Administrative Expenses and Priority Claims, would be distributed in order to satisfy Allowed Claims and interests in accordance with the priority scheme set forth in the Bankruptcy Code.

**Substantively Consolidated Liquidation**

Consistent with the Plan, the Liquidation Analysis assumes that the Debtors would be liquidated in a jointly administered and would be substantively consolidated for distribution purposes. Therefore, the Liquidation Analysis assumes that each claim is filed against Stanadyne LLC and claims against multiple Debtors will be disallowed.  Consistent with the Plan, no Distributions are made on account of intercompany claims. In the event that the Debtors were to be liquidated in separately administered chapter 7 cases, the administrative costs to the Debtors in each of the cases, including professional fees, chapter 7 trustee fees, and the Debtors' operational costs would likely be higher than if the cases were consolidated.

**Values**

Both the Plan and a chapter 7 proceeding would result in the complete liquidation of the Debtors. As such, unless otherwise stated, the Liquidation Analysis is based on estimated recoveries under the Plan, as adjusted for the impact of liquidating under a chapter 7 process.

The Plan Proponents believe that a chapter 7 liquidation would in general result in lower recoveries due to a number of factors, including but not limited to higher chapter 7 trustee fees vs. the fees to be charged by the Liquidating Trustee and higher estimated professional fees under the chapter 7 liquidation. In addition, it is anticipated that there is a lower likelihood under the chapter 7 liquidation that the Estate would be able to retain the services of certain individuals with the institutional knowledge necessary to more efficiently wind-down the Estate, as such the estimated professional fees under the chapter 7 liquidation are anticipated to be higher due to this potential inefficiency.

**Additional Global Notes and Assumptions**

The Liquidation Analysis should be read in conjunction with the following notes and assumptions:

1. *Chapter 7 liquidation costs and length of liquidation process.* The Plan Proponents have assumed that liquidation would occur over approximately 12 months in order to pursue an orderly monetization of the Estate's remaining assets, including the pursuit of Causes of Action, as well as to reconcile claims, arrange distributions and otherwise administer and close the Estates. In an actual chapter 7 liquidation, the wind-down process and time-period could vary significantly, thereby impacting recoveries. For example, it is possible that it may require a longer period of time to monetize certain assets, including the Causes of Action, and it is possible that certain Priority, Contingent, and other claims, litigation, and delays in the final determination of Allowed Claims could substantially impact both the timing and amount of the distribution of the asset proceeds to creditors. Accordingly, there can be no assurance that the values reflected in the Liquidation Analysis would be realized if the Debtors were, in fact, to undergo such a liquidation.

   Pursuant to section 726 of the Bankruptcy Code, the Allowed Administrative Expenses incurred by the chapter 7 trustee, including expenses associated with selling or otherwise monetizing the Debtors' assets, the chapter 7 trustee professionals fees would be entitled to payment in full prior to any distributions to holders of Administrative Expense Claims and Priority Claims. The estimates used in the Liquidation Analysis for the chapter 7 trustee are pursuant to the fee guidelines in section 326(a) of the Bankruptcy Code. The estimate used in the Liquidation Analysis for these expenses calculates to an approximate 3.8% fee payable to a chapter 7 trustee based upon estimated proceeds available for distribution.

2. *Certain exclusions and assumptions.* The Debtors' 2022 and 2023 tax returns have not been prepared or filed, as such priority tax obligations, if any, may not have been fully factored into this Liquidation Analysis. Once fully determined and adjudicated, the final amount of Allowed Priority Claims could have a material impact on the potential recoveries illustrated herein. Additionally, this Liquidation Analysis also does not include recoveries resulting from any potential Causes of Action. Additionally, no value has been ascribed for the potential sale of the property located in Windsor, CT. Any potential environmental claims have been excluded from this analysis, as they are unknown, given the Governmental Bar Date has not passed at the time this analysis was prepared.

## II. <u>CONCLUSION</u>

**THE PLAN PROPONENTS HAVE DETERMINED, AS SUMMARIZED IN THE FOLLOWING LIQUIDATION ANALYSIS, THAT CONFIRMATION OF THE PLAN WILL PROVIDE CREDITORS WITH A RECOVERY THAT IS NOT LESS THAN WHAT THEY MAY OTHERWISE RECEIVE IN CONNECTION WITH A LIQUIDATION OF THE DEBTORS UNDER CHAPTER 7 OF THE BANKRUPTCY CODE, AND AS SUCH BELIEVE THAT THE PLAN SATISFIES THE REQUIREMENT OF 1129(A)(7) OF THE BANKRUPTCY CODE.**

# III. LIQUIDATION ANALYSIS

| Stanadyne LLC - Liquidation Analysis | | | | | |
|---|---|---|---|---|---|
| | | **Chapter 7 Plan** | | **Chapter 11 Plan** | |
| | | **Low** | **High** | **Low** | **High** |
| **Proceeds** | | | | | |
| Initial Distribution Fund | | $ 2,625,000 | $ 2,625,000 | $ 2,625,000 | $ 2,625,000 |
| Trust Funding Amount | | 375,000 | 375,000 | 375,000 | 375,000 |
| Causes of Action[1] | | TBD | TBD | TBD | TBD |
| **Total Proceeds Available for Distribution** | | **$ 3,000,000** | **$ 3,000,000** | **$ 3,000,000** | **$ 3,000,000** |
| | | | | | |
| **Expenses** | | | | | |
| Est. Wind-Down Expenses | | $ (675,750) | $ (563,250) | $ (455,000) | $ (380,000) |
| | | | | | |
| **Net Proceeds Available After Wind-Down Expenses** | | **$ 2,324,250** | **$ 2,436,750** | **$ 2,545,000** | **$ 2,620,000** |
| | **Est. Claims** | | | | |
| **Administrative Claims[2]** | | | | | |
| Total Est. Administrative Claims | $14.4M - $20.0M | $ 20,000,000 | $ 14,350,000 | $ 20,000,000 | $ 14,350,000 |
| **Recovery** | **14.4M - 20.0M** | **20,000,000** | **14,350,000** | **20,000,000** | **14,350,000** |
| *Recovery %* | | *100.0%* | *100.0%* | *100.0%* | *100.0%* |
| | | | | | |
| **Priority Claims** | | | | | |
| Est. Priority Claims | $0.0M - $1.7M | $ 1,700,000 | $  - | $ 1,700,000 | $  - |
| **Recovery** | **0.0M - 1.7M** | **1,700,000** | **-** | **1,700,000** | **-** |
| *Recovery %* | | *100.0%* | *-* | *100.0%* | *-* |
| | | | | | |
| **General Unsecured Claims** | | | | | |
| PBGC | $15.5M | $ 15,538,178 | $ 15,538,178 | $ 15,538,178 | $ 15,538,178 |
| Est. SERP | 4.2M - 7.1M | 7,100,000 | 4,200,000 | 7,100,000 | 4,200,000 |
| Est. Other GUC Claims (excl. Cerberus Deficiency Claim) | 4.0M - 9.9M | 9,900,000 | 4,000,000 | 9,900,000 | 4,000,000 |
| Est. Executory Contract Rejections | 1.0M - 3.0M | 3,000,000 | 1,000,000 | 3,000,000 | 1,000,000 |
| Total Est. General Unsecured Claims | $25.1M - $35.5M | $ 35,538,178 | $ 24,738,178 | $ 35,538,178 | $ 24,738,178 |
| **Recovery** | | **624,250** | **2,436,750** | **845,000** | **2,620,000** |
| *Recovery %* | | *1.8%* | *9.9%* | *2.4%* | *10.6%* |

1. Causes of Action are further described in the Plan. This analysis has not ascribed values to these claims due to their speculative nature. While Cerberus does not participate in the Initial Distribution Fund, any distributions made by the Liquidating Trust to its beneficiaries from any Causes of Action or other assets of the Liquidating Trust, other than the amount per the Initial Distribution Fund, shall be distributed pro rata to all beneficiaries of the Liquidating Trust, including Cerberus on account of the Cerberus Deficiency Claim, which amount was set at $87,252,851.11 pursuant to the Term Sheet.
2. Paid Pursuant to the Asset Sale Transaction.

## IV. GENERAL ASSUMPTIONS AND NOTES

## ESTIMATED PROCEEDS:

1. **Initial Distribution Fund**

   Initial Distribution Fund means $2,625,000 available for payment of all Allowed Claims other than the Cerberus Deficiency Claim.

2. **Trust Funding Amount**

   The amount stipulated in the settlement Term Sheet and approved per the Sale Order entered on July 11, 2023 [Docket No. 443], to fund the operation of the Liquidating Trust.

3. **Causes of Action**

   Liquidating Trust Assets, including the Estates' Causes of Action, remain Assets of the Debtors pursuant to the settlement Term Sheet. Such Estate Causes of Action will be transferred to and vested in the Liquidating Trust pursuant to the Plan. The Estates' Causes of Action include Insider Avoidance Actions and Non-Go-Forward Commercial Tort Claims which are subject to insurance policies that carry a maximum of $10,000,000 in available insurance coverage. While certain potential Estates' Causes of Action may exist, no value has been assigned to this item in this Liquidation Analysis, due to the significant uncertainty surrounding this contingent asset. There are no assurances that any of the Estates' Causes of Action would be pursued by the chapter 7 trustee or the Liquidating Trustee.

   While pursuant to the settlement Term Sheet, Cerberus does not participate in the Initial Distribution Fund, any distributions made by the Liquidating Trust to its beneficiaries on account of any Causes of Action or other assets of the Liquidating Trust, other than the amount per the Initial Distribution Fund, shall be distributed pro rata to all beneficiaries of the Liquidating Trust, including Cerberus on account of the Cerberus Deficiency Claim.

## ESTIMATED WIND-DOWN EXPENSES AND FEES:

4. **Estimated Wind-Down Expenses**

   Under both scenarios we assume a 12-month wind-down period where professional fees and expenses are incurred. A description of the assumptions used to estimate total wind-down expenses under the hypothetical a chapter 7 liquidation and the chapter 11 liquidation assumed in the Plan are as follows:

   - **Est. Chapter 7 Trustee Fees:** The chapter 7 trustee fees are estimated at approximately 3.8% of gross proceeds available for distribution, which is consistent with the estimated amount of assets available for distribution and the chapter 7 trustee fee guidelines set forth in Section 326(a) of the Bankruptcy Code.

   - **Est. Chapter 7 Professional Fees:** Assumes chapter 7 professional fees are 50% higher than the amount estimated chapter 11 professionals. As previously discussed, there are certain inefficiencies anticipated under chapter 7, which would likely increase the costs as compared to the costs anticipated under the Plan. Chapter 7 professional

5

fees include the cost of attorneys, accountants, and other professionals that the chapter 7 trustee would likely retain to assist in the liquidation process.

- **Est. Wind-Down Professional Fees (Chapter 11 Liquidation):** Per the settlement Term Sheet, the Liquidating Trustee shall be compensated as follows: (a) a quarterly fee of $20,000 plus (b) cash in an amount equal to 1.5% of the net proceeds of the Liquidating Trust litigation recoveries. Additionally, it is anticipated that the Liquidating Trustee will retain certain professionals to assist with claims reconciliation, asset recoveries, and other wind-down activities, as well as legal, tax, accounting and other administrative tasks associated with the wind-down.

- In both chapter 7 and chapter 11 scenarios, the Liquidation Analysis assumes that litigation counsel is engaged by the chapter 7 trustee or Liquidating Trustee, as applicable, on a contingency fee basis to pursue the Estates' Causes of Action. Accordingly, estimated litigation professional fees in both scenarios exclude any costs associated with litigation counsel pursuing these potential actions.

## ESTIMATED CREDITOR RECOVERIES:

5. **Administrative Claims (Paid Pursuant to the Asset Sale Transaction)**

Pursuant to the Asset Purchase Agreement, Term Sheet and Sale Order, the Purchaser has agreed to assume certain administrative liabilities that are subject to ongoing reconciliation and thus an estimated range of values is included in this Liquidation Analysis.

- **Est. 503(b)(9):** The Purchaser shall assume claims made under section 503(b)(9) of the Bankruptcy Code to the extent not paid by the Sellers at or prior to the Closing Date, which occurred on July 31, 2023, and in an amount no greater in the aggregate than an amount equal to (1) $1,500,000, less (2) any amounts paid by the Sellers for such Liabilities at or prior to the Closing Date, except, in the case of each of clauses 1.3(c)(i) and 1.3(c)(ii) in the Asset Purchase Agreement, expressly excluding all Liabilities set forth on Schedule 1.3(c) to the Asset Purchase Agreement. Based on estimates, which are subject to change, as of the Closing Date, these claims were estimated to be below the $1,500,000 cap.

- **Est. Contract Cures:** The Purchaser shall assume all Determined Cure Costs with respect to any Assigned Contract as defined in the Asset Purchase Agreement. The amount reflected in the Liquidation Analysis is based on the available information at the time of the preparation of this Liquidation Analysis and is subject to change.

- **Est. Post Petition Accounts Payable:** The Purchaser shall assume undisputed post-Petition Date accrued trade payables of the Sellers incurred in the Ordinary Course of Business with respect to the Purchased Assets or Designation Rights Assets to the extent not paid by the Sellers at or prior to the Closing Date and in an amount no greater in the aggregate than an amount equal to (1) $12,000,000, less (2) any amounts paid by the Sellers for such Liabilities at or prior to the Closing Date. Based on the latest estimates, which are subject to change, as of the July 31, 2023 Closing Date these payables were estimated to be below the $12,000,000 cap.

- **Est. Employee Claims:** Pursuant to the Sale Order, the Purchaser shall assume all Liabilities arising after the Petition Date with respect to wages and salaries, in each case, earned and accrued in the ordinary course of business with respect to the Sellers' employees as of the Closing Date to the extent not previously paid by the Sellers and not in excess of an amount equal to $3,500,000. Based on the latest estimates, which are subject to change, as of the July 31, 2023 Closing Date, these claims were estimated to be below the $3,500,000 cap.

6. **Priority Claims**

Pursuant to section 507(a) of the Bankruptcy Code, a **"Priority Claim"** is entitled to priority in payment, that is not an Administrative Expense Claim or a Priority Tax Claim. **"Priority Tax Claim"** means a claim or portion of a Claim for which priority is asserted under section 507(a)(8) of the Bankruptcy Code.

At the time this Liquidation Analysis was prepared, the amount of any potential Allowed Priority Tax Claims and Allowed Priority Non-Tax Claims is uncertain. Based on the Debtors' claim register, approximately 80 claims were filed by various claimants, including potential Claims of taxing authorities, employees, executory contracts, trade claimants, and other governmental agencies. Additionally, the validity of these potential asserted claims are unknown at this time. Furthermore, additional Priority Tax Claims and Priority Non-Tax Claims may be asserted prior to the Governmental Bar Date, including potential governmental entity claims related to the Debtors property located in Windsor, CT. An abandonment motion entered on August 2, 2023 [Docket No. 486] was filed related to the Debtors property located in Windsor, CT, at this time any claims arising from this motion are unknown and unquantified in the Liquidation Analysis. Given the uncertainty around these potential claims, this Liquidation Analysis assumes a range of $0 to $1,700,000 in order to illustrate the impact of potential Priority Claims.

7. **General Unsecured Claims**

The Liquidation Analysis reflects the significant categories that comprise the General Unsecured Claims pool. General Unsecured Claims are under review and reconciliation; thus, the ranges illustrated in this Liquidation Analysis could vary materially.

- **Pension Benefit Guarantee Corporation ("PBGC"):** Reflects the $15,538,178.33 PBGC Claim consistent with the PBGC Settlement approved per the Sale Order.

- **Est. SERP:** Supplemental Employee Retirement Plan (**"SERP"**) claims are estimated to range between $4.2M based on information provided by the Debtors and certain assumptions included in the SERP Actuarial Valuation Report as of January 1, 2022, and $7.1M based upon an extrapolation of the Proofs of Claims filed by SERP participants.

- **Est. Other GUC Claims (excl. Cerberus Deficiency Claim):** Reflects an estimate of all remaining General Unsecured Claims (**"GUC"**) comprised of Trade and other claims. Note, the GUC claims are in the process of being reviewed and reconciled. As of the date of this Liquidation Analysis, no omni bus claims objection motions have been filed, as such actual amount Allowed GUC Claims is unknown and could be materially higher or lower than the amounts illustrated herein.

7

- **Est. Executory Contract Rejections:** Upon initial review, it appears that the Purchaser has assumed the majority of Executory Contracts that may have resulted in material rejection damage claims. However, this review is incomplete and as a result, the Liquidation Analysis reflects a range of $1,000,000 to $3,000,000 as illustrative potential GUC rejection damage claims. The Purchaser has until the applicable Designation Deadline as defined in the Asset Purchase Agreement.

# EXHIBIT C

*In re Stanadyne LLC, et al.*
**Case No. 23-10207 (Jointly Administered)**
**Bankr. D. Del.**

## SETTLEMENT TERM SHEET

      This term sheet (the "Term Sheet") sets forth the terms of a comprehensive settlement in the above-referenced chapter 11 cases (the "Chapter 11 Cases") among the Prepetition Agent (as defined below), the Purchaser (as defined below), and the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases (the "Committee"[1] and, collectively with the Prepetition Agent and the Purchaser, the "Parties") with respect to that certain Asset Purchase Agreement, dated as of May 8, 2023, by and among the debtors in possession in the above-captioned cases (the "Debtors") (other than Stanadyne PPT Group Holdings, Inc.) and Purchaser (as the same may be amended, amended and restated, supplemented, or otherwise modified from time to time, the "APA") and all other matters related to any challenges, claims or causes of actions against the Prepetition Agent, the Prepetition Secured Parties (as defined below) and/or the Purchaser under the Cash Collateral Order, the APA, or otherwise, including such matters set forth in the section titled "Prepetition Obligations and Release of Claims" below. Capitalized terms that are not otherwise defined herein shall have the meanings ascribed to them in the APA.

| | |
|---|---|
| Settling Parties | a) The Prepetition Agent<br>b) The Purchaser<br>c) The Committee<br><br>The term "Prepetition Agent" refers to Cerberus Business Finance, LLC, in its capacity as administrative agent and collateral agent for the lenders (the lenders together with the Prepetition Agent, collectively, the "Prepetition Secured Parties") party to that certain Financing Agreement, dated as of May 2, 2017 (as amended, amended and restated, supplemented, or otherwise modified from time to time).<br><br>The term "Purchaser" refers to Stanadyne Operating Company LLC (formerly known as S-PPT Acquisition Company LLC), in its capacity as Purchaser under the APA. |
| Binding Agreement; Conditions | This Term Sheet shall constitute a binding agreement among the Parties; *provided*, the Parties rights and obligations under this Term Sheet are conditioned upon (a) entry of an order approving the Sale Order modified as necessary to reflect this Term Sheet and attaching this Term Sheet as an exhibit, and (b) the occurrence of the Closing. |

---

[1] The term "Committee" refers to the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases in its capacity as such and not the rights or obligations of any member serving on the Committee in its individual capacity.

| Settlement Amount | The Parties agree that: |
|---|---|
| | a) subject to the terms hereof, the Purchaser will fund (or cause to be funded) $4,000,000 (the "<u>Settlement Amount</u>") comprised of (i) the Wind-Down Funding Amount, (ii) the Trust Funding Amount, and (iii) the Initial GUC Distribution Amount, each as described below; |
| | b) the Trust Funding Amount and the Initial GUC Distribution Amount shall constitute additional "Purchase Price" under the APA; |
| | c) the Settlement Amount shall be allocated and funded as follows: |
| |     i) $1,000,000, which shall be the amount of "Total Disbursements" in the Wind-Down Budget[2] to be finalized pursuant to Section 4.24 of the APA (the "<u>Wind-Down Funding Amount</u>"), and shall be funded at the Closing in accordance with the APA. The Wind-Down Budget, and any transition services agreement entered into pursuant to Section 8.16 of the APA shall be mutually acceptable to the Prepetition Agent, the Purchaser and the Committee, in consultation with the Debtors; |
| |     ii) $375,000 (the "<u>Trust Funding Amount</u>") to fund the operation of the Liquidating Trust (as defined below) consistent with the Liquidating Trust Agreement (as defined below), with such amount to be funded within five (5) business days following the effective date of Chapter 11 plan (a "<u>Plan</u>") establishing the Liquidating Trust. The Plan and documents governing the creation of the Liquidating Trust must be acceptable in form and substance to the Prepetition Agent and the Committee and may not alter or modify the terms of this Settlement Term Sheet, unless agreed to in writing by the Prepetition Agent and the Committee; |
| |     iii) $2,625,000 (as such amount may be adjusted in accordance herewith, the "<u>Initial GUC Distribution Amount</u>") for distribution to general unsecured creditors of the Debtors' estates other than the Prepetition Secured Parties, which amount shall be transferred to the Liquidating Trust within five (5) business days following its creation; *provided,* |

---

[2] The Wind-Down Budget is attached hereto as <u>Exhibit 1</u>.

| | |
|---|---|
| | *however*, that if the actual costs and expenses of the matters set forth in the Wind-Down Budget are less than $1,000,000, such difference shall be delivered to the Liquidating Trust and the amount of the Initial GUC Distribution Amount shall be increased on a dollar-for-dollar basis by the amount of such difference. |
| Purchaser Assumed Liabilities | Each of the following, without duplication, shall constitute "Assumed Liabilities" under the APA:<br><br>a) Liabilities, including Core Liabilities (as defined below), of the Debtors incurred and outstanding as of the Closing Date with respect to each customer of the Debtors that becomes a customer of the Purchaser from and after the Closing Date;<br><br>b) Core Liabilities incurred and outstanding as of the Closing Date with respect to customers of the Debtors that do not become customers of the Purchaser from and after the Closing Date solely to the extent such Core Liabilities are known as of the Closing Date as (i) reflected in the Debtors' books and records or filed proofs of claim and (ii) set forth on a schedule of the amounts of such Core Liabilities acceptable to the Purchaser (or, if not acceptable, subject to objection by the Purchaser after Closing), which schedule shall (A) separately list by customer (x) the amount of such Core Liabilities as of the date that is thirty (30) days prior to the Closing Date and (y) the estimated amount of any incremental Core Liabilities between the date that is thirty (30) days prior to the Closing Date and the Closing Date and (B) be delivered by the Debtors to the Purchaser and the Committee five (5) business days prior to the Closing Date, provided, however, amounts with respect to the foregoing clause (y) shall be subject to finalization within thirty (30) days after Closing to account for continuing sales and returns during such period through the Closing Date; and<br><br>c) Each Critical Vendor Claim (as defined in that certain *Final Order (I) Authorizing the Debtors to Pay Prepetition Claims of (A) Domestic Critical Vendors, (B) Shippers, Warehousemen, and other Lienholders, and (C) Foreign Vendors; (II) Authorizing Banks to Honor and Process Related Checks and Electronic Transfers; and (III) Granting Related Relief* [Docket No. 186]) to the extent not paid by the Debtors on or prior to the Closing Date.<br><br>"Core Liabilities" means Liabilities of the Debtors owed to customers of the Debtors as of the Closing Date in connection with |

| | |
|---|---|
| | the "core" refund program offered by the Debtors to certain of its customers for applicable products actually and properly returned and sold to the Debtors for remanufacture, provided that Core Liabilities will only be Assumed Liabilities to the extent set forth above in (a) and (b). |
| Estate Claims | Notwithstanding anything in the APA to the contrary, the Parties agree that all Avoidance Actions shall be waived and shall not be pursued by the Parties or any representative of any Debtor's estate, *except that*:<br><br>a) Avoidance Actions against insiders (as that term is defined in 11 U.S.C. § 101(31)) ("Insider Avoidance Actions") shall not be waived and shall comprise Excluded Assets; and<br><br>b) Avoidance Actions against non-insiders other than Go-Forward Creditors (as defined below) (the "Preserved Avoidance Claims") shall not be waived and shall comprise Purchased Assets under the APA; *provided*, *however*, that the Preserved Avoidance Claims shall be preserved solely for the purpose of permitting the Purchaser to set off such Preserved Avoidance Claims against any claims of the applicable creditors (other than Go-Forward Creditors) that constitute Assumed Liabilities under the APA, and Purchaser shall not be entitled to any affirmative recovery on account of any such Preserved Avoidance Claims.<br><br>All commercial tort claims and causes of action belonging to the Debtors' estates (including, without limitation, any and all claims the Debtors' estates may have (i) against any officers and directors of the Debtors and rights of the Debtors' estates to any insurance proceeds applicable thereto or (ii) related to or arising under or in connection with that certain Contribution Agreement, dated as of March 9, 2019, by and among Pure Power Technologies, Inc., Pure Power Technologies, LLC, Stanadyne Parent Holdings, Inc., and Stanadyne LLC, and the transactions contemplated thereby, including, without limitation, any rights of the Debtors' estates to any insurance proceeds applicable thereto) other than such claims against Go-Forward Creditors (as defined below) (collectively, the "Non-Go-Forward Commercial Tort Claims") shall comprise Excluded Assets.<br><br>The Insider Avoidance Actions and the Non-Go-Forward Commercial Tort Claims shall be collectively referred to herein as the "Liquidating Trust Claims". All Liquidating Trust Claims shall be transferred to the Liquidating Trust on the effective date of the |

| | |
|---|---|
| | Liquidating Trust.  The Trustee shall have authority to pursue all Liquidating Trust Claims as a representative of the Debtors' estates.<br><br>For the avoidance of doubt, the Parties waive all Avoidance Actions and Commercial Tort Claims that the Debtors' estates may have against Go-Forward Creditors, and no Party shall be entitled to any affirmative recovery or right of setoff with respect to any such claims against Go-Forward Creditors.<br><br>The term "Go-Forward Creditors" as used herein means customers, vendors, and other creditors who continue to do business with the Purchaser after the Closing Date. |
| Designation Rights Assets | If and solely to the extent and for so long as the Purchaser requests in writing that any Designation Rights Assets be maintained following the Closing, the Purchaser shall fund any and all maintenance costs, including lease costs and other third party costs, actually incurred by the Debtors in connection with such requested maintenance of the Designation Rights Assets, in accordance with and solely to the extent set forth in Section 1.5(b) of the APA. |
| Windsor, CT Property | If and solely to the extent and for so long as the Purchaser requests in writing that the Windsor, CT Property be maintained following the Closing, the Purchaser shall fund the carrying costs actually incurred by the Debtors in connection with such requested maintenance of the Windsor, CT Property, including without limitation, insurance and real property taxes.<br><br>If, subject to the terms of the APA, the Debtors sell the Windsor, CT Property, the proceeds of such sale, net of only the costs of such sale (as well as any unpaid carrying costs for which Purchaser is responsible as set forth above), and incremental US Trustee fees associated therewith, shall be paid to the Prepetition Agent for the benefit of the Prepetition Secured Parties.  The Debtors' estates shall cause such net proceeds to be delivered directly by the purchaser of the Windsor, CT Property to the Prepetition Agent, and the Deficiency Claim (as defined below) shall be reduced by the amount of such net proceeds. |
| Liquidating Trust | The "Liquidating Trust" shall be:<br><br>a)  a liquidating trust established for the benefit of the Debtors' creditors and governed by a trust agreement in form and substance acceptable to the Prepetition Agent and the Committee (the "Liquidating Trust Agreement"); |

| | |
|---|---|
| | b) administered by Brad Deitz, as trustee (the "Trustee")[3] under the supervision of the Liquidating Trust Board (as defined below) and in accordance with the terms of the Liquidating Trust Agreement; |
| | c) overseen by an oversight board consisting of two members: (i) one member appointed by the Prepetition Agent and (ii) one member appointed by the Committee (the "Liquidating Trust Board"); |
| | d) administered for the benefit of the Debtors' unsecured creditors with respect to unsatisfied general unsecured claims and the Prepetition Secured Parties with respect to the Deficiency Claim. |
| | The Trustee shall be compensated as follows: (a) a quarterly fee of $20,000 *plus* (b) cash in an amount equal to 1.5% of the net proceeds of the Liquidating Trust litigation recoveries. |
| | The Liquidating Trust Agreement shall provide that, in the event of a tie in connection with any decision subject to a vote of the Liquidating Trust Board, the final decision shall be made by the Trustee. |
| Funding and Purpose of Liquidating Trust | Upon the creation of the Liquidating Trust, the Trust Funding Amount, the Initial GUC Distribution Amount, and Liquidating Trust Claims shall be transferred to the Liquidating Trust as set forth above. |
| | The Trustee shall be empowered to: (i) assert, litigate, settle, and/or otherwise resolve the Liquidating Trust Claims for the benefit of the Liquidating Trust and its beneficiaries and (ii) resolve, litigate, and/or object to claims against the Debtors' estates other than claims allowed hereunder or by the Bankruptcy Court. |
| | The proceeds of the Liquidating Trust Claims shall be utilized to fund the administration of the Liquidating Trust and the distributions to the beneficiaries of the Liquidating Trust. |
| | The Initial GUC Distribution Amount shall be distributed pro rata among the beneficiaries of the Liquidating Trust other than the Prepetition Agent, it being agreed among the Parties that the Prepetition Secured Parties shall not recover any amounts from the |

---

[3] In the event that Mr. Deitz is unable or unwilling to serve, the Prepetition Agent shall identify two alternatives for the Committee to select between to serve as the Trustee on substantially the same terms as Mr. Dietz.

| | |
|---|---|
| | Initial GUC Distribution Amount. Any distributions made by the Liquidating Trust to its beneficiaries from any assets of the Liquidating Trust other than the Initial GUC Distribution Amount shall be distributed pro rata to *all* of the beneficiaries of the Liquidating Trust, including the Prepetition Agent for the benefit of the Prepetition Secured Parties on account of the Deficiency Claim.<br><br>Notwithstanding anything to the contrary herein, the Trustee shall have the authority to create reserves of Liquidating Trust assets (including with respect to the Initial GUC Distribution Amount) for any reason consistent with his duties under the Liquidating Trust Agreement. |
| Prepetition Obligations and Release of Claims | The Committee hereby:<br><br>a) adopts the admissions, stipulations, acknowledgements and agreements made by the Debtors as reflected in Paragraph E of the Cash Collateral Order;<br><br>b) reaffirms its agreement under that certain *Stipulation Regarding Unencumbered Assets and Occurrence of Investigation Termination Date* entered into between the Prepetition Agent and the Committee and approved by order of the Bankruptcy Court [Docket No. 293] (the "Prior Stipulation") that the Investigation Termination Date (as defined in the Cash Collateral Order) has passed and the Committee has waived all rights to assert any Challenge (as defined in Cash Collateral Order);<br><br>c) agrees that, upon the occurrence of the Closing, the Prepetition Agent, on behalf of the Prepetition Secured Parties, will have an allowed deficiency claim (the "Deficiency Claim") in the amount of $87,252,851.11, which shall remain secured by the Excluded Assets, other than the Liquidating Trust Claims, which will not be subject to the security interest of the Prepetition Secured Parties; provided, however, that the amount of the Deficiency Claim shall be reduced on a dollar-for-dollar basis by any net proceeds paid to the Prepetition Agent from any Excluded Assets;<br><br>d) releases the Prepetition Secured Parties from any and all claims and causes of action related to the Debtors, their estates, the Prepetition Obligations (as defined in the Cash Collateral Order), or these Chapter 11 Cases; and |

| | |
|---|---|
| | e) consents to the APA, the Sale Order and, in each case, the transactions contemplated thereby.<br><br>The foregoing agreements, admissions, stipulations, acknowledgements, reaffirmations, and releases by and of the Committee shall be binding on the Trustee and any chapter 7 trustee, as applicable. |
| Chapter 11 Plan | Any Plan confirmed in the Chapter 11 Cases (a) may not alter or modify the terms of this Settlement Term Sheet, the APA or the Sale Order, unless agreed to in writing by the Prepetition Agent and the Committee and, with respect to the APA and Sale Order only, the Debtors and (b) must incorporate the terms set forth in the section titled "Prepetition Obligations and Release of Claims" above. |
| Implementation | The settlement, including without limitation the payment of the Wind-Down Funding Amount, shall be effective upon entry of the Sale Order.<br><br>The Liquidating Trust shall be implemented via a Plan or such other method as mutually agreed to by the Prepetition Agent and the Committee, after consultation with the Debtors.<br><br>In the event that the Chapter 11 Cases are converted to Chapter 7, the rights of the Liquidating Trust set forth herein shall inure to the benefit of the Chapter 7 Trustee, including without limitation, the Trust Funding Amount and the Initial GUC Distribution Amount. |

**EXHIBIT 1**

**WIND-DOWN BUDGET**

*($ in thousands USD)*

| Description | Amount |
|---|---:|
| Professional Fees through Plan Effective Date | $250 |
| Wind-down Manager/Trustee Fees (does not include incentive fees) | $80 |
| Professional Support for Wind-down Manager/Trustee: | $560 |
| US Trustee Fees (8/1 - 9/30) | $35 |
| Miscellaneous / Other  (includes items such as claims agent, service of solicitation materials, independent manager, Purchaser assistance with accounting and reconciliation costs, as needed) | $75 |
| **Total Disbursements** | **$1,000** |

Purchaser agrees that it will make its personnel available at no cost to the responsible officer of the Debtors referred to in Section 2.2 of the APA or, after the effective date of a Plan, the Trustee, to provide information and assistance with accounting and claim reconciliation matters, for the following periods and capped personnel hours: (a) 25 hours per month for each of the first two months after the Closing; (b) 20 hours per month for each of the third and fourth months after the Closing; and (c) 10 hours per month for months five through 12 after the Closing.  If additional assistance is requested by such responsible officer or the Trustee, as applicable, the Purchaser shall provide such assistance as is reasonably requested for a reasonable period of time on customary terms for the assistance requested and the requesting party shall pay Purchaser its actual costs for providing such assistance and the out-of-pocket expenses incurred by the Purchaser in connection therewith.